**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KELLY PINN,** | § | |
| **Individually and on behalf of similarly** | § | |
| **situated persons,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CASE NO.: 4:23-cv-01208-Y** |
| | § | |
| **HUFSEY HOME SERVICES, INC.** | § | |
| **D/B/A ONE HOUR AIR** | § | |
| **CONDITIONING & HEATING AND 33** | § | |
| **MILE RADIUS LLC D/B/A** | § | |
| **EVERCONNECT,** | § | |
| | § | |
| *Defendants*. | | |

## 33 MILE RADIUS LLC'S APPENDIX ACCOMPANYING MOTION TO DISMISS AND BRIEF IN SUPPORT

**GREENBERG TRAURIG LLP**

Christopher S. Dodrill
State Bar No. 24110696
christopher.dodrill@gtlaw.com
Alex E. Hartzell
State Bar No. 24126522
alex.hartzell@gtlaw.com
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3600
Facsimile: (214) 665-3601

Lori Chang (*Pro Hac Vice*)
changl.@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

**ATTORNEYS FOR DEFENDANT 33
MILE RADIUS LLC D/B/A
EVERCONNECT**

Pursuant to the Court's Specific Requirements, Defendant 33 Mile Radius d/b/a EverConnect hereby submits its Appendix Accompanying Motion to Dismiss and Brief in Support ("Appendix") that contains the following materials:

| Tab No. | Description |
|---------|-------------|
| 1 | Compl., ¶¶ 31, 35 <u>in</u> *Pinn v. Cyclebar Franchising, LLC*, No. 3:23-cv-01540-G (N.D. Tex. July 7, 2023). |
| 2 | Compl., ¶ 14 <u>in</u> *Pinn v. Energy Sols. Direct Solar*, No. 3:21-cv-02330-X (N.D. Tex. Sept. 30, 2021). |
| 3 | Compl., ¶ 23 <u>in</u> *Pinn v. Vehicle Protection Servs. LLC*, No. 3:21-cv-02907-N (N.D. Tex. Nov. 19, 2021). |
| 4 | Compl., ¶ 23 <u>in</u> *Pinn v. Nations Auto Protection, LLC et al.*, No. 3:22-cv-05810 (D.N.J. Sept. 30, 2022). |
| 5 | Am. Compl., ¶ 17 <u>in</u> *Pinn v. Xponential Fitness, Inc.*, No. 3:22-cv-02684-M (N.D. Tex. Dec. 16, 2022). |
| 6 | Compl., ¶ 17 <u>in</u> *Pinn v. TogetherHealth Insurance, LLC*, No. 3:23-cv-00251-L (N.D. Tex. Feb. 3, 2023) |
| 7 | Compl., ¶ 25 <u>in</u> *Pinn v. Vehicle Protection Specialists, LLC et al.*, No. 3:23-cv-00790-K Apr. 13, 2023). |
| 8 | Compl., ¶ 15 <u>in</u> *Pinn v. Ethos Techs Inc.*, No. 3:23-cv-03869-LJC (N.D. Cal. Aug. 2, 2023). |
| 9 | Compl., ¶ 35 <u>in</u> *Pinn v. Live Calls Network, LLC*, No. 8:23-cv-0297 (D. Md. Oct. 27, 2023). |
| 10 | Compl., ¶ 21 <u>in</u> *Pinn v. United Ins. Professionals, LLC*, No. 2:24-cv-00127-MWH-EPD (S.D. Ohio Jan. 11, 2024). |
| 11 | **[Westlaw Slip Copy]:** *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 WL 2688622 (W.D. Tex. May 10, 2021). |
| 12 | **[Westlaw Slip Copy]:** *Collins v. Sonic Corp.*, No. CIV-20-01067-JD, 2022 WL 2298194 (W.D. Okla. June 22, 2022). |
| 13 | **[Westlaw Slip Copy]:** *Crittendon v. Tex. Health & Hum. Servs. Comm'n*, No. 1:23-CV-00327-LY-SH, 2023 WL 3483358 (W.D. Tex. Apr. 13, 2023). |

| 14 | **[Westlaw Slip Copy]:** *Cunningham v. Carribean Cruise Lines, Inc.*, No. 15-62580-CIV-MORENO, 2016 WL 7494871 (S.D. Fla. Dec. 29, 2016). |
| 15 | **[Westlaw Slip Copy]:** *Cunningham v. Creative Edge Mktg. LLC*, No. 4:19-CV-00669-ALM-CAN, 2021 WL 2792353 (E.D. Tex. June 16, 2021). |
| 16 | **[Westlaw Slip Copy]:** *Cunningham v. Daybreak Solar Power, LLC*, No. 4:22-cv-00599-O, 2023 WL 3985245 (N.D. Tex. June 13, 2023). |
| 17 | **[Westlaw Slip Copy]:** *Cunningham v. Spectrum Tax Relief, LLC*, No. 3:16-2283, 2017 WL 3222559 (M.D. Tenn. July 7, 2017). |
| 18 | **[Westlaw Slip Copy]:** *FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094-TCB, 2018 WL 6254580 (N.D. Ga. Oct. 15, 2018). |
| 19 | **[Westlaw Slip Copy]:** *Gaker v. Q3M Ins. Sols.*, No. 3:22-CV-00296-RJC-DSC, 2023 WL 2472649 (W.D.N.C. Feb. 8, 2023). |
| 20 | **[Westlaw Slip Copy]:** *Guadian v. United Tax DEF. LLC*, No. EP-23-CV-00349-KC, 2024 WL 140249 (W.D. Tex. Jan. 12, 2024). |
| 21 | **[Westlaw Slip Copy]:** *Hunsinger v. Alpha Cash Buyers*, No. 3:21-cv-1598-D, 2022 WL 562761 (N.D. Tex. Feb. 24, 2022). |
| 22 | **[Westlaw Slip Copy]:** *Hunsinger v. Dynata LLC*, No. 3:22-cv-00136-G-BT, 2023 WL 2377481 (N.D. Tex. Feb. 7, 2023). |
| 23 | **[Westlaw Slip Copy]:** *Katz v. Caliber Home Loans, Inc.*, No. 3:23-CV-0145-S, 2023 WL 5311488 (N.D. Tex. Aug. 17, 2023). |
| 24 | **[Westlaw Slip Copy]:** *Morgan v. U.S. Xpress, Inc.*, No. 3:17-cv-00085, 2018 WL 3580775 (W.D. Va. July 25, 2018). |
| 25 | **[Westlaw Slip Copy]:** *Morris v. Lincare, Inc.*, No. 8:22-cv-2048-CEH-AAS, 2023 WL 5336780 (M.D. Fla. Aug. 18, 2023). |
| 26 | **[Westlaw Slip Copy]:** *Pinn v. Cyclebar Franchising, LLC*, No. 3:23-cv-01540-M, 2023 WL 8374749 (N.D. Tex. Dec. 4, 2023). |
| 27 | **[Westlaw Slip Copy]:** *Spinelli v. Storm Tight Windows*, No. 8-62592-CIV-DIMITROULEAS, 2019 WL 13292490 (S.D. Fla. Feb. 21, 2019). |
| 28 | **[Westlaw Slip Copy]:** *Zehala v. American Express*, No. 2:10-cv-848, 2011 WL 4484297 (S.D. Ohio Sept. 26, 2011). |
| 29 | **[Westlaw Slip Copy]:** In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, |

| | CG Docket No. 02-278, 18 FCC Rcd. 14014 (July 3, 2003) |
|---|---|

Dated: January 19, 2024

Respectfully submitted,

**GREENBERG TRAURIG LLP**

*/s/ Christopher S. Dodrill*
Christopher S. Dodrill
State Bar No. 24110696
christopher.dodrill@gtlaw.com
Alex E. Hartzell
State Bar No. 24126522
alex.hartzell@gtlaw.com
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3600
Facsimile: (214) 665-3601

Lori Chang (*Pro Hac Vice*)
changl.@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

**ATTORNEYS FOR DEFENDANT 33
MILE RADIUS LLC D/B/A
EVERCONNECT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2024, I filed the foregoing through the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Christopher S. Dodrill*
Christopher S. Dodrill

# TAB 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| KELLY PINN, on behalf of herself and all others similarly situated, | | |
| Plaintiff, | | |
| v. | | Case No. |
| CYCLEBAR FRANCHISING, LLC, | | |
| Defendant. | | |

## DEFENDANT CYCLEBAR FRANCHISING, LLC'S NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441(c), and 1446, Defendant CycleBar Franchising, LLC ("Defendant" or "CycleBar"), through its attorneys, hereby removes this action to the United States District Court for the Northern District of Texas, Dallas Division, and in support thereof states as follows:

1.     Plaintiff Kelly Pinn ("Plaintiff") commenced her state court action on or about May 22, 2023, by filing her Class Action Petition ("Petition") in the County Court at Law No. 1, Dallas County, Texas, Case No. CC-23-03164-A (the "State Court Action"). A true and accurate copy of the Petition is attached hereto as Exhibit A.

2.     Defendant was served on or about June 8, 2023.

3.     To date, aside from the Petition, no other pleadings have been filed in the State Court Action. On July 3, 2023, Defendant filed Rule 11 Agreement stipulating that Defendant's answer deadline would be July 7, 2023. The Rule 11 Agreement is attached hereto as Exhibit B.

4.     An index of all documents filed with the state court, as required by LR 81.1(a)(4)(A), is attached hereto as Exhibit C.

5.     The State Court Action docket sheet is attached hereto as Exhibit D.

96312299v.1

**Prior Federal Lawsuit With Same Underlying Allegations By Plaintiff Against Defendant**

6.      This is not the first lawsuit by Plaintiff against Defendant based on these same underlying allegations. The LR 3.3(b) Notice of Related Case, attached hereto as Exhibit E, describes the prior lawsuit against Defendant, Civil Action No. 3:22-cv-02684-M (N.D. Tex.) ("Original Federal Action").

7.      As more fully described in the Notice of Related Case, Plaintiff filed a federal lawsuit against Defendant on December 1, 2022, which arises from the same common nucleus of operative facts and alleges the same underlying violations of the Telephone Consumer Protection Act ("TCPA") as Plaintiff's State Court Action. Original Federal Action, Dkt. No. 1.

8.      On May 10, 2023, after Plaintiff filed various amended complaints and Defendant filed a Motion to Dismiss or Strike Plaintiff's Third Amended Complaint ("Defendant's Motion"), Plaintiff filed a Notice of Dismissal (Original Federal Action, Dkt. No. 40) rather than a response to Defendant's Motion (*Id.*, Dkt. Nos. 38-39).

**Grounds For Removal**

9.      This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) as it was filed within thirty days after Defendant was served.

10.      Removal is proper in this case because this Court has original jurisdiction of this action under 28 U.S.C. § 1331 as a civil action arising under the Constitution, laws or treaties of the United States, namely the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). (*See* Ex. A).

11.      Plaintiff, on behalf of herself and a purported class, alleges that Defendant sent communications that were unlawful under the TCPA.  (Ex. A, ¶ 1).  Plaintiff's sole cause of action alleges violations under Texas's TCPA analogue, Section 305.053 of the Texas Business and Commercial Code ("TBCC").  The TBCC provides that a person may assert a claim only where he

or she "receives a communication that violates 47 U.S.C. Section 227." *See* Tex. Bus. & Com. Code Ann. § 305.053(a). Thus, Plaintiff's TBCC claim is founded directly upon federal law.

12. More specifically, Plaintiff argues that "[s]ending a text message to a telephone subscriber who has registered his or her telephone number on the National-Do-Not-Call registry is a violation of a regulation adopted under [the TCPA,] 47 U.S.C. § 227, e.g., 47 C.F.R. § 64.1200(c)(2), and in turn a violation of Section 305.053 of the Texas Business & Commerce Code." (Ex. A, ¶ 79).

13. In other words, a TCBB claim cannot stand unless a plaintiff can establish a violation of the TCPA. *See Hunsinger v. Offer, LLC,* No. 3:21-CV-2846-BH, 2022 WL 18143951, at *7 (N.D. Tex. Dec. 7, 2022), report and recommendation adopted, No. 3:21-CV-2846-BH, 2023 WL 122649 (N.D. Tex. Jan. 6, 2023) (dismissing the plaintiff's TCBB claim where the plaintiff failed to state a plausible TCPA claim against the defendants); *Horton v. Tarrant Cnty. Hosp. Dist.*, No. 4:22-CV-9-P, 2022 WL 702536, at *3 (N.D. Tex. Feb. 4, 2022), report and recommendation adopted, No. 4:22-CV-0009-P, 2022 WL 620950 (N.D. Tex. Mar. 3, 2022) (same).

14. Accordingly, federal jurisdiction exists here because "(1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state juridical responsibilities." *Bd. Of Comm'rs of the Se. La. Flood Prot. Auth.—East v. Tenn. Gas Pipeline Co., LLC et al.*, 850 F.3d 714, 721-22 (5th Cir. 2017) (affirming denial of remand motion because "the Board's negligence and nuisance claims necessarily raise federal issues sufficient to justify federal jurisdiction").

15. This action may be removed pursuant to 28 U.S.C. § 1441(a) because this Court is located in Dallas County, Texas, in which this action was pending before removal.

16. CycleBar is the only named Defendant; therefore, all defendants have joined in this

removal.

17.      Defendant submits that the basis for removal is more than sufficient, but Defendant reserves the right to amend or supplement this Notice of Removal, if challenged.

18.      A Notice of Filing Notice of Removal will be filed with the Clerk of County Court at Law No. 1 of Dallas County, Texas pursuant to 28 U.S.C. § 1446.  Defendant will also serve the same upon Plaintiff.  A true and complete copy of the written Notice of Filing Notice of Removal to be filed and served is attached hereto as Exhibit F.

WHEREFORE, Defendant respectfully requests that this action be removed and that this Court assume full jurisdiction over this case as provided by law.


Dated: July 7, 2023                                   Respectfully submitted,

_/s/ Jennifer R. Brooks_

Jennifer R. Brooks
**SEYFARTH SHAW LLP**
700 Milam St.
Suite #1400
Houston, Texas 77002-2812
713-225-2300
jrbrooks@seyfarth.com


Kristine R. Argentine (_pro hac vice_ forthcoming)
**SEYFARTH SHAW LLP**
233 S. Wacker Drive, Suite 8000
Chicago IL 60606
312-460-5332
kargentine@seyfarth.com

_Counsel for CycleBar Franchising, LLC_

## **CERTIFICATE OF SERVICE**

I, Jennifer Brooks, an attorney, hereby certify that on July 7, 2023, I caused a true and correct copy of **Defendant CycleBar Franchising, LLC's Notice of Removal** to be electronically filed with the Court via the Court's CM/ECF system. I further certify that I served a copy of the foregoing by electronic mail to the following:

>Chris R. Miltenberger (Tx. Bar No. 14171200)
>**The Law Office of Chris R. Miltenberger, PLLC**
>1360 N. White Chapel, Suite 200
>Southlake, Texas 76092
>Tel: (817) 416-5060 | Fax: (817) 416-5062
>chris@crmlawpractice.com
>
>Eric H. Weitz, Esquire
>Max S. Morgan, Esquire
>**THE WEITZ FIRM, LLC**
>1515 Market Street, #1100
>Philadelphia, PA 19102
>Tel: (267) 587-6240 | Fax: (215) 689-0875
>eric.weitz@theweitzfirm.com
>max.morgan@theweitzfirm.com

By: */s/ Jennifer R. Brooks*

96312299v.1

# EXHIBIT A

FILED
5/22/2023 4:47 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Case 4:23-cv-00684-O Document 13-1 Filed 01/09/24 Page 13 of 409 PageID 82

CC-23-03164-A

No. _____

| | | |
|---|---|---|
| **Kelly Pinn, individually and on behalf of a similarly situated class** | § § § | In the County Court at Law |
| Plaintiff | § § | |
| vs. | § § | County Court # __ |
| **CycleBar Franchising, LLC** | § § | |
| Defendant | § § | Dallas County, Texas |

## CLASS ACTION PETITION

### INTRODUCTION

1.     This action arises out of Defendant, CycleBar Franchising, LLC's ("Defendant"), practice of advertising via unsolicited text message marketing to individuals on the National Do-Not-Call Registry without prior express written consent (or any consent whatsoever), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA").

2.     Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190 and requests the Court to enter the appropriate orders.

3.     Pursuant to TEX. R. CIV. P. 28, Plaintiff moves that any partnership, unincorporated association, private corporation or individual doing business under an assumed name substitute a true name.

4.     Plaintiff never provided Defendant prior express written consent to send telemarketing text messages to her telephone number.

5.     Plaintiff had no established business relationship with Defendant.

6.     Plaintiff's telephone number was registered on the National Do-Not-Call Registry at the time of the text message(s).

7.      Accordingly, Plaintiff brings this action on behalf of herself and a class of similarly situated individuals under section 305.053 of the Texas Business & Commerce Code.

## JURISDICTION AND VENUE

8.      Plaintiff claims for herself and the Class Members monetary relief over $1,000,000 and non-monetary relief, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorneys' fees, which is within the jurisdictional limits of this Court.

9.      Venue is proper in Dallas County because at the time she received the message(s), Plaintiff resided in Dallas County and the actions complained about occurred in Dallas County. Defendant sent text messages to a resident of Dallas County. The Court has jurisdiction over Defendant because Defendant conducts business transactions in this State/County and has committed tortious acts in this State/County.

## PARTIES

10.     Plaintiff Kelly Pinn at all times mentioned herein was a citizen and resident of Irving, Texas.

11.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

12.     Plaintiff is, and at all times mentioned herein was, a "person" as defined by Tex. Bus. & Com. Code § 1.201(b)(27).

13.     Defendant CycleBar Franchising, LLC ("CycleBar") is, and at all times mentioned herein was, an Ohio limited liability company with its principal place of business at 7720 Montgomery Road, Suite 200, Cincinnati, Ohio 45236.

14.     Defendant CycleBar may be served via its registered agent Corporation Service Company located at 211 East 7th Street, Suite 620, Austin, Texas 78701.

2

15.     Defendant CycleBar is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153 (39).

16.     Defendant CycleBar was the operator of the CycleBar Southlake Franchise located at 1241 E State Hwy 114 Suite 180, Southlake, Texas 76092 ("CycleBar Southlake Franchise") on September 28, 2022.

## GENERAL FACTUAL ALLEGATIONS

17.     Defendant CycleBar is a franchisor of the fitness brand, CycleBar – an indoor cycling studio.

18.     Defendant CycleBar, at its sole discretion, formulates, develops, produces and conducts advertising and promotion programs on behalf of its network of studios.

19.     Defendant CycleBar requires that its franchisees contribute an amount up to 2% of the franchisees' gross revenue to CycleBar's marketing fund.

20.     Defendant CycleBar uses monies in its marketing fund to fund its advertising campaigns and promotional programs.

21.     With respect to "digital marketing"[1] intended to promote the brand, individual studios, or the entire network of studios, Defendant CycleBar controls all aspects of any digital marketing campaign, which includes advertising via electronic communications networks, i.e., text message marketing.

22.     As part of its digital marketing program, Defendant CycleBar, or one of its designees, operates and maintains a system website, that includes basic information related to each studio, the ability for customers to purchase classes at each studio, and access the studio's

---

[1] According to CycleBar's franchise agreements, "digital marking" includes, but is not limited to: establishing and operating websites, social media accounts, applications, keyword or adword purchase programs, accounts with websites featuring gift certificates or discount coupons, mobile applications or other means of digital advertising on the internet or any electronic communications network.

3

reservation system.

23.     Defendant CycleBar offers discounted class promotions or daily deals as part of its digital marketing program.

24.     Defendant CycleBar itself, or through an unnamed and unidentified third-party designee acting on Defendant CycleBar's behalf and at Defendant CycleBar's direction, sends automated text messages marketing Defendant CycleBar's studios.

25.     These text messages come from (972) 703-2757.

26.     Telephone number (972) 703-2757 is the number listed for the Cyclebar Southlake Franchise on its website.[2]

27.     These text messages include a link, that when clicked, opens a webpage operated by Defendant CycleBar or its designee that offers a discounted class promotion.

28.     This website is integrated with Defendant CycleBar's system website.

29.     Defendant CycleBar is in possession of business records pertaining to its outbound communications.

30.     Because these text messages advertise Defendant's services, they constitute telemarketing messages and telephone solicitations.

## PLAINTIFF PINN'S FACTUAL ALLEGATIONS

31.     Plaintiff Pinn is the sole and customary user of cellular telephone number (XXX)-XXX-2161.

32.     Plaintiff Pinn's cellular telephone number, (XXX)-XXX-2161, is a personal telephone number and is not used for business purposes.

33.     Plaintiff Pinn's cellular telephone number, (XXX)-XXX-2161 is used for

---

[2] https://www.cyclebar.com/location/southlake (last accessed January 25, 2023).

4

residential purposes.

34.     Plaintiff Pinn's cellular telephone number, (XXX)-XXX-2161 is the primary means of reaching Plaintiff Pinn.

35.     Plaintiff Pinn does not have a landline telephone number.

36.     Plaintiff Pinn's cellular telephone number (XXX)-XXX-2161 has been on the National Do-Not-Call Registry since February 9, 2009, when she placed it on the Registry.

37.     Plaintiff Pinn put her cellular telephone number (XXX)-XXX-2161 on the National Do-Not-Call Registry because she did not want unsolicited telemarketing calls or texts, such as the ones at issue here.

38.     On September 28, 2022 at 4:30pm, Ms. Pinn received at least one text message from (972) 703-2757, as shown on her cellular telephone bill:

| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |

39.     The messages advertised "unlimited rides for only $99," provided a promo code, and included a hyperlink: https://bit.ly/3Ch7VSP.

40.     Upon information and belief, Defendant CycleBar sent its text messages as part of its digital marketing program.

41.     When the above hyperlink is clicked, the consumer is redirected to a website[3] that

---

[3] https://www.clubready.com/getstarted/step1.asp?s=7308&id=544147. (last accessed Jan. 23, 2023).

promotes Defendant CycleBar's services and invites the consumer to enter into a "Recurring Dues Membership Agreement":



42.     Defendant CycleBar was the operator of the Cyclebar Southlake Franchise on September 28, 2022.

43.     Ms. Pinn never provided Defendant Cyclebar with prior express written consent for these text messages nor does Ms. Pinn have an established business relationship with Defendant Cyclebar.

44.     Defendant CycleBar is in possession of business records that it maintains showing the text messages that it sent to Plaintiff and the Class.

45.     Defendant CycleBar's records system shows that Defendant CycleBar sent Ms.

6

Pinn at least one text message:



## DEFENDANTS' LIABILITY

46.    The TCPA prohibits making telephone solicitation calls[4] to a telephone number on the National Do Not Call Registry.  *See* 47 U.S.C. § 227(c)(5).

47.    The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

48.    A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

49.    The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry.

---

[4] Although the TCPA does not define a "call," the FCC has interpreted the TCPA to encompass both voice calls and text calls or text messaging. *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.Rcd. 14014, 14115 (July 3, 2003).  Federal courts up to and including the Supreme Court have endorsed the FCC's regulation that the TCPA applies to text messages. *See, e.g., Campbell-Ewald v. Gomez*, 577 U.S. 153, 156 (2016).

50.     Defendant repeatedly violated this rule by placing telephone solicitations to telephone numbers on the National Do-Not-Call registry, including Plaintiff's number.

51.     Plaintiff has suffered concrete harm because of Defendant's unwanted and unsolicited telemarketing text messages, including, but not limited to:

- Device storage;

- Data usage;

- Lost time tending to and responding to the unsolicited text messages;

- Invasion of Privacy; and

- Nuisance.

52.     These forms of actual injury are sufficient for standing purposes.

53.     Defendant is liable for each of the TCPA-violating text messages under one or more of the following theories of liability.

## DIRECT LIABILITY

54.     Defendant CycleBar sent  at least one text message to Plaintiff and members of the Class using a software program managed by Defendant CycleBar.

55.     Defendant CycleBar is responsible for all digital marketing campaigns, including text message marketing on behalf of its franchisees and studios.

56.     Defendant CycleBar created and was solely responsible for the text messages it sent and integrated a link to its system website with these text messages.

## VICARIOUS LIABILITY

57.     Alternatively, to the extent CycleBar utilized a third-party vendor or service provider to actually send the text messages at issue, Defendant CycleBar is variously liable for the text messages at issue.

8

## ACTUAL AUTHORITY

58.    The TCPA incorporates federal common law agency principles.

59.    On May 9, 2013, the FCC held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6588 (F.C.C. 2013) ("*Dish Network*").

60.    Defendant CycleBar signed contracts with a third party, expressly authorizing and directing them to promote Defendants' services via text message.

61.    Defendant CycleBar's franchise agreements provide that Defendant CycleBar is exclusively responsible for digital marketing.

62.    Defendant CycleBar authorized this third party to use Defendant CycleBar's tradenames and to direct consumers to its system website to have the consumers enter into an agreement with Defendants pertaining to their services.

63.     Defendant CycleBar provided the third party with the telephone numbers of potential customers to be texted.

64.     Defendant CycleBar was the beneficiary of any transaction resulting from a purchase made via the third-party's text messages.

65.     The third party used text messages to market Defendant CycleBar's services.

66.     The text messages sent to Plaintiff and Class members contained hyperlinks that when clicked, connected consumers' cellular telephones to a website operated or controlled by Defendant.

67.     Defendant supervised these third parties.

68.     Defendant accepted, did not object to, and benefitted from the third party's violations of the TCPA.

69.     Defendant knows who its third parties are.

## APPARENT AUTHORITY

70.     *Dish Network* further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the [third party] access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take

10

> effective steps within its power to force the telemarketer to cease
> that conduct.

28 FCC Rcd. at 6592 (¶ 46).

71.     The integration of Defendant's website with the text messages used by the third parties was so seamless that it appeared to Plaintiff that Defendant and the third party were acting together as the same company.

72.     Defendant allowed the third party to use Defendant's website links and website content to send to consumers in an effort to market Defendant's services.

73.     Defendant gave the third parties the authority to use its websites, hyperlinks, URLs, trade name, trademark, service mark, forms, contracts, and materials.

74.     The third parties did not independently identify themselves to Plaintiff and the other Class members or provide their contact information.

75.     However, once the link was clicked, Defendant's participation in the text message could be discovered upon investigation.

## VIOLATIONS OF TEXAS STATE LAW

76.     Pursuant to § 305.053(a) of the Texas Business & Commerce Code, a person who receives a communication that violates 47 U.S.C. § 227, or a regulation adopted under that provision, may bring an action against the person who originates the communication for an injunction, damages or both.

77.     As set forth above, Defendant violated 47 U.S.C. § 227 and regulations adopted under that provision.

78.     Specifically, Defendant sent at least one telemarketing text message to a telephone number registered on the National Do-Not-Call registry.

11

79.     Sending a text message to a telephone subscriber who has registered his or her telephone number on the National-Do-Not-Call registry is a violation of a regulation adopted under 47 U.S.C. § 227, e.g., 47 C.F.R. § 64.1200(c)(2), and in turn a violation of Section 305.053 of the Texas Business & Commerce Code.

80.     Accordingly, Plaintiff is entitled to a permanent injunction, and the greater of $500.00 for each violation or her actual damages for each call made by Defendant. *See* Tex. Bus. & Com. Code § 305.053(b).

81.     Plaintiff is entitled to an additional $1,500 per call if Defendant's actions are found to be knowing or intentional. *See* Tex. Bus. & Com. Code § 305.053(c).

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action under TEX. R. CIV. P. 42 on behalf of the "Texas Class" as defined as follows:

> Plaintiff and all residents of the State of Texas (1) to whose telephone number Defendant placed (or had placed on their behalf) a text message (2) the same or similar to the text messages sent to Plaintiff Pinn, (3) from four years prior to the filing of the Compliant to the date of certification.

> (the "Texas Class")

83.     Excluded from the Class are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

84.     The Members of the Class for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

85.     The exact number and identities of the persons who fit within the Class are ascertainable in that Defendant and third parties maintain written and electronically stored data showing:

   a.   The time period(s) during which Defendant placed its text messages;

   b.   The telephone numbers to which Defendant placed its text messages;

   c.   The telephone numbers for which Defendant had prior express written consent;

   d.   The telephone numbers associated with individuals Defendant had an established business relationship with and such individual(s)' transaction history with Defendant;

   e.   The purposes of such text messages;

   f.   The names and addresses of Class members.

86.     The Class is comprised of hundreds, if not thousands, of individuals nationwide.

87.     There are common questions of law and fact affecting the rights of the Members of the Class, including, *inter alia*, the following:

   a.   Whether Defendant sends telemarketing text messages or has them sent on its behalf;

   b.   Whether Defendant obtains prior express written consent before sending telemarketing text messages;

   c.   Whether Defendant sends telemarketing text messages to individuals after Defendant's established business relationship with such individuals expires;

   d.   Whether Defendant, or the entities with which it contracts to send its messages, send ssolicitation text messages to telephone numbers registered on the National Do-Not-Call Registry;

13

e. Whether Plaintiff and the Class were damaged thereby, and the extent of damages for such violations; and

f. Whether Defendant should be enjoined from engaging in such conduct in the future.

88. Plaintiff is a member of the Class in that Defendant placed texts for telemarketing purposes to her telephone number when her telephone number was on the National Do-Not-Call Registry.

89. Plaintiff's claims are typical of the claims of the Members of the Class in that they arise from Defendant's uniform conduct and are based on the same legal theories as these claims.

90. Plaintiff and all putative Members of the Class have also necessarily suffered concrete harm in addition to statutory damages, as all Members of the Class spent time tending to Defendant's unwanted text messages, lost space on their devices, and suffered a nuisance and an invasion of their privacy.

91. Plaintiff has no interests antagonistic to, or in conflict with, the Class.

92. Plaintiff will thoroughly and adequately protect the interests of the Class, having retained qualified and competent legal counsel to represent themselves and the Class.

93. Defendant has acted and refused to act on grounds generally applicable to the Class, thereby making injunctive and declaratory relief appropriate for the Class.

94. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

95. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

14

96.     Common questions will predominate, and there will be no unusual manageability issues.

### FIRST CAUSE OF ACTION
### Violations of Texas § 305.053 Class

97.     Plaintiff and the proposed Texas Class incorporate the foregoing allegations as if fully set forth herein.

98.     Defendant placed, or had placed on its behalf, telemarketing telephone text messages to Plaintiff and Texas Class Members' telephone numbers.

99.     Each of these texts violated 47 U.S.C. § 227(c) or a regulation adopted under that provision.

100.    Further, Defendant placed texts for the purpose of making a sale to Plaintiff and Texas Class Members' telephone numbers without their consent.

101.    Plaintiff and Texas Class Members are entitled to:

     a.  a permanent injunction to prevent any further violations of the Texas Business & Commerce Code, Chapter 305;

     b.  the greater of $500 for each violation or Plaintiff's and Texas Class Members' actual damages (*see* Tex. Bus. & Com. Code §304.053(b));

     c.  the greater of $1,500 for each violation or Plaintiff's and Texas Class Members' actual damages for each call made knowingly or intentionally (*see* Tex. Bus. & Com. Code §304.053(c)).

### PRAYER FOR RELIEF

The Texas Rules of Civil Procedure require that Plaintiff choose among several statements regarding the amount Plaintiff seeks. Accordingly, pursuant to Tex. R. Civ. P. 47, Plaintiff states that she seeks monetary relief over $1,000,000 and non-monetary relief, including damages of any

15

kind, penalties, costs, expenses, pre-judgment interest, and attorneys' fees, which is within the jurisdictional limits of this Court.

Plaintiff also seeks a demand for judgment for all the other relief to which Plaintiff deems herself entitled.

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

A.      An order certifying the Class as defined above, appointing Plaintiff as the representative of the Class and appointing her counsel as Class Counsel;

B.      An order declaring that Defendant's actions, as set out above, violate 47 U.S.C. § 227(c);

C.      An order declaring that Defendant's actions, as set out above, violate 47 C.F.R. 64.1200(c)(2);

D.      An award of injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

E.      An award of statutory damages;

F.      An award of treble damages;

G.      An award of reasonable attorneys' fees and costs; and

H.      Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

16

**Dated:** May 22, 2023

By: _____ */s/ Chris R. Miltenberger* _____
Chris R. Miltenberger
Texas Bar Number: 14171200

**The Law Office of Chris R. Miltenberger, PLLC**
1360 N. White Chapel, Suite 200
Southlake, Texas 76092
Tel: (817) 416-5060
Fax: (817) 416-5062
chris@crmlawpractice.com

Eric H. Weitz, Esquire
Max S. Morgan, Esquire
**THE WEITZ FIRM, LLC**
1515 Market Street, #1100
Philadelphia, PA 19102
Tel: (267) 587-6240
Fax: (215) 689-0875
eric.weitz@theweitzfirm.com
max.morgan@theweitzfirm.com

17



**CERTIFIED MAIL**

9589 0710 5270 0020 5881 27

  

U.S. POSTAGE PAID
FCM LG ENV
MIDLAND, TX
79705
JUN 06 23
AMOUNT

RDC 99          78701          **$9.72**
R2304M113860-35

Annabel Martinez
Process Server
P. O. Box 52214
Midland, TX 79710

Cyclebar Franchising LLC
By serving its registered agent
Corporation Service Company
211 East 7th Street, Suite 620
Austin, TX 78701

# TAB 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **Kelly Pinn f/k/a Kelly Robinson,** | § § § | |
| Plaintiff, | § § | **Civil Action No. 3:21-cv-2330** |
| **v.** | § § § | |
| **Energy Solutions Direct Solar,** | § § | **Jury Trial Demanded** |
| Defendant. | § § § § | |

### COMPLAINT

**Kelly Pinn f/k/a Kelly Robinson** (Plaintiff), by and through her attorneys, **Kimmel & Silverman, P.C.**, alleges the following against **Energy Solutions Direct Solar** (Defendant):

### INTRODUCTION

1.     Plaintiff's Complaint is based on the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227, *et seq.* and § 302.101 of the Texas Business & Commercial Code.

### JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

3.     Supplemental jurisdiction for Plaintiff's related state law claims arises under 28 U.S.C. §1367.

4.     Defendant regularly conducts business in the State of Texas.

- 1 -

5. The occurrences from which Plaintiff's cause of action arises took place and caused Plaintiff to suffer injury in the State of Texas.

6. With each telephone made by Defendant to Plaintiff, Defendant knowingly and purposefully availed itself to the State of Texas and to this District specifically.

7. Accordingly, this Court has personal jurisdiction over Defendant in this matter.

8. Furthermore, Venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

9. Plaintiff is a natural person residing in Irving, Texas 75039.

10. Plaintiff is a "person" as that term is defined by 47 U.S.C. § 153(39).

11. Defendant is a business entity with principal place of business, head office, or otherwise valid mailing address at 6076 Park Boulevard, Pinellas Park, Florida 33781.

12. Defendant is a "person" as that term is defined by 47 U.S.C. § 153(39).

13. Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

## FACTUAL ALLEGATIONS

14. At all times relevant hereto, Plaintiff maintained a cellular telephone number (817) XXX-2161.

15. Plaintiff registered her cell phone number on the Do Not Call Registry on or around February 9, 2009.

16. Plaintiff registered her number on the Do Not Call registry in order to obtain solitude from unwanted and invasive telemarketing calls.

17. Plaintiff used her cell phone for primarily residential purposes.

18.     Defendant Energy Solutions Direct is a solar energy company that utilizes aggressive telemarketing to sell its energy services.

19.     Plaintiff did not consent for Defendant to call her and did not express interest in its solar energy services.

20.     Nonetheless, Defendant placed repeated harassing calls to solicit its products and/or services.

21.     Plaintiff did not request information from Defendant and Defendant did not have consent to contact Plaintiff.

22.     Defendant called Plaintiff at times including but not limited to:

- 10/16/2020 at 11:12 am CST;

- 10/16/2020 at 1:26 pm CST;

- 10/16/2020 at 4:48 pm CST;

- 10/19/2020 12:21 pm CST;

- 10/19/2020 at 3:28 pm CST;

- 10/19/2020 at 3:40 pm CST;

- 10/27/2020; and

- 10/28/2020.

23.     Upon information and belief, Defendant placed additional solicitation calls to Plaintiff not identified in the foregoing list.

24.     In one or more of Defendant's solicitation calls, including the call on October 16, 2021 at around 11:12 am CST, when Plaintiff answered the phone, she was greeted with an automated or pre-recorded voice.

- 3 -

25. Plaintiff could ascertain as much because the voice clearly sounded computerized rather than sounding like a live person.

26. Furthermore, in other calls Plaintiff heard a pause and delay before being transferred to a live agent.

27. Accordingly, Plaintiff believes and therefore avers Defendant placed calls with an automatic telephone dialing system, which uses a random or sequential number generator to dial or store numbers.

28. Defendant's calls were not made for "emergency purposes."

29. Defendant's incessant calls were bothersome, disruptive and frustrating for Plaintiff to endure.

30. Furthermore, Defendant did not register as a telephone solicitor with the Texas Secretary of State despite the obligation to do so.

31. Defendant's calls to Plaintiff were made in violation of the Telephone Consumer Protection Act and the Texas Business and Commerce Code.

## COUNT I
## DEFENDANT VIOLATED THE TCPA 47 U.S.C. §227(b)

32. Plaintiff incorporates the forgoing paragraphs as though the same were set forth at length herein.

33. The TCPA prohibits placing calls using an automatic telephone dialing system or automatically generated or prerecorded voice to a cellular telephone except where the caller has the prior express consent of the called party to make such calls or where the call is made for emergency purposes. 47 U.S.C. § 227(b)(1)(A)(iii).

34. Defendant initiated multiple telephone calls to Plaintiff's cellular telephone number using an automatically generated or pre-recorded voice.

- 4 -

35.     The dialing system used by Defendant to call Plaintiff has the present and/or future capacity to dial numbers in a random and/or sequential fashion.

36.     Specifically, Defendant uses algorithms to select the sequence of calls to be dialed from a stored list of telephone numbers.

37.     Defendant uses a dialing system that dials or stores numbers using a random or sequential number generator.

38.     Defendant's dialing system used to call Plaintiff is therefore an "automatic telephone dialing system" as defined by the TCPA.

39.     Defendant's calls were not made for "emergency purposes."

40.     Defendant's calls to Plaintiff's cellular telephone were without any prior express consent.

41.     Defendant contacted Plaintiff despite the fact that Plaintiff has been on the Do Not Call Registry since February 9, 2009.

42.     Accordingly, Defendant's acts as described above were done with malicious, intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff.

43.     The acts and/or omissions of Defendant were done unfairly, unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful right, legal defense, legal justification or legal excuse.

44.     As a result of the above violations of the TCPA, Plaintiff has suffered the losses and damages as set forth above entitling Plaintiff to an award of statutory, actual and trebles damages.

## COUNT II
## <u>DEFENDANT VIOLATED THE TCPA 47 U.S.C. § 227(c)</u>

45. Plaintiff incorporates the forgoing paragraphs as though the same were set forth at length herein.

46. The TCPA prohibits any person or entity of initiating any telephone solicitation to a residential telephone subscriber who has registered his or his telephone number on the National Do-Not-Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. 47 U.S.C. § 227(c).

47. Defendant contacted Plaintiff despite the fact that Plaintiff has been on the Do Not Call Registry since February 9, 2009.

48. Defendant called Plaintiff on multiple occasions during a single calendar year despite Plaintiff's registration on the Do Not Call list.

49. Defendant's acts as described above were done with malicious, intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff.

50. The acts and/or omissions of Defendant were done unfairly, unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful right, legal defense, legal justification or legal excuse.

51. As a result of the above violations of the TCPA, Plaintiff has suffered the losses and damages as set forth above entitling Plaintiff to an award of statutory, actual and trebles damages.

## COUNT III
## DEFENDANT VIOLATED § 302.101 of
## THE TEXAS BUSINESS & COMMERCIAL CODE

52.     Plaintiff incorporates the forgoing paragraphs as though the same were set forth at length herein.

53.     Plaintiff received all calls from Defendant in Texas and is entitled to other relief under Texas law.

54.     §302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

55.     Defendant violated § 302.101 of the Texas Business & Commercial Code when its representatives engaged in continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

56.     §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5,000 for each violation. Furthermore, §302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney fees.

       **Wherefore**, Plaintiff, **Kelly Pinn f/ka/ Kelly Robinson,** respectfully prays for judgment as follows:

       a.      All actual damages Plaintiff suffered (as provided under 47 U.S.C. § 227(b)(3)(A)) and §302.302 of the Texas Business and Commerce Code;

- 7 -

b. Statutory damages of $500.00 per violative telephone call (as provided under 47 U.S.C. § 227(b)(3)(B));

c. Additional statutory damages of $500.00 per violative telephone call (as provided under 47 U.S.C. § 227(C);

d. Treble damages of $1,500.00 per violative telephone call (as provided under 47 U.S.C. § 227(b)(3));

e. Additional treble damages of $1,500.00 per violative telephone call (as provided under 47 U.S.C. § 227(C);

f. Injunctive relief (as provided under 47 U.S.C. § 227(b)(3) and (c); and

g. Any other relief this Honorable Court deems appropriate.

## <u>**DEMAND FOR JURY TRIAL**</u>

Please take notice that Plaintiff, **Kelly Pinn f/k/a Kelly Robinson**, demands a jury trial in this case.

Respectfully submitted,

Dated: September 30, 2021  By: <u>*/s/ Jacob U. Ginsburg*</u>
        Jacob U. Ginsburg, Esq.
        Kimmel & Silverman, P.C.
        30 East Butler Pike
        Ambler, PA 19002
        Phone: (215) 540-8888 ext. 104
        Facsimile: (877) 788-2864
        Email: jginsburg@creditlaw.com
        teamkimmel@creditlaw.com

PLAINTIFF'S COMPLAINT

# TAB 3

# UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **KELLY PINN**, *individually, and on behalf* | ) | |
| *of all others similarly situated,* | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **Case No.:**  3:21-cv-2907 |
| v. | ) | |
| | ) | **Class-Action** |
| **VEHICLE PROTECTION SERVICES** | ) | |
| **LLC,** | ) | **Jury Trial Demanded** |
| *Defendant.* | ) | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff, **Kelly Pinn,** individually, and on behalf of all others similarly situated, ("Plaintiff" or "Ms. Pinn"), through her counsel, and for her Class Action Complaint against Defendant **Vehicle Protection Services, LLC** ("Defendant" or "VPS"), states:

### Introduction

1.      Plaintiff's Class-Action Complaint is based on the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227 *et seq.* and the Texas Telephone Solicitation Act, ("Texas TSA"), Tex. Bus.& Com. Code § 302.101 *se seq.*

2.      In 1991, President George H.W. Bush signed into law the TCPA, which was passed in a bi-partisan manner, to protect consumers' privacy rights. Specifically, the right to be left alone from unwanted telemarketing calls.

3.      A leading sponsor of the TCPA described telemarketing "robocalls" the "scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4.     The TCPA, through the accompanying Code of Federal Regulations, 47 C.F.R. § 64.1200 *et seq.,* affords special protections for people who registered their phone numbers on the National Do Not Call Registry.

5.     Where a consumer's phone number is registered on the Do Not Call registry, the TCPA requires that telemarketers provide clear and conspicuous notice to the consumer that it will be making telemarketing calls for solicitation or advertising purposes, and requires that the consumer provide express written consumer.

6.     Section 227(c)(5) of the TCPA provides that each person who receives more than one call within a 12-month period on their  phone, where that person did not provide express written consent upon a clear and conspicuous disclosure from the telemarketer, after the phone number was registered on the National Do Not Call Registry for more than 31 days is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated.

7.     Furthermore, § 302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

8.     Plaintiff seeks to exercise her rights under the TCPA and the Texas TSA against Defendant VPS on behalf of herself and other similarly situated putative class-members.

## The Parties

9.     Plaintiff Kelly Pinn is an adult citizen who all times relevant to this Complaint resided in in Irving, Texas.

2

10. Defendant VPS is a California corporation, which maintains its headquarters at 300 Spectrum Center Dr Suite 400, Irvine, CA 92618

11. VPS is a telemarketing company that sells extended warranty services to consumers.

12. VPS transacts business in Texas and throughout the United States.

**Jurisdiction and Venue**

13. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15. Defendant continuously and systematically transacts business in the State of Texas.

16. Defendant placed calls to Plaintiff on her cell phone with an "817" area code, which is a Texas area code associated with the Dallas-Fort Worth region.

17. Defendant's phone calls attempted to solicit business from Plaintiff.

18. Furthermore, after Plaintiff ordered a warranty service plan for investigative purposes, VPS delivered a warranty service plan to Plaintiff at her Texas address.

19. Plaintiff received the unwanted telemarketing calls while residing in the State of Texas.

20. At all times relevant hereto, Plaintiff resided in Dallas County, which is within this District.

21.     Plaintiff experienced the harm associated with Defendant's irritating and invasive telemarketing calls while she was in this District.

22.     For the foregoing reasons, personal jurisdiction exists and venue is proper, pursuant to 28 U.S.C. § 1391(b)(2).


**Statement of Relevant Facts**

23.     At all times relevant to this Complaint, Ms. Pinn owned a cell phone, the number for which was 817-XXX-2161.

24.     Ms. Pinn used that cell phone primarily for residential purposes.

25.     Ms. Pinn registered her cell phone number on the National Do Not Call Registry on or around February 9, 2009.

26.     Ms. Pinn registered her cell phone number on the National Do Not Call Registry to obtain solitude from unwanted and invasive telemarketing calls.

27.     Defendant VPS is a national telemarketing company that sells extended warranties for various automobile warranty administrators.

28.     VPS markets products and services, in part, through placing telephone calls to prospective customers' cellular and landline phones.

29.     Before VPS began placing telemarketing calls to Pinn's cell phone, VPS did not present a clear and conspicuous disclosure to Ms. Pinn that it would make telemarketing calls to her.

30.     Likewise, Ms. Pinn did not provide consent for VPS to place such telemarketing calls.

4

31.     Ms. Pinn had no prior business relationship with VPS.

32.     Ms. Pinn was not in the market for extended warranty plans and had not consented to receive calls from telemarketers selling same.

33.     Prior to the solicitation calls at issue, Ms. Pinn never inquired of VPS about any products or services.

34.     Despite the foregoing, VPS placed invasive and irritating telemarketing calls Ms. Pinn's cell phone on multiple occasions in furtherance of its efforts to sell extended warranty plans for her vehicle.

35.     Those calls were made on instances including but not limited to:

- April 15, 2021 at 10:32 am CST; and

- May 25, 2021 at 5:35 pm CST.

36.     After those two unlawful calls, for investigative purposes, Ms. Pinn purchased an extended warranty plan from VPS to ascertain the identity of the company placing unsolicited telemarketing calls.

37.     VPS mailed to her that warranty plan.  A true and correct copy of the application page of that plan is attached as Exhibit "A."[1]

38.     Plaintiff was annoyed, irritated, upset and experienced a sense that her privacy was violated by Defendant as a result of receiving multiple unwanted and unsolicited phone calls after she had long been registered on the National Do Not Call Registry.

39.     Furthermore, an online search through the Texas Secretary of State's website at https://direct.sos.state.tx.us/telephone/TelephoneSearch.asp, has confirmed that VPS is not

---

[1] The Plaintiff's last name on the warranty plan appears as "Robinson" - which is her maiden name.

5

registered to engage in telephone solicitation within the State of Texas, despite the legal obligation to do so.

### Class Allegations

40.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Ms. Pinn brings this lawsuit as a class action on behalf of herself and all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.

41.     Upon information and belief, at all times relevant hereto, VPS did not provide clear and conspicuous notice that it will make telemarketing calls to consumers before doing so, even if a consumer had placed his or her number on the National Do Not Call Registry.

42.     Likewise, upon information and belief, at all times relevant hereto, VPS did not obtain express written consent or permission to place telemarketing calls to consumers even if a consumer had placed his or her number on the National Do Not Call Registry.

43.     Furthermore, upon information and belief, VPS called hundreds if not thousands of Texas residents with Texas area codes to solicit goods or services without first having registered to engage in telephone solicitation with the Texas Office of the Secretary of State.

44.     Ms. Pinn seeks to represent the following class:

1.  **Do-Not-Call Registry Class:** For the period from four years prior to the filing of this suit until the date a class is certified, all persons in the United States who: (1) received more than phone call from VPS or someone acting on its behalf, for the purpose of soliciting goods or services, during a 12-month period; and, (2) received those calls on numbers that registered on the Do Not Call Registry for more than 31 days at the time the call(s) were received; and

2.  **Texas Solicitation Class:** For two years prior to the filing of this suit until the date the class is certified, all persons with Texas area codes who received a marketing call or text message from VPS (or someone acting on its behalf) and at such time VPS had not obtained a registration certificate from the Texas Office of the Secretary of State.

45. Ms. Pinn reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

46. The members of the proposed classes are so numerous that joinder of all members is impracticable. Ms. Pinn reasonably believes that hundreds or thousands of people have been harmed by VPS's actions. The names and phone numbers of the members of the proposed class are readily identifiable through records available to VPS or those acting on its behalf.

47. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

48. On information and belief, VPS has called and continues to call/text people who are registered on the National Do Not Call Registry. It is reasonable to expect that VPS will continue to make such calls/texts absent this lawsuit.

49. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

   a. Whether VPS or someone acting on its behalf placed two or more telemarketing calls to Ms. Pinn and the putative class members after their numbers were registered on the National Do Not Call Registry more than 31 days;

   b. Whether VPS' policies and procedures for providing disclosure that telemarketing calls would be made to a consumer was adequately clear and conspicuous;

   c. Whether VPS' policies and procedures for procuring express written consent or permission to place telemarketing calls to consumers on the Do Not Call Registry were adequate;

   d. Whether VPS' conduct violates 47 U.S.C. § 227(c)(5);

   e. Whether VPS' conduct violates the rules and regulations implementing the TCPA;

   f. Whether Ms. Pinn and the putative class members are entitled to increased damages for each violation based on the willfulness of VPS's conduct;

7

       g.   Whether VPS violated Plaintiff and putative class members' rights under the Texas Business and Commerce Code by placing telemarketing calls to Texas residents without obtaining a registration certificate from the Office of the Secretary of State.

50.    Mr. Pinn's claims are typical of the claims of the proposed class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed class and is based on the same legal theories.

51.    Ms. Pinn and her counsel will fairly and adequately protect the interests of the members of the proposed class. Pinn's interests do not conflict with the interests of the proposed class she seeks to represent. Pinn has retained lawyers who are competent and experienced in class action, TCPA litigation and consumer law.

52.    Ms. Pinn's counsel will vigorously litigate this case as a class action, and Pinn and her counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

53.    A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

54.    In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

55. Questions of law and fact, particularly the propriety of calling phone numbers registered on the National Do Not Call Registry and calling Texas numbers to solicit goods and services without having registered with the Texas Office of the Secretary of State, predominate over questions affecting only individual members.

56. VPS' acts and omissions underlying this action apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**Count I - Violations of the Telephone Consumer Protection Act ("TCPA")**
**47 U.S.C. § 227(c)(5)**

57. Pinn incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

58. Ms. Pinn brings this Count individually and on behalf of all others similarly situated.

59. The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one solicitation call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

60. The penalty for each call made in violation of the TCPA's restrictions on placing telemarketing calls to numbers registered on the National Do Not Call Registry is $500 per violation and up to $1,500 per violation if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

61.     In addition, the TCPA allows the Court to enjoin VPS's violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do Not Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

62.     By calling Ms. Pinn and the putative class members after their numbers were registered on the National Do Not Call Registry, VPS violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

63.     VPS knew or should have known that Ms. Pinn and the putative class members had their numbers registered on the Do Not Call Registry.

64.     Pinn and the putative class members are entitled to damages of $500.00 per violation for each call placed by VPS and up to $1,500.00 per violation if the Court finds that VPS willfully violated the TCPA.

## PRAYER FOR JUDGMENT

WHEREFORE Plaintiff Kelly Pinn, individually, and on behalf of all others similarly situated, requests the Court grant the following relief:

a.   Enter an order against Defendant VPS, LLC pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying this action as a class action and appointing Pinn as the class representative;

b.   Enter an order appointing Kimmel & Silverman, P.C. and Butsch Roberts & Associates LLC and as class counsel;

c.   Enter judgment in favor of Ms. Pinn and the putative class for all damages available under the TCPA, including statutory damages of $500 per violation of 47 U.S.C. § 227(c) and up to $1,500 per violation of each subsection if VPS, LLC willfully violated the TCPA;

d.   Enter a judgment in favor of Ms. Pinn and the putative class that enjoins VPS from violating the TCPA's regulations prohibiting Lending from calling/texting numbers registered on the National Do Not Call Registry;

e.   Award Ms. Pinn and the class all expenses of this action, and requiring VPS to pay the costs and expenses of class notice and administration; and,

     f.    Award Ms. Pinn and the class such further and other relief the Court deems just and appropriate.

## Count II – Violations of § 302.101 et seq. of
## The Texas Business & Commercial Code

65.    Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this count.

66.    Pinn received solicitation calls from VPS while located in Texas on her phone with a Texas area code.

67.    Section 302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

68.    VPS violated § 302.101 of the Texas Business & Commercial Code when it engaged in telephone solicitation toward Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

69.    §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5,000 for each violation. Furthermore, §302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney fees.

70.    Pinn and the putative class members are entitled to damages of $5,000.00 per violation for each call unlawful call, as well as attorneys' fees and costs.

## DEMAND FOR JUDGMENT

WHEREFORE Plaintiff, Kelly Pinn, individually, and on behalf of all others similarly situated, request the Court grant the following relief:

a. Enter an order against VPS, pursuant to Federal Rule of Civil Procedure Rule 23, certifying this action as a class action and appointing Plaintiff Kelly Pinn as representatives of the class;

b. Enter an order appointing Kimmel & Silverman, P.C. and Butsch Roberts & Associates LLC and as counsel for the class;

c. Enter judgment in favor of Plaintiff, and the putative class members for all damages available under Texas Commercial & Business Code, including statutory damages of $5,000 per violation;

d. Enter judgment in favor of Plaintiff and the putative class members against VPS and enjoining VPS from placing marketing calls before obtaining a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made;

e. Award Plaintiff and the class all expenses of this action, and requiring defendant to pay the costs and expenses of class notice and claims administration;

f. Award Plaintiff and the class all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney fees; and,

g. Award Plaintiff the class such further and other relief the Court deems just and appropriate.

[THIS PORTION OF THE PAGE IS INTENTIONALLY LEFT BLANK]

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff, Kelly Pinn demands a jury trial in this case.

Respectfully submitted,

Dated: November 18, 2021

By: /s/ *Jacob U. Ginsburg*
Jacob U. Ginsburg, Esq.
Kimmel & Silverman, P.C.
30 East Butler Pike
Ambler, PA 19002
(215) 540-8888 ext. 104
Facsimile: (877) 788-2864
Email:jginsburg@creditlaw.com
teamkimmel@creditlaw.com

Christopher E. Roberts (to seek admission *pro hac*)
Butsch Roberts & Associates LLC
231 S. Bemiston Ave., Suite 260
Clayton, MO 63105
Tel: (314) 863-5700
Fax: (314) 863-5711
roberts@butschroberts.com

# TAB 4

Amy L. B. Ginsburg
GINSBURG LAW GROUP, P.C.
1012 N. Bethlehem Pike, Suite 103, Box #9
Ambler, PA 19002
Telephone: (855) 978-6564
Facsimile: (855) 777-0043
Email: aginsburg@ginsburglawgroup.com

*Attorneys for Plaintiff, Kelly Pinn*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KELLY PINN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NATIONS AUTO PROTECTION, LLC AND PALMER ADMINISTRATIVE SERVICES, INC.,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT AND TEXAS BUSINESS & COMMERCE CODE**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiff, Kelly Pinn, on behalf of herself and all others similarly situated, through their counsel, and for her Class Action Complaint against Defendants, Nations Auto Protection, LLC ("Nations") and Palmer Administrative Services, Inc. ("Palmer") states:

**INTRODUCTION**

1.      Plaintiff brings this class action complaint for Defendants' violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. §227, *et seq*. and sections § 305.053 and § 302.101 of the Texas Business & Commercial Code.

**PARTIES**

2.      Kelly Pinn, is a natural person who, at all times relevant to this Complaint, resided in Irving, Texas.

3.      Nations is a for-profit limited liability company and maintains its principal place of business at 5301 N. Federal Hwy, Suite 295, Boca Raton, Florida 33487.

4.      Palmer is a for-profit corporation and maintains its principal place of business at

1  3430 Sunset Avenue, Ocean, New Jersey 07712.

2      5.    Whenever it is alleged herein that any Defendant did any act, it is meant that the

3  Defendant performed or participated in the act or that Defendant's officers, agents or employees

4  performed or participated in the act on behalf of and under the authority of a Defendant.

5  **JURISDICTION AND VENUE**

6      6.    This Court's jurisdiction arises under 47 U.S.C. § 227(g)(2), and 28 U.S.C. §§ 1331

7  and 1337.

8      7.    Palmer is a corporation incorporated in the state of New Jersey.

9      8.    Nations knowingly and purposefully availed itself to the state of New Jersey by

10  contracting with Palmer, a New Jersey corporate entity.

11      9.    Upon information and belief, Nations sent and received contractual documents from

12  the state of New Jersey and entered contractual relationships governed by the state of New Jersey.

13      10.    Accordingly, it was reasonably foreseeable that Nations would be brought into a

14  court in the state of New Jersey based on its relationship with Palmer.

15      11.    Supplemental jurisdiction for Plaintiff' state law claims arises under 28 U.S.C.

16  § 1367.

17      12.    Venue is appropriate in this federal district under 47 U.S.C. § 227(g)(4) and 28

18  U.S.C. § 1391 because Defendants regularly transact business within this federal judicial district

19  and, therefore, reside in this federal judicial district within the meaning of 28 U.S.C. § 1391(b) and

20  (c).

21  **BACKGROUND REGARDING CLAIMS**

22      *A.  The TCPA.*

23      13.    The TCPA regulates, among other things, the use of a prerecorded message to make

24  calls or send prerecorded calls. See 47 U.S.C. § 227, *et seq.*; *In re Rules and Regulations*

25  *Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd.

26  14014, 14115 ¶ 165 (2003).

27      14.    Specifically, the TCPA prohibits the sending of prerecorded message to wireless

28  numbers in the absence of an emergency or prior express written consent of the called party. *See,*

CLASS ACTION COMPLAINT

1   47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(2); *In the Matter of Rules & Regulations*

2   *Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1831 (F.C.C. 2012).

3        15.    "[T]elemarketing means the initiation of a telephone call or message for the purpose

4   of encouraging the purchase or rental of, or investment in, property, goods, or services, which is

5   transmitted to any person." 47 C.F.R. § 64.1200(f)(12).

6        16.    "[P]rior express written consent means an agreement, in writing, bearing the

7   signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to

8   the person called advertisements or telemarketing messages using an automatic telephone dialing

9   system or an artificial or prerecorded voice, and the telephone number to which the signatory

10   authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. §

11   64.1200(f)(8).

12       **B.  National Do Not Call Registry.**

13        17.    The National Do Not Call Registry allows consumers to register their telephone

14   numbers thereby indicating their desire not to receive telephone solicitations at those numbers; and

15   the registration "must be honored indefinitely, or until it is cancelled by the consumer or the

16   telephone number is removed by the database administrator." 47 C.F.R. § 64.1200(c)(2).

17        18.    The TCPA and implementing regulations prohibit the initiation of telephone

18   solicitations to residential telephone subscribers to the Registry and provides a private right of

19   action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47

20   U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

21                      **<u>FACTUAL ALLEGATIONS</u>**

22        19.    Nations is a "person" as that term is defined by 47 U.S.C. § 153(39).

23        20.    Palmer is a "person" as that term is defined by 47 U.S.C. § 153(39).

24        21.    Nations is a "telemarketer" within the meaning of 47 C.F.R. § 64.1200(f)(12).

25        22.    Palmer is a "telemarketer" within the meaning of 47 C.F.R. § 64.1200(f)(12).

26        23.    Ms. Pinn's telephone number, XXX-XXX-2161, is registered to a cellular telephone

27   service.

28        24.    Ms. Pinn's number ending in 2161 has been registered on the Do Not Call Registry

CLASS ACTION COMPLAINT

since February 9, 2009.

25.     Plaintiff has never sought or solicited information regarding Defendants' services prior to receiving the prerecorded calls at issue.

26.     The Defendants have never had a "established business relationship" with Plaintiff within the meaning of 47 C.F.R. § 64.1200(f)(5).

27.     Plaintiff did not consent to receiving any communications from Defendants.

28.     On October 6, 2020, Plaintiff received three calls from Defendant Nations at 9:03AM, 10:41AM, and 12:41PM.

29.     When Defendant Nations called Plaintiff a fourth time on this date, at 2:41PM, Plaintiff answered the call and heard a pre-recorded message from Defendant Nations, placed on behalf of Defendant Palmer.

30.     To confirm the identity of the caller, Ms. Pinn purchased a car warranty from Defendant Nations on this date.

31.     Plaintiff later received a copy of the warranty confirming that Defendant Nations was the Seller and Palmer was the Administrator.

32.     Defendant received an additional call from Defendant on October 19, 2020.

33.     The Defendants' initiated calls to Plaintiff and transmitted prerecorded messages for the purpose of encouraging the purchase of a Palmer car warranty.

34.     The Defendants' telephone calls and prerecorded messages, as alleged herein, constitutes "telemarketing" within the meaning of 47 C.F.R. § 64.1200(f)(13).

35.     §302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

36.     Defendants are not registered with the Office of the Secretary of State.  See https://direct.sos.state.tx.us/telephone/TelephoneSearch.asp.

**PALMER'S LIABILITY FOR NATIONS' TELEMARKETING CALLS**

37.     At all times relevant to this complaint, there existed an agency relationship between

-4-

Nations and Palmer, with Nations acting as Palmer's agent.

38.     At all times relevant to this complaint, Palmer gave its apparent, if not actual, authority to Nations to initiate the offending telephone calls, and playing the offending prerecorded message, on Palmer's behalf for the Plaintiff and putative class members.

39.     At all times relevant to this complaint, Nations acted within the scope and authority of its agency relationship with Palmer by initiating the offending telephone calls, and playing the offending prerecorded message, on behalf of Palmer for the Plaintiff and putative class members.

40.     Defendants financially benefitted from their policy and practice of initiating the offending telephone calls, and playing the offending prerecorded message complained of herein.

41.     For more than a quarter century the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

42.     On May 9, 2013, the FCC issued a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."

43.     The FCC's ruling warned sellers, like Palmer, that they may not avoid liability by outsourcing their telemarketing whims to third parties:

> Allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief.

May 2013 FCC Ruling, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted). "Sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive

1   difference for consumer privacy." *Id.*

2   44.   Even absent evidence of a formal contractual relationship between a seller and

3   telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual)

4   authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

5   45.   Nations was contractually required to promote Palmer products in telemarketing

6   calls to generate new paying customers, and did so, as they did with the Plaintiff.

7   46.   Palmer was knowingly and actively accepting the business that originated through

8   Defendants' illegal telemarketing calls for Palmer's motor vehicle warranties.

9   47.   Palmer maintained interim control over Nations' actions.

10   48.   For example, Palmer had absolute control over whether, and under what

11   circumstances, it would accept a customer.

12   49.   Palmer had day-to-day control over Nations' actions, including the ability to

13   prohibit Nations from using prerecorded methodology to contact potential Palmer customers.

14   50.   Palmer failed to instruct Nations, and as a result, is liable for Nations' conduct.

15   51.   The May 2013 FCC Ruling allows called parties to obtain "evidence of these kinds

16   of relationships . . . through discovery, if they are not independently privy to such information." *Id.*

17   at 6592-593 (¶ 46). Evidence of circumstances pointing to a telemarketer's apparent authority

18   "should be sufficient to place upon the seller the burden of demonstrating that a reasonable

19   consumer would not sensibly assume that the telemarketer was acting as the seller's authorized

20   agent." *Id.* at 6593 (¶ 46).

21   ## CLASS ALLEGATIONS

22   52.   Plaintiff brings this action on behalf of herself and the following classes ("Classes")

23   under Federal Rule of Civil Procedure 23.

24   53.   ***Class Definitions***. Plaintiff proposes the following Class definitions, subject to

25   amendment as appropriate:

26   (a)   **Prerecorded Message Class:** All persons within the United
States to whom: *(i)* Nations placed a prerecorded
27   telemarketing message call on behalf of Palmer *(ii)* to a
residential landline or cellular telephone number without prior
28

-6-

express written consent signed by the called party; and *(iii)* where the last call was made no earlier than the date that is four years prior to the filing of this action.

(b)  **National Do Not Call Registry Class**: All persons within the United States to whom: *(i)* Nations placed at least two telephone solicitation calls during a 12-month period; *(ii)* for telemarketing purposes on behalf of Palmer; *(iii)* to a residential landline or cellular telephone number registered on the do-not-call list for at least 30 days prior to the first call; *(iv)* prior express written consent signed by the called party authorizing the calls; and *(v)* where the last call was made no earlier than the date that is four years prior to the filing of this action.

(c)  **Texas 305.053 Class**: All residents of the State of Texas to whose telephone number Defendant placed a call in violation of 47 U.S.C. §227 in the four years prior to the filing of this action.

(d)  **Texas 302.101 Class**: All residents of the State of Texas to whose telephone number Defendant placed a call in violation of Texas Business and Commerce Code §302.101 in the four years prior to the filing of this action.

54.  Excluded from the Classes are the Plaintiff, Defendants, and their respective counsel, any entities in which Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

55.  ***Class Claims***.  The Class claims include all claims each Class member may have for a violation of the TCPA arising from Defendants' use of a prerecorded message and placement of calls to telephone numbers registered on the National Do Not Call Registry.  Plaintiff and all members of the Classes have been harmed by Defendants' acts, including, but not limited to, the invasion of their privacy, annoyance, waste of time, loss of their cell phone battery and cost to replenish it, and the intrusion on their cellular telephone that occupied it from receiving legitimate communications.

56.  ***Numerosity.*** The Class is so numerous and so geographically disbursed that joinder of their claims is impractical. There are at least 40 members in each of the Classes.

57.  The Classes are identifiable through the Defendants' business records, dialer

CLASS ACTION COMPLAINT

1 records, other phone records, and phone number databases.

2  58. ***Commonality.*** Common questions of law and fact exist as to members of the

3 Classes; those common principal issues include whether: *(i)* Nations' placement of telemarketing

4 calls to a Class member's residential landline or cellular telephone number, which was registered

5 on the do-not-call list at least 30 days prior to the first call, and without having the called-party's

6 prior express without prior written consent, violates the TCPA; *(ii)* Nations' placement of

7 prerecorded telemarketing message calls to a Class member's residential landline or cellular

8 telephone number without having the called-party's prior express without prior written consent,

9 which failed to clearly state at the beginning of the message the identity of the business, individual,

10 or other entity that is responsible for initiating the call, violates the TCPA; and *(iv)* Defendants'

11 TCPA violations warrant an award of treble damages.

12  59. ***Typicality.*** Plaintiff' claims are typical of each Class member because those claims

13 arise from Defendants' standardized course of conduct alleged herein.

14  60. ***Adequacy.*** Plaintiff will fairly and adequately protect Class members' interests

15 because Plaintiff' interests are not averse to the absent Class members and because they committed

16 to vigorously litigating this matter. Plaintiff retained counsel experienced in handling consumer

17 lawsuits, complex legal issues, and class actions.

18  61. This action may be maintained under Fed. R. Civ. P. 23(b)(3) because the questions

19 of law and fact common to members of the Classes predominate over any questions affecting any

20 individual member, and a class action is superior to other available methods for the fair and efficient

21 adjudication of the controversy. The individual joinder of all Class members is impracticable, class

22 action treatment will permit a large number of similarly situated persons to efficiently prosecute

23 their common claims in a single forum without unnecessary duplication of effort and expense that

24 individual actions engender, an important public interest is served by addressing the matter as a

25 class action, substantial expenses to the litigants and to the judicial system will be realized, and

26 difficulties are unlikely in the management of a class action.

27  62. This action may also be maintained under Fed. R. Civ. P. 23(b)(2) because the

28 injunctive relief is available under 47 U.S. Code § 227(c)(5)(A) and Defendants have each acted or

refused to act on grounds that apply generally to the Classes, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the each of the Classes as a whole.

**FIRST CAUSE OF ACTION**
**Violations of the TCPA's National Do-Not-Call Registry Provisions**
**47 .S.C. 227(c) and 47 C.F.R. § 64.1200(c)(2)**

63.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

64.     Defendants violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2) by initiating multiple solicitation calls within a 12-month period to the residential and cellular telephone numbers belonging to Plaintiff and putative class members despite their registration on the National Do Not Call Registry and without having their signed, written prior express invitation or permission.

65.     The Defendants' TCPA violations were negligent and/or willful.

66.     The TCPA provides a private right of action for these claims under 47 U.S.C. § 227(c)(5).

**SECOND CAUSE OF ACTION**
**Violations of the TCPA's National Do-Not-Call Registry Provisions**
**47 .S.C. 227(b)(1) and 47 C.F.R. § 64.1200(b)**

67.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

68.     The TCPA prohibits placing calls using an automatic telephone dialing system or automatically generated or prerecorded voice to a cellular telephone except where the caller has the prior express consent of the called party to make such calls or where the call is made for emergency purposes. 47 U.S.C. § 227(b)(1)(A)(iii)

69.     By calling Plaintiff and the putative class members with a prerecorded voice, and without prior express consent of the called party to make such calls, Defendants violated the TCPA including but not limited to 47 U.S.C. § 227(b)(1).

CLASS ACTION COMPLAINT

70. The TCPA provides a private right of action and statutory damages of $500 per violation, and up to $1,500 if the violated is determined to be willful. 47 U.S.C. § 227(b)(3).

71. Defendants initiated numerous calls to Plaintiff and the putative class members using an automatically generated or pre-recorded voice.

72. Defendants' calls were not made for "emergency purposes."

73. Defendants' calls to Plaintiff and the putative class members were made without any prior express written consent.

74. Defendants' acts as described above were done with malicious, intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff and the putative class members.

**THIRD CAUSE OF ACTION**
**Violations of Tex. Bus. & Com. Code § 305.053**

75. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

76. Defendants placed, or had placed on its behalf, telemarketing telephone calls to Plaintiff's and Class Members' telephone numbers.

77. Each of these calls violated 47 U.S.C. § 227.

78. Plaintiff and Class Members are entitled to: (a) a permanent injunction to prevent any further violations of the Texas Business & Commerce Code, Chapter 305; (b). the greater of $500 for each violation or Plaintiff's and Texas § 305.053 Class Members' actual damages (see Tex. Bus. & Com. Code §304.053(b); (c) the greater of $1,500 for each violation or Plaintiff's and Texas § 305.053 Class Members' actual damages for each call made knowingly or intentionally (see Tex. Bus. & Com. Code §304.053(c).

**FOURTH CAUSE OF ACTION**
**Violations of Tex. Bus. & Com. Code § 302.101**

79. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

80.     Plaintiff and each Class Member are a "consumer" as defined by § 301.001(2) of the Texas Business and Commerce Code.

81.     Defendants are each a "telephone solicitor" as defined by § 301.001(5) of the Texas Business & Commerce Code.

82.     §302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

83.     Defendants violated § 302.101 of the Texas Business & Commercial Code when their representatives engaged in continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

84.     §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5,000 for each violation. Furthermore, §302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of their proposed Classes, pray for the following relief:

A.     An order certifying the Classes as defined above, appointing Plaintiff as the representatives of the Classes and appointing their counsel as Class Counsel;

B.     An order declaring that Defendants' actions, as set out above, violate 47 U.S.C. §227(b);

C.     An award of injunctive and other equitable relief as necessary to protect the interests of the Classes, including, inter alia, an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

D.     An award of statutory damages;

CLASS ACTION COMPLAINT

E.  An award of treble damages; and

F.  Such other and further relief that the Court deems reasonable and just.

## **<u>JURY TRIAL DEMAND</u>**

Plaintiff demand trial by jury on all issues so triable.


**GINSBURG LAW GROUP, P.C.**
*Attorneys for Plaintiff, Kelly Pinn*

Dated:  September 30, 2022                    By:     *s/ Amy L. B. Ginsburg*
                                                          AMY L. B. GINSBURG

# TAB 5

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **KELLY PINN**, on behalf of herself and all others similarly situated, | Civil Case No.: 3:22-cv-2684-M |
| *Plaintiff*, | **FIRST AMENDED CLASS ACTION** |
| v. | **COMPLAINT** |
| **XPONENTIAL FITNESS, INC.,** | |
| *Defendant*. | |

## INTRODUCTION

1.      This action arises out of Defendant, Xponential Fitness, Inc.'s ("Defendant"), practice of advertising via unsolicited text message marketing to individuals on the National Do-Not-Call Registry without prior express written consent (or any consent whatsoever), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA").

2.      Plaintiff never provided Defendant prior express written consent to send telemarketing text messages to her telephone number.

3.      Plaintiff's telephone number was registered on the National Do-Not-Call Registry at the time of the text messages.

4.      Accordingly, Plaintiff brings this TCPA action on behalf of herself and two classes of similarly situated individuals under 47 U.S.C. § 227(c) and section 305.043 of the Texas Business & Commerce Code.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

1

6.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a), because it is so closely related to the federal claim that they form a single case or controversy.

7.    The Court has jurisdiction over Defendant because Defendant conducts business transactions in this District and has committed tortious acts in this District.

8.    Venue is proper in this District because Defendant conducts significant amounts of business transactions within this District and because some of the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from this District.

## PARTIES

9.    Plaintiff Kelly Pinn is, and at all times mentioned herein was, a citizen and resident of Irving, Texas.

10.    Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

11.    Defendant is, and at all times mentioned herein was, a Delaware corporation with a business address of 17877 Von Karman Avenue, Suite 100, Irvine, California 92614.

12.    Defendant may be served via its registered agent Corporation Service Company located at 251 Little Falls Drive, Wilmington, Delaware 19808.

13.    Defendant is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153 (39).

## GENERAL FACTUAL ALLEGATIONS

14.    Defendant, or someone acting on its behalf and at its direction, sends automated text messages marketing its services.

15.    These text messages come from (972) 703-2757.

16.     Because these text messages advertise Defendant's services they constitute telemarketing messages and telephone solicitations.

### PLAINTIFF PINN'S FACTUAL ALLEGATIONS

17.     Plaintiff Pinn is the sole and customary user of cellular telephone number (XXX)-XXX-2161.

18.     Plaintiff Pinn's cellular telephone number, (XXX)-XXX-2161, is a personal telephone number and is not used for business purposes.

19.     Plaintiff Pinn's cellular telephone (XXX)-XXX-2161 has been on the National Do-Not-Call Registry since February 9, 2009.

20.     On September 27, 2022 at 4:30pm, Ms. Pinn received six (6) text messages from (972) 703-2757, as shown on her cellular telephone bill:

| Sep 28 4:30 PM | 972-703-2757 | Incoming |
|---|---|---|
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |
| Sep 28 4:30 PM | 972-703-2757 | Incoming |

21.     The messages advertised "unlimited rides for only $99," provided a promo code, and included a hyperlink: https://bit.ly/3Ch7VSP.

22.     When Ms. Pinn clicked the hyperlink, she was redirected to another website[1] that, promoted Defendant's services:

---

[1]  https://www.clubready.com/getstarted/step1.asp?s=7308&id=544147

3



23.    Upon information and belief, Defendant is the owner and operator of Cyclebar Southlake.

24.    Ms. Pinn never provided prior express written consent to Defendant for these text messages.

## DEFENDANT'S LIABILITY

25.    The TCPA prohibits making multiple telephone solicitation calls[2] to a telephone number on the National Do Not Call Registry.  *See* 47 U.S.C. § 227(c)(5).

---

[2]  Although the TCPA does not define a "call," the FCC has interpreted the TCPA to encompass both voice calls and text calls or text messaging.  *See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.Rcd. 14014, 14115 (July 3, 2003).  Federal courts up to and including the Supreme Court have endorsed the FCC's regulation that the TCPA applies to text messages.  *See, e.g., Campbell-Ewald v. Gomez*, 577 U.S. 153, 156 (2016).

26.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

27.     A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

28.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provide a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

29.     Defendant repeatedly violated this rule by placing telephone solicitations to telephone numbers on the National Do-Not-Call registry, including Plaintiff's number.

30.     For violations of 47 C.F.R. § 64.1200(c), Plaintiff is entitled to $500 per text message.

31.     Plaintiff is entitled to $1,500 per text message if Defendant's actions are found to be knowing or willful.

32.     Plaintiff has suffered concrete harm because of Defendant's unwanted and unsolicited telemarketing text messages, including, but not limited to:

- Device storage;

- Data usage;

- Lost time tending to and responding to the unsolicited text messages;

- Invasion of Privacy; and

- Nuisance.

5

33.     These forms of actual injury are sufficient for Article III standing purposes.

## VIOLATIONS OF TEXAS STATE LAW

34.     Pursuant to § 305.053(a) of the Texas Business & Commerce Code, a person who receives a communication that violates 47 U.S.C. § 227, or a regulation adopted under that provision, may bring an action against the person who originates the communication for an injunction, damages or both.

35.     As set forth above, Defendant violated 47 U.S.C. § 227 and regulations adopted under that provision.

36.     Accordingly, Plaintiff is entitled to a permanent injunction, and the greater of $500.00 for each violation or her actual damages for each call made by Defendant. *See* Tex. Bus. & Com. Code § 305.053(b).

37.     Plaintiff is entitled to an additional $1500 per call if Defendant's actions are found to be knowing or intentional. *See* Tex. Bus. & Com. Code § 305.053(c).

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of the "DNC Class" and "Texas Class" (together, "the Classes") as defined as follows:

> Plaintiff and all persons within the United States (1) to whose telephone number Defendant placed (or had placed on its behalf) two or more text messages, (2) from four years prior to the filing of the Compliant to the date of certification, (3) for the purpose of encouraging the purchase of Defendant's services (4) in a 12-month period (5) when the telephone number to which the text messages were sent was on the National Do-Not-Call Registry at the time of the messages.
>
> (the "DNC Class")
>
> Plaintiff and all residents of the State of Texas (1) to whose telephone number Defendant placed (or had placed on its behalf) a text message (2) in violation of 47 U.S.C. § 227 and the regulations found at 47 C.F.R. § 64.1200, (3) from four years prior to the filing of the Compliant to the date of certification.

(the "Texas Class")

39.     Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

40.     The Members of the Classes for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

41.     The exact number and identities of the persons who fit within the Classes are ascertainable in that Defendant and third parties maintain written and electronically stored data showing:

a.  The time period(s) during which Defendant placed its text messages;

b.  The telephone numbers to which Defendant placed its text messages;

c.  The telephone numbers for which Defendant had prior express written consent;

d.  The purposes of such text messages;

e.  The names and addresses of Class members.

42.     The Classes are comprised of hundreds, if not thousands, of individuals nationwide.

43.     There are common questions of law and fact affecting the rights of the Members of the Classes, including, *inter alia*, the following:

a.  Whether Defendant sends telemarketing text messages or has them sent on its behalf;

b.  Whether Defendant obtains prior express written consent;

    c.   Whether Defendant or the entity with which it contracts to send its messages sends solicitation text messages to telephone numbers registered on the National Do-Not-Call Registry;

    d.   Whether Plaintiff and the Classes were damaged thereby, and the extent of damages for such violations; and

    e.   Whether Defendant should be enjoined from engaging in such conduct in the future.

44.    Plaintiff is a member of the Classes in that Defendant placed two or more texts for telemarketing purposes in a one-year period to her telephone number when her telephone number was on the National Do-Not-Call Registry.

45.    Plaintiff's claims are typical of the claims of the Members of the Classes in that they arise from Defendant's uniform conduct and are based on the same legal theories as these claims.

46.    Plaintiff and all putative Members of the Classes have also necessarily suffered concrete harm in addition to statutory damages, as all Members of the Classes spent time tending to Defendant's unwanted text messages, lost space on their devices, and suffered a nuisance and an invasion of their privacy.

47.    Plaintiff has no interests antagonistic to, or in conflict with, the Classes.

48.    Plaintiff will thoroughly and adequately protect the interests of the Classes, having retained qualified and competent legal counsel to represent themselves and the Classes.

49.    Defendant has acted and refused to act on grounds generally applicable to the Classes, thereby making injunctive and declaratory relief appropriate for the Classes.

50.     The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

51.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

52.     Common questions will predominate, and there will be no unusual manageability issues.

**FIRST CAUSE OF ACTION**
**Violations of the TCPA, 47 U.S.C. § 227(c)**
**(On Behalf of Plaintiff and DNC Class)**

53.     Plaintiff and the proposed DNC Class incorporate the foregoing allegations as if fully set forth herein.

54.     Defendant sent, or had sent on its behalf, text messages constituting telephone solicitations to Plaintiff's and DNC Class Members' telephone numbers.

55.     Plaintiff's and DNC Class Members' telephone numbers were all on the National Do-Not-Call Registry at the time of the text messages.

56.     Plaintiff and DNC Class Members each received two or more such text messages in a 12-month period.

57.     Plaintiff and DNC Class Members are entitled to an award of $500 in statutory damages for each text message pursuant to 47 U.S.C. § 227(c)(5).

58.     Plaintiff and DNC Class Members are entitled to an award of treble damages in an amount up to $1,500 for each text message made knowingly and/or willfully, pursuant to 47 U.S.C. § 227(c)(5).

## SECOND CAUSE OF ACTION
### Violations of Texas § 305.053 Class

59.     Plaintiff and the proposed Texas Class incorporate the foregoing allegations as if fully set forth herein.

60.     Defendant placed, or had placed on its behalf, telemarketing telephone text messages to Plaintiff and Texas  Class Members' telephone numbers.

61.     Each of these calls violated 47 U.S.C. § 227(c).

62.     Further, Defendant placed calls for the purpose of making a sale to Plaintiff and Texas Class Members' telephone numbers without their consent.

63.     Plaintiff and Texas Class Members are entitled to:

    a.  a permanent injunction to prevent any further violations of the Texas Business & Commerce Code, Chapter 305;

    b.  the greater of $500 for each violation or Plaintiff's and Texas Class Members' actual damages (*see* Tex. Bus. & Com. Code §304.053(b));

    **c.**  the greater of $1,500 for each violation or Plaintiff's and Texas Class Members' actual damages for each call made knowingly or intentionally (*see* Tex. Bus. & Com. Code §304.053(c)).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A.     An order certifying the Classes as defined above, appointing Plaintiff as the representative of the Classes and appointing their counsel as Class Counsel;

10

B.      An order declaring that Defendant's actions, as set out above, violate 47 U.S.C. § 227(c);

C.      An order declaring that Defendant's actions, as set out above, violate 47 C.F.R. 64.1200(c)(2);

D.      An award of injunctive and other equitable relief as necessary to protect the interests of the Classes, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

E.      An award of statutory damages;

F.      An award of treble damages;

G.      An award of reasonable attorneys' fees and costs; and

H.      Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

**Dated:** December 16, 2022

By:     */s/ Chris R. Miltenberger*
        Chris R. Miltenberger
        Texas Bar Number: 14171200

        **The Law Office of Chris R. Miltenberger, PLLC**
        1360 N. White Chapel, Suite 200
        Southlake, Texas 76092
        Tel: (817) 416-5060
        Fax: (817) 416-5062
        chris@crmlawpractice.com

        Eric H. Weitz, Esquire
        Max S. Morgan, Esquire
        **THE WEITZ FIRM, LLC**
        1515 Market Street, #1100
        Philadelphia, PA 19102
        Tel: (267) 587-6240
        Fax: (215) 689-0875
        eric.weitz@theweitzfirm.com

11

max.morgan@theweitzfirm.com
(*Pro Hac Vice* to be filed)

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the above and foregoing was filed electronically with the Court.  No Defendant has appeared.

By:     */s/ Chris R. Miltenberger*
              Chris R. Miltenberger

# TAB 6



**CLASS-ACTION COMPLAINT**

COME NOW Plaintiff, **Kelly Pinn** ("Plaintiff", "Pinn" or "Ms. Pinn") individually and on behalf of all others similarly situated, through her counsel, and for her Class Action Complaint against Defendant **Togetherhealth Insurance, LLC** ("THI" or "Defendant"), states as follows:

**BACKGROUND**

1.      In 1991, Congress enacted the Telephone Consumer Protection Act ("TCPA") to protect consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing phone calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

2.      The TCPA affords special protections for people who register their cell phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their cell phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of $500 per call, and potentially $1,500 per call if the calling party is determined to have willfully violated the TCPA. *See* 47 U.S.C. § 227(c) *et seq.*

1

3. From January 2022 until October 2022 alone, approximately 41.3 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com (last visited November 10, 2022). The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

4. Plaintiff Kelly Pinn brings this case to protect the privacy rights of herself and a class of similarly situated people who were improperly called on their cell phones by THI despite registering their numbers on the National Do Not Call Registry.

## PARTIES, JURISDICTION AND VENUE

5. Plaintiff Kelly Pinn is an individual who all times relevant to this Complaint resided in Irving, Texas.

6. Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

7. Defendant THI is a Florida limited liability company, which maintains its headquarters or a primary office at 3450 Buschwood Park Drive, Tampa, Florida 33618.

8. THI is a "person" as defined by 47 U.S.C. § 153(39).

9. THI's website describes itself as a company that provides "access to trusted Medicare carries with a focus on customer service that brings clarity to the complex Medicare system."

10.     THI's action as described in this Complaint were carried out through its agents, employees, officers, members, directors, and/or principals.

11.     This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

12.     THI regularly transacts business in the State of Texas.

13.     THI also knowingly and purposefully availed itself to the State of Texas when it placed calls to Pinn on her "817" area code cell phone, which is associated with Metropolitan Dallas, in the State of Texas.

14.     Pinn received the calls from THI, and experienced the resulting injuries and harms, while within this District.

15.     Accordingly, personal jurisdiction exists and venue is proper.

16.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

17.     At all times relevant to this action, Pinn owned a cell phone, the number for which is 817-XXX-2161

18.     Plaintiff used her cell phone for primarily residential purposes, such as speaking with friends and family.

19.     The phone number for that cell phone is registered to Ms. Pinn as an individual, rather than a business.

20.     Plaintiff sought to protect her right to be left alone from telemarketing calls by registering her cell phone number on the Federal Trade Commission's Do Not Call Registry on or around February 9, 2009.

21.     At no point did Ms. Pinn provide express written consent for THI to place telemarketing calls to her cell phone.

22.     Prior to THI's telemarketing campaign Pinn never expressed interest in Medicare benefit plans.

23.     On various instances in the May of 2022, THI called in connection with its efforts to sell Medicare benefits.

24.     Those calls were placed to Plaintiff on May 11, 2022, May 19, 2022 and May 26, 2022.  Information about those calls follows in the chart below:

| Date/Time | Number on Caller ID |
|---|---|
| 5/11/2022 at 3:05 pm CST | (830) 256-9984 |
| 5/19/2022 at 4:54 pm CST | (737) 276-5028 |
| 5/26/2022 at 9:37 am CST | (325) 246-0153 |

25.     Pinn believes she received additional calls from THI beyond those identified in the chart above.

26.     Ms. Pinn found the unconsented telephone calls to be irritating, annoying, disruptive and to be an invasion of her privacy.

**CLASS ACTION ALLEGATIONS**

27.     Pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(2) and 23(b)(3), Plaintiff brings this lawsuit as a class action on behalf of herself and on behalf of others similarly

situated. This action satisfies the requirements of numerosity, commonality, adequacy of representation and predominance. Only to the extent it is a requirement under applicable law, the proposed class satisfies the elements of ascertainability and typicality.

28. The proposed class that Plaintiff seek to represent is tentatively defined as follows:

> From four years prior to the filing of this suit until the date a class is certified, all persons in the United States who: (1) received more than one telephone call or text message from TogetherHealth Insurance, LLC (or someone acting on its behalf) during a 12 month period; and, (2) were registered on the Do Not Call Registry for more than 30 days at the time the calls were received; (3) where the number is registered to an individual rather than a business.

29. Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

30. The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The names and phone numbers of the members of the proposed class are readily identifiable through records available to THI.

31. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

32. On information and belief, THI has called and continues to call people who are registered on the Do Not Call Registry to solicit insurance policies. It is reasonable to expect that THI will continue to make such calls absent this lawsuit.

33. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to, whether THI called phone numbers that were registered on the Do Not Call Registry, whether the calls were "solicitations"

as defined by the TCPA, whether THI had sound practices of procuring valid consent before making such calls.

34.     Only to the extent required by law, Plaintiff's claims are typical of the claims of the proposed class members because Plaintiff's claim arose from the same practice that give rise to the claims of the members of the proposed class and is based on the same legal theories. Plaintiff is not different in any relevant matter from members of the proposed class.

35.      Plaintiff and her counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiff's interests do not conflict with the interests of the proposed class he seeks to represent. Plaintiff has retained lawyers who are competent and experienced in class action, TCPA litigation and consumer law. Plaintiff's counsel has the resources to litigate this class action, and Plaintiff and counsel are aware of their responsibilities to the putative members of the class and will discharge those duties. Plaintiff reserves the right to join other unnamed class members into this lawsuit.

36.     A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

37.     In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

38.     Questions of law and fact, particularly the propriety of calling cell phone numbers registered on the National Do Not Call Registry in order to solicit insurance policies, predominate over questions affecting only individual members.

39.     THI has acted or refused to act on grounds that apply generally to the class, so final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## COUNT I
## VIOLATIONS OF 47 U.S.C. § 227(c)(5) OF THE
## TELEPHONE CONSUMER Protection Act ("TCPA")

40.     Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this count.

41.     The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receives more than one call on their cell phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

42.     The penalty for each call placed in violation of the TCPA's restrictions on calling cell phone numbers registered on the National Do Not Call Registry is $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

43.     In addition, the TCPA allows the Court to enjoin THI's violations of the TCPA's regulations prohibiting calls to cell phone numbers registered on the National Do Not Call

Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

44.     By making calls to the cell phones of Plaintiff and the putative class members after the numbers were registered on the National Do Not Call Registry, THI violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

45.     THI knew or should have known that the putative class members had their numbers registered on the Do Not Call Registry.

46.     Plaintiff and the putative class members are entitled to damages of $500.00 per call made by or on behalf of THI and up to $1,500.00 per call if the Court finds that THI willfully violated the TCPA.

47.     Plaintiff and the putative class members are entitled to an order from the Court enjoining THI from violating the TCPA's regulations that prohibit calls to cell phone numbers registered on the Do Not Call Registry.

### Demand for Judgment

WHEREFORE Plaintiff, Kelly Pinn individually, and on behalf of all others similarly situated, requests the Court grant the following relief:

a.     Enter an order against THI Services, LLC, pursuant to Federal Rule of Civil Procedure Rule 23, certifying this action as a class action and appointing Plaintiff, Kelly Pinn as representative of the class;

b.     Enter an order appointing Kimmel & Silverman, P.C. as counsel for the class;

c.     Enter judgment in favor of Plaintiff and the putative class members for all damages available under the TCPA, including statutory damages of $500 per violation, or up to $1,500 per violation if THI willfully violated the TCPA;

d.      Enter judgment in favor of Plaintiff and the putative class members that enjoins THI from violating the TCPA's regulations by calling cell phone numbers registered on the Do Not Call Registry;

e.      Award Plaintiff and the class all expenses of this action, and requiring defendant to pay the costs and expenses of class notice and claims administration; and,

f.      Award Plaintiff and the class such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff, Kelly Pinn demands a jury trial in this case.

Respectfully submitted,

*/s/ Jacob U. Ginsburg*
Jacob U. Ginsburg, Esq.
Kimmel & Silverman, P.C.
30 East Butler Ave.
Ambler, PA 19002
Phone: (215) 540-8888 ext. 104
Direct: (267) 468-5374
Facsimile: (877) 788-2864
Email: jginsburg@creditlaw.com
teamkimmel@creditlaw.com

Dated: February 3, 2023

# TAB 7

# UNITED STATES DISTRICT COURT
## NOTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| KELLY PINN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. |
| | § | |
| VEHICLE PROTECTION | § | |
| SPECIALISTS, LLC and | § | |
| CARGUARD ADMINISTRATION, INC. | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

COMES NOW Plaintiff, Kelly Pinn, individually, and on behalf of all others similarly situated, ("Plaintiff" or "Ms. Pinn"), through her counsel, files this Complaint against Defendants Vehicle Protection Services, LLC ("VPS") and CarGuard Administration, Inc. (hereinafter referred to as "CarGuard") (collectively "Defendants") states:

### Introduction

1.     Plaintiff's Complaint is based on the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227 *et seq.* and Tex. Bus.& Com. Code § 302.101 *se seq.*

2.     In 1991, President George H.W. Bush signed into law the TCPA, which was passed in a bi-partisan manner, to protect consumers' privacy rights. Specifically, the right to be left alone from unwanted telemarketing calls.

3.     A leading sponsor of the TCPA described telemarketing "robocalls" the "scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

1

4. The TCPA, through the accompanying Code of Federal Regulations, 47 C.F.R. § 64.1200 *et seq.,* affords special protections for people who registered their phone numbers on the National Do Not Call Registry.

5. Where a consumer's phone number is registered on the Do Not Call registry, the TCPA requires that telemarketers provide clear and conspicuous notice to the consumer that it will be making telemarketing calls for solicitation or advertising purposes, and requires that the consumer provide express written consumer.

6. Section 227(c)(5) of the TCPA provides that each person who receives more than one call within a 12-month period on their  phone, where that person did not provide express written consent upon a clear and conspicuous disclosure from the telemarketer, after the phone number was registered on the National Do Not Call Registry for more than 31 days is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated.

7. Furthermore, § 302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

## The Parties

8. Plaintiff Kelly Pinn is an adult citizen who all times relevant to this Complaint resided in in Irving, Texas.

9. Defendant VPS is a California corporation, which maintains its headquarters at 300 Spectrum Center Dr Suite 400, Irvine, CA 92618

2

10. VPS is a telemarketing company that sells extended warranty services to consumers.

11. VPS transacts business in Texas and throughout the United States.

12. CarGuard is a corporation with its principal place of business, head office, or otherwise valid mailing address at 4901 West 136th Street, Leawood, Kansas 66224.

13. CarGuard is a nationwide administrator of automotive extended protection plans to consumers, include those sold by telemarketers.

14. Defendant Carguard is a "person" as that term is defined by 47 U.S.C. § 153(39).

## Jurisdiction and Venue

15. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

17. Defendant continuously and systematically transacts business in the State of Texas.

18. Defendant placed calls to Plaintiff on her cell phone with an "817" area code, which is a Texas area code associated with the Dallas-Fort Worth region.

19. Defendants' phone calls attempted to solicit business from Plaintiff.

20. Furthermore, after Plaintiff ordered a warranty service plan for investigative purposes, VPS and CarGuard delivered a CarGuard warranty service plan to Plaintiff at her Texas address.

21.     Plaintiff received the unwanted telemarketing calls while residing in the State of Texas.

22.     At all times relevant hereto, Plaintiff resided in Dallas County, which is within this District.

23.     Plaintiff experienced the harm associated with Defendant's irritating and invasive telemarketing calls while she was in this District.

24.     For the foregoing reasons, personal jurisdiction exists and venue is proper, pursuant to 28 U.S.C. § 1391(b)(2).

**Statement of Relevant Facts**

25.     At all times relevant to this Complaint, Ms. Pinn owned a cell phone, the number for which was 817-XXX-2161.

26.     Ms. Pinn used that cell phone primarily for residential purposes.

27.     Ms. Pinn registered her cell phone number on the National Do Not Call Registry on or around February 9, 2009.

28.     Ms. Pinn registered her cell phone number on the National Do Not Call Registry to obtain solitude from unwanted and invasive telemarketing calls.

29.     Defendant VPS is a national telemarketing company that sells extended warranties for various automobile warranty administrators such as CarGuard.

30.     VPS markets CarGuard  products and services, in part, through placing telephone calls to prospective customers' cellular and landline phones.

4

31.     Before VPS began placing telemarketing calls to Pinn's cell phone, VPS did not present a clear and conspicuous disclosure to Ms. Pinn that it would make telemarketing calls to her on behalf of CarGuard.

32.     Likewise, Ms. Pinn did not provide consent for VPS or CarGuard to place such telemarketing calls

33.     Ms. Pinn had no prior business relationship with VPS or CarGuard.

34.     Ms. Pinn was not in the market for extended warranty plans and had not consented to receive calls from telemarketers selling same.

35.     Prior to the solicitation calls at issue, Ms. Pinn never inquired of VPS about any products or services.

36.     Despite the foregoing, VPS placed invasive and irritating telemarketing calls Ms. Pinn's cell phone on multiple occasions in furtherance of its efforts to sell CarGuard extended warranty plans for her vehicle.

37.     Those calls were made on instances including but not limited to:

- April 15, 2021 at 10:32 am CST; and

- May 25, 2021 at 5:35 pm CST.

38.     After those two unlawful calls, for investigative purposes, Ms. Pinn purchased a CarGuard extended warranty plan from VPS to ascertain the identity of the company placing unsolicited telemarketing calls.

39.     VPS mailed to her that CarGuard warranty plan.  A true and correct copy of the application page of that plan is attached as Exhibit "A."[1]

---

[1] The Plaintiff's last name on the warranty plan appears as "Robinson" - which is her maiden name.

40.     Plaintiff was annoyed, irritated, upset and experienced a sense that her privacy was violated by Defendant as a result of receiving multiple unwanted and unsolicited phone calls after she had long been registered on the National Do Not Call Registry.

41.     Furthermore, an online search through the Texas Secretary of State's website at https://direct.sos.state.tx.us/telephone/TelephoneSearch.asp, has confirmed that VPS and CarGuard were not registered to engage in telephone solicitation within the State of Texas, despite the legal obligation to do so during the relevant time period.

**Direct and Vicarious Liability**

42.     To the extent CarGuard outsourced its unlawful telemarketing to VPS, CarGuard is still liable for calls that violate the TCPA.

43.     On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

> May 2013 FCC Ruling, 28 FCC Rcd at 6588 (internal citations omitted).

6

44.     Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. Id. At 6587 n. 107.

45.     The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." Id. At 6593.

46.     CarGuard hired, permitted, and enjoyed the benefits of VPS's unlawful robocalling and telemarketing.

47.     CarGuard had a contract with VPS where it had the ability to substantially control VPS' marketing activities.

48.     VPS had the ability to bind CarGuard in contractual relationships.

49.     CarGuard provided VPS with scripts and marketing materials.

50.     CarGuard had reason to know VPS was violating the TCPA and nonetheless accepted leads from VPS that were non-compliant with the TCPA.  Accordingly, CarGuard ratified VPS' violations.

51.     CarGuard acted as a principal to VPS, who acted as CarGuard's agent.

52.     CarGuard is not permitted under the law to outsource and contract its way out of liability by directing and benefitting from VPS's unlawful calls.

53.     For the counts identified below, Defendant VPS is directly liable as the party that caused the unlawful calls to be placed.

54.     For the counts identified below, CarGuard is vicariously liable for the unlawful calls, as they contracted with VPS, benefitted from VPS's unlawful calls and ratified VPS's violative conduct.

### Count I - Violations of the Telephone Consumer Protection Act ("TCPA")
### 47 U.S.C. § 227(c)(5)

55.     Pinn incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

56.     The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one solicitation call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

57.     The penalty for each call made in violation of the TCPA's restrictions on placing telemarketing calls to numbers registered on the National Do Not Call Registry is $500 per violation and up to $1,500 per violation if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

58.     In addition, the TCPA allows the Court to enjoin Defendants' violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do Not Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

59.     VPS knew or should have known that Ms. Pinn's numbers registered on the Do Not Call Registry.

60.     Pinn is entitled to damages of $500.00 per violation for each call placed by VPS and up to $1,500.00 per violation if the Court finds that VPS willfully violated the TCPA.

## Count II – Violations of § 302.101 et seq. of
## The Texas Business & Commercial Code

61.     Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this count.

62.     Pinn received solicitation calls from VPS while located in Texas on her phone with a Texas area code.

63.     Section 302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

64.     VPS violated § 302.101 of the Texas Business & Commercial Code when it engaged in telephone solicitation toward Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

65.     §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5,000 for each violation. Furthermore, §302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney fees.

66.     Pinn is entitled to damages of $5,000.00 per violation for each call unlawful call, as well as attorneys' fees and costs.

9

## DEMAND FOR JUDGMENT

WHEREFORE Plaintiff, Kelly Pinn respectfully prays for judgment as follows:

a.    Statutory damages of $500.00 per text/call (as provided under 47 U.S.C. § 227(c)(5)(B));

b.    Additional treble damages of $1,500.00 per text/call (as provided under 47 U.S.C. § 227(c)(5)(C);

c.    Statutory damages of $5,000 per violation (as provided under §302.302(a) of the Texas Business & Commerce Code );

d.    All reasonable attorneys' fees, witness fees, court costs and other litigation costs incurred by Plaintiff pursuant to. §302.302(a) of the Texas Business & Commerce Code

e.    Injunctive relief (as provided under 47 U.S.C. § 227(c); and

f.    Any other relief this Honorable Court deems appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff, Kelly Pinn demands a jury trial in this case.

Respectfully submitted,

Dated: April 13, 2023          By: /s/ *Jacob U. Ginsburg*
                                    Jacob U. Ginsburg, Esq.
                                    Kimmel & Silverman, P.C.
                                    30 East Butler Pike
                                    Ambler, PA 19002
                                    (267) 468-5374
                                    Facsimile: (877) 788-2864
                                    Email:jginsburg@creditlaw.com

teamkimmel@creditlaw.com

Christopher E. Roberts
Butsch Roberts & Associates LLC
231 S. Bemiston Ave., Suite 260
Clayton, MO 63105
Tel: (314) 863-5700
Fax: (314) 863-5711
roberts@butschroberts.com

# TAB 8

Ryan L. McBride, Esq. (SBN 297557)
Kazerouni Law Group, APC
301 E. Bethany Home Road, Suite C-195
Phoenix, AZ 85012
(602) 900-1288
ryan@kazlg.com
*Attorneys for Plaintiff*

Jacob U. Ginsburg, Esq. (*pro hac vice* anticipated)
Kimmel & Silverman, P.C.
30 E. Butler Ave.
Ambler, PA 19002
(267) 468-5374
jginsburg@creditlaw.com
teamkimmel@creditlaw.com
*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Kelly Pinn,** *on behalf of herself and all others similarly situated* ) ) ) | **Case No.: 3:23-cv-03869** |
| *Plaintiff,* ) ) | |
| v. ) ) | **CLASS ACTION** |
| **Ethos Technologies Inc. d/b/a Ethos Life Insurance Services,** ) ) ) | **VIOLATION OF THE TELEPHONE CONSUMER PROTECTION ACT** |
| *Defendant.* ) ) ) | **Jury Trial Demanded** |

## CLASS-ACTION COMPLAINT

Plaintiff, Kelly Pinn (hereinafter referred to as "Plaintiff" or "Pinn")

individually, and on behalf of all others similarly situated, brings this action

- 1 -

against Ethos Technology, Inc. d/b/a Ethos Life (hereinafter referred to as "Ethos" or "Defendant") for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* In support of this Complaint, Plaintiff asserts as follows:

## BACKGROUND:
## TELEMARKETING AND THE TCPA

1.      In 1991, Congress enacted the Telephone Consumer Protection Act ("TCPA") to protect consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as the "scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

2.      The TCPA also affords special protections for people who registered their phone numbers on the National Do Not Call Registry and nonetheless received telemarketing calls for which they did not expressly consent.

3.      In 2019, the FTC received over 5.4 million complaints from US residents about unwanted calls. FTC: *What Do Not Call Complaints are telling us* (Oct. 17, 2019), *available* at https://www.consumer.ftc.gov/blog/2019/10/what-do-not-call-complaints-are-telling-us.

4.      The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties

CLASS-ACTION COMPLAINT

against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, (March 28, 2019) available at: https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

### THE PARTIES

5.      Pinn is a natural person and adult, who at all times relevant hereto, resided in Irving, Texas 75039.

6.      Ethos is a life insurance company that, *inter alia*, sell its insurance policies remotely to prospective consumers.

7.      Ethos maintains its principal place of business, head office, or otherwise valid mailing address at 460 Bryant St., FL. 3, San Francisco California 94107.

8.      At all times relevant hereto, Defendant acted through its agent employees, vendors and representatives, including Junaid Syed.

9.      Plaintiff brings this Action in her individual capacity and on behalf of all other persons on who registered their residential phone numbers[1] on the Do Not Call registry seeking damages and any other available legal or equitable

---

[1] Both a wireline and wireless phone registered on the do-not-call registry is presumed to be "residential." *Chennette v. Porch.Com, Inc.*, 50 F.4th 1217 (9th Cir. 2022).

CLASS-ACTION COMPLAINT

remedies resulting from the unlawful calls or messages from Junaid Syed of Ethos Technologies Inc. within the last four years of filing this complaint and all other unlawful actions of Defendant in negligently, knowingly, and/or willfully contacting Plaintiff and other Class member on their cellular telephone in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. and related regulations specifically the National Do-Not-Call provisions.

## JURISDICTION AND VENUE

10.     This Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which grants this Court original jurisdiction of all civil actions arising under the laws of the United States.

11.     Furthermore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class are in excess of $5,000,000.00, exclusive of interests and costs.

12.     This Court has personal jurisdiction over Defendant, as it maintains its headquarters in the State of California.

13.     Furthermore, Defendant does business and maintains its headquarters within this District.

14.     Accordingly, personal jurisdiction exists and this venue is proper pursuant to 28 U.S.C. §1391(b)(1).

CLASS-ACTION COMPLAINT

## FACTUAL BACKGROUND

15.     At all times relevant hereto, Pinn was the owner of a cell phone, the number for which was (817) XXX-2161.

16.     The aforementioned cell phone was used by Pinn for primarily residential purposes, such as speaking with friends and family.

17.     The subject phone was registered to Pinn personally, and not to a business.

18.     Pinn pays her cell phone bill each month without contribution from her employer.

19.     Pinn registered her phone number on the National Do Not Call Registry on February 09, 2009 in order to obtain solitude from invasive and irritating solicitation calls.

20.     For purposes of background, Pinn is in her 40's and has never been in the market for "final expense" insurance or shopping for funeral related services.

21.     Ms. Pinn began receiving calls on behalf of Ethos beginning in or around October 2022, which were made for the purpose of soliciting "final expense" benefits plans for funerals.

22. At no point did Ms. Pinn express interest in procuring "final expense" insurance prior to the telemarketing campaign.

23. Each of those calls began with a party describing "senior benefits".

24. Having become wise to the opaque nature of the telemarketing industry, Pinn has learned the only way to ascertain the true identities of telemarketers is to feign interest in the products or services being sold.

25. After receiving many calls for "senior benefits" in the Fall of 2022, in order to ascertain the identity/identities of the calling party/parties, Pinn stayed on the line and feigned interest in Ethos' services, despite the morbid nature of what was being sold (burial insurance).

| Date/time | Caller ID: |
|---|---|
| October 28, 2022 at 4:37 pm CST | 726-201-0897 |
| October 28, 2022 at 4:54 pm CST | 737-284-0966 |
| November 1, 2022 at 7:57 pm CST | 817-557-6156 |
| November 2, 2022 at 6:35 pm CST | 601-514-7945 |

26. During the calls on October 28, 2022, the calling party stated he was offering "senior benefits" and asked about Pinn's interest in burial insurance. When the calling party declined to identify the proper corporate name of his employer, Pinn told him not to call back.

27.     Nonetheless, on November 1, 2022, Pinn received another call offering "senior benefits" such as burial insurance.  The pitch of the services was almost identical to the prior "senior benefit" calls on October 28, 2022.

28.     Rather than another futile request for Defendant to identify itself, Pinn stayed on the line and feigned interest in the burial insurance and other "senior benefit" plans being offered.

29.     Pinn was then transferred to another agent working for Defendant.

30.     The agent for the calling party disclosed his name was Junaid Syed, working for Ethos Life Insurance. Pinn then received a confirming email from Junaid Syed of Ethos. Mr. Syed's confirming email from his Ethos account, agents@ethoslife.com.  A copied image from that email is below:

From: **Junaid Syed via Ethos Life**
<agents@ethoslife.com>Date: Tue, Nov 1, 2022 at
8:06 PM
Subject: Your life insurance quote from
EthosTo: <kelchel516@gmail.com>

CLASS-ACTION COMPLAINT

## ETHOS

# Ethos has partnered with Ethos toprotect the ones you love.

Junaid Syed has invited you to apply with Ethos to protect you and your family. Based on the information provided, the following coverage optionwas created to fit your needs.

31.     On November 2, 2022, Ethos called Pinn again.

32.     Briefly after the call began, however, the Ethos agent informed Pinn he realized she had already spoken with Junaid Syed.

33.     Accordingly, it is clear Ethos had record of the call the day before in its computer system.

34.     Defendant's telephone calls were not made for "emergency purposes" but for telemarketing purposes.

35.     Each call was made for the purpose of soliciting senior benefit insurance policies.

36.     None of the calls were made with express written consent or an established business relationship.

CLASS-ACTION COMPLAINT

37.    Plaintiff found Defendant's repeated calls annoying, frustrating, upsetting, harassing, and an invasion of her privacy.

**Class Allegations**

38.    Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated who registered their phone numbers on the Do Not Call registry and received unlawful calls from Ethos Technologies Inc. within the last four years of filing this complaint.

39.     This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. commonality, typicality, and adequacy of representation.

40.    Accordingly, Defendant placed a high volume of calls to numbers listed on the Do Not Call Registry without consent or an existing business relationship.

41.    Plaintiff seeks to represent the following classes:

**227(c) Class:**  For the period from four years prior to the filing of this suit until the date a class is certified, all persons in the United States who: (1) subscribe to cellular telephones; (2) received more than one telephone call or text message from during a 12-month period; and (3) whose phone numbers were listed on the Do Not Call Registry for more than 31 days at the time the calls were received.

42.     Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

43.     The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The names and phone numbers of the numbers of the proposed class are readily identifiable through records available to Defendant.

44.     Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

45.     Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members.  The questions of law and fact common to the proposed class include, but are not limited to, whether Defendant's agents called phone numbers that were registered on the Do Not Call Registry and whether such calls violate the TCPA.

46.     Plaintiff's claims are typical of the claims of the proposed class members because their claims arise from the same practice that gives rise to the claims of the members of the proposed class and is based on the same legal theories.

CLASS-ACTION COMPLAINT

47.   Plaintiff and her counsel will fairly and adequately protect the interests of the members of the proposed class.  Plaintiff's interests do not conflict with the interests of the proposed class he seeks to represent.  Plaintiff has retained lawyers who are competent and experienced in class action, TCPA litigation and consumer law.  Plaintiff's counsel has the resources to litigate this class action, and Plaintiff and counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.  Plaintiff reserves the right to join other unnamed class members into this lawsuit.

48.   A class action is superior to all individual lawsuits for this controversy.  Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible.  The size of the individual claims is likely not large enough to justify filing a separate action for each claim.  For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery.  Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts.  Individual litigation could also result in inconsistent adjudications.

49.   In contrast to numerous individual claims, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy

CLASS-ACTION COMPLAINT

of scale and unitary adjudication resulting from supervision of the litigation by a single court.

50.    Questions of law and fact, particularly the propriety of calling cell phone numbers registered on the National Do Not Call Registry, predominate over questions affecting only individual members.

51.    Defendant has acted or refused to act in accordance with the relief sought by these classes, so final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## COUNT I
## DEFENDANT VIOLATED THE TCPA 47 U.S.C. §227(c)(5)

52.    Plaintiff incorporates the forgoing paragraphs as though the same were set forth at length herein.

53.    The TCPA provides that it is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one call on their cell phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

54.    The penalty for each call placed in violation of the TCPA's restrictions on calling cell phone numbers registered on the National Do Not Call Registry is $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. §§ 227(c)(5).

55.   In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting calls to cell phone numbers registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5)(A).

56.   Where Defendant placed calls to the residential phones of Plaintiff and the putative class members after their numbers were registered on the National Do Not Call Registry, Defendant violated the TCPA, including but not limited to, 47 U.S.C. § 227(c)(5) and the TCPA's corresponding regulations.

57.   Defendant knew or should have known that Plaintiff and the putative class members had their numbers registered on the Do Not Call Registry.

58.   Defendant did not obtain valid express written consent from the called parties.

59.   Plaintiff and putative class members are entitled to damages of $500.00 per violation for each call and up to $1,500.00 per violation if the Court finds that Defendant willfully violated the TCPA.

WHEREFORE Plaintiff Kelly Pinn, individually and on behalf of all others similarly situated, requests the Court grant the following relief:

a.   Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23 *et seq*., certifying this action as a class action and appointing Kelly Pinn as the class representative;

b.   Enter an order appointing Kimmel & Silverman as counsel for the class;

CLASS-ACTION COMPLAINT

c.  Enter judgment in favor of Plaintiff and the putative class for all damages available under the TCPA, including statutory damages of $500 per violation, or up to $1,500 per violation if Defendant willfully violated section 227(c)(5) of the TCPA;

d.  Enter a judgment in favor of Plaintiff and the putative class that enjoins Defendant from violating the TCPA's regulations prohibiting Defendant from calling numbers registered on the National Do Not Call Registry;

e.  Award Plaintiff and the class all expenses of this action, and requiring Defendant to pay the costs and expenses of class notice and administration; and

f.  Award Plaintiff and the class members all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees; and

g.  Award Plaintiff and the class such further and other relief the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

PLEASE TAKE NOTICE that Plaintiff, KELLY PINN, and all other similarly situated demand a jury trial in this case.

Respectfully submitted,

Dated: August 2, 2023.          By: */s/ Ryan L. McBride*
                                Ryan L. McBride, Esq.
                                Attorneys for Plaintiff

- 14 -

CLASS-ACTION COMPLAINT

# TAB 9

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **KELLY PINN**, *on behalf of herself and others similarly situated,* | Case No.: 8:23-CV-02927 |
| *Plaintiff,* | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| **LIVE CALLS NETWORK, LLC**, | |
| *Defendant*. | |

### Nature of this Action

1.      This action arises out of Defendant, Live Calls Network, LLC's ("LCN" or "Defendant") relentless marketing practices that violate the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA").

2.      LCN makes aggressive unsolicited telemarketing calls soliciting individuals in need of legal services so that LCN can sell the leads to third parties.

3.      These calls are made to individuals on the National Do-Not-Call Registry.

4.      LCN continues to make these calls even after the called party requests that LCN cease calling.

5.      The TCPA prohibits making telemarketing calls to individuals who have registered their telephone numbers on the National Do-Not-Call Registry.

6.      The TCPA also prohibits making telemarketing calls to a person who, like Ms. Pinn, has previously asked not to receive such calls and makes sellers like LCN for calls in violation of the TCPA's internal do-not-call rules.

7.      Accordingly, Plaintiff Kelly Pinn ("Plaintiff" or "Ms. Pinn") brings this action on behalf of herself and classes of similarly situated individuals.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the TCPA, which is a federal statute.

9.      This Court has jurisdiction over LCN because LCN resides in this District, conducts business transactions in this District and made calls from this District as part of the business it conducts in this District.

10.     Venue is proper in this District because LCN is located in this District and because some of the wrongful conduct giving rise to this case occurred in and/or emanated from this District.

## Parties

11.     Plaintiff Kelly Pinn is a natural person who at all relevant times resided in Fort Worth, Texas.

12.     Ms. Pinn is, and at all relevant times was, a "person" as defined by 47 U.S.C. § 153(39).

13.     LCN is a limited liability company organized and existing under the laws of the State of Delaware, with headquarters located at 10319 Westlake Drive, Suite 450, Bethesda, MD 20187.

14.     Defendant is, and at all relevant times was, a "person" as defined by 47 U.S.C. § 153(39).

**TCPA Background**

15.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.   In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[,]" and found that federal legislation was needed because "telemarketers [could] evade [state-law] prohibitions through interstate operations.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (citations omitted).

16.     Relevant here, the TCPA establishes a national "do not call" database of numbers not to be called.   *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 ("DNC Order").

17.     These regulations are codified at 47 C.F.R. §§ 64.1200(e)(1-2).

18.     Specifically, a company may not initiate any "telephone solicitation" to a telephone subscriber "who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).

19.     A violation of 47 C.F.R. § 64.1200(c) carries statutory damages of $500 to $1,500 per call through § 227(c) of the TCPA.

20.     The TCPA also specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

21.     The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific do not call systems …)" and

"develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.*

22. Pursuant to this statutory mandate, the FCC established company-specific "do not call" rules. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752 (Oct. 16, 1992) ("TCPA Implementation Order").

23. The FCC found that "the company-specific do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *Id.* at 8765, ¶ 23.

24. However, recognizing that an honor system would probably be insufficient, the FCC found that it "must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24.

25. These regulations are codified at 47 C.F.R. § 64.1200(d)(1)-(7).

26. Specifically, these regulations require a company to keep a written policy, available upon demand, for maintaining a do-not-call list, train personnel engaged in telemarketing on the existence and use of its internal do-not-call list, and record and honor "do not call" requests for no less than five years from the time the request is made. 47 C.F.R. § 64.1200(d) (1, 2, 3, 6).

27. These policies and procedures prohibit a company from making calls for

telemarketing purposes[1] unless they have implemented these policies and procedures. 47

C.F.R. § 64.1200(d).

28.     Accordingly, all telemarketing calls violate the TCPA, unless Defendant can

demonstrate that it has implemented the required policies and procedures.

29.     There is a private right of action to enforce 47 C.F.R. § 64.1200(d) through §

227(c):

> Section 227(c)(5)… empowers 'any person' to sue for damages
> and injunctive relief for do-not-call violations 'by or on behalf of'
> a company. In accordance with this statutory provision, the
> Commission's company-specific do-not-call rules provide that
> '[n]o person or entity shall initiate any call for telemarketing
> purposes to a residential telephone subscriber unless such person
> or entity has instituted procedures for maintaining a list of persons
> who request not to receive telemarketing calls made by or on
> behalf of that person or entity[.]' 47 C.F.R. § 64.1200(d).

*In re Dish Network*, 28 FCC. Rcd. 6574, ¶ 29 (2013)

30.     These requirements are separate but cumulative.  In other words, a company must

comply with both the procedures for the company specific do-not-call list *and* the

procedures for complying with the national "do not call" database regulations.  A failure

---

[1]  The distinction between the use of "telephone solicitation" in relation to the national do-not-call database and calls for "telemarketing purposes" in relation to the company-specific do-not-call list is significant. "Telephone solicitation" excludes calls made to a person with whom the company has as established business relationship, 47 CFR 64.1200(f)(14), which can be established by a "voluntary two-way communication". 47 CFR 64.1200(f)(5). But this business relationship can be terminated by a "do not call" request. 47 CFR 64.1200(f)(5)(i). "Telemarketing purposes", on the other hand, includes any calls made for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, regardless of any consent or established business relationship. 47 CFR 64.1200(f)(12). In other words, prior to making any telemarketing calls to anyone, regardless of relationship, a company must implement the company-specific do-not-call regulations, but it only need to comply with the national do-not-call registry provisions with respect to persons with whom it does not have an existing established business relationship.

to comply with either is distinct a violation of 47 U.S.C. § 227(c).

31.     Though some of these requirements mention "residential" telephones, they were all extended to cover calls to cellular telephones that are used for residential purposes. 47 CFR. § 64.1200(e).

32.     Further, a person or entity can be liable for calls made on its behalf in violation of the TCPA, even if that person or entity did not directly dial such calls.  *See, e.g., In re Rules & Regs. Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995) (explaining that the FCC's "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any [TCPA] violations").  In fact, in May 2013, the FCC issued a binding declaratory ruling clarifying that sellers "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers . . . under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification."  *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6584 ¶28 (2013).

33.     Accordingly, an entity can be liable under the TCPA for a prohibited call made on its behalf under a number of theories including vicarious liability.  Under those circumstances, the seller is properly deemed to have initiated the call through the person or entity that actually placed the call.

**Factual Allegations**

34.     Ms. Pinn is the sole and customary user of a cellular telephone number (XXX)-XXX-2161.

35.     Ms. Pinn's cellular telephone number (XXX)-XXX-2161 is used for residential purposes and is not associated with a business.

36.     Ms. Pinn's cellular telephone number (XXX)-XXX-2161 has been on the National Do-Not-Call Registry since February 9, 2009.

37.     Ms. Pinn personally placed his cellular telephone number (XXX)-XXX-2161 on the National Do-Not-Call Registry because she did not want unsolicited telemarketing calls or texts, such as the ones at issue here.

38.     On or about May 19, 2023, Ms. Pinn began receiving telephone calls from Defendant soliciting legal services.

39.     These calls came from changing ten-digit numbers, which were likely "spoofed."

40.     For example, on May 19, 2023 at 9:37 am CST, Ms. Pinn received a call from telephone number (210) 953-5751.

41.     When Ms. Pinn answered the phone, the caller advised that he was calling from the "Accidental Claim Helpline" and stated that he was calling in regard to Ms. Pinn's previous car accident.

42.     Ms. Pinn advised the individual that she did not have any car accidents and to stop calling.  Ms. Pinn then terminated the call.

43.     On May 19, 2023 at 3:19pm CST, Ms. Pinn received another call from Defendant.

44.     This call came from (986) 229-0171.

45.     When Ms. Pinn answered the phone, the caller advised that he was calling from the "Accidental Claim Helpline" and stated that he was calling in regard to Ms. Pinn's previous car accident.

46.     Ms. Pinn again requested that Defendant stop calling and terminated the call.

47.     On May 19, 2023 at 4:41 pm CST, Ms. Pinn received another call from Defendant.

48.     This call came from (727) 361-2423.

49.     When Ms. Pinn answered the phone, the caller advised that he was calling from the "Accidental Claim Helpline" and stated that he was calling in regard to Ms. Pinn's previous car accident.

50.     Tired of the calls, and in an effort to have the calls stop, Ms. Pinn engaged with the caller to identify the company or individuals behind the calls, so that she could send a written complaint to the company about the calls.

51.     The initial caller transferred Ms. Pinn to his "senior supervisor" who requested more information about a car accident.

52.     The senior supervisor stated he was with "Injury Claim Services."

53.     Upon information and belief, Defendant uses names like "Accidental Claim Helpline" and "Injury Claim Services."

54.     The "senior supervisor" ultimately terminated the call and stated that Ms. Pinn was wasting his time as she kept asking for information about the company he was with.

55.     On May 30, 2023, Ms. Pinn received another call from Defendant.

56.     This call came from (860) 864-8869.

57.     When Ms. Pinn answered the phone, the caller advised that he was calling from the "Accidental Claim Helpline" and stated that he was calling in regard to Ms. Pinn's previous car accident.

58.     Again, in an effort to have the calls stop, Ms. Pinn engaged with the caller to identify the company or individuals behind the calls, so that she could send a written complaint to the company about the calls..

59.     The initial caller transferred Ms. Pinn to his "senior supervisor" who requested more information about a car accident.

60.     The "senior supervisor" transferred Ms. Pinn to a female individual with a third-party company that stated she would take some additional information from Plaintiff then attempted to connect her with an attorney.

61.     Following the call, Ms. Pinn wrote to the third-party company to complain about the illegal calls she received.

62.     On June 13, 2023 at 9:12am CDT, Ms. Pinn received another call from Defendant.

63.     This call came from (817) 570-0217.

64.     When Ms. Pinn answered the phone, the caller advised that he was calling from the "Accidental Claim Helpline" and stated that he was calling in regard to Ms. Pinn's previous car accident.

65.     The initial caller transferred Ms. Pinn to his "senior supervisor" who requested more information about a car accident.

66.     The "senior supervisor" transferred Ms. Pinn to a female caller who stated she was with the same third-party company she was connected to during the May 30, 2023 call.

67.     Ms. Pinn asked for that company's website and the female caller provided it.  Ms.

Pinn then stated she would review the site and call back if interested but didn't need any call backs.

68.     On June 16, 2023 at 3:19pm CDT, Ms. Pinn received another call from Defendant.

69.     This call came from (631) 314-7114.

70.     When Ms. Pinn answered the phone, the caller advised that he was calling from the "Accidental Claim Helpline" and stated that he was calling in regard to Ms. Pinn's previous car accident.

71.     The initial caller transferred Ms. Pinn to his "senior supervisor."

72.     The senior supervisor asked if he was speaking with "Kelly."

73.     When Ms. Pinn confirmed that the senior supervisor was speaking with her, the "senior supervisor" began verbally attacking Ms. Pinn with offensive, harassing, profane language that included racial slurs highly offensive to African Americans.

74.     Upon information and belief, the senior supervisor's offensive tirade was in direct response to Ms. Pinn complaining about the calls to the third-party company on May 30, 2023.

75.     Ms. Pinn contacted the third-party company following this call and requested that the third-party company identify the company or persons responsive for the calls she received.

76.     The third-party company advised Ms. Pinn that Defendant LCN was responsible for the calls she received.

77.     Ms. Pinn did not provide prior express invitation or permission or consent for

these telephone calls.

78.    To the contrary, in response to the unwanted calls, Ms. Pinn repeatedly requested that they stop.

79.    Defendant, did not have written do-not-call policies or procedures at the time of the calls it made to Ms. Pinn and the classes defined below.

80.    Alternatively, whatever written policies existed either failed to comply with the minimum requirements under the TCPA, 47 C.F.R. § 64.1200(d), or were never properly implemented—including as evidenced by the continued telephone calls to Ms. Pinn after she directly asked not to be contacted.

81.    Defendant's violations were negligent.

82.    Alternatively, Defendant's violations were willful and knowing.

83.    Ms. Pinn and the classes were damaged by the violations alleged herein.  Their privacy was improperly invaded, Defendant's calls temporarily seized and trespassed upon the use of their phones, and/or they were forced to divert attention away from other activities to address the unwanted telephone calls.  Defendant's telephone calls and text messages were annoying and a nuisance, and wasted the time of Ms. Pinn and the class members.  *See, e.g., Mims,* 565 U.S. at 372 (discussing congressional findings of consumer "outrage" as to prerecorded calls).

## **DEFENDANT'S LIABILITY**

84.    Defendant used automated systems to make outbound telephonic sales calls to hundreds if not thousands of consumers across the U.S., including to consumers whose phone numbers are listed on the National Do-Not Call Registry.

85.     Defendant made two or more telephone solicitations to Ms. Pinn, whose number

was on the National Do-Not-Call Registry at the time of the telephone calls. This

constitutes a violation of 47 U.S.C. § 227(c) through 47 C.F.R. § 64.1200(c).

86.     Accordingly, for violations of 47 C.F.R. § 64.1200(c), Ms. Pinn is entitled to $500

per call through 47 U.S.C. § 227(c).

87.     Ms. Pinn is entitled to $1,500 per call if Defendant's actions are found to be

knowing or willful.

88.     Defendant placed two or more telemarketing calls to Ms. Pinn, despite not having

in place the required policies and procedures prior to making such calls.  This constitutes

a violation of 47 U.S.C. § 227(c) through 47 C.F.R. § 64.6200(d).

89.     Accordingly, for violations of 47 C.F.R. § 64.1200(d), Ms. Pinn is entitled to $500

per call through 47 U.S.C. § 227(c).

90.     Ms. Pinn is entitled to $1,500 per call if Defendant's actions are found to be

knowing or willful.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of two proposed

"Classes," as defined as follows:

### THE TCPA CLASSES

Plaintiff and all persons within the United States to whose
telephone number Defendant placed (or had placed on its behalf)
two or more telemarketing calls in a 12-month period when the
telephone number to which the telephone calls were made was on
the National Do-Not-Call Registry for more than 30 days at the
time of the calls from four (4) years prior to the filing of the
Complaint.

("Registry Class")

> Plaintiff and all persons within the United States whose telephone number Defendant placed (or had placed on its behalf) two or more telemarketing calls in a 12-month period from four (4) years prior to the filing of the Complaint.

("Policy Class").

(The Registry Class and the Policy Class are collectively referred to herein as the "Classes.")

92.     Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; any Judge and Magistrate Judge to whom this action is assigned and any member of their staffs and immediate families, and any claims for personal injury, wrongful death, and/or emotional distress.

93.     The Members of the Classes for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

94.     The exact number and identities of the persons who fit within the Classes are ascertainable in that Defendant and third parties maintain written and electronically stored data showing:

- The time period(s) during which Defendant or its agent made the telephone calls;

- The telephone numbers to which Defendant or its agent made telephone calls;

- The telephone numbers for which Defendant had prior express written consent;

- The purposes of such telephone calls; and

- The names and addresses of Class members.

95.     The Classes are comprised of hundreds, if not thousands, of individuals.

96.     There are common questions of law and fact affecting the rights of the Members of the Classes, including, *inter alia*, the following:

•       Whether Defendant (or someone acting on its behalf) make telemarketing calls;

•       Whether Defendant (or someone acting on its behalf) obtains prior express written consent;

•       Whether Defendant or the entities with which they contract makes solicitation calls and to telephone numbers registered on the National Do-Not-Call Registry;

•       Whether Defendant had the required policies and procedures prior to making telemarketing calls;

•       Whether Defendant's statutory violations were willful and knowing; and

•       Whether Defendant should be enjoined from engaging in such conduct in the future.

97.     Plaintiff is a member of the Classes in that Defendant placed two or more calls for telemarketing purposes, in a one-year period to his telephone number, without her prior express written consent, after she asked Defendant to stop, and while her telephone number was on the National Do-Not-Call Registry.

98.     Plaintiff's claims are typical of the claims of the Members of the Classes in that they arise from Defendant's uniform conduct and are based on the same legal theories as these claims.

99.     Plaintiff and all putative Members of the Classes have also necessarily suffered concrete harm in addition to statutory damages, as all Members of the Classes spent time

tending to Defendant's unwanted calls and suffered a nuisance and an invasion of their privacy.

100.  Plaintiff has no interests antagonistic to, or in conflict with, the Classes.

101.  Plaintiff will thoroughly and adequately protect the interests of the Classes, having retained qualified and competent legal counsel to represent her and the Classes.

102.  Defendant has acted and refused to act on grounds generally applicable to the Classes, thereby making injunctive and declaratory relief appropriate for the Classes.

103.  The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

104.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

105.  Common questions will predominate, and there will be no unusual manageability issues.

**FIRST CAUSE OF ACTION**
**Violations of the TCPA, 47 U.S.C. § 227(c)**
**(On Behalf of Plaintiff and the Registry Class)**

106.  Plaintiff and the proposed Registry Class incorporate the allegations of paragraphs 1-103 as if fully set forth herein.

107.  Defendant made, or had made on its behalf, telephone solicitations to Plaintiff's and putative Registry Class Members' telephone numbers.

108.  Plaintiff's and putative Registry Class Members' telephone numbers were all on the National Do-Not-Call Registry at the time of the calls.

109.    Plaintiff and putative Registry Class Members each received two or more such calls in a 12-month period.

110.    Plaintiff and putative Registry Class Members are entitled to an award of $500 in statutory damages for each telephone solicitation call pursuant to 47 U.S.C. § 227(c)(5).

111.    Plaintiff and putative Registry Class Members are entitled to an award of treble damages in an amount up to $1,500 for each telephone solicitation call made knowingly and/or willfully, pursuant to 47 U.S.C. § 227(c)(5).

**SECOND CAUSE OF ACTION**
**Violations of the TCPA, 47 U.S.C. § 227(c)**
**(On behalf of Plaintiff and the Policy Class)**

112.    Plaintiff and the proposed Policy Class incorporate the allegations of paragraphs 1-103 as if fully set forth herein.

113.    Defendant made numerous telephone calls for telemarketing purposes to Plaintiff's and putative Policy Class Members' telephone numbers.

114.    Defendant did so despite not having a written policy pertaining to "do not call" requests.

115.    Defendant did so despite not having such a policy available "upon demand."

116.    Defendant did so despite not training its personnel on the existence or use of any internal "do not call" list or policy.

117.    Defendant did so despite not recording or honoring "do not call" requests.

118.    Defendant made two or more telemarketing calls to Plaintiff and putative Policy Class Members' telephone numbers in a 12-month period.

119.    Plaintiff and putative Policy Class Members are entitled to an award of $500 in statutory damages telephone call pursuant to 47 U.S.C. § 227(c)(5).

120.    Plaintiff and putative Policy Class Members are entitled to an award of treble damages in an amount up to $1,500 telephone call, pursuant to 47 U.S.C. § 227(c)(5).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A.      An order certifying the Classes as defined above, appointing Plaintiff as the representatives of the Classes and appointing her counsel as Class Counsel;

B.      An order declaring that Defendant's actions, as set out above, violate the statutes referenced herein;

C.      An award of injunctive and other equitable relief as necessary to protect the interests of the Classes, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.      An award of statutory damages;

E.      An award of treble damages; and

F.      Such other and further relief that the Court deems reasonable and just

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

and all triable issues.

Dated: October 27, 2023

*/s/ John T. McGowan*_____
John T. McGowan, Esq. Bar No. 21477
KINNER & McGOWAN PLLC
413 East Capitol Street SE, First Floor
Washington, D.C. 20003
Tel: (202) 846-7148
jmcgowan@kinnermcgowan.com

*/s/ Max S. Morgan*_____
Eric H. Weitz, Esquire*
Max S. Morgan, Esquire*
THE WEITZ FIRM, LLC
1515 Market Street, #1100
Philadelphia, PA 19102
Tel: (267) 587-6240
Fax: (215) 689-0875
max.morgan@theweitzfirm.com
eric.weitz@theweitzfirm.com

*Counsel for Plaintiff and
the proposed classes*

(*to seek admission *pro hac vice*)

# TAB 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTH DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS**

| | | |
|---|---|---|
| KELLY PINN, on behalf of herself and others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Case No. |
| | : | |
| v. | : | |
| | : | CLASS ACTION COMPLAINT |
| UNITED INSURANCE PROFESSIONALS, LLC | : | |
| | : | |
| Defendant. | : | |
| _____ / | | |

**CLASS ACTION COMPLAINT**

**Preliminary Statement**

1.     Plaintiff Kelly Pinn ("Plaintiff") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2.     United Insurance Professionals, LLC ("United" or "Defendant"), who offers several insurance products, sent multiple telemarketing calls to residential telephone numbers, including the Plaintiff, which is prohibited by the TCPA, despite their presence on the National Do Not Call Registry. Moreover, United Insurance Professionals, LLC continued to send calls to individuals who it admitted it knew were on the Registry, as it did with Plaintiff.

3.     The Plaintiff never consented to receive the calls, which were placed to her for telemarketing purposes. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, the Plaintiff brings this action on

behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendant.

4.     A class action is the best means of obtaining redress for the Defendant's wide scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## Parties

5.     Plaintiff Kelly Pinn is a Texas resident.

6.     Defendant United Insurance Professionals, LLC is an Ohio corporation headquartered in this District.

## Jurisdiction & Venue

7.     The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

8.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, as the telemarketing calls to the Plaintiff was placed from this District.

## The Telephone Consumer Protection Act

9.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The National Do Not Call Registry

10.     The TCPA specifically required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

11.     The FCC was instructed to "compare and evaluate alternative methods and procedures (including the use of … company-specific 'do not call systems …)" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish purposes of this section." *Id.* at (c)(1)(A), (E).

12.      Pursuant to this statutory mandate, the FCC established a national "do not call" database. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014* ("DNC Order").

13.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

14.     A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*.

15.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

**Factual Allegations**

16.     Defendant is in the business of selling insurance for multiple insurance companies.

17.     One of Defendant's strategies for marketing insurance services and generating business is through telemarketing.

18.     Defendant telemarketing includes sending autodialed robocalls to residential numbers on the National Do Not Call Registry.

19.     Recipients of these calls, including Plaintiff, did not consent to receive them.

<u>Calls to Plaintiff</u>

20.     Plaintiff is, and at all times mentioned herein, a "person" as defined by 47 U.S.C. § 153(39).

21.     The Plaintiff registered her residential cellular telephone number, 817-XXX-XXXX on the National Do Not Call Registry on February 9, 2009 and it has been on the Registry continuously since that time.

22.     The Plaintiff has received at least 17 calls from the Defendant to sell her final expense insurance, from various illegally "spoofed" caller ID number of 210-460-17RR, where RR represents a random two-digit number, for example, 210-460-1714 and 210-460-1732.

23.     The first call Plaintiff received came at 8:24 AM Central Time on December 11, 2023 from the spoofed caller ID 210-460-1714. During that call, an agent claiming to be from "US Benefits" attempted to sell the Plaintiff final expense insurance before asking the Plaintiff if there was another number the agent could call the Plaintiff back on because her number was on the National Do Not Call Registry.

24. Despite not giving her permission to call, the calls continued at 8:28 AM, and 8:31 AM. During the 8:31 AM call, the caller, who also stated he was from "US Benefits" disconnected the call after he impersonated an insurance agent and provided a fake Texas insurance license number.

25. The calls further continued, including multiple calls within the same minute that same day from various spoofed caller IDs.

26. Finally, at 10:25 AM, the Plaintiff received a call from 210-460-1732. During that call, where the initial caller stated they were calling from "US Benefits" and were calling to sell the Plaintiff final expense insurance, the caller then transferred the call to Adlai "AJ" Saul with Defendant. Mr. Saul provided the Plaintiff his Texas insurance license number 2710364.

27. Ms. Pinn's cellular telephone number is used for residential purposes and is assigned to a cellular telephone service for consumers and consumer use.

28. Ms. Pinn's cellular telephone number is not associated with a business, nor is it associated with a telephone service sold for business use.

29. Ms. Pinn's telephone number has been on the National Do Not Call Registry since 2009, as the Defendant admits it knew about during the very first call.

30. The calls were unwanted.

31. The Defendant did not have the required prior express written consent to make the telemarketing calls at issue.

32. Indeed, prior to filing this lawsuit, the Plaintiff attempted to contact the Defendant, who admitted the calls took place.

33. Defendant never provided Plaintiff's prior express written consent to receive the calls at issue.

34.     The calls were not necessitated by an emergency.

35.     Plaintiff's privacy has been violated by the above-described telemarketing robocalls from, or on behalf of, Defendant. The calls were an annoying, harassing nuisance.

36.     Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendant because their privacy has been violated, they were annoyed and harassed, and, in some instances, they may have been charged for incoming calls.  The calls occupied their cellular telephone lines, rendering them unavailable for legitimate communication.

## Class Action Statement

37.     As authorized by Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

38.     The class of persons Plaintiff proposes to represent is tentatively defined as:

**National Do Not Call Registry Class**: All persons in the United States whose (1) telephone numbers were on the National Do Not Call Registry for at least 31 days, (2) but who received more than one telemarketing call from or on behalf of Defendant (3) within a 12-month period, (4) from four years prior the filing of the Complaint.

39.     The Class as defined above are identifiable through phone records and phone number databases.

40.     The potential members of the Class number likely at least in the thousands based on the generic and nationwide nature of the Defendant's telemarketing.

41.     Individual joinder of these persons is impracticable.

42.     The Plaintiff is a member of the Class.

43.     There are questions of law and fact common to Plaintiff and to the proposed Class, including but not limited to the following:

(a) whether Defendant systematically made multiple telephone calls to members of the National Do Not Call Registry Class;

(b) whether Defendant made calls to Plaintiff and members of the Class without first obtaining prior express written consent to make the calls;

(c) whether Defendant's conduct constitutes a violation of the TCPA;

(d) whether members of the Class are entitled to treble damages based on the willfulness of Defendant's conduct.

44.     Plaintiff's claims are typical of the claims of members of the Class.

45.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class, she will fairly and adequately protect the interests of the Class, and she is represented by counsel skilled and experienced in class actions, including TCPA class actions.

46.     Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendant and/or their agents.

47.     The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

**FIRST CAUSE OF ACTION**
**Telephone Consumer Protection Act**
**(Violations of 47 U.S.C. § 227)**
**(On Behalf of Plaintiff and the National Do Not Call Registry Class)**

48.     Plaintiff repeats the prior allegations of this Complaint and incorporates them by reference herein.

49.     The foregoing acts and omissions of Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf constitute numerous and multiple

violations of the TCPA, 47 U.S.C. § 227, by making telemarketing calls, except for emergency

purposes, to the Plaintiff and the Class despite their numbers being on the National Do Not Call

Registry.

50.     The Defendant's violations were negligent, willful, or knowing.

51.     As a result of Defendant's and/or its affiliates, agents, and/or other persons or

entities acting on Defendant's behalf violations of the TCPA, 47 U.S.C. § 227, Plaintiff and

members of the Class presumptively are entitled to an award of between $500 and $1,500 in

damages for each and every call made.

52.     Plaintiff and members of the Class are also entitled to and do seek injunctive

relief prohibiting Defendant and/or its affiliates, agents, and/or other persons or entities acting on

Defendant's behalf from making telemarketing calls to numbers on the National Do Not Call

Registry, except for emergency purposes, in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the

following relief:

A.     Certification of the proposed Class;

B.     Appointment of Plaintiff as a representative of the Class;

C.     Appointment of the undersigned counsel as counsel for the Class;

D.     A declaration that Defendant and/or their affiliates, agents, and/or other related

entities' actions complained of herein violate the TCPA;

E.     Plaintiff and members of the Class are also entitled to and do seek injunctive

relief prohibiting Defendant and/or its affiliates, agents, and/or other persons or entities acting on

8

Defendant's behalf from making calls, except for emergency purposes, to any residential number listed on the National Do Not Call Registry in the future.

      F.     An award to Plaintiff and the Class of damages, as allowed by law; and

      G.     Orders granting such other and further relief as the Court deems necessary, just, and proper.

**JURY DEMAND**

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

PLAINTIFF,
By their attorneys

*/s/Brian T. Giles*
Brian T. Giles (0072806)
GILES & HARPER, LLC
7247 Beechmont Ave.
Cincinnati, Ohio 45230
Telephone:  (513) 379-2715
Bgiles@gilesharper.com

Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com
*Subject to Pro Hac Vice*

Andrew Roman Perrong
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com
*Subject to Pro Hac Vice*

# TAB 11

2021 WL 2688622
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

Brandon CALLIER, Plaintiff,
v.
GREENSKY, INC., Defendant.

EP-20-CV-00304-KC
|
Signed 05/10/2021

**Attorneys and Law Firms**

Brandon Callier, El Paso, TX, Pro Se.

Sean W. Fleming, Macdonald Devin, Dallas, TX, Daniel H. Hernandez, Ray, Valdez, McChristian & Jeans a Professional Corporation, El Paso, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS

KATHLEEN CARDONE, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Defendant GreenSky, Inc.'s ("Defendant") "Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) ("Motion") (ECF No. 4), filed January 21, 2021, Plaintiff Brandon Callier's ("Plaintiff") "Response to Defendant GreenSky, LLC's Motion to Dismiss Under Fed. R. Civ. P. 12(B)(6) [sic]" ("Response") (ECF No. 10), filed February 1, 2021, and Defendant's "Supplement to its Motion to Dismiss Under Fed. R. Civ. P. 12(B)(6) [sic]" ("Supplement") (ECF No. 19), filed March 30, 2021. After careful consideration, the Court will deny in part and grant in part Defendant's Motion for the reasons herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

This case arises from a series of automated calls that Defendant allegedly made to Plaintiff's cell phone. *See generally* Pl.'s Original Compl., ECF No. 1, Dec. 7, 2020. Plaintiff contends these calls violated the Telephone Consumer Protection act of 1991 ("TCPA"), 47 U.S.C. § 227. *Id.* at 9.

At 1:07 p.m. on November 21, 2020, Plaintiff received the first of several unwanted calls from Defendant. *Id.* at 5 ¶ 22.

Plaintiff received a call on his cell phone. *Id.* The call came from (915) 975-1004. *Id.* Caller ID indicated "GreenSkyProgram" placed the call. *Id.*

Like those to come, this call followed a familiar script: When Plaintiff answered the call and said hello, he was met with silence for approximately twenty seconds before the call was disconnected. *Id.* at 5 ¶¶ 24–25. At 2:28 p.m., roughly an hour after receiving the first call, Plaintiff received another call from (915) 975-1004. *Id.* at 5 ¶ 26.

At 5:41 p.m. on November 23, 2020, Plaintiff received a call on his cell phone from phone number (915) 975-0164. *Id.* at 5 ¶ 27. Caller ID indicated this call was made by "GreenSkyProgram." *Id.* at 5 ¶ 28. Plaintiff answered the call, was met with approximately ten seconds of silence, and was connected to a live agent who asked to speak to "Armando." *Id.* at 5 ¶¶ 29–30. Plaintiff informed the agent that he had the wrong number and asked him to remove Plaintiff's number from Defendant's call list. *Id.* at 6 ¶ 31. After this interaction, Plaintiff called back (915) 975-0164 and was informed that "GreenSky, Inc." had made the prior call. *Id.* at 6 ¶ 32.

At 9:36 a.m. on November 25, 2020, Plaintiff received his fourth call. The call came from phone number (915) 975-1034, and the caller ID indicated "GreenSkyProgram" made the call. *Id.* at 6 ¶ 33. Again, Plaintiff was met with several seconds of silence before he was connected to an agent. *Id.* at 6 ¶ 34. Again, the live agent asked to speak with someone by the name of "Armando." *Id.* at 6 ¶ 35. Again, Plaintiff informed the agent that he had the wrong number and asked Defendant to remove his number from their call list. *Id.* at 6 ¶ 36.

### B. Procedural Background

On December 7, 2020, Plaintiff filed the instant action. He contends that Defendant violated the TCPA, rules promulgated by the Federal Communication Commission ("FCC"), and Texas law. *See* Original Compl. 9–11. Specifically, Plaintiff contends that Defendant violated § 227(b)(1)(A) by using an automatic telephone dialing system to make unwanted calls to his cell phone. *Id.* at 9 ¶¶ 1–5. Relatedly, Plaintiff contends Defendant violated the FCC's rule that requires the existence and use of a do-not-call list. *Id.* at 10 ¶¶ 1–5. Plaintiff contends that this conduct also violates § 305.053 of the Texas Business and Commerce Code, which codifies the TCPA as state law. *Id.* at 11 ¶¶ 1–4.

**\*2** On January 21, 2021, Defendant filed its Motion to Dismiss. Plaintiff responded on February 1, 2021. Thereafter, on March 30, 2021, Defendant filed its Supplement.

### C. Legal Arguments

In its Motion to Dismiss, Defendant requests that the Court dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. Defendant argues that dismissal is warranted because Plaintiff's account does not reasonably suggest that Defendant uses an automatic telephone dialing system, which is necessary to trigger liability under § 227(b). Mot. to Dismiss 3; Suppl. 3. Additionally, Defendant argues that Plaintiff's Original Complaint does include enough factual content to support his claims. Finally, Defendant contends the Court lacks subject-matter jurisdiction over this action because he has not demonstrated that he has standing to bring claims under the TCPA.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure authorize dismissal of an action that "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Upon a motion brought pursuant to Rule 12(b)(6), a district court must determine whether

the plaintiff's pleadings provide "a short and plain statement of the claim that that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (reasoning that a 12(b)(6) motion challenges the sufficiency of a plaintiff's pleadings).

Dismissal pursuant to 12(b)(6) may be warranted "on the basis of a dispositive issue of law." *Covington v. City of Madisonville*, 812 F. App'x 219, 223 (5th Cir. 2020) (quoting *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)). Additionally, dismissal pursuant to 12(b)(6) is warranted if the plaintiff fails to allege "enough facts to state a claim that is plausible on its face." *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955).

A claim is facially plausible when the complaint includes sufficient factual allegations for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In contrast, a claim lacks facial plausibility when the plaintiff offers "a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937, or facts that are "merely consistent with" a defendant's liability, *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

In this posture, a district court must accept a plaintiff's allegations as true and indulge all reasonable inferences in their favor. *Gonzalez*, 577 F.3d at 603. However, the court may not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Arnold*, 979 F.3d at 262 (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). " 'Determining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Covington*, 812 F. App'x at 223 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

**\*3** As Plaintiff is *pro se*, the Court holds his Original Complaint "to less stringent standards than formal pleadings drafted by lawyers." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002). Nevertheless, even *pro se* litigants must set forth "direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these materials points will be introduced at trial." *Govea v. BATFE*, 207 F. App'x 369, 372 (5th Cir. 2006) (quoting *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995)).

## III. ANALYSIS

### A. Subject Matter Jurisdiction

Defendant argues that the Court must dismiss Plaintiff's Original Complaint for lack of subject-matter jurisdiction.

As a court of limited jurisdiction, the Court lacks authority to adjudicate claims absent a grant of congressional authority. *Home Depot U.S.A., Inc. v. Jackson*, —— U.S. ——, 139 S. Ct. 1743, 1746, 204 L.Ed.2d 34 (2019). As relevant here, Congress has authorized federal courts to adjudicate claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Section 1331 vests federal courts with jurisdictional over claims arising from federal statutes, including the TCPA. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012). As subject-matter jurisdiction is required by Article III of the Constitution, federal courts have a duty to assure that it possesses subject-matter jurisdiction. *Id.*

Defendant does not deny that TCPA claims fall within § 1331's jurisdictional grant. Nor could they. The Supreme Court has expressly confirmed that federal courts are authorized to adjudicate private suits arising from the TCPA. *Mims*, 565 U.S. at 372, 132 S.Ct. 740.

Instead, Defendant's jurisdictional attack is more limited. It claims that the Court lacks jurisdiction over *this* action because Plaintiff has not suffered an injury and thus lacks standing. Specifically, Defendant argues that Plaintiff has multiple cell phones because he wants to receive robocalls in order to file multiple TCPA and turn a profit from litigation. Supplement 6.

Article III provides that the judicial power of federal courts "extends only to 'Cases' and 'Controversies.' " *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (quoting Art. III, § 2). At a minimum, the Constitution requires three elements for a litigant to have standing. *Uzuegbunam v. Preczewski*, —— U.S. ——, 141 S. Ct. 792, 797, 209 L.Ed.2d 94 (2021). The Plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Id.* At the pleading stage, the plaintiff bears the burden of establishing these elements. *Spokeo*, 136 S. Ct. at 1547.

The injury-in-fact requirement is an essential component of standing under Article III. *Id.* It ensures "that federal courts do not exceed their authority" by intruding upon executive or legislative powers. *Id.* To satisfy this requirement, a plaintiff must show that they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548, 194 L.Ed.2d 635 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). At the pleading stage, "a TCPA plaintiff who alleges a defendant placed multiple harassing calls that would annoy or harass a reasonable person has sufficiently [pleaded] an injury-in-fact." *Cunningham v. Britereal Mgmt.*, No. 4:20-cv-144-SDJ-KPJ, 2020 WL 7391693, at *3, 2020 U.S. Dist. LEXIS 236135, at *6 (E.D. Tex. Nov. 20, 2020) (internal quotations omitted).

**\*4** Here, Plaintiff has alleged an injury-in-fact. In particular, he alleged that Defendant made at least five unwanted calls to his cellphone. *See* Original Compl. 5 ¶¶ 22–42. He alleged that these calls were made without his consent and for a non-emergency purpose, resulting in a nuisance, invasion of privacy, intrusion into his seclusion, reduced storage space, battery life and data, and loss of time. *Id.* at 7 ¶¶ 52–56. He also claims that he experienced anger, frustration, and reduced enjoyment of his cell phone. *Id.* These allegations, which the Court assumes to be true, amount to multiple unwanted calls that would annoy and harass a reasonable person. Based on these allegations, Plaintiff has sufficiently alleged an injury-in-fact. *See Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 999 (11th Cir. 2020) (reasoning that "the receipt of unwanted phone calls is a concrete injury" under the TCPA).

Defendant resists this conclusion. It claims Plaintiff has not suffered an "injury-in-fact" because he has multiple cell phones for the sole purpose of receiving unwanted calls for the express purpose of filing TCPA actions. Suppl. 6. For support, Defendant cites *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp 3d 782, 802 (W.D. Pa. 2016), a case from the U.S. District Court for the Western District of Pennsylvania. There, the court held that a plaintiff who invites unwanted calls for the sole purpose of filing TCPA claims lacks standing under Article III. *See id.* ("Because Plaintiff has admitted that her only purpose in purchasing cell phones and minutes is to receive more calls, thus neabline her to file TCPA lawsuits, she has not suffered an economic injury.").

The Court is not bound by this decision and does not find this holding applicable to the current case. Moreover, *Stoops* is readily distinguishable.

There, the court granted summary judgment in favor of the defendant based on the plaintiff's testimony that she purchased over forty cell phones that she did not use for any reason except to gin up TCPA claims. *Id.* Finding that the plaintiff lacked standing to sue, the court held she had not suffered an injury-in-fact because she had "collected[ ] a shoebox full of cell phones" that she did not use for any purpose except to "fish for accidental wrong number calls." *Id.* at 796. Accordingly, the court held that a plaintiff that invited automated calls on phones had not suffered an invasion of privacy and, therefore, had not suffered an injury-in-fact. *Id.*

In contrast, Plaintiff received calls to his "personal cell phone that he uses for personal, family, and household use." Original Compl. 8 ¶ 8. Plaintiff states he relies on his cell phone to communicate with friends and family, navigate, send and receive emails." *Id.* As Plaintiff alleges that he uses his cell phone for personal uses, it is reasonable to infer that he a privacy interest in being immune from unwanted cals. *Cf. id.* at 802.

Moreover, *Stoops* was decided at the summary judgment stage, where the plaintiff had the burden to prove there is a genuine dispute of material fact. *Id.* at 289. It is well settled that on a motion to dismiss, as here, the Court must credit Plaintiff's factual account.[2] Plaintiff has alleged he uses his cell phones for personal use; he has pleaded enough facts to show he has suffered a concrete and particularized injury traceable to Defendant's conduct. *See Stoops*, 197 F. Supp 3d at 979 (collecting cases holding that "a plaintiff demonstrates a violation of privacy interests, and therefore an injury-in-fact, after receiving

automated calls").

### B. TCPA Violation

**\*5** Next, the Court considers Plaintiff's claim that Defendant violated § 227(b)(1)(A) of the TCPA by making "non-emergency telemarketing robocalls to [his] cellular telephone number without his prior express written consent." Original Compl. 9 ¶ 2. Defendant argues Plaintiff has offered nothing more than "conclusory and vague statements" to support this claim.

Section 227(b)(1)(A) of the TCPA prohibits calling "any telephone number assigned to a ... cellular telephone service" using "any automatic telephone dialing system" absent "prior express consent of the called party." The TCPA provides a private right of action for aggrieved individuals. 47 U.S.C. § 227(b)(3). "A plaintiff may recover their 'actual monetary loss' or $500 for each violation, 'whichever is greater,' and the statute authorizes treble damages 'if the defendant willfully or knowingly violated' the Act." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016) (quoting *id.*).

A TCPA claim requires that the defendant have used "an automatic telephone dialing system ("ATDS")." 47 U.S.C. § 227(b)(1)(A). An ATDS may be any equipment that can "store or produce telephone numbers to be called, using a random or sequential number generator" and can dial such numbers. 47 U.S.C. § 227(a)(1). The Supreme Court has clarified that a TCPA claim does not lie whenever someone receives an unwanted call from an automated system; liability is triggered only if the automated system "us[es] a random or sequential number generator" to store or produce the phone numbers that are called. *Facebook, Inc. v. Duguid*, ––– U.S. ––––, 141 S. Ct. 1163, 1181, 209 L.Ed.2d 272 (2021).

Plaintiff has adequately alleged a violation of § 227(b)(1)(A). Plaintiff received multiple calls to his cell phone. Original Compl. 5 ¶¶ 22–37. He did not consent to these calls, and no emergency necessitated the calls. *Id.* at 7 ¶¶ 44, 46. He states that "[e]ach call was sent by an ATDS." *Id.* at 7 ¶ 45.

Further, each call followed a familiar script. When Plaintiff answered, he was met with silence for several seconds before the system connected him with a live agent. This reasonably suggests that Defendant placed the call using an automated system. Each time, the live agent asked to speak with "Armando." To be sure, that each agent asked to speak with "Armando" suggests that Defendant did not use a random number generator to produce its call list. *Cf. Facebook*, 141 S. Ct. at 1169, 209 L.Ed.2d 272 (finding no TCPA violation where the defendant "sent targeted, individualized texts to numbers linked to specific accounts."). However, it is not unreasonable to infer from the pleadings that Defendant relied on a sequential number generator to place its calls. Indeed, such an inference is appropriately drawn at the pleadings stage, where the Court is required to credit Plaintiff's account, view the facts in the light most favorable to Plaintiff, and draw inferences therefrom under the flexible standard afforded to *pro se* litigants.

### C. Violation of 47 C.F.R. § 64.1200

The Court now turns to Plaintiff's second count, wherein he alleges a violation of 47 C.F.R. § 64.1200, an FCC regulation promulgated pursuant to its rulemaking authority under § 227(c). Original Compl. 10 ¶¶ 1–3. Specifically, Plaintiff contends that Defendant violated this regulation because it did not have a "written policy, available upon demand, for maintaining a do-not-call list" and training individuals on implementing a do-not-call list. *Id.* 10 ¶ 2(a) (quoting 47 C.F.R. § 64.1200(d)(1)). Defendant contends that Plaintiff's claim fails as a matter of law because this regulation applies to "residential telephone subscribers" and does not apply to cell phones. Mot. to Dismiss 4 (quoting § 64.1200(d)(1)). The Court agrees with Defendant.

**\*6** By its plain terms, 47 C.F.R. § 64.1200(d)(1) prohibits telemarketing calls made to "a residential telephone subscriber." 47 C.F.R. § 64.1200(d)(1). Plaintiff alleges that the calls were placed to his cellphone, not a residential line. Within his Response, Plaintiff expands on his allegations regarding Defendant's do-not-call policies but does not address Defendant's argument that the regulation does not apply to cellphones. *See* Resp. 4. Plaintiff does not cite—and the Court is not aware

of—any authority that has found § 64.1200(d)(1) applicable to cellphones. Accordingly, the Court finds that this claim fails as a matter of law.

**D. State Law Claims**

Finally, Plaintiff alleges that Defendant's conduct violated § 305.053 of the Texas Business and Commerce Code. Original Compl. 11. Under § 305.053, a "person who receives a communication that violates 47 U.S.C Section 227 ... may bring an action in [Texas] against the person who originates the communication." Tex. Bus. & Com. § 305.053. Defendant concedes the elements of a § 305.053 correspond to the necessary elements for a TCPA claim. Mot. to Dismiss 5. The thrust of Defendant's argument in support of dismissal is that Plaintiff's state TCPA claim must be dismissed because his (federal) TCPA claim should be dismissed. *Id.* As Plaintiff's underlying (federal) TCPA section 227(b) claims are cognizable, Plaintiff's state TCPA claim under § 305.053 are as well. *See, e.g., Morris v. Hornet Corp.*, No. 4:17-cv-00350, 2018 U.S. Dist. LEXIS 170945, 2018 WL 4781273, at *6-7 (E.D. Tex. Sept. 14, 2018) ("Plaintiff's TCPA violation claims regarding the first two uninvited calls made by Defendant should not be dismissed. Accordingly, Plaintiff's claim for a violation based on the coextensive Texas statute also should not be dismissed."); *Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568, at *8, 2019 U.S. Dist. LEXIS 102449, at *20 (E.D. Tex. Apr. 30, 2019). Accordingly, the Court concludes that Plaintiff has stated a claim under § 305.053.

## IV. CONCLUSION

For the reasons set forth above, the Court enters the following orders:

**IT IS HEREBY ORDERED** that Defendant GreenSky, Inc.'s "Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) ("Motion") (ECF No. 4) is **GRANTED** in part and **DENIED** in part. The motion is **GRANTED** as to the claim under 47 C.F.R. § 64.1200, and **DENIED** as to the claims under 47 U.S.C. § º227 and § º305.053 of the Texas Business and Commerce Code.

**IT IS FURTHER ORDERED** that Plaintiff Brandon Callier's claim under 47 C.F.R. § 64.1200 is **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2688622

Footnotes

1    Defendant contends it is improperly named as GreenSky, Inc. and that its actual name is GreenSky, LLC. Mot. 1. As the pleadings refer to Defendant as GreenSky, Inc., the Court will do the same.

2    Defendant emphasizes that Plaintiff has filed three actions under the TCPA in the Western District of Texas with different cell phone numbers. Suppl. 6. The Court acknowledges these actions. Nevertheless, the Court is required to accept Plaintiff's factual allegations as true. Plaintiff has adequately alleged that he uses (915) 383-4604 for personal reasons, which is what is required at the pleading stage. If Defendant wishes to attack Plaintiff's allegation that (915) 383-4604 is a cell phone used for personal reasons, such an attack is appropriate at the summary judgment stage. *Cunningham v. Britereal Mgmt.*, No. 4:20-cv-144-SDJ-KPJ, 2020 WL 7391693, at *4, 2020 U.S. Dist. LEXIS 236135, at *8, *adopted by* No. 4:20-cv-144-SDJ-KPJ, 2020 WL 7388415, at *——, 2020 U.S. Dist. LEXIS 235956, at *1 (E.D. Tex. Dec. 16, 2020) (holding that *Stoops* did not countenance dismissal at the

pleading stage, which would be "premature, particularly when the complaint lacks factual allegations affirmatively showing the plaintiff is a serial [TCPA] plaintiff.")

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

2022 WL 2298194
Only the Westlaw citation is currently available.
United States District Court, W.D. Oklahoma.

Danny COLLINS, individually and on behalf of all others similarly situated, Plaintiff,
v.
SONIC CORP., a Delaware corporation d/b/a Sonic Drive-In, Defendant.

Case No. CIV-20-01067-JD
|
Signed 06/22/2022

**Attorneys and Law Firms**

Andrew J. Shamis, Shamis & Gentile PA, Miami, FL, J. David Jorgenson, Waller Jorgenson, PLLC, Tulsa, OK, Mark A. Waller, Sneed Lang Herrold, Tulsa, OK, Scott A. Edelsberg, Edelsberg Law, Aventura, FL, for Plaintiff.

Craig A. Fitzgerald, Gable & Gotwals, Tulsa, OK, for Defendant.

**ORDER**

JODI W. DISHMAN, UNITED STATES DISTRICT JUDGE

**\*1** Under federal law, telemarketers can be liable if they send people more than one communication that violates federal telemarketing regulations. Plaintiff Danny Collins ("Collins") filed this suit claiming that Defendant Sonic Corp. ("Sonic") sent him two text messages in violation of federal regulations. Sonic filed a Motion to Dismiss ("Motion") [Doc. No. 31], Collins responded [Doc. No. 32], and Sonic replied [Doc. No. 33]. Because Sonic only sent one text message that plausibly violated telemarketing regulations, Collins has not stated a claim. Therefore, the Court grants the Motion and dismisses the amended complaint.

**I. Background**

Collins alleges that on July 11, 2020, Sonic sent him a telemarketing text message advertising that "[t]he BBLT is back at SONIC and bringing the bacon!" (the "July 11 Text"). [Doc. No. 25 at 6].[1] Collins, apparently not tempted by the prospect of "six slices of crispy bacon, hand-cut tomatoes, fresh lettuce and creamy mayo," [id.], responded "Stop" within a minute of receiving this text message. [Id.]. Sonic confirmed via another text message that Collins "will no longer receive text messages from SONIC" one minute later. [Id.].[2] Notwithstanding this confirmation, Sonic sent Collins another text message on July 22, 2020, inviting him to "Celebrate Nat'l Hot Dog Day at SONIC!" (the "July 22 Text"). [Id.].

Collins filed suit three months later alleging that these communications violated the Telephone Consumer Protection Act ("TCPA"). [Doc. No. 1]. In his amended complaint, Collins brings one count of a violation of 47 U.S.C. § 227(c)(5) on behalf of himself and a putative class, alleging that Sonic violated the regulations in 47 C.F.R. §§ 64.1200(d)(3), and (6).

[Doc. No. 25 at 11–12].

Sonic seeks to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that (1) Collins fails to allege he received more than one message from Sonic in violation of the regulations, and (2) there is no private cause of action for these kinds of alleged violations. The parties both submitted notices of supplemental authority on the second argument. [Doc. Nos. 35, 37, 38]. Because dismissal is warranted on the first basis, the Court does not address Sonic's second argument.

## II. <u>Applicable Law</u>

### A. Dismissal Standard

**\*2** To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a complaint does not need detailed factual assertions, a pleading that offers only "labels and conclusions" or "pleads facts that are merely consistent with a defendant's liability" will not suffice. *Id.* (citation omitted).

The burden is on the plaintiff to plead factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Under this standard, all well-pled factual allegations are accepted as true. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010). However, the Court "will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1195 (10th Cir. 2018) (citation omitted).

### B. Section 227(c) of the TCPA

Section 227(c) of the TCPA instructs the Federal Communications Commission ("FCC") to promulgate regulations to establish and operate a national database of telephone numbers of people who object to receiving telephone solicitations, and permits the FCC to prohibit telephone solicitations to any number in the database. 47 U.S.C. § 227(c). The FCC promulgated these regulations that, in general, prohibit "telemarketers from placing telephone calls to residential telephone subscribers without following certain procedures." *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 628–29 (6th Cir. 2009). The TCPA provides a claim if a person "has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under" § 227(c)(5). *See* 47 U.S.C. § 227(c).

### C. Relevant Telemarketing Regulations: 47 C.F.R. §§ 64.1200(d)(3) and (6)

If a person requests that the telemarketer not contact them, telemarketers must honor a person's "do-not-call" request and must maintain a list of such do-not-call requests for five years. 47 C.F.R. §§ 64.1200(d)(3), (6). 47 C.F.R. § 64.1200(d)(6) requires a telemarketer to maintain a list of individuals who have requested not to be called, and § 64.1200(d)(3) requires the telemarketer to comply with a person's request not to be called. *See also Childress v. DeSilva Auto. Servs., LLC*, No. CIV 20-0136 JB\ JHR, 2020 WL 3572909, at \*8 (D.N.M. July 1, 2020) (describing the same).

A person can object directly to the telemarketer and opt out of further communications, or they can put themselves on a federal do-not-call registry. *See* 47 C.F.R. §§ 64.1200(c) and (d). *Cf. Mestas v. CHW Grp. Inc.*, 508 F. Supp. 3d 1011, 1029

(D.N.M. 2020) (stating that "Plaintiff may properly base his [TCPA] claim on a violation of [47 C.F.R. § 64.1200(c)], and has done so here by alleging that Jane Does made telephone solicitations on Defendants' behalf more than once within 12 months to his phone number that was registered on the national do-not-call registry.").

### III. Discussion

Sonic claims that § 227(c)(5) was not triggered because Collins did not receive *more than one* text after he objected or opted out on July 11, 2020. *See generally* Motion. In essence, Sonic claims that the July 11 Text was not sent "in violation of" any regulation under the facts alleged here, and after Collins demanded that Sonic "Stop," § 227(c)(5) requires that Sonic would need to send at least two texts after that point. *Id.*

**\*3** Collins argues that § 227(c)(5) makes no mention of the distinction between texts received before or after objecting or opting out; instead Collins simply focuses on Sonic sending two, allegedly violative messages within a twelve-month period. [Doc. No. 32 at 6]. The parties appear to agree that Collins could state a plausible claim that the July 22 Text violated § 227(c)(5). But Collins must show Sonic sent at least two texts in violation of regulations. *See* 47 U.S.C. § 227(c)(5). The focus is therefore on the July 11 Text.

Collins argues that the second, post-objection text that he received from Sonic on July 22 is an *indication* that Sonic did not adequately maintain and honor a list of individuals who may not be called under 47 C.F.R. § 64.1200(d). Put another way, Collins argues that based on Sonic's purported violation of 47 C.F.R. §§ 64.1200(d)(3) and (6) on July 22, it is plausible to infer that Sonic also did not adequately maintain an internal do-not-call list and policy at the time it sent the July 11 Text either, and if the Court now views these two texts together, Collins satisfies the two-text minimum required by § 227(c)(5). *See* [Doc. No. 32 at 5–7 (describing the "reasonable inference" that Collins would not have received the July 22 Text after opting out if Sonic had adequately "maintain[ed] and properly utilize[d] the legally required internal do-not-call list and related procedures")].

The Court agrees with Sonic's position. The Court must honor the plain text of § 227(c)(5), requiring that more than one text be sent to Collins "*in violation of* the regulations prescribed" in that section. 47 U.S.C. § 227(c)(5) (emphasis added). Nothing before the Court shows that the first text was not lawfully sent. Looking at the two regulations that have been invoked by Collins and the well-pled factual allegations:

  • Collins has not stated a plausible claim for the July 11 Text based on a violation of 47 C.F.R. § 64.1200(d)(3) because that regulation requires Sonic comply with Collins's request not to be called, and Collins does not allege that he made such a request prior to the July 11 Text. *See* [Doc. No. 25].

  • Collins has not stated a plausible claim for the July 11 Text based on a violation of 47 C.F.R. § 64.1200(d)(6), which requires Sonic to maintain a list of consumers who may not be called, because there is no apparent reason that Collins should have been on such a list at the time, or least none alleged.

Thus, looking at the July 11 Text on its own, Collins has not plausibly alleged that it was sent in violation of 47 C.F.R. §§ 64.1200(d)(3) or (6). *Cf. Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019) ("The statute marks its own boundary. Suit can only be brought by those who receive multiple violative calls. Calls are only violative if the phone number was on the Do-Not-Call registry.").

The Court is not persuaded by Collins's novel argument that because Sonic might have violated 47 C.F.R. §§ 64.1200(d)(3) or (6) by sending the July 22 Text, the Court should assume or infer that Sonic was also in violation of the relevant regulations when it sent the July 11 Text. But that possibility is "short of the line" of plausibility. *Twombly*, 550 U.S. at 546. It stops short of Collins plausibly demonstrating that the July 11 Text itself was sent to him "in violation of" the telemarketing regulations. 47 U.S.C. § 227(c)(5); *Kyle v. Fed. Trade Comm'n*, No. 21-MC-9004-SRB, 2021 WL 1407960, at \*5 (W.D. Mo. Apr. 14, 2021) (Congress enacted do-not-call legislation "[t]o ensure telemarketer compliance and to vindicate the harm *caused by* [do-not-call] Registry violations") (emphasis added). *See also* 47 U.S.C. § 227(c)(1) (the FCC "shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations *to which they object*," including creating "industry-based or company-specific 'do not call'

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 158 of 409   PageID 227

Collins v. Sonic Corp., Not Reported in Fed. Supp. (2022)

systems") (emphasis added).[3] *Cf. Johansen v. Efinancial LLC*, No. 2:20-cv-01351-RAJ-BAT, 2021 WL 7161969, at *6–9 (W.D. Wash. June 11, 2021), *R. & R. adopted*, No. 2:20-CV-01351-DGE, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022) (calls made while customer consented to communications do not trigger § 227(c)(5)); *Gibbs v. SolarCity Corp.*, 239 F. Supp. 3d 391, 397 (D. Mass. 2017) ("The complaint alleges numerous unsolicited calls after [plaintiff's] first revocation of consent. Certainly 'more than one,' which is all that is required.").[4]

**\*4** The Court cannot infer that Sonic sent two violative texts when Collins has only plausibly alleged one violative text. *Cf. Krakauer*, 925 F.3d at 657 ("Suit can only be brought by those who receive multiple violative calls. Calls are only violative if the phone number was on the Do-Not-Call registry."). Simply put, "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" Collins receiving more than one text by Sonic in violation of the regulations "reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.' " *Twombly*, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)(2)).

## IV. **Conclusion**

Collins has not plausibly alleged a claim for a violation of § 227(c)(5) based on the July 11 Text because he has not sufficiently alleged that it was sent "in violation of" any regulation. He has therefore only plausibly alleged receipt of one communication from Sonic in violation of § 227(c)(5), but that statute plainly requires that he receive "more than one" communication.

Accordingly, the Court GRANTS the Motion to dismiss the amended complaint. Sonic requests that the Court dismiss the action with prejudice. The amended complaint is Collins's second complaint filed in this action.[5] Collins fails to respond to Sonic's requested with-prejudice dismissal in his briefing or seek leave to amend in response to the Motion. Consequently, the Court has no argument or analysis before it regarding how the pleading deficiency could be cured by allowing further amendment. With no request to amend and no argument on how amendment would cure the defect, the Court will dismiss the action with prejudice as requested by Sonic. *See Slocum v. Corp. Express U.S. Inc.*, 446 F. App'x 957, 960 (10th Cir. 2011) (unpublished) ("Rule 12(b)(6) dismissals, unless otherwise indicated, constitute a dismissal *with* prejudice."); *Higgins v. City of Tulsa*, 103 F. App'x 648, 651 (10th Cir. 2004) (unpublished) (same).

IT IS SO ORDERED this 22nd day of June 2022.

## **All Citations**

Not Reported in Fed. Supp., 2022 WL 2298194

Footnotes

1  The Court cites ECF page numbering.

2  The parties agree that this confirmatory text was not in violation of telemarketing regulations.

3  As stated in *Charvat v. ATW, Inc.*:

   The purpose of [§ 227(c)(5)] is to prevent repeated telemarketing calls *to someone who has told the telemarketer not to call.* No private right of action accrues and a telemarketer is not in violation of the statute unless and until it telephones a party more than once in any twelve-month period *after* the person has informed the telemarketer that he or she does not want to be called.

   127 Ohio App. 3d 288, 292, 712 N.E.2d 805, 807 (1998) (emphasis added).

Collins v. Sonic Corp., Not Reported in Fed. Supp. (2022)

4    It should be noted that the Court is not making any conclusions regarding whether Collins could eventually *recover damages* for the July 11 Text if he could state a claim. An issue that arises in some other do-not-call cases is whether, because the statute uses "more than one," this means that plaintiffs cannot recover damages for the first call—they can only recover for subsequent calls. But the dispute in this case is whether, for the purposes of *stating a claim*, a plaintiff must plausibly allege at least two communications were made in violation of the relevant regulations. Here, Collins has not plausibly alleged that some violation of the regulations led to the July 11 Text. The measure of damages *after* plaintiffs can state a claim is a different issue.

5    Moreover, consistent with the Court's chamber procedures for civil cases requesting that parties confer before filing motions to dismiss, the parties conferred through counsel. Despite Sonic explaining the basis for its Motion, the parties were unable to reach an accord. *See* [Doc. No. 31 at 2 n.1 (explaining the parties conferred through counsel regarding whether plaintiff could maintain a claim under 47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(d) "given that it is undisputed that plaintiff did not receive more than one text message after allegedly opting out"); Doc. No. 33 at 2 n.2 ("Despite having amended the original Complaint after counsel for the parties conferred on this issue, Plaintiff still cannot allege more than one call in violation of the TCPA and thus cannot plead a claim under § 227(c), and therefore his [amended] Complaint should be dismissed with prejudice.")].

---

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

2023 WL 3483358
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, Austin Division.

Xavier L. CRITTENDON, Plaintiff

v.

State of Texas HEALTH AND HUMAN SERVICES COMMISSION, Defendant

Case No. 1:23-CV-00327-LY-SH
|
Signed April 13, 2023

**Attorneys and Law Firms**

Xavier L. Crittendon, DeSoto, TX, Pro Se.

Glen Imes, Office of the Attorney General, Austin, TX, for Defendant.

**ORDER AND REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

SUSAN HIGHTOWER, UNITED STATES MAGISTRATE JUDGE

**\*1**
**TO: THE HONORABLE LEE YEAKEL**
**UNITED STATES DISTRICT JUDGE**
Before the Court are Plaintiff's Complaint and Request for Injunction (Dkt. 1) and Motion to Proceed in District Court Without Prepaying Fees or Costs, both filed March 24, 2023 (Dkt. 2); and Plaintiff's Motion for Permission to File Electronically (Dkt. 5) and Motion to Proceed and Order for Immediate Injunction, both filed April 11, 2023 (Dkt. 6). The District Court referred this case to this Magistrate Judge, pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72, Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, and the Court Docket Management Standing Order for United States District Judge Lee Yeakel. Dkt. 3.

**I. General Background**

Pro se Plaintiff Xavier Crittendon, a Texas resident, brings this lawsuit against the Texas Department of Health and Human Services ("TDHHS"), alleging violations of her rights under the United States Constitution and the Texas Protection of Religious Organization Act, Tex. Gov't Code Ann. § 2401.002 (West 2021). Complaint, Dkt. 1. Plaintiff was the owner and director of All Things Good Kids Academy, a child care facility, in Ovilla, Texas. She alleges that since 2011, TDHHS has committed "acts of terrorism against Plaintiff," as well as "repeated acts of scandalmongering, public humiliation (public posting) and harassment." *Id.* at 4, 39. Specifically, Plaintiff alleges that TDHHS falsely accused Plaintiff and her child care facility of violating various regulations and "maliciously" forcing the closure of its "faith-based religious early childhood education program" in retaliation. *Id.* at 13, 33. In addition to injunctive relief, Plaintiff seeks monetary damages of "2%

biennial budget" of the TDHHS since 2011. *Id.* at 5.

This is not the first federal suit Plaintiff has filed against TDHHS concerning its enforcement of regulations of Plaintiff's child care facility. On May 1, 2019, Plaintiff sued TDHHS and its affiliates in the Southern District of Texas, alleging that TDHHS committed conspiracy and "mob-like crimes," including threatening to shut down a child care facility, committing perjury before administrative courts, committing intrinsic and extrinsic fraud to prevent a facility's submission of evidence to an administrative court, and intentionally delaying new applicants' background checks. *Crittendon v. Tex. Dept. of Health and Human Servs.*, 4:19-CV-01624 (S.D. Tex. May 1, 2019).[1] On November 12, 2019, the district court dismissed that case without prejudice after finding that Plaintiff failed to properly serve the defendants, and that Plaintiff's claims against TDHHS were barred by the Eleventh Amendment. *Id.* at Dkt. 50.

## II. Motion to Proceed *In Forma Pauperis*

Plaintiff seeks leave to file her Complaint without having to pay the filing fee. After reviewing Plaintiff's Financial Affidavit, the Court finds that she is indigent. Accordingly, the Court hereby **GRANTS** Plaintiff *in forma pauperis* status. This indigent status is granted subject to a later determination that the action should be dismissed if the allegation of poverty is untrue or the action is found frivolous or malicious pursuant to 28 U.S.C. § 1915(e). Plaintiff is further advised that although she has been granted leave to proceed *in forma pauperis*, a Court may, in its discretion, impose costs of court at the conclusion of this lawsuit, as in other cases. *Moore v. McDonald*, 30 F.3d 616, 621 (5th Cir. 1994).

**\*2** The Court has conducted a § 1915(e) review of the claims in the Complaint and recommends that Plaintiff's claims should be dismissed. Therefore, service on Defendant should be withheld pending the District Court's review of the recommendations made in this Report. If the District Court declines to adopt the recommendations, service should be issued on Defendant at that time.

## III. Application for Permission to File Electronically

Plaintiff also asks the Court to approve her request to become an electronic filing user in the United States District Court for the Western District of Texas. The Court hereby **GRANTS** Plaintiff's Application for Permission to File Electronically (Dkt. 5) and **ORDERS** that Plaintiff may file electronically on the Western District of Texas Official Court Electronic Document Filing System in this action. If she has not already done so, Plaintiff is directed to review the "General Information" section on the "CM/ECF" tab on the United States District Court for the Western District of Texas's website (www.txwd.uscourts.gov). Plaintiff shall submit a completed United States District Court for the Western District of Texas E-Filing and E-Noticing Registration Form via email to the email address provided on the form (txwd_ecf_help@txwd.uscourts.gov).

## IV. Section 1915(e)(2) Frivolousness Review

Because Plaintiff has been granted leave to proceed *in forma pauperis*, the Court is required by standing order to review her Complaint under § 1915(e)(2). A district court may summarily dismiss a complaint filed *in forma pauperis* if it concludes that the action is (1) frivolous or malicious; (2) fails to state a claim on which relief may be granted; or (3) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B). A complaint is frivolous "where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory. A complaint lacks an arguable basis in fact if, after providing the plaintiff the opportunity to present additional facts when necessary, the facts alleged are clearly baseless." *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998) (citations omitted).

District courts have broad discretion in determining whether a complaint is frivolous under § 1915(d). *Wilson v. Lynaugh*, 878 F.2d 846, 849 (5th Cir. 1989). "This broad discretion derives from § 1915's dual role of keeping the courtroom doors open to all litigants regardless of financial resources, yet guarding against abuse of this free access by litigants, such as prisoners, who have nothing to lose by flooding courts with suit after suit." *Id.*

The Eleventh Amendment bars a state's citizens from filing suit against the state or its agencies in federal courts. *Cozzo v. Tangipahoa Par. Council–President Gov't*, 279 F.3d 273, 280 (5th Cir. 2002). "When a state agency is the named defendant, the Eleventh Amendment bars suits for both money damages and injunctive relief unless the state has waived its immunity," *id.* at 280-81, or Congress has clearly abrogated it. *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). Congress did not waive the states' sovereign immunity in enacting the Civil Rights Act, 42 U.S.C. § 1983. *Aguilar v. Texas Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998). As a state agency, TDHHS is entitled to Eleventh Amendment immunity from Plaintiff's suit.[2] Congress has not abrogated TDHHS's sovereign immunity for civil rights suits, and there is no indication Texas has consented to this suit. Plaintiff's suit is barred by the Eleventh Amendment and her Complaint should be dismissed under § 1915. *See Talib*, 138 F.3d at 211 (affirming dismissal of state agency under § 1915 based on Eleventh Amendment immunity).

### V. Order and Recommendation

**\*3** The Court **GRANTS** Plaintiff's Motion to Proceed in District Court Without Prepaying Fees or Costs (Dkt. 2) and Plaintiff's Motion for Permission to File Electronically (Dkt. 5).

This Magistrate Judge **RECOMMENDS** that the District Court **DISMISS** Plaintiff's lawsuit as frivolous under 28 U.S.C. § 1915(e)(2), and **DISMISS** as **MOOT** Plaintiff's Motion for Permanent Injunction (Dkt. 1) and Motion to Proceed and Order for Immediate Injunction (Dkt. 6).

The Court **FURTHER ORDERS** the Clerk to **REMOVE** this case from the Magistrate Court's docket and **RETURN** it to the docket of the Honorable Lee Yeakel.

### VI. Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

### All Citations

Slip Copy, 2023 WL 3483358

### Footnotes

[1]     The Court may take judicial notice of Plaintiff's other lawsuits as a matter of public record. *In re Deepwater Horizon*, 934 F.3d 434, 440 (5th Cir. 2019).

2  *Texas v. Becerra*, 575 F. Supp. 3d 701, 712 (N.D. Tex. 2021), *appeal dismissed*, 2022 WL 2752370 (5th Cir. Jan. 24, 2022) (finding TDHHS to be a state agency); *Castillo v. San Antonio Hous. Auth.*, No. SA-06-CA-841-XR, 2007 WL 208611, at *3 (W.D. Tex. Jan. 24, 2007) (same).

---

**End of Document**         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

2016 WL 7494871
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

Craig CUNNINGHAM, Plaintiff,

v.

Carribean Cruise LINES, Inc, Defendant.

Case Number: 15-62580-CIV-MORENO
|
Filed 12/29/2016
|
Entered 12/28/2016

**Attorneys and Law Firms**

Sylvia L. Wenger, Wenger Mediation & Legal Services, Jupiter, FL, for Plaintiff.

Jeffrey Aaron Backman, Greenspoon Marder, P.A., Fort Lauderdale, FL, for Defendant.

**ORDER GRANTING MOTION TO DISMISS**

FEDERICO A. MORENO, UNITED STATES DISTRICT JUDGE

**\*1** THIS CAUSE came before the Court upon Defendant Carribean Cruise Line, Inc.'s Motion to Dismiss Plaintiff's Complaint (D.E. 23), filed on **March 9, 2016.**

THE COURT has considered the motion, the response in opposition, the reply, pertinent portions of the record, and arguments presented in open court on December 13, 2016, and being otherwise fully advised in the premises, it is

**ORDERED AND ADJUDGED** that Defendant's Motion is **GRANTED.** Counts II, III, and IV are dismissed with prejudice and Counts I and V are dismissed without prejudice.

**I. BACKGROUND**

This is a Telephone Consumer Protection Act and Florida Deceptive and Unfair Trade Practices Act case. Plaintiff filed a five-count complaint against Defendant, alleging violation of the Telephone Consumer Protection Act, § 227(b)(l)(A)(iii) (Count I), the Telephone Consumer Protection Act, § 227(b)(1)(B) (Count II), the Telephone Consumer Protection Act, § 64.1220(a)(2) (Count III), the Telephone Consumer Protection Act, § 64.1220(b)(1) (Count IV), and the Florida Deceptive and Unfair Trade Practices Act (Count V). Plaintiff alleges Defendant utilized an automatic dialing system to repeatedly call Plaintiff, without consent and without identifying itself, in order to induce him to purchase a cruise package. Plaintiff

ultimately purchased one of the packages in an attempt to end the calls and ascertain the caller's identity. Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

"A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986). To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Detailed factual allegations are not required, but a pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly,* 550 U.S. at 555; *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004) ("To survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions," instead plaintiffs must "allege some specific factual basis for those conclusions or face dismissal of their claims."). In short, the complaint must not merely allege a misconduct, but must demonstrate that the pleader is "entitled to relief." *Iqbal,* 556 U.S. at 677-78.

## III. LEGAL ANALYSIS

### A. Counts I and V: Violations of 47 U.S.C. § 227(b)(l)(A)(iii) and Fla. Stat. § 501.201 are Dismissed without Prejudice

Counts I and V of Plaintiff's Complaint are dismissed without prejudice as stated on the record in open court on December 13, 2016. Plaintiff may amend her claims for violations of the Telephone Consumer Protection Act under 47 U.S.C. § 227(b)(A)(iii) and the Florida Deceptive and Unfair Practices Act, Fla. Stat. § 501.201, *et seq.*, retaining the designations "Count I" and "Count V" respectively.

### B. Count II, Violation of 47 U.S.C. § 227(b)(1)(B), is Dismissed with Prejudice.

**\*2** The Telephone Consumer Protection Act states:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States ... to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B).

47 U.S.C. § 227(b)(1)(B) (2016).

While Plaintiff argues that his cellular phone serves as both a mobile and residential line, the Eleventh Circuit distinguishes residential land line telephone numbers from cell-phone numbers. In *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014), the court differentiated between residential landlines and cellular phone numbers in its analysis of the statutory intent behind the phrases "intended recipient" and "called parties":

To start with, the case concerned 47 U.S.C. § 227(b)(1)(B), which prohibits initiating any telephone call to any *residential telephone line* using an artificial or prerecorded voice to deliver a message without the prior express consent of the called

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 168 of 409   PageID 237

Cunningham v. Lines, Not Reported in Fed. Supp. (2016)

party. No. 8626, the telephone number in question here, is a cell-phone number.

*Id.* (emphasis in original) (citing § 227(b)(1)(B)). In *Breslow v. Wells Fargo Bank,* 755 F.3d 1265 (11th Cir. 2014), the Eleventh Circuit further distinguished residential landline telephone numbers from cellular phones under the Act by affirming a lower court ruling that noted:

> Practical realities support a distinction between residential and cellular lines. *Residential lines* are often shared by multiple users. An individual giving her home phone number to a creditor may also be giving the creditor her husband's, mother's or roommate's home number. Any of these individuals could answer the phone should the creditor attempt to call the line in an effort to collect the debt ...*Cellular lines,* on the other hand, are personal to an individual—one person rarely answers another's cellular phone. Thus, the intended recipient and actual recipient of a call to a cellular line is most often the same person, making a broader exemption less necessary than for residential lines.

857 F. Supp. 2d 1316, 1320-21 (S.D. Fla. 2012) (emphasis added); *see also Fini v. Dish Network,* L.L.C., 955 F. Supp. 2d 1288, 1300 (M.D. Fla. 2013) ("It is also apparent that Defendant would be shielded from TCPA liability by the FCC's exemption for commercial calls that do not constitute telephone solicitation, if only its customer had misrepresented that his phone number was a residential line instead of a cellular line.... Nevertheless, this Court is bound by the law that it finds, not the law that it seeks.").

Plaintiff concedes that all telephone calls at issue were made to his cellular telephone number, and the Court finds Plaintiff's assertion that a cellular phone can be converted into a residential phone unavailing. Therefore, the Court grants Defendant's motion as to Count II.

**C. Count III, Violation of 47 C.F.R. § 64.1220(a)(2), is Dismissed with Prejudice**

**\*3** Plaintiff brings claims under both 47 C.F.R. § 64.1220(a)(2) and 42 U.S.C. § 227(b)(1)(A). Section 227(b)(3)(A)-(C) provides a private right of action:

> A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State
>
> > (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
> >
> > (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
> >
> > (C) both such actions.
>
> If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(3)(A)-(C).

While Plaintiff also seeks a private right of action under 47 C.F.R. 64.1220(a)(2), section 64.1220 merely reiterates the statutory prohibition prescribed by 42 U.S.C. § 227(b)(1)(A). Because Plaintiff has the opportunity to amend her allegations under section 227(b)(1)(A), the Court grants Defendant's motion to dismiss Count III.

**D. Count IV: Violation of 47 C.F.R. § 64.1220(b)(1), is Dismissed with Prejudice**

Plaintiff similarly seeks a private right of action under 47 C.F.R. § 64.1220(b)(1). For the reasons stated in the Court's analysis of Plaintiff's claim for violation of 47 C.F.R. § 64.1220(a)(2), the Court also grants Defendant's motion to dismiss

Count IV.

**IV. CONCLUSION**

For the reasons put forth in this Order, it is

**ORDERED AND ADJUDGED** that Defendant Carribean Cruise Lines, Inc.'s Motion to Dismiss Plaintiff Craig Cunningham's Complaint is **GRANTED.** It is further

**ORDERED AND ADJUDGED** that Counts II, III, and IV are <u>**dismissed with prejudice**</u>. It is further

**ORDERED AND ADJUDGED** that Count I and V are <u>**dismissed without prejudice**</u>. It is further

**ORDERED AND ADJUDGED** that Plaintiff shall file an Amended Complaint by <u>**noon**</u> on <u>**January 15, 2017**</u> and the failure to do so will be grounds for dismissal.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th of December 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7494871

**End of Document**                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 15

2021 WL 2792353
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

Craig CUNNINGHAM, Plaintiff,
v.
CREATIVE EDGE MARKETING LLC, et al., Defendants.

CIVIL ACTION NO. 4:19-CV-00669-ALM-CAN
|
Signed 06/16/2021

**Attorneys and Law Firms**

Leland Garrett McRae, Law Office of Leland Garrett McRae, San Antonio, TX, for Plaintiff.

Craig Cunningham, Plano, TX, Pro Se.

Terrell Samuels, Houston, TX, Pro Se.

## AMENDED REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Christine A. Nowak, UNITED STATES MAGISTRATE JUDGE

**\*1** Pending before the Court is Plaintiff Craig Cunningham's Motion for a Default Judgment and Request for a Hearing to Determine Damages ("Plaintiff's Motion for Default Judgment") [Dkt. 37]. The Court, after providing notice to Defendant Creative Edge Marketing, LLC [Dkt. 38], held an evidentiary hearing on September 15, 2020, at which Plaintiff was represented by counsel [Dkt. 45].[1] Following hearing, Plaintiff filed a Supplemental Brief in Support of Motion for Default Judgment [Dkt. 44]. On September 24, 2020, the undersigned recommended Plaintiff's Motion for Default Judgment be granted in part and denied in part, which the District Court adopted. *Cunningham v. Creative Edge Mktg. LLC*, No. 4:19-CV-00669-ALM-CAN, 2020 WL 8409093 (E.D. Tex. Sept. 24, 2020), *report and recommendation adopted*, No. 4:19-CV-669, 2021 WL 351295 (E.D. Tex. Feb. 2, 2021). Before entry of any judgment, the District Court *sua sponte* withdrew its Memorandum Adopting [Dkt. 53] the undersigned's September 24, 2020 recommendation. The District Court instructed the undersigned to issue an amended report and recommendation considering its recent opinion in *Cunningham v. Matrix Fin. Services, LLC*, No. 4:19-CV-896, 2021 WL 1226618 (E.D. Tex. Mar. 31, 2021). Having now done so, the Court recommends Plaintiff's Motion for Default Judgment [Dkt. 37] be **DENIED**.

## BACKGROUND

### *Summary of Live Pleading and Default Motion*

Plaintiff moves the Court to enter default judgment against Defendant Creative Edge Marketing LLC ("Defendant") under Federal Rule of Civil Procedure 55 [Dkts. 37; 44; 45]. On September 16, 2019, Plaintiff filed suit against Defendants Creative Edge Marketing LLC and Terrell Samuels in the Eastern District of Texas [Dkt. 1].[2] On February 12, 2020, Plaintiff filed his Amended Complaint [Dkt. 18]—the live pleading. Therein, Plaintiff alleges federal question jurisdiction and asserts three causes of action against Defendant Creative Edge Marketing, LLC for violations of: (1) the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A) [Dkt. 18 at 10-11]; (2) 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d) [Dkt. 18 at 11-12]; and (3) Texas Business and Commerce Code § 305.053 [Dkt. 18 at 12-13].

Plaintiff's Amended Complaint alleges he received multiple calls between April and October 2019, in violation of the TCPA and Texas Business and Commerce Code, by or on behalf of Defendant; Defendant is alleged to have solicited Plaintiff over the phone to purchase internet advertising services [Dkt. 18 at 6-7]. Defendant Creative Edge Marketing LLC "provides internet marketing, website design and branding, online advertising, social media marketing and business consulting services"—the same services offered in the alleged calls [Dkt. 18 at 5-6]. Plaintiff alleges the calls made by or on behalf of Defendant were initiated by an automated telephone dialing system ("ATDS") to place calls to his cellphone for non-emergency purposes without his consent [Dkt. 18 at 7]. Plaintiff further alleges the callers did not identify who they were calling on behalf of until asked [Dkt. 18 at 6]. Plaintiff claims that, after he completed screening questions with an initial foreign telemarketer, he was transferred to a "product specialist" who offered incentives to purchase Defendant's marketing services [Dkt. 18 at 6]. Plaintiff believes Defendant knew "overseas telemarketers were placing calls on [its] behalf" using an ATDS, without Plaintiff's consent, and without maintaining a written do-not-call policy [Dkt. 18 at 6-7]. Further to this point, Plaintiff's pleadings detail certain conversations with Defendant Terrell Samuels, alleged to be the managing partner of Creative Edge Marketing LLC [Dkt. 18 at 1, 6-7]. Plaintiff claims he emailed Samuels that Plaintiff no longer wanted to receive "unwanted telemarketing calls and threatened to sue" [Dkt. 18 at 8]. Plaintiff pleaded that he received forty-five calls to his cell phone by or on behalf of Defendant after he sent the email to Samuels on April 17, 2019 [Dkt. 18 at 8-9].

**\*2** Relevant to the District Court's directive to the undersigned, at hearing, Plaintiff proffered a phone log and spreadsheet demonstrating specific days, times, and phone numbers for calls from the phone numbers he alleges are violative of the statute—all calls occurred between April 24, 2019, and October 21, 2019 [Dkts. 45; 46 at 4]. By way of his Motion for Default Judgment, Plaintiff seeks statutory damages of $1,500 per phone call under § 227(b) for willful and knowing violations, $1,500 per phone call under § 227(c) for willful and knowing violations, $1,500 per phone call under the Texas Business and Commerce Code for willful and knowing violations, court costs, interest, and attorneys' fees [Dkt. 18 at 10-13]. As indicated, the undersigned previously recommended Plaintiff's requested relief be granted in part and denied in part; specifically, Plaintiff receive damages for forty-three violations of § 227(b) [Dkt. 46].

### *Relevant Procedural History Regarding Issuance of Amended Report*

On June 9, 2021, the District Court *sua sponte* reconsidered the February 2, 2021 Memorandum Adopting [Dkt. 58]. The June 9, 2021 order noted that "less than two months after the February 2 Memorandum Adopting and before entry of any judgment in this case, the Court issued its decision in *Matrix*" [Dkt. 58 at 2]. Analyzing the Supreme Court's decision in *Barr v. American Association of Political Consultants, Inc. (AAPC)*, 140 S. Ct. 2335 (2020), the District Court in *Cunningham v. Matrix Fin. Services, LLC*, No. 4:19-CV-896, 2021 WL 1226618 (E.D. Tex. Mar. 31, 2021), "determined it lacks subject matter jurisdiction over any § 227(b)(1)(A)(iii) claims for calls made between November 2015, *see* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (2015), and July 6, 2020, *see AAPC*, 140 S. Ct. at 2356" [Dkt. 58 at 2]. This time span encompasses those calls about which Plaintiff complains in the instant cause. As such, the District Court has instructed the undersigned to "expeditiously issue an amended Report and Recommendation on Plaintiff Craig Cunningham's Motion for a Default Judgment (Dkt. #37) in light of this Order and the Court's decision in *Cunningham v. Matrix Financial Services, LLC*, No. 4:19-CV-896, 2021 WL 1226618 (E.D. Tex. Mar. 31, 2021)" [Dkt. 58 at 3]. *AAPC*, the Supreme Court case that *Matrix* analyzes, was decided on July 6, 2020—roughly coeval with the September 24, 2020 Report and Recommendation [Dkt. 46]. Moreover, the Court had not yet been presented with the issue squarely addressed by *Matrix* at the time of issuance of its earlier recommendation. *See* [Dkt. 46]. The Court now considers the pending Motion for Default Judgment in light of the District Court's instruction.

## LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure sets forth the conditions upon which default may be entered against a party, as well as the procedure to seek the entry of default judgment. *See* Fed. R. Civ. P. 55. Securing a default judgment involves a three-step procedure: (1) the defendant's default; (2) the entry of default; and (3) the entry of default judgment. *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). A "default" occurs when the defendant does not plead or otherwise respond to the complaint. *Id.* An "entry of default" is the notation the clerk makes after the default is established by affidavit. *Id.* Here, because Defendant has failed to properly answer or otherwise respond to Plaintiff's suit and Plaintiff has obtained an entry of default, the first two requisites for a default judgment have been met. Thus, the only remaining issue for determination is whether a default judgment is warranted.

An entry of default against the defendant does not automatically entitle the plaintiff to a default judgment. *See, e.g., Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975); *Waltner v. Aurora Loan Servs., L.L.C.*, 51 F. App'x 741, 749 (5th Cir. 2013). Entry of default judgment is within the Court's discretion. *See* Fed. R. Civ. P. 60(b); *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). "Default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (quoting *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989)). "Any doubt as to whether to enter or set aside a default judgment must be resolved in favor of the defaulting party." *John Perez Graphics & Design, LLC v. Green Tree Inv. Grp.*, No. 3:12-CV-4194-M, 2013 WL 1828671, at *3 (N.D. Tex. May 1, 2013) (citing *Lindsey*, 161 F.3d at 893). And the Court must still discern whether it has subject matter jurisdiction before entering a default judgment. *Johnson v. Coastal Private Prot. Sec., Inc.*, No. CV 19-12660, 2020 WL 3888286, at *3 (E.D. La. July 10, 2020); *Vanderbol v. Tuller*, No. 4:18-CV-882-ALM-CAN, 2019 WL 5691818, at *7 (E.D. Tex. Aug. 26, 2019), *report and recommendation adopted*, No. 4:18-CV-882, 2019 WL 4686362 (E.D. Tex. Sept. 26, 2019).

**\*3** "In determining whether to enter a default judgment against a defendant, Courts in the Fifth Circuit utilize a three-part analysis: 1) whether the entry of default judgment is procedurally warranted, 2) whether a sufficient basis in the pleadings based on the substantive merits for judgment exists, and 3) what form of relief, if any, a plaintiff should receive." *Graham v. Coconut LLC*, No. 4:16-CV-606, 2017 WL 2600318, at *1 (E.D. Tex. June 15, 2017) (Mazzant, J.) (citing *Lindsey*, 161 F.3d at 893). Here, the Court turns immediately to the second factor: whether a sufficient basis in the pleadings based on the substantive merits for judgment exists.

## ANALYSIS

### No Sufficient Basis in the Pleadings to Enter Default Judgment

Where, as here, a default has been entered under Rule 55, "the factual allegations of the complaint are taken as true." *Pathway Senior Living LLC v. Pathways Senior Living LLC*, No. 3:15-CV-02607-M, 2016 WL 1059536, at *2 (N.D. Tex. Mar. 17, 2016). However, "[t]here must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co.*, 515 F.2d at 1206; *see also Graham*, 2017 WL 2600318, at *1.

### I. Section 227(b)

Plaintiff asserts a claim under 47 U.S.C. § 227(b). "Section 227(b) of the TCPA makes it unlawful for any person 'to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service for which the called party is charged for the call,' or 'to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called

party.' " *Cunningham v. TechStorm, LLC*, No. 3:16-CV-2879-S-BH, 2018 WL 3118400, at *3 (N.D. Tex. May 29, 2018) (quoting 47 U.S.C. § 227(b)(1)(A)(iii), (B)), *report and recommendation adopted*, No. 3:16-CV-2879-S-BH, 2018 WL 3117529 (N.D. Tex. June 25, 2018). In *Matrix*, the Court recently concluded "§ 227(b)(1)(A)(iii) [of the TCPA] was unconstitutional from the moment Congress enacted the government-debt exception until the Supreme Court handed down its decision in *AAPC*." 2021 WL 1226618, at *11. Thus, the Court lacks subject matter jurisdiction over any § 227(b)(1)(A)(iii) claims regarding calls made between November 2015 and July 6, 2020. Each of the calls in this case were placed between April 24, 2019, and October 21, 2019 [Dkts. 45; 46 at 14]. Without jurisdiction, the Court is unable to conclude there is a sufficient basis in the pleadings to enter default judgment for any claims under § 227(b). *See Cunningham v. Radius Global Solutions LLC*, No. 4:20-cv-00294-ALM (E.D. June 3, 2021), ECF No. 49 ("[T]he Court finds it lacks subject matter jurisdiction for the same reasons discussed in *Matrix Financial Services*.").


## II. *Section 227(c)(5) and 47 C.F.R. § 64.1200(d)*

Plaintiff also brings a claim under § 227(c)(5) of the TCPA for violations of 47 C.F.R. § 64.1200(d). Section 227(c)(5) of the TCPA provides as follows:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions.

*4 47 U.S.C. § 227(c)(5). 47 C.F.R. § 64.1200(d), which was promulgated under § 227, states that "[n]o person or entity shall initiate any call for telemarketing purposes to a *residential telephone subscriber* unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d) (emphasis added). "The regulation relates to a marketer's duty to prepare internal policies to receive and implement affirmative requests not to receive calls." *See Bailey v. Domino's Pizza, LLC*, 867 F. Supp. 2d 835, 842 (E.D. La. 2012).

Plaintiff has not sufficiently alleged a violation of § 227(c)(5) of the TCPA and 47 C.F.R. § 64.1200(d). 47 C.F.R. § 64.1200(d) applies "to a *residential telephone subscriber*." *See* 47 C.F.R. § 64.1200(d). Plaintiff alleges, and indeed confirmed at the evidentiary hearing, that the calls were made to one of his cell phones—not a residential telephone. Various courts, including this Court, have considered similar claims by Plaintiff and found that the regulation does not encompass Plaintiff's cell phone. *See, e.g., Cunningham v. Arco Media Inc.*, No. 4:19-CV-00901-RWS-CAN, 2020 WL 2310021, at *4 (E.D. Tex. Apr. 3, 2020), *report and recommendation adopted*, No. 4:19-CV-00901-RWS-CAN, 2020 WL 2306589 (E.D. Tex. May 8, 2020); *Politi*, 2019 WL 2517085, at *4; *Cunningham v. Sunshine Consulting Group, LLC*, No. 3:16-2921, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018); *Cunningham v. Rapid Capital Funding, LLC*, No. 3:16-02629, 2017 WL 3574451, at *3 (M.D. Tenn. July 27, 2017); *Cunningham v. Spectrum Tax Relief, LLC*, No. 3:16-2283, 2017 WL 3222559, at *7 (M.D. Tenn. July 7, 2017); *Cunningham v. Enagic USA, Inc.*, No. 3:15-0847, 2017 WL 2719992, at *5-6 (M.D. Tenn. June 23, 2017); *see also Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1195-96 (M.D. Tenn. 2017). As such, Plaintiff has not provided a sufficient basis to proceed on his claim under § 227(c)(5) of the TCPA and 47 C.F.R. § 64.1200(d). *See TechStorm*, 2018 WL 3118400, at *4; *Cunningham v. Professional Education Institute, Inc.*, No. 4:17-CV-894, 2018 WL 6709515, at *6 (E.D. Tex. Nov. 5, 2018).


## III. *Texas Business and Commerce Code*

The Court next turns to Plaintiff's claim under the Texas Business and Commerce Code.[3] Under Texas law, "[a] person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A [i.e., Texas Business and Commerce Code § 305.001 et seq.] may bring an action in this state against the person who originates the communication for ... damages in the amount provided by this section[.]" Tex. Bus. & Com. Code § 305.053(a)(2). As to the Texas Business and Commerce Code, Plaintiff's live pleading alleges:

• The Texas Business and Commerce code has an analogous portion that it related to the TCPA and was violated in this case. [Dkt. 18 at 5].

• The Plaintiff may seek damages under this Texas law for violations of *47 USC 227* or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages. [Dkt. 18 at 5].

• The actions of the Defendants violated the *Texas Business and Commerce Code 305.05* by placing automated calls to a cell phone which violate *47 USC 227(b)*. The calls violated Texas law by placing calls with a pre-recorded message to a cell phone which violate *47 USC 227(c)(5)* and *47 USC 227(d)* and *47 USC 227(d)(3)* and *47 USC 227(e)*. [Dkt. 18 at 10].

**\*5** • The calls by the Defendants violated Texas law by spoofing the caller ID's [sic] per *47 USC 227(e)* which in turn violates the Texas statute. [Dkt. 18 at 10].

• The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the *Texas Business and Commerce Code 305.053*, by making non-emergency telemarketing robocalls to Mr. Cunningham's cellular telephone number without his prior express written consent in violation of *47 USC 227 et seq.* The Defendants violated *47 USC 227(d)* and *47 USC 227(d)(3)* and *47 USC 227(e)* by using an ATDS that does not comply with the technical and procedural standards under this subsection. [Dkt. 18 at 12].

Plaintiff bases his relief under the Texas Business and Commerce Code on violations of 47 U.S.C. §§ 227(b), 227(c)(5), 227(d), and 227(e).

As detailed herein, the Court lacks subject matter jurisdiction over claims under § 227(b) because all calls were made between November 2015 and July 6, 2020. *See Matrix*, 2021 WL 1226618, at *11. Plaintiff fails to state a claim under § 227(c)(5) because the calls were made to his personal cell phone—not a residential telephone. *See TechStorm*, 2018 WL 3118400, at *4; *Professional Education Institute, Inc.*, 2018 WL 6709515, at *6. Next, § 227(d) governs "technical and procedural standards." But § 227(d)(3), which in turn governs "artificial or prerecorded voice systems," "does not give rise to a private cause of action." *Cunningham v. Credit Mgmt., L.P.*, No. 3:09-CV-1497-GB(BF), 2010 WL 3791104, at *5 (N.D. Tex. Aug. 30, 2010), *report and recommendation adopted*, No. 3:09-CV-1497-G(BF), 2010 WL 3791049 (N.D. Tex. Sept. 27, 2010); *see also Ashland Hosp. Corp. v. Serv. Employees Intern. Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 745 (6th Cir. 2013) ("Section 227(d) does not contain a similar private right of action, unlike other subsections."); *Hurley v. Wayne County Bd. of Educ.*, No. 3:16-9949, 2017 WL 2454325, at *4 (S.D.W. Va. June 6, 2017) ("Congress did not intend private parties to enforce either Section 227(d) or the regulations prescribed pursuant to that section."). Similarly, there is no private right of action under § 227(e), which governs "prohibition on provision of misleading or inaccurate caller identification information." *Clark v. Avatar Techs. Phl, Inc.*, No. H-13-2777, 2014 WL 1342033, at *4 (S.D. Tex. Apr. 3, 2014) ("[T]he Court concludes that Plaintiff does not have a private right of action for an alleged violation of the TCIA, 47 U.S.C. § 227(e)."); *Free Conferencing Corp. v. Comcast Corp.*, No. CV 15-4076 FMO (PJWx), 2016 WL 7637664, at *7 (C.D. Cal. May 31, 2016) ("There is no private right of action for violations of 47 U.S.C. § 227(e)."). Indeed, the statue specifically prescribes a private right of action for violations of §§ 227(b) and 227(c), but not §§ 227(d) or 227(e). *See* 47 U.S.C. §§ 227(b)(3), 227(c)(5). Thus, there is no basis for a violation of the subsections of 47 U.S.C. § 227 upon which Plaintiff relies to support his state-law claim.

**\*6** Again, under Texas law, "[a] person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A [i.e., Texas Business and Commerce Code § 305.001 et seq.] may bring an action in this state against the person who originates the communication for ... damages in the amount provided by this section[.]" Tex. Bus. & Com. Code § 305.053(a)(2). " 'If no violation of the TCPA exists, there is no violation of' Section 305.053." *Shields v. Dick*, No. 3:20-CV-00018, 2020 WL 5522991, at *3 (S.D. Tex. July 9, 2020) (quoting *Cherkaoui v. Santander Consumer USA, Inc.*, 32 F. Supp. 3d 811, 815 (S.D. Tex. 2014)). Because Plaintiff has not demonstrated a violation of 47 U.S.C. § 227—the sole basis upon which he asserts a claim under the Texas Business and Commerce Code—Plaintiff has not provided a sufficient basis to proceed on his claim under the Texas Business and Commerce Code. *See Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519702, at *7 (E.D. Tex. Apr. 26, 2019) ("Because Plaintiff's underlying (federal) TCPA claims fail, Plaintiff's state TCPA claim under § 305.053 also fails."), *report and recommendation adopted*, No. 4:18-CV-362, 2019 WL 2526536 (E.D. Tex. June 19, 2019); *Cherkaoui*, 32 F. Supp. 3d at 815 ("If no violation of the TCPA exists, there is no violation of the Texas TCPA."); *cf. Shields v. Gawk Inc.*, No. 3:18-CV-00150, 2019 WL 1787781, at *5 (S.D. Tex. Apr. 24, 2019) ("The Court has already found that [the defendant]

violated Section 227(b) of the TCPA. As such, the Court finds that [the plaintiff] is also entitled to summary judgment on his Section 305.053 claim based on the violation of Section 227(b).”), *report and recommendation adopted*, No. 3:18-CV-00150, 2019 WL 2103423 (S.D. Tex. May 14, 2019).

Without a sufficient basis in the pleadings for any of his claims, the Court is unable to recommend the “drastic remedy” of entry of a default judgment. *See, e.g., Jyue Hwa Fu v. Yeh Chin Chin*, No. 3:18-CV-2066-N-BN, 2020 WL 4296360, at *6 (N.D. Tex. May 6, 2020) (recommending a motion for default judgment be denied because “there is no sufficient basis in the pleadings for the judgment requested against” the defendant), *report and recommendation adopted*, No. 3:18-CV-2066-N-BN, 2020 WL 4287590 (N.D. Tex. July 27, 2020); *United States v. Donalson*, No. H-13-00153, 2014 WL 7524985, at *2 (S.D. Tex. Dec. 10, 2014) (denying a motion for default judgment after finding the plaintiff failed to provide a sufficient basis in the pleadings). Thus, Plaintiff’s Motion for Default Judgment should be denied.

**CONCLUSION**

Based on the foregoing, the Court recommends (1) Plaintiff Craig Cunningham’s “Motion for a Default Judgment and Request for a Hearing to Determine Damages” [Dkt. 37] be **DENIED**; and (2) the claims asserted against Defendant Creative Edge Marketing, LLC be *sua sponte* dismissed for lack of subject matter jurisdiction[4] and failure to state a claim.[5]

**\*7** Within fourteen (14) days after service of the magistrate judge’s report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge’s report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass’n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2792353

Footnotes

| | |
|---|---|
| 1 | Plaintiff is no longer represented by counsel and is presently proceeding *pro se*. On March 2, 2021, the Court granted Plaintiff’s prior counsel’s Motion to Withdraw [Dkt. 57]. |
| 2 | Terrell Samuels, who is proceeding *pro se*, is not subject to the Court’s recommendation herein. Plaintiff has separately filed a Motion for Summary Judgment as to Defendant Terrell Samuels [Dkt. 48]. |
| 3 | Under 28 U.S.C. § 1367(a), a court has express authority to exercise supplemental jurisdiction over state law claims Plaintiff properly pleads that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. But a court can decline to exercise supplemental jurisdiction “if the district court has dismissed all claims over which it has original jurisdiction.” *See id.* § 1367(c)(3). |

4     A district court has "the responsibility to consider the question of subject matter jurisdiction *sua sponte* if it is not raised by the parties." *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1297 (5th Cir. 1985). If the court finds that it lacks subject matter jurisdiction, it has a duty to dismiss the case. *Id.*; Fed. R. Civ. P. 12(h)(3).

5     Generally, a district court may dismiss a plaintiff's claim for failure to state a claim *sua sponte*, "as long as the procedure employed is fair to the parties." *Century Sur. Co. v. Blevins*, 799 F.3d 366, 372 (5th Cir. 2015) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)); *see also Cofresi v. Medtronic, Inc.*, 450 F. Supp. 3d 759, 770 n.5 (W.D. Tex. 2020) (same). A litigant must "have the opportunity to be heard before a claim is dismissed, except where the claim is patently frivolous." *Blevins*, 799 F.3d at 372 (citing *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)). Fairness requires "both notice of the court's intention and an opportunity to respond." *Id.* at 373 (quoting *Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 309 (5th Cir. 2014)). Here, Plaintiff is being provided both notice and an opportunity to respond. Plaintiff has fourteen days to object to the instant recommendation. *See Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998) (finding that the magistrate judge's recommendation put the habeas petitioner on notice of procedural default issue and that the objection period allowed petitioner opportunity to respond, such that district court could raise issue *sua sponte*); *Alexander v. Trump*, 753 F. App'x 201, 208 (5th Cir. 2018) (per curiam).

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 16

2023 WL 3985245
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Fort Worth Division.

Craig CUNNINGHAM, Plaintiff,
v.
DAYBREAK SOLAR POWER, LLC, Defendant.

Civil Case No. 4:22-cv-00599-O
|
Signed June 13, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Paronich Law PC, Hingham, MA, Karl S. Gwaltney, Pro Hac Vice, Maginnis Howard, Raleigh, NC, Katherine Hendler Fayne, Katherine Fayne Law PLLC, Dallas, TX, for Plaintiff.

Michael P. Hutchens, William Brent Shellhorse, Whitaker Chalk Swindle & Sawyer, Fort Worth, TX, John D. Boutwell, Charlotte, NC, for Defendant.

**ORDER AND OPINION**

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Defendant's Motion to Dismiss (ECF No. 38), filed February 23, 2023; Plaintiff's Response and Objection (ECF No. 39), filed March 9, 2023; and Defendant's Reply (ECF No. 41), filed March 23, 2023. Defendant's Motion is hereby **GRANTED**.

   **I. Factual Background**[1]
On December 23, 2021, Plaintiff Craig Cunningham alleges he received a pre-recorded call from Defendant Daybreak Solar Power, LLC. Plaintiff states that the message started off saying "Hi, this is Brian Lee calling on behalf of The-Solar-Project.com."[2] Plaintiff describes The-Solar-Project.com as not being linked to any "specific entity," and therefore, Plaintiff alleges that it is a "trade or marketing name" used by Defendant.[3] Plaintiff states the call then continued through Defendant's alleged employee "Yesenia."[4]

In subsequent calls with Defendant's employees, Plaintiff claims that "at no point did [they] deny [calling him]."[5] As Defendant did not deny calling him, Plaintiff concludes that "Daybreak called him directly."[6] Plaintiff did not consent to receiving such calls.

Plaintiff initially filed this lawsuit on January 7, 2022 in the United States District Court for the Western District of North Carolina.[7] The case was transferred to this Court on July 14, 2022.[8] Defendant filed its original Motion to Dismiss on August

4, 2022.[9] The Court granted the motion and granted Plaintiff leave to amend his original complaint.[10]

Plaintiff filed his Amended Complaint on February 9, 2023.[11] Plaintiff brings a class action on behalf of the "Robocall Class," which includes "[a]ll persons within the United States: (1) to whose cellular telephone number or other number for which they are charged for the call (2) Defendant (or an agent acting on behalf of Defendant) placed a telemarketing call (3) within the four years prior to the filing of the Complaint (4) using an identical or substantially similar pre-recorded message used to place telephone calls to Plaintiff."[12] He also brings claims on behalf of the "NCTSA Class," which includes "[a]ll North Carolina Telephone Subscribers whose (1) telephone numbers received calls using a recorded message player (2) from or on behalf of Defendant (3) from four years prior to the filing of the Complaint."[13] Plaintiff alleges Defendant violated § 227(b) and § 227(c) of the Telephone Consumer Protection Act ("TCPA") and § 75-100 of the North Carolina Telephone Solicitations Act ("NCTSA").[14]

**\*2** Defendant filed the present Motion to Dismiss on February 23, 2023.[15] Plaintiff filed his Response on March 9, 2023.[16] Defendant filed its Reply on March 23, 2023.[17] The Motion is now ripe for the Court's review.

## II. Legal Standard

Rule 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy *Rule 8(a)*, the defendant may file a motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (cleaned up). A court may not accept legal conclusions as true. *Id.* at 678–79. When well-pleaded factual allegations are present, a court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

## III. Analysis

The Court turns first to Plaintiff's TCPA claims. Under the TCPA, a plaintiff must establish that a defendant is either directly or vicariously liable for any violations. *See Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568, at \*5 (E.D. Tex. Apr. 30, 2019) ("Theories of direct and vicarious liability are both cognizable under the TCPA."). Direct liability is found when an entity "initiates" a phone call. *Hunsinger v. Dynata LLC*, No. 3:22-cv-00136-G-BT, 2023 WL 2377481, at \*5 (N.D. Tex. Feb. 7, 2023). Initiating a phone call is recognized to mean that the Defendant "takes the steps necessary to physically place a telephone call." *Cunningham v. Lifestyles Dev., LLC*, No. 4:19-CV-00006-ALM-CAN, 2019 WL 4282039, at \*3 (E.D. Tex. Aug. 8, 2019). At the pleading stage, the plaintiff must allege facts to support claim that the defendant is the party that initiated the phone calls. *See id.*

In this case, Defendant contends Plaintiff fails to sufficiently plead direct liability.[18] Plaintiff states that he received a pre-recorded message that started with "Hi, this is Brian Lee calling on behalf of The-Solar-Project.com."[19] Plaintiff alleges that "[t]he solicitation for Daybreak Solar continued through Daybreak's employee 'Yesenia.' "[20] In ruling on Defendant's initial motion to dismiss, this Court found that those same facts failed to show "whether Defendant physically initiated the phone call or whether the call was instead placed by a third-party telemarketer."[21] The Court concluded from the pleadings that Plaintiff did "not know who actually placed the offending call."[22] In an attempt to cure this defect Plaintiff now alleges

that The-Solar-Project.com is a "trade or marketing name used by the Defendant for its pre-recorded telemarketing."[23] Yet, at the same time, Plaintiff alleges that The-Solar-Project.com "doesn't appear to be linked to any specific entity."[24] The Plaintiff fails to provide any facts in support of the assertion that The-Solar-Project is simply a "trade or marketing" name used by the Defendant. Thus, this Court finds that such conclusory assertions fail to plausibly show that Defendant physically initiated the phone call.

**\*3** Furthermore, Plaintiff states in his Amended Complaint that Defendant called him directly.[25] He points to the fact that he eventually spoke with Defendant's employee "Yesenia," and, in subsequent calls, Defendant never denied calling him.[26] However, like in his original complaint, Plaintiff fails to allege how "Yesenia" came to be on the other end of the call.[27] Accordingly, this Court again finds that Plaintiff has not sufficiently pled facts indicating Defendant is directly liable for any alleged TCPA violation.

Regarding vicarious liability, the Court finds that Plaintiff in his Amended Complaint still does not make any allegation that Defendant was vicariously liable. Even if Plaintiff's assertions that The-Solar-Project.com is simply a "trade or marketing name" can be taken as alleging vicarious liability, they fall short. A seller "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Callier v. SunPath Ltd.*, No. EP-20-CV-00106-FM, 2020 WL 10285659, at *3 (W.D. Tex. Aug. 10, 2020) (citation omitted). To prove the existence of an agency relationship, the principal must have "both the right: (1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task." *Id.* (quoting *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*, 535 F.3d 359, 364 (5th Cir. 2008)). Here, Plaintiff alleges no facts indicating that Defendant had any sort of control over The-Solar-Project.com. Therefore, the Court again finds that Defendant is not vicariously liable for any TCPA violation.

Turning to Plaintiff's NCTSA claim, the Court, for the reasons discussed above, likewise finds Plaintiff fails to plead facts sufficiently showing Defendant's liability.

### IV. Conclusion

As Plaintiff has failed to sufficiently plead facts to support his claims under the TCPA and NCTSA, Plaintiff's Amended Complaint is hereby **DISMISSED with prejudice.**

**SO ORDERED** on this **13th day** of **June, 2023**.

### All Citations

Slip Copy, 2023 WL 3985245

Footnotes

| | |
|---|---|
| 1 | This Court previously provided extensive recitation of the facts in the prior Order (ECF No. 27) on the Defendant's initial Motion to Dismiss. Here, the Court offers a brief summation of those facts with careful attention to newly pleaded facts in the Plaintiff's Amended Complaint. *See* Pl.'s Am. Compl., ECF No. 28. At the 12(b)(6) stage, these facts are taken as true and viewed in the light most favorable to the plaintiff. *See Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). |
| 2 | *Id.* at 5. |
| 3 | *Id.* |

4       *Id.*

5       Pl.'s Am. Compl. 6, ECF No. 28.

6       *Id.*

7       Pl.'s Orig. Compl., ECF No. 1.

8       *See* ECF No. 17.

9       Def.'s Orig. Mot. to Dismiss, ECF No. 23.

10      *See* Order Granting Mot. to Dismiss, ECF No. 27.

11      *See* Pls. Am. Compl., ECF No. 28.

12      *Id.* at 7.

13      *Id.*

14      *Id.* at 8-9.

15      Def.'s Mot. to Dismiss, ECF No. 38.

16      Pl.'s Resp., ECF No. 39.

17      Def.'s Reply, ECF No. 41.

18      Def.'s Mot. to Dismiss 5, ECF No. 38.

19      Pl.'s Am. Compl. 5, ECF No. 28.

20      *Id.*

21      Order Granting Mot. to Dismiss 11, ECF No. 27.

22      *Id.*

23      Pl.'s Am. Compl. 5, ECF No. 28.

24      *Id.*

25      *Id.* at 6.

26      *Id.* at 5.

27      *Id.* at 5–6.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 17

Cunningham v. Spectrum Tax Relief, LLC, Not Reported in Fed. Supp. (2017)

2017 WL 3220411
Only the Westlaw citation is currently available.
United States District Court, M.D. Tennessee, Nashville Division.

Craig CUNNINGHAM, Plaintiff,
v.
SPECTRUM TAX RELIEF, LLC, et al., Defendants.

Civil No. 3:16-cv-02283
|
Filed 07/28/2017

**Attorneys and Law Firms**

Craig Cunningham, Nashville, TN, pro se.

Rocklan W. King, III, Adams and Reese LLP, Nashville, TN, for Defendants.

**<u>ORDER</u>**

ALETA A. TRAUGER, U.S. District Judge

**\*1** On July 7, 2017, the magistrate judge issued a Report and Recommendation (DE #17), to which no timely objections have been filed. The Report and Recommendation is therefore ACCEPTED and made the findings of fact and conclusions of law of this court. For the reasons expressed therein, the following are hereby ORDERED:

1. The Motion to Dismiss (Docket No. 10) is GRANTED on the issue of lack of personal jurisdiction as to Defendants Montserratt Araujo, Victoria Blasiak, and the Araujo Law Offices, PC and these Defendants are DISMISSED from the action.

2. The Motion to Dismiss (Docket No. 10) is DENIED on the issue of lack of personal jurisdiction as to Defendants Spectrum Tax Relief, LLC, and Manuel Araujo.

3. The Motion to Dismiss (Docket No. 10) is GRANTED as to Count II of the Complaint and this count is DISMISSED for failure to state a claim upon which relief can be granted.

4. The Motion to Dismiss (Docket No. 10) is GRANTED as to Count I of the Complaint as to Defendants Montserratt Araujo, Manuel Araujo, Victoria Blasiak, and the Araujo Law Offices, PC and that this count is DISMISSED as to these Defendants.

This case is returned to the magistrate judge for further handling under the original referral order.

It is so **ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3220411

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 18

Federal Trade Commission v. Hornbeam Special Situations, LLC, Not Reported in Fed....

2018-2 Trade Cases P 80,555

2018 WL 6254580
United States District Court, N.D. Georgia, Atlanta Division.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

HORNBEAM SPECIAL SITUATIONS, LLC, et al., Defendants.

CIVIL ACTION FILE NO. 1:17-cv-3094-TCB
|
Signed 10/15/2018

**Attorneys and Law Firms**

Elizabeth J. Averill, Korin Ewing Felix, Omolara Bewaji Joseney, Reenah L. Kim, Amanda C. Basta, Hong Park, Pro Hac Vice, Kimberly L. Nelson, Pro Hac Vice, Federal Trade Commission, Washington, DC, Anna Mirshak Burns, R. Michael Waller, Federal Trade Commission-Atlanta Regional Office, Atlanta, GA, for Plaintiff.

Alexis Miller Buese, Lauren M. De Lilly, Michael L. Mallow, Sidley Austin, LLP, Los Angeles, CA, Jessica Rutledge Watson, Jeffrey L. Mapen, Nelson Mullins Riley & Scarborough, LLP, Julia Blackburn Stone, Michael A. Caplan, Caplan Cobb LLP, Cody Sams Wigington, Baker & Hostetler, LLP, Bryan B. LaVine, Katie Lamb Balthrop, Keith Jerrod Barnett, Tiffany Nichols Bracewell, Troutman Sanders, LLP, Allison S. H. Ficken, Edward Joseph Dovin, Dovin Ficken, LLC, Atlanta, GA, Leonard L. Gordon, Pro Hac Vice, Matthew S. Renick, Venable, LLP, Andrew Case, Richard Lawson, Manatt, Phelps & Phillips, LLP, New York, NY, Mary M. Gardner, Venable, LLP, Washington, DC, Michael Dominic Meuti, Baker & Hostetler LLP, Cleveland, OH, for Defendants.

Earl G. Robinson, Atlanta, GA, pro se.

Mark Ward, Woodland Hills, CA, pro se.

**ORDER**

Timothy C. Batten, Sr., United States District Judge

**\*1** This case comes before the Court on its sua sponte request for supplemental briefing on whether the Court should reconsider a portion of its earlier order holding that the FTC's "reason to believe" under 15 U.S.C. § 53(b) was unreviewable on a motion to dismiss.

**I. Background**

On April 16, 2018, the Court entered an order [181] denying motions to dismiss filed by various Defendants. In that motion, the EDP Defendants[1] argued that the FTC's § 53(b) case should be dismissed unless it first avers facts demonstrating that Defendants "[are] violating, or [are] about to violate" a law committed to FTC enforcement. The Court refers to this as the

"reason to believe" element of a § 53(b) case. Defendants argued that because their alleged unlawful conduct had ceased, the FTC could not satisfy this element, and therefore, the FTC failed to state a claim under § 53(b).

The Court initially rejected this argument, following the decision in *Federal Trade Commission v. National Urological Group, Inc.*, No. 1:04-cv-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006), deferring to the FTC pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2), which precludes judicial review of administrative actions "committed to agency discretion." Following *National Urological*, the Court held that when the FTC brings a claim under § 53(b), it should defer to the FTC's averments regarding its "reason to believe" because the decision to file suit was committed to agency discretion. Thus, the Court denied the motion to dismiss because Defendants were attempting to have the Court review the FTC's decision to file suit, which was unreviewable.

Defendants then filed a motion to dismiss for lack of subject-matter jurisdiction on similar grounds. They argued that the FTC had not pleaded adequate facts to invoke § 53(b), such that the Court lacked jurisdiction under § 53(b). The Court rejected the jurisdictional challenge as a successive motion to dismiss, but ordered supplemental briefing on whether it should reconsider its previous holding that § 53(b)'s "reason to believe" element was unreviewable on a 12(b)(6) motion to dismiss.

The issue has been briefed and is now ripe for the Court to reconsider.

## II. Legal Standard

Ordinarily, reconsideration comes before the Court on the parties' motion. Here, the Court raised the issue sua sponte to deal with a possible error raised by Defendants' motion. Ordinarily, motions for reconsideration "should be reserved for certain limited situations, namely the discovery of new evidence, an intervening development or change in the controlling law, or the need to correct a clear error or prevent a manifest injustice." *See Pres. Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995). The Court has determined that reconsideration is necessary.[2]

## III. Discussion

**\*2** Many of the FTC's claims against Defendants are based largely on long-ceased misconduct. The FTC seeks to invoke § 53(b) to obtain injunctive and sundry other equitable remedies for Defendants' alleged deceptive marketing practices. Defendants argue that § 53(b) is designed to remedy only future, rather than past, misconduct, and to the extent the FTC is basing its claims for relief on past misconduct, it must make a Rule-8-compliant showing that Defendants are violating, or about to violate, the law.

The FTC argues that it has discharged its Rule 8 pleading obligations. Naturally, Defendants disagree. This disagreement can be broken into two separate questions. First, there is a question of whether the Court defers to a conclusory pleading of the "reason to believe" element or the FTC must aver facts sufficient to survive a Rule 12(b)(6) motion to dismiss. Finding that the FTC must aver facts, the next question is what standard the FTC must aver to when it predicates "reason to believe" on past conduct. These are taken in turn.

### A. The FTC Must Aver Facts Under Rule 8 to State a Claim for Relief Under § 53(b)

"The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). Section 53(b) provides:

Whenever the Commission has reason to believe (1) that any person, partnership, or corporation is violating, or is about to

violate, any provision of law enforced by the Federal Trade Commission ... the Commission by any of its attorneys ... may bring suit in a district court of the United States to enjoin any such act or practice.[3]

This language plainly creates a precondition to the FTC's statutory authorization to bring suit under § 53(b). That is, the FTC may sue only when it has a "reason to believe" that a violation of law is occurring or about to occur, and filing the lawsuit is in the "interest of the public...." 15 U.S.C. § 53(b). Thus, its "entitlement to relief" under Rule 8 necessarily depends upon the satisfaction of this element.

It is axiomatic that to survive a Rule 12(b)(6) motion, the pleader must "set[ ] forth 'well-pleaded facts ... permit[ting] the court to infer more than the mere possibility of misconduct.' " *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1233 (11th Cir. 2018) (some alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ). The factual allegations must be "enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 544 U.S. 555, 555–56 (2007), and the averments should "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Conclusory allegations are not sufficient." *Cox v. Stone Ridge at Vinings, LLC*, No. 1:12-cv-02633-AT, 2012 WL 12931994, at *2 (N.D. Ga. Oct. 23, 2013).

A straightforward application of these principles means that, in order to obtain the relief provided under § 53(b), the FTC must demonstrate by more than conclusory allegations that it has a reason to believe that the laws entrusted to its enforcement are being or about to be violated.

The FTC, however, takes issue with this conclusion. It maintains, and the Court previously held, that the "reason to believe" element is unreviewable on a Rule 12(b)(6) motion because it is within the agency's discretion to file suit. In other words, the Court should defer to the agency's conclusory averment that it has the requisite reason to believe. In support of this, the FTC (and the Court) relied on *National Urological*.

**\*3** *National Urological* involved an FTC suit under § 53(b) against defendants for false advertising. When the agency sued, the defendants filed a counterclaim against the FTC under the APA, alleging that the FTC's suit was, inter alia, arbitrary and capricious. The Court held that under the APA, the FTC's decision to initiate suit was committed to agency discretion. As a result, the action was unreviewable.

Upon further reflection and after reviewing the briefs, *National Urological* is distinguishable. Its posture involved judicial review of agency action under the APA. Here, the Court is faced with whether the FTC has stated a claim under the Federal Rules of Civil Procedure. These postures are governed by two different statutory frameworks, the former by the APA, which explicitly precludes judicial review for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and the latter by Rule 8, which contains no such exemption. Quite the opposite. It is precisely the Court's duty under Rule 8 to scrutinize a party's right to proceed in federal court. Here, the Court is not reviewing the FTC's decision to sue. It is analyzing whether it has satisfied the federal pleading standards.

The FTC argues that averments supporting its "reason to believe" are not required because no court has imposed any such requirement in any other case involving § 53(b). That may be true, but it is persuasive only in that it is an argument from silence, a silence for which there are several plausible explanations. The silence may be as much a result of the parties' failure to raise the issue as it is an indication that no such requirement exists. It could also be that the FTC's "reason to believe" was not in dispute in the cited cases. Here, however, the parties have raised the issue and brought the FTC's "reason to believe" into dispute.

What is more, the cases cited by the FTC are not helpful to resolve the question before it. Two cases hardly address § 53(b). *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (deciding narrow issue of whether misrepresentations were material under 15 U.S.C. § 45(a) ); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1356 (11th Cir. 1988) (reviewing FTC order on direct appeal under 15 U.S.C. § 45(c)–(d) ).

The other two cases involved § 53(b), yet are still inapposite. One dealt with whether the FTC had the authority to seek equitable remedies other than an injunction under § 53(b), *see Gem Merch. Corp.*, 87 F.3d at 470, and the other, whether an injunction under § 53(b) should issue at all, *see FTC v. RCA Credit Servs., LLC*, No. 8:08-cv-2062-T-27AEP, 2010 WL 2990068, at *5 (M.D. Fla. July 29, 2010). Thus, the cases provide little guidance for determining what should happen if the

FTC's "reason to believe" is wanting from the face of the complaint.

Consider also this oddity if the Court simply defers to the FTC's averments: Since filing, two Defendants have died. Even though their estates may remain responsible for the temporal consequences of their decedents' *past* misdeeds, it strains credulity to blindly accept that the dead men are violating (or about to violate) any laws.

The FTC has the power to act only to the extent Congress has authorized it. Limitations on this power are enshrined in the words of statutory text. *See NLRB v. Cmty. Health Servs.*, 812 F.3d 768, 780 (10th Cir. 2016) (Gorsuch, J., dissenting) ("[I]n our legal order federal agencies must take care to respect the boundaries of their congressional charters."). To ensure that the powers granted to the FTC are exercised properly, especially when it seeks to do so by engaging the Court's Article III powers, the Court must carefully scrutinize the scope of its exercise.

**\*4** Congress has spoken plainly about when deference to agency discretion is appropriate, for example, in the APA. But this stage of the proceedings is governed by Rule 8, and Rule 8 provides for no such deference. Thus, the Court must conclude that it was improper to defer to a conclusory allegation by the FTC that it has a reason to believe that a violation of law is occurring or about to occur. Instead, the FTC is required to aver facts sufficient for this purpose.

**B. The FTC's "Reason to Believe" Is a Distinct Statutory Standard from the Injunction Inquiry**
The Court has already determined the FTC must make factual averments regarding its "reason to believe." Now it moves on to the content of those averments. The FTC's case targets Defendants' past conduct. Yet the FTC is proceeding under § 53(b) on the theory that, based on Defendants' past conduct, they are "about to" violate the law. The Court must therefore determine what "about to" means and whether the FTC has satisfied the Court that, based on its averments, it is plausible that the Defendants are about to violate the law.

The FTC argues that it means that the misconduct is likely to recur, i.e., the same showing required to establish that injunctive relief would not be moot. Defendants contend that this is not what the text of the statute says, and argue for a more exacting definition.

Part of the confusion comes from the analogical relationship of the mootness inquiry for an injunction and the "about to violate" scenario. When seeking an injunction based solely on past conduct, there is a risk that an injunction would be moot. To determine whether mootness is an issue, a court asks whether "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *RCA Credit Servs., LLC*, 2010 WL 2990068, at *5 (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980) ). This is the standard the FTC seeks to have the Court apply to the "about to violate" provision of § 53(b). Further confusion obtains due to many courts that have accepted this interpretation of § 53(b). The Court believes, however, that such an interpretation is inconsistent with the plain language of § 53(b).

This issue was raised in *FTC v. Shire ViroPharma, Inc.*, No. 17-131-RGA, 2018 WL 1401329 (D. Del. Mar. 20, 2018), *appeal docketed*, No. 18-1807 (3d Cir. Apr. 12, 2018). There, the FTC sued drug manufacturers for improper use of patents and drug listings. The defendant-manufacturers challenged the FTC's action under Rule 12(b)(6), arguing that the FTC had not demonstrated that the defendants were violating or about to violate the law because their alleged illegal acts had ceased. The FTC similarly argued that satisfying the "reason to believe" element was equivalent to demonstrating that injunctive relief would not be moot, i.e., that the alleged misconduct has "likely to recur." *Id.* at *5. The court disagreed. It held that the questions of whether injunctive relief was appropriate and whether the FTC was entitled to bring suit in the first place were distinct inquiries.

This Court agrees. The statutory text of § 53(b) must be given its plain meaning, and unless Congress says otherwise, the requisite showing should not be conflated with standards that, though analytically related, do not comport with the statutory language.

The linguistic distinction is evident when we look at the ordinary meaning of "about to." *See SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) (looking to dictionaries to find the "ordinary meaning" of statutory language); *Nat'l Ass'n of State Util.*

*Consumer Advocates v. FCC*, 457 F.3d 1238, 1254 (11th Cir. 2006) (same). This phrase evokes imminence, as if the offending action could be resumed with little delay. *See About*, Oxford English Dictionary Online (2018) ("12. At the very point when one is going *to* do something; intending or preparing immediately *to* do something."); *About*, The American Heritage Dictionary (5th ed. 2016) ("8a. On the verge of doing something; presently going to do something.").

**\*5** This is contrasted with the mootness standard of "likely to recur." Likelihood of recurrence is less immediate than "about to." It is similar to a preponderance, "more likely than not," and therefore cannot be considered synonymous with "about to." Conflating them would do violence to the plain language, jiggering it by judicial sleight.

The FTC complains that this interpretation requires it to show more to survive a Rule 12(b)(6) challenge than is required to obtain the injunctive relief it seeks under § 53(b). That may be true, but because this is the interpretation demanded by the plain language, the Court can accept such an outcome.

Even if the FTC is correct, the outcome is consistent with the statute's plain meaning unencumbered by judicial gloss. Section 53(b) is not, on its face, a broad and sweeping avenue of relief, certainly not as broad as it has become through generous interpretation. It is simply an injunctive remedy, a stop-gap to discontinue ongoing or threatening conduct violative of the laws the FTC enforces. It is a discrete authorization for the FTC to invoke the federal courts to assist it in the enforcement of its statutory mandates. If applying the plain language means that the showing to get into the courthouse is greater than the one required once the FTC is inside, narrowing § 53(b)'s scope, that is fine because that is what the language demands.[4]

It would not be fine, however, if applying the plain language created an outcome that is *absurd*. But this outcome is at most odd, not absurd. It therefore does not require deviation from the statute's language. As the Eleventh Circuit has observed:

> We have recognized that courts may reach results inconsistent with the plain meaning of a statute "if giving the words of a statute their plain and ordinary meaning produces a result that is not just unwise but is clearly absurd." However, we have also observed that:
>
> > Though venerable, the principle is rarely applied, because the result produced by the plain meaning canon must be *truly absurd* before the principle trumps it. Otherwise, clearly expressed legislative decisions would be subject to the policy predilections of judges.
>
> In other words, it is irrelevant that "[w]e may not have made the same policy decision had the matter been ours to decide [if] we cannot say that it is absurd, ridiculous, or ludicrous for Congress to have decided the matter in the way the plain meaning of the statutory languages indicates it did."

*CBS, Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001) (alterations in original) (emphasis added) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1188 (11th Cir. 1997); then quoting *id.*; and then quoting *id.*).

Again, the outcome is odd, but not absurd. It would be admittedly easier to apply an already existing framework (i.e., the injunction mootness standard) to the statute, but ignoring the clearly distinct statutory language risks making the Court a super-legislature; it would be substituting its own judgment for Congress's. This is not the Court's role. The Court's role is to apply the text of a statute, and it ends there.

**\*6** The difficulty of statutes like § 53(b) arises from the accretions of time, those well-meaning or oversighted judicial glosses that encrust themselves upon a law through loose interpretation. Among these encrustations is the ubiquitous holding of the courts of appeals that equitable relief under § 53(b) other than injunctions is available. This is not supported by the plain text of the statute, but has been read into it by well-meaning judicial efforts to effect the "purpose" of the statute. These meta-textual pontifications seem good in the short run, but a long journey on even a narrowly wrong heading can be ruinous. Section 53(b) clearly states that it is a provision for injunctive relief, temporary or permanent. It mentions nothing of disgorgement or otherwise. The Court is, of course, bound to accept the binding interpretations of higher courts on this matter. But if it can prevent further encrustation through linguistic fidelity, it will.

The issue becomes even more apparent when one considers that retrospective relief (including remedies resembling disgorgement) is available to the FTC in an action under 15 U.S.C. § 57b. But unlike § 53(b), § 57b contains a statute of limitations. That makes sense if § 53(b) is only prospective in effect. A statute aimed at only future conduct would not be

concerned with expiration because by definition the conduct it targets would be either ongoing or imminent.

Interpreting § 53(b) with both prospective *and* retrospective application means § 57b gets neglected. Without the burden of a statute of limitations, the FTC will be inclined to proceed under § 53(b) because it can obtain the same relief through equitable disgorgement under § 53(b) as is provided under § 57b *without limitation*. Thus, § 57b is denatured. The Court hopes that its holding here prevents further deterioration of this statutory scheme.

The Court is also aware of the need to carefully scrutinize an agency's suggested interpretations of its mandates and which have the effect of expanding its authority beyond the statutory bounds. If an agency was meant to have authority to do such and such a thing, Congress must say so. And when it has said, "Thus far and no farther," it is the Court's responsibility to blow the whistle and call the out of bounds. *See City of Arlington v. FCC*, 569 U.S. 290, 307 (2013) ("The fox-in-the-henhouse syndrome is to be avoided not by establishing an arbitrary and undefinable category of agency decision making that is accorded no deference, but by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority. Where Congress has established a clear line, the agency cannot go beyond it[.]").

Therefore, in keeping with the plain meaning of the statute, the Court holds that when the FTC attempts to bring suit under § 53(b), it must satisfy the Court under Rule 8 that it has a reason to believe that *each* of the Defendants is violating or is about to violate the law. When the FTC's reason to believe is predicated upon past conduct, it must show that a defendant is "about to" violate the law—requiring more than mere likelihood of resuming the offending conduct—in order to state a claim. Its previous opinion [181] must therefore be vacated as to Part III.D.2.

The next step is for the Court to go Defendant-by-Defendant and ascertain whether the FTC has properly alleged that each "is violating or is about to violate" the law. Prior to this step, however, the Court will hear from the parties in light of this Order. And at the FTC's behest, it will be granted leave to file a second amended complaint within twenty-one days to correct any deficiencies. Upon the filing of the FTC's second amended complaint or the expiration of twenty-one days, whichever is sooner, Defendants will have ten days to file motions to dismiss, strictly limited to the issue of whether the FTC has adequately pleaded facts showing that Defendants are violating or about to violate the law under § 53(b) as described in this Order. Defendants should also reiterate which claims would be time-barred under § 57b if the FTC has failed to make the requisite showing to invoke § 53(b) as to those claims.

**\*7** IT IS SO ORDERED this 15th day of October, 2018.


**All Citations**

Not Reported in Fed. Supp., 2018 WL 6254580, 2018-2 Trade Cases P 80,555

Footnotes

1   Including Dale Paul Cleveland, William R. Wilson, and EDebitPay, LLC.


2   The Court is not concerned with Defendants' failure to cite the relevant standard for reconsideration or argue in those terms. This is because the Court raised the issue of reconsideration sua sponte. The Defendants were entitled to take this as an invitation to jump straight to the correctness of the Court's previous holding.


3   The courts of appeals have interpreted this section to allow the FTC to seek a range of equitable remedies other than permanent and temporary injunctive relief, including disgorgement of ill-gotten gains. *See FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996).


4   The *Shire ViroPharma* court is in accord. The Court stated, "I appreciate the argument, [but] I see no reason why I should ignore the plain language of the statute, which authorizes the FTC to file suit in federal court only if it has reason to believe a corporation

'is violating, or is about to violate' a provision of law enforced by the FTC." *Shire ViroPharma*, 2018 WL 1401329, at *5 n.7.

---

**End of Document**                                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 19

2023 WL 2472649
Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina,
Charlotte Division.

Heather GAKER, individually and on behalf of all others similarly situated, Plaintiff,
v.
Q3M INSURANCE SOLUTIONS d/b/a Final Expense Assistant and TZ Insurance Solutions LLC, Defendants.

CIVIL ACTION NO. 3:22-CV-00296-RJC-DSC
|
Signed February 7, 2023
|
Filed February 8, 2023

**Attorneys and Law Firms**

Christopher E. Roberts, Pro Hac Vice, Butsch Roberts & Associates LLC, Clayton, MO, Jacob U. Ginsburg, Pro Hac Vice, Kimmel & Silverman, P.C., Ambler, PA, Mitchel Erik Luxenburg, Luxenburg & Levin, LLC, Beachwood, OH, for Plaintiff.

Lauri A. Mazzuchetti, Whitney Morgan Smith, Pro Hac Vice, Kelley Drye & Warren, LLP, Parsippany, NJ, Thomas G. Hooper, Nelson Mullins Riley & Scarborough LLP, Charlotte, NC, for Defendants.

## MEMORANDUM AND RECOMMENDATION

David S. Cayer, United States Magistrate Judge

**\*1 THIS MATTER** is before the Court on Defendants' "Motion to Dismiss or, in the Alternative, Motion to Strike," Doc. No. 19, filed November 8, 2022.

The Motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and is now ripe for consideration.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that Defendants' Motion to Dismiss be **GRANTED** and the Motion to Strike be **DENIED**.

## I. FACTUAL BACKGROUND

Accepting the factual allegations in the Complaint as true, Plaintiff is a former schoolteacher and pharmacy technician residing in Palm Beach County, Florida. Defendant Q3M Insurance Solutions is a telemarketer that sells burial insurance on behalf of insurers. Defendant TZ Insurance Solutions is an insurance broker that sells life insurance and burial insurance. It

primarily relies on telemarketers to generate business.

Plaintiff has a personal cell phone which she registered on the National Do Not Call Registry on November 15, 2019, to avoid unwanted telemarketing calls. Doc. No. 16, at ¶¶ 21–22. After her name and phone number were purportedly entered into a "sweepstakes" in January 2020, she began receiving unsolicited telemarketing calls.[1] Id. at ¶¶ 27–28. In the early months of 2020, Plaintiff received six calls where a live agent attempted to sell her "final expense insurance." Id. at ¶¶ 28–31. During several of those calls, Plaintiff stayed on the line and engaged with the caller to ascertain who originated the calls. Id. at ¶ 31. During one of those calls, Defendant Q3M transferred her to Defendant TZ, who attempted to sell final expense insurance policies. Id.

Plaintiff brings a cause of action under the Telephone Consumer Protection Act, 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2). She seeks to hold Defendant TZ vicariously liable as an agent of Defendant Q3M.

## II. DISCUSSION

### 1. 12(b)(6) Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

**\*2** In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard. First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555) (allegation that government officials adopted challenged policy "because of" its adverse effects on protected group was conclusory and not assumed to be true). Although the pleading requirements stated in "Rule 8 [of the Federal Rules of Civil Procedure] mark[ ] a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a Plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, to the extent there are well-pleaded factual allegations, the court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief 'will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " Id. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' 'that the pleader is entitled to relief,' " and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The sufficiency of the factual allegations aside, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Sons of Confederate Veterans v. City of Lexington, 722 F.3d 224, 228 (4th Cir. 2013) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)). Indeed, where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed." Neitzke, 490 U.S. at 328; see Stratton v. Mecklenburg Cnty. Dept. of Soc. Servs., 521 F. App'x 278, 293 (4th Cir. 2013). The court must not "accept as true a legal conclusion couched as a factual allegation." Anand v. Ocwen Loan Servicing, LLC, 754 F.3d 195, 198 (4th Cir. 2014).

### a. TCPA Claim

Section 227(c) of the TCPA and the corresponding regulations prohibit businesses from placing "telephone solicitation" calls to a "residential telephone subscriber" who has placed her phone number on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). A person who receives more than one call within a twelve-month period that violates those regulations may bring a private cause of action under section 227(c). 47 U.S.C. § 227(c)(5). Defendants argue the TCPA applies only to residential telephones and based upon the statutory language and structure, does not extend to cell phones.

In 2003, the Federal Communications Commission interpreted "residential subscribers" to include those who register their cell phone numbers on the NDNCR. See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014 (2003). The FCC concluded that "[t]he rules set forth in section[] 64.1200(c) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers...." Id. at 14148.

The Fourth Circuit has not addressed whether cell phone owners are considered "residential telephone subscribers." Courts that have addressed the issue are split as to whether the TCPA extends to wireless telephone numbers. Compare Boger v. Citrix Sys., Inc., No. 8:19-cv-01234-PX, 2020 WL 1939702, at *4 (D. Md. Mar. 3, 2020) ("[T]he Complaint does not foreclose that [the plaintiff's] cell phone functioned as a residential telephone number for the purposes of the statute."), with Cunningham v. Politi, No. 4:18-cv-362, 2019 WL 2526536, at *4 (E.D. Tex. Apr. 26, 2019) ("Recent courts considering [similar] claims ... have found [the TCPA] does not encompass ... cellular phones." (collecting cases)).

**\*3** The FCC's interpretation at issue does not preclude this Court from applying the clear text of the TCPA. "[T]he judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws." Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 119 (2015) (Thomas, J., concurring); see also Gorss Motels, Inc. v. Safemark Sys., LP, 931 F.3d 1094, 1106 (11th Cir. 2019) (Pryor, J., concurring) ("The Hobbs Act, correctly construed, does not require district courts adjudicating cases within their ordinary jurisdiction to treat agency orders that interpret federal statutes as binding precedent."). The structure and language of the TCPA controvert coverage of cell phones.

The FCC's rulemaking authority under section 227(c) extends only to unwanted telephone solicitations directed at "residential telephone subscribers." 47 U.S.C. § 227(c)(1). "[T]he language of the TCPA specifically provides that the regulations implemented pursuant to Subsection 227(c) concern only 'the need to protect residential telephone subscribers' privacy rights." Cunningham v. Sunshine Consulting Grp., LLC, No. 3:16-cv-2921, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018) (quoting 47 U.S.C. § 227(c)(1)). "Residential" is defined as " 'used as a residence or by residents,' and 'resident' is defined as 'living in a place for some length of time,' or 'one who resides in a place.' " Shelton v. Fast Advance Funding, LLC, 378 F. Supp. 3d 356, 363 n.7 (E.D. Pa. 2019) (quoting Residential, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/residential; Resident, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/residents).

Notably, Congress referenced "cellular telephone" in other provisions of the statute. See 47 U.S.C. § 227(b)(1)(A)(3); 47 U.S.C. § 227(b)(2)(C); 47 U.S.C. § 227(b)(2)(H). "[T]he TCPA specifically mentions 'cellular telephone service' in § 227(b) and § 64.1200(a)(1)(iii), evidencing that both Congress and the FCC were aware of the distinction between a cellular telephone and a residential telephone and purposely protected only 'residential telephone subscribers' under § 227(c), § 64.1200(c) and (d)." Shelton, 378 F. Supp. 3d at 363 n. 7. "[E]xpressing one item of [an] associated group or series excludes another left unmentioned." United States v. Vonn, 535 U.S. 55, 65 (2002). "The expressio unius canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded." N.L.R.B. v. SW General, Inc., 580 U.S. 288 (2017) (quoting Chevron U.S.A., Inc. v. Echazabal, 536 U.S. 73, 81 (2002)).

Cell phones do not present the same concerns as residential telephones. The Eleventh Circuit noted the distinctions between a cell phone and residential phone in accordance with the statutory purpose of the TCPA. "[T]he findings of the Senate show a concern for privacy within the sanctity of the home ... cell phones are often taken outside of the home and often have their ringers silenced, presenting less potential for nuisance and home intrusion." Salcedo v. Hanna, 936 F.3d 1162, 1168–69 (11th Cir. 2019). Cell phones' mobility and functionality to silence or decline calls alleviate the concerns inherent with a home telephone. Plaintiff alleges no facts showing where she was when she received the calls or whether her phone was on silent.

She did not answer four of the six calls she allegedly received, thus diminishing any claim that such calls invaded her privacy. In sum, the authority rests with Congress to amend the TCPA and bring cell phones within its protections.

**\*4** For those reasons, the undersigned respectfully recommends that Defendants' Motion to Dismiss be <u>granted</u>.

## III. <u>RECOMMENDATION</u>

FOR THE FOREGOING REASONS, the undersigned respectfully recommends that Defendants' Motion to Dismiss be **<u>GRANTED</u>** and that Defendants' Motion to Strike be **<u>DENIED</u>**.

## IV. <u>NOTICE OF APPEAL RIGHTS</u>

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within fourteen days after service of the same. Failure to file objections to this Memorandum with the Court constitutes a waiver of the right of de novo review by the District Judge. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315–16 (4th Cir. 2005); <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989). Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Wells</u>, 109 F.3d at 201; <u>Wright v. Collins</u>, 766 F.2d 841, 845–46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 2472649

Footnotes

[1]   Plaintiff asserts she does not recall entering a sweepstakes.

---

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 20

2024 WL 140249
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

MANUEL GUADIAN, Plaintiff,
v.
UNITED TAX DEFENSE LLC, Defendant.

EP-23-CV-00349-KC
|
Filed 01/12/2024

## REPORT AND RECOMMENDATION

ROBERT F. CASTAÑEDA UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court is Plaintiff Manuel Guadian's ("Plaintiff") "Motion for Default Judgment" (ECF No. 9), filed on December 6, 2023. On the same day, United States District Judge Kathleen Cardone referred the motion to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the Court **RECOMMENDS** that Plaintiff's Motion for Default Judgment be **GRANTED**.

## I. FACTUAL BACKGROUND

This case arises from alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Plaintiff asserts that he received eight text and voice messages from Empower People, an offshore telemarketing company, over the course of August 25, 2023, to September 12, 2023. Pl.'s Original Compl. ¶ 43, ECF No. 1.

Plaintiff has maintained his personal cell phone number, ending in -8351, on the National Do-Not-Call Registry since April 6, 2023. *Id.* at ¶ 24. Plaintiff's cell phone is used for residential purposes. *Id.* at ¶ 91.

Plaintiff states that he "received a text message to his personal cell phone" from Empower People on August 25, 2023. *Id.* at ¶ 31. The text message offered debt relief services and was from the number 339-220-6538, with a callback number of 234-282-0292. *Id.* Plaintiff then asserts that he received five prerecorded voice messages, also from Empower People, over the course of August 28, 2023, to September 7, 2023. *Id.* at ¶¶ 32, 43. These voice messages were from various phone numbers, but all used exactly the same language: "Important notification, Empower People has a crucial message regarding a financial assistance account. You have been pre-approved for a financial assistance program." *Id.* Plaintiff asserts that he received two more text messages from Empower People regarding debt relief services to his personal cell phone on September 11 and 12, 2023. *Id.* at ¶¶ 33–34. These text messages came from different numbers and provided different callback numbers. *Id.*

On September 12, Plaintiff called Empower People and expressed interest in its financial assistance services to find out on

whose behalf the calls were made. *Id.* at ¶¶ 35–36. The representative from Empower People informed Plaintiff that he would transfer Plaintiff to a "senior tax advisor." *Id.* at ¶ 36. Plaintiff states that he was then transferred to a representative from Defendant United Tax Defense LLC ("Defendant"). *Id.* at ¶¶ 37–39. Plaintiff received an email containing Defendant's company information from this representative. *Id.* at ¶ 40.

## II. PROCEDURAL HISTORY

On September 15, 2023, Plaintiff filed his Original Complaint, seeking relief against Defendant under the TCPA and Texas Business & Commerce Code Sections 305.053 ("§ 305.053") and 302.101 ("§ 302.101"). *See id.* He requested monetary damages in the amount of $1,500 per call for violations of 47 U.S.C. § 227(b); $1,500 per call for violations of 47 U.S.C. § 227(c); and $5,000 per call for violations of § 302.101, among other damages. *Id.* at ¶¶ 95, 101, 135.

**\*2** Upon Plaintiff's request, the Clerk of the Court issued a summons for Defendant. Summons in a Civil Action, ECF No. 2. Plaintiff filed proof of executed summons, which indicated that the summons was delivered by hand on September 25, 2023, to Gary W. Craig, the registered agent for Defendant, at 2062 Valley Road, Costa Mesa, CA 92627. Proof of Service, ECF No. 3. Defendant had twenty-one days from service to answer, Fed. R. Civ. P. 12(a)(1)(A)(i), which meant that Defendant's answer was due by October 16, 2023. On October 31, after Defendant failed to timely answer or otherwise appear, Plaintiff requested entry of default against Defendant. Req. Entry Default, ECF No. 4. On the same day, the Clerk of the Court entered default against Defendant. Entry Default, ECF No. 5. Plaintiff filed the current Motion for Default Judgment on December 5, 2023. Pl.'s Mot. Default J., ECF No. 9. Defendant has not responded to the Motion or otherwise appeared in this matter.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 55 governs entry of default and default judgment. In ruling on a motion for default judgment, courts generally analyze the following three issues: (1) the procedural propriety of default judgment, (2) the substantive merits of the plaintiff's claims, and (3) the appropriate form of relief. *See United States v. 1998 Freightliner Vin #: 1FUYCZYB3WP886496*, 548 F. Supp. 2d 381, 384 (W.D. Tex. 2008); *J & J Sports Prods., Inc. v. Morelia Mexican Rest., Inc.*, 126 F. Supp. 3d 809, 813–14 (N.D. Tex. 2015).

Procedurally, a defendant defaults if he or she fails to timely respond to the complaint. Fed. R. Civ. P. 55(a); *N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996). When default is shown "by affidavit or otherwise," the clerk of the court "must enter the party's default." Fed. R. Civ. P. 55(a). After entry of default, the plaintiff may seek an entry of default judgment. Fed. R. Civ. P. 55(b). Default judgment is "a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead and Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989) (footnotes omitted). In deciding whether default judgment is procedurally proper, the court considers the following factors:

> [1] whether material issues of fact are at issue, [2] whether there has been substantial prejudice, [3] whether the grounds for default are clearly established, [4] whether the default was caused by a good faith mistake or excusable neglect, [5] the harshness of a default judgment, and [6] whether the court would think itself obliged to set aside the default on the defendant's motion.

*Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998) ("*Lindsey* factors").

Next, as to the merits of a motion for default judgment, the court accepts the plaintiff's well-pleaded allegations as true, except regarding damages. *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975); *U.S. for Use of M-CO Const., Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987). Default judgment is appropriate only if the pleadings provide a "sufficient basis" for the judgment. *Nishimatsu*, 515 F.2d at 1206. In other words, "a defendant's default does not in itself warrant the court in entering a default judgment.... The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Id.* Courts apply the Federal Rule of Civil Procedure 8 standard for the

sufficient basis inquiry. *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015); *see also id.* n.3 ("Although most cases addressing Rule 8 arise in the context of a Rule 12(b)(6) motion to dismiss, ... we decline to import Rule 12 standards into the default-judgment context.").

Finally, as to appropriate form of relief, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The court may conduct a hearing on a default judgment motion, as needed, to: "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). A hearing on damages is required "unless the amount claimed is a liquidated sum or one capable of mathematical calculation." *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979).

## IV. DISCUSSION

### A. Jurisdiction and Venue

**\*3** The Court first confirms that it has jurisdiction to hear this matter. *See Drew v. Lexington Consumer Advoc.*, No. 16-CV-00200-LB, 2016 WL 9185292, at \*2 (N.D. Cal. Aug. 11, 2016) ("Before entering default judgment, a court must determine whether it has subject-matter jurisdiction over the action and personal jurisdiction over the defendant."), *report and recommendation adopted sub nom. Drew v. Lexington Consumer Advoc., LLC*, No. C 16-00200 SBA, 2016 WL 9223901 (N.D. Cal. Sept. 2, 2016). The Court has subject-matter jurisdiction over Plaintiff's TCPA claims because the TCPA is a federal statute. *See* 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's claims under the Texas Business & Commerce Code. *See* 28 U.S.C. § 1367(a).

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017). A state has general personal jurisdiction over a corporation if the corporation "is fairly regarded as at home" in the state. *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). Generally, a corporation is "at home" only in its place of incorporation or principal place of business. *Frank v. P.N.K. (Lake Charles) LLC*, 947 F.3d 331, 336 (5th Cir. 2020). Plaintiff alleges that Defendant "is a corporation organized and existing under the laws of California." Pl.'s Original Compl. ¶ 2. As a result, this Court cannot exercise general personal jurisdiction over Defendant.

For specific jurisdiction, the suit must arise out of the defendant's contacts with the forum. *Bristol-Myers Squibb Co.*, 582 U.S. at 262. "[A] federal court may assert personal jurisdiction if the state long-arm statute permits jurisdiction and the exercise of such jurisdiction would not violate due process.... Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry reduces to only the federal due process analysis." *Conn Appliances, Inc. v. Williams*, 936 F.3d 345, 347 (5th Cir. 2019) (internal quotes and citation omitted). The analysis requires addressing whether the defendant "purposely availed himself of Texas's benefits and protections" and whether exercising personal jurisdiction over the defendant in Texas would not "offend traditional notions of fair play and substantial justice." *Id.* (citation omitted).

"A corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Rogers v. Nat'l Car Cure, LLC*, 636 F. Supp. 3d 762, 768 (S.D. Tex. 2022) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 134 (2014)). An agency relationship is established when one party, the principal, "manifests assent" to another party, the agent, "that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 338–39 (D. Md. 2022) (citation omitted). "The 'essential element' of an agency relationship is the 'principal's control over the agent's actions.' ... The relevant inquiry in TCPA cases is whether the principal controlled—or had the right to control—the 'manner and means' of the telemarketing campaign." *Id.* at 339 (citation omitted).

In his complaint, Plaintiff alleges that Defendant "knowingly and actively directed the alleged phone calls" and "instructed [Empower People] on what states to call, what hours to call, and what to say when the phone calls were answered." Pl.'s

Original Compl. ¶¶ 65–66. Plaintiff also alleges that Defendant "directed [Empower People] on the qualifications required for each customer and supplied [Empower People] with the hardware and software use to enter those qualifications." *Id.* at ¶ 67. He adds that Defendant "had day-to-day control over the actions of its telemarketers" and "gave interim instructions to [Empower People]." *Id.* at ¶¶ 70–71. These statements, taken as true, are enough to establish that Empower People was operating as Defendant's agent. Therefore, Empower People's actions are imputed to Defendant. *See Callier v. SunPath Ltd.,* No. EP-20-CV-00106-FM, 2020 WL 10285659, at *3 (W.D. Tex. Aug. 10, 2020) ("[T]he authorized actions of an agent may be imputed to that agent's principal."). This means that Empower People's telemarketing calls constitute Defendant's minimum contacts with Texas.

**\*4** Notions of fair play and substantial justice would not be offended by the Court's exercise of personal jurisdiction. The five factors the Fifth Circuit has identified when considering whether it is reasonable to exercise personal jurisdiction are:

> (1) the burden on the nonresident defendant of having to defend itself in the forum, (2) the interests of the forum state in the case, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interests of the states in furthering fundamental social policies.

*Rogers,* 636 F. Supp. 3d at 771. The court in *Rogers* concluded that its exercise of personal jurisdiction over a TCPA defendant was reasonable because "Texas has an interest in litigation enforcing its telephone consumer protection laws, and [the] [p]laintiff would be inconvenienced if required to litigate his claims in [the defendant's] preferred state." Additionally, the *Rogers* court held that "enforcement of state telephone consumer protection laws could be frustrated if plaintiffs as a group were forced to travel to the defendants' preferred state." *Id.* The same considerations apply here, and Defendant has not made a case for why personal jurisdiction would not be reasonable.

Lastly, Defendant was properly served. A corporation can be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Plaintiff served a copy of the summons and complaint on the individual listed on California's Secretary of State website as Defendant's registered agent at the address also listed on the website.[1] *See* Proof of Service. Additionally, a corporation can be served "in the manner prescribed by Rule 4(e)(1) for serving an individual." Fed. R. Civ. P. 4(h)(1)(A). Service may be carried out on an individual by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). "Texas law authorizes service on a corporation through the corporation's registered agent, president, or vice president." *Lawson v. GEICO,* No. 5:15–CV–481, 2015 WL 6161247, at *2 (W.D. Tex. Oct. 19, 2015). Thus, the Court may exercise personal jurisdiction over Defendant.

Venue is proper in this District because it is the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2); *see* Pl.'s Original Compl. ¶ 11. Plaintiff resides in the Western District of Texas and received all of the calls while in this District. *Id.* at ¶ 1.

### B. Procedural Propriety

Default judgment against Defendant is procedurally appropriate. There are no material issues of fact at issue in the case, given that Defendant has defaulted and filed no responsive pleadings. *See Cunningham v. Greenstar Cap. Sols., LLC,* No. 4:18-CV-000161-ALM-CAN, 2018 WL 4572711, at *3 (E.D. Tex. Aug. 1, 2018) ("When a defendant defaults, he admits to the plaintiff's well-pleaded allegations of fact, and therefore, there are no material issues of fact.") (citation omitted), *report and recommendation adopted,* No. 4:18-CV-161, 2018 WL 4567706 (E.D. Tex. Sept. 24, 2018). Plaintiff has been prejudiced and will continue to be prejudiced by the delay in this case due to Defendant's failure to timely answer and defend the case. The grounds for default are clearly established. As discussed, Defendant failed to timely respond to the Complaint, Plaintiff moved for default, and the Clerk of the Court entered default against Defendant. The District Court ordered Plaintiff to move for default judgment "on or before December 5, 2023." Order, ECF No. 7. Plaintiff certified that he filed his Motion for Default Judgment on December 5. Pl.'s Mot. Default J. 13. There is no evidence that Defendant's default was caused by a good faith mistake or excusable neglect. Default judgment against Defendant would not be unduly harsh, given that Defendant has been given notice and opportunity to respond to this action. Lastly, there is not any basis on which a court

would think itself obliged to set aside Defendant's default. Thus, all the *Lindsey* factors are satisfied.

### C. Substantive Merits

1. Violation of 47 U.S.C. § 227(b)(1)(A)(iii)

**\*5** 47 U.S.C. § 227(b)(1)(A)(iii) makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice to any ... cellular telephone service." Plaintiff has alleged that five phone calls were made to his cellular phone. Pl.'s Original Compl. ¶¶ 32, 43. Plaintiff has asserted that he "never gave his prior express written consent" to receive any of these calls. *Id.* at ¶ 44. He "never had any business relationship with Defendant and never knew who Defendant was prior to the calls being made to his personal cell phone." *Id.* at ¶ 45. Plaintiff also stated that the five voice messages he received on his phone were "artificial or prerecorded" and all used the same words. *Id.* at ¶ 32. Plaintiff thus has adequately pleaded all the elements of the claim and established a sufficient basis for relief.

2. Violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)

47 U.S.C. § 227(c)(5) provides that "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action "in an appropriate court." The "regulations prescribed under this subsection" are codified at 47 U.S.C. § 64.1200. 47 C.F.R. § 64.1200(c)(2) makes it an offense to "initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government."

Courts within the Fifth Circuit have come out both ways on the question of whether a cellular telephone can be considered a residential telephone for purposes of 47 C.F.R. § 64.1200. *Compare Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 WL 2688622, at \*5–6 (W.D. Tex. May 10, 2021) *with Strange v. ABC Co.*, No. CV 19-1361, 2021 WL 798870, at \*3 (W.D. La. Mar. 1, 2021). However, there is no "binding precedent that would foreclose Plaintiff's allegations, as pleaded, under the TCPA." *Myrick v. Adapthealth, LLC*, No. 6:22-CV-00484-JDK, 2023 WL 5162396, at \*2 (E.D. Tex. June 26, 2023), *report and recommendation adopted*, No. 6:22-CV-484-JDK, 2023 WL 4488848 (E.D. Tex. July 12, 2023). Further, the Federal Communications Commission has arguably "extended the full coverage of the TCPA to cell phones." *Id.* at \*3 (citing *In re Rules & Reguls. Implementing the TCPA of 1991*, 18 FCC Rcd. 14014, 14039, 2003 WL 21517853 (FCC June 26, 2003)). This Court agrees with other courts in the Fifth Circuit that have held that a cellular telephone number qualifies as a residential number under the TCPA as long as the plaintiff alleges sufficient facts to make it clear that his cellular telephone is used for residential purposes. *See id.*; *Strange*, 2021 WL 798870, at \*4; *Hunsinger v. Alpha Cash Buyers, LLC*, No. 3:21-CV-1598-D, 2022 WL 562761, at \*3 (N.D. Tex. Feb. 24, 2022).

Plaintiff has confirmed that his cellular phone is a residential number. Pl.'s Original Compl. ¶ 91. He asserts that his cellular phone is used "for personal, family, and household use" and is the primary way that he contacts "friends and family." *Id.* He also states that this phone is "registered in his personal name" and paid for "from his personal accounts." *Id.* The phone was registered on the national do-not-call registry during the relevant time period. Pl.'s Original Compl. ¶¶ 24–25. Plaintiff has also stated that he received more than one call in a 12-month period, and all the calls were on behalf of Defendant. *Id.* at ¶¶ 41, 43. As such, Plaintiff has pleaded enough to establish a sufficient basis for default judgment for the eight calls received.[2]

3. Violation of Texas Business & Commerce Code § 302.101

**\*6** Section 302.101 makes it a violation for "a seller" to "make a telephone solicitation ... to a purchaser located in this state

unless the seller holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101. Other courts in this Circuit have determined that the federal common law principles of agency apply here, too, and the conduct of the telemarketer who makes the calls can be imputed to the seller if the telemarketer is an agent of the seller. *See Johnson v. Palmer Admin. Servs., Inc.*, No. 6:22-CV-00121-JCB-KNM, 2022 WL 17546957, at *9 (E.D. Tex. Oct. 20, 2022) (stating that the plaintiff had "presented sufficient factual allegations" for the court "to infer the existence of a principal-agent relationship" between the telemarketer and the defendant and thus impute the telemarketer's conduct to the defendant), *report and recommendation adopted*, No. 6:22-CV-00121, 2022 WL 16919786 (E.D. Tex. Nov. 14, 2022); *Salaiz v. Beyond Fin., LLC*, No. EP-23-CV-6-KC, 2023 WL 6053742, at *5 (W.D. Tex. Sept. 18, 2023) (finding that the plaintiff had "plausibly alleged that [the] [d]efendant effected or attempted to effect the thirteen calls [the] [p]laintiff received by hiring telemarketers to make those calls.").

Plaintiff asserts that he is a resident of Texas. Pl.'s Original Compl. ¶ 1. Defendant is a seller, since Defendant ordered that the calls be made on Defendant's own behalf, in order to promote its financial assistance services. *See* Tex. Bus. & Com. Code § 302.001(5) (" 'Seller' means a person who makes a telephone solicitation on the person's own behalf."). Plaintiff also asserts that Defendant is not registered with the Texas Secretary of State, as required by § 302.101. Pl.'s Original Compl. ¶ 49. As a result, Plaintiff has pleaded a sufficient basis to establish a claim.

### D. Entitlement to Damages

If no hearing regarding the amount of damages is held, then damages must be proven "by detailed affidavits establishing the necessary facts." *United Artists Corp.*, 605 F.2d at 857. No hearing has been held on damages here. Even so, the amount of damages available to Plaintiff is capable of mathematical calculation, and Plaintiff has provided these calculations in his Motion for Default Judgment and attached affidavit. *See* Pl.'s Mot. Default J.; Decl. Manuel Guadian Supp. Mot. Default J, ECF No. 10. Plaintiff seeks damages in the amount of $31,977.00, based on $500 each for 5 violations of § 227(b), $500 each for 8 violations of § 227(c), and $5,000 each for 5 violations of § 302.101, along with $402 in filing fees and $75 in service fees. Pl.'s Mot. Default J. 12; Decl. Manuel Guadian Supp. Mot. Default J. ¶¶ 5–8.

47 U.S.C. §§ 227(b)(3) and 227(c)(5) authorize private rights of action under the TCPA. Under both subsections, an individual can file suit to recover his actual monetary losses or to receive $500 in damages for each violation. 47 U.S.C. § 227(b)(3)(B); 47 U.S.C. § 227(c)(5)(B).³ One call can violate multiple subsections of the TCPA and thus be subject to multiple awards of damages. *See Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1105–06 (11th Cir. 2015) (holding that one fax violated multiple subsections of the TCPA and the plaintiff was entitled to damages of $1,000 as a result). Through the allegations in the Original Complaint, Plaintiff has shown that Defendant is liable for five phone calls that violated § 227(b) and eight calls that violated § 227(c). As such, Plaintiff is entitled to $6,500.

**\*7** Plaintiff also requests $25,000 for Defendant's five⁴ violations of § 302.101. Pl.'s Mot. Default J. 12; Dec. Manuel Guadian Supp. Mot. Default J. ¶ 7. A person or entity who violates Chapter 302 of the Texas Business & Commerce Code ("Chapter 302") faces "a civil penalty of not more than $5,000 for each violation." Tex. Bus. & Com. Code § 302.302(a). There is a private right of action available to enforce the provisions of Chapter 302. Tex. Bus. & Com. Code § 302.303(b); *see also Auguston v. Nat'l Admin. Serv. Co.*, No. 4:21-CV-819-ALM-KPJ, 2023 WL 1810397, at *8 (E.D. Tex. Jan. 11, 2023) ("While Texas Business and Commerce Code Section 302.101 itself does not provide a private right of action, Section 302.303 provides the plaintiff a private right of action to enforce violations of Section 302.101."), *report and recommendation adopted*, No. 4:21-CV-819-ALM-KPJ, 2023 WL 1802389 (E.D. Tex. Feb. 7, 2023). Other courts in this Circuit have approved damages under both the TCPA and Chapter 302. *See Thomas v. Zenith Solar, LLC*, No. MO:22-CV-00047-DC-RCG, 2022 WL 17813168, at *4 (W.D. Tex. Aug. 1, 2022) (granting the plaintiff $1,500 under the TCPA and $5,000 under Chapter 302 for each violation), *report and recommendation adopted*, No. MO:22-CV-00047-DC, 2022 U.S. Dist. LEXIS 202853 (W.D. Tex. Aug. 24, 2022); *Thompson v. Dealer Renewal Servs.*, No. 4:21-CV-0467-P, 2021 WL 5416605, at *3 (N.D. Tex. Nov. 18, 2021) (granting the plaintiff damages under 47 U.S.C. § 227(b), 47 U.S.C. § 227(c), and Chapter 302). Plaintiff is entitled to $25,000 for five violations of § 302.101.

Lastly, Plaintiff seeks a total of $477 in filing and service fees. Pl.'s Mot. Default J. 11. Plaintiff is allowed to recoup "all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees,

MANUEL GUADIAN, Plaintiff, v. UNITED TAX DEFENSE LLC,..., Slip Copy (2024)

and attorney's fees." Tex. Bus. & Com. Code § 302.302(d). The category of "court costs" would include Plaintiff's filing fee. The fee Plaintiff paid for service of process would also be included. Since this is a Texas statute, the Court looks to Texas law, which considers fees for service of process to be court costs that may be included in a judgment. Michol O'Connor, *O'Connor's Texas Causes of Action* Ch. 44, § 2.3.1(2) (2024 ed.) ("Service fees are taxable court costs.... Service fees are recoverable regardless of whether the service was made by a public officer or a private process server."); *see also Bates Energy Oil & Gas, LLC v. Complete Oil Field Servs., LLC*, No. 5:17-cv-808-RCL, 2021 WL 3137421, at *16 (W.D. Tex. Feb. 22, 2021) ("If Texas law controls, then the sums expended on private process servers are recoverable."). As a result, Plaintiff is entitled to recover $477 in total in court costs.

## V. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Plaintiff Manuel Guadian's Motion for Default Judgment be **GRANTED** and that he be awarded $31,977.00 as damages for Defendant's violations of 47 U.S.C. § 227(b), 47 U.S.C. § 227(c), and Tex. Bus. & Com. Code § 302.101.

**SIGNED** this 12th day of January, 2024.

## NOTICE

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THE FOREGOING REPORT, WITHIN FOURTEEN DAYS OF SERVICE OF SAME, MAY BAR DE NOVO DETERMINATION BY THE DISTRICT JUDGE OF AN ISSUE COVERED HEREIN AND SHALL BAR APPELLATE REVIEW, EXCEPT UPON GROUNDS OF PLAIN ERROR, OF ANY UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS AS MAY BE ACCEPTED OR ADOPTED BY THE DISTRICT COURT.**

**All Citations**

Slip Copy, 2024 WL 140249

Footnotes

1       *Business Search*, Cal. Sec'y of State, https://bizfileonline.sos.ca.gov/search/business (search "United Tax Defense LLC") (last visited Dec. 11, 2023).

2       "Text messages are 'calls' subject to the TCPA, as previously determined by the Commission." *In re Rules and Reguls. Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7965, 2015 WL 4387780 (FCC July 10, 2015).

3       Both subsections also contain provisions allowing for treble damages if the defendant's violation is willful and knowing. 47 U.S.C. § 227(b)(3); 47 U.S.C. § 227(c)(5). Plaintiff addresses these provisions but does not actually request treble damages in the Motion. Pl.'s Mot. Default J. 10–12. Since Plaintiff does not seek treble damages, the Court will not address whether he is entitled to them.

4       Section 302.101 does not apply to text messages, "[u]nder a plain reading of the [Texas Business and Commerce] Code." *Powers v. One Techs., LLC*, No. 3:21-CV-2091, 2022 WL 2992881, at *4 (N.D. Tex. July 28, 2022). Plaintiff properly does not seek

damages under § 302.101 for the three text messages he received from Defendant.

# TAB 21

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 210 of 409   PageID 279

Hunsinger v. Alpha Cash Buyers, LLC, Not Reported in Fed. Supp. (2022)

2022 WL 562761
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Joe HUNSINGER, Plaintiff,
v.
ALPHA CASH BUYERS, LLC, Defendant.

Civil Action No. 3:21-CV-1598-D
|
Signed 02/24/2022

**Attorneys and Law Firms**

Joe Hunsinger, Dallas, TX, Pro Se.

Robert Leach, Allen Edgar Robertson, III, Jaffer & Associates PLLC, Addison, TX, Shawn Jaffer, Jaffer & Associates PLLC, Dallas, TX, Stanley Wu, Wu Law Office PLLC, Houston, TX, for Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

SIDNEY A. FITZWATER, SENIOR JUDGE

**\*1** *Pro se* plaintiff Joe Hunsinger ("Hunsinger") sues defendant Alpha Cash Buyers, LLC ("Alpha Cash"), alleging, *inter alia*, violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Alpha Cash moves to dismiss Hunsinger's amended complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. Hunsinger opposes the motion, and, in the alternative, requests leave to amend. For the reasons that follow, the court grants in part and denies in part Alpha Cash's motion to dismiss, and it also grants Hunsinger leave to amend.

I

The court assumes the parties' familiarity with its prior memorandum opinion and order in this case, *see Hunsinger v. Alpha Cash Buyers, LLC* (*Hunsinger I*), 2021 WL 5040228, at \*1 (N.D. Tex. Oct. 29, 2021) (Fitzwater, J.), and recounts the facts and procedural history only as is necessary to understand this memorandum opinion and order.

This case arises out of eight unsolicited telephone calls and six Short Message Service ("SMS")[1] text messages that Hunsinger received on his cellular telephone in 2021. These telephone calls and text messages all originated from a ten-digit telephone number, or an SMS "long code,"[2] ending in 7938.

On June 28, 2021 Hunsinger received and answered one of these unsolicited telephone calls. The caller did not identify himself other than as "Albert," and did not disclose the company on whose behalf he was calling. To identify the caller, Hunsinger provided his email address to Albert. And based on the subsequent email he received, Hunsinger was able to

determine that Alpha Cash was responsible for the telephone calls and text messages.

Following these calls, Hunsinger received on July 3, 2021 two identical text messages that read: "Hey Joseph, Albert here. Just checking in to see if you had any questions on the agreement. Thnx." Am. Compl. 35. On July 7, 2021 Hunsinger received additional text messages signed by Albert. Hunsinger alleges that these text messages were sent using an Automatic Telephone Dialing System ("ATDS"). On October 9, 2021 Hunsinger also received a call from Vincent Ajaegbu ("Ajaegbu"), a managing member of Alpha Cash. Hunsinger alleges that this call was placed using a third party vendor and that there were "a few seconds of pause" between when he answered the call and when Ajaegbu came on the line. *Id.* ¶ 6.33.

Hunsinger filed this action on July 9, 2021. Alpha Cash moved to dismiss Hunsinger's complaint under Rule 12(b)(6), and the court granted the motion but also granted Hunsinger leave to replead. *See Hunsinger I*, 2021 WL 5040228, at *4. Hunsinger thereafter filed the instant amended complaint, alleging, *inter alia*, violations of 47 U.S.C. § 227(b)(1)(A)(iii) for using an ATDS to place telephone calls, and send text messages, to Hunsinger's cellular telephone without his prior express consent, as required by 47 C.F.R. § 64.1200(a)(1); violations of 47 C.F.R. § 64.1200(c)(2) for making more than one telephone solicitation to a person on the National Do-Not-Call Registry in a 12-month period; violations of 47 C.F.R. § 64.1200(d) for failing to institute procedures for maintaining a list of persons who request not to receive telemarketing calls and failing to provide Alpha Cash's Do-Not-Call Policy upon Hunsinger's request; violations of Tex. Bus. & Com. Code Ann. § 305.053, which provides a private right of action for violations of the TCPA; and a violation of the common law right to privacy based on unreasonable intrusion on seclusion. Alpha Cash now moves to dismiss Hunsinger's amended complaint pursuant to Rule 12(b)(6). Hunsinger opposes the motion. The court is deciding the motion on the briefs.

## II

**\*2** In deciding Alpha Cash's Rule 12(b)(6) motion, the court evaluates the sufficiency of Hunsinger's complaint by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a motion to dismiss, Hunsinger must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 (quoting Rule 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678, 129 S.Ct. 1937. But because Hunsinger is proceeding *pro se*, the court construes the allegations of the complaint liberally. *See Hughes v. Rowe*, 449 U.S. 5, 9-10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam); *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (per curiam).

## III

The court first addresses Alpha Cash's motion to dismiss with respect to Hunsinger's claims for violations of 47 C.F.R. § 64.1200(c)(2) and (d), promulgated pursuant to 47 U.S.C. § 227(c).

## A

Alpha Cash contends that Hunsinger has failed to plausibly plead a violation of 47 U.S.C. § 227(c)(5) because the delivery

restrictions in 47 C.F.R. §§ 64.1200(c)(2) and (d) apply only to residential telephones, and Hunsinger pleads that he was contacted on his cellular telephone. Hunsinger responds that these provisions apply to cellular telephones that are used for residential purposes, and he posits that his cellular telephone is used for personal and household purposes.

B

Section 227(c)(1) authorizes the Federal Communications Commission ("FCC") to promulgate regulations on telephone solicitations. *See* 47 U.S.C. § 227(c)(1) ("[T]he Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."). Based on this authorization, "the FCC issued regulations prohibiting 'person[s] or entit[ies] [from] initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless [the] person or entity has instituted [certain listed] procedures for maintaining' a do-not-call list." *Charvat v. NMP, LLC*, 656 F.3d 440, 443-44 (6th Cir. 2011) (alterations in original) (quoting 47 C.F.R. § 64.1200(d)). If a person or entity violates these delivery restrictions, § 227(c)(5) grants a right of private action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection."

Although defendants are correct that 47 C.F.R. §§ 64.1200(c) and (d) state that these procedures apply to persons and entities making telemarketing calls to "a residential telephone subscriber," the regulations also state that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers" as described in a 2003 FCC order ("2003 Order"). *See* 47 C.F.R. § 64.1200(e) (citing *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014 (2003)). In the 2003 Order, the FCC explained that "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections[,]" and that "wireless subscribers may participate in the national do-not-call list." 18 F.C.C. Rcd. at 14039. And other courts have held that cellular telephones can qualify as residential telephones, so long as a plaintiff pleads that the cellular telephone is used for residential purposes. *See, e.g., Callier v. Nat'l United Grp., LLC*, 2021 WL 5393829, at *9 (W.D. Tex. Nov. 17, 2021) ("[Defendant's] claim that § 64.1200(d) does not apply to cell phones is therefore erroneous; it applies to any cell phone being used as a residential phone."); *Smith v. Truman Rd. Dev., LLC*, 2020 WL 2044730, at *10 (W.D. Mo. Apr. 28, 2020) (holding that "[a] cell phone user can qualify as a residential telephone subscriber under 47 C.F.R. § 64.1200(c) and (d)," and collecting cases); *see also Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 131 (N.D. Tex. 2020) (Pittman, J.) (rejecting defendants' contention that "cell phones, as a matter of law, cannot be 'residential subscribers,' " in the context of a motion to certify a class); *but see Callier v. GreenSky, Inc.*, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021) ("Plaintiff does not cite—and the Court is not aware of—any authority that has found § 64.1200(d)(1) applicable to cellphones. Accordingly, the Court finds that this claim fails as a matter of law.").[3]

**\*3** Hunsinger alleges that his cellular telephone, which is registered on the National Do-Not-Call Registry, is "primarily used for personal, family, and household use." Am. Compl. ¶ 7.04. The court therefore concludes that Hunsinger has alleged sufficient facts for the court to draw the reasonable inference that his cellular telephone is a "residential telephone" for purposes of 47 C.F.R. §§ 64.1200(c) and (d). Consequently, the court denies Alpha Cash's motion to dismiss Hunsinger's claims under these provisions.

IV

The court next addresses Alpha Cash's motion to dismiss Hunsinger's claim under § 227(b)(1)(A)(iii).

A

Alpha Cash contends that Hunsinger has failed to plausibly plead a violation of § 227(b)(1)(A)(iii) because the allegations of

his amended complaint do not allow the court to reasonably infer that the telephone calls were made using an ATDS, or that the text messages were sent to him using an ATDS. Hunsinger responds that he has pleaded sufficient facts for the court to reasonably infer that an ATDS was used, and that Alpha Cash's arguments are more appropriately considered on motion for summary judgment.

**B**

Section 227(b) of the TCPA makes it unlawful for any person to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service...." 47 U.S.C. § 227(b)(1)(A)(iii). Section 227(b)(1)(A)(iii) is violated if: "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system [or an artificial or prerecorded voice]; (3) without the recipient's prior express consent." *Cunningham v. Nationwide Sec. Sols., Inc.*, 2017 WL 10486988, at *2 (N.D. Tex. Nov. 2, 2017) (Lynn, C.J.) (alteration in original) (quoting *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)). "A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156, 136 S.Ct. 663, 193 L.Ed.2d 571 (2016).

The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Last year, the Supreme Court resolved a circuit split "regarding whether an autodialer must have the capacity to generate random or sequential phone numbers," or whether an ATDS "need only have the capacity to store numbers to be called and to dial such numbers automatically." *Facebook, Inc. v. Duguid*, ––– U.S. ––––, 141 S. Ct. 1163, 1168, 209 L.Ed.2d 272 (2021) (internal quotations omitted). The Court held that, "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Id.* at 1167. Thus to establish a claim under § 227(b), "the equipment in question must use a random or sequential number generator," not merely auto-dial stored numbers. *Id.* at 1170.

Chief Judge Lynn has held that "[s]imply alleging the use of an ATDS, without more, is insufficient to sustain a TCPA claim." *Cunningham*, 2017 WL 10486988, at *3. She has also observed that "courts have noted the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery...." *Id.* (quoting *Hickey v. Voxernet LLC*, 887 F.Supp.2d 1125, 1129-30 (W.D. Wash. 2012)).

**\*4** In light of this difficulty, courts have allowed plaintiffs to "rely on indirect allegations, such as the content of the message, the context in which it was received, and the existence of similar messages to raise an inference that an ATDS was used." *Jones v. FMA All. Ltd.*, 978 F.Supp.2d 84, 87 (D. Mass. 2013) (quoting *Gragg v. Orange Cab Co.*, 942 F.Supp.2d 1111, 1114 (W.D. Wash. 2013)); *see Schley v. One Planet Ops Inc.*, 445 F.Supp.3d 454, 459-60 (N.D. Cal. 2020) (explaining factors that support an inference of ATDS use in the context of text messages, such as: generic messages, identical messages sent to multiple parties at the same time, and the use of an SMS short code to send the message). In the context of allegations related to telephone calls, courts have also allowed plaintiffs to rely on indirect allegations, such as assertions of "dead-air time" during the call. *See Cunningham*, 2017 WL 10486988, at *3.

**C**

Hunsinger alleges that Alpha Cash "used an ATDS system that uses a random or sequential number generator." Am. Compl. ¶ 6.47. And he asserts that Alpha Cash contacted him about buying his real property, and that real estate investors like Alpha Cash "use up to date modern technology and skip tracing tools to 1) find real estate that they want to buy and 2) initiate contact with the property owner...." *Id.* ¶ 6.10. Hunsinger also alleges that Alpha Cash uses modern technology that allows it to send up to 500 text messages at once for $1.00.

These allegations, however, do not support a reasonable inference that Alpha Cash used an ATDS with the capacity to *randomly or sequentially* store or produce telephone numbers. Instead, these factual allegations support a reasonable inference that Alpha Cash was interested in purchasing Hunsinger's property, used modern technology to obtain his telephone number, and then contacted him about this property. Even liberally construing Hunsinger's amended complaint to allege that Alpha Cash used an ATDS to randomly or sequentially contact a list of property owners that Alpha Cash had compiled through "modern technology and skip tracing tools," other courts have held that, after *Duguid*, using an autodialer to randomly or sequentially dial numbers from a pre-produced list does not violate § 227(b)(1)(A)(iii). *See, e.g., Samataro v. Keller Williams Realty, Inc.*, 2021 WL 4927422, at \*4 (W.D. Tex. Sept. 27, 2021) (dismissing plaintiff's complaint "because it is based on calls made to specific individuals in connection with their property listings, whose numbers were compiled into a preproduced list of phone numbers, as opposed to generated randomly by an autodialer"); *see also Meier v. Allied Interstate LLC*, 2022 WL 171933, at \*1 (9th Cir. Jan. 19, 2022) (mem.) (rejecting, in light of *Duguid*, the argument that any system that stores a pre-produced list of telephone numbers and that could also autodial these stored numbers is an ATDS); *In re Portfolio Recovery Assocs., LLC*, 2021 WL 5203299, at \*2-4 (S.D. Cal. Nov. 9, 2021) (collecting cases and rejecting plaintiffs' request to conduct additional discovery as futile because "Plaintiffs do not allege their numbers were generated from a list that was produced in a random or sequential way as they allege Plaintiffs are consumers from which Defendant attempted to collect debts through repeated phone calls and Defendant obtained Plaintiffs' numbers through the use of skip-tracing services").

Even construing Hunsinger's allegations liberally because he is proceeding *pro se*, the court concludes that Hunsinger's contradictory allegations do not allow the court to reasonably infer that Alpha Cash used an ATDS that produced or stored telephone numbers using a random or sequential number generator. Hunsinger has therefore failed to plausibly plead a claim based on a violation of § 227(b)(1)(A)(iii).

**\*5** Moreover, although the court need only conclude that Hunsinger has failed to allege facts that support a reasonable inference that Alpha Cash used an ATDS using a random or sequential number generator, the indirect allegations in Hunsinger's amended complaint likewise fail to support a reasonable inference that an ATDS *of any kind* was used to send the text messages. As the court explained in *Hunsinger I*, the personal nature of the text messages, the context in which they were sent, and the fact that the text messages were sent from an SMS long code all fail to support a reasonable inference that Alpha Cash used an ATDS to send the text messages. *See Hunsinger I*, 2021 WL 5040228, at \*4. Hunsinger alleges that "[t]he impersonal and generic nature of Defendant[']s text message(s), demonstrate[s] that Defendant utilized an ATDS in transmitting the message." Am. Compl. ¶ 3.22. But the copies of the text messages that Hunsinger attaches to his amended complaint only permit the court to draw the reasonable inference that the messages are neither impersonal nor generic. The messages were sent directly to Hunsinger, and two messages address him by his first name. The direct and personal nature of the text messages weighs against a reasonable inference that Alpha Cash used an ATDS to send the messages. *See Suttles v. Facebook, Inc.*, 461 F.Supp.3d 479, 487 (W.D. Tex. 2020) ("Allegations of directly targeting specific individuals weigh against an inference that an ATDS was used.").

The context in which the text messages were received also cuts against a reasonable inference that they were sent using an ATDS. According to the amended complaint, the text messages were sent after Hunsinger had spoken with an Alpha Cash agent several times by telephone. And the contents of the text messages suggest that they were sent with the purposes of following-up on the prior telephonic interactions and discussing a potential transaction between Alpha Cash and Hunsinger. Although not dispositive, a "pre-existing relationship" between Hunsinger and Alpha Cash, or the fact that Alpha Cash had a "specific reason to contact [Hunsinger]," suggests that an ATDS was not used to send the text messages. *See Schley*, 445 F.Supp.3d at 460.

Finally, the fact that the text messages were sent from an SMS long code telephone number does not support a reasonable inference that an ATDS was used. Hunsinger's alleges that the text messages were sent from a long code telephone number. *See* Am. Compl. ¶¶ 3.24-25. "The use of a short code [as opposed to a long code] suggests the use of an ATDS." *Schley*, 445 F.Supp.3d at 460. Although the use of a long code "does not preclude the use of an ATDS," it does not support an inference that an ATDS was used either. *Id.*; *Matthews v. Mid City Cannabis Club, Inc.*, 2020 WL 7978499, at \*4 (C.D. Cal. Nov. 6, 2020) ("Plaintiff's allegations that Defendant used a 'long code' number does not suggest an ATDS was used.").

The court therefore dismisses Hunsinger's claims under § 227(b)(1)(A)(iii) for failure to state a claim on which relief can be granted.

## V

The court turns next to Alpha Cash's motion to dismiss as it relates to Hunsinger's claim under Tex. Bus. & Com. Code Ann. § 305.053.

Alpha Cash argues that Hunsinger has failed to state a plausible claim under Tex. Bus. & Com. Code Ann. § 305.053 because he has failed to plead a violation of the TCPA and there can be no violation of § 305.053 without an underlying valid TCPA claim.

Tex. Bus. & Com. Code Ann. § 305.053 provides a private right of action for a violation of the TCPA. Under § 305.053, a "person who receives a communication that violates 47 U.S.C. Section 227, [or] a regulation adopted under that provision ... may bring an action in this state against the person who originates the communication...." Tex. Bus. & Com. Code § 305.053(a). Section 305.053 "proscribes only that conduct which is also prohibited by the TCPA. If no violation of the TCPA exists, there is no violation of" Tex. Bus. & Com. Code § 305.053(a). *Cherkaoui v. Santander Consumer USA, Inc.*, 32 F.Supp.3d 811, 815 (S.D. Tex. 2014).

As explained, Hunsinger has failed to plausibly allege a violation of § 227(b)(1)(A)(iii), *see supra* § IV(C), but he has plausibly alleged that Alpha Cash violated regulations promulgated pursuant to § 227(c), *see supra* § III(B). The court therefore grants Alpha Cash's motion to dismiss Hunsinger's claim under Tex. Bus. & Com. Code Ann. § 305.053 to the extent that it relies on an underlying violation of § 227(b)(1)(A)(iii), but otherwise denies Alpha Cash's motion to dismiss Hunsinger's claim under Tex. Bus. & Com. Code Ann. § 305.053.

## VI

**\*6** Although the court is granting Alpha Cash's motion to dismiss, and although Hunsinger has already amended once, the court will grant Hunsinger another opportunity to replead. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). Hunsinger has not stated that he cannot, or is unwilling to, cure the defects that the court has identified. To the contrary, he explicitly requests leave to amend if the court disagrees with his position on Alpha Cash's motion to dismiss. Moreover, plaintiffs have cured pleading defects when amending after a motion to dismiss has been granted. *See, e.g., Reneker v. Offill*, 2010 WL 1541350, at \*2, \*7 (N.D. Tex. Apr. 19, 2010) (Fitzwater, C.J.) (concluding, after twice granting motions to dismiss, that plaintiff's second amended complaint stated claim on which relief could be granted). And in granting leave to replead, the court takes into consideration that Hunsinger is proceeding *pro se*. *See, e.g., Smallwood v. Bank of Am.*, 2012 WL 32654, at \*5 (N.D. Tex. Jan. 6, 2012) (Fitzwater, C.J.) (granting leave to file third amended complaint because plaintiffs were appearing *pro se*).

The court therefore grants Hunsinger 28 days from the date this memorandum opinion and order is filed to file a second amended complaint. If Hunsinger repleads, Alpha Cash may move anew to dismiss, if it has grounds to do so.

\* \* \*

In sum, for the reasons explained, the court grants in part and denies in part Alpha Cash's motion to dismiss, and it grants Hunsinger 28 days from the date this memorandum opinion and order is filed to file a second amended complaint.

**SO ORDERED**.

Hunsinger v. Alpha Cash Buyers, LLC, Not Reported in Fed. Supp. (2022)

**All Citations**

Not Reported in Fed. Supp., 2022 WL 562761

Footnotes

1    SMS messages are standard text messages on cellular devices. *See Jovanovic v. SRP Invs. LLC*, 2021 WL 4198163, at *3 n.1 (D. Ariz. Sept. 15, 2021).

2    "SMS long codes are standard ten-digit telephone numbers including an area code, used by individual and business subscribers alike." *Id.* Text messages can also be sent from "SMS short-code[s]," which are "four to six digit telephone number[s] used only for texting, and most frequently for commercial marketing purposes." *Id.*

3    The court recognizes that there is a split among district courts over whether cellular telephone owners, as a matter of law, can be residential telephone subscribers. Although the court now holds that Hunsinger can qualify as a residential telephone subscriber within the meaning of 47 C.F.R. §§ 64.1200(c) and (d) because he pleads that he received telephone calls and text messages on a cellular telephone that was used for residential purposes, the court may reconsider this conclusion at a later stage in this court if developments in the law so warrant.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 22

2023 WL 2377481
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Joe HUNSINGER, Plaintiff,
v.
DYNATA LLC, Defendant.

Case No. 3:22-cv-00136-G-BT
|
Signed February 7, 2023

**Attorneys and Law Firms**

Joe Hunsinger, Dallas, TX, Pro Se.

Kevin David Rice, Plano, TX, for Defendant.

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

REBECCA RUTHERFORD, UNITED STATES MAGISTRATE JUDGE

**\*1** Before the Court is Defendant Dynata, LLC's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 20). For the following reasons, the Court should **GRANT** Dynata's Motion and **DISMISS** Hunsinger's amended complaint.

**Background**

Plaintiff Joe Hunsinger brings this *pro se* civil action alleging violations of the Telephone Consumer Protection Act (TCPA), violations of the Texas Business and Commerce Code (TBCC), and claims for intentional intrusion on solitude, seclusion, and private affairs.[1] He also seeks treble damages for willful and knowing violations of the TCPA and TBCC.

In his amended complaint, Hunsinger alleges that he registered his phone number on the national do-not-call (DNC) registry list. Am. Compl. 6 (ECF No. 17). However, on September 21, 2021, Hunsinger received a single call from an "unidentified caller" to his DNC-registered phone number. Am. Compl. 10. When Hunsinger answered, "[i]t took several seconds for the caller to pick up the line." Am. Compl. 10. Hunsinger alleges the brief delay indicates the caller used a "predictive dialer" or an automated telephone dialing system (ATDS) to place the call. Am. Compl. 10.

Hunsinger asked the caller to identify themselves, but the caller only told Hunsinger to "go to Dynata.com." Am. Compl. 10. According to Hunsinger, Dynata is a survey and marketing business which makes "survey cold calls on behalf of itself and [its] customers to increase brand awareness." Am. Compl. 10-11; *see* Mot. Dismiss 16 (ECF No. 20). Hunsinger claims that the September 21 caller "was an agent of Defendant Dynata" and that "Dynata has an agreement with the caller and compensates the caller for their time." Am. Compl. 10. He further states that the caller "directly made the call using Dynata's

phone number." Am. Compl. 10.

Thereafter, Hunsinger sent Dynata a certified letter requesting a copy of Dynata's DNC policy. Am. Compl. 11. Dynata allegedly responded with a letter asserting its immunity from the TCPA and the TCPA's penalties and further advising Hunsinger that other people sometimes "spoof" Dynata's phone numbers.[2] Am. Compl. 11. Dynata never sent Hunsinger a copy of its DNC policy. Am. Compl. 11, 12.

**\*2** Based on this conduct, Hunsinger filed the pending lawsuit alleging that Dynata violated the TCPA, the TBCC, and his common law right to privacy. *See generally* Compl. (ECF No. 1). After Dynata filed a motion to dismiss and that motion had been fully briefed, Hunsinger—with Dynata's consent and leave of court—amended his complaint.

In addition to Hunsinger's initial claims, the amended complaint alleges that, on June 3, 2022—after Hunsinger advised Dynata to put his phone number on its "internal DNC list," Hunsinger received a text message from a Short Messaging Service (SMS) short code[3] that included a link to a website that is allegedly affiliated with Dynata. Am. Compl. 13. Hunsinger replied to the message but received an automated response to his request for information from the number and to his response "Stop.", until he responded with the term "Stop".[4] Am. Compl. 13-14. During the exchange, Hunsinger asked the sender to identify themselves, but did not receive any response. Am. Compl. 13.

Hunsinger's amended complaint alleges that Dynata's purported call and text violated certain provisions of the TCPA and its implementing regulations, as well as section 305.053 of the TBCC, which grants a state law private right of action for violations of the TCPA, by contacting him twice in twelve months on a registered DNC number using an ATDS and by failing to implement a written policy for maintaining a list of persons who request not to receive telemarketing calls. Am. Compl. 22-25 (Counts I-VI, asserting violations of 47 U.S.C. § 227(b) and (c) and of 47 C.F.R. § 64.1200(a), (c) and (d)). Hunsinger further alleges that Dynata's actions also constitute a violation of the common law right to privacy based on intrusion on seclusion. Am. Compl. 24 (Count VII). By this lawsuit, he seeks damages and injunctive relief.

Dynata moves to dismiss Hunsinger's amended complaint under Rule 12(b)(6) and 12(b)(1). Dynata's principal argument is that Hunsinger fails to allege sufficient facts to support the essential elements of a claim under the TCPA §§ 227(b) or (c); that is, Hunsinger does not plead that the alleged illegal call or text was a "telephone solicitation" or that an ATDS was used to make the call or text. Mot. Dismiss 15-19 (ECF No. 20). Dynata further argues that Hunsinger fails to plead facts sufficient to establish that Dynata is either directly or vicariously liable for any TCPA violation. Mot. Dismiss 20-25. Dynata also argues Hunsinger's allegations are too conclusory to state a claim under the TBCC or his state law tort claims. Mot. Dismiss 24-26. Finally, Dynata argues Hunsinger failed to plead sufficient facts to show he has Article III standing, because he failed to plead sufficient facts tracing his purported injuries to only Dynata or to explain how relief from Dynata will redress alleged injuries caused by unidentified third parties. Mot. Dismiss 28-29. Hunsinger filed a response. Pl.'s Resp. (ECF No. 21). Dynata did not file a reply, and the time for doing so has passed. *See* N.D. Tex. Loc. Civ. R. 7.1(f) ("[A] party who has filed an opposed motion may file a reply brief within 14 days from the date the response is filed."). The motion is thus ripe for determination.

**Legal Standards**

**I. Rule 12(b)(6)**
**\*3** When deciding a 12(b)(6) motion to dismiss for failure to state a claim, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citations omitted). To survive a Rule 12(b)(6) motion, therefore, a plaintiff's complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555).

This pleading standard does not require "detailed factual allegations," but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Where the facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has stopped short of showing that the plaintiff is plausibly entitled to relief. *Id.* at 678 (citing *Twombly*, 550 U.S. at 557).

### II. Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges a federal court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Standing to sue is part of the common understanding of what it takes to make a justiciable case." *Steel Co.*, 523 U.S. at 102 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The "irreducible constitutional minimum of standing" includes three elements: "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). Second, the injury must be causally connected to the complained-of conduct; in other words, it must be " 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " *Id.* (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)) (brackets in original). And third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

"[W]here issues of fact are central both to subject matter jurisdiction and the claim on the merits, [the Fifth Circuit holds] that the trial court must assume jurisdiction and proceed to the merits." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004). "In circumstances where 'the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper court of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case' under either Rule 12(b)(6) or Rule 56." *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981)). "Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits." *Williamson*, 645 F.2d at 415.

**\*4** When, as here, a party files a Rule 12(b)(1) motion in conjunction with other Rule 12 motions, the court should consider the jurisdictional challenge before addressing any attack on the merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citation omitted).

### Analysis

### I. Standing

With respect to his claims arising out of the alleged September 21, 2021 call and the June 3, 2022 text, Dynata disputes that Hunsinger has sufficiently pleaded the second and third elements of constitutional standing: traceability and redressability.[5] More particularly, Dynata argues that Hunsinger has failed to allege any facts showing either that the alleged wrongful conduct was attributable only to Dynata—as opposed to third parties—or that "Dynata had any relationship with any responsible third party." Mot. Dismiss 28.

Courts reviewing TCPA claims have noted that certain 12(b)(1) challenges relate directly to the analysis of whether a plaintiff states a claim, and they have analyzed these challenges under a Rule 12(b)(6) standard. *See Clark v. Avatar Techs.*

*Phl, Inc.*, 2014 WL 309079, at *1-4 (S.D. Tex. Jan. 28, 2014); *see also Hicks v. Alarm.com Inc.*, 2020 WL 9261758, at *5 (E.D. Va. Aug. 6, 2020) ("Based on the deficiencies identified under Rule 12(b)(6), Plaintiff also fails to properly plead causation and redressability."). Because the existence of an agency relationship intertwines inquiries of redressability and traceability required for standing and a central aspect of any TCPA claim, the Court should assume jurisdiction and treat the attack as one on the merits of the claim under Rule 12(b)(6). *See Montez*, 392 F.3d at 150.

### II. TCPA Claims

Dynata challenges the sufficiency of Hunsinger's amended complaint with respect to the alleged TCPA violations, arguing that Hunsinger fails to adequately plead facts to show (i) the September 21, 2021 call and the June 3, 2022 text are "telephone solicitations" covered by the TCPA, (ii) Dynata used an ATDS to make the call or the text, (iii) Dynata directly placed the call or the text or had an agency relationship with the entity that did, and (iv) Dynata is required to have minimum procedures in place for a DNC registry because they are making telephone solicitation calls. Mot. Dismiss 15-26.

The TCPA contains two distinct sections that grant individuals a private right of action. Under § 227(b), the TCPA regulates various telecommunications devices and prohibits the use of certain technologies for calling several types of end-users without an emergency purpose or prior express consent of the called party. *Mims v. Arrow Fin. Svcs., LLC*, 565 U.S. 368, 373 (2012); *see* 47 U.S.C. § 227(b). The Supreme Court has succinctly outlined the four prohibited practices:

> First, the Act makes it unlawful to use an automatic telephone dialing system or an artificial or prerecorded voice message, without the prior express consent of the called party, to call any emergency telephone line, hospital patient, pager, cellular telephone, or other service for which the receiver is charged for the call. *See* 47 U.S.C. § 227(b)(1)(A). Second, the TCPA forbids using artificial or prerecorded voice messages to call residential telephone lines without prior express consent. § 227(b)(1)(B). Third, the Act proscribes sending unsolicited advertisements to fax machines. § 227(b)(1)(C). Fourth, it bans using automatic telephone dialing systems to engage two or more of a business' telephone lines simultaneously. § 227(b)(1)(D).

**\*5** *Mims*, 565 U.S. at 373. The TCPA grants a private right of action to individuals "based on a violation of [§ 227(b)] or the regulations prescribed under [§ 227(b)]." 47 U.S.C. § 227(b)(3). Even one instance of a violation of § 227(b) is actionable in the Fifth Circuit. *See Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 689-91 (5th Cir. 2021).

Under § 227(c), the TCPA also delegates authority to the Federal Communications Commission (FCC) to promulgate regulations "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c). This subsection grants a private right of action to individuals "who ha[ve] received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [§ 227(c)]." 47 U.S.C. § 227(c)(5). Unlike § 227(b), § 227(c) does not regulate automated technologies; rather, it regulates calling practices to protect rights of privacy of those registered on the DNC list.

### A. Hunsinger fails to sufficiently plead that Dynata may be directly or vicariously liable for any TCPA violation arising out of the September 21, 2021 call or the June 3, 2022 text.

Dynata asserts that Hunsinger does not state a claim for any violation of the TCPA because Hunsinger fails to establish that Dynata is directly or vicariously liable for the alleged misconduct. According to Dynata, Hunsinger's "conclusory allegations and various legal buzzwords, without supporting facts," warrant dismissal. Mot. Dismiss 20-25.

"Theories of direct and vicarious liability are both cognizable under the TCPA." *Cunningham v. Politi*, 2019 WL 2519568, at *5 & n.11 (E.D. Tex. Apr. 30, 2019) (noting that the Supreme Court adopted an FCC ruling applying federal common law principles of agency to TCPA violations under a theory of vicarious liability). A plaintiff may use either theory to base a claim under § 227(b) or § 227(c). *See Cunningham v. Nationwide Sec. Sols., Inc.*, 2017 WL 10486988, at *2 (N.D. Tex. Nov. 2, 2017) (§ 227(b)); *204S6TH LLC*, 2022 WL 1110354, at *7 (§ 227(c)).

Hunsinger v. Dynata LLC, Slip Copy (2023)

Under the TCPA, direct liability is found when an entity "initiates" a telephone call. *See In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C. Rcd. at 6582 ¶ 24 (2013) ("[W]e clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call, but [the seller] may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer."). "Initiating" a telephone call means that the entity "takes the steps necessary to physically place a telephone call." *Cunningham v. Lifestyles Dev., LLC*, 2019 WL 4282039, at *3 (E.D. Tex. Aug. 8, 2019).

An entity may also be vicariously liable for violations by third parties under the TCPA. "[A] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship ... between the defendant and a third-party caller." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 136 S. Ct. 664 (2016); *see Politi*, 2019 WL 2519568, at *6. An agency relationship exists where a principal "manifests assent to [an agent] ... that the agent shall act on the principal's behalf and subject to the principal's control." *Lifestyles Dev., LLC*, 2019 WL 4282039, at *4 (quoting Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006)). "Agency is typically a factual issue, with the plaintiff at the pleading stage only required to allege a factual basis that gives rise to the inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Politi*, 2019 WL 2519568, at *6 (quoting *Mauer v. Am. Intercontinental Uni., Inc.*, 2016 WL 4651395, at *2 (N.D. Ill. Sept. 7, 2016)). "Three theories of agency could support a claim for vicarious liability: (1) actual authority; (2) apparent authority; and (3) ratification." *Lifestyles Dev., LLC*, 2019 WL 4282039, at *4.

**\*6** The amended complaint does not allege that Dynata itself initiated the September 21 call or sent Hunsinger a text on June 3. Instead, Hunsinger generally alleges—without any elaboration or specific factual support—that the September 21, 2021 caller" is an agent for Dynata," that Dynata has an agreement with the caller, and that Dynata compensates the caller for their time. Am. Compl. 10. These allegations are wholly conclusory and represent nothing more than formulaic recitations of an agency relationship.

The amended complaint also states—again without any elaboration or specific factual support—that Dynata owns the phone number used to call him on September 21.[6] Am. Compl. 10. It further states that the September 21 caller told Hunsinger "to go to Dynata.com" and that the link Hunsinger received in the June 3, 2022 text message sent him to a Dynata-affiliated website. Am. Compl. 10, 13. But these alleged facts are still not sufficient to permit the Court to infer the call or the text was initiated by an entity acting with any authority—either actual or apparent—from Dynata. And the amended complaint does not plead any facts to support an allegation that Dynata ratified the call or the text. Indeed, on the facts alleged, the Court cannot infer that any unidentified third party acted with actual authority as Dynata's agent and called or texted Hunsinger, that any unidentified third party sent Hunsinger a message with apparent authority from Dynata, or that any unidentified third party sent Hunsinger a message and Dynata ratified those actions. A sheer possibility that a third party—on Dynata's behalf—initiated a call or a text to Hunsinger does not establish an agency relationship sufficient to state a claim under the TCPA. *See Horton v. Nat'l Republican Senatorial Comm.*, 2023 WL 372066, at *5 (N.D. Tex. Jan. 23, 2023) (finding similar allegations "fail[ed] to plead more than conclusions and formulaic recitations of vicarious liability"). The Court should dismiss Hunsinger's TCPA and state law claims arising out of the alleged September 21, 2021 call and the June 3, 2022 text under Rule 12(b)(6).

B. Additionally, even assuming the facts alleged are sufficient to plead the September 21, 2021 caller was Dynata's agent, Hunsinger fails to plead a violation of 47 C.F.R. § 64.1200(a)(1) with respect to the September 21 phone call.

In Count I of the Complaint, Hunsinger alleges a violation of 47 C.F.R. § 64.1200(a)(1), which reflects the language of 47 U.S.C. § 227(b) and regulates the use of automated telephonic technology to place calls. Dynata moves to dismiss these claims, asserting that Hunsinger fails to adequately plead facts to infer usage of an ATDS. Mot. Dismiss 17-19.

**\*7** The TCPA and related FCC regulations prohibit any person or entity from using an ATDS or artificial or prerecorded voice to call "any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(iii); 47 C.F.R. § 64.1200(a)(1)(iii). The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity [ ] to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers. 47 U.S.C. § 227(a)(1). A "necessary feature" of an ATDS device is "the capacity to use a random or sequential number

generator to either store or produce phone numbers to be called." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1173 (2021). For a plaintiff to succeed under an ATDS TCPA claim, a plaintiff must "allege that a call was made to a cell or wireless phone by the use of any automatic dialing system or an artificial or prerecorded voice and without prior express consent of the called party." *Cunningham v. TechStorm, LLC*, 2018 WL 3118400, at *3 (N.D. Tex. May 29, 2018), *adopted by* 2018 WL 3117529 (N.D. Tex. June 25, 2018). "A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co.*, 577 U.S. at 156.

A bare allegation of the usage of an ATDS, "without more, is insufficient to sustain a TCPA claim." *Nationwide Sec. Sols., Inc.*, 2017 WL 10486988, at *3. But "courts have noted the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery and found that courts can rely on details about the call to infer the use of an ATDS." *Id.* (quoting *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129-30 (W.D. Wash. 2012)). "In light of this difficulty, courts have allowed plaintiffs to 'rely on indirect allegations, such as the content of the message, the context in which it was received, and the existence of similar messages to raise an inference that an ATDS was used.'" *Alpha Cash Buyers I*, 2021 WL 5040228, at *3 (quoting *Jones v. FMA All. Ltd.*, 978 F. Supp. 2d 84, 87 (D. Mass. 2013)).

Here, it is essential to distinguish between the phone call and the text message for the purposes of the ATDS TCPA claim. As to the phone call, the call was from a long code phone number and, when the call connected, an unidentified person spoke to Hunsinger. Am. Compl. 10. Hunsinger's bare allegation that "the silence and then 'hearing a [live] person o[n] the other end signifies the algorithm of a predictive dialer in operation,'" without more, is mere speculation. Am. Compl. 10. Such a conclusory allegation does not support any inference that a random or sequential number generator was used. *See TechStorm, LLC*, 2018 WL 3118400, at *4 (noting that multiple playback errors, a prerecorded message, and dead airtime and clicking before the message was played may support an inference of an ATDS); *Watts v. Emergency Twenty Four, Inc.*, 2021 WL 2529613, at *3 (N.D. Ill. June 21, 2021) (holding that an ATDS TCPA is deficient where a plaintiff solely alleges a defendant used an ATDS and could call thousands of numbers). Therefore, any claim that the phone call uses an ATDS in violation of the TCPA should be dismissed.


C. Hunsinger fails to plead a violation of 47 C.F.R. § 64.1200(c).

In Counts I and II of his amended complaint, Hunsinger alleges Dynata violated 47 C.F.R. § 64.1200(c)(2), which prohibits telephone solicitations to residential numbers on the national DNC registry, by calling him on September 21, 2021 call and texting him on June 3, 2022. Am. Compl. 10, 13. Dynata moves to dismiss these claims because Hunsinger failed to plead facts to show the allegedly improper contacts are "telephone solicitations" covered under the regulation. Mot. Dismiss 15-16.

The FCC regulations prohibit any person or entity from "initiat[ing] any *telephone solicitations* to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2) (emphasis added). A "telephone solicitation" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4); *see* 47 C.F.R. § 64.1200(f)(15). A cause of action under this regulation is only available to individuals "who [have] received more than one telephone call within any 12-month period by or on behalf of the same entity." 47 U.S.C. § 227(c)(5).

**\*8** Here, Hunsinger does not allege facts from which the Court can infer that either of the communications at issue was "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." Hunsinger alleges that Dynata is a "survey and marketing business" and that it "makes survey cold calls on behalf of itself and their customers to increase brand awareness [sic] for their customers." Am. Compl. 10, 11. He alleges that on September 21, 2021, he received a call from a phone number allegedly associated with Dynata. Am. Compl. 10. He states that the caller refused to identify themselves and "told him to go to Dynata.com." Am. Compl. 10. On June 3, 2022, he allegedly received an SMS text with a link that took him to a Dynata survey. Am. Compl. 13. He does not allege any specific facts about the contents of the website or the survey. Significantly, he does not allege that the call or the text, or that the website or the survey to which he was directed, asked or encouraged him to purchase, rent, or invest in any property, good, or service.

Furthermore, the FCC has explained that calls involving "surveys, market research, political or religious speech" do not fall

within the definition of "telephone solicitation" and will not be precluded by registering a number on the national DNC list. *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14040 (2003). While the FCC also stated that "[survey] calls may be prohibited if they serve as a pretext to an otherwise prohibited advertisement or means of establishing a business relationship," *id.* at 14040 n. 141, Hunsinger's bald allegations that Dynata engages in "commercial telemarketing calls" does nothing more than use conclusory language to attempt to state a claim. Am. Compl. 17. Because there is no factual basis in Hunsinger's amended complaint to show there was an attempted commercial transaction, the survey calls are not "telephone solicitations" prohibited by the TCPA.

Hunsinger attempts to salvage his claim by arguing that Dynata engages in marketing, branding, and advertising activities to *influence* consumer purchases, and that Dynata "paid to make the call to induce the Plaintiff and steer and/or influence his purchasing decisions." Pl.'s Resp. 9 (ECF No. 21). However, this argument finds no support in the facts alleged in his amended complaint. And even if he had made such an allegation, it would conflict with the FCC's promulgated guidance that market research calls are *not* telephone solicitations and do not subject the calling entities to TCPA liability. *In re Rules & Regs.*, 18 F.C.C. Rcd. at 14040; *see Suttles v. Facebook, Inc.*, 461 F. Supp. 3d 479, 482-83 (W.D. Tex. May 20, 2020) ("[Plaintiff] has provided no caselaw, and the court is unaware of any, that has held that an invitation to visit a website—even one whose business model is centered around user data—may be converted into a telephone solicitation ...."). Hunsinger's attempted argument would render the FCC's guidance meaningless, as all market research could fall under his proposed "influence liability" theory and thus the FCC guidance would be unnecessary. Both the call and the text allegedly directed Hunsinger to visit dynata.com or to engage in a market survey. *See* Am. Compl. 10, 13. These communications are expressly outside the TCPA's purview. Therefore, the Court should dismiss Hunsinger's claims under 47 C.F.R. § 64.1200(c)(2). *Suttles*, 461 F. Supp. 3d at 482 (holding that to survive a motion to dismiss, plaintiff must allege facts that indicate the contacts at issue were for the purpose prohibited by the regulation).

## D. Hunsinger fails to plead a violation of 47 C.F.R. § 64.1200(d).

In Count III of his Complaint, Hunsinger alleges Dynata violated 47 C.F.R. § 64.1200(d) by failing to have policies and procedures in place for complying with the TCPA's DNC provisions. Am. Compl. 23. Dynata moves to dismiss these under a similar theory they advanced to dismiss Hunsinger's 47 C.F.R. § 64.1200(c) claims.

Section 64.1200(d) provides that:

**\*9** No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d). This provision then lists out "minimum standards" that must be met, including (i) a written policy, (2) training of telemarketing personnel on DNC list rules and regulations, (iii) recording and disclosure of DNC requests, (iv) identification of sellers and telemarketers to callers, (v) a policy for any affiliated persons or entities, and (vi) maintenance of DNC lists. *Id.* § 64.1200(d)(1)-(6). The regulations define telemarketing as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 64.1200(f)(15).

However, these regulations only apply to "person[s] or entit[ies]" that engage in "telemarketing purposes." *Id.* § 64.1200(d). As discussed, the purported call and text from Dynata are not alleged to have been "for the purpose of encourage the purchase or rental of ... property, goods, or services." *Id.* § 64.1200(f)(15). Dynata again correctly points out that no allegations by Hunsinger show he was encouraged to engage in any purchase, rental, or investment. Thus, the Court should also dismiss Hunsinger's claims under 47 C.F.R. § 64.1200(d).

## III. State Law Claims

A. <u>Hunsinger fails to plead violations of section 305.053 of the Texas Business & Commerce Code.</u>

In Counts IV and V of his Complaint, Hunsinger alleges Dynata violated section 305.053 of the TBCC. Dynata argues that Hunsinger's TBCC claims fail because he failed to plead a violation of the TCPA. Mot. Dismiss 26-27.

Section 305.053 provides a state private cause of action for a violation of the TCPA. Under this section:

> (a) A person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A1 may bring an action in this state against the person who originates the communication for:

> > (1) an injunction;

> > (2) damages in the amount provided by this section; or

> > (3) both an injunction and damages.

Tex. Bus. & Com. Code § 305.053(a). "Section 305.053 'proscribes only that conduct which is also prohibited by the TCPA. If no violation of the TCPA exists, there is no violation of Tex. Bus. & Com. Code § 305.053(a).'" *Alpha Cash Buyers II,* 2022 WL 562761, at *5 (quoting *Cherkaoui v. Santander Consumer USA, Inc.,* 32 F. Supp. 3d 811, 815 (S.D. Tex. 2014)).

For the reasons set forth above, Hunsinger has failed to state a claim under the TCPA with respect to the September 21, 2021 call or the June 3, 2022 text. His claims under section 305.053 should also be dismissed.

B. <u>Hunsinger fails to plead common law invasion of the right to privacy through intrusion upon seclusion.</u>

Dynata also moves to dismiss Hunsinger's Count VII claim of intrusion upon seclusion.

Under Texas law, a claim for invasion of privacy in the form of intrusion upon seclusion requires a plaintiff to show: "(1) an intentional intrusion; (2) upon a plaintiff's seclusion, solitude, or private affairs; (3) that would be highly offensive to a reasonable person." *Doe v. Siddiqui,* 2018 WL 3956292, at *3 (N.D. Tex. Aug. 17, 2018) (Godbey, J.) (citing *Patton v. United Parcel Serv., Inc.,* 910 F. Supp. 1250, 1276 (S.D. Tex. 1995)). As a "quasi-trespass tort," an intrusion upon seclusion claim "typically involves some sort of *physical* invasion of a person's property, such as spying, opening private mail, wire-tapping, or entering a person's residence." *Id.* (quoting *Doe v. United States,* 83 F. Supp. 2d 833, 840 (S.D. Tex. 2000)). "Texas courts have previously recognized repeated phone calls as actionable intrusions upon a person's seclusion or solitude based on the nature and frequency of the calls." *Id.* (quoting *Cherkaoui v. Santander Consumer USA, Inc.,* 2013 WL 12328769, at *2 (S.D. Tex. June 7, 2013)).

**10** Hunsinger has not alleged any sort of physical invasion of privacy that rises to the level of "highly offensive to a reasonable person." *Id.* He makes conclusory statements that Dynata "harmed Plaintiff by intruding upon Plaintiffs seclusion" and "intentionally intruded on Plaintiffs solitude, seclusion, and private affairs by transmitting unsolicited telemarketing calls to his cellular phone." Am. Compl. 20, 24. But this formulaic recitation of the elements for his claim do not plausibly state how a single call and one text can raise to the level of "highly offensive." *Id.* (holding taking topless photos of an individual without knowledge or consent state a claim for invasion of privacy); *see Household Credit Servs., Inc. v. Driscol,* 989 S.W.2d 72, 84 (Tex. App.—El Paso 1998, pet. denied) (noting that a debt collector's multiple calls to plaintiff's work and home, at early and late hours throughout the day, after requests to stop could support an invasion of privacy claim). Accordingly, the Court should dismiss Hunsinger's intrusion upon seclusion claim.

C. <u>The Court should decline to exercise supplemental jurisdiction over Hunsinger's claims for violations of section 302.101 of the Texas Business & Commerce Code.</u>

The Court liberally construes Hunsinger's complaint with all possible deference due to a *pro se* litigant. *See Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007) (holding that *pro se* pleadings are "to be liberally construed," and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers"); *cf.* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Construing Hunsinger's amended complaint liberally, it appears that Hunsinger also alleges a claim under section 302.101 of the TBCC and maintains Dynata has "engaged in continuous and repetitive telephone solicitation ... without obtaining a registration certificate from the Office of the Secretary of State." Am. Compl. 14-15. Dynata appears to have considered challenging this allegation as the section is mentioned in their table of authorities, *see* Mot. Dismiss, at vi, but it does not appear to be discussed on the stated pages referenced and gives no basis for any potential dismissal. Therefore, Dynata does not challenge this allegation.

However, although the Court has supplemental jurisdiction over this state law claim under 28 U.S.C. § 1367, the Court should decline to exercise supplemental jurisdiction here because the claims that permitted original jurisdiction lack merit. *See* 28 U.S.C. § 1367(c)(3) (court may decline to exercise supplemental jurisdiction where it has dismissed all claims over which it has original jurisdiction). The state law claim should therefore be dismissed without prejudice to Hunsinger raising it in state court.

## IV. Damages

A. Hunsinger fails to allege claims for treble damages under the TCPA and the TBCC.

Dynata claims that Hunsinger only makes conclusory allegations that the TCPA violations were willful and intentional and knowing and therefore Hunsinger's claims for treble damages should be dismissed. Mot. Dismiss 26.

"When a plaintiff succeeds on a TCPA claim, he can recover the greater of actual damages or $500 for each violation of the regulations." *204S6TH LLC*, 2022 WL 1110354, at *8. But the TCPA also provides that "[i]f the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available [under § 227(b)(3)(B)]." 47 U.S.C. § 227(b)(3). The TBCC contains a similar provision allowing treble damages for willful or knowing violations of the TCPA. Tex. Bus. & Com. Code § 305.053(c). "A willful or knowing violation does 'not requir[e] bad faith, but only that the person have reason to know, or should have known, that his conduct would violate the statute.' " *204S6TH LLC*, 2022 WL 1110354, at *9.

**\*11** Hunsinger fails to allege any cognizable claim under the TCPA. This state law claim depends on the successful allegation of a TCPA claim. Accordingly, the Court should grant Dynata's motion to dismiss Hunsinger's claims for treble damages.

B. The Court should decline to exercise supplemental jurisdiction over Hunsinger's claims for civil penalties under section 302.302 of the Texas Business & Commerce Code.

In Count IV of his amended complaint, Hunsinger requests civil penalties and attorneys' fees for violations of Chapter 302 of the Texas Business and Commerce Code. Texas law provides that "[a] person who violates [Chapter 302] is subject to a civil penalty of not more than $5,000 for each violation" and that "the party bringing the action also is entitled to recover all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorneys' fees." Tex. Bus. & Com. Code § 302.302(a), (d). Dynata did not seek to dismiss Hunsinger's section 302.101. However, for the same reasons stated previously, the Court should decline supplemental jurisdiction over the remaining state law claims, and they should be dismissed without prejudice to Hunsinger raising them in state court.

Hunsinger v. Dynata LLC, Slip Copy (2023)

**Conclusion**

For the reasons stated, the District Court should **GRANT** Dynata's Motion to Dismiss.

**SO RECOMMENDED.**


**INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Svcs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


**All Citations**

Slip Copy, 2023 WL 2377481

Footnotes

[1]   Although Hunsinger is proceeding *pro se*, he is no stranger to this Court. Indeed, as another judge in this district recently noted, Hunsinger "has filed more than fifty cases in the Northern District of Texas over the last ten years, and more than forty of those were filed within the last eighteen months." *Hunsinger v. Offer, LLC*, 2022 WL 18143951, at *9 (N.D. Tex. Dec. 7, 2022) (Ramirez, J.), *adopted by* 2023 WL 122649 (N.D. Tex. Jan. 6, 2023) (Godbey, C.J.). Almost all of his recent cases involve alleged violations of the TCPA and the TBCC for unwanted calls or texts to his cell phone. *See, e.g., id.*; *Hunsinger v. 204S6TH LLC*, 2022 WL 1110354 (N.D. Tex. Mar. 23, 2022) (Ramirez, J.), *adopted by* 2022 WL 1102864 (Apr. 13, 2022) (Fish, J.); *Hunsinger v. Alpha Cash Buyers, LLC* (*Alpha Cash Buyers II*), 2022 WL 562761 (N.D. Tex. Feb. 24, 2022) (Fitzwater, J.).


[2]   The term "spoofing" refers to a process in which a caller obscures the telephone number from which a call originates and replaces it with a different, "spoofed" number so the Caller ID system will interpret the call as originating from the "spoofed" number. *Sw. Bell Tel. Co. v. Iverson*, 2012 WL 652040, at *1 n.1 (N.D. Tex. Feb. 6, 2012), *adopted by* 2012 WL 676283 (N.D. Tex. Feb. 29, 2012).


[3]   SMS short codes are "four to six digit telephone number[s] used only for texting, and most frequently for commercial marketing purposes." *Hunsinger v. Alpha Cash Buyers, LLC* (*Alpha Cash Buyers I*), 2021 WL 5040228, at *1 n.3 (N.D. Tex. Oct. 29, 2021).


[4]   The period outside of the quotation marks is intentional, as Hunsinger also states that he received an automated response to which his response "Stop." was not recognized. Only when he responded with "Stop", omitting the period, did he receive a response recognized by the short code number. Am. Compl. 14.


[5]   Although Dynata does not concede that Hunsinger suffered a concrete and particularized injury-in-fact sufficient for Article III standing purposes, it fails to make any specific argument that Hunsinger cannot satisfy that requirement. Mot. Dismiss 11 n.3. Thus, the Court limits its analysis to the arguments Dynata briefed and of which Hunsinger had notice and an opportunity to

respond.

6    Hunsinger asserts, in his response to the motion to dismiss, that he called the phone number back, and that it was received by a Dynata office. Pl.'s Resp. 7 (ECF No. 21). However, responses to a Motion to Dismiss are not considered as part of the pleadings and the Court thus does not consider this alleged fact in its analysis of whether an agency relationship exists. *See United States ex rel. Grynberg Prod. Corp. v. Kinder Morgan CO2 Co., L.P.*, 491 F. Supp. 3d 220, 231 (N.D. Tex. Sept. 30, 2020) (noting that a party "may not amend its Complaint through its response to Defendant's motion to dismiss") (citation omitted). Even if the Court were to consider this alleged fact or Hunsinger is allowed to amend his complaint to include it, any amendment would be futile as he fails to state any usage of an ATDS for either a § 227(b) or 47 C.F.R. § 64.1200(a)(1)(iii) claim relating to the telephone call.

---

**End of Document**                                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 23

2023 WL 5311488
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Samuel KATZ, Individually and on Behalf of All Others Similarly Situated

v.

CALIBER HOME LOANS, INC.

CIVIL ACTION NO. 3:23-CV-0145-S
|
Signed August 17, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law PC, Hingham, MA, Adam J. Schwartz, Adam J. Schwartz, Attorney at Law, Beverly Hills, CA, Chris R. Miltenberger, The Law Office of Chris R. Miltenberger PLLC, Southlake, TX, for Samuel Katz.

Thomas Nathaniel Abbott, Pro Hac Vice, Perkins Coie LLP, Portland, OR, David T. Biderman, Kristine Elizabeth Kruger, Simon M. Feng, Perkins Coie LLP, San Francisco, CA, Elizabeth Gardner, Perkins Coie LLP, Dallas, TX, Skyler Michelle Howton, Rogge Dunn Group PC, Dallas, TX, for Caliber Home Loans Inc.

**MEMORANDUM OPINION AND ORDER**

KAREN GREN SCHOLER, UNITED STATES DISTRICT JUDGE

**\*1** This Memorandum Opinion and Order addresses Defendant Caliber Home Loans, Inc.'s Motion to Dismiss ("Motion") [ECF No. 33]. The Court has reviewed the Motion, Plaintiff Samuel Katz's Opposition to the Motion to Dismiss ("Response") [ECF No. 35], Defendant's Reply Brief in Support of Its Motion to Dismiss [ECF No. 38], and the applicable law. For the following reasons, the Court **GRANTS** the Motion.

**I. BACKGROUND**

This putative class action arises out of Plaintiff's receipt of unwanted telemarketing calls. Compl. for Inj. and Damages ("Compl.") [ECF No. I] ¶ 3. Plaintiff's residential phone number is on the National Do Not Call Registry. *Id.* ¶ 17. Plaintiff uses his residential phone number "for personal, residential, and household reasons." *Id.* ¶ 18. In 2022, Plaintiff received multiple phone calls from the phone number (207) 203-7685. *Id.* ¶¶ 21-22. Plaintiff did not answer the first phone calls in May and June 2022; however, he did answer the last phone call from this phone number on July 5, 2022. *Id.* ¶¶ 23-24.

When Plaintiff answered the July 5, 2022, phone call, the caller allegedly offered a "VA, conventional or FHA loan," asked Plaintiff if he had a recent bankruptcy, and asked about Plaintiff's credit score and debt. *Id.* ¶¶ 26-28. The caller then allegedly offered services from the Caliber Home Loan Mortgage Refinance Team. *Id.* ¶ 29. Plaintiff states that he did not

consent to receive phone calls from Defendant, did not do business with Defendant, and did not request these phone calls. *Id.* ¶¶ 19-20, 31.

Based on the foregoing, Plaintiff brings a single cause of action for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c)(5), and 47 C.F.R. § 64.1200(c). *Id.* ¶¶ 48-52. Plaintiff brings this claim on behalf of himself and a putative class of persons in the United States who, at any time in the period from four years before the Complaint's filing to trial, "received more than one telemarketing call from or on behalf of Defendant[ ] within a 12-month period" despite their phone numbers being on the Do Not Call Registry for at least 31 days. *Id.* ¶ 33. Defendant moved to dismiss, arguing that Plaintiff has failed to plausibly allege that Defendant is either directly or vicariously liable for the alleged TCPA violations and that Plaintiff has failed to plausibly allege that he received more than one telemarketing call.

## II. LEGAL STANDARD

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (citation omitted). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

**\*2** In ruling on a Rule 12(b)(6) motion, the court limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the Court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

## III. ANALYSIS

To state a claim under 47 U.S.C. § 227(c)(5), Plaintiff must plausibly allege that he received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of regulations promulgated under Section 227(c). Plaintiff claims that the regulation Defendant violated is 47 C.F.R. § 64.1200(c). In relevant part, that regulation prohibits an entity from "initiat[ing] a telephone solicitation to ... a residential telephone subscriber who has registered [his] telephone number on that national do-not-call registry." 47 C.F.R. § 64.1200(c)(2).

### A. *Defendant's Liability*

"Theories of direct and vicarious liability are both cognizable under the TCPA." *Hunsinger v. Dynata LLC*, No. 3:22-CV-00136-G-BT, 2023 WL 2377481, at \*5 (N.D. Tex. Feb. 7, 2023) (citation omitted), *report and recommendation adopted by* 2023 WL 2386710 (N.D. Tex. Mar. 4, 2023). Based on Plaintiff's Response, Plaintiff is relying solely on a direct liability theory; however, Plaintiff does not adequately allege that Defendant is directly liable for placing the challenged

phone calls.

i. *Direct Liability*

For Defendant to be directly liable for the alleged TCPA violations, Defendant must have "initiated" the phone calls. *Id.* (citing *In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C. Red. At 6582 ¶ 24 (2013)). Initiating a phone call, in turn, "means that the entity takes the steps necessary to physically place a telephone call." *Id.* (internal quotation marks and citation omitted). "[A] seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA[.]" *Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568, at *6 (E.D. Tex. Apr. 30, 2019) (quoting *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1255 (11th Cir. 2015)), *report and recommendation adopted by* 2019 WL 2524736 (E.D. Tex. June 19, 2019).

Plaintiff argues that he has pleaded sufficient facts to support a direct liability theory because he alleged that Defendant made the phone calls at issue. *See* Resp. 3. Plaintiff points to the portions of the Complaint in which he alleges that Defendant "ma[de] telemarketing calls to numbers on the National Do Not Call Registry," and that "Plaintiff got calls from the Defendant in 2022, including on May 26, June 4, 20, 22, and July 5, 2022." *Id.* (emphases omitted) (citing Compl. ¶¶ 3, 21). But conclusory allegations such as these are insufficient. "[A]t the pleadings stage, plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone." *Aaronson v. CHW Grp., Inc.*, No. 1:18-CV-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019) (citations omitted).

**\*3** The only fact Plaintiff alleges in support of his conclusion that Defendant initiated the challenged phone calls is that at some point during the July 5, 2022, phone call, the unidentified caller "offered the Defendant's services from the Caliber Home Loan Mortgage Refinance Team." Compl. ¶ 29. Plaintiff does not allege any facts regarding, for example, the identity of the caller or the nature of the phone number connected to the phone calls (such as whether it belonged to Defendant or was a fictitious phone number), and the facts Plaintiff does provide about the content of the phone call are vague. Without more, Plaintiff's solitary allegation is insufficient to plausibly allege that Defendant took the steps necessary to physically place the phone call. *See, e.g., Horton v. Nat'l Republican Senatorial Comm.*, No. 3:22-CV-1000-G-BK, 2023 WL 372066, at *5 (N.D. Tex. Jan. 23, 2023)* ("Merely stating that he received a message which included a link to a website that solicits donations for [defendant] is not enough to nudge [plaintiff's] argument across the line from conceivable to plausible.").

The lack of factual allegations supporting the notion that Defendant initiated the call distinguishes this case from others in which courts have found a basis for direct liability, including the cases cited by Plaintiff in his Response. For example, in *Stemke v. Marc Jones Construction, LLC*, the plaintiff and her attorneys called several of the phone numbers from which the plaintiff received phone calls and confirmed they belonged to the defendant. No. 5:21-CV-274-30PRL, 2021 WL 4340424, at *1, *3 (M.D. Fla. Sept. 23, 2021). And in *Smith v. American-Amicable Life Insurance Co. of Texas*, a case in which the plaintiff relied on theories of both direct and vicarious liability, the court found a plausible basis for liability because: (1) the plaintiff was informed that he was speaking with the defendant; (2) the plaintiff was directed to the defendant's website; (3) the callback number provided to the plaintiff had an area code from the same state in which the defendant was based; and (4) the phone calls concerned insurance benefits, the defendant's area of business. No. 22-333, 2022 WL 1003762, at *2 (E.D. Pa. Apr. 22, 2022). In both cases, the plaintiffs pleaded facts that suggested the defendant itself—as opposed to a third party—initiated the phone calls. *See also, e.g., Whittaker v. Freeway Ins. Servs. Am., LLC*, No. CV-22-8042-PCT-DGC, 2023 WL 167040, at *5 (D. Ariz. Jan. 12, 2023)* (holding that plaintiff stated theory of direct liability where: (1) defendant allegedly operated call center, conducted telemarketing campaign, and repeatedly sent unsolicited telemarketing calls; (2) plaintiff called phone number to confirm defendant initiated unwanted calls; and (3) defendant's in-house counsel confirmed defendant placed calls); *Atkinson v. Choice Home Warranty*, No. 22-04464, 2023 WL 166168, at *3 (D.N.J. Jan. 11, 2023)* (holding that plaintiff stated theory of direct liability where plaintiff "asked if *the company making the calls* had a website" and was provided with defendant's website). Unlike in these cases, Plaintiff's Complaint in this case lacks factual allegations sufficient to support a theory of direct liability.

Because Plaintiff has not adequately pleaded "that [D]efendant actually, physically initiated the telephone calls at issue," the Court concludes that Plaintiff has failed to state a TCPA claim under a theory of direct liability. *Aaronson*, 2019 WL 8953349, at *2.

Katz v. Caliber Home Loans, Inc., Slip Copy (2023)

### ii. *Vicarious Liability*

Even if Plaintiff cannot plausibly allege direct liability, "[a] defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship ... between the defendant and a third-party caller." *Hunsinger*, 2023 WL 2377481, at *5 (citation omitted). The Court expresses no opinion on whether Plaintiff's allegations could state a claim for vicarious liability, as Plaintiff does not appear to advance such a theory. Plaintiff only makes conclusory statements suggesting vicarious liability in his Complaint. *See, e.g.*, Compl. ¶ 49 ("The foregoing acts and omissions of Defendant and/or its affiliates, agents, and/or other persons or entities acting on Defendant's behalf constitute ... violations of the TCPA ...."). Further, Plaintiff does not address vicarious liability in his Response and instead reaffirms that he is pursuing a theory of direct liability. *See, e.g.*, Resp. 1 ("[Plaintiff] plainly alleges that [Defendant] is directly liable for the calls it made to him ...."); *id.* at 4 ("[T]he only party alleged to have any involvement in the calls [is] [Defendant] ...."). As such, the Court will not analyze whether Plaintiff stated a claim for TCPA violations under a vicarious liability theory at this time.

### B. *More Than One Phone Call*

**\*4** Defendant also moves to dismiss on the ground that Plaintiff has not alleged that he received more than one phone call in violation of regulations promulgated under Section 227(c). Plaintiff allegedly received at least five phone calls from the same phone number in less than two months beginning on May 26, 2022. *See* Compl. ¶ 21. On July 5, 2022, he answered a phone call from that phone number and was offered services from the Caliber Home Loan Mortgage Refinance Team. *Id.* ¶ 29. The Court recognizes that district courts have reached differing conclusions regarding whether a plaintiff states a claim when he only answers one of the allegedly violative phone calls. *Compare Moore v. Healthcare Sols., Inc.*, No. 21-CV-4919, 2022 WL 17487823, at *3 (N.D. Ill. Dec. 7, 2022) ("[T]he content and timing of an answered call can allow the court to draw the reasonable inference that unanswered calls were sales solicitations from the defendant." (cleaned up)), *with Greene v. Select Funding, LLC*, No. 2:20-CV-07333-RGK-KS, 2021 WL 4926495, at *5 (C.D. Cal. Feb. 5, 2021) ("And while [plaintiff] alleges that he received eight calls from [d]efendant's number within a one-year period, he only answered one of these calls—on April 10, 2020. Thus, at best, Plaintiff has only alleged *one* telephone solicitation.").

In the absence of binding authority to the contrary, the Court agrees that "[i]t is a reasonable inference that the [five] phone calls from the same number" within the span of less than two months "were about the same thing." *Moore*, 2022 WL 17487823, at *3. Viewing the Complaint in the light most favorable to Plaintiff, as it must, the Court declines to dismiss Plaintiff's claim on this basis at this time.[1] However, the ultimate resolution of this question will rely on whether Plaintiff plausibly alleges that Defendant is liable for the challenged phone calls.

### IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendant's Motion to Dismiss [ECF No. 33]. Given the Federal Rules of Civil Procedure's liberal policy of allowing amendments to pleadings, the Court sua sponte **GRANTS** Plaintiff leave to amend his Complaint. Plaintiff must file an amended complaint by **August 30, 2023.** If an amended complaint is not filed within such time, Plaintiff's claims will be dismissed with prejudice.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 5311488

**Katz v. Caliber Home Loans, Inc., Slip Copy (2023)**

Footnotes

[1]     Although it is unclear, it does not appear that Defendant challenges whether the call Plaintiff answered constituted a "solicitation" within the meaning of the TCPA. *See, e.g.*, Mot. 8-9 ("Indeed, [Plaintiff] admits that he answered only one call.... This fact alone makes it impossible for [Plaintiff] to establish that at least two calls were 'telephone solicitations.' "). Therefore, the Court will not analyze that issue.

**End of Document**                                                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 24

2018 WL 3580775
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Charlottesville Division.

Christopher MORGAN, Plaintiff,
v.
U.S. XPRESS, INC., Defendant.

Case No. 3:17-cv-00085
|
Signed 07/25/2018

**Attorneys and Law Firms**

Michael Brian Hissam, Ryan McCune Donovan, Bailey & Glasser L.L.P., Charleston, WV, for Plaintiff.

John Curtis Lynch, David Michael Gettings, Troutman Sanders LLP, Virginia Beach, VA, for Defendant.

<u>MEMORANDUM OPINION</u>

NORMAN K. MOON, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** This case arises under the Telephone Consumer Protection Act, or TCPA. That statute prohibits, among other things, the use of various types of prerecorded calls. *See* 47 U.S.C. §§ 227(b)(1)(A), (b)(1)(B). The Defendant in this case, U.S. Xpress, Inc., is a Nevada trucking company headquartered in Tennessee. (Dkt. 4 at ¶ 6). The Plaintiff, Virginia resident Christopher Morgan, alleges Defendant used prerecorded calls to recruit him to become a truck driver. (*Id.* at ¶¶ 5, 12–14). Importantly, Plaintiff allegedly received these calls on a "residential, cellular telephone line." (*Id.* at ¶ 12). Plaintiff filed this putative class action in response.

Defendant has moved to dismiss two portions of the complaint. (Dkt. 11). The Court will grant the motion to dismiss Count One because Plaintiff has failed to plausibly allege the calls were made to a "residential telephone line" within the meaning of the relevant section of the TCPA. The Court will deny the motion to dismiss the claims of putative nonresident class members because the Court has personal jurisdiction over Defendant as to their claims.

**I. Standard**

The motion to dismiss Count One is evaluated under the familiar Fed. R. Civ. P. 12(b)(6) standard. The Rule 12(b)(6) motion tests the legal sufficiency of a complaint to determine whether Plaintiff has plausibly alleged a claim. *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). The Court takes all factual allegations in the complaint as true and draws all reasonable inferences in the Plaintiff's favor. *Id.* at 212. But the Court will not "accept the legal conclusions drawn from the facts," *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011), and "[t]hreadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The motion to dismiss putative nonresident class members for lack of personal jurisdiction is evaluated under Fed. R. Civ. P. 12(b)(2). "When a district court considers a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a *prima facie* showing in support of its assertion of jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558, 560 (4th Cir. 2014). In conducting its analysis, "the district court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* at 558.

## II. Analysis

The allegations in the introductory paragraph adequately summarize the complaint for purposes of this motion. The parties simply dispute how the law applies to those few allegations.

### A. Motion to dismiss Count One

Count One of the complaint alleges Defendant violated the TCPA by calling Plaintiff's "residential telephone line." (Dkt. 4 at ¶ 30). Count Two alleges Defendant violated the TCPA by calling Plaintiff's "cellular telephone line." (*Id.* at ¶ 33). Both counts arise out of the same calls to Plaintiff's cell phone, which he labels a "residential, cellular telephone line." (*Id.* at ¶ 12). Plaintiff argues the same calls can give rise to both Counts. Defendant disagrees, and argues that calls made to a cell phone, even when used at home, are not calls made to "residential telephone lines." The Court holds that the structure and language of the TCPA demonstrate that calls made to a cell phone are not calls made to a "residential telephone line," and so Count One will be dismissed. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

**\*2** To start, Plaintiff's characterization of the cell phone as a "residential, cellular telephone line" is not determinative of this question. These are not factual allegations, but legal terms drawn from the operative statute. And "[t]he court is not obligated to assume the veracity of the legal conclusions drawn from the facts alleged." *Birmingham v. PNC Bank, N.A.*, 846 F.3d 88, 92 (4th Cir. 2017). The underlying factual allegations, which the Court credits, are simply that Plaintiff received four phone calls to his cell phone. (Dkt. 4 at ¶¶ 12–14). The Court also fairly infers, from Plaintiff's labeling of the line as "residential," that Plaintiff used this cell phone at his home, at least some of the time. (*Id.* at ¶ 12). The question is simply how the relevant sections of the TCPA treat those calls.

The structure of the statute makes it clear that a call can be to either a cell phone or residential line, and the statute addresses those two distinct possibilities in two different sections. Section 227(b)(1)(A)(iii) prohibits automated or prerecorded calls made "to any telephone number assigned to a ... cellular telephone service...." And Section 227(b)(1)(B) prohibits automated or prerecorded calls made "to any residential telephone line...." These side-by-side provisions anticipate calls made to two different types of phones. Plaintiff's arguments would erase that distinction.

Congress's structural choice to treat these different types of calls differently has been observed by abundant and uniform (although largely out-of-circuit) authority. *See, e.g., Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014) (distinguishing a case that concerns calls to residential lines, because "the telephone number in question here, is a cell-phone number"); *Rahn v. Bank of Am., N.A.*, No. 1:15-CV-4485-ODE-JSA, 2016 WL 7325657, at \*4 (N.D. Ga. June 24, 2016) ("The statute clearly differentiates between calls to residential lines (covered by § 227(b)(1)(B) ) and calls to cellular and other types of mobile lines (§ 227(b)(1)(A) ), as is applicable here."), *report and recommendation adopted*, No. 1:15-CV-4485-ODE-JSA, 2016 WL 7335392 (N.D. Ga. Sept. 2, 2016); *Iniguez v. The CBE Grp.*, 969 F. Supp. 2d 1241, 1249 (E.D. Cal. 2013) ("[T]he TCPA makes a clear distinction between the provisions that apply to residential lines and those that apply to numbers assigned to a cellular telephone service"). Admittedly, fewer courts have

considered the precise question presented here, whether one phone can serve as both a residential and cellular line, but at least one court has rejected it. *See Cunningham v. Carribean Cruise Lines, Inc.*, No. 15-62580-CIV, 2016 WL 7494871, at *2 (S.D. Fla. Dec. 29, 2016) ("While Plaintiff argues that his cellular phone serves as both a mobile and residential line, the Eleventh Circuit distinguishes residential land line telephone numbers from cell-phone numbers.... [T]he Court finds Plaintiff's assertion that a cellular phone can be converted into a residential phone unavailing."). This authority recognizing that the statute's structure addresses different types of phones in different sections of the statute supports the Court's conclusion.

Additionally, Congress used different language to discuss cell phones and residential lines, further demonstrating that they are not interchangeable. When regulating calls made to cell phones, Section 227(b)(1)(A)(iii) addresses calls made to "telephone number[s] assigned to a ... cellular telephone service...." Contrast that with how Section 227(b)(1)(B) addresses "residential telephone *line*[*s*]." Of course, cell phones are wireless, and so one does not have a cellular "line," at least in the same way one has a "landline." The statute recognizes this distinction, using a broader formulation (*i.e.*, "number[s] assigned to ...") to cover cell phones than the residential "lines" formulation that covers landlines. Shoehorning cell phones into the "residential telephone lines" portion of the statute ignores these distinctions.[1]

**\*3** Finally, Plaintiff's proposed readings creates practical problems. The finely reticulated scheme discussed above creates careful categories. It would be odd if a cell phone, largely used outside the home and at work, became a residential line just because it was brought home and thereby erased those statutory categories. How frequently would it need to be used at home before it became a residential telephone line? Would it revert to its previous state as a mere cell phone if you added a landline at your house? How would these things be proved? Thankfully, these difficult questions can be avoided simply by following the natural reading of the TCPA and treating cell phones and residential lines differently.

Plaintiff responds by citing cases and regulations that concern a different part of the TCPA. Plaintiff turns from Section 227(b)(1) to Section 227(c)(5), which does not govern automatic dialing at all; it instead gives the Federal Communications Commission authority to create a "Do Not Call" directory. And, instead of using the "residential telephone *lines*" language discussed above, it pointedly refers to "residential telephone *subscribers*." While the FCC has interpreted this "residential telephone *subscriber*" language to include cell phones for purposes of the "Do Not Call" directory, this interpretation does not inform how the phrase "residential telephone *line*" should be understood in Section 227(b)(1)(B). *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14038 (2003). The FCC order actually points to Section 227(b)(1), the section of the TCPA implicated in this case, as an example of how Congress "knew how to address wireless services or consumers explicitly." *Id.* Section 227(b)(1)'s "explicit" treatment of the differing categories is then contrasted with the ambiguous language found in the "Do Not Call" context. *Id.* This interpretation of a different portion of the statute, that uses different language, and which explicitly differentiates itself from the relevant text, does not inform the interpretation of Section 227(b)(1). Plaintiff's arguments concerning that order fail.[2]

The motion to dismiss Count One will be granted.[3]

## B. Motion to dismiss putative non-resident class members

In the second portion of its motion, Defendant argues that it "is not subject to personal jurisdiction as to [non-Virginia resident] class members' claims." (Dkt. 11 at 11). This argument turns on Defendant's belief that *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), was a "seminal" case that revolutionized class action practice. (Dkt. 12 at 2). The Supreme Court, however, described its work more modestly, writing that the case was a "straightforward application ... of settled principles of personal jurisdiction [that] will not result in the parade of horribles that respondents conjure up." *Bristol-Myers Squibb*, 137 S. Ct. at 1783. Because this Court does not believe *Bristol-Myers Squibb* upended years of class action practice *sub silentio*, Defendant's motion will be denied.

**\*4** Taking a step back, "two conditions must be satisfied" for this Court "to validly assert personal jurisdiction over a non-resident defendant." *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). "First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." *Id.* Here, the

Morgan v. U.S. Xpress, Inc., Not Reported in Fed. Supp. (2018)

Defendant only argues that personal jurisdiction does not comport with due process; it does not raise any separate arguments under Virginia's long-arm statute.

There are two types of personal jurisdiction under the Due Process Clause: general and specific. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). Defendant is not subject to general jurisdiction in Virginia; it is a Nevada corporation headquartered in Tennessee. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (U.S. 2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."). So the question is whether there is specific jurisdiction. Specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* at 919. In order to be subject to personal jurisdiction, the "defendant must have purposefully established minimum contacts in the forum State such that [it] should reasonably anticipate being haled into court there," and in making this determination, "a court must weigh the totality of the facts before it." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016).

Defendant does not dispute that it is subject to personal jurisdiction as to the claims made by putative class members injured in Virginia. However, Defendant does deny that it is subject to personal jurisdiction as to the claims made by class members injured outside of Virginia. This attempt to parse nationwide class actions into state-by-state actions appears to have grown out of the Supreme Court's 2017 *Bristol-Myers Squibb* decision. The question for this Court is what effect, if any, *Bristol-Myers Squibb* has on the ability of plaintiffs to bring putative class actions on behalf of a nationwide class against defendants subject to only to specific jurisdiction.

Because of its importance to Defendant's argument, it is helpful to briefly summarize *Bristol-Myers Squibb*. That case was a tort "mass action" where a nationwide class of plaintiffs each brought their claims against a pharmaceutical company in California state court. The Supreme Court held that the California court's exercise of personal jurisdiction over the non-resident plaintiffs violated due process. *Bristol-Myers Squibb*, 137 S. Ct. at 1782. This was because, "[i]n order for a state court to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.' " *Id.* at 1780 (emphasis in the original, citations omitted). Without this connection, the defendant could be overly burdened by being sued in a forum it had never contacted. *Id.* And so, the Court explained:

> The mere fact that other plaintiffs were prescribed, obtained, and ingested [the pharmaceutical company's drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims. As we have explained, 'a defendant's relationship with a ... third party, standing alone, is an insufficient basis for jurisdiction.' This remains true even when third parties (here, the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents.

**\*5** *Id.* at 1781 (citation omitted). Justice Sotomayor, the only dissenting justice, noted that "[t]he Court today does not confront the question whether its opinion here would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." *Id.* at 1789 n.4. Defendant argues that what question was left open by the Court, the logic of the case extends to class actions.

This Court holds, alongside the "most of the courts that have encountered this issue," *Chernus v. Logitech, Inc.*, No. CV 17-673(FLW), 2018 WL 1981481, at \*7 (D.N.J. Apr. 27, 2018) (collecting cases), that *Bristol-Myers Squibb*'s holding and logic do not extend to the federal class action context.[4] This is for two primary reasons. First, "in a mass tort action [like *Bristol-Myers Squibb*], each plaintiff is a real party in interest to the complaints; by contrast, in a putative class action [like the instant case], one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the 'named plaintiffs' are the only plaintiffs actually named in the complaint." *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 126 (D.D.C. 2018) (denying motion to dismiss on these grounds). This is critically important because *Bristol-Myers Squibb* framed the specific jurisdiction analysis at the level of the suit: " 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.' " 137 S. Ct. at 1780 (emphasis in the original, citations omitted). In this case, unlike *Bristol-Myers Squibb*, there is only one suit: the suit between Plaintiff and Defendant. While Plaintiff may end up representing other class members, this is different than a mass action where independent suits with independent parties in interest are joined for trial. *See Devlin v. Scardelletti*, 536 U.S. 1, 2 (2002) ("[N]onnamed class members ... may be parties for some purposes and not for others."). Accordingly, unlike the mass action in *Bristol-Myers Squibb*, the only suit before the Court does arise out of or relate to Defendant's contacts with the forum.

Second, Rule 23's requirements (numerosity, commonality, typicality, adequacy of representation, predominance, and

Morgan v. U.S. Xpress, Inc., Not Reported in Fed. Supp. (2018)

superiority) "supply due process safeguards not applicable in [*Bristol-Myers Squibb*'s] mass tort context." *Molock*, 297 F. Supp. 3d 114. "Often, mass torts cannot qualify for class action treatment because they are unable to satisfy these standards." *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622, at *14 (E.D. La. Nov. 30, 2017)* (rejecting Defendant's argument in response to a motion to reconsider class certification). And so these requirements help ensure that the claims of a class action's named plaintiff have more commonality and typicality with those of class members than in a mass tort action. This is important because the defendant in a class action will be "presented with a unitary, coherent claim to which it need respond only with a unitary, coherent defense." *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018)* (denying motion to dismiss on this grounds). This is fundamentally different than the significant variations that might occur in a tort mass action like *Bristol-Myers Squibb*. *Id.* Due process concerns raised by that aggregation of claims are lessened in the class action context.

**\*6** Admittedly, some other district courts have accepted Defendant's position in spite of these arguments.[5] The best argument found in these cases is based on the uncontroversial proposition that "Rule 23's [class action] requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that the [federal court] rules of procedure 'shall not abridge, enlarge, or modify any substantive right.' " *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997)* (quoting 28 U.S.C. § 2072(b) ). These courts then characterize *Bristol-Myers Squibb* as holding "that the Fourteenth Amendment's due process clause precludes nonresident plaintiffs injured outside the forum from aggregating their claims with an in-forum resident." *Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, No. 14 C 2032, 2018 WL 1255021, at *16 (N.D. Ill. Mar. 12, 2018).* The courts then reason: "Under the Rules Enabling Act, a defendant's due process interest should be the same in the class context." *Id.* Or, put differently, "[t]he constitutional requirements of due process does not wax and wane when the complaint is individual or on behalf of a class." *In re Dental Supplies Antitrust Litig.*, No. 16CIV696BMCGRB, 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017).*

While it is true that the Rules Enabling Act cannot abridge substantive rights, this argument neglects the above observation from *Bristol-Myers Squibb* that the specific jurisdiction inquiry happens at the level of the "suit." 137 S. Ct. at 1780. It is the Supreme Court then, not the Federal Rules of Civil Procedure, that has framed the substantive right at this level of generality. *Id.* And so this Court concludes that when a court validly has personal jurisdiction over a defendant for purposes of that class action suit, the defendant may not attempt to parse the Court's exercise of personal jurisdiction at this finer level of granularity.

Finally, in denying this motion, the Court notes that Congress created class actions to help "overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997)* (internal quotation marks omitted). The Court is reluctant to believe that the Supreme Court's "straightforward application ... of settled principles of personal jurisdiction" in *Bristol-Myers Squibb* requires a substantial limiting of that valuable tool. Accordingly, the Court will not rush to carry that case beyond its holding and logic, and so will deny this aspect of Defendant's motion to dismiss.[6]

## III. Conclusion

**\*7** Plaintiff's failure to plausibly allege the calls were made to a "residential telephone line" within the meaning of the relevant section of the TCPA dooms Count One. But the Court will deny the motion to dismiss the claims of putative nonresident class members because the Court has personal jurisdiction over Defendant as to their claims. For these reasons, the motion to dismiss will be granted only in part. An appropriate order will issue. The Clerk of Court is requested to send a copy of this Opinion and the accompanying Order to the parties.

## All Citations

Not Reported in Fed. Supp., 2018 WL 3580775

Footnotes

1    Plaintiff argues that Section 227(b)(1)(B)'s use of "residential telephone line" is meant to be juxtaposed against "business" telephone lines, not cell phones. Plaintiff cites no law for this proposed reading, which is contradicted uniformly by the above case law.

2    While the Hobbs Act prevents district courts from setting aside FCC interpretations of the TCPA, *see Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 464 (4th Cir. 2018), Plaintiff's argument about it is not implicated here because this FCC interpretation does not concern Section 227(b)(1). Likewise, Plaintiff's cases about the "Do Not Call" context are not relevant to Section 227(b)(1) because of the structural and textual differences.

3    One other brief argument also fails. Plaintiff complains Defendant is only seeking to dismiss the "residential" count to prevent certification of a larger class. While such a strategy may or may not be successful, *see Fisher v. MJ Christensen Jewelers, LLC*, 2018 WL 1175215, at *5 (D. Nev. Mar. 6, 2018) (finding commonality between residential and cell phone owners in class certification), Defendant's underlying strategy is legally irrelevant to the sufficiency of Plaintiff's complaint.

4    *See, e.g., Becker v. HBN Media, Inc.*, No. 18-60688-CIV, 2018 WL 3007922, at *3 (S.D. Fla. June 6, 2018); *Tickling Keys, Inc. v. Transamerica Fin. Advisors, Inc.*, No. 617CV1734ORL37KRS, 2018 WL 1701994, at *6 (M.D. Fla. Apr. 4, 2018) (TCPA action); *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114 (D.D.C. 2018); *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prod., Inc.*, No. CV 17-2161, 2018 WL 1377608, at *4 (E.D. La. Mar. 19, 2018); *Sanchez v. Launch Tech. Workforce Sols., LLC*, 297 F. Supp. 3d 1360 (N.D. Ga. 2018); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. MDL 09-2047, 2017 WL 5971622, at *12 (E.D. La. Nov. 30, 2017); *Swamy v. Title Source, Inc.*, No. C 17-01175 WHA, 2017 WL 5196780, at *2 (N.D. Cal. Nov. 10, 2017) (FLSA collective action); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-CV-00564 NC, 2017 WL 4224723, at *3 (N.D. Cal. Sept. 22, 2017).

5    The Court notes that many of these decisions all arise out of the Northern District of Illinois, where subsequent judges have decided to follow an early decision in that district that accepted this argument. *See, e.g., Practice Management Support Services Inc. v. Cirque Du Soleil Inc.*, No. 14 C 2032, 2018 WL 1255021, at *16 (N.D. Ill. Mar. 12, 2018); *DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *1 (N.D. Ill. Jan. 18, 2018); *Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 875 (N.D. Ill. 2017); *McDonnell v. Nature's Way Prod., LLC*, No. 16 C 5011, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017). However, this is not to say courts outside that district have not accepted Defendant's argument. *See, e.g., Maclin v. Reliable Reports of Texas, Inc.*, No. 1:17 CV 2612, 2018 WL 1468821, at *3 (N.D. Ohio Mar. 26, 2018) (FLSA collective action); *Wenokur v. AXA Equitable Life Ins. Co.*, No. CV-17-00165-PHX-DLR, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017); *In re Dental Supplies Antitrust Litig.*, No. 16CIV696BMCGRB, 2017 WL 4217115, at *9 (E.D.N.Y. Sept. 20, 2017); *Spratley v. FCA US LLC*, No. 317CV0062MADDEP, 2017 WL 4023348, at *7 (N.D.N.Y. Sept. 12, 2017); *Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*, No. CV 16-665, 2017 WL 3129147, at *6 (E.D. Pa. July 24, 2017).

6    The Court does not rely on Plaintiff's argument concerning *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). In that case, the Court held that it did not violate the due process rights of nonresident class action *plaintiffs* for the Court to exercise personal jurisdiction over them. But "the Court explained that the authority of a State to entertain the claims of nonresident class members is entirely different from its authority to exercise jurisdiction over an out-of-state defendant." *Bristol-Myers*, 137 S. Ct. at 1783 (summarizing *Shutts* ). And so, in *Bristol-Myers*, the Court said *Shutts* "has no bearing on the question presented here [*i.e.*, jurisdiction over a defendant]." *Id.* at 1783.

---

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 25

2023 WL 5336780
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

Janet MORRIS, Plaintiff,
v.
LINCARE, INC., Defendant.

Case No: 8:22-cv-2048-CEH-AAS
|
Signed August 18, 2023

**Attorneys and Law Firms**

Manuel Santiago Hiraldo, Hiraldo PA, Ft. Lauderdale, FL, Rachel Nicole Dapeer, Dapeer Law, P.A., Aventura, FL, for Plaintiff.

Matthew Agojo Ceriale, Shumaker, Loop & Kendrick, LLP, Tampa, FL, for Defendant.

**ORDER**

**\*1** In this putative class action, Plaintiff Janet Morris sues Defendant Lincare, Inc. for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"), and the Florida Telephone Solicitation Act, Fla. Stat. § 501.059 ("FTSA"). This matter is before the Court on the Defendant's Motion to Dismiss and Motion to Strike Amended Class Action Complaint (Doc. 20). In the motion, Defendant requests dismissal of Plaintiff's Amended Complaint and/or to strike any references to unverified, unsubstantiated complaints from anonymous individuals. Plaintiff filed a response in opposition (Doc. 21), and Defendant replied (Doc. 26). The Court, having considered the motion and being fully advised in the premises, will dismiss Plaintiff's Amended Complaint as a shotgun pleading and grant Plaintiff leave to file a Second Amended Complaint. Accordingly, Defendant Lincare Inc.'s Motion to Dismiss and Motion to Strike Amended Class Action Complaint will be denied without prejudice.

**I. BACKGROUND**[i]

**A. Factual Background**

Plaintiff Janet Morris ("Plaintiff") is a Florida citizen and a "called party" of Lincare Inc. ("Defendant"). Doc. 14 ¶¶ 5–6. As alleged in the Amended Complaint, Defendant engages in unsolicited robocalling in violation of the TCPA and FTSA in an effort to promote its goods and services. *Id.* ¶ 2. Beginning in September 2020, Defendant "sent unsolicited and unconsented to pre-recorded voice calls" ("robocalls") (*id.* ¶ 14), to Plaintiff's cellphone to "encourage or invite Plaintiff to purchase supplies from Defendant and advertise the commercial availability of Defendant's supplies." *Id.* ¶ 17. Defendant contacted Plaintiff's cellphone (*id.* ¶ 18); and because Plaintiff "utilizes her cell[phone]...as her home phone," Plaintiff considers her cellphone number to be her residential telephone line. *Id.* ¶ 19.

Plaintiff's cellphone telephone number was registered on the National Do-Not-Call Registry for over 30 days prior to Defendant's first robocall. *Id.* ¶ 20. Defendant utilizes a software platform ("the Platform"), which permitted Defendant to transmit pre-recorded advertising messages to Plaintiff and the other members of the class. *Id.* ¶ 23. Defendant opted to use the Platform to maximize the reach of its message advertisements at a nominal cost to Defendant. *Id.* ¶ 24. Plaintiff never provided Defendant with express written consent authorizing Defendant to transmit prerecorded sales or marketing calls to Plaintiff's cellular telephone number. *Id.* ¶ 34. Plaintiff alleges that since July 1, 2021, Defendant is believed to have sent at least 50 robocalls to as many consumers in Florida. *Id.* ¶ 39.

### B. Procedural Background

**\*2** In a three-count Amended Complaint, Plaintiff sues Defendant under federal and Florida law. Doc. 14 ¶ 1. In her Amended Complaint, Plaintiff asserts the following causes of action against Defendant: violation of 47 U.S.C. § 227 and 47 C.F.R. § 64.1200 (Count I); violation of Florida Statute § 501.059 (Count II); and injunctive relief pursuant to Florida Statute § 501.059(10)(a) (Count III).

Plaintiff sues Defendant in Count I for violating §§ 227(b)(1)(A)(iii) and 227(b)(1)(B) of the TCPA. Plaintiff seeks $500.00 in damages for each violation, as well as an injunction against future calls. In Count II, Plaintiff alleges that Defendant's robocalls violated § 501.059(8)(a) of the FTSA. *Id.* ¶ 63. For the alleged violations, Plaintiff requests a minimum of $500.00 in damages for each violation and an injunction against future calls. *Id.* ¶ 68. In Count III, Plaintiff seeks injunctive relief under § 501.059(10(a) for Defendant's "ongoing and continuing violations" of the FTSA.

Defendant moves to dismiss and strike the Amended Complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6). Doc. 20. Regarding Plaintiff's TCPA claims in Count I, Defendant argues that its health-care related messages are exempt from the TCPA, do not violate the provisions that relate to residential lines as Plaintiff only alleges her cellphone was called, and are not advertisements or telemarketing violative of the TCPA. Defendant further argues that Plaintiff fails to allege the immediate threat of future harm to justify injunctive relief.

As for Counts II and III, Defendant argues that the voicemails referenced are not violative of the FTSA as they do not qualify as solicitations. Defendant next argues that Plaintiff's claims fail because she did not suffer actual damages as required under Fla. Stat. § 768.734. Lastly, Defendant contends that, at a minimum, the Court should strike the allegations in paragraph 12 that consist of unverified, unsubstantiated complaints from anonymous individuals.

Responding in opposition to Defendant's motion to dismiss, Plaintiff argues that Defendant's messages are not exempt "health-care messages," but even if they were, the TCPA still requires express (albeit not written) consent, which is lacking here. Doc. 21. Considering the allegations of the Amended Complaint, which the Court must accept as true for purposes of the instant motion, Plaintiff urges the Court to deny the motion to dismiss because the calls are not exempt under the "Health Care Rule," and Plaintiff alleges there was no express consent. Finally, Plaintiff contends that Defendant fails to proffer a valid reason for the Court to strike the allegations in paragraph 12 of the Amended Complaint. Defendant replied, arguing the language of the incorporated voicemails belie Plaintiff's argument that they are not exempt health-care related messages. Doc. 26.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id.* A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face."

*Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id.*

### III. DISCUSSION

**\*3** The TCPA is codified under Title 47 of the U.S. Code and is enforced by the Federal Communications Commission ("FCC"). *See Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2352 (2020). The FCC enforces the TCPA by prescribing and implementing regulations under Title 47 of the Code of Federal Regulations ("CFR"). *Id.* at 2344 n.1. In Plaintiff's Amended Complaint, she cites to both the statute and its related regulations.

In Count I Plaintiff alleges that Defendant violated § 227(b)(1)(A)(iii), which prohibits "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any...artificial or prerecorded voice to any telephone number assigned to a...cellular telephone service ...." 47 U.S.C. § 227(b)(1)(A)(iii). Doc. 14 ¶ 52. The implementing regulation promulgated by the FCC similarly bans "any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice...[t]o any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 C.F.R. § 64.1200(a)(1)(iii).

In Count I, Plaintiff also sues Defendant for violating § 227(b)(1)(B), which makes it a violation of the TCPA "to initiate any telephone call to any *residential telephone line* using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party...." 47 U.S.C. § 227(b)(1)(B) (emphasis added).

#### A. Shotgun Pleading

As a threshold matter, the Court will dismiss the Amended Complaint, with leave to amend, because it is a shotgun pleading. A shotgun pleading is a "complaint that fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading." *Lampkin-Asam v. Volusia Cnty. Sch. Bd.*, 261 F. App'x 274, 277 (11th Cir. 2008) (citation omitted).

The Eleventh Circuit has identified four general types of shotgun pleadings and each one "fail[s] to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). Relevant here, a complaint that does "not separate into a different count each cause of action or claim for relief" is a shotgun pleading. *Id.* at 1323. When faced with a shotgun pleading, a court should strike the complaint and instruct plaintiff to file a more definite statement. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 984 (11th Cir. 2008) (collecting cases), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

The Eleventh Circuit repeatedly condemns the use of shotgun pleadings for "imped[ing] the administration of the district courts' civil dockets." *PVC Windows, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 806 n.4 (11th Cir. 2010). Shotgun pleadings require that the district court sift through allegations in an attempt to separate the meritorious claims from the unmeritorious which results in a "massive waste of judicial and private resources." *Id.* (citation omitted). Thus, the Eleventh Circuit has established that a shotgun pleading is an unacceptable form of establishing a claim for relief.

**\*4** In Count I of the Amended Complaint, Plaintiff sues Defendant for violations of §§ 227(b)(1)(A)(iii) and 227(b)(1)(B) of the TCPA and their related regulations. In general, the first provision bars robocalls to a cell phone while the second prohibits such calls to a residential line. To the extent that Plaintiff intends to sue Defendant for these two statutory violations, they are separate causes of action that must be pleaded in separate counts. Accordingly, the Court will dismiss the Amended Complaint without prejudice and with leave to amend to correct the defect. Although this conclusion moots the motion to

dismiss, the Court will address some of the other grounds of Defendant's motion to facilitate the orderly progression of this case. *See, e.g., zIT Consulting GmbH v. BMC Software, Inc.*, No. 6:15-CV-1012-RBD-KRS, 2016 WL 231215, at *2 n.4 (M.D. Fla. Jan. 15, 2016).

### B. Residential Phones and Cell Phones are Distinct

It is worth noting that courts use "home phone" and "residential telephone" to refer to the TCPA's language "residential telephone line." While these terms are used by courts interchangeably, they are distinct from cell phones. *See, e.g., Barr v. Am. Ass'n of Political Consultants*, 140 S.Ct. 2335, 2345 n.3 (2020) ("Plaintiffs have not challenged the TCPA's separate restriction on robocalls to home phones. *See* 47 U.S.C. § 227(b)(1)(B)");*Turizo v. Subway Franchisee Adver. Fund Trust Ltd.*, 603 F. Supp. 3d 1334, 1340 (S.D. Fla. 2019) ("The TCPA clearly draws a distinction between cellular telephones and residential telephones. Compare 47 U.S.C. § 227(b)(1)(A)(iii)...with *id.* § 227(b)(1)(B)"); *Sliwa v. Bright House Networks, LLC*, No. 2:16-cv-235-JES-MRM, 2016 WL 3901378, at *2 n.2 (M.D. Fla. July 19, 2016) ("section 227(b)(1)(B) prohibits calls to residential telephone lines, not cell phones").

As raised by Defendant, Plaintiff appears to only be claiming that calls were made to her cell phone. While Plaintiff alleges she uses her cell phone as a residential line, the statute and case law make clear they are not one in the same. Perhaps, tellingly, Plaintiff's response to the motion to dismiss does not specifically address that cell phones and residential lines are different. Thus, in amending her complaint, Plaintiff should be mindful that calls to a cell phone that are violative of the TCPA are addressed under § 227(b)(1)(A)(iii), whereas calls to a residential line are properly brought in a separate count under § 227(b)(1)(B). If no calls were made to a residential line, no claim should be brought under the latter provision.

### C. The Health Care Exception Requires At Least Express Consent

Defendant claims that since its calls are "inarguably health related," the Health Care Rule exempts Defendant from needing to acquire any type of consent before contacting consumers. Doc 20 at 9. Plaintiff argues she has pleaded sufficient facts to support that the calls do not fall within the Health Care exemption. Such factual disputes may not be resolved on a motion to dismiss. But even if the calls were health-care related to invoke the exemption, courts in this Circuit have recognized that "[t]he Health Care Rule require[s] prior express consent." *Coleman v. Rite Aid of Ga., Inc.*, 284 F. Supp. 3d 1343, 1348 (N.D. Ga. 2018). Plaintiff alleges that no express consent was given. In a light favorable to the Plaintiff, the Health Care Rule would not bar Plaintiff's TCPA claims on these allegations.

### D. An Injunction is Not a Cause of Action; It is a Remedy. In Count III, Plaintiff requests an injunction as an independent claim for relief.

Defendant complains that Plaintiff's claim fails because the voice mails do not qualify as solicitations under the FTSA.[2] Count III fails for a more fundamental reason: an injunction is not a cause of action, but a remedy.[3] *See, e.g., Rodriguez v. City of Laredo*, No. 5:06–cv–175, 2007 WL 2329860, at *1 n. 1 (S.D. Tex. Aug. 13, 2007). Although Defendant does not raise this issue, the Court will address it in the interest of judicial efficiency.

**\*5** The Eleventh Circuit is clear that "any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action. *See Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (citation and internal quotation marks omitted); *see also Blue Water Innovations, LLC v. Fettif*, 18-60671-CIV, 2019 WL 1904589, at *2 (S.D. Fla. Mar. 8, 2019) (dismissing claim for injunctive relief with prejudice because injunctive relief is not an independent cause of action). Plaintiff alleges that Defendant violated sections of the FTSA and requests an injunction pursuant to § 501.059(10)(a) of the FTSA. Doc. 14 ¶ 71. In so doing, Plaintiff requests the injunction as an independent claim for relief in Count III. *Id.* Since "injunctive relief cannot be pled as an independent claim for relief" and "there is no such thing as a suit for a traditional injunction in the abstract," Count III is due to be dismissed with prejudice. *See Organo Gold Int'l, Inc. v. Aussie Rules Marine Servs.*, Ltd., 416 F. Supp. 3d 1369, 1379 (S.D. Fla. 2019). To the extent that Plaintiff seeks injunctive relief, she should request such relief as a remedy in the statutory cause of action.

Morris v. Lincare, Inc., Slip Copy (2023)

**E. Striking Allegations Under Rule 12(f)**

Defendant requests this Court strike paragraph 12 of the Amended Complaint under Fed. R. Civ. P. 12(f) because the allegations consist of anonymous, unverified on-line message postings that are prejudicial to Defendant. Federal Rule of Civil Procedure 12(f) provides that a court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Anonymous, unverified and prejudicial are not the basis for striking of allegations under Rule 12(f). Moreover, a court will not strike allegations in a complaint merely because a defendant disputes the veracity of the allegations.[4] *See Colodny v. Iverson, Yoakum, Papiano & Hatch*, 838 F. Supp. 572, 575 (M.D. Fla. 1993) (finding "allegations in a complaint cannot be stricken simply because a defendant challenges their factual basis"). Defendant also claims that the allegations are irrelevant. The Court disagrees that such allegations are irrelevant to the extent that Plaintiff alleges that such on-line complaints were directed at the conduct of this Defendant. In any event, relevancy is not a basis for the extreme sanction of striking allegations under Rule 12(f). Whether such on-line comments are ultimately admissible, however, is a separate issue for another day.

Accordingly, it is hereby

**ORDERED**:

1. Plaintiff's Amended Complaint is dismissed as a shotgun pleading. Plaintiff may file a Second Amended Complaint within fourteen (14) days that cures the pleading and other deficiencies discussed herein.

2. Defendant Lincare's Motion to Dismiss and Motion to Strike Amended Class Action Complaint (Doc. 20) is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on August 18, 2023. Copies to:

**All Citations**

Slip Copy, 2023 WL 5336780

Footnotes

[1]   The following statement of facts is derived from the Amended Complaint (Doc. 14), the allegations of which the Court must accept as true in ruling on the instant Motion to Dismiss. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

[2]   To the extent Defendant makes this argument regarding Count II, the Court is unpersuaded as Defendant argues factual disputes not appropriate for consideration on a motion to dismiss where the Court must accept the Plaintiff's well-pleaded allegations as true.

[3]   *See, e.g., Rodriguez v. City of Laredo*, No. 5:06–cv–175, 2007 WL 2329860, at *1 n. 1 (S.D.Tex. Aug. 13, 2007); *Abboub v. Int'l Bus. Machs. Corp.*, No. C 04–00017 JW, 2006 WL 905319, at *9 (N.D.Cal. Apr. 7, 2006); Minn. Indus. Ventures, L.L.C. v. City of Roseville, No. Civ. 052488RHKJSM, 2006 WL 763208, at *5 n. 4 (D.Minn. Mar. 24, 2006); Booth v. Quantum3D, Inc., No. C–04–5376 EMC, 2005 WL 1512138, at *4 (N.D.Cal. June 15, 2005).

4       Of course, Rule 11 must always serve as a guide for attorneys drafting a complaint.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 26

2023 WL 8374749
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Kelly PINN, Plaintiff,
v.
CYCLEBAR FRANCHISING, LLC, Defendant.

Civil Action No. 3:23-cv-01540-M
|
Signed December 4, 2023

**Attorneys and Law Firms**

Chris R. Miltenberger, The Law Office of Chris R. Miltenberger PLLC, Southlake, TX, Max Scott Morgan, The Weitz Firm LLC, Philadelphia, PA, for Plaintiff.

Jennifer R. Brooks, Seyfarth Shaw LLP, Houston, TX, Jennifer Hardy, Willkie Farr & Gallagher LLP, Houston, TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

BARBARA M. G. LYNN, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** Defendant CycleBar Franchising, LLC's ("CycleBar") Motion to Dismiss is **GRANTED**. ECF No. 6. Plaintiff Kelly Pinn is **DISMISSED WITH PREJUDICE** and the putative class is **DISMISSED WITHOUT PREJUDICE**.

### I. Factual Matters[i]

Pinn's cell phone number has been on the National Do-Not-Call Registry since February 9, 2009. ECF No. 1-1 ¶¶ 36–37. On September 28, 2022, she received a text message from a phone number identical to that listed on the website for CycleBar's Southlake Franchise. *Id.* ¶¶ 26, 38. The message advertised "unlimited rides for only $99," and provided a promo code and a hyperlink to CycleBar's website, where the person using the hyperlink would be presented with a "Recurring Dues Membership Agreement." *Id.* ¶¶ 39, 41. Pinn alleges the text message amounted to solicitation in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). *Id.* ¶ 1. She alleges a single cause of action, that CycleBar violated the Texas Business and Commerce Code ("TBCC") § 305.053, which incorporates the TCPA. *Id.* ¶¶ 97–101. She brings this lawsuit on behalf of a putative class, defined as follows:

> Plaintiff and all residents of the State of Texas (1) to whose telephone number Defendant placed (or had placed on their behalf) a text message (2) the same or similar to the text messages sent to Plaintiff Pinn, (3) from four years prior to the filing of the Compliant [sic] to the date of certification.

*Id.* ¶ 82. CycleBar moves to dismiss.

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a pleading must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Glob. Plasma Sols., Inc. v. D Zine Partners, LLC*, No. 3:21-CV-00884-M, 2022 WL 16540677, at *3 (N.D. Tex. Oct. 28, 2022) (Lynn, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). Applying the "plausibility" standard from *Iqbal* and *Twombly*, the Fifth Circuit disregards "legal conclusions; mere 'labels'; '[t]hreadbare recitals of the elements of a cause of action'; 'conclusory statements'; and 'naked assertions devoid of further factual enhancement.' " *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc) (quoting *Iqbal*, 556 U.S. at 678). Indeed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A sheer possibility that a defendant has acted unlawfully" is not sufficient to satisfy a plaintiff's pleading obligations. *Iqbal*, 556 U.S. at 678; *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011).

## III. Analysis

CycleBar argues that Pinn's claims under TBCC § 305.053 fail because they would fail under the TCPA. In relevant part, TBCC § 305.053, provides:

> (a) A person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A may bring an action in this state against the person who originates the communication for:

> **\*2** (1) an injunction;

> (2) damages in the amount provided by this section; or

> (3) both an injunction and damages.

"The Texas TCPA [referring to TBCC § 305.053] proscribes only that conduct which is also prohibited by the TCPA. If no violation of the TCPA exists, there is no violation of the Texas TCPA." *Cherkaoui v. Santander Consumer USA, Inc.*, 32 F. Supp. 3d 811, 815 (S.D. Tex. 2014). It is axiomatic that if no violation of the TCPA exists, then there is no violation of TBCC § 305.053; in other words, the two are coextensive. *Guadian v. Progressive Debt Relief, LLC*, No. EP-23-CV-00235-FM, 2023 WL 7393129, at *4 (W.D. Tex. Nov. 8, 2023); *Callier v. Jumpstart Fin., LLC*, No. EP-22-CV-00399-FM, 2023 WL 4155421, at *5 (W.D. Tex. Apr. 13, 2023); *Hunsinger v. Dynata LLC*, No. 3:22-CV-00136-G-BT, 2023 WL 2377481, at *9 (N.D. Tex. Feb. 7, 2023), report and recommendation adopted, No. 3:22-CV-0136-G-BT, 2023 WL 2386710 (N.D. Tex. Mar. 4, 2023); *Johnson v. Palmer Admin. Servs., Inc.*, No. 6:22-CV-00121, 2022 WL 16919786, at *2 (E.D. Tex. Nov. 14, 2022) (holding the inverse is true as well—that sufficient pleading of a TCPA violation indicates sufficient pleading of a § 305.053 claim); *Callier v. Defendant Home Loans, Inc.*, No. EP-22-CV-49-DB, 2022 WL 16858520, at *7 (W.D. Tex. Nov. 10, 2022); *Starling v. J Wales Home Sols. LLC*, No. 4:21-CV-01261-O, 2022 WL 1156021, at *4 (N.D. Tex. Apr. 19, 2022); *Hunsinger v. Alpha Cash Buyers, LLC*, No. 3:21-CV-1598-D, 2022 WL 562761, at *5 (N.D. Tex. Feb. 24, 2022); *Shields v. Gawk Inc.*, No. 3:18-CV-00150, 2019 WL 1787781, at *5 (S.D. Tex. Apr. 24, 2019), report and recommendation adopted, No. 3:18-CV-00150, 2019 WL 2103423 (S.D. Tex. May 14, 2019); *Stein v. Navient Sols., LLC*, No. A-17-CV-907 LY, 2018 WL 2124108, at *1 n.1 (W.D. Tex. May 7, 2018); *Masters v. Wells Fargo Bank S. Cent., N.A.*, No. A-12-CA-376-SS, 2013 WL 3713492, at *2 (W.D. Tex. July 11, 2013); *Brown v. Enter. Recovery Sys., Inc.*, No. 02-11-00436-CV, 2013 WL 4506582, at *5 (Tex. App.—Fort Worth Aug. 22, 2013, no pet.); *Shields v. Americor Lending Grp., Inc.*, No. 01-06-00475-CV, 2007 WL 2005079, at *3 (Tex. App.—Houston [1st Dist.] July 12, 2007, no pet.).

In 47 U.S.C. § 227(c)(5), the TCPA grants a right of private action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." The parties' argument centers on whether TBCC § 305.053 requires Pinn to allege more than one communication.

For a violation of the TCPA, the plaintiff must plead receipt of "more than one telephone" communication. 47 U.S.C. § 227(c)(5); *Katz v. Caliber Home Loans, Inc.*, No. 3:23-CV-0145-S, 2023 WL 5311488, at *4 (N.D. Tex. Aug. 17, 2023); *Noviello v. Adam Wines Consulting, LLC*, No. 3:22-CV-52-BN, 2023 WL 2776696, at *4 (N.D. Tex. Apr. 4, 2023) (quoting *Charvat v. NMP, LLC*, 656 F.3d 440, 448 (6th Cir. 2011)); *Hunsinger v. Dynata LLC*, No. 3:22-CV-00136-G-BT, 2023 WL 2377481, at *7 (N.D. Tex. Feb. 7, 2023), report and recommendation adopted, No. 3:22-CV-0136-G-BT, 2023 WL 2386710 (N.D. Tex. Mar. 4, 2023).

**\*3** Pinn has not pleaded more than one telephone communication from CycleBar and thus has not pleaded a violation of the TCPA or TBCC § 305.053. Thus, the Court will dismiss the claim, with prejudice, because this is not Pinn's first attempt to sue on the same nucleus of operative facts. *Kelly Pinn v. CycleBar Franchising, LLC*, No. 3:22-cv-02684 (N.D. Tex.). Her attempt here to restrict her claim to the TBCC fails to make her case meritorious, and no repleading can save her lawsuit.

As the named Plaintiff's claim fails before class certification, the Court dismisses the putative class action, without prejudice. *Conditt v. Owens*, 457 F. App'x 420, 422 (5th Cir. 2012) ("dismissal of [plaintiff]'s complaint on its merits mooted any request for class certification"); *Holmes v. Serv. Corp. Int'l*, No. CIV.A. H-10-4841, 2014 WL 3046971, at *3 (S.D. Tex. July 3, 2014) (Rosenthal, J.); *see also Beavers v. Metro. Life Ins. Co.*, No. CIV.A. G-07-00260, 2007 WL 3342540, at *2 (S.D. Tex. Nov. 8, 2007), aff'd, 566 F.3d 436 (5th Cir. 2009) ("In the class action context, if the defendant demonstrates that the named plaintiffs' cause of action should be dismissed for failure to state a claim, the entire putative class action complaint should be dismissed.").

### IV. Conclusion

CycleBar's Motion to Dismiss is **GRANTED**. ECF No. 6. Plaintiff Kelly Pinn's claims are **DISMISSED WITH PREJUDICE**, with all costs of court taxed to the Plaintiff, and the claims of the putative class are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED.**

### All Citations

Slip Copy, 2023 WL 8374749

Footnotes

1        These facts are drawn from the Plaintiff's Petition, filed prior to removal, and are assumed to be true for purposes of this motion. *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007).

---

**End of Document**                                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

2019 WL 13292490
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Anthony SPINELLI, Eric Jedrzej, Emma Mendoza, and Manuel Mendoza, individually and
on behalf of a class of others similarly situated, Plaintiffs,
v.
STORM TIGHT WINDOWS, INC., a Florida corporation, Defendant.

CASE NO. 18-62592-CIV-DIMITROULEAS
|
Signed February 20, 2019
|
Entered February 21, 2019

**Attorneys and Law Firms**

Andrew John Shamis, Shamis & Gentile P.A., Miami, FL, Gary Michael Klinger, Pro Hac Vice, Milberg Coleman Bryson Phillips Grossman PLLC, Chicago, IL, Jibrael Jarallah Said Hindi, The Law Offices of Jibrael S. Hindi, Fort Lauderdale, FL, Jordan David Utanski, Black Srebnick, P.A., Boca Raton, FL, Scott Adam Edelsberg, Edelsberg Law PA, Aventura, FL, for Plaintiffs.

Capri Trigo, Gordon & Rees LLP, MIami, FL, for Defendant.

**ORDER DENYING MOTION TO DISMISS**

WILLIAM P. DIMITROULEAS, United States District Judge

**\*1 THIS CAUSE** is before the Court on Defendant Storm Tight Windows, Inc. ("Storm Tight" or "Defendant")'s Motion to Dismiss [DE 11], filed on January 7, 2019. The Court has carefully considered the Motion, Plaintiffs, Anthony Spinelli ("Spinelli"), Eric Jedrzej ("Jedrzej"), Emma Mendoza and Manuel Mendoza (collectively, "Plaintiffs")'s Response [DE 18], Defendant's Reply [DE 19], and is otherwise fully advised in the premises.

**I. BACKGROUND**

This action was filed on October 28, 2018 by Plaintiff Spinelli. *See* [DE 1]. Plaintiffs filed an Amended Complaint, the operative complaint in this action, on December 10, 2018. *See* [DE 7]. According to the factual allegations of the Amended Complaint, which the Court assumes as true for purposes of this motion to dismiss:

Defendant Storm Tight, a Florida corporation with principal office in Deerfield Beach, Florida, is a window manufacturer and installation service. *Id.* ¶¶ 3, 11. Plaintiffs Spinelli and Jedrzej are Florida citizens. ¶¶ 7, 8. Plaintiffs Emma Mendoza and Manuel Mendoza are Florida citizens. ¶¶ 9, 10.

For over a year, Plaintiff Spinelli has been receiving unsolicited marketing/promotional text messages from Defendant. ¶ 28. All of the text messages sent to Spinelli's cellular device by Defendant were without Plaintiff Spinelli's prior express written consent to be sent marketing/promotional text messages by use of an automatic telephone dialing system ("ATDS"). ¶¶ 28, 31. The text messages were sent from the short-code "797979." ¶ 30. An example of the most recent text messages sent by Defendant is depicted below:



¶ 29. 30.
Plaintiff Jedrzej is the subscriber and sole user of a cellular telephone number ending in 4943 (the "4943 Number") and is financially responsible for phone service to the 4943 Number. ¶ 38. Plaintiff Jedrzej has been registered with the national do-not-call registry since November 22, 2004. ¶ 39. On or about October 3, 2018, Defendant sent the following telemarketing text message to Plaintiff Jedrzej's cellular telephone at the 4943 Number:

Spinelli v. Storm Tight Windows, Inc., Not Reported in Fed. Supp. (2019)



¶ 32. At no point in time did Plaintiff Jedrzej provide Defendant with his express written consent to be contacted using an ATDS. ¶ 37.

Plaintiff Manuel Mendoza is a subscriber of a cellular telephone whose phone number is: (713) 826-XXXX. ¶ 42. Manuel Mendoza's cellular telephone number has been listed on the national Do Not Call registry for 9 years. ¶ 42. Plaintiff Emma Mendoza is a subscriber to a residential landline telephone whose phone number is: (281) 470-XXXX. ¶ 43. Plaintiff's residential landline telephone number has been listed on the national Do Not Call registry for 10 years. ¶ 43.

Over the past year, the Mendoza Plaintiffs have received numerous unsolicited telemarketing phone calls from representatives of Defendant advertising its services and goods. ¶ 40. In particular, the Mendoza Plaintiffs have received various telemarketing calls to their respective phones from representatives of Defendant that were placed for the purpose of marketing and/or selling Defendant's windows and doors. 41. All of the telemarketing calls alleged herein that representatives of Defendant placed to the Mendoza Plaintiffs' respective phones were made without their prior express written consent to receive such calls. ¶ 44. At no point did Defendant obtain either of the Mendoza Plaintiffs' prior express written consent to place telemarketing calls and prerecorded messages to their respective phones. ¶ 49.

**\*2** An example of one such call occurred as recently as November 13, 2018. ¶ 45. At or around 4:00 PM, Plaintiff Emma Mendoza received a telemarketing call from a representative of Defendant that was placed, on information and belief, from the following phone number: 281-528-1159. ¶ 45. When Ms. Mendoza answered the call, she was connected with a representative from Defendant who then solicited her to purchase Defendant's goods and services. ¶ 45. After a brief

conversation, Ms. Mendoza informed Defendant representative she was not interested, requested that she be taken off Defendant's marketing list, and terminated the phone call. ¶ 45. Plaintiff Emma Mendoza estimates that she has received more than five (5) telemarketing calls to her residential landline within the last twelve (12) months from representatives of Defendant — all placed for the purpose of soliciting her business. ¶ 46. On each occasion, Ms. Mendoza requested to be taken off of Defendant's marketing list. ¶ 46. Despite this fact, Defendant's representatives continued to bombard her residential landline with telemarketing calls. ¶ 46. In addition, Plaintiff Emma Mendoza recollects that some of the telemarketing calls she received from Defendant contained a prerecorded message advertising Defendant's goods and services. ¶ 47.

Plaintiff Manuel Mendoza had a similar experience with Defendant and its sales representatives. ¶ 48. He estimates that he received approximately 5 telemarketing calls to his cellular phone over the past year—all placed for the purpose of soliciting his business. ¶ 48.

Based on this conduct, Plaintiffs filed a three-count Amended Complaint, alleging the following: Count I – Violations of Telephone Consumer Protection Act, 47 U.S.C. § 227(b) ("TCPA"); Count II–Knowing and/or Willful Violation of TCPA, 47 U.S.C. § 227(b); and Count III – Violation of the TCPA, 47 U.S.C. § 227. *See* [DE 7]. Defendant subsequently filed the instant motion seeking dismissal pursuant to Fed. R. Civ. P. 12(b)(6). *See* [DE 11].

## II. STANDARD OF REVIEW

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). "[A] court must view a complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1066 (11th Cir. 2007).

However, the court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. "Mere labels and conclusions or a formulaic recitation of the elements of a cause of action will not do, and a plaintiff cannot rely on naked assertions devoid of further factual enhancement." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013). "[I]f allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012). In sum, "[t]he plausibility standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability." *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

Defendant moves to dismiss the Amended Complaint on several grounds in a rather disorganized fashion. The Court will address each argument, in turn.

First, Defendant asserts that any claims brought by the Mendoza Plaintiffs must be dismissed because they have sued the wrong entity, Storm Tight Windows, Inc., a Florida corporation. Defendant suggests that the entity responsible for any of the calls to the Mendoza Plaintiffs is another Storm Tight in the Houston, Texas area. Resolution of this issue involves numerous factual issues outside of the four corners of the Amended Complaint which are inappropriate for a motion to dismiss. The Court denies the motion to dismiss on this ground.

**\*3** Second, Defendant argues that dismissal is warranted because the EZ-Texting platform utilized by Defendant is not an

automatic telephone dialing system ("ATDS") under the TCPA.[1] Defendant relies upon Judge Moreno's summary judgment decision in *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d 1262, 1266 (S.D. Fla. 2018) ("The Court finds that Snyder's testimony is insufficient to create an issue of material fact and that Thinkaran's testimony, coupled with the undisputed evidence of Pentecost's actions in this case, establish that the EZ-program texting system is not an automatic telephone dialing system under the Telephone Consumer Protection Act."). The Court rejects this argument, as Judge Moreno did not create a judicial fact in his order that binds all subsequent judicial inquiry into the EZ-Texting platform. *See, e.g., Fenwick v. Aventura Dance Cruise, LLC*, Case No. 0:18-cv-61587-BB, [DE 16] (S.D. Fla. Aug. 20, 2018) ("The Court is not persuaded that the pending intra-district case, *Katiria Ramos v. Hopele of Fort Lauderdale, LLC, et al.*, Case No. 17-cv-62100-Moreno/Seltzer (S.D. Fla.) would control the issues in the present case."). Defendant's reliance on summary judgment decisions from other courts as to this issue is also unavailing on a motion to dismiss. Whether Defendant's system qualifies as an ATDS involves issues of fact not properly before the Court at this stage of the litigation. Defendant's motion to dismiss on this ground is denied. Defendant may raise the issue of whether an ATDS was used at summary judgment, after the opportunity to conduct discovery. *See, e.g., Adams v. Ocwen Loan Servicing, LLC*, No. 18-81028-CIV, 2018 WL 6488062, at *4 (S.D. Fla. Oct. 26, 2018).

Third, Defendant contends that the Mendozas' TCPA claims fail because they have not sufficiently alleged the use of an ATDS. This argument is fundamentally flawed because the TCPA prohibits the use of an ATDS *or* an artificial or prerecorded voice. *See* 47 U.S.C. § 227(b)(1)(A)(iii).[2] Further, upon consideration, the Court concludes that the Mendozas include sufficient allegations that support their claim, where relevant to that particular cause of action[3], that the calls were autodialed and/or prerecorded. Plaintiff Emma Mendoza alleges that some of the telemarketing calls she received from Defendant contained a prerecorded message advertising Defendant's goods and services. ¶ 47. This alone is sufficient to meet the TCPA's requirement. Additionally, the Mendoza Plaintiffs allege that Defendant ignored their numerous demands that Defendant cease calling, which also suggests that Defendant was autodialing Plaintiffs. ¶¶ 46, 48. *See Adams*, 2018 WL 6488062, at *4 (holding at the motion to dismiss stage that a defendant ignoring numerous demands by plaintiff to cease calling is indicative of autodialing). Accordingly, Defendant's motion to dismiss the Mendozas' TCPA claims for failure to allege the use of an ATDS shall be denied.

**\*4** Fourth, Defendant argues that Count III of the Amended Complaint is deficient because Plaintiffs fail to properly plead factual allegations that would sufficiently allow this Court to draw any reasonable inference that Storm Tight is liable for a violation of the do-not-call provisions of the TCPA. *See* 47 U.S.C. § 227(c)(5).

Under 47 U.S.C. § 227(c) and the related regulations, it is a violation of the TCPA for parties to make more than one call within a twelve-month period to a number listed on a do-not-call registry provided for by the Federal Communications Commission ("FCC") without the residential telephone subscriber's prior express written consent. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2); 47 C.F.R. § 64.1200(e).

According to the allegations of the Amended Complaint, Plaintiff Jedrzej has been registered with the national do-not-call registry since November 22, 2004. ¶ 39. Plaintiff Jedrzej alleges that he received multiple text messages from Defendant on October 3, 2018 without his express written consent. ¶¶ 32-37. Plaintiff Manuel Mendoza's cellular telephone number has been listed on the national Do Not Call registry for nine (9) years. ¶ 42. Plaintiff Emma Mendoza's residential landline telephone number has been listed on the national Do Not Call registry for 10 years. ¶ 43. The Mendoza Plaintiffs each allege that they received at least 5 telemarketing calls from Defendant in the last 12 months alone, without their express prior written consent. ¶¶ 46, 48, 49, 50. These Plaintiffs state a TCPA claim for violations of the Do Not Call list.[4] *See* 47 U.S.C. § 227(c)(5). Defendant's motion to dismiss Count III shall be denied.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion to Dismiss [DE 11] is hereby **DENIED**. Defendant shall file its answer within fourteen (14) days.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 20th day of February. 2019.

Spinelli v. Storm Tight Windows, Inc., Not Reported in Fed. Supp. (2019)

---

**All Citations**

Not Reported in Fed. Supp., 2019 WL 13292490

Footnotes

[1]    The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator, and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

[2]    § 227(b)(1)(A)(iii) of the TCPA prohibits anyone from using an automated telephone dialing system to call a cell phone number without the called party's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii); *see also Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1305 (11th Cir. 2015). The relevant provision of the TCPA provides as follows:

   It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States ... [t]o make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

   47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides a private right of action for any violation of this provision and permits the recovery of the greater of $500 or actual losses, with the potential for treble damages if a court determines that the violation was willful. § 227(b)(3).

[3]    Whether an ATDS was used is "not be relevant to Plaintiffs' claim of violating the do-not-call requirements ... because such calls need not be automated to violate the regulations." *Somogyi v. Freedom Mortg. Corp.*, No. CV 17-6546 (JBS/JS), 2018 WL 3656158, at *4 (D.N.J. Aug. 2, 2018).

[4]    While Plaintiffs' response to the motion to dismiss states that paragraph 28 of the Amended Complaint alleges that Plaintiff Spinelli is a member of the national do-not-call registry, *see* [DE 18] p. 15, that allegation appears absent from the pleading. In the event Plaintiff Spinelli wishes to proceed as to Count III, he must allege that Plaintiff Spinelli was registered with the national do-not-call registry when he received more than one call/text to that number during a twelve-month period. The Court will otherwise assume Plaintiff Spinelli is only proceeding as a Plaintiff as to Counts I and II of the Amended Complaint.

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 28

2011 WL 4484297
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

Stephen ZEHALA, Plaintiff,
v.
AMERICAN EXPRESS, et al., Defendant.

No. 2:10–cv–848.
|
Sept. 26, 2011.

**Attorneys and Law Firms**

Stephen Zehala, Columbus, OH, pro se.

Suzana Kukovec–Krasnicki, Keith D. Weiner & Associates Co. LPA, Cleveland, OH, Jeffrey Charles Turner, John P. Langenderfer, Surdk Dowd & Turner Co. LPA, Miamisburg, OH, Boyd W. Gentry, Law Office of Boyd W. Gentry, West Alexandria, OH, for Defendants.

***OPINION AND ORDER***

MICHAEL H. WATSON, District Judge.

**\*1** This case arises from the alleged improper furnishing of information about Plaintiff Stephen Zehala ("Plaintiff" or "Zehala") by Defendant to major credit reporting agencies in violation of the Fair Debt Collections Practice Act ("FDCPA"), the Telephone Consumer Protection Act ("TCPA"), and Ohio's Telephone Solicitation Sales Act ("TSSA"). This matter is before the Court on the following motions: Defendant American Express' ("AmEx") Motion to Dismiss, ECF No. 10; Plaintiffs Motion to Vacate Judgment, ECF No. 29; Defendant AmEx's Motion for Default Judgment, ECF No. 33; Plaintiffs Motion to be Granted a Pacer Account to File Pleadings Electronically, ECF No. 34; Plaintiff's Motion for Extension of Time to File Response, ECF No. 35; Plaintiff's Motion Requesting a PACER Account to File Pleadings Electronically, ECF No. 36; Plaintiff's Motion to Dismiss and Strike Exhibits, ECF No. 58; and AmEx's Motion to Strike Answer to Counterclaim, ECF No. 62.

## I. BACKGROUND

Zehala, who is proceeding pro se, resides in Franklin County, Ohio. Compl. ¶ 1, ECF No. 2. Defendants remaining in this litigation are AmEx and GC Services Limited Partnership ("GC"). Defendant AmEx notes that the Complaint's caption

incorrectly identifies it as simply American Express; the proper name is American Express Bank, FSB.

> Zehala states that he incurred debt for "personal, household, or family purposes." *Id.* ¶ 15. In the letters attached to the Complaint, he acknowledges the account in "my name Stephen Zehala acct ending ***77002." Compl. Exs. 1–2, PAGEID # : 33, 34, ECF No. 2–1. He alleges that Defendants AmEx and GC reported negative information to major credit reporting agencies, such as Experian, Trans Union, and Equifax. *Id.* ¶ 17. He further alleges that AmEx and GC made calls to him, *Id.* ¶ 28, and that in those calls and also in letters AmEx and GC made "threats to collect fees and costs" regarding his account. *Id.* ¶ 29. Zehala alleges AmEx sold or assigned the debt associated with his account and thus no longer owns that debt. *Id.* ¶ 45–45. He further alleges that GC had a contractual agreement with AmEx regarding the debt. *Id.* ¶ 86.

## II. AmEx's MOTION TO DISMISS

### A. Standard of Review

Defendant AmEx moves to dismiss Zehala's Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss under Rule 12(b)(6) attacks the legal sufficiency of the complaint. *Roth Steel Prod. v. Sharon Steel Co.,* 705 F.2d 134, 155 (6th Cir.1983). A claim survives a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) if it "contain [s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 546, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**\*2** A court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir.2002). In doing so, however, plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555; *see also Iqbal,* 129 S.Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir.2007). In the process of applying this standard, the Court must be cautious to remember that a pro se complaint must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

### B. Analysis

As an initial matter, the Court notes that AmEx's motion to dismiss was filed on October 14, 2010 simultaneously with its Answer. Answer, ECF No. 9; AmEx's Mot. Dismiss, ECF No. 10. Accordingly, the Court will construe AmEx's motion to dismiss as a motion for judgment on the pleadings.[1] A motion for judgment on the pleadings under Rule 12(c) attacks the sufficiency of the pleadings and is reviewed under the same standard applicable to a motion to dismiss under Rule 12(b)(6). *Ziegler v. IBP Hog Mid.,* 249 F.3d 509, 511–12 (6th Cir.2001).

On November 30, 2010, Zehala attempted to file a stipulation for extension of time to reply to that motion, which AmEx opposed. The Magistrate Judge struck the stipulation as improper under the Local Rules. *See* Order, ECF No. 32. Then, on December 10, 2010, Zehala filed a motion for extension of time to file a response to the motion to dismiss. Mot. Extension Time, ECF No. 35. That motion remains pending. Notwithstanding, Zehala filed his response to the motion to dismiss on

December 23, 2010. ECF No. 37. AmEx filed its reply on December 28, 2010. ECF No. 38. Recently, on August 26, 2011, Zehala filed an additional supplemental memorandum opposing the motion to dismiss. ECF No. 61.

The Court **GRANTS** Zehala's motion for extension of time to file a response, ECF No. 35, and considers his response, ECF No. 37, as timely. The Court, however, will not consider Zehala's additional supplemental memorandum opposing the motion to dismiss, ECF No. 61, because it was filed over ten months after the initial motion to dismiss and because Zehala did not seek leave to file the supplemental memoranda as required by the Local Rules. *See* S.D. Ohio L.R. 7.2(a)(2). While "pro se litigants may be entitled to some latitude when dealing with sophisticated legal issues, acknowledging their lack of formal training, there is no cause for extending this margin to straightforward procedural requirements that a layperson can comprehend as easily as a lawyer." *Jourdan v. Jabe,* 951 F.2d 108, 109 (6th Cir.1991). Although the Court finds it appropriate to grant Zehala's motion for extension in this instance, Zehala is on notice that the Court is unlikely to be as lenient should he fail to comply with the Federal or Local Rules of Civil Procedure in the future.

**\*3** In moving to the substantive matters, AmEx asserts that the claims Zehala brings against it must be dismissed because the FDCPA, the TCPA, and the TSSA are inapplicable to a creditor such as AmEx. The Court will address each argument in turn.

### 1. FDCPA Claims

AmEx first argues that Zehala's claims for violations of the FDCPA, 15 U.S.C. § 1692 *et seq.,* must be dismissed because AmEx is not a debt collector and thus not subject to the statute. Zehala's brief response argues that the principal purpose of AmEx's business could be interpreted as both advancing and collecting debt, thus bringing AmEx within the purview of the FDCPA.

The Court, however, agrees with AmEx that it is not a "debt collector" for purposes of the FDCPA and that the statute therefore does not apply to this case. The FDCPA was enacted to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The statute defines a "debt collector" as:

> any person who uses any instrumentality of interstate commerce orthe mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).

"The term 'debt collector' has a particular meaning, however: it refers only to persons attempting to collect debts due 'another.' " *MacDermid v. Discover Fin. Servs.,* 488 F.3d 721, 735 (6th Cir.2007); *see also Stafford v. Cross Country Bank,* 262 F.Supp.2d 776, 794 (W.D.Ky.2003) (considering it "well-settled" that "a creditor is not a debt collector for the purposes of the FDCPA and creditors are not subject to the FDCPA when collecting their accounts"). "To this, the federal courts are in agreement: A bank that is a creditor is not a debt collector for the purposes of the FDCPA and creditors are not subject to the FDCPA when collecting their accounts." *Montgomery v. Huntington Bank,* 346 F.3d 693, 699 (6th Cir.2003) (internal quotation marks omitted). *See also MacDermid,* 488 F.3d at 735 (credit card company is not a "debt collector" for purposes of FDCPA as it is the "very party to whom the debt is due"); *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 411 (6th Cir.1997) (American Express not a "debt collector" for purposes of the FDCPA).

The Complaint alleges that the debt was incurred by Zehala with AmEx as the creditor. Thus, AmEx was attempting to collect its own debt when, if the allegations are accepted as true, it called and mailed letters to Zehala. Even accepting Zehala's allegation that AmEx both advances credit and collects debt does not bring AmEx within the scope of the FDCPA. While Zehala alleges in his Complaint that AmEx is a "debt collector," more than mere legal conclusions and labels must exist to withstand a Rule 12(b)(6) motion to dismiss. *Twombly,* 550 U.S. at 557. The Complaint contains no allegations of fact to support a plausible inference that AmEx is a debt collector. Thus, Zehala's claims under the FDCPA against AmEx, Counts VI–XVI, are dismissed.

### 2. TCPA Claims

**\*4** AmEx argues that Zehala's claim under the TCPA, Count V, is insufficient because the TCPA is inapplicable to a creditor such as AmEx.[2] Zehala did not respond to AmEx's arguments regarding the inapplicability of the TCPA. However, in reading the Complaint in the light most favorable to Plaintiff, Zehala appears to allege that AmEx violated the TCPA through automatic dialing systems and/or artificial or prerecorded voice message dialers to both his home and cellular phones. As discussed below, the Court agrees that Zehala fails to state a claim with regard to AmEx's calls to his residential line. He does assert, however, a viable claim with regard to calls placed to his cellular phone.

The Telephone Consumer Protection Act, enacted to address certain telemarketing practices that Congress found to be an invasion of consumer privacy, regulates the use of automated telephone equipment. 47 U.S.C. § 227, *et seq.* Section 227(b)(1) of the TCPA provides in pertinent part:

> (1) Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United
>
> States—
>
>> (A) to make any call ... using any automatic telephone dialing system or an artificial or prerecorded voice-
>>
>> (iii) to any telephone number assigned to a paging service, *cellular telephone service,* ... [or]
>>
>> (B) to initiate any telephone call to any *residential telephone line* using an artificial or prerecorded voice to deliver a message without prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B)[.]

47 U.S.C. § 227(b)(1) (emphasis added).

### a. Calls made to Zehala's residential phone

In relevant part, the TCPA states that "[i]t shall be unlawful ... to initiate any telephone call to any residential telephone line ... using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call ... is exempted by rule or order by the [Federal Communications] Commission under paragraph (2)(B)." 47 U.S.C. § 227(b)(1)(B). The Federal Communications Commissions ("FCC") adopted regulations pursuant to § 227(b)(2)(B), which include two exemptions relevant to Zehala's TCPA claims.

First, § 227(b)(1)(B) imposes no liability for a prerecorded call if it "[i]s made for a commercial purpose but does not include or introduce an unsolicited advertisement or constitute telephone solicitation." 47 C.F.R. § 64.1200(a)(2)(iii).

Second, § 227(b)(1)(B) imposes no liability for a prerecorded call if it "[i]s made to any person with whom the caller has an established business relationship at the time the call is made." 47 C.F.R. § 64.1200(a)(2)(iv). *See, e.g., Meadows v. Franklin Collection Serv., Inc.,* Case No. 10–13474, 414 F. App'x 230, 235 (11th Cir. Feb.11, 2011) (quoting 47 C.F.R. 64.1200(a)(2)(iv)). "The FCC has also clarified that 'all debt collection circumstances involve a prior or existing business relationship.'" 7D *Id.* (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 7 FCC Rcd. 8752, 8771–72, ¶ 36 (1992)).

**\*5** Viewing the facts alleged in the Complaint in a light most favorable to Plaintiff, both exceptions apply to the conduct alleged in Zehala's Complaint regarding phone calls to his residential line. Prerecorded telephone calls made for the purpose of debt collection have consistently been found to fit both exemptions for calls not containing "unsolicited advertisement or constitute telephone solicitation" and calls made to a recipient "with whom the caller has an established business

relationship." *See, e.g., Pugliese v. Prof'l Recovery Serv., Inc.,* No. 09–12262, 2010 WL 2632562, at *7 (E.D.Mich. June 29, 2010).

Zehala's Complaint and exhibits establish that he had an established business relationship with AmEx—as debtor and creditor—at the time of the calls. *See, e.g., Sardinas v. Geithner,* 2:10–CVB–501JCM, 2010 WL 2696626, at *3 (D.Nev. July 6, 2010) (dismissing TCPA claim based upon existence of established business relationship with the consumer). Accordingly, the Court grants AmEx's motion to dismiss with regards to Zehala's TCPA claim as based on calls to his residential line.

### b. Calls made to Plaintiff's cellular phone

To state a claim under the TCPA for calls made to a cellular phone, a plaintiff must establish that: (1) a call was made to a cell or wireless phone, (2) by the use of any automatic dialing system or an artificial or prerecorded voice, and (3) without prior express consent of the called party. 47 U.S.C. § 227(b)(1)(A); *see generally Pugliese,* 2010 WL 2632562. Defendant bears the burden of establishing prior consent. *See Pollock v. Bay Area Credit Serv.,* LLC, No. 08–61101–Civ., 2009 WL 2475167, at *9–10 (S.D.Fla. Aug.13, 2009). The FCC stated in a 2008 declaratory ruling that, "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." 23 F.C.C.R. 559, 564.

Zehala alleges that AmEx "used an automatic telephone dialing systems, and/or predictive dialer systems and/or artificial prerecorded voice message auto dialers as defined by the TCPA when calling him regarding the alleged account that caused expense to him such as the result of calling cell phone numbers or other such fees." Compl. ¶ 56. He also states that AmEx "never had and still does not have express permission from Plaintiff to call him at any phone number regarding the alleged account ...." *Id.* ¶ 54.

AmEx does not address Zehala's claim that it violated the TCPA by also calling his cellular phone, nor does it address whether Zehala released his cell phone number to it. Additionally, the Court is aware of no precedential authority demonstrating that the exemption for an established business relationship in section 227(b)(1)(B) applies to claims brought under section 227(b)(1)(A). Rather, the exemption appears to qualify the language of only section 227(b)(1) (B) regarding residential lines. Notably, persuasive authority from other circuits suggests that the exemption for an established business relationship in section 227(b)(1)(B) does not apply to claims brought under section 227(b)(1)(A). *See, e.g., Bentley v. Bank of America, N.A.,* 773 F.Supp.2d 1367 (S.D.Fla.2011).

**\*6** Taking the facts in the light most favorable to Plaintiff, Zehala pleaded that a call was made to a cell phone by the use of any automatic dialing system or an artificial or prerecorded voice and without his prior express consent. Compl. ¶¶ 54, 56. Accordingly, the Court finds Zehala sufficiently pleads a violation of the TCPA under section 227(b)(1)(A)(iii) for calls to his cellular phone to withstand a motion to dismiss.

### 3. TSSA claims

AmEx also asserts that Zehala's TSSA claims must fail because the TSSA is inapplicable to a creditor such as AmEx. Zehala did not respond to AmEx's arguments regarding the inapplicability of the TSSA.

The Court notes that within the 31–page, 337 paragraph Complaint, Zehala mentions the TSSA only once, stating that "Defendants are subject to, and required to abide by, the laws of the United States and the State of Ohio, which include [*inter alia* ] ... the Telephone Solicitation Sales Act...." Compl. ¶ 6. Although Zehala lays out 64 causes of action in the Complaint, each one referencing a state or federal statute, he does not ever cogently state a claim based on an alleged violation of the TSSA. Even though the Court holds Zehala's Complaint to a more lenient standard because he is proceeding pro se, it is not required to parse together any possible claim deriving from a set of facts. Moreover, even if Zehala did assert a plausible claim under the TSSA, supervised financial institutions, such as a bank like AmEx, are exempt from the statute. Ohio

Rev.Code § 4719.01(B)(9). Accordingly the Court grants AmEx's motion to dismiss with regard to any purported TSSA claim.

### III. DEFAULT JUDGMENT

On October 14, 2010, AmEx filed its Answer and counterclaims for, *inter alia,* breach of contract and unjust enrichment against Zehala. ECF No. 9. In its counterclaims, AmEx alleged that Zehala was the holder of a Business Platinum Card that enabled him to charge items to a Business Platinum Card Account (Account No. xxxx–xxxxxx–77002). *Id.* ¶ 3, PAGE ID# 127. AmEx further alleged that Zehala is currently indebted over $29,000 to AmEx and has failed to pay any portion of that amount. *Id.* ¶¶ 12–13, PAGE ID# 129. It brings claims for breach of contract and unjust enrichment seeking judgment in the amount of the debt plus fees. *Id.* ¶¶ 10–24.

On November 9, 2010, AmEx filed an application to the Clerk of Court for an entry of default against Zehala for his failure to serve a responsive pleading to the counterclaims. ECF No. 21. An Entry of Default was entered against Zehala pursuant to Federal Rule of Civil Procedure 55(a). ECF No. 22. The Court notes that AmEx's Motion for Default Judgment, ECF No. 33, is still pending.

Soon thereafter on November 30, 2010, Zehala filed a Motion to Vacate Judgment. ECF No. 29. Pointing to Rule 55(c) which provides that the Court may set aside an entry of default for good cause, Zehala reminds the Court that he is proceeding pro se and argues he inadvertently overlooked the counterclaims at the end of AmEx's Answer and that as soon as he realized his oversight, he filed his motion to vacate judgment. Then, approximately nine months later on August 26, 2011, Zehala filed a motion to dismiss the counterclaims as well as an answer to those counterclaims. Zehala's Mot. Dismiss, ECF No. 58; Zehala's Answer, ECF No. 59. Zehala did not receive leave of court to file either his motion to dismiss or his answer.

**\*7** Rule 55(c) states that a "court may set aside an entry of default for good cause ...." Fed.R.Civ.P. 55(c). "When a [party] seeks relief from a default that has been entered by the clerk upon a [the opposing party's] request, the district court enjoys considerable latitude under the 'good cause shown' standard." *Waifersong, Ltd. v. Classic Music Vending,* 976 F.2d 290, 292 (6th Cir.1992). "In addition, even negligent conduct by a [party] that is "careless and inexcusable" may still qualify for relief under the "good cause" standard required to set aside an entry of default." *Union Cent. Life Ins. Co. v. Anchor Fin. Servs.,* 2010 WL 4642896, at *3 (S.D.Ohio Oct.6, 2010) (citing *Shepard Claims Service, Inc. v. William Darrah & Assocs.,* 796 F.2d 190, 194 (6th Cir.1986)).

The Court evaluates the adequacy of Zehala's showing of cause in light of whether (1) AmEx will be prejudiced; (2) Zehala has a meritorious defense; and (3) Zehala's culpable conduct led to the default. *Berthelsen v. Kane,* 907 F.2d 617, 620 (6th Cir.1990). In the context of setting aside a clerk's entry of default—as opposed to a default judgment-the court balances these factors more leniently to reflect the strong policy preference for trial on the merits. *Shepard Claims Serv., Inc.,* 796 F.2d at 193–94 (6th Cir.1986). And "[a]lthough 'all three factors must be considered in ruling on a motion to set aside an entry of default,' when a [party seeking to set aside the default] has a meritorious defense and the [opposing party] would not be prejudiced, 'it is an abuse of discretion for the district court to deny a Rule 55(c) motion in the absence of a willful failure of the moving party to appear and plead.' " *United States v. $22,050 United States Currency,* 595 F.3d 318, 324 (6th Cir.2010) (quoting *Shepard,* 796 F.2d at 194).

For Rule 55(c)'s purposes, a "meritorious defense" exists if "there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *INVST Fin. Group, Inc. v. Chem–Nuclear Sys., Inc.,* 815 F.2d 391, 399 (6th Cir.1987) (citation omitted). "If a defense is 'good at law,' regardless of the likelihood of success, it will be considered meritorious." *Burrell v. Henderson,* 434 F.3d 826, 834 (6th Cir.2006) (quoting *United Coin Meter Co. v. Seaboard Coastline R.R.,* 705 F.2d 839, 845 (6th Cir.1983)).

Zehala's proposed answer and motion to dismiss, which deny responsibility for the alleged debt, assert, *inter alia,* a statute of limitations defense which qualifies as a "meritorious defense" under the rule. AmEx did not oppose the relief requested by

Zehala and thus makes no argument that it will be prejudiced by the setting aside of the clerk's entry of default. Under these circumstances, the Court finds that Zehala has established "good cause," entitling him to relief from the Clerk's entry of default.

Accordingly, the clerk's entry of default is hereby **VACATED.** Zehala's motion to vacate judgment is **GRANTED IN PART** as it pertains to setting aside the entry of default, but **DENIED AS MOOT** as it pertains to vacating a default judgment because this matter never proceeded to default judgment. ECF No. 29. Additionally, AmEx's motion for default judgment against Zehala is **DENIED.** ECF No. 33.

**\*8** Because Zehala's Motion to Dismiss and Answer to the counterclaims were filed untimely and without leave, ECF Nos. 58 & 59, the Court **GRANTS** AmEx's motion to strike those filings. AmEx Mot. Strike, ECF No. 62.

Zehala shall have fourteen days from the date of this Order to seek leave of Court to file *either an* Answer or a motion to dismiss with respect to AmEx's counterclaims. Zehala is on notice that the Court will not be lenient should he fail to comply with this order and with the Federal Rules of Civil Procedure in the future.

## IV. PACER ACCOUNT

Zehala filed two motions seeking that he be granted a PACER account so that he can file electronically. Mot. Pl. to be Granted a Pacer Account to File Pleadings Electronically, ECF No. 34; Pl.'s Mot. Requesting a PACER Account to File Pleadings Electronically, ECF No. 36.

The Southern District of Ohio's Local Rule 83.5(b) states that "[i]f the Court permits, a party to a pending proceeding who is not represented by an attorney may register as a Filing User solely for the purposes of that action." S.D. Ohio L.R. 83.5(b).

The Court finds that Zehala, like most pro se litigants, is successfully filing documents manually in the Clerk's Office. At this time, the Court does not find cause to permit Zehala to register for electronic filing for this action. Accordingly, Zehala's motions for a PACER account are **DENIED.** ECF Nos. 34 and 36.

## V. CONCLUSION

Based on the above, the Court orders as follows:

1. Defendant American Express' ("AmEx") Motion to Dismiss, ECF No. 10, is **GRANTED IN PART** and **DENIED IN PART.** Zehala's claims against AmEx under the FDCPA, Counts VI–XVI, are **DISMISSED WITH PREJUDICE.** Zehala's claim against AmEx under the TCPA as it pertains to his residential telephone line is **DISMISSED WITH PREJUDICE.** Zehala's claim against AmEx under the TCPA as it pertains to his cellular telephone remains pending.

2. Plaintiffs Motion to Vacate Judgment, ECF No. 29, is **GRANTED IN PART** as it pertains to setting aside the entry of default, but **DENIED AS MOOT** as it pertains to vacating a default judgment because this matter never proceeded to default judgment. The clerk's entry of default, ECF No. 22, is hereby **VACATED.**

3. Defendant AmEx's Motion for Default Judgment, ECF No. 33, is **DENIED.**

4. Plaintiff's Motion for Plaintiff to be Granted a Pacer Account to File Pleadings Electronically, ECF No. 34, is **DENIED.**

5. Plaintiffs Motion for Extension of Time to File Response, ECF No. 35, is **GRANTED,** and his response, ECF No. 27, is considered to be timely.

6. Plaintiff's Motion Requesting a PACER Account to File Pleadings Electronically, ECF No. 36, is **DENIED.**

7. AmEx's Motion to Strike Answer to Counterclaim, ECF No. 62, is **GRANTED.** Zehala's Motion to Dismiss and Strike Exhibits, ECF No. 58, and Zehala's Answer, ECF No. 59, are **STRICKEN.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4484297

Footnotes

1    A motion to dismiss filed under Rule 12(b)(6), subsequent to the filing of an answer, cannot "properly lie because Rule 12(b) requires that '[a] motion making any of these defenses shall be made before pleading.' " *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988) (quoting Fed.R.Civ.P. 12(b)). However, Rule 12(h)(2) of the Federal Rules of Civil Procedure provides that a Rule 12(b)(6) defense may be raised by a motion for judgment on the pleadings pursuant to Rule 12(c). Accordingly, courts will generally construe a post-answer Rule 12(b)(6) motion to dismiss as a Rule 12(c) motion for judgment on the pleadings. *See, e.g., Clarke v. Howard,* No. 405CV1977, 2006 WL 3700238 (N.D.Ohio Dec.8, 2006). Therefore, the Court will consider the instant Rule 12(b)(6) motion as one for judgment on the pleadings and evaluate it pursuant to the standard for dismissal under Rule 12(b) (6). *Id.*

2    AmEx also summarily argues that "the TCPA provides for private causes of action in state court only." Def.'s Mot. Dismiss 7, ECF No. 10. While "[t]he jurisdiction of federal courts over private TCPA claims has been the subject of much debate[,]" the Sixth Circuit definitively held recently that "federal-question jurisdiction [over private TCPA claims] exists under the TCPA." *Charvat v. NMP, LLC, et al.,* ––– F.3d –––, 2011 WL 3805618, at *4 (6th Cir. Aug.30, 2011) (following *Charvat v. Echostar Satellite, LLC,* 630 F.3d 459, 465 (6th Cir.2010)).

---

**End of Document**                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 29

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 270 of 409 PageID 339

KeyCite Yellow Flag - Negative Treatment

Order Clarified by IN THE MATTER OF WESTFAX, INC. PETITION FOR CONSIDERATION AND CLARIFICATION, F.C.C., August 28, 2015

18 FCC Rcd. 14014 (F.C.C.), 18 F.C.C.R. 14014, 29 Communications Reg. (P&F) 830, 2003 WL 21517853

Federal Communications Commission (F.C.C.)

Report and Order

IN THE MATTER OF RULES AND REGULATIONS IMPLEMENTING
THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

CG Docket No. 02-278
FCC 03-153
Adopted: June 26, 2003
Released: July 3, 2003

**\*\*1  \*14014**  By the Commission: Chairman Powell, Commissioners Abernathy, Copps and Adelstein issuing separate statements.

## \*14017  I. INTRODUCTION

1. In this Order, we revise the current Telephone Consumer Protection Act (TCPA) [1] rules and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations. Specifically, we establish with the Federal Trade Commission (FTC) a national do-not-call registry for consumers who wish to avoid unwanted telemarketing calls. The national do-not-call registry will supplement the current company-specific do-not-call rules for those consumers who wish to continue requesting that particular companies not call them. To address the more prevalent use of predictive dialers, we have determined that a telemarketer may abandon no more than three percent of calls answered by a person and must deliver a prerecorded identification message when abandoning a call. The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibits them from blocking such information. The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited fax, and we have clarified when fax broadcasters are liable for the transmission of unlawful facsimile advertisements. We believe the rules the Commission adopts here strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers.

2. It has now been over ten years since the Commission adopted a broad set of rules that respond to Congress's directives in the TCPA. Over the last decade, the telemarketing industry has undergone significant changes in the technologies and methods used to contact consumers. The Commission has carefully reviewed the record developed in this rulemaking proceeding. The record confirms that these marketplace changes warrant modifications to our existing rules, and adoption of new rules if consumers are to continue to receive the protections that Congress intended to provide when it enacted the TCPA. The number of telemarketing calls has risen steadily; the use of predictive dialers has proliferated; and consumer frustration with unsolicited telemarketing calls continues despite the efforts of the states, the Direct Marketing Association (DMA), [2] and the company-specific approach to the problem. Consumers often feel frightened, threatened, and harassed by telemarketing calls. They are angered by hang-ups and "dead air" calls, by do-not-call requests that are not honored, and by unsolicited fax advertisements. Many consumers who commented in this proceeding "want something done" about unwanted solicitation calls, and the vast majority of them support the establishment of a national do-not-call registry. Congress, too, has responded by enacting the Do-Not-Call Implementation Act (Do-Not-Call Act), [3] authorizing the establishment of a national do-not-call registry, and directing this Commission to issue final rules in its second major TCPA proceeding that maximize consistency with those of the FIC.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 271 of 409   PageID 340

**2  *14018  3. The Commission recognizes that telemarketing is a legitimate method of selling goods and services, and that many consumers value the savings and convenience it provides. Thus, the national do-not-call registry that we adopt here will only apply to outbound telemarketing calls and will only include the telephone numbers of consumers who indicate that they wish to avoid such calls. Consumers who want to receive such calls may instead continue to rely on the company-specific do-not-call lists to manage telemarketing calls into their homes. Based on Congress's directives in the TCPA and the Do-Not-Call Act, the substantial record developed in this proceeding, and on the Commission's own enforcement experience, we adopt these amended rules, as described in detail below.

## II. BACKGROUND

### A. Telephone Consumer Protection Act of 1991

4. On December 20, 1991, Congress enacted the TCPA in an effort to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety. [4] The statute restricts the use of automatic telephone dialing systems, artificial and prerecorded messages, and telephone facsimile machines to send unsolicited advertisements. Specifically, the TCPA provides that:
It shall be unlawful for any person within the United States–

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice–

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine; or

*14019  (D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously. [5]

Under the TCPA, those sending fax messages or transmitting artificial or prerecorded voice messages are subject to certain identification requirements. [6] The statute also provides consumers with several options to enforce the restrictions on unsolicited telemarketing, including a private right of action. [7]

**3  5. The TCPA requires the Commission to prescribe regulations to implement the statute's restrictions on the use of autodialers, artificial or prerecorded messages and unsolicited facsimile advertisements. [8] The TCPA also requires the

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 272 of 409   PageID 341

Commission to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights" and to consider several methods to accommodate telephone subscribers who do not wish to receive unsolicited advertisements, including live voice solicitations. [9]  Specifically, section 227(c)(1) requires the Commission to "compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages." [10]  The TCPA specifically authorizes the Commission to "require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone **14020** solicitations." [11]

## B. TCPA Rules

6. In 1992, the Commission adopted rules implementing the TCPA, including the requirement that entities making telephone solicitations institute procedures for maintaining do-not-call lists. [12]  Pursuant to the Commission's rules, a person or entity engaged in telemarketing is required to maintain a record of a called party's request not to receive future solicitations for a period of ten years. [13]  Telemarketers must develop and maintain written policies for maintaining their lists, [14]  and they are required to inform their employees of the list's existence and train them to use the list. [15]  Commission rules prohibit telemarketers from calling residential telephone subscribers before 8 a.m. or after 9 p.m. [16]  and require telemarketers to identify themselves to called parties. [17]  As mandated by the TCPA, the Commission's rules also establish general prohibitions against autodialed calls being made without prior express consent to certain locations, including emergency lines or health care facilities, [18]  the use of prerecorded or artificial voice message calls to residences, [19]  line seizure by prerecorded messages, [20]  and the transmission of unsolicited advertisements by facsimile machines. [21]  The TCPA rules provide that facsimile and prerecorded voice transmissions, as well as telephone facsimile machines, must meet specific identification requirements. [22]

7. In 1995 and 1997, the Commission released orders addressing petitions for reconsideration of the *1992 TCPA Order*. In a Memorandum Opinion and Order released on  **14021**  August 7, 1995, the Commission exempted from its TCPA rules calls made on behalf of tax-exempt nonprofit organizations, clarified treatment of debt collection calls, and required telemarketers to honor a do-not-call request for a period of ten years. [23]  The Commission also extended its TCPA rules to respond to technical advances in computer-based facsimile modems that enable solicitors to become "fax broadcasters." [24]  On April 10, 1997, the Commission issued an Order on Further Reconsideration requiring that all facsimile transmissions contain the identifying information of the business, other entity, or individual creating or originating the facsimile message, rather than the entity that transmits the message. [25]

## C. Marketplace Changes Since 1992

 **\*4**  8. The marketplace for telemarketing has changed significantly in the last decade. When the TCPA was enacted in 1991, Congress determined that 300,000 solicitors were used to telemarket goods and services to more than 18 million Americans every day. [26]  Congress also found that in 1990 sales generated through telemarketing amounted to $435 billion dollars. [27]  Some estimate that today telemarketers may attempt as many as 104 million calls to consumers and businesses every day, [28]  and that telemarketing calls generate over $600 billion in sales each year. [29]  The telemarketing industry is considered the single largest direct marketing system in the  **14022**  country, representing 34.6% of the total U.S. sales attributed to direct marketing. [30]  The number of telemarketing calls, along with the increased use of various technologies to contact consumers, has heightened public concern about unwanted telemarketing calls and control over the telephone network. Autodialers can deliver prerecorded messages to thousands of potential customers every day. Predictive dialers, [31]  which initiate phone calls while telemarketers are

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 273 of 409   PageID 342

talking to other consumers, frequently abandon calls before a telemarketer is free to take the next call. [32] Using predictive dialers allows telemarketers to devote more time to selling products and services rather than dialing phone numbers, but the practice inconveniences and aggravates consumers who are hung up on. Despite a general ban on faxing unsolicited advertisements, [33] and aggressive enforcement by the Commission, [34] faxed advertisements also have proliferated, as facsimile service providers (or "fax broadcasters") enable sellers to send advertisements to multiple destinations at relatively little cost. These unsolicited faxes impose costs on consumers, result in substantial inconvenience and disruption, and also may have serious implications for public safety. [35]

#### *14023  D. FTC National Do-Not-Call Registry and Telemarketing Rules

9. In response to these changes in the marketplace, the FTC recently amended its own rules to better protect consumers from deceptive and abusive telemarketing practices, including those that may be abusive of consumers' interest in protecting their privacy. On December 18, 2002, the FTC released an order adopting a national do-not-call registry to be maintained by the federal government to help consumers avoid unwanted telemarketing calls. In that order, the FTC Also adopted other changes to its Telemarketing Sales Rule (TSR), which are based on its authority under the 1994 Telemarketing Consumer Fraud and Abuse Prevention Act. [36] The FTC's amended TSR supplements its current company-specific do-not-call rules with a provision allowing consumers to stop unwanted telemarketing calls by registering their telephone numbers with a national do-not-call registry at no cost. Telemarketers will be required to pay fees to access the database and to "scrub" their calling lists of the telephone numbers in the database. [37] The FTC's list will not cover those entities over which it has no jurisdiction, including common carriers, banks, credit unions, savings and loans, companies engaged in the business of insurance, and airlines. [38] It also will not apply to intrastate telemarketing calls. In addition, the FTC concluded that nonprofit organizations are not subject to the national do-not-call list; however, they must, when using for-profit telemarketers, comply with the company-specific do-not-call rules. [39]

**5  10. The FTC indicated in its order that it does not intend the national do-not-call registry to preempt state do-not-call laws. Instead, it will allow all states, and the DMA if it so desires, to download into the national registry the telephone numbers of consumers on their lists. The FTC anticipates a relatively short transition period leading to one harmonized registry, and *14024  said that it will work with the states to coordinate implementation, minimize duplication, and maximize efficiency for consumers. [40] The FTC has also announced that online registration for the do-not-call registry will be available nationwide on or around July 1, 2003. Telephone registration will be open on the same date for consumers in states west of the Mississippi River and open to the entire country on July 8, 2003. On October 1, 2003, the FTC and the States will begin enforcing the national do-not-call provisions of the amended TSR. [41]

11. The FTC also adopted new rules on the use of predictive dialers and the transmission of caller ID information. The amended TSR prohibits telemarketers from abandoning any outbound telephone call, and provides in a safe harbor provision, that to avoid liability, a telemarketer must, among several other requirements, abandon no more than three percent of all calls answered by a person. [42] Telemarketers will also be required to transmit the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service. [43]

#### E. State Do-Not-Call Lists

12. A growing number of states have also adopted or are considering legislation to establish statewide do-not-call lists. To date, 36 states have passed "do-not-call" statutes, [44] and numerous others have considered similar bills. [45] Consumers remain enthusiastic about do-not-call lists, as they continue to register their telephone numbers with state lists. [46] State do-not-call *14025  lists vary in the methods used for collecting data, the fees charged, and the types of entities required to comply with their restrictions. Some state statutes provide for state-managed do-not-call lists, while others require telemarketers to use the

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 274 of 409 PageID 343

Direct Marketing Association's Telephone Preference Service.[47] In some states, residents can register for the do-not-call lists at no charge.[48] In others, telephone subscribers must pay a fee. For example, Georgia requires its residents to pay $5 to place their phone numbers on the do-not-call list for a period of two years.[49] To register with the Texas do-not-call list, residents must pay $2.25 for three years.[50] In most states, telemarketers must pay to access the state do-not-call list if they wish to call residents in that state; however, such access fees vary from state to state. In Oregon, telemarketers must pay $120 per year to obtain the state do-not-call list;[51] in Missouri, the fee is $600 per year, although telemarketers can pay less if they want only numbers from certain area codes.[52] The state "do-not-call" statutes provide varying exceptions to their requirements.

**6 13. As state legislatures continue to consider their own do-not-call laws, others have, in anticipation of the national do-not-call registry, begun the process of harmonizing their lists with the national list. The Illinois legislature, for example, passed a bill to reconcile differences between the state and federal no-call laws. The measure would make the FTC's national no-call list the official state list for Illinois and would direct the Illinois Commerce Commission to work with local exchange providers on how to inform consumers about the existence of the list.[53] California's Attorney General's office is allowing residents to pre-register for the national registry on the internet, and says it will deliver the pre-registered California telephone numbers to the FTC as soon as it is ready to receive them.[54] The FTC indicated in its order that it will take some time to harmonize the various state do-not-call registries with the national registry.[55] While **14026 some states will be able to transfer their state "do-not-call" registration information by the time telemarketers first gain access to the national registry, other states may need from 12 to 18 months to achieve those results.[56]

### F. Notice of Proposed Rulemaking

14. On September 18, 2002, the Commission released a Memorandum Opinion and Order and Notice of Proposed Rulemaking seeking comment on whether the Commission's rules need to be revised in order to carry out more effectively Congress's directives in the TCPA.[57] Specifically, we sought comment on whether to revise or clarify our rules governing unwanted telephone solicitations[58] and the use of automatic telephone dialing systems,[59] prerecorded or artificial voice messages,[60] and telephone facsimile machines.[61] We also sought comment on the effectiveness of company-specific do-not-call lists.[62] In addition, we sought comment on whether to revisit the option of establishing a national do-not-call list[63] and, if so, how such action might be taken in conjunction with the FTC's proposal to adopt a national do-not-call list and with various state do-not-call lists.[64] Lastly, we sought comment on the effect proposed policies and rules would have on small business entities, including *inter alia* those that engage in telemarketing activities and those that rely on telemarketing as a method to solicit new business.[65] Following the FTC's announcement that it had amended its TSR, the Commission extended the reply comment period in this proceeding to ensure that all interested parties had ample opportunity to comment on possible Commission action in light of the FTC's new rules.[66]

### *14027 G. Do-Not-Call Implementation Act

15. On March 11, 2003, the Do-Not-Call Act was signed into law, authorizing the FTC to collect fees from telemarketers for the implementation and enforcement of a do-not-call registry. The Do-Not-Call Act also requires the FCC to issue a final rule in its ongoing TCPA proceeding within 180 days of enactment, and to consult and coordinate with the FTC to "maximize consistency" with the rule promulgated by the FTC. Congress recognized that because the FCC is bound by the TCPA, it would not be possible for the FCC to adopt rules that are identical to those of the FTC in every instance.[67] In those instances where such inconsistencies exist, Congress stated that either the FTC or FCC must address them administratively or Congress must address them legislatively.[68] The FTC's recent rule changes expand that agency's regulation of telemarketing activities and require coordination to ensure consistent and non-redundant federal enforcement. The FCC's jurisdiction over telemarketing practices, however, is significantly broader than the FTC's. The FCC staff intends to negotiate a Memorandum of Understanding

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 275 of 409   PageID 344

between the respective agencies to achieve an efficient and effective enforcement strategy that will promote compliance with federal regulations. The FCC is required to report to Congress within 45 days after the issuance of final rules in this proceeding, and annually thereafter. [69]  The Commission released a Further Notice of Proposed Rulemaking on March 25, 2003, seeking comment on the Do-Not-Call Act's requirements. [70]  By this Order, we are complying with Congress's directives to issue final rules in our TPCA proceeding within 180 days of the Do-Not-Call Act's enactment. Furthermore, we have consulted and coordinated with the FTC to adopt a national do-not-call list and other telemarketing rules that maximize consistency with the FTC's amended Telemarketing Sales Rule. [71]  Pursuant to the requirements of the Do-Not-Call Act, the Commission will note the remaining inconsistencies between the FCC and FTC rules in the report to Congress. The Commission will also continue to work, within the framework of the TCPA, to maximize consistency with the FTC's rules.

**\*14028  III. NATIONAL DO-NOT-CALL LIST**

**A. Background**

**\*\*7**  16. _Section 227._  The TCPA requires the Commission to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. [72]  In so doing, section 227(c)(1) directs the Commission to "compare and evaluate alternative methods and procedures" including the use of electronic databases and other alternatives in protecting such privacy rights. [73]  Pursuant to section 227(c)(3), the Commission "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase." [74]  If the Commission determines that adoption of a national database is warranted, section 227(c)(3) enumerates a number of specific statutory requirements that must be satisfied. [75]  Additionally, section 227(c)(4) requires the Commission to consider the different needs of telemarketers operating on a local or regional basis and small businesses. [76]  In addition to our general authority over interstate communications, section 2(b) of the Communications Act specifically provides the Commission with the authority to apply section 227 to intrastate communications. [77]

17. _TCPA Order and 2002 Notice._  The Commission initially considered the possibility of adopting a national do-not-call database in the 1992 _TCPA Order_. At that time, the Commission declined to adopt a national do-not-call registry citing concerns that such a database would be costly and difficult to establish and maintain in a reasonably accurate form. [78]  The Commission noted that frequent updates would be required, regional telemarketers would be forced to purchase a national database, costs might be passed on to consumers, and the information compiled could present problems in protecting consumer privacy. The Commission opted instead to implement an alternative approach requiring commercial telemarketers to maintain their own company-specific lists of consumers who do not wish to be called. [79]

18. In the _2002 Notice_, the Commission sought comment on whether to revisit its  **\*14029**  1992 determination not to adopt a national do-not-call list. [80]  As evidenced by the persistent consumer complaints regarding unwanted telephone solicitations, the Commission concluded that the time was ripe to revisit this issue as part of its overall review of the TCPA rules. [81]  In so doing, the Commission noted that the increasing number of telemarketing calls over the last decade, along with the increased use of various technologies, such as predictive dialers, to contact consumers, has heightened public concern about unwanted telemarketing calls and control over the telephone network. [82]  The Commission also noted that technological innovations may make the creation and maintenance of a national do-not-call database more viable than in the past. Therefore, the Commission sought comment on whether a national do-not-call list should be adopted and, if so, how such a list could be implemented in the most efficient and effective manner for consumers, businesses, and regulators. The Commission noted that a national list would provide consumers with a one-step method for preventing unwanted telemarketing calls. This option could be less burdensome for consumers than repeating requests on a case-by-case basis, particularly in light of the number of entities that conduct telemarketing today. In particular, the Commission sought comment on: (1) whether the cost, accuracy, and privacy

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 276 of 409   PageID 345

concerns noted in 1992 remain relevant today; (2) the effectiveness of the company-specific list in protecting consumer privacy rights; (3) changes in the technology or the marketplace that might influence this analysis; (4) the constitutionality of a national database; (5) satisfying the statutory requirements of section 227(c); and (6) the potential relationship of a national database with the FTC's proposed rules and various state-adopted do-not-call registries. [83]

**\*\*8** 19. The issues relating to the adoption and implementation of a national do-not-call registry generated extensive comment from consumers, businesses, and state governments. Individual consumers and consumer interest groups overwhelmingly support the adoption of a national do-not-call list. [84] In fact, several commenters support more restrictive alternatives such as adopting an "opt-in" list for those consumers that wish to receive telephone solicitations. [85] **\*14030** Commenters supporting a national do-not-call list cite the numerous and increasing receipt of unwanted telephone solicitation calls; inadequacies of the company-specific approach due to the failure of many telemarketers to honor do-not-call requests or, the impossibility of relaying such requests in the case of "dead air" or hang-up calls initiated by predictive dialers; the burdens of making do-not-call requests for every such call, particularly on the elderly and individuals with disabilities; and the costs imposed on consumers in acquiring technologies to reduce the number of unwanted calls. [86] Many such commenters argue that unwanted telephone solicitations have reached the point of harassment that constitutes an invasion of privacy within their homes. [87] Others indicate that consumers are often frightened by dead-air and hang-up calls generated by predictive dialers believing they are being stalked. [88] Several consumers indicate that they no longer answer their telephones or they disconnect the phone during the day to avoid telemarketing calls. These commenters support the adoption of a one-step option for those consumers that desire to reduce the number of unwanted solicitation calls that they receive each day.

20. Many consumers indicate that their state lists have reduced the number of unwanted calls that they receive and express concern that any federal do-not-call registry not undermine the protections afforded by the state do-not-call laws. [89] Assuming that a national do-not-call database is adopted, commenters encourage the Commission to work closely with the FTC to adopt a single national registry that operates as consistently and efficiently as possible for all interested parties. [90] State regulators generally support a national database provided that it does not preempt state do-not-call rules or preclude the states from enforcing these laws. [91]

21. Industry representatives generally oppose the adoption of a national do-not-call database, but some support this approach provided the Commission adopts an established business relationship exemption and preempts state lists. [92] These commenters contend that the **\*14031** concerns noted by the Commission in 1992, including the costs, accuracy, and privacy issues involved in creating and maintaining such a database remain valid today. [93] In addition, industry commenters argue that a national do-not-call database is not necessary because the current rules are sufficient to protect consumer privacy rights. [94] Several note the economic importance of telemarketing and indicate that a national registry would have severe economic consequences for their industry. [95] Several industry representatives request specific exemptions from the national do-not-call requirements for newspapers, magazines, insurance companies and small businesses. [96] These commenters contend that they provide valuable goods or services to the public and that telemarketing is the most cost-effective means to promote those services. [97] Representatives of various non-profit organizations oppose any extension of the national do-not-call rules to their organizations. [98] Several commenters argue that a national registry would impose an unconstitutional restriction on commercial speech. [99] They urge more stringent enforcement of the Commission's current rules.

**\*\*9** 22. *FTC Order*. On December 18, 2002, the FTC released an order establishing a national do-not call registry. [100] The FTC cited an extensive record that revealed that the current rules on telemarketing were not sufficient to protect consumer privacy. The FTC's do-not-call rules provide several options for consumers to manage telemarketing calls - one of which is to allow consumers who do not want to receive telephone solicitation calls to register their telephone number with a national do-not-call database. [101] The FTC indicates that consumers may do so at no cost by two methods: either through a toll-free call

from the phone number that they **\*14032** wish to register or over the Internet. [102] Consumer registrations will remain valid for a period of five years, with the registry purged on a monthly basis of numbers that have been disconnected or reassigned. Each seller engaged in telemarketing or on whose behalf telemarketing is conducted will be required to pay an annual fee for access to the database based on the number of area codes of data that the company wishes to access. [103] The only consumer information that telemarketers will receive from the national registry is the registrants' telephone numbers. The FTC's rules prohibit the sale, purchase, rental, lease, or use of the national registry for any purpose other than compliance with the do-not-call provision. [104]

23. The FTC's national do-not-call rules will not apply to those entities over which it has no jurisdiction, including common carriers, banks, insurance companies, and airlines. The FTC rules also will not apply to intrastate telemarketing calls. In addition, the FTC exempts certain types of calls from the national do-not-call provisions. Specifically, the FTC has established exemptions for calls made by or on behalf of charitable organizations, [105] calls to consumers with whom the seller has an "established business relationship" [106] (as long as the consumer has not asked to be placed on the seller's company-specific do-not-call list), and calls to businesses. The FTC also decided to retain the provision of its rules that allows sellers to obtain the express agreement of consumers who wish to receive calls from that seller. The FTC requires that such express agreement be evidenced by a signed, written agreement. As a result, consumers registered on the national do-not-call list may continue to receive calls from those sellers that have acquired their express agreement. The FTC also adopted a "safe harbor" from liability under its do-not-call provisions concluding that sellers or telemarketers that have made a good faith effort to provide consumers with an opportunity to exercise their do-not-call rights **\*14033** should not be liable for violations that result from an error. [107] The FTC clarified that because wireless subscribers are often charged for the calls they receive, they will be allowed to register their wireless telephone numbers on the national do-not-call database.

**\*\*10** 24. The FTC concluded that it does not intend its rules establishing a national do-not-call registry to preempt state do-not-call laws. The FTC indicated its desire to work with those states that have enacted such laws, as well as this Commission, to articulate requirements and procedures during what it anticipates will be a relatively short transition period leading to one harmonized registry system. The FTC has articulated a goal whereby consumers, in a single transaction, can register their requests not to receive calls to solicit sales of goods or services, and sellers and telemarketers can obtain a single list to ensure that they do not contravene consumer requests not to be called. [108]

**B. Discussion**

25. As discussed in greater detail below, we conclude that the record compiled in this proceeding supports the establishment of a single national database of telephone numbers of residential subscribers who object to receiving telephone solicitations. Consistent with the mandate of Congress in the Do-Not-Call Act, the national do-not-call rules that we establish in this order "maximize consistency" with those of the FTC. [109] The record clearly demonstrates widespread consumer dissatisfaction with the effectiveness of the current rules and network technologies available to protect consumers from unwanted telephone solicitations. [110] Indeed, many consumers believe that with the advent of such technologies as predictive dialers that the vices of telemarketing have become inherent, while its virtues remain accidental. We have compared and evaluated alternative methods to a national do-not-call list for protecting consumer privacy rights and conclude that these alternatives are costly and/or ineffective for both telemarketers and consumers. [111]

26. A national do-not-call registry that is supplemented by the amendments made to our existing rules will provide consumers with a variety of options for managing telemarketing calls. Consumers may now: (1) place their number on the national do-not-call list; (2) continue to make do-not-call requests of individual companies on a case-by-case basis; and/or (3) register on the national list, but provide specific companies with express permission to call them. **\*14034** Telemarketers may continue to call individuals who do not place their numbers on a do-not-call list and consumers with whom they have an established business relationship. We believe this result is consistent with Congress' directive in the TCPA that "[i]ndividuals' privacy rights, public

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 278 of 409   PageID 347

safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices." [112]

27. We agree with Congress that consistency in the underlying regulations and administration of the national do-not-call registry is essential to avoid consumer confusion and regulatory uncertainty in the telemarketing industry. In so doing, we emphasize that there will be one centralized national do-not-call database of telephone numbers. The FTC has set up and will maintain the national database, while both agencies will coordinate enforcement efforts pursuant to a forthcoming Memorandum of Understanding. [113] The states will also play an important role in the enforcement of the do-not-call rules. The FTC has received funding approval from Congress to begin implementation of the national do-not-call registry. Because the FTC lacks jurisdiction over certain entities, including common carriers, banks, insurance companies, and airlines, those entities would be allowed to continue calling individuals on the FTC's list absent FCC action exercising our broad authority given by Congress over telemarketers. In addition, the FTC's jurisdiction does not extend to intrastate activities. Action by this Commission to adopt a national do-not-call list, as permitted by the TCPA, requires all commercial telemarketers to comply with the national do-not-call requirements, thereby providing more comprehensive protections to consumers and consistent treatment of telemarketers.

## 1. National Do-Not-Call Registry

**11** 28. Pursuant to our authority under section 227(c), we adopt a national do-not-call registry that will provide residential consumers with a one-step option to prohibit unwanted telephone solicitations. This registry will be maintained by the FTC. Consistent with the FTC's determination, the national registry will become effective on October 1, 2003. [114] Subject to the exemptions discussed below, telemarketers will be prohibited from contacting those consumers that register their telephone numbers on the national list. In reaching this conclusion, we agree with the vast majority of consumers in this proceeding and the FTC that a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations. In response to the widespread consumer dissatisfaction with telemarketing practices, Congress has recently affirmed its support of a national do-not-call registry in approving funding for the FTC's national database. [115] In so doing, Congress has **14035** indicated that this Commission should adopt rules that "maximize consistency" with those of the FTC. [116] The record in this proceeding is replete with examples of consumers that receive numerous unwanted calls on a daily basis. [117] The increase in the number of telemarketing calls over the last decade combined with the widespread use of such technologies as predictive dialers has encroached significantly on the privacy rights of consumers. [118] For example, the effectiveness of the protections afforded by the company-specific do-not-call rules have been reduced significantly by dead air and hang-up calls that result from predictive dialers. In these situations, consumers have no opportunity to invoke their do-not-call rights and the Commission cannot pursue enforcement actions. As detailed previously, such intrusions have led many consumers to disconnect their phones during portions of the day or avoid answering their telephones altogether. The adoption of a national do-call-list will be an important tool for consumers that wish to exercise control over the increasing number of unwanted telephone solicitation calls.

29. Although some industry commenters attempt to characterize unwanted solicitation calls as petty annoyances and suggest that consumers purchase certain technologies to block unwanted calls, the evidence in this record leads us to believe the cumulative effect of these disruptions in the lives of millions of Americans each day is significant. As a result, we conclude that adoption of a national do-not-call list is now warranted. We believe that consumers should, at a minimum, be given the opportunity to determine for themselves whether or not they wish to receive telephone solicitation calls in their homes. The national do-not-call list will serve as an option for those consumers who have found the company-specific list and other network technologies ineffective. The telephone network is the primary means for many consumers to remain in contact with public safety organizations and family members during times of illness or emergency. Consumer frustration with telemarketing practices has reached a point in which many consumers no longer answer their telephones while others disconnect their phones during some hours of the day to maintain their privacy. We agree with consumers that incessant telephone solicitations are especially burdensome for the elderly, disabled, and those that work non-traditional hours. [119] Persons with disabilities are often unable

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 279 of 409   PageID 348

to register do-not-call requests on many company-specific lists because many telemarketers lack the equipment necessary to **\*14036** receive that request. [120] Given the record evidence, along with Congress's recent affirmative support for a national do-not-call registry, we adopt a national do-not-call registry. [121] As discussed more fully below, however, we are mindful of the need to balance the privacy concerns of consumers with the interests of legitimate telemarketing practices. Therefore, we have provided for certain exemptions to the national do-not-call registry.

**\*\*12** 30. While we agree that concerns regarding the cost, accuracy, and privacy of a national do-not-call database remain relevant, we believe that circumstances have changed significantly since the Commission first reviewed this issue over a decade ago such that they no longer impose a substantial obstacle to the implementation of a national registry. As several commenters in this proceeding note, advances in computer technology and software now make the compilation and maintenance of a national database a more reasonable proposition. [122] In addition, considerable experience has been gained through the implementation of many state do-not-call lists. In 1992, it was estimated by some commenters that the cost of establishing such a list in the first year could be as high as $80 million. As noted above, Congress has recently reviewed and approved the FTC's request for $18.1 million to fund the national do-not-call list. [123] We believe that the advent of more efficient technologies and the experience acquired in dealing with similar databases at the state level is responsible for this substantial reduction in cost.

31. Similarly, we believe that technology has become more proficient in ensuring the accuracy of a national database. The FTC indicates that to guard against the possibility of including disconnected or reassigned telephone numbers, technology will be employed on a monthly basis to check all registered telephone numbers against national databases, and remove those numbers that have been disconnected or reassigned. [124] The length of time that registrations remain valid also directly affects the accuracy of the registry as telephone numbers change hands over time. As discussed more fully below, we conclude that the retention period for both the national and company-specific do-not-call requests will be five years. [125] This is consistent with the FTC's determination and our own record that reveals that the current ten-year retention **\*14037** period for company-specific requests is too long given changes in telephone numbers. Consumers must also register their do-not-call requests from either the telephone number of the phone that they wish to register or via the Internet. The FTC will confirm the accuracy of such registrations through the use of automatic number identification (ANI) [126] and other technologies. We believe that a five-year registration period coupled with a monthly purging of disconnected telephone numbers adequately balances the need to maintain accuracy in the national registry with any burden imposed on consumers to re-register periodically their telephone numbers.

32. We conclude that appropriate action has been taken to ensure the privacy of those registering on the national list. Specifically, the only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number. [127] This is the minimum amount of information that can be provided to implement the national registry. We note that the majority of telephone numbers are publicly available through telephone directories. To the extent that consumers have an unlisted number, the consumer will have to make a choice as to whether they prefer to register on a national do-not-call list or maintain complete anonymity. We reiterate, however, that the only information that will be provided to the telemarketer is the telephone number of the consumer. [128] No corresponding name or address information will be provided. We believe that this approach reduces the privacy concerns of such consumers to the greatest extent possible. As an additional safeguard, we find that restrictions should be imposed on the use of the national list. Consistent with the FTC's determination and section 227(c)(3) (K), we conclude that no person or entity may sell, rent, lease, purchase, or use the national do-not-call database for any purpose except compliance with section 227 and any such state or federal law to prevent telephone solicitations to telephone numbers on such list. [129] We conclude that these safeguards adequately protect the privacy rights of those consumers who choose to register on the national do-not-call list.

**\*\*13** 33. We conclude that the national database should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act. In so doing, we agree with the FTC and several commenters that wireless subscribers should not be excluded from the protections of the TCPA, particularly the option to register on a national-do-not-call list. [130] Congress has indicated its intent to provide **\*14038** significant protections under

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 280 of 409    PageID 349

the TCPA to wireless users. [131] Allowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA, including protection for wireless subscribers from unwanted telephone solicitations for which they are charged.

34. Nextel argues, however, that, because the "TCPA only authorizes the Commission to regulate solicitations to 'residential telephone subscribers,'" wireless subscribers may not participate in the do-not-call list. [132] Nextel states we should define "residential subscribers" to mean "telephone service used primarily for communications in the subscriber's residence." [133] However, Nextel's application would result in "[a]t most, the Commission [having the] authority to regulate solicitations to wireless subscribers in those circumstances where wireless service actually has displaced a residential land line, and functions as a consumer's primary residential telephone service." [134]

35. Nextel's definition of "residential subscribers" is far too restrictive and inconsistent with the intent of section 227. Specifically, there is nothing in section 227 to suggest that only a customer's "primary residential telephone service" was all that Congress sought to protect through the TCPA. In addition, had Congress intended to exclude wireless subscribers from the benefits of the TCPA, it knew how to address wireless services or consumers explicitly. For example, in section 227(b)(1), Congress specifically prohibited calls using automatic telephone dialing systems or artificial or prerecorded voice to telephone numbers assigned to "paging service [or] cellular telephone service ...." Moreover, under Nextel's definition, even consumers who use their wireless telephone service in their homes to supplement their residential wireline service, such as by using their wireless telephone service to make long distance phone calls to avoid wireline toll charges, would be excluded from the protections of the TCPA. Such an interpretation is at odds even with Nextel's own reasoning for its definition - that the TCPA's goal is "to curb the 'pervasive' use of telemarketing 'to market goods and services to the home'." [135] As described, it is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones. [136] **14039** Indeed, as even Nextel recognizes, there is a growing number of consumers who no longer maintain wireline phone service, and rely only on their wireless telephone service. Thus, we are not persuaded by Nextel's arguments.

**14** 36. Moreover, we believe it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections. As indicated above, Congress afforded wireless subscribers particular protections in the context of autodialers and prerecorded calls. [137] In addition, although Congress expressed concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers. [138] Therefore, we conclude that wireless subscribers may participate in the national do-not-call list. As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers." [139] Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.

37. We emphasize that it is not our intent in adopting a national do-not-call list to prohibit legitimate telemarketing practices. We believe that industry commenters present a false choice between the continued viability of the telemarketing industry and the adoption of a national do-not-call list. We are not persuaded that the adoption of a national do-not-call list will unduly interfere with the ability of telemarketers to contact consumers. Many consumers will undoubtedly take advantage of the opportunity to register on the national list. Several industry commenters suggest, however, that consumers derive substantial benefits from telephone solicitations. If so, many such consumers will choose not to register on the national do-not-call list and will opt instead to make do-not-call requests on a case-by-case basis or give express permission to be contacted by specific companies. [140] In addition, as discussed further below, we have provided for certain exemptions to the do-not-call registry in recognition of legitimate telemarketing business practices. For example, sellers of goods or services via telemarketing may continue to contact consumers on the national list with whom they have an established business relationship. We also note that calls that do not fall within the definition of "telephone **14040** solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list. These may include surveys, market research, political or religious speech calls. [141] The national

do-not-call rules will also not prohibit calls to businesses and persons with whom the marketer has a personal relationship. Telemarketers may continue to contact all of these consumers despite the adoption of a national do-not-call list. Furthermore, we decline to adopt more restrictive do-not-call requirements on telemarketers as suggested by several commenters. For example, we decline to adopt an "opt-in" approach that would ban telemarketing to any consumer who has not expressly agreed to receive telephone solicitations. We believe that establishing such an approach would be overly restrictive on the telemarketing industry. As discussed more fully below, we also decline to extend the national do-not-call requirements to tax-exempt nonprofit organizations or entities that telemarket on behalf of nonprofit organizations.

**\*\*15** 38. We agree with the FTC that a safe harbor should be established for telemarketers that have made a good faith effort to comply with the national do-not call rules. [142] A seller or telemarketer acting on behalf of the seller that has made a good faith effort to provide consumers with an opportunity to exercise their do-not-call rights should not be liable for violations that result from an error. Consistent with the FTC, we conclude that a seller or the entity telemarketing on behalf of the seller will not be liable for violating the national do-not-call rules if it can demonstrate that, as part of the seller's or telemarketer's routine business practice: (i) it has established and implemented written procedures to comply with the do-not-call rules; (ii) it has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to the do-not-call rules; (iii) the seller, or telemarketer acting on behalf of the seller, has maintained and recorded a list of telephone numbers the seller may not contact; (iv) the seller or telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to the do-not-call rules employing a version of the do-not-call registry obtained from the administrator of the registry no more than three months prior to the date any call is made, and maintains records documenting this process; and (v) any subsequent call otherwise violating the do-not-call rules is the result of error. [143] We acknowledge that the three-month safe harbor period for telemarketers may prove to be too long to benefit some consumers. The national do-not-call list has the capability to process new registrants virtually instantaneously and telemarketers will have the capability to download the list at any time at no extra cost. The Commission intends to carefully monitor the impact of this requirement pursuant to its annual report to Congress and may consider a shorter time frame in the future.

**\*14041** 39. As required by section 227(c)(1)(A), we have compared and evaluated the advantages and disadvantages of certain alternative methods to protect consumer privacy including the use of network technologies, special directory markings, and company-specific lists in adopting a national do-not-call database. [144] As noted below, the effectiveness of the company-specific approach has significantly eroded as a result of hang-up and "dead air" calls from predictive dialers. Consumers in these circumstances have no opportunity to assert their do-not-call rights. As discussed more fully below, we believe that, as a stand-alone option, the company-specific approach no longer provides consumers with sufficient privacy protections. We also conclude that the availability of certain network technologies to reduce telephone solicitations is often ineffective and costly for consumers. Although technology has improved to assist consumers in blocking unwanted calls, it has also evolved in such a way as to assist telemarketers in making greater numbers of calls and even circumventing such blocking technologies. [145] Millions of consumers continue to register on state do-not-call lists despite the availability of such technologies. Several commenters note that they continue to receive unwanted calls despite paying for technologies to reduce telephone solicitations. [146] Several commenters also note that telemarketers routinely block transmission of caller ID. In particular, we are concerned that the cost of technologies such as caller ID, call blocking, and other such tools in an effort to reduce telemarketing calls fall entirely on the consumer. We believe that reliance on a solution that places the cost of reducing the number of unwanted solicitation calls entirely on the consumer is inconsistent with Congress' intent in the TCPA. [147] For the reasons outlined in the *1992 TCPA Order*, we also decline to adopt special area codes or prefixes for telemarketers. [148] We believe this option is costly for telemarketers that would be required to change their telephone numbers and administratively burdensome to implement. We also decline to adopt special directory markings of area white page directories because it would require telemarketers to purchase and review thousands of local telephone directories, at great cost to the telemarketers. [149] We also note that telemarketers often compile solicitation lists from many sources other than local telephone directories. In addition, such directories do not include unlisted or unregistered telephone numbers and are often updated infrequently. We also note that the record in this proceeding provides little support for this option.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 282 of 409   PageID 351

**16   *14042**  40. We now review the other requirements of section 227(c)(1). As required by section 227(c)(1)(B), we have evaluated AT&T Government Solutions, the entity selected by the FTC to administer the national database, and conclude that it has the capacity to establish and administer the national database. [150] Congress has reviewed and approved funding for the implementation of that database. We believe that it is unnecessary to evaluate any other such entities at this time. As discussed in greater detail below, we have considered whether different methods and procedures should apply for local telephone solicitations and small businesses as required by section 227(c)(1)(C). [151] For the reasons outlined below, we conclude that the national do-not-call database takes into consideration the costs of those conducting telemarketing on a local or regional basis, including many small businesses. In particular, we note that the national do-not-call database will permit access to five or fewer area codes at no cost to the seller. Pursuant to section 227(c)(1)(D), we have considered whether there is a need for additional authority to further restrict telephone solicitations. We conclude that no such authority is required at this time. [152] Pursuant to the Do-Not-Call Act, the Commission must report to Congress on an annual basis the effectiveness of the do-not-call registry. Should the Commission determine that additional authority is required over telephone solicitations as part of that analysis; the Commission will propose specific restrictions pursuant to that report. As required by section 227(c)(1)(E), we have developed regulations to implement the national do-not-call database in the most effective and efficient manner to protect consumer privacy needs while balancing legitimate telemarketing interests.

41. As noted above, the FTC's decision to adopt a national do-not-call list is currently under review in federal district court. [153] Because Congress has approved funding for the administration of the national list only for the FTC, this Commission would be forced to stay implementation of any national list should the plaintiffs prevail in one of those proceedings.

### 2. Exemptions

42. *Established Business Relationship*. We agree with the majority of industry commenters that an exemption to the national do-not-call list should be created for calls to consumers with whom the seller has an established business relationship. [154] We note that section 227(a)(3) excludes from the definition of telephone solicitation calls made to any person with  **14043** whom the caller has an established business relationship. [155] We believe the ability of sellers to contact existing customers is an important aspect of their business plan and often provides consumers with valuable information regarding products or services that they may have purchased from the company. For example, magazines and newspapers may want to contact customers whose subscriptions have or soon will expire and offer new subscriptions. This conclusion is consistent with that of the FTC and the majority of states that have adopted do-not-call requirements and considered this issue. As discussed in further detail below, we revise the definition of an established business relationship so that it is limited in duration to eighteen (18) months from any purchase or transaction and 3 months from any inquiry or application. [156]

**17  43.** To the extent that some consumers oppose this exemption, we find that once a consumer has asked to be placed on the seller's company-specific do-not-call list, the seller may not call the consumer again regardless of whether the consumer continues to do business with the seller. We believe this determination constitutes a reasonable balance between the interests of consumers that may object to such calls with the interests of sellers in contacting their customers. This conclusion is also consistent with that of the FTC.

44. *Prior Express Permission*. In addition to the established business relationship exemption, we conclude that sellers may contact consumers registered on a national do-not-call list if they have obtained the prior express permission of those consumers. We note that section 227(a)(3) excludes from the definition of telephone solicitation calls to any person with "that person's prior express invitation or permission." [157] Consistent with the FTC's determination, we conclude that for purposes of the national do-not-call list such express permission must be evidenced only by a signed, written agreement between the consumer and the seller which states that the consumer agrees to be contacted by this seller, including the telephone number to which the calls may be placed. [158] Consumers registered on the national list may wish to have the option to be contacted by particular entities.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 283 of 409 PageID 352

Therefore, we conclude that sellers may obtain the express written agreement to call such consumers. The express agreement between the parties shall remain in effect as long as the consumer has not asked to be placed on the seller's company-specific do-not-call list. If the consumer subsequently requests not to be called, the seller must cease calling the consumer regardless of whether the consumer continues to do business with the seller. We also note that telemarketers may not call consumers on the national do-not-call list to request their written permission to be called unless they fall within some other exemption. We believe that to allow such calls would circumvent the purpose of this exemption. Prior express **\*14044** permission must be obtained by some other means such as direct mailing.

45. _Tax-Exempt Nonprofit Organizations_. We agree with those commenters that contend that the national do-not-call requirements should not be extended to tax-exempt nonprofit organizations or calls made by independent telemarketers on behalf of tax-exempt nonprofit organizations. [159] We note that section 227(a)(3) specifically excludes calls made by tax-exempt nonprofit organizations from the definition of telephone solicitation. [160] In so doing, we believe Congress clearly intended to exclude tax-exempt nonprofit organizations from prohibitions on telephone solicitations under the TCPA. The legislative history indicates that commercial calls constitute the bulk of all telemarketing calls. [161] A number of commenters and the FTC agree with Congress' conclusion as it relates to a national do-not-call list. [162] For this reason, we decline to extend the national do-not-call requirements to tax-exempt nonprofit organizations. A few commenters seek clarification that requests for blood donations will be exempt from the national do-not-call list. [163] When such requests are made by tax-exempt nonprofit organizations, they will fall within the exemption for tax-exempt nonprofit organizations.

**\*\*18** 46. _Others_. We decline to create specific exemptions to the national do-not-call requirements for entities such as newspapers, magazines, regional telemarketers, or small businesses. [164] For the reasons discussed above, we find unpersuasive arguments that application of the national do-not-call database adopted herein will result in severe economic consequences for these entities. In particular, we note the exemptions adopted for calls made to consumers with whom the seller has an established business relationship and those that have provided express agreement to be called. As noted, many consumers may also determine not to register on the national database. Telemarketers may continue to contact all of these consumers. We believe these exemptions provide telemarketers with a reasonable opportunity to conduct their business while balancing consumer privacy interests. Although we agree that newspapers and **\*14045** other entities may often provide useful information and services to the public, given our conclusion that adoption of the national do-not-call list will not unduly interfere with the ability of telemarketers to reach consumers, we do not find this to be a compelling basis to exempt these entities.

47. We find that the national do-not-call rules adopted today do not apply to calls made to persons with whom the marketer has a personal relationship. As discussed herein, a "personal relationship" refers to an individual personally known to the telemarketer making the call. In such cases, we believe that calls to family members, friends and acquaintances of the caller will be both expected by the recipient and limited in number. [165] Therefore, the two most common sources of consumer frustration associated with telephone solicitations - high volume and unexpected solicitations - are not likely present when such calls are limited to persons with whom the marketer has a personal relationship. [166] Accordingly, we find that these calls do not represent the type of "telephone solicitations to which [telephone subscribers] object" discussed in section 227(c)(1). Moreover, we conclude that the Commission also has authority to recognize this limited carve-out pursuant to section 227(c)(1)(E). This subsection provides the Commission with discretion in implementing rules to protect consumer privacy to "develop proposed regulations to implement the methods and procedures that the Commission determines are the most effective and efficient to accomplish the purpose of this section." [167] To the extent that any consumer objects to such calls, the consumer may request to be placed on the telemarketer's company's company-specific do-not-call list. We intend to monitor the rules we adopt today and caution that any individual or entity relying on personal relationships abusing this exemption may be subject to enforcement action.

48. In addition, we decline to extend this approach beyond persons that have a personal relationship with the marketer. For example, Vector urges the Commission to adopt an exemption that covers "face-to-face" appointment calls to anyone known personally to the "referring source." [168] We note that such relationships become increasingly tenuous as they extend

to individuals not personally known to the marketer and thus such calls are more likely to be unexpected to the recipient and more voluminous. Accordingly, referrals to persons that do **\*14046** not have a personal relationship with the marketer will not fall within the category of calls discussed above.

**\*\*19** 49. We also decline to establish an exemption for calls made to set "face-to-face" appointments per se. [169] We conclude that such calls are made for the purpose of encouraging the purchase of goods and services and therefore fall within the statutory definition of telephone solicitation. We find no reason to conclude that such calls are somehow less intrusive to consumers than other commercial telephone solicitations. The FTC has reviewed this issue and reached the same conclusion. [170] In addition, we decline to exempt entities that make a "*de minimis*" number of commercial telemarketing calls. [171] In contrast to Congress' rationale for exempting nonprofit organizations, we believe that such commercial calls continue to be unexpected to consumers even if made in low numbers. As defined by one commenter, a *de minimis* number of calls would not be based on the total number of calls originating from one organization, but would be based on the number of calls placed by individual employees of the company. [172] Thus, the telemarketing entity could circumvent the do-not-call regulations by hiring any number of individual marketers, so long as they each did not make more than 20 calls per day. We believe that such an exemption, extrapolated to the entire direct marketing industry, would result in a significant number of unwanted telephone solicitations. This would undoubtedly result in consumer confusion and frustration regarding the application of the national do-not-call rules. In addition, we believe that it would be difficult, if not impossible, to monitor and enforce such a requirement. For the reasons discussed below, we do not believe the costs to access the national database are unreasonable for any small business or entity making a "*de minimis*" number of calls.

50. In response to the *Further Notice*, a few commenters contend that any new rules the Commission adopts would not apply to entities engaged in the business of insurance, because such rules would conflict with the McCarran-Ferguson Act. [173] The McCarran-Ferguson Act provides that "[t]he business of insurance ... shall be subject to the laws of the ... States which relate to the regulation ... of such business." [174] The McCarran-Ferguson Act further provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically **\*14047** relates to the business of insurance." [175] American Council of Life Insurers (ACLI) explains that insurers' marketing activities are extensively regulated at the state level. The Commission's proposal, ACLI argues, "intrudes upon the insurance regulatory framework established by the states" and, therefore, should not be applicable to insurers under McCarran-Ferguson. [176]

51. The McCarran-Ferguson Act does not operate to exempt insurance companies wholesale from liability under the TCPA. It applies only when their activities constitute the "business of insurance," the state has enacted laws "for the purpose of regulating" the business of insurance, and the TCPA would "impair, invalidate, or supersede" such state laws. [177] In the one case cited by commenters as addressing the interplay between McCarran-Ferguson and the TCPA, a federal district court dismissed a claim brought against two insurance companies under the TCPA for sending unsolicited facsimile advertisements. [178] The *Chair King* court found that the TCPA conflicted with a Texas law that prohibited untrue, deceptive, or misleading advertising by insurers and their agents. In its analysis, the court determined that insurance advertising was part of the "business of insurance," [179] and that the Texas law in question was enacted for the purpose of regulating the business of insurance. [180] The court then concluded that because the TCPA "prohibits unsolicited insurance advertising by facsimile while the Texas [laws] permit [such] advertising ... so long as the advertisements are truthful and not misleading," the TCPA conflicts with the Texas law and is preempted under McCarran-Ferguson. [181]

**\*\*20** 52. To the extent that any state law regulates the "business of insurance" [182] and the TCPA is found to "invalidate, impair, or supersede" such state law, it is possible that a particular activity involving the business of insurance would not fall within the reach of the TCPA. Any determination about the applicability of McCarran-Ferguson, however, requires an analysis of the particular activity and State law regulating it. In addition, McCarran-Ferguson applies only to federal statutes that "invalidate,

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 285 of 409 PageID 354

impair, or supersede" state insurance regulation. Courts have **\*14048** held that duplication of state law prohibitions by a federal statute do not " invalidate, impair, or supersede" state laws regulating the business of insurance.[183] Nor is the mere presence of a regulatory scheme enough to show that a state statute is "invalidated, impaired or superseded."[184]

53. We believe that the TCPA, which was enacted to protect consumer privacy interests, is compatible with states' regulatory interests.[185] In fact, the TCPA permits States to enforce the provisions of the TCPA on behalf of residents of their State.[186] In addition, we believe that uniform application of the national do-not-call registry to all entities that use the telephone to advertise best serves the goals of the TCPA. To exempt the insurance industry from liability under the TCPA would likely confuse consumers and interfere with the protections provided by Congress through the TCPA. Therefore, to the extent that the operation of McCarran-Ferguson on the TCPA is unclear, we will raise this issue in our Report to Congress as required by the Do-Not-Call Act.

54. We conclude that the national do-not-call mechanism established by the FTC and this Commission adequately takes into consideration the needs of small businesses and entities that telemarket on a local or regional basis in gaining access to the national database. As required by section 227(c)(1)(C), we have considered whether different procedures should apply for local solicitations and small businesses. We decline, however, to exempt such entities from the national do-not-call requirements. Given the large number of entities that solicit by telephone, and the technological tools that allow even small entities to make a significant number of solicitation calls, we believe that to do so would undermine the effectiveness of the national do-not-rules in protecting consumer privacy and create consumer confusion and frustration. In so doing, we conclude that the approach adopted herein satisfies section 227(c)(4)'s requirement that the Commission, in developing procedures for gaining *access* to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level and develop a fee schedule for recouping the cost of such database that recognizes such differences.[187] The national database will be available for purchase by sellers on an area-code-by-area-code basis. The cost to access the database will vary depending on the number of area codes requested. Sellers need only purchase those area codes in which the seller intends to telemarket. In fact, sellers that request access to five or fewer area codes will be granted access to those area codes at no cost. We note that thirty-three states currently have five or fewer area codes. Thus, **\*14049** telemarketers or sellers operating on a "local" or "regional" basis within one of these thirty-three states will have access to all of that states' national do-not-call registrants at no cost. In addition, the national database will provide a single number lookup feature whereby a small number of telephone numbers can be entered on a web page to determine whether any of those numbers are included on the national registry. We believe this fee structure adequately reflects the needs of regional telemarketers, small business and those marketing on a *de minimis* level. For these reasons, we conclude that this approach will not place any unreasonable costs on small businesses.[188]

### 3. Section 227(c)(3) Requirements

**\*\*21** 55. We conclude that the national do-not-call database adopted jointly by this Commission and the FTC satisfies each of the statutory requirements outlined in section 227(c)(3)(A)-(L). We now discuss each such requirement. Section 227(c)(3) (A) requires the Commission to specify the method by which an entity to administer the national database will be selected. On August 2, 2002, the FTC issued a Request for Quotes (RFQ) to selected vendors on GSA schedules seeking proposals to develop, implement, and operate the national registry. After evaluating those proposals, the FTC selected a competitive range of vendors and issued an amended RFQ to those vendors on November 25, 2002. After further evaluation, the FTC selected AT&T Government Solutions as the successful vendor for the national do-not-call database on March 1, 2003.[189] As noted above, Congress has approved the necessary funding for implementation of the national database.

56. Pursuant to sections 227(c)(3)(B)-(C), we require each common carrier providing telephone exchange service to inform subscribers for telephone exchange service of the opportunity to provide notification that such subscriber objects to receiving telephone solicitations. Each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national database and (ii) the methods by which such rights may be exercised by the subscriber. Pursuant to

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 286 of 409 PageID 355

section 227(c)(3)(C), we conclude that, beginning on January 1, 2004, such common carriers shall provide an annual notice, via an insert in the customer's bill, to inform their subscribers of the opportunity to register or revoke registrations on the national do-not-call database. Although we do not specify the exact description or form that such notification should take, such notification must be clear and conspicuous. At a minimum, it must include the toll-free telephone number and internet address established by the FTC to register or revoke registrations on the national do-not-call database.

57. Section 227(c)(3)(D) requires the Commission to specify the methods by which registrations shall be collected and added to the database. As discussed above, consumers will be able to add their telephone numbers to the national do-not-call registry either through a toll-free **\*14050** telephone call or over the Internet. [190] Consumers who choose to register by phone will have to call the registration number from the telephone line that they wish to register. Their calls will be answered by an Interactive Voice Response (IVR) system. The consumers will be asked to enter on their telephone keypad the telephone number from which the consumer is calling. This number will be checked against the ANI that is transmitted with the call. If the number entered matches the ANI, then the consumer will be informed that the number has been registered. Consumers who choose to register over the Internet will go to a website dedicated to the registration process where they will be asked to enter the telephone number they wish to register. [191] We encourage the FTC to notify consumers in the IVR message that the national registry will prevent most, but not all, telemarketing calls. Specifically, we believe consumers should be informed that the do-not-call registry does not apply to tax-exempt nonprofit organizations and companies with whom consumers have an established business relationship. The effectiveness and value of the national registry depends largely on an informed public. Therefore, we also intend to emphasize in our educational materials and on our website the purpose and scope of the new rules.

**\*\*22** 58. Section 227(c)(3)(E) prohibits any residential subscriber from being charged for giving or revoking notification to be included on the national do-not-call database. As discussed above, consumers may register or revoke do-not-call requests either by a toll-free telephone call or over the Internet. No charge will be imposed on the consumer. Section 227(c)(3)(F) prohibits any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included on the national database. Subject to the exemptions discussed above, we adopt rules herein that will prohibit telephone solicitations to those consumers that have registered on the national database. [192]

59. Section 227(c)(3)(G) requires the Commission to specify (i) the methods by which any person deciding to make telephone solicitations will obtain access to the database, by area code or local exchange prefix, and (ii) the costs to be recovered from such persons. Section 227(c)(3)(H) requires the Commission to specify the methods for recovering, from the persons accessing the database, the costs involved in the operations of the database. To comply with the national do-not-call rules, telemarketers must gain access to the telephone numbers in the national database. Telemarketers will have access to the national database by means of a fully-automated, secure website dedicated to providing information to these entities. [193] The first time a telemarketer accesses the system, the company will be asked to provide certain limited identifying information, such as name and address, contact person, and contact person's telephone number and address. If a telemarketer is accessing the registry on behalf of a client seller, the telemarketer will also need to identify that client. [194] When a telemarketer first submits **\*14051** an application to access registry information, the company will be asked to specify the area codes they want to access. An annual fee will be assessed based upon the number of area codes requested. [195] Each entity on whose behalf the telephone solicitation is being made must pay this fee via credit card or electronic funds transfer. After payment is processed, the telemarketer will be given an account number and permitted to access the appropriate portions of the registry. [196] Telemarketers will be permitted to access the registry as often as they wish for no additional cost, once the annual fee is paid.

60. Section 227(c)(3)(I) requires the Commission to specify the frequency with which the national database will be updated and specify the method by which such updates will take effect for purposes of compliance with the do-not-call regulations. Because the registration process will be completely automated, updates will occur continuously. Consumer registrations will be added to the registry at the same time they register - or at least within a few hours after they register. As discussed above, the safe harbor provision requires telemarketers to employ a version of the registry obtained not more than three months before any call is made. Thus, telemarketers will be required to update their lists at least quarterly. Instead of marking the list available on

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 287 of 409 PageID 356

specific dates, the registry will be available for downloading on a constant basis so that telemarketers can access the registry at any time. [197] As a result, each telemarketer's three-month period may begin on different dates. [198] In addition, the administrator will check all telephone numbers in the do-not-call registry each month against national databases, and those numbers that have been disconnected or reassigned will be removed from the registry. [199] We encourage parties that may have specific recommendations on ways to improve the overall accuracy of the database in removing disconnected and reassigned telephone numbers to submit such proposals to our attention and to the FTC directly.

**23** 61. Section 227(c)(3)(J) requires that the Commission's regulations be designed to enable states to use the database for purposes of administering or enforcing state law. [200] Section 227(c)(3)(K) prohibits the use of the database for any purpose other than compliance with the do-not-call rules and any such state law and requires the Commission to specify methods for protection of the privacy rights of persons whose numbers are included in such database. Consistent with the determination of the FTC, we conclude that any law enforcement agency that **14052** has responsibility to enforce federal or state do-not-call rules or regulations will be permitted to access the appropriate information in the national registry. [201] This information will be obtained through a secure Internet website. Such law enforcement access to data in the national registry is critical to enable state Attorneys General, public utility commissions or an official or agency designated by a state, and other appropriate law enforcement officials to gather evidence to support enforcement of the do-not-call rules under the state and federal law. In addition, as discussed above, we have imposed restrictions on the use of the national list. [202] Consistent with the FTC's determination, we have concluded that no person or entity may sell, rent, lease, purchase, or use the national do-not-call database for any purpose except compliance with section 227 and any such state or federal law to prevent telephone solicitations to telephone numbers on such list. We specifically prohibit any entity from purchasing this list from any entity other than the national do-not-call administrator or dispensing the list to any entity that has not paid the required fee to the administrator. The only information that will be made available to telemarketers is the telephone number of consumers registered on the list. Given the restrictions imposed on the use of the national database and the limited amount of information provided, we believe that adequate privacy protections have been established for consumers.

62. Section 227(c)(3)(L) requires each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of the national do-not-call rules and the regulations thereunder. We therefore require common carriers, beginning January 1, 2004, to make a one-time notification to any person or entity making telephone solicitations that is served by that carrier of the national do-not-call requirements. We do not specify the exact description or form that such notification should take. At a minimum, it must include a citation to the relevant federal do-not-call rules as set forth in 47 C.F.R. § 64.1200 and 16 C.F.R. Part 310, respectively. Although we recognize that carriers may not be capable of identifying every person or entity engaged in telephone solicitations served by that carrier, we require carriers to make reasonable efforts to comply with this requirement. We note that failure to give such notice by the common carrier to a telemarketer served by that carrier will not excuse the telemarketer from violations of the Commission's rules.

### 4. Constitutionality

**24** 63. We conclude that a national do-not-call registry is consistent with the First Amendment. As discussed in more detail below, we believe, like the FTC, that our regulations satisfy the criteria set forth in *Central Hudson Gas & Elec. v. Pub. Serv. Comm. of N.Y.*, in which the Supreme Court established the applicable analytical framework for determining the constitutionality of a regulation of commercial speech. [203] Our conclusion is also consistent with **14053** every Court of Appeals decision that has considered First Amendment challenges to the TCPA. [204]

64. Under the framework established in *Central Hudson*, a regulation of commercial speech will be found compatible with the First Amendment if (1) there is a substantial government interest; (2) the regulation directly advances the substantial government interest; and (3) the proposed regulations are not more extensive than necessary to serve that interest. [205] Under the first prong, we find that there is a substantial governmental interest in protecting residential privacy. The Supreme Court has "repeatedly

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 288 of 409    PageID 357

held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom." [206]

65. In particular, the government has an interest in upholding the right of *residents* to bar unwanted speech from their homes. In *Rowan v. United States Post Office*, the Supreme Court upheld a statute that permitted a person to require that a mailer remove his name from its mailing lists and stop all future mailings to the resident:

> The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property. In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer.... In effect, Congress has erected a wall - or more accurately permits a citizen to erect a wall - that no advertiser may penetrate without **\*14054** his acquiescence. [207]

66. Here, the record supports that the government has a substantial interest in regulating telemarketing calls. In 1991, Congress held numerous hearings on telemarketing, finding, among other things, that "[m]ore than 300,000 solicitors call more than 18,000,000 Americans every day" and "[u]nrestricted telemarketing can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety. [208] Our record, like the FTC's, demonstrates that telemarketing calls are even more of an invasion of privacy than they were in 1991. The number of daily calls has increased five fold (to an estimated 104 million), due in part to the use of new technologies, such as predictive dialers. [209] An overwhelming number of consumers in the approximately 6,500 commenters in this proceeding support the adoption and implementation of a national do-not-call registry. In addition to citing concerns about the numerous and ever-increasing number of calls, they complain about the inadequacies of the company-specific approach, the burdens of such calls on the elderly and people with disabilities, and the costs of acquiring technologies to reduce the number of unwanted calls. [210] Accordingly, we believe that the record demonstrates that telemarketing calls are a substantial invasion of residential privacy, and regulations that address this problem serve a substantial government interest.

**\*\*25** 67. Under *Central Hudson's* second prong, we find that the Commission's regulations directly advance the substantial government interest. Under this prong, the government must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." [211] It may justify the restrictions on speech "based solely on history, consensus, and 'simple common sense.'" [212] Creating and implementing a national do-not-call registry will directly advance the government's interest in protecting residential privacy from unwanted telephone solicitations. Congress, consumers, state governments and the FTC have reached the same conclusion. The history of state administered do-not-call lists demonstrates that such do-not-call programs have a positive impact on the ability of many consumers to protect their privacy by reducing the number of unwanted telephone solicitations that they receive each day. [213] As noted above, Congress has reviewed the FTC's decision to establish a **\*14055** national do-not-call list and concluded that the do-not-call initiative will provide significant benefits to consumers throughout the United States. [214] We reject the arguments that because our do-not-call registry provisions do not apply to tax-exempt nonprofit organizations, our regulations do not directly and materially advance the government interest of protecting residential privacy. [215] "Government [need not] make progress on every front before it can make progress on any front." [216]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 289 of 409   PageID 358

68. We believe that the facts here are easily distinguishable from those in *Rubin v. Coors Brewing Company*, 514 U.S. 476 (1995) and *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993). In *Coors*, the Court struck down a prohibition against disclosure of alcoholic content on labels or in advertising that applied to beer but not to wine or distilled spirits, finding that "the irrationality of this unique and puzzling regulatory framework ensures that the labeling ban will fail to achieve [the Government's interest in combating strength wars.]" In *Discovery Network*, the Court struck down an ordinance which banned 62 newsracks containing commercial publications but did not ban 1,500-2,000 newsracks containing newspapers, finding that "the distinction bears no relationship *whatsoever* to the particular [aesthetic] interests that the city has asserted." Here, Congress' decision to exclude tax-exempt nonprofit organizations from the definition of telemarketing in the TCPA was both rational and related to its interest in protecting residential privacy. The House Report finds that "the record suggests that most unwanted telephone solicitations are commercial in nature....[T]he Committee also reached the conclusion, based on the evidence, that ... calls [from tax-exempt nonprofit organizations] are less intrusive to consumers because they are more expected. Consequently, the two main sources of consumer problems - high volume of solicitations and unexpected solicitations - are not present in solicitations by nonprofit organizations." [217]

**26** 69. Commenters in our record also express the concern that subjecting tax-exempt nonprofit organizations to the national do-not-call requirements may sweep too broadly because it would prompt some consumers to accept blocking of non-commercial, charitable calls to which they might not otherwise object as an undesired effect of registering on the national database to stop unwanted commercial solicitation calls. Both the Eighth and the Ninth Circuits found that the provisions of the TCPA, which bans unsolicited commercial faxes but not non-commercial faxes, directly advance a substantial government interest, [218] and we believe that the same **14056** distinction may be applied to the national do-not-call registry. [219]

70. We find under the third prong of the *Central Hudson* test that our proposed regulations are not more extensive than necessary to protect residential privacy. The Supreme Court has made clear that with respect to this prong, "the differences between commercial speech and noncommercial speech are manifest." [220] The Court held that:

> [T]he least restrictive means test has no role in the commercial speech context. What our decisions require, instead, is a fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served .... [T]he existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech is certainly a relevant consideration in determining whether the fit between the ends and means is reasonable. [221]

In *Florida Bar*, the Supreme Court found that a prohibition against lawyers using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident was not more extensive than necessary to "protect... the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers." [222] Similarly, the Ninth Circuit has found that the TCPA's ban on prerecorded telemarketing calls constitutes a "reasonable fit" with the government's legitimate interest in protecting residential privacy. [223]

**14057** 71. Here, we find that our regulations meet the requirements of *Central Hudson's* third prong. Pursuant to our regulations, we adopt a single, national do-not-call database that we will enforce jointly with the FTC. Our rules mandate that common carriers providing telephone exchange service shall inform their subscribers of their right to register on the database either through a toll-free telephone call or over the Internet. Furthermore, telemarketers and sellers must gain access

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 290 of 409   PageID 359

to telephone numbers in the national database and will be able to do so by means of a fully automated, secure website dedicated to providing information to these entities. In addition, sellers will be assessed an annual fee based upon the number of area codes they want to assess, with the maximum annual fee capped at $7,250. Our rules also provide that the national database will be updated continuously, and telemarketers must update their lists quarterly. We find that our regulations are a reasonable fit between the ends and means and are not as restrictive as the bans upheld in the cases cited above. In *Florida Bar*, the Supreme Court upheld an *absolute* ban against lawyers using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident. Similarly, the Ninth Circuit has upheld the TCPA's *absolute* ban on prerecorded telemarketing calls, and both the Eighth and Ninth Circuit have upheld the TCPA's *absolute* ban on unsolicited faxes. Here, our regulations do not absolutely ban telemarketing calls. Rather, they provide a mechanism by which individual consumers may choose not to receive telemarketing calls. We also note that there are many other ways available to market products to consumers, such as newspapers, television, radio advertising and direct mail. [224] In addition, there simply are not "numerous and obvious less-burdensome alternatives" to the national do-not-call registry. The record clearly demonstrates widespread consumer dissatisfaction both with the effectiveness of the current company-specific rules that are currently in place [225] and the effectiveness and expense of certain technological alternatives to reduce telephone solicitations. [226] We also note that many of the "burdens" of the national do-not-call registry - issues concerning its costs, accuracy, and privacy - have been addressed by advances in computer technology and software over the last ten years. [227] Thus, we find that our regulations implementing the national do-not-call registry are consistent with the First Amendment and the framework established in *Central Hudson*.

**\*\*27   \*14058**  72. Furthermore, we reject the arguments that the *Central Hudson* framework is not appropriate and that strict scrutiny is required because the regulations implementing the national do-not-call list are content-based, due to the TCPA's exemptions for non-profit organizations and established business relationships. [228]  For support, commenters cite to *Discovery Network*, 507 U.S. 410, in which the Court struck down Cincinnati's ordinance which banned newsracks containing commercial publications but did not ban newsracks containing newspapers. The Court found that the regulation could neither be justified as a restriction on commercial speech under *Central Hudson*, nor could it be upheld as a valid time, place, or manner restriction on protected speech. [229]  The Court explained that "the government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech'." [230]  In this case, the Court held that the City's ban which covered commercial publications but not newspapers was content-based. [231]  "It is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral." [232]

73. Here, however, there was a neutral justification for Congress' decision to exclude non-profit organizations. As we noted *supra*, Congress found that "the two sources of consumer problems - high volume of solicitations and unexpected solicitations - are not present in solicitations by nonprofit organizations." [233]  Congress also made a similar finding with respect to  **\*14059** solicitations based on established business relationships. [234]  Consumers are more likely to anticipate contacts from companies with whom they have an existing relationship and the volume of such calls will most likely be lower. Furthermore, as the Eighth Circuit noted when it distinguished the *Discovery Network* case in upholding the TCPA's ban on unsolicited faxes that applies to commercial speech but not to noncommercial speech, "the government may regulate one aspect of a problem without regulating all others." [235]  Thus, we believe it is clear that our do-not-call registry regulations may apply to commercial solicitations without applying to tax-exempt nonprofit solicitations, and that such regulations are not subject to a higher level of scrutiny. Indeed, we agree with the FTC that regulation of non-profit solicitations are subject to a higher level of scrutiny than solicitations of commercial speech, [236]  and "greater care must be given [both] to ensuring that the governmental interest is actually advanced by the regulatory remedy, and [to] tailoring the regulation narrowly so as to minimize its impact on First Amendment rights." [237]

**5. Consistency with State and FTC Do-Not-Call Rules**

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 291 of 409 PageID 360

**\*\*28** 74. We conclude that harmonization of the various state and federal do-not-call programs to the greatest extent possible will reduce the potential for consumer confusion and regulatory burdens on the telemarketing industry.[238] An underlying concern expressed by many commenters in this proceeding is the potential for duplication of effort and/or inconsistency in the rules relating to the state and federal do-not-call programs. Congress has indicated a similar **\*14060** concern in requiring the Commission to "maximize consistency" with the FTC's rules.[239] As discussed below, we find that the use of a single national database of do-not-call registrants will ultimately prove the most efficient and economical means for consumer registrations and access for compliance purposes by telemarketing entities and regulators.

75. The states have a long history of regulating telemarketing practices, and we believe that it is critical to combine the resources and expertise of the state and federal governments to ensure compliance with the national do-not-call rules. In fact, the TCPA specifically outlines a role for the states in this process.[240] In an effort to reconcile the state and federal roles, we have conducted several meetings with the states and FTC.[241] We expect such coordination to be ongoing in an effort to promote the continued effectiveness of the national do-not-call program. We clarify below the respective governmental roles in this process under the TCPA. As noted above, we intend to develop a Memorandum of Understanding with the FTC in the near future outlining the respective federal responsibilities under the national do-not-call rules. We note that a few commenters have expressed concern that the FTC and this Commission may adopt separate national do-not-call lists.[242] We reiterate here that there will be only one national database.

76. _Use of a Single Database._ We conclude that the use of a single national do-not-call database, administered by the vendor selected by the FTC, will ultimately prove the most efficient and economical means for consumer registrations and access by telemarketers and regulators. The establishment of a single database of registrants will allow consumers to register their requests not to be called in a single transaction with one governmental agency. In addition, telemarketers may access consumer registrations for purposes of compliance with the do-not-call rules through one visit to a national database. This will substantially alleviate the potential for consumer confusion and administrative burden on telemarketers that would exist if required to access multiple databases. In addition, we note that section 227(e)(2) prohibits states, in regulating telephone solicitations, from using any database, list, or list system that does not include the part of such single national database that relates to that state.[243] Thus, pursuant to this requirement, any individual state do-not-call database must include all of the registrants on the national database for that state. We determine that the administrator of the national database shall make the numbers in the database available to the states as required by the TCPA.[244]

**\*\*29** **\*14061** 77. We believe the most efficient way to create a single national database will be to download the existing state registrations into the national database. The FTC has indicated that the national database is designed to allow the states to download into the national registry - at no cost - the telephone numbers of consumers that have registered with their state do-not-call lists.[245] As noted above, we believe that consumers, telemarketers, and regulators will benefit from the efficiencies derived from the creation of a single do-not-call database. We encourage states to work diligently toward this goal. We recognize that a reasonable transition period may be required to incorporate the state registrations in a few states into the national database.[246] We therefore adopt an 18-month transition period for states to download their state lists into the national database. Having an 18-month transition period will allow states that do not have full-time legislatures to complete a legislative cycle and create laws that would authorize the use of a national list. In addition, this transition period is consistent with the amount of time that the FTC anticipates it would take to incorporate the states' lists into the national database. Although we do not preempt or require states to discontinue the use of their own databases at this time, once the national do-not-call registry goes into effect, states may not, in their "regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of [the national do-not-call registry] that relates to [each] State."[247] As noted above, we believe that there are significant advantages and efficiencies to be derived from the creation and use of a single database for all parties, including states, and we strongly encourage states to assist in this effort. The Commission intends to work diligently with the states and FTC in an effort to establish a single do-not-call database.

78. *Interplay of State and Federal Do-Not-Call Regulations*. In the *2002 Notice*, we generally raised the issue of the interplay of state and federal do-not-call statutes and regulations. [248]  In response, several parties argued that state regulations must or should be preempted in whole, [249] or at least in part, [250] and several other parties argued that the Commission  **\*14062**  cannot or should not preempt. [251]  For example, several industry commenters contend that the TCPA provides the Commission with the authority to preempt state do-not-call regulations. [252]  These commenters contend that Congress intended the TCPA to occupy the field or, at the very least, intended to preempt state regulation of interstate telemarketing. Many state and consumer commenters note, however, that the TCPA contemplates a role for the states in regulating telemarketing and specifically prohibits preemption of state law in certain instances. [253]  States and consumers note that state do-not-call regulations have been a successful initiative in protecting consumer privacy rights. In addition, several commenters note the importance of federal and state cooperation in enforcing the national do-not-call regulations. [254]  The record also indicates that states have historically enforced their own state statutes within, as well as across state lines. [255]  The statute also contains a savings clause for state proceedings to enforce civil or criminal statutes, [256]  and at least one federal court has found that the TCPA does not preempt state regulation of autodialers that are not in actual conflict with the TCPA. [257]

**\*\*30**  79. The main area of difference between the state and federal do-not-call programs relates to the exemptions created from the respective do-not-call regulations. Some state regulations are less restrictive by adopting exemptions that are not recognized under federal law. For example, some states have adopted exemptions for insurance agents, newspapers, or small businesses. [258]  In addition, a few states have enacted laws that are more restrictive than the federal regulations by not recognizing federal exemptions such as the established business relationship. [259]  Most states, however, exempt nonprofit organizations and companies with whom  **\*14063**  the consumer has an established business relationship in some manner consistent with federal regulations. [260]

80. At the outset, we note that many states have not adopted any do-not-call rules. The national do-not-call rules will govern exclusively in these states for both intrastate and interstate telephone solicitations. [261]  Pursuant to section 227(f)(1), all states have the ability to enforce violations of the TCPA, including do-not-call violations, in federal district court. [262]  Thus, we conclude that there is no basis for conflict regarding the application of do-not-call rules in those states that have not adopted do-not-call regulations.

81. For those states that have adopted do-not-call regulations, we make the following determinations. First, we conclude that, by operation of general conflict preemption law, the federal rules constitute a floor, and therefore would supersede all less restrictive state do-not-call rules. [263]  We believe that any such rules would frustrate Congress' purposes and objectives in promulgating the TCPA. Specifically, application of less restrictive state exemptions directly conflicts with the federal objectives in protecting consumer privacy rights under the TCPA. Thus, telemarketers must comply with the federal do-not-call rules even if the state in which they are telemarketing has adopted an otherwise applicable exemption. Because the TCPA applies to both intrastate and interstate communications, the minimum requirements for compliance are therefore uniform throughout the nation. We believe this resolves any potential confusion for industry and consumers regarding the application of less restrictive state do-not-call rules.

82. Second, pursuant to section 227(e)(1), we recognize that states may adopt more restrictive do-not-call laws governing intrastate telemarketing. [264]  With limited exceptions, the TCPA specifically prohibits the preemption of any state law that imposes more restrictive intrastate requirements or regulations. Section 227(e)(1) further limits the Commission's ability to preempt any state law that prohibits certain telemarketing activities, including the making of telephone solicitations. This provision is ambiguous, however, as to whether this prohibition applies both to intrastate and interstate calls, [265]  and is silent on the issue of whether state law that  **\*14064**  imposes more restrictive regulations on interstate telemarketing calls may be

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 293 of 409   PageID 362

preempted. As set forth below, however, we caution that more restrictive state efforts to regulate interstate calling would almost certainly conflict with our rules.

**\*\*31**  83. We recognize that states traditionally have had jurisdiction over only intrastate calls, while the Commission has had jurisdiction over interstate calls. [266] Here, Congress enacted section 227 and amended section 2(b) to give the Commission jurisdiction over both interstate and intrastate telemarketing calls. Congress did so based upon the concern that states lack jurisdiction over interstate calls. [267] Although section 227(e) gives states authority to impose more restrictive intrastate regulations, we believe that it was the clear intent of Congress generally to promote a uniform regulatory scheme under which telemarketers would not be subject to multiple, conflicting regulations. [268] We conclude that inconsistent interstate rules frustrate the federal objective of creating uniform national rules, to avoid burdensome compliance costs for telemarketers and potential consumer confusion. The record in this proceeding supports the finding that application of inconsistent rules for those that telemarket on a nationwide or multi-state basis creates a substantial compliance burden for those entities. [269]

84. We therefore believe that any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted. We will consider any alleged conflicts between state and federal requirements and the need for preemption on a case-by-case basis. Accordingly, any  **\*14065** party that believes a state law is inconsistent with section 227 or our rules may seek a declaratory ruling from the Commission. We reiterate the interest in uniformity - as recognized by Congress - and encourage states to avoid subjecting telemarketers to inconsistent rules.

85. NAAG contends that states have historically enforced telemarketing laws, including do-not-call rules, within, as well as across, state lines pursuant to "long-arm" statutes. [270] According to NAAG, these state actions have been met with no successful challenges from telemarketers. We note that such "long-arm" statutes may be protected under section 227(f)(6) which provides that "nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such state." [271] Nothing that we do in this order prohibits states from enforcing state regulations that are consistent with the TCPA and the rules established under this order in state court.

## IV. COMPANY SPECIFIC DO-NOT-CALL LISTS

### A. Background

86. In the *1992 TCPA Order*, the Commission adopted a "company-specific do-not-call" approach to protect residential telephone subscriber privacy by requiring telemarketers to place consumers on a do-not-call list if the consumer requests not to receive future solicitations. [272] In the *2002 Notice*, the Commission sought comment on whether the company-specific approach has proven effective in providing consumers with a means to curb unwanted telephone solicitations. [273] The Commission noted that under the company-specific approach, consumers must repeat their request not to be called on a case-by-case basis. Given the apparent increase in telemarketing calls, the Commission requested comment on whether this approach continues to balance adequately the interests of consumers with those of legitimate telemarketers. In particular, the Commission sought comment on whether changes in the marketplace now make this approach unreasonably burdensome for consumers, including elderly and disabled consumers. [274] In addition, the Commission sought comment on whether the company-specific  **\*14066** approach should be retained if the FTC, either acting alone or in conjunction with this Commission, adopts a national do-not-call list. Finally, the Commission sought comment on whether to consider any additional modifications to the company-specific list such as requiring companies to provide a toll-free number or website to register such requests. [275]

**\*\*32**  87. In response to the *2002 Notice*, the Commission received a number of comments relating to the company-specific do-not-call rules. The majority of individual consumers addressing these issues contend that the current company-specific approach

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 294 of 409   PageID 363

is inadequate to prevent unwanted telephone solicitations. [276]   In general, they argue that the company-specific approach is extremely burdensome to consumers who must repeat their request to every telemarketer that calls; such requests are often ignored or, in the case of abandoned calls, there is no opportunity to make such a request; and that consumers have no way to verify whether they have been placed on such lists. [277]   In addition, many consumers contend that telemarketers often fail to identify themselves or provide written copies of their do-not-call policies as required by the Commission's rules. [278]   Some consumers note that these limitations make it difficult to pursue any private right of action against telemarketers. [279]   Commenters also indicate that telemarketers frequently inform them that it will take as long as two months to process their do-not-call requests. [280]   An organization representing persons with disabilities contends that such consumers often cannot communicate requests not to be called to telemarketers. [281]

88. Many industry commenters contend that the company-specific approach has been effective and that a national do-not-call list is therefore unnecessary. These commenters argue that the advantages of the company-specific approach, as identified by the Commission in 1992, remain valid today. Specifically, these commenters contend that companies already maintain such lists, the company-specific approach allows consumers to halt calls selectively, businesses gain useful information about consumer preferences, consumer confidentiality is protected, and the costs remain on the telemarketer. A number of industry commenters request that the retention period for those consumers requesting not to be called be reduced from ten years. [282]   In general, industry commenters oppose any requirement to establish a toll-free number or website  *14067  for consumers to register and/or verify their do-not-call requests. [283]   These commenters contend that any such requirement would be costly and unnecessary given their compliance with the existing rules.

89. The FTC concluded that its company-specific do-not-call rules should be retained despite the adoption of a national registry. [284]   Although the FTC found that the company-specific list was often ineffective in protecting consumers, the FTC concluded it will work in a complementary fashion with a national do-not-call list to effectuate the appropriate balance between consumer privacy and enabling sellers to have access to customers. While the FTC has decided to exempt telemarketing calls on behalf of charitable organizations from the national registry, it concluded that calls by for-profit telemarketers on behalf of charitable organizations will now be subject to the company-specific rules. [285]

**B. Discussion**

**1. Efficacy of the Company-Specific Rules**

 **\*\*33**  90. We conclude that retention of the company-specific do-not-call rules will complement the national do-not-call registry by providing consumers with an additional option for managing telemarketing calls. We believe that providing consumers with the ability to tailor their requests not to be called, either on a case-by-case basis under the company do-not-call approach or more broadly under the national registry, will best balance individual privacy rights and legitimate telemarketing practices. As a result, those consumers that wish to prohibit telephone solicitations from only certain marketers will continue to have the option to do so. In addition, consumers registered on the national do-not-call registry will have the opportunity to request that they not be called by entities that would otherwise fall within the established business relationship exemption by using the option to be placed on the company-specific lists. This finding is consistent with that of the FTC.

91. As discussed above, we agree with those commenters that contend that the company-specific do-not-call approach has not proven ideal as a stand-alone method to protect consumer privacy. In particular, the increase in telemarketing calls over the last decade now places an extraordinary burden on consumers that do not wish to receive telephone solicitations. These consumers must respond on a case-by-case basis to request that they not be called. The record in this proceeding is replete with examples of consumers that receive numerous unwanted telemarketing calls each day. [286]   In addition, the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to  *14068  make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers. We believe, however,

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 295 of 409 PageID 364

that the measures adopted elsewhere in this order will enhance the effectiveness of the company-specific list. For example, the adoption of a national do-not-call registry alleviates the concerns of those consumers, including elderly and disabled consumers that may find a case-by-case do-not-call option particularly burdensome. In addition, restrictions on abandoned calls will reduce the number of "dead air" calls. Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers. We also note that although many commenters question the effectiveness of the company-specific approach, there is little support in the record to eliminate those rules based on the adoption of the national do-not-call list. [287] For the reasons stated above, we retain the option for consumers to request on a case-by-case basis whether they desire to receive telephone solicitations.

### 2. Amendments to the Company-Specific Rules

92. We agree with several industry commenters that the retention period for records of those consumers requesting not to be called should be reduced from the current ten-year requirement to five years. [288] As many commenters note, telephone numbers change hands over time and a shorter retention period will help ensure that only those consumers who have requested not to be called are retained on the list. [289] Both telemarketers and consumers will benefit from a list that more accurately reflects those consumers who have requested not to be called. The FTC has concluded and several commenters in this proceeding agree that five years is a more reasonable period to retain consumer do-not-call requests. [290] We believe a five-year retention period reasonably balances any administrative burden imposed on consumers in requesting not to be called with the interests of telemarketers in contacting consumers. As noted, a shorter retention period increases the accuracy of the database while the national do-not-call option mitigates the burden on those consumers who may believe more frequent company-specific do-not-call requests are overly burdensome. We believe any shorter retention period, as suggested by a few industry commenters, would unduly increase the burdens on consumers who would be forced to make more frequent renewals of their company-specific do-not-call requests without substantially improving the accuracy of the database. We therefore amend our rules to require that a do-not-call request be honored for five years from the time the request is made. [291]

 **34  93. We decline at this time to require telemarketers to make available a toll-free number or website that would allow consumers to register company-specific do-not-call requests  *14069  or verify that such a request was made with the marketer. We also decline to require telemarketers to provide a means of confirmation so that consumers may verify their requests have been processed at a later date. Telemarketers should, however, confirm that any such request will be recorded at the time the request is made by the consumer. In addition, consumers calling to register do-not-call requests in response to prerecorded messages should be processed in a timely manner without being placed on hold for unreasonable periods of time. Although we believe the additional measures discussed above would improve the ability of consumers, including consumers with disabilities, to register do-not-call requests, we agree with those commenters that contend that such requirements would be unduly costly to businesses. [292] In particular, we are concerned with the costs imposed on small businesses. The Commission will, however, continue to monitor compliance with our company-specific do-not-call rules and take further action as necessary.

94. We conclude that telemarketers must honor a company-specific do-not-call request within a reasonable time of such request. We disagree, however, with commenters that suggest that periods of up to 90 days are a reasonable time required to process do-not-call requests. [293] Although some administrative time may be necessary to process such requests, this process is now largely automated. [294] As a result, such requests can often be honored within a few days or weeks. Taking into consideration both the large databases of such requests maintained by some entities and the limitations on certain small businesses, we conclude that a reasonable time to honor such requests must not exceed thirty days from the date such a request is made. [295] We note that the Commission's rules require that entities must record company-specific do-not-call requests and place the subscriber's telephone number on the do-not-call list at the time the request is made. [296] Therefore, telemarketers with the capability to honor such company-specific do-not-call requests in less than thirty days must do so. [297] We believe this determination adequately balances the privacy interests of those consumers that have requested not to be called with the interests of the telemarketing industry.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 296 of 409   PageID 365

Consumers expect their requests not to be called to be honored in a timely manner, and thirty days should be the maximum administrative time  **\*14070**  necessary for telemarketers to process that request.

95. In addition, we decline to extend the company-specific do-not-call rules to entities that solicit contributions on behalf of tax-exempt nonprofit organizations. The TCPA excludes calls or messages by tax-exempt nonprofit organizations from the definition of telephone solicitation. [298]  The Commission has clarified that telemarketers who solicit on behalf of tax-exempt nonprofit organizations are not subject to the rules governing telephone solicitations. [299]  In the *2002 Notice*, the Commission declined to seek further comment on this issue. [300]  We acknowledge that this determination creates an inconsistency with the FTC's conclusion to extend its company-specific requirements to entities that solicit contributions on behalf of tax-exempt nonprofit organizations. The Commission, however, derives its authority to regulate telemarketing from the TCPA. As noted above, that statute excludes tax-exempt nonprofit organizations from the definition of telephone solicitation. We therefore decline to extend the company-specific requirements to entities that solicit on behalf of tax-exempt nonprofit organizations. We note that some tax-exempt nonprofit organizations have determined to honor voluntarily specific do-not-call requests. Other organizations may find it advantageous to follow this example.

 **\*\*35**  96. Finally, to make clear our determination that a company must cease making telemarketing calls to a customer with whom it has an established business relationship when that customer makes a do-not-call request, we amend the company-specific do-not-call rules to apply to any call for telemarketing purposes. [301]  We also adopt a provision stating that a consumer's do-not-call request terminates the established business relationship for purposes of telemarketing calls even if the consumer continues to do business with the seller. [302]

## V. INTERPLAY OF SECTIONS 222 AND 227

### A. Background

97. In the *2002 Notice*, the Commission sought comment generally on the interplay  **\*14071**  between sections 222 and 227. [303]  Section 222, entitled "Privacy of Consumer Information," obligates telecommunications carriers to protect the confidentiality of certain information and to protect the customer proprietary network information (CPNI) created by the customer-carrier relationship. [304]  Under the CPNI rules, a customer may allow her carrier to use her CPNI for marketing purposes. Depending on the uses the carrier intends to make of the customer's CPNI, the carrier must provide the customer notice of her CPNI rights and a means to effectuate her CPNI choice - either "opt-in" or "opt-out" consent. [305]  The TCPA, on the other hand, governs a particular method - telemarketing - by which carriers (and other companies) market to their customers, and those customers' rights to choose whether or not they wish to receive such telemarketing calls. Accordingly, a consumer's decision to allow her carrier to use her CPNI reflects whether she is willing to have her carrier look at her personal usage information in order to tailor its marketing [306]  based on her usage patterns. A consumer's decision to enroll on the national do-not-call list reflects her decision about whether she wishes to receive telemarketing calls.

98. In the *2002 Notice*, the Commission tentatively concluded that a customer's request to be placed on a telecommunications carrier's do-not-call list limits that carrier's ability to market to that consumer via telephone. [307]  The Commission reasoned that "[h]onoring a do not  **\*14072**  call request under section 227 does not render a consent under section 222 a spatity, but instead merely limits the manner of contact (i.e., marketing over the telephone) consistent with the express request of the customer under section 227." [308]  Numerous commenters generally supported the Commission's tentative determination that a customer's section 222 approval to use his or her CPNI should not override that customer's request to be placed on a do-not-call list. [309]  However, some commenters urged the Commission to draw distinctions based on: (1) the type of CPNI consent received (opt-in versus opt-out); and/or (2) national and state do-not-call lists versus company-specific do-not-call lists.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 297 of 409    PageID 366

99. In particular, some commenters argued that a customer's CPNI approval should be deemed to override her request to be included on a national (or other general) do-not-call list, but should not override a request to be placed on a company-specific do-not-call list. [310] Additionally, some commenters supported an approach where a customer's CPNI approval, if obtained through an opt-out mechanism, would not overcome the customer's request to be placed on a do-not-call list; however, opt-in CPNI approval would be deemed to overcome a customer's inclusion on a do-not-call list. [311] A few commenters argued that any CPNI approval should be deemed to overcome a customer's inclusion on a do-not-call registry. [312] Finally, one commenter suggested that the question of the interplay between a customer's opt-in consent to use her CPNI and request to be on a do-not-call list should be judged on a customer-by-customer basis, based on which request was made most recently. [313]

**B. Discussion**

 **\*\*36** 100. We first note that the fact that a telecommunications carrier has current CPNI about a particular consumer indicates that the consumer is a customer of that carrier. In that situation, there exists an established business relationship between the customer and the carrier. [314] The established business relationship is an exception to the national do-not-call registry. [315] However, based on the evidence in the record and as supported by numerous **\*14073** commenters, [316] we confirm our tentative conclusion that if a customer places her name on a carrier's do-not-call list, that request must be honored even though the customer may also have provided consent to use her CPNI under section 222. [317] By doing so, we maximize the protections and choices available to consumers, while giving maximum effect to the language of both statutes. At the outset, the average consumer seems rather unlikely to appreciate the interrelationship of the Commission's CPNI and do-not-call rules. Allowing CPNI consent to trump a do-not-call request would, therefore, thwart most consumers' reasonable expectations about how a company-specific do-not-call list functions. Equally important, permitting a consumer's CPNI consent to supercede a consumer's express do-not call request might undermine the carrier's do-not-call database as the first source of information about the consumer's telemarketing preferences.

101. As discussed *infra*, because we retain the exemption for calls and messages to customers with whom the carrier has an established business relationship, [318] the determination that a customer's CPNI approval does not trump her inclusion on a do-not-call list should have no impact on carriers' ability to communicate with their customers via telemarketing. [319] Carriers will be able to contact customers with whom they have an established business relationship via the telephone, unless the customer has placed her name on the company's do-not-call list; whether the customer has consented to the use of her CPNI does not impact the carrier's ability to contact the customer via telemarketing. [320]

 **\*14074** 102. We are not persuaded by the arguments of those commenters who urge the Commission to find that CPNI consent should trump a customer's request to be placed on a do-not-call list or similarly, that CPNI consent equates to permission to market "without restriction." [321] We note that the Concerned Telephone Companies assert that CPNI consent equates to "consent to market *without restriction* based on [customers'] CPNI." [322] The Commission finds no support for this assertion in any Commission order or statutory provision and, as we discuss herein, we specifically determine that CPNI approval does not equate to unlimited consent to market without restriction.

103. Similarly, a number of commenters argue that a customer's CPNI authorization "covers a number of forms of marketing, including telemarketing." [323] However, such assertions ignore the plain fact that CPNI approval deals specifically with a carrier's use of a customer's personal information, and only indirectly pertains to or arguably "authorizes" marketing to the customer. Do-not-call lists, on the other hand, speak directly to customers' preferences regarding telemarketing contacts. [324] Accordingly, we are convinced that a customer's do-not-call request demonstrates more directly her willingness (or lack thereof) to receive telemarketing calls, as opposed to any indirect inference that can be drawn from her CPNI approval.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 298 of 409 PageID 367

**\*\*37** 104. Additionally, we disagree with those commenters who claim that allowing CPNI approval to trump a consumer's request to be on a national or state do-not-call list gives consumers greater flexibility. [325] As stated above, a carrier's established business relationship with a customer exempts the carrier from honoring the customer's national do-not-call request. However, as stated above, CPNI consent is not deemed to trump a carrier-specific do-not-call list request. For similar reasons, we decline to make a distinction based on what type of CPNI consent (opt-in versus opt-out) received, as some commenters urge. [326]

105. We do not allow carriers to combine the express written consent to allow them to contact customers on a do-not-call list with the CPNI notice in the manner that AT&T Wireless describes. However, we do allow carriers to combine in the same document CPNI notice with a request for express written consent to call customers on a do-not-call list, provided that such notices and opportunities for consumer consent are separate and distinct. That is, consumers **\*14075** must have distinct choices regarding both whether to allow use of their CPNI and whether to allow calls after registering a do-not-call request, but carriers may combine those requests for approval in the same notice document. Finally, we find a distinction based on the type of CPNI consent unnecessary here, as carriers can avail themselves of the established business relationship exception to contact their existing customers, irrespective of the type of CPNI consent obtained.

106. Similarly, we agree with those commenters [327] who advise against using a time element to determine whether a customer's do-not-call request takes precedence over the customer's opt-in approval to use her CPNI, [328] because adding a time element would unnecessarily complicate carrier compliance and allow carriers to game the system. In particular, the New York State Consumer Protection Board argues that "enrollment on a national do-not-call list should take precedence over the prior implied consent through the 'opt-out' procedure, but that the latest in time should prevail regarding 'opt-in' consents." [329] Because we determine that carriers can contact consumers with whom they have established business relationships, irrespective of those consumers' CPNI preferences, we find this proposed methodology unnecessary in determining whether a customer's CPNI consent should trump her do-not-call request. Additionally, we note that this proposal could be manipulated by carriers to overcome consumers' do-not-call preferences, by allowing carriers to send CPNI notices to customers that are intentionally timed to "overcome" previously expressed do-not-call requests.

107. Finally, although it was not directly raised in the *2002 Notice*, some commenters raised the issue of whether any type of do-not-call request revokes or limits a carrier's ability to use CPNI in a manner other than telemarketing. [330] To the degree such affirmation is necessary, we agree with those commenters who maintain that a carrier's ability to use CPNI is not impacted by a customer's inclusion on a do-not-call list, except as noted above.

**\*\*38** 108. *Constitutional Implications*. We disagree with those commenters who argue that our decision that a customer's CPNI approval does not trump her request to be on a do-not-call list violates the First Amendment rights of carriers and customers. [331] Commenters cite no authority to support their arguments, and we do not believe the fact that customers have given their approval for carriers to use their CPNI implicates any additional First Amendment issues beyond those discussed in Section III.B.4., *supra*. Accordingly, we find our rules implementing the do-not-call registry are consistent with the First Amendment as applied to any consumer, including those who have previously given their approval to carriers to use their CPNI, pursuant to section 222. Furthermore, we believe that the exception which allows carriers to call consumers with whom they necessarily have an established business relationship renders **\*14076** commenters' arguments moot, as carriers necessarily have an established business relationship with any customer from whom they solicit CPNI approval.

## VI. ESTABLISHED BUSINESS RELATIONSHIP

### A. Background

109. The TCPA provides that the term "telephone solicitation" does not include a call or message to any person with whom the caller has an established business relationship (or EBR). [332] The Commission determined during its initial TCPA rulemaking

In re Rules and Regulations Implementing the Telephone, 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 299 of 409 PageID 368

that, based on the record and legislative history, the TCPA also permits an "established business relationship" exemption from the restrictions on artificial or prerecorded message calls to residences. [333] In the *2002 Notice*, we sought comment on the exemption generally, and more specifically, on the definition of "established business relationship," and whether any circumstances have developed that would justify revisiting these conclusions. [334] The current rules define the term "established business relationship" to mean:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party. [335]

110. Industry commenters overwhelmingly support retaining the exemption for calls to customers with whom companies have an established business relationship, [336] and many urge the Commission not to narrow the scope of the exemption. [337] Many industry members are also opposed to any time limitation on the exemption, [338] or any modification of the rules that would **\*14077** interfere with a company's ability to market different services and products. [339] Most consumer groups and state organizations support the exemption, provided the scope of the definition is narrowed. [340] A few consumers advocated eliminating the exemption for prerecorded messages. [341] Some consumer advocates disagreed with the assumption that consumers want to hear from companies with whom they have an existing relationship. One commenter stated that because a consumer might have established a relationship with a company does not necessarily mean that he or she wishes to receive telemarketing calls from that company. [342] Many consumers' groups argued that the relationship should be ongoing, [343] should require a completed transaction, such as a purchase or payment, [344] and should be limited in duration. [345] Of commenters who advocated a specific time limit on the EBR, there was less consensus about how long the relationship should last following a transaction between the seller and consumer. [346]

**\*\*39** 111. The FTC decided to provide an exemption for "established business relationships" from the national "do-not-call" registry, as long as the consumer has not asked to be placed on the seller's company-specific "do-not-call" list. The FTC's amended Rule limits the "established business relationship" exemption to relationships formed by the consumer's purchase, rental or **\*14078** lease of goods or services from, or financial transaction with, the seller within eighteen (18) months of the telephone call or, in the case of inquiries or applications, to three (3) months from the inquiry or application. [347] The FTC explained that this time frame is consistent with most state laws that include a time limit, [348] and is more in keeping with consumer expectations than an open-ended exemption. [349] The FTC also determined that affiliates will fall within the exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or services offered and the identity of the affiliate. [350]

## B. Discussion

112. We conclude that, based on the record, an established business relationship exemption is necessary to allow companies to communicate with their existing customers. [351] Companies maintain that the exemption allows them to make new offers to existing customers, such as mortgage refinancing, insurance updates, and subscription renewals. [352] They suggest that customers benefit from calls that inform them in a timely manner of new products, services and pricing plans. American Express

contends that its financial advisors have a fiduciary duty to their customers, requiring them to contact customers with time-sensitive information. [353] We are persuaded that eliminating this EBR exemption would possibly interfere with these types of business relationships. Moreover, the exemption focuses on the relationship between the sender of the message and the consumer, rather than on the content of the message. It appears that consumers have come to expect calls from companies with whom they have such a relationship, and that, under certain circumstances, they may be willing to accept these calls. [354] Finally, we believe that while consumers may find prerecorded voice messages intrusive, such messages do not necessarily impose the same costs on the recipients as, for example, unsolicited facsimile messages. [355] Therefore, we retain the exemption for established business relationship calls from **\*14079** the ban on prerecorded messages. Telemarketers that claim their prerecorded messages are delivered pursuant to an established business relationship must be prepared to provide clear and convincing evidence of the existence of such a relationship.

## 1. Definition of Established Business Relationship

113. We conclude that the Commission's current definition of "established business relationship" should be revised. We are convinced that consumers are confused and even frustrated more often when they receive calls from companies they have not contacted or done business with for many years. The legislative history suggests that it was Congress's view that the relationship giving a company the right to call becomes more tenuous over time. [356] In addition, we believe that this is an area where consistency between the FCC rules and FTC rules is critical for both consumers and telemarketers. We conclude that, based on the range of suggested time periods that would meet the needs of industry, along with consumers' reasonable expectations of who may call them and when, eighteen (18) months strikes an appropriate balance between industry practices and consumers' privacy interests. Therefore, the Commission has modified the definition of established business relationship to mean:

> **\*\*40** a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three (3) months immediately preceding the date of the call, which relationship has not been previously terminated by either party. [357]

The 18-month time period runs from the date of the last payment or transaction with the company, making it more likely that a consumer would expect a call from a company with which they have recently conducted business. The amended definition permits the relationship, once begun, to exist for eighteen (18) months in the case of purchases or transactions and three (3) months in the case of inquiries or applications, unless the consumer or the company "terminates" it. We emphasize here that the termination of an established business relationship is significant **\*14080** only in the context of solicitation calls. [358] Therefore, consistent with the language in the definition, a company's prior relationship with a consumer entitles the company to call that consumer for eighteen (18) months from the date of the last payment or financial transaction, even if the company does not currently provide service to that customer. [359] For example, a consumer who once had telephone service with a particular carrier or a subscription with a particular newspaper could expect to receive a call from those entities in an effort to " winback" or "renew" that consumer's business within eighteen (18) months. In the context of telemarketing calls, a consumer's "prior or existing relationship" continues for eighteen (18) months (3 months in the case of inquiries and applications) or until the customer asks to be placed on that company's do-not-call list. [360]

114. _Inquiries_. The Commission asked whether we should clarify the type of consumer _inquiry_ that would create an "established business relationship" for purposes of the exemption. Some consumers and consumer groups maintain that a consumer who merely inquires about a product should not be subjected to subsequent telemarketing calls. [361] Industry commenters, on the other hand, believe that companies should be permitted to call consumers who have made inquiries about their products and services, and that consumers have come to expect such calls. [362] The legislative history suggests that Congress contemplated that an inquiry by a consumer could be the basis of an established business relationship, [363] but that such an inquiry should occur within a reasonable period of time. [364] While we do not believe any communication would amount to an established business relationship for purposes of telemarketing calls, we do not think the definition should be narrowed to only include situations where a purchase or transaction is completed. [365] The nature of any inquiry must, however, be such to create an expectation on the **\*14081** part of the consumer that a particular company will call them. As confirmed by several industry commenters, an inquiry regarding a business's hours or location would not establish the necessary relationship as defined in Commission rules. [366] By making an inquiry or submitting an application regarding a company's products or services, a consumer might reasonably expect a prompt follow-up telephone call regarding the initial inquiry or application, not one after an extended period of time. Consistent with the FTC's conclusion, the Commission believes three months should be a reasonable time in which to respond to a consumer's inquiry or application. [367] Thus, we amend the definition of "established business relationship" to permit telemarketing calls within three (3) months of an inquiry or application regarding a product or service offered by the company.

**\*\*41** 115. We emphasize here that the definition of "established business relationship" requires a voluntary two-way communication between a person or entity and a residential subscriber regarding a purchase or transaction made within eighteen (18) months of the date of the telemarketing call or regarding an inquiry or application within three (3) months of the date of the call. Any seller or telemarketer using the EBR as the basis for a telemarketing call must be able to demonstrate, with clear and convincing evidence, that they have an EBR with the called party.

116. _Different Products and Services_. The Commission also invited comment on whether to consider modifying the definition of "established business relationship" so that a company that has a relationship with a customer based on one type of product or service may not call consumers on the do-not-call list to advertise a different service or product. [368] Industry commenters believe an EBR with a consumer should not be restricted by product or service, but rather, should permit them to offer the full range of their services and products. [369] Consumer advocates who commented on the issue maintain that a company that has a relationship based on one service or product should not be allowed to use that relationship to market a different service **\*14082** or product. [370] The Commission agrees with the majority of industry commenters that the EBR should not be limited by product or service. In today's market, many companies offer a wide variety of services and products. Restricting the EBR by product or service could interfere with companies' abilities to market them efficiently. Many telecommunications and cable companies, for example, market products and services in packages. [371] As long as the company identifies itself adequately, [372] a consumer should not be surprised to receive a telemarketing call from that company, regardless of the product being offered. If the consumer does not want any further calls from that company, he or she may request placement on its do-not-call list.

117. _Affiliated Entities_. In the _1992 TCPA Order_, the Commission found that a consumer's established business relationship with one company may also extend to the company's affiliates and subsidiaries. [373] Consumer advocates maintain that the EBR exemption should not automatically extend to affiliates of the company with whom a consumer has a business relationship. [374] Industry members argue that it should apply to affiliates that provide reasonably-related products or services. [375] The Commission finds that, consistent with the FTC's amended Rule, affiliates fall within the established business relationship exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or **\*14083** services offered and the identity of the affiliate. [376] This definition offers flexibility to companies whose subsidiaries or affiliates also make telephone solicitations, but it is based on consumers' reasonable expectations of which companies will call them. [377]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 302 of 409   PageID 371

As the ATA and other commenters explain, consumers often welcome calls from businesses they know. A call from a company with which a consumer has not formed a business relationship directly, or does not recognize by name, would likely be a surprise and possibly an annoyance. This determination is also consistent with current Commission rules on the applicability of do-not-call requests made to affiliated persons or entities. Under those rules, a residential subscriber's do-not-call request will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product advertised. [378]

**\*\*42** 118. _Other Issues_. The Commission clarifies that the established business relationship exemption does not permit companies to make calls based on referrals from existing customers and clients, [379] as the person referred presumably does not have the required business relationship with the company that received the referral. An EBR is similarly not formed when a wireless subscriber happens to use another carrier's services through roaming. [380] In such a situation, the consumer has not made the necessary purchase or inquiry that would constitute an EBR or provided prior express consent to receive telemarketing calls from that company. We recognize that companies often hire third party telemarketers to market their services and products. In general, those telemarketers may rely on the seller's EBR to call an individual consumer to market the seller's services and products. [381] However, we disagree with Nextel that a consumer's EBR with a third party telemarketer, including a retail store or independent dealer, extends to a seller simply because the seller has a contractual relationship with that telemarketer. The seller would only be entitled to call a consumer under the EBR exemption based on its own EBR with a consumer. [382] We also disagree with WorldCom that the EBR should extend to marketing **\*14084** partners for purposes of telemarketing joint offers, to the extent the "partner" companies have no EBR with the consumer. [383]

## 2. Telecommunications Common Carriers

119. In the _2002 Notice_, we asked what effect the established business relationship exemption might have on the telecommunications industry, if a national do-not-call list is established. According to WorldCom, telephone solicitations are the primary mechanism for, and the means by which consumers are accustomed to, purchasing competitive telecommunications services. [384] WorldCom argues that with the advent of competition in the formerly monopolized local telephone markets, and the entry of the Regional Bell Operating Companies into the long distance market, carriers need to be able to market effectively their new services. [385] WorldCom argues that a national do-not-call list that exempts calls to persons with whom a company has established business relationships will favor incumbent providers. [386] According to WorldCom, incumbent local exchange carriers maintain most of the local customer base, and therefore would be able to telemarket new services to all those customers, regardless of whether they were on the national do-not-call registry, because of the established business relationship exemption. New competitors, on the other hand, would be restricted from calling those same consumers.

120. One approach would be to narrow the "established business relationship" for telecommunications carriers, so that a carrier doing business with customers based on one type of service may not call those customers registered with the national do-not-call list to advertise a different service. [387] We find, however, that the record does not support such an approach in the context of telemarketing calls. Along with the majority of industry commenters in this proceeding, WorldCom maintains that companies "must have flexibility in communicating with their customers not only about their current services, but also to discuss available alternative **\*14085** services or products...." [388] Limiting a common carrier's "established business relationship" by product or service might harm competitors' efforts to market new goods or services to existing customers, and would not be in the public interest.

**\*\*43** 121. WorldCom proposes instead that the Commission revise the definition of established business relationship so that all providers of a telecommunications service–incumbents and new entrants alike–are deemed to have an established business relationship with all consumers. [389] Alternatively, WorldCom suggests that the definition of an established business relationship be revised to exclude a company whose relationship with a consumer is based solely on a service for which the company has

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 303 of 409 PageID 372

been a dominant or monopoly provider of the service, until such time as competitors for that service have sufficiently penetrated the market. [390]

122. Although we take seriously WorldCom's concerns about the potential effects of a national do-not-call list on competition in the telecommunications marketplace, we decline to expand the definition of "established business relationship" so that common carriers are deemed to have relationships with all consumers for purposes of making telemarketing calls. Broadening the scope of the established business relationship in such a way would be inconsistent with Congress's mandate "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." [391] To permit common carriers to call consumers with whom they have no existing relationships and who have expressed a desire not to be called by registering with the national do-not-call list, would likely confuse consumers and interfere with their ability to manage and monitor the telemarketing calls they receive. [392]

123. We further note that with the establishment of a national do-not-call registry, carriers will still be permitted to contact competitors' customers who have not placed their numbers on the national list. In addition, carriers will be able to call their prior and existing customers for 18 months to market new products and services, such as long distance, local, or DSL services, as long as those customers have not placed themselves on that carrier's company- **\*14086** specific do-not-call list. [393] For the remaining consumers with whom common carriers have no established business relationship and who are registered with the do-not-call list, carriers may market to them using different advertising methods, such as direct mail. Therefore, we find that treating common carriers like other entities that use the telephone to advertise, best furthers the goals of the TCPA to protect consumer privacy interests and to avoid interfering with existing business relationships.

### 3. Interplay Between Established Business Relationship and Do-Not-Call Request

124. In the *2002 Notice*, we sought comment on the effect of a do-not-call request on an established business relationship. [394] We noted the legislative history on this issue, which suggests that despite an established business relationship, a company that has been asked by a consumer not to call again, must honor that request and avoid further calls to that consumer. [395] Consumer advocates who discussed the interplay between the established business relationship and a do-not-call request maintained that a do-not-call request should "trump" an established business relationship, [396] and that consumers should not be required to terminate business relationships in order to stop unwanted telemarketing calls. [397] The majority of industry commenters also supported the notion that companies should honor requests from individual consumers not to be called, regardless of whether there is a business relationship. [398] As discussed earlier, companies will be permitted to call consumers with whom they have an established business relationship for a period of 18 months from the last payment or transaction, even when those consumers are registered on the national do-not-call list, as long as a consumer has not asked to be placed on the company's do-not-call list. Once the consumer asks to be placed on the company-specific do-not-call list, the company may not call the consumer again regardless of **\*14087** whether the consumer continues to do business with the company. This will apply to all services and products offered by that company. [399] If the consumer continues to do business with the telemarketer after asking not to be called (by, for example, continuing to hold a credit card, subscribing to a newspaper, or making a subsequent purchase), the consumer cannot be deemed to have waived his or her company-specific do-not-call request. [400] As described above, we amend the company-specific do-not-call rules to apply to " any call for telemarketing purposes" to make clear that a company must cease making telemarketing calls to any customer who has made a do-not-call request, regardless of whether they have an EBR with that customer. [401] We also adopt a provision stating that a consumer's do-not-call request terminates the EBR for purposes of telemarketing calls even if the consumer continues to do business with the seller. [402]

### VII. TAX-EXEMPT NONPROFIT ORGANIZATION EXEMPTION

### A. Background

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 304 of 409   PageID 373

**\*\*44** 125. The term "telephone solicitation," as defined in the TCPA, does not include a call or message "by a tax-exempt nonprofit organization." [403] The Commission concluded, as part of its *1995 Reconsideration Order*, that calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call. [404] Therefore, calls made by independent telemarketers on behalf of tax-exempt nonprofits also are not subject to the rules governing telephone solicitations. [405]

126. Over the years, the Commission has received inquiries about calls made jointly by nonprofit and for-profit organizations. In the *2002 Notice*, we described a scenario in which a tax-exempt nonprofit organization calls consumers to sell another company's magazines and receives a portion of the proceeds. We then asked whether such calls should be exempt from the restrictions on telephone solicitations and prerecorded messages as calls made by a tax-exempt **\*14088** nonprofit organization. [406]

127. Tax-exempt nonprofit organizations explained that they rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns. Therefore, they support the continued exemption for professional fundraisers that call on behalf of nonprofit organizations. [407] Many commenters, while supportive of the exemption for calls by nonprofits, were concerned that it frequently has been used to veil what is in reality a commercial venture. [408] Some commenters emphasized that "the TCPA nonprofit exemption should not function as an artifice for an inherently commercial enterprise." [409] NAAG, for example, maintained that calls that serve to benefit for-profit companies (in whole or in part) are not calls by or on behalf of nonprofits and should remain subject to the TCPA's restrictions. [410] The Association of Fundraising Professionals similarly asserted that this type of nonprofit/for-profit initiative does not represent a "pure" charitable appeal; that the primary purpose of such a transaction is receipt of a product or service by the consumer, not the charitable transfer of funds. [411] One commenter suggested that the test for whether a call is made on behalf of a nonprofit organization should be whether payment is made to the tax-exempt nonprofit organization. [412] DialAmerica, on the other hand, urged the Commission to confirm that the exemption also applies when for-profits call, conduct a commercial transaction, and donate a percentage of the proceeds to nonprofit organizations. [413]

**\*14089  B. Discussion**

128. We reaffirm the determination that calls made by a for-profit telemarketer hired to solicit the purchase of goods or services or donations on behalf of a tax-exempt nonprofit organization are exempted from the rules on telephone solicitation. [414] In crafting the TCPA, Congress sought primarily to protect telephone subscribers from unrestricted commercial telemarketing activities, finding that most unwanted telephone solicitations are commercial in nature. [415] In light of the record before us, the Commission believes that there has been no change in circumstances that warrant distinguishing those calls made by a professional telemarketer on behalf of a tax-exempt nonprofit organization from those made by the tax-exempt nonprofit itself. The Commission recognizes that charitable and other nonprofit entities with limited expertise, resources and infrastructure, might find it advantageous to contract out its fundraising efforts. [416] Consistent with section 227, a tax-exempt nonprofit organization that conducts its own fundraising campaign or hires a professional fundraiser to do it, will not be subject to the restrictions on telephone solicitations. [417] If, however, a for-profit organization is delivering its own commercial message as part of a telemarketing campaign (*i.e.*, encouraging the purchase or rental of, or investment in, property, goods, or services), [418] even if accompanied by a donation to a charitable organization or referral to a tax-exempt nonprofit organization, [419] that call is not *by or on behalf of a tax-exempt nonprofit organization.* [420] Such calls, whether made by a live telemarketer or using a prerecorded message, would not be entitled to exempt treatment under the TCPA. We emphasize here, as we did in the *2002 Notice*, that the statute and our rules clearly apply already to messages that are predominantly commercial in nature, and that we will not hesitate to consider enforcement action should the provider of an otherwise commercial message seek to immunize itself by simply inserting purportedly "non-commercial" content into that message. A call to sell debt consolidation services, for example, is a commercial call regardless of whether the consumer is also referred to a tax-exempt nonprofit organization

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 305 of 409   PageID 374

for counseling **\*14090** services. [421] Similarly, a seller that calls to advertise a product and states that a portion of the proceeds will go to a charitable cause or to help find missing children must still comply with the TCPA rules on commercial calls.

## VIII. AUTOMATED TELEPHONE DIALING EQUIPMENT

### A. Background

**\*\*45** 129. The TCPA and Commission's rules prohibit calls using an automatic telephone dialing system (or "autodialer") to emergency telephone lines, to the telephone line of a guest room of a health care facility, to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call. [422] Section 227 defines automatic telephone dialing system as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." [423] In the *2002 Notice*, the Commission explained that more sophisticated dialing systems, such as predictive dialers and answering machine detection software, are now widely used by telemarketers to increase productivity. We invited comment on these and other technologies and asked whether they fall within the restrictions on "automatic telephone dialing systems." [424]

130. Most industry members that commented on the issue of autodialed calls argue that predictive dialers do not fall within the statutory definition of "automatic telephone dialing system," primarily because, they contend, predictive dialers do not dial numbers "randomly or sequentially." [425] Rather, they state that predictive dialers store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers. [426] Most consumers and consumer groups maintain that predictive dialers are autodialers; that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference. [427] **\*14091** They argue that for the recipient of the call, there is no difference whether the number is dialed at random or from a database of numbers. [428] A few commenters contend that even when a database of numbers is used, the numbers can be dialed in sequence. [429] In addition, LCC urges the Commission to clarify that modems used for non-telemarketing purposes are excluded from the definition of "automatic telephone dialing system." [430]

### B. Discussion

### 1. Predictive Dialers

131. _Automated Telephone Dialing Equipment_. The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. [431] The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. [432] As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. [433] The principal feature of predictive dialing software is a timing function, not number storage or generation. Household Financial Services states that these machines are not conceptually different from dialing machines without the predictive computer program attached. [434]

**\*\*46** 132. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." [435] The statutory definition **\*14092** contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "*capacity* to store or produce telephone numbers (emphasis added)...." It is clear from the statutory language and the legislative history that Congress

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 306 of 409   PageID 375

anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. [436] In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. [437] The basic function of such equipment, however, has not changed–the *capacity* to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.

133. The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem–an increasing number of automated and prerecorded calls to certain categories of numbers. [438] The TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call. [439] Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to consumers. [440] Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these specified categories of numbers are particularly troublesome. Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the **\*14093** requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. [441] Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of " automatic telephone dialing equipment" and the intent of Congress. [442]

**\*\*47** 134. *Predictive Dialers as Customer Premises Equipment*. A few commenters maintain that predictive dialers are Customer Premises Equipment (CPE) [443] over which the Communications Act gives the FCC exclusive jurisdiction. [444] The ATA and DMA urge the Commission to assert exclusive authority over CPE and, in the process, preempt state laws governing predictive dialers. They contend that, in the absence of a single national policy on predictive dialer use, telemarketers will be subject to the possibility of conflicting state standards. [445] In the past, CPE was regulated as a common carrier service based on the Commission's jurisdiction and statutory responsibilities over *carrier-provided* equipment. [446] The Commission long ago deregulated CPE, finding that the CPE market was becoming increasingly competitive, and that in order to increase further the options that consumers had in obtaining equipment, it would require common carriers to separate the provision of CPE from the provision of telecommunications services. [447] As part of its review of CPE regulations, the Commission pointed out that it had never regarded the provision of terminal equipment in **\*14094** isolation as an activity subject to Title II regulation. [448] While the Commission recognized that such equipment is within the FCC's authority over wire and radio communications, [449] it found that the equipment, by itself, is not a "communication" service, and therefore there was no mandate that it be regulated. [450] None of the commenters who argue this point describe a change in circumstances that would warrant reevaluating the Commission's earlier determination and risk disturbing the competitive balance the Commission deemed appropriate in 1980. [451] In addition, it is not the equipment itself that states are considering regulating; it is the use of such equipment that has caught the attention of some state legislatures. [452] We believe it is preferable at this time to regulate the use of predictive dialers under the TCPA's specific authority to regulate telemarketing practices. Therefore, we decline to preempt state laws governing the use of predictive dialers and abandoned calls or to regulate predictive dialers as CPE.

## 2. "War Dialing"

135. In the *2002 Notice*, the Commission sought comment on the practice of using autodialers to dial large blocks of telephone numbers in order to identify lines that belong to telephone facsimile machines. Of those commenters who weighed in on "war dialing," [453] there was unanimous support for a ban on the practice. [454] Commenters explained that ringing a **\*14095**

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y  Document 13  Filed 01/19/24  Page 307 of 409  PageID 376

telephone for the purpose of determining whether the number is associated with a fax or voice line is an invasion of consumers' privacy interests and should be prohibited. Moreover, they asserted there is no free speech issue when the caller has no intention of speaking with the called party. [455]  The TCPA prohibits the transmission of unsolicited facsimile advertisements absent the consent of the recipient. The Commission agrees that because the purpose of "war dialing" is to identify those numbers associated with facsimile machines, the practice serves few, if any, legitimate business interests and is an intrusive invasion of consumers' privacy. Therefore, the Commission today adopts a rule that prohibits the practice of using any technology to dial any telephone number for the purpose of determining whether the line is a fax or voice line. [456]

## IX. ARTIFICIAL OR PRERECORDED VOICE MESSAGES

### A. Background

**\*\*48**  136. As described above, the TCPA and Commission rules prohibit telephone calls to residences using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is for emergency purposes or is specifically exempted. [457]  The TCPA permits the Commission to exempt from this provision calls which are non-commercial and commercial calls which do not adversely affect the privacy rights of the called party and which do not transmit an unsolicited advertisement. [458]  In its 1992 proceeding, the Commission determined to exempt calls that are non-commercial and commercial calls that do not contain an unsolicited advertisement, noting that messages that do not seek to sell a product or service do not tread heavily upon the consumer interests implicated by section 227. [459]  The Commission also concluded that a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests, and adopted an exemption for prerecorded messages delivered to consumers with whom a company has an established business relationship. [460]  Finally, the Commission concluded that tax-exempt nonprofit organizations should be exempt from the prohibition on prerecorded message calls to residences as non-commercial calls. [461]  In the *2002 Notice*, the Commission sought comment on  **\*14096**  artificial or prerecorded messages containing offers for free goods or services and messages purporting to provide "information only" about products or services. We also invited comment on calls seeking people to help sell or market a business' products. We asked whether such messages should be viewed as advertisements under the rules.

137. The record reveals that the practice of sending prerecorded messages to residential telephone lines is widespread. [462]  Consumers are frustrated by such messages, which often fill up the tapes of their answering machines, [463]  fail to identify adequately the company delivering the message, and provide no option for requesting that the company not call again. [464]  When consumers attempt to place their numbers on a do-not-call list in response to a prerecorded message, they often reach busy signals, [465]  additional prerecorded messages, or are told that do-not-call requests are not processed at that number. [466]  Consumers also indicate that they have been told by telemarketers that "free" offers and informational messages are not subject to the prerecorded message prohibition, as they do not ask the called party to purchase any product or service. [467]

138. The majority of consumers and consumer groups contend that messages offering "free" goods or services or those that claim to provide information-only are designed with the ultimate goal of soliciting consumers to buy products and services and are therefore prohibited without the prior express consent of the called party. [468]  These messages, they argue, are intended to generate future sales, and the fact that no sale occurs during the call is irrelevant to their intrusiveness. [469]  Industry members provided very few examples of prerecorded messages used to  **\*14097**  deliver advertisements. Instead, they described the benefits of communicating with existing customers through prerecorded messages. Commenters specifically cautioned the Commission against restricting "dual purpose" calls which, they contend, provide both a convenient customer service and cost effective marketing tool. [470]  One company explained that it uses prerecorded messages to notify its customers about delinquent bills or changes in service, and to simultaneously inform them of alternative services and products. [471]  Another commenter described messages sent by a mortgage broker alerting homeowners to lower interest rates and offering refinancing options. [472]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 308 of 409 PageID 377

## B. Discussion

### 1. Offers for Free Goods or Services; Information-Only Messages

**\*\*49** 139. Congress found that "residential telephone subscribers consider automated or prerecorded telephone calls ... to be a nuisance and an invasion of privacy." [473] It also found that "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." [474] Congress determined that such prerecorded messages cause greater harm to consumers' privacy than telephone solicitations by live telemarketers. The record reveals that consumers feel powerless to stop prerecorded messages largely because they are often delivered to answering machines and because they do not always provide a means to request placement on a do-not-call list.

140. Additionally, the term "unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." [475] The TCPA's definition does not require a sale to be made during the call in order for the message to be considered an advertisement. Offers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute "advertising the commercial availability or quality of any property, goods, or services." [476] Therefore, the Commission finds **\*14098** that prerecorded messages containing free offers and information about goods and services that are commercially available are prohibited to residential telephone subscribers, if not otherwise exempted. [477]

141. In addition, we amend the prerecorded message rule at 47 C.F.R. § 64.1200(c)(2) so that the prohibition expressly applies to messages that constitute "telephone solicitations," as well as to those that include or introduce an "unsolicited advertisement." [478] We agree with those commenters who suggest that application of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message. [479] Amending the rule to apply to messages that constitute "telephone solicitations," is consistent with the goals of the TCPA [480] and addresses the concerns raised by commenters about purported "free offers." [481] In addition, we believe the amended rule will afford consumers a greater measure of protection from unlawful prerecorded messages and better inform the business community about the general prohibition on such messages. [482]

142. The so-called "dual purpose" calls described in the record–calls from mortgage brokers to their clients notifying them of lower interest rates, calls from phone companies to customers regarding new calling plans, or calls from credit card companies offering overdraft protection to existing customers–would, in most instances, constitute "unsolicited advertisements," regardless of the customer service element to the call. [483] The Commission explained in the *2002 Notice* that such messages may inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services. If the call is intended to offer property, goods, or services for sale either during the call, or in the future (such as in response to a message that provides a toll-free number), that call is an advertisement. Similarly, a message that seeks people to help sell or **\*14099** market a business's products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, during or after the call. However, the Commission points out that, if the message is delivered by a company that has an established business relationship with the recipient, it would be permitted under our rules. We also note that absent an established business relationship, the telemarketer must first obtain the prior express consent of the called party in order to lawfully initiate the call. Purporting to obtain consent during the call, such as requesting that a consumer "press 1" to receive further information, does not constitute the *prior* consent necessary to deliver the message in the first place, as the request to "press 1" is part of the telemarketing call.

### 2. Identification Requirements

**\*\*50** 143. The TCPA rules require that all artificial or prerecorded messages delivered by an automatic telephone dialing system identify the business, individual, or other entity initiating the call, and the telephone number or address of such business, individual or other entity. [484] Additionally, the Commission's rules contain identification requirements that apply without limitation to "any telephone solicitation to a residential telephone subscriber." [485] The term "telephone solicitation" is defined to mean "the initiation of a telephone call or *message* for the purpose of encouraging the purchase or rental of ... property, goods, or services ..." (emphasis added). [486] We sought comment, however, on whether we should modify our rules to state expressly that the identification requirements apply to otherwise lawful artificial or prerecorded messages, as well as to live solicitation calls. [487]

144. The vast majority of consumer and industry commenters support modifying the rules to provide expressly that telemarketers must comply with the identification requirements when delivering prerecorded messages. [488] Some consumers urge the Commission to require specifically that companies provide the name of the company under which it is registered to do business. [489] They explain that a company will often use a "d/b/a" ("doing business as") or "alias" in the text of the prerecorded message, making it difficult to identify the company calling. The Commission recognizes that adequate identification information is vital so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules. [490] Therefore, we are amending our rules to expressly require **\*14100** that all prerecorded messages, whether delivered by automated dialing equipment or not, identify the name of the business, individual or other entity that is responsible for initiating the call, along with the telephone number of such business, other entity, or individual. [491] With respect to the caller's name, the prerecorded message must contain, at a minimum, the legal name under which the business, individual or entity calling is registered to operate. The Commission recognizes that some businesses use " d/b/as" or aliases for marketing purposes. The rule does not prohibit the use of such additional information, provided the legal name of the business is also stated. The rule also requires that the telephone number stated in the message be one that a consumer can use during normal business hours to ask not to be called again. [492] If the number provided in the message is that of a telemarketer hired to deliver the message, the company on whose behalf the message is sent is nevertheless liable for failing to honor any do-not-call request. This is consistent with the rules on live solicitation calls by telemarketers. [493] If a consumer asks not to be called again, the telemarketer must record the do-not-call request, and the company on whose behalf the call was made must honor that request.

### 3. Radio Station and Television Broadcaster Calls

**\*\*51** 145. The TCPA prohibits the delivery of prerecorded messages to residential telephone lines without the prior express consent of the called party. [494] Commission rules exempt from the prohibition calls that are made for a commercial purpose but do not include any unsolicited advertisement. [495] The Commission sought comment on prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or similar opportunity. [496] We asked whether the Commission should specifically address these kinds of calls, and if so, how. The record reveals that such calls by radio stations and television broadcasters do not at this time warrant the adoption of new rules. Few commenters in this proceeding described either receiving such messages or that they **\*14101** were particularly problematic. [497] The few commenters who addressed the issue were split on whether such messages fall within the TCPA's definition of "unsolicited advertisement" and are thus subject to the restrictions on their delivery. [498] We conclude that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the current rules as a commercial call that "does not include the transmission of any unsolicited advertisement" and under the amended rules as "a commercial call that does not include or introduce an unsolicited advertisement or constitute a telephone solicitation." [499] The Commission reiterates, however, that messages that are part of an overall marketing campaign to encourage the purchase of goods or services or that describe the commercial availability or quality of any goods or services, are "advertisements" as defined by the TCPA. Messages need not contain a solicitation of a sale during the call to constitute an advertisement.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 310 of 409 PageID 379

## X. ABANDONED CALLS

### A. Background

146. In the *2002 Notice,* the Commission noted that various technologies are widely used by telemarketers to contact greater numbers of consumers more efficiently.[500] We explained that the use of one such technology–predictive dialing software–may result in a significant number of abandoned calls.[501] Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call. In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead **\*14102** air."[502] Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call. Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate.[503] The higher the abandonment rate, the higher the number of hang-up calls. The Commission asked what approaches we might take to minimize the harm that results from the use of predictive dialers.[504] We invited comment specifically on the possibility of setting a maximum rate on the number of abandoned calls.[505]

**\*\*52** 147. The record shows that the use of predictive dialers has, in fact, become more prevalent in the telemarketing industry.[506] The record also reveals that predictive dialers are responsible for the vast majority of abandoned telemarketing calls–both hang-ups and "dead air" calls. Individual consumers report receiving between three and ten hang-up calls each day.[507] Consumers often feel harassed or aggravated by "dead air" calls.[508] Many describe the burdens these calls impose on individuals with disabilities, who often struggle to answer the telephone.[509] Hang-ups and "dead air" calls also can be frightening for the elderly.[510] Consumers complain that they do not have an opportunity to request placement on a company's do-not-call list when predictive dialers disconnect calls.[511] Abandoned calls can also interfere with Internet usage or simply tie-up telephone lines for people telecommuting or operating businesses out of the **\*14103** home.[512] Many consumer groups contend that the only way to effectively alleviate these harms is to implement a zero abandonment rate on calls delivered by predictive dialers, or one as close to zero as possible.[513] Other consumer advocates support a ban on predictive dialers altogether.[514]

148. Telemarketers acknowledge that use of predictive dialers results in a certain percentage of dropped calls.[515] But they contend that predictive dialers are a valuable tool for increasing productivity and lowering costs for telemarketers and, ultimately, for consumers.[516] Some industry members oppose restrictions on the use of predictive dialers, maintaining that the industry has "natural incentives" to keep abandonment rates low to avoid alienating consumers.[517] Others contend that a set rate would not account for the needs of various telemarketing campaigns.[518] While many telemarketers maintain that a maximum abandonment rate would eliminate the benefits that result from the use of predictive dialers,[519] most would nevertheless support a call abandonment rate of 5 percent.[520] A few commenters, including the DMA, would not oppose a 3 percent maximum rate.[521] One industry commenter, who supported a set abandonment rate on predictive dialers, stated that if non-telemarketing entities continue to dial without restriction, consumers will be encouraged to join do-not-call lists.[522]

149. In its telemarketing proceeding, the FTC determined that a total ban on abandoned calls would amount to a ban on predictive dialers, and would not strike the proper balance between addressing an abusive practice and allowing for a technology that reduces costs for **\*14104** telemarketers.[523] The FTC's amended Rule prohibits abandoned calls,[524] but provides in a "safe harbor" that a seller or telemarketer will not be deemed to have violated the TSR if the seller or telemarketer can show that its

conduct conforms to certain specified standards, including a call abandonment rate of no more than three (3) percent, measured on a per day per campaign basis. [525]

## B. Discussion

**\*\*53** 150. Given the arguments raised on both sides of this issue as well as the FTC's approach to the problem, the Commission has determined to adopt a rule to reduce the number of abandoned calls consumers receive. [526] Under the new rules, telemarketers must ensure that any technology used to dial telephone numbers abandons no more than three (3) percent of calls answered by a person, measured over a 30-day period. A call will be considered abandoned if it is not transferred to a live sales agent within two (2) seconds of the recipient's completed greeting. When a call is abandoned within the three (3) percent maximum allowed, a telemarketer must deliver a prerecorded identification message containing only the telemarketer's name, telephone number, and notification that the call is for "telemarketing purposes." To allow time for a consumer to answer the phone, the telemarketer must allow the phone to ring for **\*14105** fifteen seconds or four rings before disconnecting any unanswered call. Finally, telemarketers using predictive dialers must maintain records that provide clear and convincing evidence that the dialers used comply with the three (3) percent call abandonment rate, "ring time" and two-second-transfer rule.

## 1. Maximum Rate on Abandoned Calls

151. The Commission believes that establishing a maximum call abandonment rate is the best option to reduce effectively the number of hang-ups and "dead air" calls consumers experience. We recognize that industry generally advocates a five percent abandonment rate, claiming that a rate lower than five percent would reduce efficiencies the technology provides. [527] However, the Commission is not convinced that a five percent rate will lead to a reasonable reduction in the number of abandoned calls. The DMA's current guideline, cited by many commenters, calls for an abandonment rate of no higher than five percent. [528] And several telemarketers maintain that they now utilize an abandonment rate of five percent or lower in their calling campaigns. [529] Consumers nevertheless report receiving as many as 20 dropped calls per day that interrupt dinners, interfere with home business operations, and sometimes frighten the elderly and parents with young children. [530] A rule that is consistent with the FTC's will effectively create a national standard with which telemarketers must comply and should lead to fewer abandoned calls, while permitting telemarketers to continue to benefit from such technology. It is also responsive to Congress' mandate in the Do-Not-Call Act to maximize consistency with the FTC's rules.

152. The three percent abandonment rate will be measured over a 30-day period, a standard supported by several industry commenters. [531] Industry members maintain that measuring the abandonment rate on a per day basis would severely curtail the efficiencies gained from the use of predictive dialers, and may be overly burdensome to smaller telemarketers. A per day measurement, they argue, would not account for short-term fluctuations in marketing campaigns. [532] They further argue that the impact of abandoned calls on consumers depends more **\*14106** on the aggregate number of contacts made by a telemarketer over time and not on the number in any given day. [533] The Commission believes that a three (3) percent abandonment rate measured over a 30-day period will ensure that consumers consistently receive fewer disconnected calls, and that telemarketers are permitted to manage their calling campaigns effectively under the new rules on abandoned calls. Although we recognize that this rate of measurement differs from the FTC's rule, we believe a rate measured over a longer period of time will allow for variations in telemarketing campaigns such as calling times, number of operators available, number of telephone lines used by the call centers, and other similar factors. [534] The record also suggests that an abandonment rate measured over a 30-day period will allow telemarketers to more easily comply with the recordkeeping requirements associated with the use of predictive dialers. [535]

## 2. Two-Second-Transfer Rule

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 312 of 409   PageID 381

**54  153. The record confirms that many consumers are angered by the "dead air" they often face when answering the telephone. Running to the telephone only to be met by silence can be frustrating and even frightening, if the caller cannot be identified. [536] To address the problem of "dead air" produced by dialing technologies, the Commission has determined that a call will be considered abandoned if the telemarketer fails to connect the call to a sales representative within two (2) seconds of the person's completed greeting. [537] Calls disconnected because they were never answered (within the required 15 seconds or 4 rings) or because they received busy signals will not be considered abandoned. [538] This requirement is consistent with the FTC's rule. [539]

154. *Answering Machine Detection*. Opposition from industry to the two-second-transfer requirement appears to be based largely on its implications for use of Answering Machine Detection (AMD). [540] Some industry members explain that AMD is used by telemarketers to detect answering machines, and thereby avoid leaving messages on them. [541] The **14107** ATA and DMA maintain that if telemarketers are required to connect to a sales agent or message within 1-2 seconds, a large percentage of calls reaching answering machines will be transferred to sales agents, thereby reducing the efficiencies gained from AMD. [542] According to these commenters, 1-2 seconds is often insufficient for AMD to determine accurately if the call has reached an answering machine. [543] Other commenters explain that AMD is used instead by telemarketers to transmit prerecorded messages to answering machines; in such circumstances, calls that reach live persons are disconnected. [544] It is unclear from the record how prevalent the use of AMD is in the telemarketing industry. One commenter stated that the elimination of AMD would put "consumer-oriented" telemarketing firms out of business. [545] However, other industry members acknowledge that AMD contributes significantly to the amount of "dead air" consumers experience, [546] and one large telemarketing firm maintains that AMD should be banned completely. [547] The Commission believes that the record does not warrant a ban on the use of AMD. Instead, if the AMD technology is deployed in such a way that the delay in transfer time to a sales agent is limited to two seconds, then its continued use should not adversely affect consumers' privacy interests. [548]

**14108  3. Prerecorded Message for Identification**

155. As noted above, the FTC's "safe harbor" provisions require that, when a sales agent is unavailable to speak to a person answering the phone, marketers deliver a prerecorded message that states the name and telephone number of the seller on whose behalf the call was made. [549] The Commission has similarly determined that when a telemarketer abandons a call under the three (3) percent rate allowed, the telemarketer must deliver a prerecorded message containing the name of the business, individual or other entity initiating the call, as well as the telephone number of such business, individual or other entity. The message must also state that the call is for "telemarketing purposes." [550] We recognize that many consumers are frustrated with prerecorded messages. [551] However, the record also reveals that consumers are frightened and angered by "dead air" calls and repeated hang-ups. A prerecorded message, limited to identification information only, should mitigate the harms that result from "dead air," as consumers will know who is calling them. [552] And, they will more easily be able to make a do-not-call request of a company by calling the number provided in the message. We note that such messages sent in excess of the three (3) percent allowed under the call abandonment rate, will be considered abandoned calls, unless otherwise permitted by our rules. The content of the message must be limited to name and telephone number, along with a notice to the called party that the call is for "telemarketing purposes." The message may not be used to deliver an unsolicited advertisement. [553] We caution that additional information in the prerecorded message constituting an unsolicited advertisement would be a violation of our rules, if not otherwise permitted under 47 C.F.R. § 64.1200(a)(2). [554]

**4. Established Business Relationship**

**55  156. While the TCPA prohibits telephone calls to residential phone lines using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, the Commission determined that the TCPA permits an

exemption for established business **\*14109** relationship calls from the restriction on artificial or prerecorded message calls to residences. [555] As discussed in detail above, the record reveals that an established business relationship exemption is necessary to allow companies to contact their existing customers. [556] Companies currently use prerecorded messages, for example, to notify their customers about new calling plans, new mortgage rates, and seasonal services such as chimney sweeping and lawn care. [557] Therefore, prerecorded messages sent by companies to customers with whom they have an established business relationship will not be considered " abandoned" under the revised rules, if they are delivered within two (2) seconds of the person's completed greeting. Similarly, any messages initiated with the called party's prior express consent and delivered within two (2) seconds of the called person's completed greeting are not "abandoned" calls under the new rules. [558] Such messages must identify the business, individual or entity making the call and contain a telephone number that a consumer may call to request placement on a do-not-call list. We recognize that the established business relationship exception to the prohibition on prerecorded messages conflicts with the FTC's amended rule. [559] However, for the reasons described above, we believe the current exception is necessary to avoid interfering with ongoing business relationships.

**5. Ring Duration**

157. The Commission also adopts a requirement that telemarketers allow the phone to ring for 15 seconds or four (4) rings before disconnecting any unanswered call. This standard is consistent with that of the FTC, similar to current DMA guidelines, [560] and used by some telemarketers already. [561] One industry commenter asserted that telemarketers often set the predictive dialers to ring for a very short period of time before disconnecting the call; in such cases, the predictive dialer does not record the call as having been abandoned. [562] The practice of ringing and then disconnecting the call before the consumer has an opportunity to answer the phone is intrusive of consumer privacy and serves only to increase efficiencies for telemarketers. Moreover, in discussing the interplay between the FTC's rules with the Commission's rules, **\*14110** very few commenters opposed the "ring time" requirement adopted by the FTC, [563] or raised any particular concerns about how it might work in the TCPA framework. Therefore, given the substantial interest in protecting consumers' privacy interests, as well as Congress's direction to maximize consistency with the FTC's rules, we have determined to adopt the 15 second or four (4) ring requirement.

**\*\*56** 158. Finally, consistent with the FTC's rules, the Commission has determined that telemarketers must maintain records establishing that the technology used to dial numbers complies with the three (3) percent call abandonment rate, "ring time," and two-second rule on connecting to a live sales agent. Telemarketers must provide such records in order to demonstrate compliance with the call abandonment rules. Only by adopting a recordkeeping requirement will the Commission be able to adequately enforce the rules on the use of predictive dialers.

159. The TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls, and therefore exempts calls or messages by tax-exempt nonprofit organizations from the definition of telephone solicitation. [564] Therefore, the Commission has determined not to extend the call abandonment rules to tax-exempt nonprofit organizations in the absence of further guidance from Congress. [565] However, the call abandonment rules will apply to all other companies engaged in telemarketing, and the existence of an established business relationship between the telemarketer and consumer will not be an exception to these rules. For these entities, the call abandonment rules will become effective on October 1, 2003. We decline to establish an effective date beyond October 1, 2003, which is consistent with the date that telemarketers must comply with the FTC's call abandonment rules. [566] This should permit telemarketers to make any modifications to their autodialing equipment or purchase any new software to enable them to comply with the three (3) percent call abandonment rate, the prerecorded message requirement and the two-second-transfer rule.

**XI. WIRELESS TELEPHONE NUMBERS**

**A. Background**

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 314 of 409    PageID 383

160. In the *2002 Notice*, the Commission noted that the TCPA permits the Commission to exempt from the restrictions on autodialer or prerecorded message calls, "calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to **\*14111** such conditions as the Commission may prescribe as necessary in the interest of the privacy rights [the TCPA] is intended to protect." [567] In the *1992 TCPA Order*, the Commission concluded that calls made by *cellular carriers* to their subscribers for which the subscribers were not charged do not fall within the prohibitions on autodialers or prerecorded messages. [568] We sought comment on the extent to which telemarketing to wireless consumers exists today and if so, the nature and frequency of such solicitations. [569] We asked whether there are other types of calls to wireless telephone numbers that are not charged to the called party, and whether such calls also should not fall within the prohibitions on autodialers or prerecorded messages. [570] We also sought comment on any developments anticipated in the near future that may affect telemarketing to wireless phone numbers. Specifically, we asked how telemarketers will identify wireless numbers in order to comply with the TCPA when consumers are able to port numbers from their wireline phones to wireless phones, [571] or receive numbers from a thousands-block [572] that was part of a central office code previously assigned to a wireline carrier. [573] The Commission further sought comment on whether the Commission's rules should be modified to facilitate telemarketers' efforts to comply with the TCPA.

**\*\*57** 161. *Local Number Portability and Pooling*. The Commission's local number portability (LNP) decisions date back to 1996, with the Commission granting a number of extensions to the effective date for wireless carriers, providing the industry and other interested parties with extensive advance notice of the impending implementation of wireless LNP. The Commission determined in the *Number Portability First Report and Order* that LECs and certain CMRS providers operating in the 100 largest MSAs must offer local number portability, according to a phased deployment schedule. [574] This requirement was subsequently limited by the *Number Portability First Order on Reconsideration*, in which the Commission concluded that LECs and covered CMRS providers were required only to deploy LNP within switches for which **\*14112** another carrier has made a specific request for the provision of LNP. [575] CMRS carriers are required to implement LNP on November 24, 2003, for switches in the top 100 MSAs requested by February 24, 2003. [576] After November 24, 2003, CMRS carriers have 30 to 180 days from the request date to implement number portability for switches in the top 100 MSAs not previously requested and for switches outside the top 100 MSAs. [577]

162. In the *Numbering Resource Optimization First Report and Order*, the Commission established national thousands-block number pooling (pooling) as an LNP-based numbering resource optimization measure designed to help slow the pace of area code and North American Numbering Plan (NANP) exhaust. [578] This measure involves breaking up the 10,000 numbers in an NXX into ten sequential blocks of 1,000 numbers each, and allocating each thousands-block to a different service provider, and possibly a different switch, within the same rate center. The Commission mandated participation in national pooling by all carriers that are required to be LNP-capable, because it believed that LNP capability was required before a carrier could participate in thousands-block number pooling. [579] In the *Numbering Resource Optimization Fourth Report and Order*, the Commission determined that thousands-block number pooling need not be linked to a carrier's ability to provide LNP because a carrier can participate in pooling once it deploys the location routing number architecture. [580] The Commission, therefore, concluded that all carriers, except those specifically exempted, are required to participate in thousands-block number pooling in accordance with the national rollout schedule, [581] regardless of whether they are required to provide LNP, including covered CMRS **\*14113** providers. [582]

163. *Telemarketing to Wireless Numbers.* The record suggests that while consumers receive telemarketing calls on their wireless phones, it is not a widespread practice at this time. [583] However, some industry members believe that telemarketing calls to wireless numbers are likely to increase, [584] particularly as growing numbers of consumers use wireless phones as their primary phones. [585] One commenter pointed out that the record in this proceeding demonstrates that telemarketers would like to solicit

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 315 of 409   PageID 384

consumers on their wireless phones.[586] Although the record does not reflect the full panoply of methods telemarketers currently use to avoid calling wireless telephone numbers, the record provides a sampling of such methods.[587] For example, the Direct Marketing Association's (DMA) Telephone Preference Service allows consumers to opt-out of national telemarketing lists, allowing consumers to register their wireless phone numbers in order to ensure that they do not receive telemarketing calls on their wireless phones.[588] Additionally, the DMA has created the "Wireless Telephone Suppression Service."[589] A number of commenters contended that telemarketing to wireless phones is not a significant problem, indicating that the industries' voluntary efforts have been successful.[590] Commenters also state that the wireless and telemarketing industries have been actively working together to ensure that telemarketing does not become a problem for wireless customers.[591]

**\*\*58  \*14114**  164. Most consumer groups maintain that all telemarketing calls to wireless numbers should be prohibited, regardless of whether they are made using an autodialer, prerecorded message, or live sales agent.[592] The vast majority of consumer advocates contend that telemarketing calls to cell phones are as intrusive of consumers' privacy interests as calls to landline phones.[593] Some believe they are more so, as consumers carry their cell phones on their persons, to work, and while driving.[594] Some also contend the prohibition should apply whether the consumer incurs a per-minute charge or a reduction from a "bucket" of minutes purchased at a fixed rate.[595] A few industry commenters agree that wireless subscribers should be protected from telemarketing calls to their wireless numbers.[596] Other industry members contend that wireless phones should be treated like wireline phones, in part because of the difficulty in distinguishing between wireline and wireless numbers.[597] American General Finance argues that the incremental cost of receiving a cell phone call is not significantly different from the cost of receiving a non-cellular call.[598] Some commenters suggest permitting calls to wireless numbers when there is an established business relationship,[599] when the calls are made for survey research purposes,[600] or when consumers have provided their cell phone numbers to the calling entity.[601] The ATA urges the Commission to find that calls to cellular telephones are not "charged to the called party" as contemplated by the TCPA's restriction on autodialed calls.[602]

**\*14115  B. Discussion**

**1. Telemarketing Calls to Wireless Numbers**

165. We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number.[603] Both the statute and our rules[604] prohibit these calls, with limited exceptions, "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged."[605] This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service.[606] Congress found that automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls.[607] Moreover, such calls can be costly and inconvenient.[608] The Commission has long recognized, and the record in this proceeding supports the same conclusion, that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.[609] Wireless subscribers who purchase a large "bucket" of minutes at a fixed rate nevertheless are charged for those minutes, and for any minutes that exceed the "bucket" allowance. This "bucket" could be exceeded more quickly if consumers receive numerous unwanted telemarketing calls.[610] Moreover, as several commenters point out, telemarketers have no way to determine how consumers are charged for their wireless service.

**\*\*59  \*14116**  166. Although the same economic and safety concerns apply to all telephone solicitation calls received by wireless subscribers, the Commission has determined not to prohibit all live telephone solicitations to wireless numbers.[611] The national do-not-call database will allow for the registration of wireless telephone numbers for those subscribers who wish

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 316 of 409   PageID 385

to avoid live telemarketing calls to their wireless phones. Wireless subscribers thus have a simple means of preventing most live telemarketing calls if they so desire. [612] Moreover, relying on the do-not-call database to control live telephone solicitations recognizes that prohibiting such calls to wireless numbers may unduly restrict telemarketers' ability to contact those consumers who do not object to receiving telemarketing calls [613] and use their wireless phones as either their primary or only phone. [614]

167. The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists. [615] For the reasons described above, [616] we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers. [617]

**2. Wireless Number Portability and Pooling**

168. Based on the evidence in the record, we find that it is not necessary to add rules to implement the TCPA as a result of the introduction of wireless LNP and thousands-block number pooling. The TCPA rules prohibiting telemarketers from placing autodialed and prerecorded message calls to wireless numbers have been in place for twelve years. [618] Further, the Commission's pooling requirements have been in place for several years and the porting requirements have been in place for over five years. Accordingly, telemarketers have received sufficient notice of these requirements in order to develop business practices that will allow them to continue to comply with the TCPA.

**\*14117** 169. Additionally, telemarketers have taken measures in the past to identify wireless numbers, and there is no indication that these measures would not continue to be effective for identifying wireless numbers affected by pooling and porting. As noted above, the industry currently makes use of a variety of tools to enable it to avoid making prohibited calls. As discussed in detail *supra*, [619] the record provides a sampling of methods, including the DMA's "Wireless Telephone Suppression Service," that telemarketers use to avoid making prohibited calls to wireless numbers. [620]

170. LNP and pooling do not make it impossible for telemarketers to comply with the TCPA. The record demonstrates that information is available from a variety of sources to assist telemarketers in determining which numbers are assigned to wireless carriers. For example, NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers. Also, other commercial enterprises such as Telcordia, the owner-operator of the Local Exchange Routing Guide (LERG) maintain information that can assist telemarketers in identifying numbers assigned to wireless carriers. We acknowledge that beginning November 24, 2003, numbers previously used for wireline service could be ported to wireless service providers and that telemarketers will need to take the steps necessary to identify these numbers. We also note that there are various solutions that will enable telemarketers to identify wireless numbers in a pooling and number portability environment. We decline to mandate a specific solution, but rather rely on the telemarketing industry to select solutions that best fit telemarketers' needs. The record demonstrates that telemarketers have found adequate methods in the past to comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to any telephone number assigned to a cellular telephone service, a paging service, or any service for which the called party is charged for the call. We expect telemarketers to continue to make use of the tools available in the marketplace in order to ensure continued compliance with the TCPA. [621]

**\*\*60** 171. Moreover, the record indicates that telemarketing to wireless phones is not a significant problem, indicating that the industries' voluntary efforts have been successful. [622] Commenters further declare that the wireless and telemarketing industries have been actively working together to ensure that telemarketing does not become a problem for wireless customers.

172. Finally, we reject proposals to create a good faith exception for inadvertent autodialed or prerecorded calls to wireless numbers and proposals to create implied consent because we find that there are adequate solutions in the marketplace to enable telemarketers to **\*14118** identify wireless numbers. [623]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 317 of 409 PageID 386

## XII. CALLER IDENTIFICATION

### A. Background

173. In the *1992 TCPA Order*, the Commission considered whether to require telemarketers to use a special area code or telephone number prefix that would allow consumers to block unwanted telephone solicitations using a caller identification (caller ID) service. Based on cost and the "technological uncertainties associated with implementation," the Commission declined to adopt any type of network technologies to accomplish the objectives of the TCPA. [624]

174. In the *2002 Notice*, the Commission sought comment on whether network technologies have been developed over the last decade that may allow consumers to avoid receiving unwanted telephone solicitations. The Commission sought comment specifically on whether to require telemarketers to transmit the name and telephone number of the calling party, when possible, or prohibit them from blocking or altering the transmission of such information. [625] Comments filed by consumers, state utility commissions, and wireless service providers generally support a requirement that telemarketers transmit caller identification information. [626] Consumers are frustrated by the failure of many telemarketers to transmit caller ID information, which, under certain circumstances, makes it difficult for consumers to enforce the TCPA. [627] Commenters also noted that the increased use of predictive dialers has led to a corresponding increase in the number of hang-ups. Caller ID information would allow consumers, they contend, to identify those telemarketers responsible for hang-up calls. [628] Some commenters stated that the inability to identify callers has led them to purchase other tools, such **\*14119** as the " telezapper," to try to stop unwanted solicitation calls. [629] Most commenters that addressed these issues support a prohibition against the blocking of caller ID information. [630] Several parties stated that the Commission should prohibit blocking independent of any caller ID mandate. [631] It was also suggested that the Commission could prohibit tampering with data or providing false data. [632]

175. Some industry members suggest that the transmission of caller ID information may not be technically possible in all circumstances. [633] They also maintain that a caller ID requirement could be costly for telemarketers. [634] One particular concern raised by parties opposed to a caller ID mandate is the technical feasibility of transmitting caller ID information when using private branch exchanges (PBX). WorldCom maintains that, in situations where telemarketers use a PBX that connects to their telephone company through typical T-1 trunks, Calling Party Number (CPN) cannot be transmitted. [635] WorldCom contends that Integrated Services Digital Network (ISDN) T-1 trunks *may* be capable of transmitting CPN, but that typical T-1 trunks do not have this capability. [636] DialAmerica notes that it has been delivering CPN for over two years using regular T-1 trunk groups provisioned by AT&T. [637] DialAmerica transmits an outgoing number which is captured by caller ID equipment. If a consumer chooses to call that number, the local exchange carrier (LEC) forwards the call to DialAmerica's **\*14120** customer service center. [638] DialAmerica asserts that ISDN T-1 trunks are available from all carriers and enable a user to control whether CPN is delivered and what telephone number is displayed. [639] WorldCom notes that even if we accept DialAmerica's assertion that ISDN trunks are universally available, carriers would have to upgrade network switches to accommodate additional digital switch ports necessitated by telemarketers' shift to ISDN-PRI trunks. [640]

**\*\*61** 176. Telemarketers also raised technical concerns that the ability to transmit caller ID information is dependent on the deployment of Signaling System 7 (SS7). [641] They argue that SS7 is not nationally deployed and thus the capability to transmit caller ID is not available throughout the country. [642] Moreover, they maintain that Commission rules exempt PBX and Centrex systems from existing caller ID requirements because some of them cannot transmit CPN, [643] and not all carriers are able or permitted to transmit CPN, if they lack blocking capability. [644] The DMA and WorldCom expressed concern that regardless

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 318 of 409   PageID 387

of whether the telemarketer is able to transmit CPN, consumers will expect it, and may incorrectly believe a company has violated the rules. [645]

177. Several parties argue that even if a telemarketer can transmit CPN information, how to transmit a number that is useful to consumers remains a challenge. [646] Comments were mixed on what information actually needed to be transmitted for purposes of caller ID. Several parties opined that the name of the telemarketing operator would be adequate identification. [647] Others asserted that the name of the company on whose behalf the call was being made should be provided. [648] Emergency Communications Network argued that a company's website information should be a permitted as a substitute for the name and phone number. [649]

178. The FTC's amended TSR mandates transmission of caller ID information and **\*14121** prohibits any seller or telemarketer from "failing to transmit or cause to be transmitted the telephone number, and when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call." [650] Under the FTC's rule, telemarketers may transmit any number associated with the telemarketer that allows the called consumer to identify the caller. [651] The FTC concluded that transmission of caller ID would provide increased accountability and was technically feasible at minimal costs to telemarketers. The DMA stated that it was concerned that technical issues were not adequately taken into account during the FTC's proceeding. The DMA requested that the FCC initiate a comprehensive review of the technical feasibility of caller ID. [652]

**B. Discussion**

179. The Commission has determined to require all sellers and telemarketers to transmit caller ID information, regardless of their calling systems. In addition, any person or entity engaging in telemarketing is prohibited from blocking the transmission of caller ID information. Caller ID information must include either ANI or CPN and, when available by the telemarketer's carrier, the name of the telemarketer. If the information required is not passed through to the consumer, through no fault of the telemarketer originating the call, then the telemarketer will not be held liable for failure to comply with the rules. [653] In such a circumstance, the telemarketer must provide clear and convincing evidence that the caller ID information could not be transmitted. However, the Commission concurs with the FTC that caller ID information can be transmitted cost effectively for the vast majority of calls made by telemarketers. [654] Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again. Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and "dead air" calls. [655] We disagree with those commenters who argue that caller ID information only benefits those consumers who subscribe to caller ID services. [656] Consumers can also use the \*69 feature to **\*14122** obtain caller ID information transmitted by a telemarketer. [657] Caller ID also should increase accountability and provide an important resource for the FCC and FTC in pursuing enforcement actions against TCPA and TSR violators. [658]

**\*\*62** 180. We conclude that while SS7 capability is not universally available, the vast majority of the United States has access to SS7 infrastructure. The SS7 network contains functionality to transmit both the CPN and the charge number. [659] Under the Commission's rules, with certain limited exceptions, common carriers using SS7 and offering or subscribing to any service based on SS7 functionality are required to transmit the CPN associated with an interstate call to connecting carriers. [660] Regardless of whether SS7 is available, a LEC at the originating end of a call must receive and be able to transmit the Automated Number Identification (ANI) to the connecting carrier, [661] as the ANI is the number transmitted through the network that identifies the calling party for billing purposes. Thus, we determine that telemarketers must ensure that either CPN or ANI is made available for all telemarketing calls in order to satisfy their caller ID requirements. Whenever possible, CPN is the preferred number and should be transmitted. [662] Consistent with the FTC's rules, CPN can include any number associated with the telemarketer or party on whose behalf the call is made, that allows the consumer to identify the caller. [663] This includes a number assigned to

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 319 of 409   PageID 388

the telemarketer by its carrier, the specific number from which a sales representative placed a call, the number for the party on whose behalf the telemarketer is making the call, or the seller's customer service number. Any number supplied must permit an individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign. [664]

**\*14123**  181. As discussed above, some commenters state that it is not technically feasible for telemarketers to transmit caller ID information when using a PBX and typical T-1 trunks. [665]  As noted by NASUCA, the Commission's rules exempt from the current caller ID rules, PBX and Centrex systems which lack the capability to pass CPN information. Regardless of whether a call is made using a typical T-1 trunk or an ISDN trunk, ANI is transmitted to the Local Exchange Carrier for billing purposes. [666] With both PBX and Centrex systems, the carrier can determine the billing number from the physical line being used to make a call, even if the billing number is not transmitted along that line to the carrier. We are cognizant of the fact that with PBX and Centrex systems, the billing number could be associated with multiple outgoing lines. Nevertheless, telemarketers using PBX or Centrex systems are required under the new rules not to block ANI, at a minimum, for caller ID purposes.

182. We recognize that ISDN technology is preferred, as it presents the opportunity to transmit both CPN and ANI. However, in situations where existing technology permits only the transmission of the ANI or charge number, then the ANI or charge number will satisfy the Commission's rules, provided it allows a consumer to make a do-not-call request during regular business hours. [667]  By allowing transmission of ANI or charge number to satisfy the caller ID requirement, we believe that carriers need not incur significant costs to upgrade T-1 and ISDN switches. [668]  For these same reasons, we also believe that mandating caller ID will not create a competitive advantage towards particular carriers. [669]  As typical T-1 technology is upgraded to ISDN technology, we expect that telemarketers will increasingly be able to transmit the preferred CPN instead of ANI or charge number.

**\*\*63**  183. Finally, the record strongly supports a prohibition on blocking caller ID information. [670]  Both NCL and NASUCA state that there is no valid reason why a telemarketer should be allowed to intentionally block the transmission of caller ID. [671] We conclude that the  **\*14124**  caller ID requirements for commercial telephone solicitation calls do not implicate the privacy concerns associated with blocking capability for individuals. [672]  We recognize that absent a prohibition on blocking, a party could transmit CPN in accordance with the new rules and simultaneously transmit a request to block transmission of caller ID information. Thus, the Commission has determined to prohibit any request by a telemarketer to block caller ID information or ANI.

184. As explained above, the TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls. Therefore, the Commission has determined not to extend the caller ID requirements to tax-exempt nonprofit organizations. However, the caller ID rules will apply to all other companies engaged in telemarketing, and the existence of an established business relationship between the telemarketer and the consumer shall not be an exception to these rules. For all covered entities, the effective date of the caller ID requirements will be January 29, 2004. [673]  This will provide telemarketers a reasonable period of time to obtain or update any equipment or systems to enable them to transmit caller ID information. We decline to extend the effective date beyond January 29, 2004, which is consistent with the date on which telemarketers are required to comply with the FTC's caller ID provision. [674]

## XIII. UNSOLICITED FACSIMILE ADVERTISEMENTS

### A. Background

185. The TCPA prohibits the use of any telephone facsimile machine, computer or other device to send an "unsolicited advertisement" to a telephone facsimile machine. [675]  An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 320 of 409   PageID 389

person's prior express invitation or permission." [676]  The TCPA also requires those sending any messages via telephone facsimile machines to identify themselves to message recipients. [677]  In **\*14125** the *1992 TCPA Order*, the Commission stated that "the TCPA leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition." [678]  It noted, however, that facsimile transmission from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. [679]  The Commission sought comment on the effectiveness of these regulations and on any developing technologies, such as computerized fax servers, that might warrant revisiting the rules on unsolicited faxes. [680]  We specifically asked about the need to clarify what constitutes prior express invitation or permission for purposes of sending an unsolicited fax. [681]

 **\*\*64**  186. The record indicates that some consumers feel "besieged" by unsolicited faxes; [682]  others explain that advertisers continue to send faxes despite asking to be removed from senders' fax lists. [683]  Consumers emphasize that the burden of receiving unsolicited faxes is not just limited to the cost of paper and toner, but includes the time spent reading and disposing of faxes, the time the machine is printing an advertisement and is not operational for other purposes, and the intrusiveness of faxes transmitted at inconvenient times, including in the middle of the night. [684]  Some of the consumer advocates maintain that the current rules are ineffective [685]  and urge the Commission to take tougher measures to stop unwanted faxes by stricter enforcement measures, [686]  including higher penalties. A few home-based businesses and other companies maintain that facsimile advertisements interfere with receipt of faxes connected to their own business, and that the time spent collecting and sorting these faxes increases their labor costs. [687]   **\*14126**  Industry members maintain that faxing is a cost-effective way to reach customers, [688]  and that the current exemption for established business relationships works well, [689]  particularly for small businesses for whom faxing is a cheaper way to advertise. [690]

**B. Discussion**

**1. Prior Express Invitation or Permission**

187. The Commission has determined that the TCPA requires a person or entity to obtain the prior express invitation or permission of the recipient before transmitting an unsolicited fax advertisement. This *express* invitation or permission must be in writing and include the recipient's signature. [691]  The recipient must clearly indicate that he or she consents to receiving such faxed advertisements from the company to which permission is given, and provide the individual or business's fax number to which faxes may be sent.

188. *Established Business Relationship*. The TCPA does not act as a total ban on fax advertising. Persons and businesses that wish to advertise using faxes may, under the TCPA, do so with the express permission of the recipients. In the *2002 Notice*, we sought comment on whether an established business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisements. [692]  The majority of industry commenters support the finding that facsimile transmissions from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. [693]  These commenters maintain that eliminating the EBR exemption for facsimile  **\*14127**  advertisements would interfere with ongoing business relationships, raise business costs, and limit the flow of valuable information to consumers. [694]  They urge the Commission to amend the rules to expressly provide for the EBR exemption. [695]  Conversely, the majority of consumer advocates argue that the TCPA requires companies to obtain express permission from consumers–even their existing customers–before transmitting a fax to a consumer. [696]  Some consumer advocates maintain that the Commission erred in its 1992 determination that a consumer, by virtue of an established business relationship, has given his or her express invitation or permission to receive faxes from that company. [697]  They urge the Commission to eliminate the

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 321 of 409    PageID 390

EBR exemption, noting that Congress initially included in the TCPA an EBR exemption for faxes, but removed it from the final version of the statute. [698]

 **65  189. We now reverse our prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers. As of the effective date of these rules, the EBR will no longer be sufficient to show that an individual or business has given their express permission to receive unsolicited facsimile advertisements. [699] The record in this proceeding reveals consumers and businesses receive faxes they believe they have neither solicited nor given their permission to receive. Recipients of these  *14128  faxed advertisements assume the cost of the paper used, the cost associated with the use of the facsimile machine, and the costs associated with the time spent receiving a facsimile advertisement during which the machine cannot be used by its owner to send or receive other facsimile transmissions. [700]

190. The legislative history indicates that one of Congress' primary concerns was to protect the public from bearing the costs of unwanted advertising. Certain practices were treated differently because they impose costs on consumers. For example, under the TCPA, calls to wireless phones and numbers for which the called party is charged are prohibited in the absence of an emergency or without the prior express consent of the called party. [701] Because of the cost shifting involved with fax advertising, Congress similarly prohibited unsolicited faxes without the prior express permission of the recipient. [702] Unlike the do-not-call list for telemarketing calls, Congress provided no mechanism for opting out of unwanted facsimile advertisements. Such an opt-out list would require the recipient to possibly bear the cost of the initial facsimile and inappropriately place the burden on the recipient to contact the sender and request inclusion on a "do-not-fax" list. [703]

191. Instead, Congress determined that companies that wish to fax unsolicited advertisements to customers must obtain their express permission to do so before transmitting any faxes to them. [704] Advertisers may obtain consent for their faxes through such means as direct mail, websites, and interaction with customers in their stores. Under the new rules, the permission to send fax advertisements must be provided in writing, include the recipient's signature and facsimile number, and cannot be in the form of a "negative option." [705] For example, a company that requests a fax number on an application form could include a clear statement indicating that, by providing such fax number, the individual or business agrees to receive facsimile advertisements from that company. Such statement, if accompanied by the recipient's signature, will constitute the necessary prior express permission to send facsimile advertisements to that individual or business. We believe that even small businesses may easily obtain permission from existing customers who agree to receive faxed advertising, when customers patronize their stores or provide their contact information. The Commission believes  *14129  that given the cost shifting and interference caused by unsolicited faxes, the interest in protecting those who would otherwise be forced to bear the burdens of unwanted faxes outweighs the interests of companies that wish to advertise via fax.

 **66  192. _Membership in a Trade Association_. In its _1995 Reconsideration Order_, the Commission determined that mere distribution or publication of a telephone facsimile number is not the equivalent of prior express permission to receive faxed advertisements. [706] The Commission also found that given the variety of circumstances in which such numbers may be distributed (business cards, advertisements, directory listings, trade journals, or by membership in an association), it was appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements on a case-by-case basis. [707] In the _2002 Notice_, we sought comment specifically on the issue of membership in a trade association or similar group and asked whether publication of one's fax number in an organization's directory constitutes an invitation or permission to receive an unsolicited fax. [708] The American Business Media argued that those willing to make fax numbers available in directories released to the public do so with an expectation that such fax numbers will be used for advertising. [709] Consumer advocates, however, contend that publicly listing a fax number is not a broad invitation to send commercial faxes. [710] TOPUC asserted that businesses often publish their fax numbers for the convenience of their customers, clients and other trade association members, not for the benefit of telemarketers. [711]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 322 of 409   PageID 391

193. The Commission agrees that fax numbers are published and distributed for a variety of reasons, all of which are usually connected to the fax machine owner's business or other personal and private interests. The record shows that they are not distributed for other companies' advertising purposes. Thus, a company wishing to fax ads to consumers whose numbers are listed in a trade publication or directory must first obtain the express permission of those consumers. Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements. We believe the burden on companies to obtain express permission is warranted when balanced  **\*14130**  against the need to protect consumers and businesses from bearing the advertising costs of those companies. Finally, the Commission affirms that facsimile requests for permission to transmit faxed ads, including toll-free opt-out numbers, impose unacceptable costs on the recipients. This kind of "negative option" is contrary to the statutory requirement for prior express permission or invitation. [712]

## 2. Fax Broadcasters

194. The Commission explained in the *2002 Notice* that some fax broadcasters, who transmit other entities' advertisements to a large number of telephone facsimile machines for a fee, maintain lists of facsimile numbers that they use to direct their clients' advertisements. [713] We noted that this practice, among others, indicates a fax broadcaster's close involvement in sending unlawful fax advertisements and may subject such entities to enforcement action under the TCPA and our existing rules. We then sought comment on whether the Commission should address specifically in the rules the activities of fax broadcasters. [714] Companies and organizations whose members hire fax broadcasters to transmit their messages argue that the fax broadcaster should be liable for violations of the TCPA's faxing prohibition. [715] AIADA maintains this should be the case, even if the fax broadcaster uses the list of fax numbers provided by the company doing the advertising. [716] Nextel argues that liability ought to lie with the party controlling the destination of the fax; that fax broadcasters who actively compile and market databases of fax numbers are the major perpetrators of TCPA fax violations. [717] Nextel specifically urges the Commission to find that companies whose products are advertised by independent retailers should not be liable for TCPA violations when they have no knowledge of such activities. [718] Fax broadcasters disagree that they should be liable for unlawful faxes, maintaining that many of them do not exercise any editorial control or discretion over the content of the messages, [719] and do not provide the list of fax numbers to which the ads are transmitted. [720]  **\*14131**  Many industry as well as consumer commenters agree that only those fax broadcasters who are closely involved in the transmission of the fax should be subject to liability. [721] Reed asserts that liability should rest with the entity on whose behalf a fax is sent; that fax broadcasters are not in a position to know firsthand whether, for example, an established business relationship exists between the company and consumer. [722]

 **\*\*67**  195. The Commission's rulings clearly indicate that a fax broadcaster's exemption from liability is based on the type of activities it undertakes, and only exists "[i]n the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions.'" [723] The Commission believes that, based on the record and our own enforcement experience, addressing the activities of fax broadcasters will better inform both consumers and businesses about the prohibition on unsolicited fax advertising. The Commission has determined to amend the rules to explicitly state that a fax broadcaster will be liable for an unsolicited fax if there is a high degree of involvement or actual notice on the part of the broadcaster. The new rules provide that if the fax broadcaster supplies the fax numbers used to transmit the advertisement, the fax broadcaster will be liable for any unsolicited advertisement faxed to consumers and businesses without their prior express invitation or permission. We agree, however, that if the company whose products are advertised has supplied the list of fax numbers, that company is in the best position to ensure that recipients have consented to receive the faxes and should be liable for violations of the prohibition. Therefore, the fax broadcaster will not be responsible for the ads, in the absence of any other close involvement, such as determining the content of the faxed message. [724] In such circumstances where both the fax broadcaster and advertiser demonstrate a high degree of involvement, they may be held jointly and severally liable for violations of the unsolicited facsimile provisions. In adopting this rule, the Commission focuses on the nature of an entity's activity rather than on any label that the entity may claim. We believe the rule will better inform the business community about the prohibition

on unsolicited fax advertising and the liability that attaches to such faxing. And, it will better serve consumers who are often confused about which party is responsible for unlawful fax advertising. For the same reasons, the new rules define "facsimile broadcaster" to mean a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee. [725]

**\*14132**  196. Some commenters ask the Commission to clarify the extent of common carriers' liability for the transmission of unsolicited faxes. [726]  Cox specifically urges the Commission to distinguish the obligations of fax broadcasters from "traditional common carriers." [727]  As noted above, the Commission has stated that "[i]n the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions,' common carriers will not be held liable for the transmission of a prohibited facsimile message." [728]  We reiterate here that if a common carrier is merely providing the network over which a subscriber (a fax broadcaster or other individual, business, or entity) sends an unsolicited facsimile message, that common carrier will not be liable for the facsimile.

**\*\*68**  197. Nextel urges the Commission to clarify that section 217 of the Communications Act does not impose a higher level of liability on common carriers than on other entities for violations of the TCPA. [729]  Section 217 provides that "[i]n construing and enforcing the provisions of this Act, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person." [730]  The Commission declines to address the scope of section 217 in this rulemaking, which was not raised in the *2002 Notice* or in subsequent notices in this proceeding.

### 3. Fax Servers

198. The TCPA makes it unlawful for any person to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine. [731]  The TCPA defines the term "telephone facsimile machine" to mean "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." [732]  The Commission sought comment on any developing technologies, such as computerized fax servers, that might warrant revisiting these rules. [733]

199. Commenters who addressed this issue were divided on whether fax servers should  **\*14133**  be subject to the unsolicited facsimile provisions. Some industry representatives urged the Commission to clarify that the TCPA does not prohibit the transmission of unsolicited fax advertisements to fax servers and personal computers because these transmissions are not sent to a "telephone facsimile machine," as defined in the statute. [734]  Nextel maintains that such faxes do not implicate the harms Congress sought to redress in the TCPA, as they are not reduced to paper and can be deleted from one's inbox without being opened or examined. [735]  Other commenters disagree, noting that there are other costs associated with faxes sent to computers and fax servers. [736]  They note that the TPCA only requires that the equipment have the *capacity* to transcribe text or messages onto paper, [737]  and that computer fax servers and personal computers have that capacity.

200. We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes. However, we clarify that the prohibition does not extend to facsimile messages sent as email over the Internet. The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways. Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes. "Fax servers" enable multiple desktops to send and receive faxes from the same or shared telephony lines. [738]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 324 of 409 PageID 393

**\*\*69** 201. The TCPA's definition of "telephone facsimile machine" broadly applies to any equipment that has the capacity to send or receive text or images. The purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented. Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines. As the House Report accompanying the TCPA explained, "facsimile machines are designed to accept, process and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax **\*14134** numbers, knowing that it will be received and printed by the recipient's machine." [739] However, Congress also took account of the "interference, interruptions, and expense" resulting from junk faxes, emphasizing in the same Report that "[i]n addition to the costs associated with the fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications." [740]

202. Facsimile messages sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed. They may also tie up lines and printers so that the recipients' requested faxes are not timely received. [741] Such faxes may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business. Finally, because a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it.

### 4. Identification Requirements

203. The TCPA and Commission rules require that any message sent via a telephone facsimile machine contain the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. [742] In the *2002 Notice*, the Commission asked whether these rules have been effective at protecting consumers' rights to enforce the TCPA. [743] The Commission determined in its *1997 Reconsideration Order* that a facsimile broadcast service must ensure that the identifying information of the entity on whose behalf the provider sent messages appear on facsimile messages. In its discussion, the Commission clarified that the sender of a facsimile message is the creator of the content of the message, finding that Section 227(d)(1) of the TCPA mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message, and not the entity that transmits the message. [744] The Commission believes that if a fax broadcaster is responsible for the content of the message or for determining the destination of the message (*i.e.*, supplying the list of facsimile numbers to which the faxes are sent), it should be identified on the facsimile, along **\*14135** with the entity whose products are advertised. [745] Therefore, we amend the rules to require any fax broadcaster that demonstrates a high degree of involvement in the transmission of such facsimile message to be identified on the facsimile, along with the identification of the sender. [746] This will permit consumers to hold fax broadcasters accountable for unlawful fax advertisements when there is a high degree of involvement on the part of the fax broadcaster. [747] Commenters suggested the Commission clarify what constitutes an adequate identification header. [748] Consistent with our amended identification rules for telemarketing calls, senders of fax advertisements will be required under the new rules to use the name under which they are officially registered to conduct business. [749] Use of a "d/b/a" ("doing business as") or other more widely recognized name is permissible; however, the official identification of the business, as filed with state corporate registration offices or comparable regulatory entities, must be included, at a minimum.

## XIV. PRIVATE RIGHT OF ACTION

### A. Background

**\*\*70** 204. The TCPA is a unique statute in that it provides consumers with two private rights of action for violations of the TCPA rules. One provision permits a consumer to file suit immediately in state court if a caller violates the TCPA's prohibitions

on the use of automatic dialing systems, artificial or prerecorded voice messages, and unsolicited facsimile advertisements. [750] A separate private right of action permits a consumer to file suit in state court if he or she has received more than one telephone call within any 12-month period by or on behalf of the same company in violation of the guidelines for making telephone solicitations. [751] Based on inquiries received about the private right of action, the Commission asked whether we should clarify whether a consumer may file suit after receiving one call from a telemarketer who, for example, fails to properly identify himself or makes a call outside the time of day **\*14136** restrictions. [752]

205. Industry commenters argue that the statutory language is clear; that only a person who has received more than one telephone call that violates the telephone solicitation rules within any 12-month period may file suit under the TCPA's private right of action. [753] Consumers and consumer advocates were split on the issue. Some maintained that a consumer should be permitted to pursue a private right of action for a telemarketer's first offense; [754] others acknowledged that the statute does not permit a cause of action for the first time a telemarketer violates the telephone solicitation rules. [755] Several industry commenters point out that they have been named as defendants in class action lawsuits under the TCPA in state courts. [756] They urge the Commission to determine that the TCPA's private right of action does not contemplate or permit class action lawsuits. [757] Some consumer commenters and plaintiffs' attorneys who have filed class action suits argue that foreclosing class actions would severely handicap the effectiveness of the TCPA and consumers' ability to enforce its provisions. They also contend that the FCC is not authorized to interfere with state courts' certification of class actions. [758]

**B. Discussion**

206. The Commission declines to make any determination about the specific contours of the TCPA's private right of action. Congress provided consumers with a private right of action, "if otherwise permitted by the laws or rules of court of a State." [759] This language suggests that Congress contemplated that such legal action was a matter for consumers to pursue in appropriate state courts, subject to those courts' rules. The Commission believes it is for Congress, not the Commission, to either clarify or limit this right of action.

**\*14137  XV. INFORMAL COMPLAINT RULES**

207. In the *2002 Notice*, the Commission noted that it had released another Notice of Proposed Rulemaking in February of 2002, seeking comment on whether to extend the informal complaint rules to entities other than common carriers. [760] We sought comment in this proceeding on whether the Commission should amend these informal complaint rules to apply to telemarketers. We will review this issue as part of the Informal Complaints proceeding. All comments filed in this proceeding that address the applicability of the informal complaint rules to telemarketers will be incorporated into CI Docket No. 02-32.

**XVI. TIME OF DAY RESTRICTIONS**

**\*\*71** 208. Commission rules restrict telephone solicitations between the hours of 8:00 a.m. and 9:00 p.m. local time at the called party's location. [761] As part of our review of the TCPA rules, we sought comment on how effective these time restrictions have been at limiting objectionable solicitation calls. [762] The Commission also asked whether more restrictive calling times could work in conjunction with a national registry to better protect consumers from telephone solicitations to which they object.

209. Industry members that commented on the calling time restrictions unanimously asserted that the current calling times should be retained. [763] Some explained that any restrictions on calls made during the early evening hours, in particular, would interfere with telemarketers' ability to reach their customers. [764] Consumers, on the other hand, urged the Commission to adopt tighter restrictions on the times that telemarketers may call them. Some object to calls at the end of the day and during the

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 326 of 409   PageID 395

dinner hour; [765] others prefer that telemarketers not be able to begin calling until later in the morning. [766] Some suggest the calling times should parallel local noise **14138** ordinances. [767] EPIC advocated allowing consumers to specify the hours they wish to receive calls. [768]

210. The Commission declines to revise the restrictions on calling times. Instead, we retain the current calling times, which are consistent with the FTC's rules. [769] We believe the current calling times strike the appropriate balance between protecting consumer privacy and not unduly burdening industry in their efforts to conduct legitimate telemarketing. We also believe that Commission rules that diverge from the FTC's calling restrictions will lead to confusion for consumers. Moreover, consumers who want to block unwanted calls during certain times will now have the option of placing their telephone numbers on the national do-not-call registry. They will have the additional option of giving express verifiable authorization to only those companies they wish to hear from. The Commission declines at this time to require companies to adhere to consumers' calling preferences, including "acceptable" calling times. [770] We believe that the costs of monitoring calling times for individual consumers could be substantial for many companies, particularly small businesses. The Commission may revisit this option in the future.

## XVII. ENFORCEMENT PRIORITIES

211. TCPA enforcement has been a Commission priority over the past several years, [771] and we intend that it remain so. In guiding our future enforcement plans, we recognize that the FTC's recent rule changes expand that agency's regulation of telemarketing activities and require coordination to ensure consistent and non-redundant federal enforcement in this area. Most notably, the FTC's adoption of a nationwide do-not-call registry, the related Do-Not-Call Act, and finally our adoption here of requirements that maximize consistency with those adopted by the FTC create an overlap in federal regulations governing major telemarketing activities. [772] We hereby direct Commission staff to negotiate with FTC staff a Memorandum of Understanding between the respective staffs to achieve an efficient and effective enforcement strategy that will promote compliance with federal telemarketing regulations, consistent with the guidelines set forth below.

**\*\*72** 212. The FCC's jurisdiction over telemarketing is significantly broader than the FTC's. First, as noted above, the FTC does not have authority over telemarketing calls made by in-house employees of common carriers, banks, credit unions, savings and loans, insurance companies, **14139** and airlines. In addition, the FTC's telemarketing rules pertain only to interstate transmissions. In contrast, the FCC's telemarketing rules apply without exception to any entity engaged in any of the telemarketing activities targeted by the TCPA and the Commission's related rules, including those that involve purely intrastate activities. [773] Given the substantial gaps in the FTC's authority over the full range of telemarketing activities, we contemplate that our enforcement staff will focus particularly on those activities and entities that fall outside the FTC's reach - airlines, banks, credit unions, savings and loans, insurance companies, and common carriers, as well as intrastate transmissions by any entity.

213. Nevertheless, we do not contemplate Commission enforcement that targets only those activities, entities, or transmissions that are outside the FTC's jurisdiction. The TCPA creates a statutory expectation for FCC enforcement in the telemarketing area. [774] Moreover, the TCPA's detailed standards pertaining to do-not-call matters evince Congressional intent that the FCC assume a prominent role in federal regulation of this aspect of telemarketing, a mandate that is not altered by the Do-Not-Call Act. Accordingly, even with the FTC's new do-not-call regulations, including its administration of a national do-not-call registry, we emphasize that the Commission must stand ready to enforce each of our telemarketing rules in appropriate cases. For reasons of efficiency and fairness, our staff will work closely with the FTC to avoid unnecessarily duplicative enforcement actions.

214. In determining enforcement priorities under the new telemarketing rules, we contemplate that the Enforcement Bureau will continue its policy of reviewing FCC and FTC consumer complaint data and conferring with appropriate state and federal agencies to detect both egregious violations and patterns of violations, and will act accordingly. [775] The Enforcement Bureau has in place effective procedures to review aggregate complaint information to determine the general areas that merit enforcement

actions, and to identify both particular violators and the individual consumers who may be able to assist the staff in pursuing enforcement actions against such violators. [776]  Enforcement action could include, for example, forfeiture proceedings under section 503(b), [777] cease and desist proceedings under section 312(c), injunctions under section 401, and revocation of common carrier section 214 operating authority.

## *14140  XVIII. OTHER ISSUES

### A. Access to TCPA Inquiries and Complaints

215. The Commission stated that the *2002 Notice* was "prompted, in part, by the increasing number and variety of inquiries and complaints involving our rules on telemarketing and unsolicited fax advertisements." [778]  A few commenters maintain that the Commission should not consider final rules until parties have had an opportunity to analyze the consumer complaints referenced in the *2002 Notice*. [779]  Other commenters contend that the number of complaints received by the Commission does not necessarily demonstrate a problem that demands government intervention. [780]  The ATA filed a Freedom of Information Act (FOIA) request with the Commission on October 16, 2002, seeking access to the TCPA-related informal complaints. [781]  The FOIA generally provides that any person has a right to obtain access to federal agency records, subject to enumerated exemptions from disclosure. [782]  The FOIA requirements do not apply to records that contain "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." [783]  Many of the complaints sought by the ATA contain personal private information. In addition, the complaints are part of a system of records subject to the Privacy Act. [784]  For these reasons, the Commission agreed to release the complaints on a rolling basis only after personal information was redacted. [785]  In response to ATA's FOIA request, the Commission has thus far provided  **\*14141** approximately 2,420 redacted complaints. [786]

 **\*\*73**  216. We agree with commenters that the increasing number of inquiries and complaints about telemarketing practices should not form the basis upon which we revise or adopt new rules under the TCPA. [787]  Rather, such information can be considered in determining whether to seek comment on the effectiveness of any of its rules. [788]  We note that, even in the absence of any such complaints, the Commission is required by the Do-Not-Call Act to complete the TCPA rulemaking commenced last year. We disagree with commenters who suggest that parties must have access to all of the complaints referenced in the NPRM in order to be able to have a meaningful opportunity to participate in this proceeding. [789]  It is not the existence of the complaints, or the number of complaints, that led the Commission to institute this proceeding to consider revision of its TCPA rules. Rather, our TCPA rules have been in place for more than ten years. We opened this proceeding to determine "whether the Commission's rules need to be revised in order to more effectively carry out Congress's directives in the TCPA." [790]  In any event, since September 2002, consumers, industry, and state governments have filed over 6,000 comments in this proceeding, during which time the Commission extended the comment periods twice and released a *Further Notice* in order to ensure that parties had ample opportunity to comment on possible FCC action. The substantial record compiled in this proceeding, along  **\*14142**  with the Commission's own enforcement experience, provides the basis for the actions we take here today.

### B. Reports to Congress

217. The Do-Not-Call Act requires the Commission to transmit reports to Congress within 45 days after the promulgation of final rules in this proceeding, and annually thereafter. [791]  By this Order, the Commission delegates its authority to the Chief, Consumer & Governmental Affairs Bureau, to issue all such reports.

### XIX. PROCEDURAL ISSUES

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 328 of 409   PageID 397

## A. Regulatory Flexibility Act Analysis

218. Pursuant to the Regulatory Flexibility Act of 1980, as amended, [792] the Commission's Final Regulatory Flexibility Analysis in this Order is attached as Appendix B.

## B. Paperwork Reduction Act Analysis

219. This Order contains modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office of Management and Budget (OMB) for review under § 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the modified information collections contained in this proceeding.

## C. Late-Filed Comments

220. We note that there were comments filed late in this proceeding. In the interest of having as complete and accurate a record as possible, we will accept late-filed comments and waive the requirements of 47 C.F.R. § 1.46(b).

## D. Materials in Accessible Formats

 **74  221. To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY). This *Report and Order* can also be downloaded in Text and ASCII formats at: http:// www.fcc.gov/ cgb/policy/telemarketing.html.

## XX. ORDERING CLAUSES

222. Accordingly, IT IS ORDERED that, pursuant to the authority contained in Sections 1-4, 222, 227, and 303(r) of the Communications Act of 1934, as amended; 47 U.S.C. §§ 151-154, 222 and 227; and 47 C.F.R. § 64.1200 of the Commission's rules, and the Do-Not-  **14143  Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557, the Report and Order in CG Docket No. 02-278 IS ADOPTED, and Parts 64 and 68 of the Commission's rules, 47 C.F.R. Parts 64.1200, 64.1601, and 68.318, are amended as set forth in Appendix A. The requirements of this Report and Order shall become effective 30 days after publication of a summary thereof in the Federal Register, with the following exceptions. As discussed herein, the national do-not-call rules at 47 C.F.R. § 64.1200(c)(2) will go into effect on October 1, 2003; the call abandonment rules at 47 C.F.R. §§ 64.1200(a)(5) and (6) will become effective on October 1, 2003; and the caller ID requirements at 47 C.F.R. § 64.1601(e) will go into effect on January 29, 2004. The amendments to the rules in § 64.1200 that contain information collection requirements under the PRA are not effective until approved by OMB. The Commission will publish a document in the Federal Register announcing the effective date of these rules.

223. IT IS FURTHER ORDERED that the comments addressing the applicability of the informal complaint rules to telemarketers ARE INCORPORATED into CI Docket 02-32.

224. IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau shall have authority to issue any reports to Congress as required by the Do-Not-Call Implementation Act.

225. IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 329 of 409   PageID 398

**\*\*75**  Marlene H. Dortch

Secretary

**\*14144  Appendix A**

**<u>Final Rules</u>**

Part 64 of the Code of Federal Regulations is amended as follows:

**PART 64 - MISCELLANEOUS RULES RELATING TO COMMON CARRIERS**

1. Authority: 47 U.S.C. § 227.

\* \* \* \* \*

2. Subpart L is amended by revising the Subpart Heading to read as follows:

**Subpart L - Restrictions on Telemarketing and Telephone Solicitation**

\* \* \* \* \*

3. Section 64.1200 is revised to read as follows:

<u>§ 64.1200</u> Delivery restrictions.

(a) No person or entity may:

(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice,

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(2) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call:

(i) Is made for emergency purposes,

(ii) Is not made for a commercial purpose,

(iii) Is made for a commercial purpose but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation,

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 330 of 409   PageID 399

**\*14145**  (iv) Is made to any person with whom the caller has an established business relationship at the time the call is made, or

(v) Is made by or on behalf of a tax-exempt nonprofit organization.

(3) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

(i) For purposes of paragraph (a)(3) of this section, a facsimile advertisement is not "unsolicited" if the recipient has granted the sender prior express invitation or permission to deliver the advertisement, as evidenced by a signed, written statement that includes the facsimile number to which any advertisements may be sent and clearly indicates the recipient's consent to receive such facsimile advertisements from the sender.

(ii) A facsimile broadcaster will be liable for violations of paragraph (a)(3) of this section if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

(4) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

**\*\*76**  (5) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(6) Abandon more than three percent of all telemarketing calls that are answered live by a person, measured over a 30-day period. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting. Whenever a sales representative is not available to speak with the person answering the call, that person must receive, within two (2) seconds after the called person's completed greeting, a prerecorded identification message that states only the name and telephone number of the business, entity, or individual on whose behalf the call was placed, and that the call was for "telemarketing purposes." The telephone number so provided must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign. The telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. The seller or telemarketer must maintain records establishing compliance with paragraph (a)(6) of this section.

(i) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line that is assigned to a person who either has granted prior express consent for the call to be made or has an established business relationship with the caller shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(ii) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by paragraph (a)(6) of this section.

**\*14146**  (7) Use any technology to dial any telephone number for the purpose of determining whether the line is a facsimile or voice line.

(b) All artificial or prerecorded telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated, and

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 331 of 409 PageID 400

to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign.

(c) No person or entity shall initiate any telephone solicitation, as defined in paragraph (f)(9) of this section, to:

**77** (1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government. Such do-not-call registrations must be honored for a period of 5 years. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) it can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

(A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

(B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;

(C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than three months prior to the date any call is made, and maintains records documenting this process; and

(E) Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone **14147** solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers; or

(ii) It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed; or

(iii) The telemarketer making the call has a personal relationship with the recipient of the call.

(d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

**78** (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 332 of 409   PageID 401

(2) <u>Training of personnel engaged in telemarketing</u>. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) <u>Recording, disclosure of do-not-call requests</u>. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) <u>Identification of sellers and telemarketers</u>. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

 **\*14148** (5) <u>Affiliated persons or entities</u>. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) <u>Maintenance of do-not-call lists</u>. A person or entity making calls for telemarketing purposes must maintain a record of a caller's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

(7) Tax-exempt nonprofit organizations are not required to comply with 64.1200(d).

(e) The rules set forth in sections 64.1200(c) and 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

 **\*\*79** (f) As used in this section:

(1) The terms <u>automatic telephone dialing system</u> and <u>autodialer</u> mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(2) The term <u>emergency purposes</u> means calls made necessary in any situation affecting the health and safety of consumers.

(3) The term <u>established business relationship</u> means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 333 of 409   PageID 402

(i) The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.

(ii) The subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate.

(4) The term <u>facsimile broadcaster</u> means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.

 **14149**  (5) The term <u>seller</u> means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(6) The term <u>telemarketer</u> means the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(7) The term <u>telemarketing</u> means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(8) The term <u>telephone facsimile machine</u> means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(9) The term <u>telephone solicitation</u> means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

 **\*\*80**  (i) To any person with that person's prior express invitation or permission.

(ii) To any person with whom the caller has an established business relationship; or

(iii) By or on behalf of a tax-exempt nonprofit organization.

(10) The term <u>unsolicited advertisement</u> means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

(11) The term <u>personal relationship</u> means any family member, friend, or acquaintance of the telemarketer making the call.

(g) Beginning January 1, 2004, common carriers shall:

(1) When providing local exchange service, provide an annual notice, via an insert in the subscriber's bill, of the right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national do-not-call database maintained by the federal government and the methods by which such rights may be exercised by the subscriber. The notice must be clear and conspicuous and include, at a minimum, the Internet address and toll-free number that residential telephone subscribers may use to register on the national database.

(2) When providing service to any person or entity for the purpose of making telephone solicitations, make a one-time notification to such person or entity of the national do-not-call requirements, including, at a minimum, citation to 47 C.F.R. §

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 334 of 409   PageID 403

64.1200 and 16 C.F.R. Part 310. **\*14150** Failure to receive such notification will not serve as a defense to any person or entity making telephone solicitations from violations of this section.

(h) The administrator of the national do-not-call registry that is maintained by the federal government shall make the telephone numbers in the database available to the States so that a State may use the telephone numbers that relate to such State as part of any database, list or listing system maintained by such State for the regulation of telephone solicitations.

§ 64.1601 Delivery requirements and privacy restrictions.

4. Section 64.1601 is amended by adding paragraph (e) to read as follows:

* * * * *

(e) Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(7) must transmit caller identification information.

(i) For purposes of this paragraph, caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. The telephone number so provided must permit any individual to make a do-not-call request during regular business hours.

 **\*\*81** (ii) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.

(iii) Tax-exempt nonprofit organizations are not required to comply with this paragraph.

§ 68.318 Additional limitations.

5. Section 68.318 is amended by revising (d) to read as follows:

* * * * *

(d) Telephone facsimile machines; Identification of the sender of the message. It shall be unlawful for person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. If a facsimile broadcaster demonstrates a high degree of involvement in the sender's facsimile messages, such as supplying the numbers to which a message is sent, that broadcaster's name, under which it is registered to conduct business with the State Corporation Commission (or comparable regulatory authority), must be identified on the facsimile, along with **\*14151** the sender's name. Telephone facsimile machines manufactured on and after December 20, 1992, must clearly mark such identifying information on each transmitted page.

* * * * *

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y  Document 13  Filed 01/19/24  Page 335 of 409  PageID 404

*14152  Appendix B

## FINAL REGULATORY FLEXIBILITY ANALYSIS

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), [793] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking and Memorandum Opinion and Order [794] (*2002 Notice*) released by the Federal Communications Commission (Commission) on September 18, 2002. The Commission sought written public comments on the proposals contained in the *2002 Notice*, including comments on the IRFA. On March 25, 2003, the Commission released a Further Notice of Proposed Rulemaking (Further Notice), seeking comments on the requirements contained in the Do-Not-Call Implementation Act (Do-Not-Call Act), [795] which was signed into law on March 11, 2003. [796] None of the comments filed in this proceeding were specifically identified as comments addressing the IRFA; however, comments that address the impact of the proposed rules and policies on small entities are discussed below. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA. [797]

### A. Need for, and Objectives of, the Order

2. Since 1992, when the Commission adopted rules pursuant to the Telephone Consumer Protection Act (TCPA), [798] telemarketing practices have changed significantly. New technologies have emerged that allow telemarketers to better target potential customers and make marketing using telephones and facsimile machines more cost-effective. At the same time, these new telemarketing techniques have heightened public concern about the effect telemarketing has on consumer privacy. A growing number of states have passed, or are considering, legislation to establish statewide do-not-call lists, and the Federal Trade Commission (FTC) has decided to establish a national do-not-call registry. [799] Congress provided in the TCPA that "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing  *14153*  practices." [800]

**82  3. The *2002 Notice* sought comments on whether to revise or clarify Commission rules governing unwanted telephone solicitations, the use of automatic telephone dialing systems, prerecorded or artificial voice messages, telephone facsimile machines, the effectiveness of company-specific do-not-call lists, and the appropriateness of establishing a national do-not-call list. In addition, in the IRFA, the Commission sought comments on the effect the proposed policies and rules would have on small business entities. [801]

4. In this Report and Order (Order) the Commission revises the current TCPA rules and adopts new rules to provide consumers with additional options for avoiding unwanted telephone solicitations. We establish a national do-not-call registry for consumers who wish to avoid most unwanted telemarketing calls. This national do-not-call registry will supplement the current company-specific do-not-call rules, which will continue to permit consumers to request that particular companies not call them. The Commission also adopts a new provision to permit consumers registered with the national do-not-call list to provide permission to call to specific companies by an express written agreement. The TCPA rules exempt from the "do-not-call" requirements nonprofit organizations and companies with whom consumers have an established business relationship. The definition of "established business relationship" has been amended so that it is limited to 18 months from any purchase or financial transaction with the company and to three months from any inquiry or application from the consumer. Any company that is asked by a consumer, including an existing customer, not to call again must honor that request for five years. We retain the current calling time restrictions of 8:00 a.m. until 9:00 p.m.

5. To address the use of predictive dialers, we have determined that a telemarketer must abandon no more than three percent of calls answered by a person, must deliver a prerecorded identification message when abandoning a call, and must allow the telephone to ring for 15 seconds or four rings before disconnecting an unanswered call. The new rules also require all companies conducting telemarketing to transmit caller identification information when available, and they prohibit companies from blocking such information. The Commission has revised its earlier determination that an established business relationship

*In re Rules and Regulations Implementing the Telephone...*, 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 336 of 409 PageID 405

constitutes express invitation or permission to receive an unsolicited facsimile advertisement. We find that the permission to send fax ads must be in writing, include the recipient's signature, and clearly indicate the recipient's consent to receive such ads. In addition, we have clarified when fax broadcasters are liable for the transmission of unlawful fax advertisements.

6. We believe the rules the Commission adopts in the Order strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers. In addition, the Commission must comply with the Do-Not-Call Act, which requires the Commission to file an annual report to the House Committee on Energy and Commerce and the Senate Committee on Commerce, Science and Transportation. This report is to include: (1) an analysis of the effectiveness of the registry; (2) the number of consumers **14154** included on the registry; (3) the number of persons accessing the registry and the fees collected for such access; (4) a description of coordination with state do-not-call registries; and, lastly, (5) a description of coordination of the registry with the Commission's enforcement efforts.[802]

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

**\*\*83**  7. There were no comments filed in direct response to the IRFA. Some commenters, however, raised issues and questions about the impact the proposed rules and policies would have on small entities. Telemarketers maintained that "telemarketing is used to introduce consumers to novel and competitive products and services,"[803] often offered by small businesses.[804] Some commenters insisted that business-to-business telemarketing is essential for small businesses.[805] They indicated that they rely on fax broadcasting as a cost-effective form of advertising.[806] On the other hand, other small businesses have requested that the Commission allow their telephone numbers to be included on any national do-not-call list[807] and urged the Commission to adopt rules protecting them from unsolicited faxes.[808] The rules adopted herein reflect not only the difficult balancing of individuals' privacy rights against the protections afforded commercial speech, but the difficult balancing of the interests of small businesses that rely on telemarketing against those that are harmed by unwanted telephone calls and facsimile transmissions. The amended rules should reduce burdens on both consumers and businesses, including small businesses.

8. *National Do-Not-Call List.* As discussed more extensively in the Order,[809] some commenters opposed the adoption of a national do-not-call registry, stating that company-specific do-not-call lists adequately protect consumer privacy.[810] Other commenters supported the establishment of a national do-not-call registry, arguing that "further regulation is needed because the current system does little or nothing to protect privacy in the home."[811] NFIB "believes that significant burdens are being placed upon businesses of all sizes in order to comply **14155** with the regulations..., but that small businesses bear the brunt of those burdens."[812] NFIB suggested that women, minorities and small businesses will be affected disproportionately by any new restrictions.[813] And, some commenters maintained that businesses, including small businesses, will suffer a reduction in telemarketing sales as a result of the establishment of a national do-not-call list.[814] SBSC, while opposed to a national do-not-call list, nevertheless offered a recommendation that would make such a list less onerous for small businesses. SBSC suggested exempting local calls that might result in a face-to-face transaction from the do-not-call list requirements.[815] NAIFA also encouraged exempting calls which result in face-to-face meetings and recommended an exemption for those businesses that make a *de minimus* number of calls.[816]

9. The Commission received comments arguing that a national do-not-call list "would be cumbersome"[817] and too expensive for small businesses to use.[818] DSA specifically indicated that a national do-not-call list would increase businesses' start-up costs if they were required to purchase the list.[819] In addition, MBA maintained that many small lenders use referrals from existing customers, not large lists, to attract new business. Such referrals, MBA suggested, will be difficult to scrub against a national do-not-call list.[820] Some commenters suggested that an option to help reduce the cost of a national do-not-call list for small businesses would be to offer smaller pieces of the list to small businesses.[821]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 337 of 409    PageID 406

**\*\*84** 10. Yellow Pages urged the Commission to continue to exempt business-to-business calls from a national do-not-call list, because small businesses benefit tremendously by advertising in yellow pages and on-line. [822] However, other commenters requested that small businesses be allowed to include their telephone numbers on the national do-not-call list. [823] One **\*14156** small business commenter stated that "... telemarketing ... interferes with business operations, especially small business operations ...." [824] Another commenter argued that "people that work from home ... should not have to be bothered with telemarketing calls that would impact their job performance and potentially their ability to make a living." [825] Finally, some have assured the Commission that a national do-not-call list would be manageable and feasible to maintain. [826] NCS, for example, maintained that even extremely small telemarketers could gain access to the do-not-call list at a reasonable cost using the Internet. [827]

11. _Website or Toll-Free Number to Access Company-Specific Lists and to Confirm Requests_. The Commission sought comment on whether to consider any modifications that would allow consumers greater flexibility to register on company-specific do-not-call lists. [828] We specifically asked whether companies should be required to provide a toll-free number and/or website that consumers can access to register their names on do-not-call lists. [829] Some commenters argued that it would be costly if small, local businesses were required to design and maintain websites or provide toll-free numbers for consumers to make do-not-call requests. [830] In addition, they maintained that businesses should not be required to confirm registration of a consumer's name on a company's do-not-call list. [831] Confirmations by mail, they stated, would be expensive for a business and probably perceived by the consumer as "junk mail." [832]

12. _Established Business Relationship_. One issue raised by commenters as particularly burdensome for small business was monitoring existing business relationships and do-not-call requests. NFIB stated that members have found requests by existing customers to cease contacting them "unwieldy and difficult ... to translate as a business practice." [833] "An individual who continues to interact with a [sic] these small businesses following a 'do not contact' request does not sever the business relationship _de facto..._" [834] According to NFIB, it should be the right of the business to continue to call that customer. They argued that it should be the responsibility of the customer to terminate the relationship with that business **\*14157** affirmatively. [835]

13. NADA indicated that there has been no significant change that would warrant a revision of the established business relationship exemption. [836] In fact, NADA stated that "narrowing the exemption would unnecessarily deprive small businesses of a cost-effective marketing opportunity." [837] According to NADA, small businesses must maximize their marketing resources and the best way to do so is to direct their marketing efforts toward their existing customers. [838]

**\*\*85** 14. While no commenter specifically addressed the effect of time limits on small businesses, several entities discussed time limits for the established business relationship rule in general. [839] DMA indicated the difficulty in establishing a "clock" that "will apply across all the industries that use the phone to relate to their customers." [840] DMA continued by stating "[d]ifferent business models require different periods of time." [841] This concept was supported by Nextel, "the FTC's eighteen-month limit on its EBR rule would be inappropriate for the telecommunications industry" and would "dramatically increase administrative burdens and costs for all businesses as they would be forced to monitor and record every customer inquiry and purchasing pattern to ensure compliance with the FCC's rules." [842]

15. _Unsolicited Facsimile Advertising and "War Dialing"_. Privacy Rights commented that the practice of dialing large blocks of numbers to identify facsimile lines, _i.e._, "war dialing," should be prohibited, especially because such calls cannot be characterized as telemarketing. [843] It argued that "this practice is particularly troubling for small business owners who often

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 338 of 409   PageID 407

work out of home offices" because it deprives the small business owner of the use of the equipment, creates an annoyance and interrupts business calls. [844]

16. NFIB advocated on behalf of its small business members that "the ability to fax information to their established customers is an essential commercial tool." [845]  Any customer  **\*14158**  who provides contact information when patronizing a business is providing express permission to be contacted by that business, including via facsimile advertising. [846]  In addition, NFIB indicated that businesses engaged in facsimile advertising should not be required to identify themselves, and that customers should be required to notify the business that they do not wish to receive such faxes. [847]  NADA agreed that the Commission should "preserve its determination that a prior business relationship between a fax sender and recipient establishes the requisite consent to receive fax advertisements." [848]  According to NADA, changing these rules would deprive small businesses of a marketing tool upon which they have come to rely. [849]

17. Other commenters disagreed, explaining that numerous small businesses are burdened by the intrusion of ringing telephones and fax machines, [850] the receipt of advertisements in which they are not interested, [851] the depletion of toner and paper, [852] and the time spent dealing with these unwanted faxes. [853]  A few home-based businesses and other companies maintain that facsimile advertisements interfere with the receipt of faxes connected to their own business, and that the time spent collecting and sorting these faxes increases their labor costs. [854]  In fact, NFIB has received complaints from its own members "who ... failed to realize that their membership underlines entitles them to the receipt of such information via fax." [855]

 **\*\*86**  18. _Caller ID Requirements_.  In response to the Commission's proposal to require telemarketers to transmit caller ID or prohibit the blocking of such information, NYSCPB favored prohibiting the intentional blocking of caller ID information, but acknowledged that  **\*14159**  requiring the transmission of caller ID may be inappropriate for smaller firms. [856]  NYSCPB stated that " [w]hile mandatory transmission of caller ID information would undoubtedly facilitate do-not-call enforcement ... we would not want to impose onerous burdens on smaller, less technically sophisticated firms ...." [857]  In addition, NYSCPB suggested that smaller businesses that lack the capability to transmit caller ID be exempt from providing caller ID information until the business installs new equipment with caller ID capabilities. [858]

### C. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

19. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. [859]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." [860]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. [861]  Under the Small Business Act, a "small business concern" is one that: 1) is independently owned and operated; 2) is not dominant in its field of operation; and 3) satisfies any additional criteria established by the Small Business Administration (SBA). [862]

20. The Commission's rules on telephone solicitation and the use of autodialers, artificial or prerecorded messages and telephone facsimile machines apply to a wide range of entities, including all entities that use the telephone or facsimile machine to advertise. [863]  That is, our action affects the myriad of businesses throughout the nation that use telemarketing to advertise. For instance, funeral homes, mortgage brokers, automobile dealers, newspapers and telecommunications companies could all be affected. Thus, we expect that the rules adopted in this proceeding could have a significant economic impact on a substantial number of small entities.

 **\*14160**  21. Nationwide, there are a total of 22.4 million small businesses, according to SBA data. [864]  And, as of 1992, nationwide there were approximately 275,801 small organizations [not-for-profit]. [865]

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 339 of 409   PageID 408

22. Again, we note that our action affects an exhaustive list of business types and varieties. We will mention with particularity the intermediary groups that engage in this activity. SBA has determined that "telemarketing bureaus" with $6 million or less in annual receipts qualify as small businesses. [866] For 1997, there were 1,727 firms in the "telemarketing bureau" category, total, which operated for the entire year. [867] Of this total, 1,536 reported annual receipts of less than $5 million, and an additional 77 reported receipts of $5 million to $9,999,999. Therefore, the majority of such firms can be considered to be small businesses.

**D. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

**\*\*87**  23. The rules contained herein require significant recordkeeping requirements on the part of businesses, including small business entities. First, while the national do-not-call list will be developed and maintained by the FTC, all businesses that engage in telemarketing will be responsible for obtaining the list of telephone numbers on the national do-not-call list and scrubbing their calling lists to avoid calling those numbers. [868] They must also continue to be responsible for maintaining their own company-specific do-not-call lists; however, this is not a new requirement, but a continuation of the Commission's existing rules. The Commission has reduced the period of time that businesses must retain company-specific do-not-call requests from 10 years to five years. In addition, for those businesses, including small businesses, that wish to call consumers under the "established business relationship" exemption, they must continue to maintain customer lists in the normal course of business. Because of the time limits associated with this rule, businesses will need to monitor and record consumer contacts to assure that they are complying with the 18-month and three-month provisions in the rule. Businesses that want to call consumers with whom they have no relationship, but who are listed on the national do-not-call list, must obtain a consumer's express permission to call. This permission must be evidenced by a signed, written agreement.

24. Second, all businesses that use autodialers, including predictive dialers, to sell goods or services, will be required to maintain records documenting compliance with the call **\*14161** abandonment rules. [869] Such records should demonstrate the telemarketers' compliance with a call abandonment rate of no less than three percent measured over a 30-day period, with the two-second-transfer rule, and with the ring duration requirement.

25. Third, with the exception of tax-exempt nonprofit organizations, all businesses that engage in telemarketing will be required to transmit caller ID information. [870]

26. Fourth, businesses that advertise by fax will be required to maintain records demonstrating that recipients have provided express permission to send fax advertisements. Such permission must be given in writing, and businesses must document that they have obtained the required permission. [871]

**E. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

27. The RFA requires an agency to describe any significant alternatives that it has considered in developing its approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities." [872]

**\*\*88**  28. There were five specific areas in which the Commission considered alternatives for small businesses. These areas were: (1) establishing a National Do-Not-Call List ((a) providing a portion of the national do-not-call list (five area codes) for free, (b) providing businesses with 30 days to process do-not-call requests, and (c) reducing the do-not-call record retention rate from 10 years to five years); (2) maintaining the current established business rule exemption and adopting the FTC's time limits of 18 months and three months; (3) establishing a call abandonment rate of three percent, rather than zero percent, and

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 340 of 409   PageID 409

measuring the rate over a 30-day period, rather than on a per day basis; (4) continuing to prohibit facsimile advertising to residential and business numbers; and (5) declining to require businesses to maintain a website or toll-free number for do-not-call requests or confirmation of such requests by consumers. As mentioned, *supra*, in Section B of the FRFA, small businesses presented arguments on both sides of each of these issues.

29. *National Do-Not-Call List*. This Order establishes a national do-not-call list for those residential telephone subscribers who wish to avoid most unwanted telephone  **\*14162**  solicitations. [873]  Although many businesses, including small businesses, objected to a national do-not-call registry, [874]  the Commission determined that a national do-not-call list was necessary to carry out the directives in the TCPA. We agreed with those commenters who maintained that the company-specific approach to concerns about unwanted telephone solicitations does not alone adequately protect individuals' privacy interests. [875]  We declined to exempt local solicitations and small businesses from the national do-not-call list. [876]  Given the numerous entities that solicit by telephone, and the technological tools that allow even small entities to make a significant number of solicitation calls, we believe that to do so would undermine the effectiveness of the national do-not-call rules in protecting consumer privacy. In addition, we declined to permit businesses to register their numbers on the national do-not-call registry, despite the requests of numerous small business owners to do so. [877]  The TCPA expressly contemplates that a national do-not-call database includes residential telephone subscribers' numbers. Although business numbers will not be included in the national do-not-call database, a business could nevertheless *request* that its number be added to a company's do-not-call list.

30. The Commission considered the costs to small businesses of purchasing the national do-not-call list. In an attempt to minimize the cost for small businesses, we have considered an alternative and determined that businesses will be allowed to obtain up to five area codes free of charge. [878]  Since many small businesses telemarket within a local area, providing five area codes at no cost should help to reduce or eliminate the costs of purchasing the national registry for small businesses. [879]  Furthermore, as suggested by NCS, small businesses should be able to gain access to the national list in an efficient, cost-effective manner via the Internet. [880]

 **\*\*89**  31. As discussed extensively in the Order, many businesses, including small business entities, requested specific exemptions from the requirements of a national do-not-call list. [881]  In order to minimize potential confusion for both consumers and businesses alike, we declined to create specific exemptions for small businesses. [882]  We believe the exemptions adopted for calls  **\*14163**  made to consumers with whom a seller has an established business relationship and those that have provided express agreement to be called provide businesses with a reasonable opportunity to conduct their business while protecting consumer privacy interests.

32. The Commission also considered modifying for small businesses the time frames for (1) processing consumers' do-not-call requests; (2) retaining consumer do-not-call records; and (3) scrubbing calling lists against the national do-not-call registry. In doing so, we recognized the limitations on small businesses of processing requests in a timely manner. [883]  Therefore, we determined to require that both large and small businesses must honor do-not-call requests within 30 days from the date such a request is made, instead of requiring that businesses honor requests in less time. [884]  Although some commenters suggested periods of up to 60 to 90 days to process do-not-call requests, we determined that such an inconsistency in the rules would lead to confusion for consumers. Consumers might not easily recognize that the telemarketer calling represented a small business and that they must then allow a longer period of time for their do-not-call requests to be processed.

33. The Commission also determined to reduce the retention period of do-not-call records from 10 years to five years. [885]  This modification should benefit businesses that are concerned about telephone numbers that change hands over time. They argue that a shorter retention requirement will result in do-not-call lists that more accurately reflect those consumers who have requested not to be called. Finally, we considered allowing small businesses additional time to scrub their customer call lists against the national do-not-call database. The FTC's rules require telemarketers to scrub their lists every 90 days. For the sake

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 341 of 409   PageID 410

of consistency, and to avoid confusion on the part of consumers and businesses, the Commission determined to require all businesses to access the national registry and scrub their calling lists of numbers in the registry every 90 days.

34. _Established Business Relationship_. We have modified the current definition of "established business relationship"[886] so that it is limited in duration to 18 months from any purchase or transaction and three months from any inquiry or application. The revised definition is consistent with the definition adopted by the FTC.[887] We concluded that regulating the duration of an established business relationship is necessary to minimize confusion and frustration for consumers who receive calls from companies they have not contacted or patronized for many years. There was little consensus among industry members about how long an established business relationship should last following a transaction between the consumer  **14164  and seller.[888] We believe the 18-month timeframe strikes an appropriate balance between industry practices and consumer privacy interests. Although businesses, including small businesses must monitor the length of relationships with their customers to determine whether they can lawfully call a customer, we believe that a rule consistent with the FTC's will benefit businesses by creating one uniform standard with which businesses must comply.

 **90  35. _Call Abandonment_. In the _2002 Notice_, the Commission requested information on the use of predictive dialers and the harms that result when predictive dialers abandon calls.[889] In response, some small businesses urged the Commission to adopt a maximum rate of zero on abandoned calls. They described their frustration over hang-up calls that interrupt their work and with answering the phone "only to find complete silence on the other end."[890] Most industry members encouraged the Commission to adopt an abandonment rate of no less than five percent, claiming that this rate "minimizes abandoned calls, while still allowing for the substantial benefits achieved by predictive dialers."[891] The Commission has determined that a three percent maximum rate on abandoned calls balances the interests of businesses that derive economic benefits from predictive dialers and consumers who find intrusive those calls delivered by predictive dialers.[892] We believe that this alternative, a rate of three percent, will also benefit small businesses that are affected by interruptions from hang-ups and "dead air" calls.

36. The three percent rate will be measured over a 30-day period, rather than on a per day basis. Industry members maintained that a per day measurement would not account for short-term fluctuations in marketing campaigns[893] and may be overly burdensome to smaller telemarketers. We believe that measuring the three percent rate over a longer period of time will still reduce the overall number of abandoned calls, yet permit telemarketers to manage individual calling campaigns effectively. It will also permit telemarketers to more easily comply with the recordkeeping requirements associated with the use of predictive dialers.

37. _Unsolicited Facsimile Advertising_. The record reveals that facsimile advertising can both benefit and harm small businesses with limited resources. The small businesses and organizations that rely upon faxing as a cost-effective way to advertise insist that the Commission allow facsimile advertising to continue.[894] Other small businesses contend that facsimile advertising interferes with their daily operations, increases labor costs, and wastes  **14165  resources such as paper and toner.[895] The Commission has reversed its prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers.[896] Under the amended rules, a business may advertise by fax with the prior express permission of the fax recipient, which must be in writing.[897] Businesses may obtain such written permission through direct mail, websites, or during interaction with customers in their stores. This alternative will benefit those small businesses, which are inundated with unwanted fax advertisements.

38. _Website or Toll-Free Number to Access Company-Specific Lists and to Confirm Requests_. Lastly, the Commission has determined not to require businesses to provide a website or toll-free number for consumers to request placement on company-specific do-not-call lists or to respond affirmatively to do-not-call requests or otherwise provide some means of confirmation that consumers have been added to a company's do-not-call list.[898] Several commenters indicated that such requirements would be costly to small businesses.[899] Although we believe these measures would improve the ability of consumers to register do-not-

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 342 of 409 PageID 411

call requests, we agree that such requirements would be potentially costly to businesses, particularly small businesses. Instead, we believe that the national do-not-call registry will provide consumers with a viable alternative if they are concerned that their company-specific do-not-call requests are not being honored. In addition, consumers may pursue a private right of action if there is a violation of the do-not-call rules. This alternative should reduce, for small businesses who engage in telemarketing, both the potential cost and resource burdens of maintaining company-specific lists.

**91** 39. **REPORT TO CONGRESS:** The Commission will send a copy of the Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[900] In addition, the Commission will send a copy of the Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the Order and FRFA (or summaries thereof) will also be published in the Federal Register.[901]

## *14166 Appendix C

### Comments Filed

**92** *Due to the significant number of comments filed by individual consumers in this proceeding, we have listed below only those comments received from industry, consumer advocacy groups and governmental entities. All individual consumer comments, including those cited in the Report and Order, are available for inspection on the Commission's Electronic Comment Filing System (ECFS).*

| | |
|---|---|
| ACI Telecentrics Incorporated (5-2-03) | ACI |
| Allstate Life Insurance Company (Lisa Behzad; 12-9-02) | Allstate |
| Americall Group, Inc. (11-26-02) | Americall |
| American Association of Blood Banks (Marlene H. Dortch; 12-6-02) | AABB |
| American Association of Retired Persons (AARP; 1-31-03) | AARP |
| American Bankers Association (12-9-02) | ABA |
| American Business Media (11-22-02) | ABM |
| American Express Company (12-5-02) | American Express |
| American General Finance, Inc. (12-10-02) | AGF |
| American Insurance Association (11-21-02) | AIA |
| American International Automobile Dealers Association (12-9-02) | AIADA |
| American Red Cross (12-9-02) | Red Cross |
| American Resort Development Association (11-15-02) | ARDA |
| American Teleservices Association (12-9-02) (12-23-02) | ATA |
| America's Blood Centers (Jeanne Dariotis; 12-5-02) | ABC |
| Ameriquest Mortgage Company (12-9-02) | Ameriquest |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 343 of 409   PageID 412

Association for Communications Technology Professionals in

Higher Education (ACUTA, Inc.) and Association of College

and University Housing Officers-International (ACUHO-I)

| | |
|---|---|
| (ACUTA and ACUHO-I; 12-9-02) | ACUTA |
| Association for Competitive Technology (12-9-02) | ACT |
| Association of Fundraising Professionals (11-27-02) | AFP |
| AT&T Wireless Services, Inc. (12-9-02) | AT&T Wireless |
| Autoflex Leasing (11-18-02) | Autoflex |
| Avinta Communications, Inc. (Abraham Y. Chen; 11-18-02) | Avinta |
| Bank of America (12-3-02) | Bank of America |
| BellSouth Corporation (12-9-02) | BellSouth |
| Blocklist.com (12-9-02) | Blocklist.com |
| BMO Financial Group (12-9-02) | BMO Financial |
| The Broadcast Team (12-6-02) | TBT |
| Brunswick Corporation (12-9-02) | Brunswick |
| Californians Against Telephone Solicitation (Robert Arkow; 12-9-02) | CATS |
| Call Compliance, Inc. (12-9-02) | Call Compliance |
| Castel, Inc. (2-28-03) | Castel |
| Cellular Telecommunications & Internet Association (12-9-02) | CTIA |
| Cendant Corporation (11-22-02) | Cendant |
| Center for Democracy & Technology (12-9-02) | CDT |
| Cherry Communications (11-21-02) | Cherry |
| Cingular Wireless LLC (12-9-02) | Cingular |
| Citigroup, Inc. (12-12-02) | Citigroup |
| City of Chicago (11-22-02) | City of Chicago |
| CMOR (12-9-02) | CMOR |
| CNN.com (4-22-03) | CNN |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 344 of 409 PageID 413

| | |
|---|---|
| Colorado Public Utilities Commission (12-3-02) | CO PUC |
| Comcast Cable Communications, Inc. (12-9-02) | Comcast |
| Concerned Telephone Companies (12-9-02) | CTC |
| Consumer Bankers Association (12-9-02) | CBA |
| Consumer Choice Coalition (12-2-02) | Coalition |
| Consumer Disability Telecommunications Advisory Committee (12-24-02) | CDTAC |
| Consumer Mortgage Coalition (12-19-02) | CMC |
| Convergys Corporation (12-9-02) | Convergys |
| Copilevitz and Canter, LLC (William E. Raney; 12-9-02) | Copilevitz & Canter |
| Cox Enterprises, Inc. (12-9-02) | Cox |
| DialAmerica Marketing, Inc. (12-10-02) | DialAmerica |
| Direct Marketing Association (12-9-02) | DMA |
| Direct Selling Association (12-9-02) | DSA |
| DIRECTV, Inc. (12-9-02) | DIRECTV |
| Discover Bank (12-9-02) | Discover |
| Electronic Privacy Information Center; Consumer Task Force for Automotive Issues; Remar Sutton; Consumer Action; Privacy Rights Clearinghouse; Consumer Federation of America; International Union, UAW; Free Congress Foundation; Junkbusters Corp.; Consumer Project on Technology; Computer Professionals for Social Responsibility; and Private Citizens, Inc. (12-9-02) | EPIC |
| Electronic Retailing Association (12-9-02) | ERA |
| Emergency Communications Network, Inc. (12-6-02) | ECN |
| Farmers Insurance Group (11-22-02) | Farmers |
| Financial Services Roundtable (12-12-02) | FSR |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 345 of 409   PageID 414

| | |
|---|---|
| Florida Department of Agriculture and Consumer Services (1-8-03) | FL DACS |
| Fund for Public Interest Research, Inc. (Jon Scarlett; 12-6-02) | Fund for Public Interest |
| Globecomm Systems, Inc. (12-9-02) | Globecomm |
| Hilton Head Hospitality Resort Services (1-31-03) | Hilton Head |
| Household Automotive Finance Corporation; OFL-A Receivables | |
| Corp.; and Household Automotive Credit Corporation (12-9-02) | Household Automotive |
| Household Bank (SB), N.A. (12-9-02) | Household Bank |
| Household Finance Corp. (House Hold Finance Corporation; 12-12-02) | Household Finance |
| Household Financial Services, Inc. (12-10-02) | HFS |
| Hunton & Williams (11-22-02) | Hunton & Williams |
| IBM Corporate Market Intelligence (2-4-03) | IBM |
| Intellidyn Corporation (Kathie Fleischer; 12-4-02) | Intellidyn |
| Interactive Teleservices Corporation (Barbara Bricker; 4-10-03) | |
| (Duane L. Billingslea; 4-11-03) | ITC |
| Intrado Inc. (11-22-02) | Intrado |
| Intuit, Inc. (12-9-02) | Intuit |
| Katz & Korin (Robert J. Schuckit; 10-5-02) | Katz & Korin |
| Kauffman Group Inc. (11-25-02) | Kauffman |
| Kondos & Kondos Law Offices (11-14-02) | Kondos & Kondos |
| LCC International, Inc. (12-9-02) | LCC |
| The Leukemia & Lymphoma Society (George Dahlman; | |
| 1-31-03 and 5-2-03) | L&LS |
| LSSi Corp. (12-9-02) | LSSi |
| Magazine Publishers of America (12-9-02) | MPA |
| March of Dimes (11-22-02) | March of Dimes |
| MasterCard International Incorporated (12-9-02) | Mastercard |

In re Rules and Regulations Implementing the Telephone, 18 FCC Rcd, 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 346 of 409   PageID 415

| | |
|---|---|
| Mathemaesthetics, Inc. (11-22-02) (*see also* Douglas M. McKenna) | Mathemaesthetics |
| MBNA America Bank, N.A. (12-9-02) (Revised 12-10-02) | MBNA |
| Metris Companies, Inc. (12-6-02) | Metris |
| Meyer Associates, Inc. ([Thoams] Caprio; 4-24-03) | Meyer |
| MidFirst Bank (1-9-03) | MidFirst |
| Mortgage Bankers Association of America (12-9-02) | MBA |
| Mortgage Investors Corporation, Inc. (12-9-02) | Mortgage Investors |
| Mothers Against Drunk Driving (1-30-03) (Wendy J. Hamilton; 5-1-03) | MADD |
| Moultrie Independent Telephone Company (12-9-02) | Moultrie |
| National Association of Attorneys General (12-9-02) | NAAG |
| National Association of Broadcasters (12-9-02) | NAB |
| National Association of Consumer Agency Administrators (Kathleen Thuner, President; 11-22-02) | NACAA |
| National Association of Independent Insurers (12-10-02) | NAII |
| National Association of Insurance & Financial Advisors (11-22-02) | NAIFA |
| National Association of Mortgage Brokers (12-9-02) (*see also* Armand Cosenza) | NAMB |
| National Association of Regulatory Utility Commissioners (11-22-02) | NARUC |
| National Association of State Utility Consumer Advocates (NASUCA; 12-9-02) | NASUCA |
| National Automobile Dealers Association (12-10-02) | NADA |
| National Cable & Telecommunications Association (12-9-02) | NCTA |
| National Consumers League (12-6-02) | NCL |
| National Energy Marketers Association (11-22-02) | NEM |
| National Federation of Independent Business (1-9-03) | NFIB |
| National Public Radio, Inc. (12-9-02) | NPR |
| National Retail Federation (12-9-02) | NRF |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 347 of 409 PageID 416

| | |
|---|---|
| National Telecommunications Cooperative Association (11-22-02) | NTCA |
| NCS Pearson, Inc. (12-9-02) | NCS |
| NeuStar, Inc. (12-9-02) | NeuStar |
| New Orleans, Utility, Cable & Telecommunications Committee | |
| of the City Council (11-18-02) | City of New Orleans |
| Newsletter & Electronic Publishers Association (12-9-02) | NEPA |
| Newspaper Association of America (12-9-02) | NAA |
| New York State Consumer Protection Board (11-22-02) (3 comments) | NYSCPB |
| Nextel Communications, Inc. (12-9-02) | Nextel |
| Nielsen Media Research, Inc. (1-31-03) | Nielsen |
| North Dakota Public Service Commission (12-2-02) | ND PSC |
| Not-For-Profit and Charitable Coalition (11-22-02) | NPCC |
| Office of the People's Counsel for the District of Columbia | |
| (Elizabeth A. Noel; 12-9-02) | OPC-DC |
| Ohio, Public Utilities Commission (12-9-02) | PUC of Ohio |
| Oregon Telecommunications Association (12-3-02) | OTA |
| Pacesetter Corporation (11-20-02) | Pacesetter |
| Personal Legal Plans, Inc. (12-16-02) | PLP |
| Progressive Casualty Insurance Company (11-18-02) | Progressive Casualty |
| Privacilla.org (12-9-02) | Privacilla.org |
| Privacy Rights Clearinghouse (Beth Givens; 12-5-02) | PRC |
| Private Citizen, Inc. (12-9-02) | Private Citizen |
| Process Handler et al. For Hire, Inc. (5-14-03) | Process Handler |
| Progressive Business Publications (Edward M. Satell; 4-28-03) | Progressive Business |
| Qwest Services Corporation (12-9-02) | Qwest |
| R & D Lawn & Tree Services (11-18-02) | R & D |
| Reed Elsevier, Inc. (12-9-02) | Reed |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 348 of 409   PageID 417

| | |
|---|---|
| Reese Brothers, Inc. (12-9-02) | Reese |
| Response Catalyst (Doug Hibbeler; 12-9-02) | Response Catalyst |
| Royal Sonesta Hotel (4-7-03) | Royal Sonesta |
| SBC Communications, Inc. (12-9-02) | SBC |
| Scholastic, Inc. (12-9-02) | Scholastic |
| The Seattle Times Company (12-9-02) | Seattle Times |
| SER Solutions, Inc. (11-19-02) | SER |
| Small Business Survival Committee (1-31-03) | SBSC |
| Special Olympics Florida (Laurie Moyson; 5-8-03) | Special Olympics FL |
| Special Olympics Hawaii (Nancy Bottelo; 1-30-03) | Special Olympics HI |
| Special Olympics Kansas (5-1-03) | Special Olympics KS |
| Special Olympics New Jersey (Suzanne Schwanda; 1-31-03) | Special Olympics NJ |
| Special Olympics New Mexico (Randy Mascorella; 4-30-03) | Special Olympics NM |
| Special Olympics New York (5-2-03) | Special Olympics NY |
| Special Olympics Ohio (Federal Communications Commission; 1-31-03) | Special Olympics OH |
| Special Olympics Virginia (5-2-03) | Special Olympics VA |
| Special Olympics Wisconsin (Dennis H. Alldridge; 1-30-03) | Special Olympics WI |
| Sprint (12-9-02) | Sprint |
| Student Parent Support Services Corp. (3-19-03) | Student Support |
| Suggs & Associates, P.C. (James [M.Suggs]; 12-4-02) | Suggs |
| Sytel Limited (12-9-02) | Sytel |
| Technion Communications Corp. (11-19-02) | Technion |
| Telatron Marketing Group, Inc. (12-9-02) | Telatron |
| Telecommunications for the Deaf (11-15-02) | TDI |
| Teleperformance USA (Julie Loppe-Peyrin; 12-6-02) | |
| (Timothy J. Casey; 12-6-02) | Teleperformance |
| Telestar Marketing, L.P. (11-19-02) | Telestar |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 349 of 409   PageID 418

| | |
|---|---|
| Tennessee Regulatory Authority and the | |
| Tennesse Attorney General (12-9-02) | TN AG |
| Texas, Office of Public Utility Counsel (12-9-02) | TOPUC |
| Texas, Public Utility Commission (12-3-02) | Texas PUC |
| TSI Telecommunications Services, Inc. (11-7-02) | TSI |
| U. S. Chamber of Commerce (12-26-02) | Chamber of Commerce |
| Vector Marketing Corporation (12-9-02) | Vector |
| Ver-A-Fast (12-10-02) (*see also* Bob Bensman; 11-19-02) | Ver-A-Fast |
| VeriSign, Inc. (f/n/a Illuminet, Inc.) (3-31-03) | VeriSign |
| Verizon (12-10-02) | Verizon |
| Verizon Wireless (12-9-02) | Verizon Wireless |
| Visa U.S.A. Inc. (12-9-02) | Visa |
| Wells Fargo & Company (11-5-02) | Wells Fargo |
| Winnebago Cooperative Telephone Association (1-30-03) | Winnebago |
| Worldcom, Inc. (12-9-02) | Worldcom |
| Xpedite Systems, Inc. (12-9-02) | Xpedite |
| Yellow Pages Integrated Media Association (12-9-02) | Yellow Pages |

## Reply Comments Filed

| | |
|---|---|
| Adval Communications, Inc. (1-31-03) | ADVAL |
| American Teleservices Association (1-31-03) (3-5-03, correction) | ATA |
| Ameriquest Mortgage Company (1-31-03) | Ameriquest |
| AT&T Wireless Services, Inc. (1-31-03) | AT&T Wireless |
| BellSouth Corporation (1-31-03) | BellSouth |
| Cablevision Systems Corporation (1-31-03) | Cablevision |
| Cavalier Telephone, LLC (1-31-03) | Cavalier |
| CMOR (1-31-03) | CMOR |
| Coontz, J. Greg (1-8-03) | |
| DialAmerica Marketing, Inc. (1-31-03) | DialAmerica |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 350 of 409   PageID 419

| | |
|---|---|
| Direct Marketing Association (1-31-03) | DMA |
| DIRECTV, Inc. (1-31-03) | DIRECTV |
| Hershovitz, Marc B., Michael Jablonski, Ned Blumenthal and C. Ronald Ellington (1-8-03) (3 comments) | Hershovitz |
| The International Softswitch Consortium (1-31-03) | ISC |
| Intuit, Inc. (1-31-03) | Intuit |
| LSSi Corp. (Lissi Corp; 1-31-03) | LSSi |
| Mathemaesthetics, Inc. (1-8-03) (*see also* Douglas McKenna; 1-6-03) | Mathemaesthetics |
| MBNA America Bank, N.A. (1-31-03) | MBNA |
| Mortgage Bankers Association of America (Stephen A. O'Conner; 1-31-03) | MBA |
| National Association of Broadcasters (1-31-03) | NAB |
| National Association of State Utility Consumer Advocates (NASUCA; 1-31-03) | NASUCA |
| National Public Radio, Inc. (1-31-03) | NPR |
| NCS Pearson, Inc. (1-31-03) | NCS |
| The Newspaper Association of America (1-21-03) | NAA |
| Nextel Communications, Inc. (1-31-03) | Nextel |
| Office of the People's Counsel for the District of Columbia (Elizabeth A. Noël, People's Counsel; 1-31-03) | OPC-DC |
| Private Citizen, Inc. (1-9-03) | Private Citizen |
| RoperASW (1-30-03) | RoperASW |
| SBC Communications, Inc. (1-31-03) | SBC |
| Sytel Limited (2-3-03) | Sytel |
| Teleperformance USA (4-30-03) | Teleperformance |
| Vector Marketing Corporation (1-31-03) | Vector |
| Verizon (1-31-03) | Verizon |
| Verizon Wireless (1-31-03) | Verizon Wireless |
| Visa (1-31-03) | Visa |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 351 of 409   PageID 420

VoltDelta (Brad Schorer; 12-9-02)                                  VoltDelta

Worldcom, Inc. (1-31-03)                                           Worldcom

Xpedite Systems, Inc. (1-31-03)                                    Xpedite

Yellow Pages Integrated Media Association (1-31-03)                Yellow Pages

## Further Comments Filed

Active Periodicals, Inc. (5-5-03)                                  Active Periodicals

Allstate Life Insurance Company (5-5-03)                           Allstate

American Association of Retired Persons (AARP; 5-19-03)            AARP

American Council of Life Insurers (5-5-03)                         ACLI

American Teleservices Association (5-5-03)                         ATA

America's Community Bankers (5-8-03)                               ACB

Ameriquest Mortgage Company (5-5-03)                              Ameriquest

Bank of America Corporation (Kathryn D. Kohler; 5-2-03)           Bank of America

Bank One Corporation (5-5-03)                                      Bank One

Cendant Corporation (5-5-03)                                       Cendant

Citigroup Inc. (5-19-03)                                           Citigroup

City of Chicago (5-1-03)                                           City of Chicago

Chrusch, Michael J., Esq. (5-5-03)

Consumer Council of America (5-5-03)                              CCA

Direct Marketing Association (5-5-03)                             DMA

DIRECTV, Inc. (5-5-03)                                            DIRECTV

Electronic Retailing Association (5-5-03)                         ERA

Federal Trade Commission (5-12-03)                               FTC

Household Bank (SB), N.A. (5-2-03)                                Household

InfoCision Management Corporation (5-5-03)                        InfoCision

Interactive Teleservices Corporation                             ITC

Intuit Inc. (5-5-03)                                             Intuit

Lorman Education Services (5-5-03)                               Lorman

| | |
|---|---|
| MBNA America Bank, N.A. (5-5-03) | MBNA |
| Metris Companies Inc. (5-5-03) | Metris |
| Miller Isar, Inc. (5-2-03) | Miller Isar |
| Mortgage Bankers Association of America (Kurt Pfotenhauer; 5-5-03) | MBA |
| National Association of Independent Insurers (National Association of Independent Insures [sic]; 5-5-03) | NAII |
| National Association of Realtors (National Association of Realtor; 5-5-03) | NAR |
| National Association of State Utility Consumer Advocates (NASUCA; 5-5-03) | NASUCA |
| National Association of Insurance and Financial Advisors (5-2-03) | NAIFA |
| National Telecommunications Cooperative Association (NTCA; 5-5-03) | NTCA |
| Newspaper Association of America (5-5-03) | NAA |
| New Jersey State Division of the Ratepayer Advocate (5-5-03) | New Jersey Ratepayer |
| Nextel Communications, Inc. (5-5-03) | Nextel |
| Scholastic Inc. (5-5-03) | Scholastic |
| Securities Industry Association (James Y. Chin; 5-5-03) | SIA |
| Software & Information Industry Association (5-5-03) | SIIA |
| Sprint Corporation (5-5-03) | Sprint |
| Stonebridge Life Insurance Companies (5-5-03) | Stonebridge |
| Teleperformance USA (4-29-03) | Teleperformance |
| Tennessee Regulatory Authority (5-5-03) | TN RA |
| Vector Marketing Corporation (Vector – Marketing Corporation; 4-29-03) | Vector |
| Verizon (5-5-03) | Verizon |
| Winstar Communications, LLC (5-5-03) | Winstar |
| Worldcom, Inc. (5-5-03) | Worldcom |

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 353 of 409   PageID 422

| | |
|---|---|
| Yellow Pages Integrated Media Association (5-5-03) | Yellow Pages |

**Further Reply Comments Filed**

| | |
|---|---|
| American Council of Life Insurers (5-19-03) | ACLI |
| American Teleservices Association (5-19-03) | ATA |
| America's Community Bankers (5-8-03) | ACB |
| Ameriquest Mortgage Company (5-5-03) | Ameriquest |
| Competitive Telecommunications Association (5-19-03) | Competitive Telecom |
| DialAmerica Marketing, Inc. (5-19-03) | DMA |
| Indiana Attorney General Steve Carter (5-19-03) | Indiana AG |
| National Association of State Utility Consumer Advocates (NASUCA; 5-19-03) | NASUCA |
| New Jersey State Division of the Ratepayer Advocate (5-19-03) | New Jersey Ratepayer |
| Primerica Financial Services, Inc. (5-19-03) | Primerica |
| SBC Communications, Inc. (SBC Communications Inc.; 5-19-03) | SBC |
| Verizon (5-5-03) | Verizon |

**\*14174  SEPARATE STATEMENT OF CHAIRMAN MICHAEL K. POWELL**

*Re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; CG Docket No. 02-278*

Our decision today is the most sweeping consumer protection measure ever adopted by the FCC. No longer will consumers be forced to endure unwanted telephone calls and faxes. Under the Telephone Consumer Protection Act (TCPA) and our revised rules, consumers are empowered to choose.

The TCPA is about tools. It gives consumers the tools they need to build a high and strong fence around their homes to protect them from unsolicited telephone calls and faxes. It also allows other consumers to have a lower fence or no fence at all, if they wish to take advantage of these commercial messages. Our decision makes the American consumer's toolbox more complete by creating a national do not call list and strengthening and modifying our other longstanding protections under the TCPA. Our goal: to maximize consumers' ability to control the messages they receive on their personal phones and faxes.

Since the enactment of the TCPA a decade ago, the rapid growth of technology has led to a five-fold increase in marketing contacts via telephone. An increased number of telemarketing calls, the proliferation of predictive dialers, and the incomplete protections of less-comprehensive do not call lists have combined to necessitate the Commission's new approach. Consumers want more control over their telephones - today we give it to them.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 354 of 409   PageID 423

In addition to the national do not call list, our decision contains a number of other important provisions. First, although telemarketing calls made pursuant to an existing business relationship are exempt under the TCPA, the Commission today significantly narrows the scope of that exemption to better protect consumers. Consumers may eliminate even these commercial calls upon request. Second, we tighten the limitations on our existing do not call rules and impose additional requirements on predictive dialers, pre-recorded messages, and calls to wireless phones. We also require telephone solicitations to provide caller identification. Finally we adopt stricter rules to control unsolicited fax advertising. Taken together and combined with vigilant enforcement, our rules provide consumers with the tools they need to craft the commercial relationships they want.

Consistent with the instructions in the recently enacted Do Not Call Implementation Act, our order maximizes consistency and complements the FTC's recently amended rules. I look forward to working with the FTC, under the fine leadership of Chairman Muris, to harmonize our rules and move forward with nation-wide implementation of the federal Do-Not-Call Registry.

### *14175  SEPARATE STATEMENT OF COMMISSIONER KATHLEEN Q. ABERNATHY

*Re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order*

Today's decision to establish a national do-not-call list is directly responsive to consumer frustration with telemarketing overload. Consumers are fed up with the barrage of telemarketing calls that intrude on their privacy, and they crave the ability to just say no. Congress also has made clear the importance of giving consumers a more effective means of blocking unwanted calls. Congress authorized establishment of a national do-not-call registry in the Telephone Consumer Protection Act of 1991, and earlier this year, it enacted the Do-Not-Call Implementation Act. This legislation authorizes funding for the Federal Trade Commission's national registry and directs this Commission to "maximize consistency" with the FTC's Telemarketing Sales Rule. Today's action responds to this congressional direction by providing a convenient, one-stop solution that will enable consumers to place their phone numbers on a unified national do-not-call list at no charge.

At the same time, I remain mindful that telemarketing can serve a valuable function by providing information to consumers about goods and services. Many consumers appreciate learning about ways to save money, obtain better service, or otherwise take advantage of commercial opportunities. Moreover, telemarketers enjoy protection under the First Amendment, which requires that any restrictions on commercial speech advance a substantial governmental interest and be no more extensive than necessary. Accordingly, I am pleased that we have crafted rules that balance the competing interests at stake.

In particular, we have preserved and in some cases modified the exemptions for calls to consumers with whom the marketer has an established business relationship, calls to consumers who have expressly consented to being called, and calls by tax-exempt nonprofit organizations (or by independent telemarketers calling on their behalf). Consumers should understand that, as a result of these statutory exemptions, placing a phone number on the national do-not-call list will not necessarily mean that you will receive *no* telemarketing calls. But the small number of calls received should be more consistent with consumers' expectations of privacy, and consumers can prohibit any further contact through company-specific do-not-call lists.

I am also pleased that the Commission has established a narrow exemption from the national do-not-call list to permit marketers to contact people with whom they have a personal relationship. I believe the record shows that Congress was concerned about anonymous calls using autodialers; it did not intend to put the Avon Lady out of business. Consumers generally expect and welcome calls from family, friends, and acquaintances who want to promote products and services. Restricting such calls therefore would impose a more extensive burden on speech than is necessary to achieve Congress's goals.

 *14176  In addition, the Order appropriately clarifies the interplay between federal and state telemarketing restrictions. While I support empowering consumers to block unwanted calls, telemarketers should not have to comply with multiple, inconsistent rules. Indeed, Congress clearly called on this Commission and the FTC to establish a uniform federal regime. Thus, the Order appropriately clarifies that, while states may enforce the federal rules and may adopt more restrictive rules for intrastate calls, states generally may not regulate interstate calls.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 355 of 409   PageID 424

In sum, I am pleased to support this Order, because it provides effective mechanisms for consumers to restrict unwanted telemarketing calls, while balancing the legitimate interests that companies and individuals have in communicating with customers and potential customers. I expect companies to comply with our new rules, and I look forward to working together with the FTC and state attorneys general to ensure that consumers receive the privacy protection they want and deserve.

### *14177   SEPARATE STATEMENT OF COMMISSIONER MICHAEL J. COPPS

Re: *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CG Docket No. 02-278), Report and Order*

Few rights are so fundamental as the right to privacy in our daily lives, yet few are under such frontal assault. Our dinners are disrupted by unwanted phone calls. Our computer accounts are besieged with bothersome spam. Our mailboxes are swollen with advertisements for products, goods and services. We conduct our whole lives against the white noise of commercial solicitation. These intrusions exhaust us, irritate us and threaten our cherished right to be left alone.

Today we have an opportunity to do something about it. We have an opportunity to reinforce our homes against the constant invasion of commercialism and the endless nuisance of unwanted telemarketing calls. At the direction of Congress and through coordinated action with the Federal Trade Commission, we now return a measure of privacy control to citizens. We establish a national Do-Not-Call registry that permits each of us to choose limits on the telemarketing calls we receive. We do this in a way that balances the First Amendment rights of marketers with the right of each individual and every household to determine the scope of permissible intrusion. This decision represents a positive step for all of us, not only as consumers, but as citizens. I am pleased to support it.

I am especially pleased that the rules we adopt are in harmony with those put in place by our allies in this exercise at the Federal Trade Commission. This is consistent with Congress' direction that we "maximize consistency" with the rules adopted by our fellow agency. This makes for a user-friendly registry.

To ensure that the Do-Not-Call list achieves the protective power and prominence that Congress intended, both agencies must now work together–and with our partners in the states–to enforce the national program we establish here today. When the Do-Not-Call list is open for business, we will share the duty of vigilant enforcement. We worked hard here to balance the rights and privileges of personal contacts and relationships with the right to be left alone. I think we achieve good balance, but I never underestimate the inventiveness of some in skirting or abusing rules, and these individuals and enterprises should understand that such actions will not go unnoticed or unpunished.

We all owe a debt of gratitude to the many people at our Consumer and Governmental Affairs Bureau who worked hard to draft and coordinate and bring this item before the Commission and who will continue to labor on behalf of the American people to implement the rules and make the national registry a success. I also want to commend my colleagues for the productive discussions we have had on this item in recent days. The result is a little more privacy in our not-so-private society.

### *14178   SEPARATE STATEMENT OF COMMISSIONER JONATHAN S. ADELSTEIN

Re: *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CG Docket 02-278).*

I am pleased to support this item. By adopting a National Do-Not-Call List, we arm American consumers with a powerful tool to protect their privacy. This is one of the most significant things that the FCC has ever done for American families. It will benefit consumers on a daily basis and in a very personal way. It's certainly the thing that people will notice as much as anything else we have done. We're restoring peace and quiet around the dinner table for everyone who asks for it, and plenty will ask,

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 356 of 409   PageID 425

myself included. The public has sent a resounding directive telling us that uninvited telephone solicitations are not merely a distraction but are driving customers away from their phones. Consumers have also made clear that our prior rules - without a national Do-Not-Call List - do not work to their satisfaction. And Congress has made its wishes clear by adopting the Do-Not-Call Act which authorized the establishment of the national list. My hope is that our actions here will allow the American public to once again view their phones as a useful connection to the world rather than a source of nightly harassment.

At the same time, we balance the interests of consumer privacy alongside the commercial speech interests of those businesses who use the telephone to offer goods and services and the interests of those consumers willing to receive such offers. The record bears out that many consumers find telephone solicitations valuable. According to industry estimates, outbound telemarketing generates between 300 and 600 billion dollars in annual revenues. So, I am sensitive to the potential impact of these rules on the businesses that rely on telephones to reach their customers. I have particular concern about the local telephone industry, where the practical effect of our established business relationship exemption may have an uneven impact on competitors. Nonetheless, Congress has captured the will of the people - certainly, as reflected in our record - when it directed us to "maximize the consistency" of our rules with the newly-adopted FTC national list. Congress did not explicitly provide for particular treatment of the local telephone industry in the Do-Not-Call Act, but I believe that this area warrants our special attention and monitoring.

So that our rules are no more extensive than necessary and because American consumers each hold different views about the value of telephone solicitations, we adopt a suite of options from which customers can choose the approach that best serves their needs. Under our rules, customers may sign up for the new national Do-Not-Call List or, alternatively, may continue to receive telemarketing calls and sign up for the company-specific lists when they no longer wish to hear from a particular company. When customers sign up for the national list, they still have the ability to grant express permission to receive calls from particular companies. So our rules are flexible enough to allow consumers to choose the best option for them.

We have a special obligation to remain vigilant in our implementation of these rules. Congress has asked us to report to it annually. I look forward to those reports with the optimism that we have adopted measures that will put American consumers back in control of their phones.


### Footnotes

1    Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227. The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*

2    The Direct Marketing Association (DMA) is a trade association of businesses that advertise their products and services directly to consumers by mail, telephone, magazine, internet, radio or television. *See also infra*, note 47.

3    Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 6101 *(Do-Not-Call Act)*.

4    *See TCPA*, Section 2(5), *reprinted in* 7 FCC Rcd 2736 at 2744.

5    47 U.S.C. § 227(b)(1).

6    47 U.S.C. §§ 227(d)(1)(B) and (d)(3)(A). *See also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Order on Further Reconsideration, 12 FCC Rcd 4609, 4613, para. 6 (1997) (*1997 TCPA Reconsideration Order*), in which the Commission found that "[s]ection 227(d)(1) of the statute mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message and not the entity that transmits the message." (footnotes omitted)

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 357 of 409   PageID 426

7    The TCPA permits consumers to file suit in state court if an entity violates the TCPA prohibitions on the use of facsimile machines, automatic telephone dialing systems, and artificial or prerecorded voice messages and telephone solicitation. 47 U.S.C. §§ 227(b)(3) and (c)(5). Consumers may recover actual damages or receive up to $500 in damages for each violation, whichever is greater. If the court finds that the entity willfully or knowingly violated the TCPA, consumers may recover an amount equal to not more than three times this amount. 47 U.S.C. § 227(b)(3). Consumers may also bring their complaints regarding TCPA violations to the attention of the state attorney general or an official designated by the state. This state entity may bring a civil action on behalf of its residents to enjoin a person or entity engaged in a pattern of telephone calls or other transmissions in violation of the TCPA. 47 U.S.C. § 227(f)(1). Additionally, a consumer may request that the Commission take enforcement actions regarding violations of the TCPA and the regulations adopted to enforce it. *See* 47 C.F.R. § 1.41 on informal requests for Commission action and 47 C.F.R. § 1.716 on the Commission's process for complaints filed against common carriers.

8    47 U.S.C. § 227(b)(2).

9    47 U.S.C. § 227(c)(1)-(4).

10    47 U.S.C. § 227(c)(1)(A).

11    47 U.S.C. § 227(c)(3).

12    *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752 (1992) (*1992 TCPA Order*); *see also* 47 C.F.R. § 64.1200.

13    Initially telemarketers were required to honor a do-not-call request indefinitely. The Commission later modified its rules to require that the request be honored for a ten-year period. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397-98, para. 14 (1995) (*1995 TCPA Reconsideration Order*); 47 C.F.R. § 64.1200(e)(2)(vi).

14    47 C.F.R. § 64.1200(e)(2)(i).

15    47 C.F.R. § 64.1200(e)(2)(ii).

16    47 C.F.R. § 64.1200(e)(1).

17    47 C.F.R. § 64.1200(e)(2)(iv).

18    47 C.F.R. § 64.1200(a)(1)(i)-(iii).

19    47 C.F.R. § 64.1200(a)(2).

20    47 C.F.R. §§ 64.1200(a)(4) and 68.318(c).

21    47 C.F.R. § 64.1200(a)(3).

22    47 C.F.R. §§ 64.1200(d)(1) and (2); 47 C.F.R. § 68.318(d).

23    *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397-401, paras. 12-19.

24    *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12404-06, paras. 27-31.

25    *1997 TCPA Reconsideration Order*, 12 FCC Rcd at 4612-13, para. 6. The Commission also "[did] not find anything in the TCPA that would prohibit a facsimile broadcast provider from supplying identification of itself and the entity originating a message if it arranges with the message sender to do so." *Id.* at 4613, para. 6.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y  Document 13  Filed 01/19/24  Page 358 of 409  PageID 427

26    *See TCPA*, Section 2(3), *reprinted in* 7 FCC Rcd 2736 at 2744.

27    *See TCPA*, Section 2(4), *reprinted in* 7 FCC Rcd 2736 at 2744.

28    In attempting to estimate the number of outbound marketing calls made each day in the United States, representatives of the Direct Marketing Association (DMA) have stated that, with as many as 1 million telemarketing representatives making 13 calls an hour, working 8 hours a day, it is possible that 104 million outbound calls are made to businesses and consumers every day. They noted that, of these calls, as many as 41% of them may be abandoned (because they get busy signals, no answer, hang-ups, or answering machines). *See* transcript from FTC Do-Not-Call Forum, Testimony of Jerry Cerasale, DMA, June 6, 2002 at 68. Another study presented to the FTC during its proceeding, estimates that the annual number of outbound calls that are answered by a consumer is 16,129,411,765 (*i.e.*, 16 billion calls). This figure does not include those calls that are abandoned. James C. Miller, III, Jonathan S. Bowater, Richard S. Higgins, and Robert Budd, "An Economic Assessment of Proposed Amendments to the Telemarketing Sales Rule," June 5, 2002 at 28, Att. 1 (prepared for the Consumer Choice Coalition and its members, ACI Telecentrics, Coverdell & Company, Discount Development Services, HSN LP d/b/a HSN and Home Shopping Network, Household Credit Services, MBNA America Bank, Member Works Incorporated, Mortgage Investors Corporation, Optima Direct, TCIM Inc., Trilegiant Corporation and West Corporation). *See Telemarketing Sales Rule, Final Rule,* Federal Trade Commission, 68 Fed. Reg. 4580 at 4629-30, n.591 (Jan. 29, 2003) *(FTC Order)*.

29    This figure represents telemarketing sales to consumers and businesses. *See* Seth Stern, "Will feds tackle telemarketers?" (April 15, 2002) <http:// www.csmonitor.com/2002/0415/p16s01-wmcn.html> (citing Direct Marketing Association statistics).

30    *See* "The Economic Impact of Direct Marketing by Telephone," a study presented by Direct Marketing Association Telephone Marketing Council, <http:// www.third-wave.net/economics.htm> (visited July 3, 2002).

31    A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call. *See Telemarketing Sales Rule, Notice of Proposed Rulemaking*, Federal Trade Commission, 67 Fed. Reg. 4492 at 4522 (January 30, 2002) *(FTC Notice)*.

32    Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (*i.e.*, the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone, resulting in "dead air" or a hang-up. *See FTC Notice,* 67 Fed. Reg. at 4523.

33    47 U.S.C. § 227(b)(1)(C) and 47 C.F.R. § 64.1200(a)(3).

34    The Commission or the Commission's Enforcement Bureau have issued forfeiture orders totaling $1.56 million for violations of the TCPA's prohibition on unsolicited fax advertisements. The Commission has also proposed a $5,379,000 forfeiture against a fax broadcaster. *See Fax.com, Inc. Apparent Liability for Forfeiture*, Notice of Apparent Liability for Forfeiture, 17 FCC Rcd 15927 (2002) *(Fax.com NAL), stayed Missouri v. American Blast Fax*, No. 4:00CV933SNL (E.D. Mo. Aug. 29, 2002). The Enforcement Bureau has also issued 189 citations for such prohibited faxes. For a description of the Commission's enforcements actions involving the TCPA, *see* <http:// www.fcc.gov/eb/tcd/ working.html>. Under section 503 of the Act, the Commission is required in an enforcement action to issue a warning citation to any violator that does not hold a Commission authorization. Only if the non-licensee violator subsequently

*In re Rules and Regulations Implementing the Telephone...*, 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 359 of 409   PageID 428

engages in conduct described in the citation may the Commission propose a forfeiture, and the forfeiture may only be issued as to the subsequent violations. *See* 47 U.S.C. §§ 503(b)(5), (b)(2)(C).

35   *See, e.g., Fax.com NAL*, 17 FCC Rcd at 15932-33, para. 9, which describes a medical doctor's complaint about unsolicited fax advertisements he received on a line that is reserved for the receipt of patient medical data.

36   *See FTC Order*, 68 Fed. Reg. at 4580. The FTC adopted its Telemarketing Sales Rule, 16 C.F.R. Part 310, on August 16, 1995, pursuant to the Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108. The Telemarketing Act, which was signed into law on August 16, 1994, directed the FTC to issue a rule prohibiting deceptive and abusive telemarketing acts or practices. *FTC Notice*, 67 Fed. Reg. at 4492-93.

37   "Scrubbing" refers to comparing a do-not-call list to a company's call list and eliminating from the call list the telephone numbers of consumers who have registered a desire not to be called.

38   Despite these jurisdictional limitations, the FTC stated that it can reach telemarketing activity conducted by non-exempt entities. Therefore, it maintains that when an exempt financial institution, telephone company, insurance company, airline, or nonprofit entity conducts its telemarketing campaign using a third-party telemarketer not exempt from the amended TSR, then that campaign is subject to the provisions of the TSR. *See FTC Order*, 68 Fed. Reg. 4580 at 4587.

39   The FTC's national do-not-call registry and other amendments to the TSR have been challenged on grounds that a national do-not-call registry violates the First Amendment and that the FTC exceeded its statutory authority under the Telemarketing Consumer Fraud and Abuse Prevention Act. *See Mainstream Marketing Services, Inc. v. FTC*, No. 03-N-0184 (D. Colo. filed Jan. 29, 2003). *See also U.S. Security et al v. FTC*, Civ. No. 03-122-W (W.D. Okla. filed Jan. 29, 2003). On March 26, 2003, the U.S. District Court for the Western District of Oklahoma denied plaintiffs' Motion for Preliminary Injunction of the FTC's abandoned call rules, stating that plaintiffs "have failed to show a substantial likelihood that they will prevail on the merits of their challenges to the Final Rule." *See U.S. Security et al. vs. FTC*, No. Case CIV-03-122-W (W. D. Okla. March 26, 2003).

40   *See FTC Order*, 68 Fed. Reg. 4580 at 4641.

41   *See* FTC press materials at <http:// www.ftc.gov/opa/2003/06/dncaccelerated.htm> (accessed June 3, 2003).

42   *See FTC Order*, 68 Fed. Reg. 4580 at 4641-45; 16 C.F.R. §§ 310.4(b)(1)(iv) and 310.4(b)(4).

43   *See FTC Order*, 68 Fed. Reg. 4580 at 4623-28; 16 C.F.R. § 310.4(a)(7).

44   Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Wisconsin and Wyoming have no-call laws. Of these states, Connecticut, Maine, Michigan, Pennsylvania, Vermont, and Wyoming require telemarketers to use the DMA's Telephone Preference Service (TPS) list. *See infra* note 47. Alaska's statute requires telephone companies to place a black dot in the telephone directory by the names of consumers who do not wish to receive telemarketing calls.

45   States that are considering laws to create state-run do-not-call lists are Delaware, District of Columbia, Hawaii, Iowa, Maryland, Michigan, Nebraska, Nevada, North Carolina, Ohio, Rhode Island, South Carolina, Washington, and West Virginia.

46   In Indiana, more than 1,000,000 residential telephone numbers have been submitted to the State's do-not-call list. In Missouri, more than 1,000,000 residential telephone numbers are now enrolled in the State's do-not-call database, placing approximately 40% of the State's households on that State's do-not-call list. In Tennessee, 762,000 telephone numbers have been registered, representing an estimated 33% of all households. In New York, the number of residential telephone numbers enrolled on that State's do-not-call list is nearly 2 million. Connecticut's do-not-call list contains nearly 400,000

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 360 of 409    PageID 429

telephone numbers, and Georgia's is nearing 360,000. Colorado has 977,000 registered phone numbers, almost half of the number of residential phone lines in the state. Texas has more than 782,000 registered phone lines. Kentucky has 740,000 registered phone lines, representing 46% of Kentucky residents. The Kansas list contains more than 367,000 phone lines. Approximately 1,600,000 residents enrolled in Pennsylvania's registry in less than six weeks. *See* NAAG Comments at 6, n.5.

47    *See, e.g.*, Wyoming (Wyo. Stat. Ann. § 40-12-301) and Maine (Me. Rev. Stat. Ann. tit. 32, § 14716 (2003). Established in 1985, the DMA's Telephone Preference Service (TPS) is a list of residential telephone numbers for consumers who do not wish to receive telemarketing calls. The DMA requires its members to adhere to the list. Telemarketers who are not members of DMA are not required to use the list, but may purchase the TPS for a fee. *See* <http://www.dmaconsumers.org/offtelephonelist.html> (accessed April 8, 2003).

48    *See, e.g.*, Connecticut (Conn. Gen. Stat. Ann. § 42-288a); Indiana (H. B. 1222, to be codified at Ind. Code Ann. § 24.4.7); Missouri (Mo. Rev. Stat. § 407.1098); and Tennessee (Tenn. Code Ann. § 65-4-404 (2002)); *see also* rules at Tenn. Comp. R & Regs. Chap. 1220-4-11.

49    *See* Ga. Code Ann. § 46-5-27 (2002); *see also* rules at Ga. Comp. R & Regs. R. 515-14-1.

50    *See* H.B. 472, to be codified at Tex. Bus. & Com. Code Ann. § 43.001.

51    *See* Or. Rev. Stat. § 646.574.

52    *See* Mo. Rev. Stat. § 407.1098.

53    *See* Illinois H.B. 3407.

54    *See* <http://nocall.doj.state.ca.us/> (accessed April 8, 2003).

55    *See FTC Order*, 68 Fed. Reg. 4580 at 4641.

56    *See* FTC Order, 68 Fed. Reg. 4580 at 4641.

57    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking (NPRM) and Memorandum Opinion and Order (MO&O), 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90 (2002) (*2002 Notice*). In the MO&O, the Commission closed and terminated CC Docket No. 92-90 and opened a new docket to address the issues raised in this proceeding.

58    *2002 Notice*, 17 FCC Rcd at 17468-71, paras. 13-17.

59    *2002 Notice*, 17 FCC Rcd at 17473-76, paras. 23-27.

60    *2002 Notice*, 17 FCC Rcd at 17477-81, paras. 30-35.

61    *2002 Notice*, 17 FCC Rcd at 17482-84, paras. 37-40.

62    *2002 Notice*, 17 FCC Rcd at 17468-71, paras. 13-17.

63    *2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.

64    *See FTC Notice*, 67 Fed. Reg. 4492 and *FTC Order*, 68 Fed. Reg. 4580.

65    *2002 Notice*, 17 FCC Rcd at 17497-501, paras. 70-80.

*In re Rules and Regulations Implementing the Telephone...*, 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 361 of 409 PageID 430

66    On December 20, 2002, the Commission extended its reply comment period until January 31, 2003. *See Consumer & Governmental Affairs Bureau Announces An Extension of Time To File Reply Comments on the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, DA 02-3554 (rel. Dec. 20, 2002).

67    *See* H.R. REP. No. 108-8 at 4 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 671.

68    *Id.*

69    The Do-Not-Call Act provides that the FTC and FCC shall each transmit a report to Congress which shall include: "(1) an analysis of the telemarketing rules promulgated by both the Federal Trade Commission and the Federal Communications Commission; (2) any inconsistencies between the rules promulgated by each such Commission and the effect of any such inconsistencies on consumers, and persons paying for access to the registry; and (3) proposals to remedy any such inconsistencies." *See* Do-Not-Call Act, Sec. 4(a).

70    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Further Notice of Proposed Rulemaking, FCC 03-62 (rel. March 25, 2003) (*Further Notice*).

71    *See* Comments filed by the FTC in response to the Commission's *Further Notice. See also* NARUC Winter Committee Meetings, February 23-26, 2003, at which FCC and FTC staff discussed the national do-not-call registry and ways to harmonize federal and state programs; Letter from James Bradford Ramsay, NARUC General Counsel, to FCC filed March 14, 2003 (NARUC *ex parte*).

72    47 U.S.C. § 227(c)(1).

73    47 U.S.C. § 227(c)(1)(A).

74    47 U.S.C. § 227(c)(3).

75    *See* 47 U.S.C. § 227(c)(3)(A)-(L).

76    47 U.S.C. § 227(c)(4).

77    47 U.S.C. § 152(b). *See also Texas v. American Blast Fax*, 121 F. Supp. 2d 1085 at 1087-89 (W.D. Tex. 2000), *Minnesota v. Sunbelt Communications and Marketing*, Civil No. 02-CV-770 (D. Minn. Sept. 4, 2002).

78    *1992 TCPA Order*, 7 FCC Rcd at 8760, para. 14. At that time commenters estimated the start-up and operational costs for a national database in the first year could be as high as $80 million. *Id.* at 8758, para. 11.

79    *See infra* paras. 86-96 for a discussion of the company-specific do-not-call requirements.

80    *2002* Notice, 17 FCC Rcd at 17487-96, paras. 49-66. On December 20, 2002, the Commission extended its reply comment period to allow parties an opportunity to comment on the FTC's order establishing a national do-not-call database for those entities over which it has jurisdiction. *See Consumer & Governmental Affairs Bureau Announces An Extension of Time To File Reply Comments on the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, DA 02-3554 (rel. Dec. 20, 2002).

81    *2002 Notice*, 17 FCC Rcd at 17487-88, para. 49 (also noting that the FTC had received over 40,000 comments in response to its Notice on telemarketing).

82    *2002 Notice*, 17 FCC Rcd at 17464, para. 7, n.34 (citing estimate that as many as 104 million outbound calls are made every day).

83    *See 2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 362 of 409   PageID 431

84    *See, e.g.*, Maureen Matthews Comments; Gloria Toso Comments; Shirley A. Weaver Comments. *See also* ACUTA Comments at 2; NACAA Comments at 2; Telecommunications for the Deaf Comments at 4; NJ Ratepayer Further Comments at 2.

85    *See, e.g.*, EPIC Comments at 2-5; Private Citizens, Inc. Comments at 3; Teresa Wilkie Comments; Benjamin Philip Johnson Comments.

86    *See, e.g.,* Terry L. Krodel Comments (disabled individual has difficulty answering phone); Brian Lawless (contends that consumers should not be forced to pay additional charges to stop telemarketing calls); J. Raymond de Varona Comments (telemarketers hang up when he requests to be added to do-not call list); Mandy Burkart Comments (elderly grandmother targeted by telemarketers). *See also* AARP Comments at 1 (noting that elderly consumers are often the subject of telemarketing fraud).

87    *See, e.g.*, Emily Malek Comments; Lester D. McCurrie Comments; Andrea Sattler Comments; Sandra S. West Comments (receives as many as 20 telemarketing calls per day).

88    Edwin Bailey Hathaway Comments; Cynthia Stichnoth Comments.

89    *See, e.g.,* Brenda J. Donat Comments (cancer patient appreciates reduction in calls due to Indiana Telephone Privacy Act); Alice and Bill Frazee Comments; Tammy Puckett Comments (Indiana law provides quiet for terminally ill family member).

90    *See, e.g.*, Verizon Comments at 2; Bank of America Further Comments at 2.

91    *See, e.g.*, NAAG Comments at 8-13; New York State Consumer Protection Board Comments at 7; Ohio PUC Comments at 3-7; Texas PUC Comments at 10.

92    *See, e.g.*, Bank of America Comments at 2-4 (endorse national list provided it establishes a uniform national standard and retains established business relationship); Cox Enterprises Comments at 4-9 (would not oppose national list if established business relationship exemption is retained); Sprint Comments at 11-12 (state lists should be preempted); Verizon Wireless Comments at 4-6 (support national list if state lists preempted and established business relationship retained). *See also* DMA Further Comments at 3 (should preempt states); DirectTV Further Comments at 3 (preempt); Nextel Further Comments at 8.

93    *See, e.g.*, MBA Comments at 2; NAII Comments at 2; SBC Comments at 6; WorldCom Comments at 17.

94    *See, e.g.*, ABA Comments at 7; BellSouth Reply Comments at 5.

95    *See, e.g.*, Dial America Comments at 15-18; Technion Comments at 3-4; Vector Comments at 14-15.

96    *See, e.g.*, MPA Comments at 13-14; NAA Comments at 12-14; Seattle Times Comments at 2; Vector Comments at 14-15.

97    *See, e.g.*, MPA Comments at 4, 13-14; NAA Comments at 13; PLP Comments at 1.

98    *See, e.g.*, March of Dimes Comments at 2; Leukemia and Lymphoma Society Comments; Special Olympics Hawaii Comments at 2.

99    *See, e.g.*, ATA Comments at 58-91; SBC Comments at 6, 16-17; WorldCom Comments at 19-30.

100   *See FTC Order*, 68 Fed. Reg. at 4628-33.

101   The FTC has awarded a contract to AT&T Government Solutions for $3.5 million to create the national registry of consumers who do not want to be contacted by telemarketers.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 363 of 409 PageID 432

102    The FTC indicates that calls will be answered by an Interactive Voice Response (IVR) system. Consumers will be directed to enter their telephone numbers. That number will then be checked against an automatic number information (ANI) that is transmitted with the call. Consumers will also be able to verify or cancel their registration in the same way. *See FTC Order*, 68 Fed. Reg. at 4638-39.

103    As discussed herein, the terms "seller" and "telemarketer" may refer to the same entity or separate entities. The "telemarketer" is the entity that actually initiates the telephone call. The "seller" is the entity on whose behalf the telephone call is being made. *See* amended 47 C.F.R. § 64.1200(f)(5) and (6). Sellers may often hire telemarketing entities to contact consumers on their behalf. *See* amended 47 C.F.R. § 64.1200(f)(7) for the definition of "telemarketing." Pursuant to the FTC's do-not-call program, each seller must pay for access to the do-not-call database. Thus, telemarketing entities cannot share do-not-call data among various client sellers.

104    *See* 16 C.F.R. § 310.4(b)(2).

105    The FTC has concluded, however, that calls on behalf of charitable organizations will be subject to the company specific do-not-call provisions. *See FTC Order*, 68 Fed. Reg. at 4629.

106    The FTC defines an "established business relationship" as a relationship between a seller and consumer based on: (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the *eighteen* months immediately preceding the date of a telemarketing call; or (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the *three* months immediately preceding the date of a telemarketing call. 16 C.F.R. § 310.2(n). Regarding the interplay between the established business relationship and do-not-call rules, the FTC concluded that if the consumer continues to do business with the seller after asking not to be called, the consumer cannot be deemed to have waived their company-specific do-not-call request. *FTC Order*, 68 Fed. Reg. at 4634.

107    *See* 16 C.F.R. § 310.4(b)(3).

108    *FTC Order*, 68 Fed. Reg. at 4638-41.

109    *See also* H.R. REP. No. 108-8 at 3 (2003), reprinted in 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

110    *See, e.g.*, Joseph A. Durle Comments (forced to turn phone off due to constant telemarketing calls and missed call that family member had a stroke); John D. Milhous Comments; Gregory Reichenbach Comments; Christopher C. Parks Comments (receives numerous calls every day).

111    *See* 47 U.S.C. § 227(c)(1)(A).

112    *See TCPA*, Section 2(9), *reprinted in* 7 FCC Rcd at 2744.

113    In the *FTC Order*, the FTC outlines in detail how the national registry will be administered, including how consumers may register and how sellers may purchase the list. *See also infra*, Enforcement Priorities section, paras. 211-214.

114    We decline to extend the effective date for the national do-not-call rules beyond October 1, 2003. *See Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 9.5-month implementation period for the national do-not-call list requirements).

115    *See* H.R. J. Res. 2, 108th Congress at 96 (2003) (*Consolidated Appropriations Resolution*). *See also* H.R. REP. No. 108-8 at 3 (2003), reprinted in 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 364 of 409   PageID 433

a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

116   *See* Do-Not-Call Act, Sec. 3.

117   *See, e.g.*, Sean Herriott Comments (receives numerous telemarketing calls each day); Lester D. McCurrie (receives between 8-12 call per day); David K. McClain Comments; Greg Rademacher Comments (receives so many calls that he now refuses to answer the phone); John Rinderle Comments; Steven D. Thorton Comments; Sandra West Comments (receives 20 calls per day).

118   *See supra* para. 8.

119   *See, e.g.*, Karen M. Meyer Comments (86 year-old receives as many as 10 solicitation calls per day); Vivian Sinclair Comments (85 year old with cane receives numerous telephone solicitations); Mr. and Mrs. Joseph Stephanik Comments (works at night and telemarketing calls interfere with sleep); Mavis Selway Comments (husband who works at night must answer telemarketing calls during day).

120   *See* Telecommunications for the Deaf Comments at 2-3 (noting that telemarketers often lack TTY or telecommunications relay service).

121   *See* H.R. REP. No. 108-8 at 3 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities.").

122   *See, e.g.*, LSSi Comments at 5-6; NCS Comments at 2-4.

123   As noted above, the FTC has awarded a contract to AT&T Government Solutions for $3.5 million to create the national registry. The Congressional Budget Office estimates that the FTC will collect and spend a total of about $73 million in fees over 2003-2008 to implement the national database. *See* H.R. REP. NO.108-8 at 6 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 673.

124   *FTC Order*, 68 Fed. Reg. at 4640.

125   *See FTC Order*, 68 Fed. Reg. at 4640. Our rules previously required a company-specific do-not-call request to be honored for ten years. *See* 47 C.F.R. § 64.1200(e)(2)(vi).

126   The term "ANI" refers to the delivery of the calling party's billing number by a local exchange carrier to any interconnecting carrier for billing or routing purposes, and to the subsequent delivery of such number to end users. 47 C.F.R. § 64.1600(b).

127   *FTC Order*, 68 Fed. Reg. at 4640.

128   As noted above, the "seller" and "telemarketer" may be the same entity or separate entities. Each entity on whose behalf the telephone call is being made must purchase access to the do-not-call database.

129   *See* 47 U.S.C. § 227(c)(3)(K). *See also* 16 C.F.R. § 310.4(b)(2). We also note that telemarketers will be prohibited from selling the list to others or dividing the costs of accessing the list among various client sellers. Such action would threaten the financial support for maintaining the database.

130   *See, e.g.*, AT&T Wireless Reply Comments at 22; Charles Ferguson Comments; City of New Orleans Comments at 12; Texas Office of Public Utility Counsel Comments at 7. *See also* NAAG Comments at 35-36 contending that public safety implications may arise if wireless consumers receive unsolicited marketing calls while operating automobiles.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 365 of 409   PageID 434

131  47 U.S.C. § 227(b)(1)(iii).

132  Nextel Comments at 19. We note that section 227(c)(1) uses the phrase "residential telephone subscribers" and that section 227(c)(3), which more specifically discusses the do-not-call database, uses the phrase "residential subscribers." Neither of these terms is defined in the TCPA. Thus, we see no basis in the legislative language or history for considering them to be materially different. Nor do we see a basis for distinction in common usage. Therefore, we will interpret them to be synonymous and will refer to both by using the term "residential subscribers."

133  Nextel Comments at 19.

134  Nextel Comments at 21.

135  Nextel Comments at 20.

136  For example, the Commission recently relied on wireless broadband PCS substitution to support "Track A" findings in two section 271 proceedings where residential customers in New Mexico and Nevada had replaced their landline service with wireless service. *See Application by SBC Communications Inc., Nevada Bell Telephone Company, and Southwestern Bell Communications Services, Inc., for Authorization to Provide In-Region, InterLATA Services in Nevada*, WC Docket No. 03-10, Memorandum Opinion and Order, FCC 03-80 at paras. 16 - 26 (rel. April 14, 2003); *see also* Federal Communications Commission, Seventh Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services at 32-36 (*Seventh Annual CMRS Competition Report*).

137  47 U.S.C. § 227(b)(1)(A)(iii).

138  S. REP. NO. 102-178 at 1 (noting that telephone solicitations are both a nuisance and an invasion of privacy).

139  This presumption is only for the purposes of section 227 and is not in any way indicative of any attempt to classify or regulate wireless carriers for purposes of other parts of Title II.

140  We also note that numerous alternative marketing outlets remain available to sellers, such as newspapers, television, radio, and direct mail.

141  Such calls may be prohibited if they serve as a pretext to an otherwise prohibited advertisement or a means of establishing a business relationship. Moreover, responding to such a "survey" does not constitute express permission or establish a business relationship exemption for purposes of a subsequent telephone solicitation. *See* H.R. REP. NO. 102-317 at 13 ("[T]he Committee does not intend the term 'telephone solicitation' to include public opinion polling, consumer or market surveys, or other survey research conducted by telephone. A call encouraging a purchase, rental, or investment would fall within the definition, however, even though the caller purports to be taking a poll or conducting a survey.").

142  See *FTC Order*, 68 Fed. Reg. at 4645-46.

143  See 16 C.F.R. § 310.4(b)(3).

144  See 47 U.S.C. § 227(c)(1)(A).

145  See "New telemarketer tool trumps TeleZapper," CNN.com (February 26, 2003) <http://edition.cnn.com/2003/TECH/ptech/02/26/telemarket.tool.ap/> (noting development of software that allows telemarketers to circumvent the telezapper and other blocking devices).

146  See, *e.g.*, Leslie Price Comments (telezapper ineffective); Josephine Presley Comments (call blocking ineffective).

147  For example, section 227(c) prohibits consumers from being charged to place their number on a national do-not-call list. *See* 47 U.S.C. § 227(c)(3)(E).

148   *See 1992 TCPA Order*, 7 FCC Rcd at 8761-62, paras. 16-17.

149   *See* 47 U.S.C. § 227(c)(4)(C) (requiring the Commission to consider "whether the needs of telemarketers operating on a local basis could be met through special markings of area white page directories"). This conclusion is consistent with the Commission's conclusion in 1992.

150   *See* Letter from Michael Del Casino, AT&T, to Marlene Dortch, FCC, dated march 18, 2003.

151   *See infra* para. 54.

152   This finding is dependent, in large part, on conclusions that we have reached elsewhere in this order. For example, our conclusion that the McCarran-Ferguson Act does not necessarily prohibit the application of the national registry to insurance companies; rather, the implications of the McCarran-Ferguson Act will need to be evaluated on a case-by-case basis. The Commission may seek further clarification or authority from Congress as necessary to support these conclusions.

153   *See supra* note 39.

154   *See, e.g.*, NCTA Comments at 6; NAA Comments at 14; MBA Further Comments at 4.

155   47 U.S.C. § 227(a)(3).

156   *See* amended 47 C.F.R. § 64.1200(f)(3).

157   47 U.S.C. § 227(a)(3). *See also* H.R. REP. No. 102-317 at 13 (1991) (suggesting that Congress did not believe such prior express permission need be in writing) We believe that in discussing the form in which *prior express permission* must be given, Congress was addressing an exemption to the definition of telephone solicitation. Here, we are addressing the type of prior express permission that would allow calls to consumers who already have indicated that they do not wish to receive telemarketing calls (by registering on the do-not-call list).

158   For purposes of this exemption, the term "signed" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal or state contract law.

159   *See, e.g.*, Association of Fundraising Professionals Comments at 3-4; Fund for Public Interest Comments at 2; March of Dimes Comments at 2; Special Olympics of Hawaii Comments.

160   47 U.S.C. § 227(a)(3).

161   *See* H.R. REP. No. 102-317 at 16 (1991).

162   *See, e.g.*, Fund for Public Interest Comments at 2; March of Dimes Comments at 2; Non-for-Profit Coalition Comments at 11-13; Special Olympics Hawaii Comments. *But see* Wayne G. Strang Comments at 7-8; Michael C. Worsham Comments at 10. Commenters also argue that restrictions imposed on tax-exempt nonprofit organizations or organizations acting on their behalf are subject to more stringent scrutiny under the First Amendment as noncommercial speech. *See* NPCC Comments at 15-18.

163   *See, e.g.*, American Red Cross Comments at 2; America's Blood Centers Comments at 1.

164   *See, e.g.*, Newspaper Association of America Comments at 12-14 (noting that newspapers are holders of second-class mail permits); Personal Legal Plans Comments at 5 (contending that small businesses should be exempt); Seattle Times Comments at 2 (proposing exemption for newspapers); Vector Comments at 7 (proposing exemption for entities that make a *de minimis* number of calls); Ameriquest Further Comments at 2 ("face-to-face" exemption).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 367 of 409 PageID 436

165    In determining whether a telemarketer is considered a 'friend' or 'acquaintance' of a consumer, we will look at, among other things, whether a reasonable consumer would expect calls from such a person because they have a close or, at least, firsthand relationship. If a complaining consumer were to indicate that a relationship is not sufficiently personal for the consumer to have expected a call from the marketer, we would be much less likely to find that the personal relationship exemption is applicable. While we do not adopt a specific cap on the number of calls that a marketer may make under this exemption, we underscore that the limited nature of the exemption creates a strong presumption against those marketers who make more than a limited number of calls per day.

166    We note that this conclusion is consistent with Congress' rationale in exempting tax-exempt nonprofit organizations and established business relationships from the definition of telephone solicitation. *See* H.R. Rep. No. 102-317 at 14 and 16 (1991).

167    47 U.S.C. § 227(c)(1)(E).

168    *See* Vector Further Comments at Att. 2. Vector makes approximately 4 million calls per year. Vector Comments at 6.

169    *See, e.g.*, Ameriquest Comments at 14; Vector Comments at 6-7. Such calls may, however, be permissible when they fall within exemptions for personal or established business relationships as discussed herein.

170    *FTC Order*, 68 Fed. Reg. 4655-56.

171    For example, Vector suggests that the Commission exempt individual direct sellers who make no more than 20 calls per day. Vector Comments at 8-10.

172    Vector Further Comments at 4. Vector makes approximately 4 million calls per year. Vector Comments at 6.

173    *See* ACLI Further Comments at 1-3; Stonebridge Further Comments at 5-7; Cendant Further Comments at 3-4; NAII Further Comments at 3. We note that many other commenters representing insurance interests did not raise this issue before or during the Further Notice comment period.

174    15 U.S.C. § 1012(a).

175    15 U.S.C. § 1012(b).

176    *See* ACLI Further Comments at 1-2.

177    *See* 15 U.S.C. § 1012(b); *see also The Chair King, Inc. v. Houston Cellular Corp.*, 1995 WL 1760037 (S.D. Tex. 1995), *vacated for lack of subject matter jurisdiction* 131 F.3d 507 (5th Cir. 1997).

178    *The Chair King, Inc. v. Houston Cellular Corp.*, 1995 WL 1760037 (S.D. Tex. 1995).

179    *See Chair King*, 1995 WL 1760037 at 3 (*citing SEC v. National Securities Inc.*, 393 U.S. 453, 460 (1960) and *FTC v. National Casualty Co.*, 357 U.S. 560 (1958)).

180    *See Chair King*, 1995 WL 1760037 at 4.

181    We note that the TCPA's prohibition does not specifically reference insurance advertising. The TCPA also permits facsimile advertising to persons who have given their prior express invitation or permission. See 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

182    NAII explains that "[s]tate insurance codes prohibit a variety of unfair trade practices, such as rebating, deceptive advertising, inequitable claim settlement and unfair discrimination." *See* NAII Further Comments at 2.

In re Rules and Regulations Implementing the Telephone... 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 368 of 409   PageID 437

183  *See, e.g., Merchant Home Delivery Serv. Inc. v. Frank B. Hall & Co. Inc.*, 50 F.3d 1486, 1492 (9th Cir. 1995) (holding federal statute prohibiting acts also prohibited under state law not to "invalidate, impair, or supersede" state law under McCarran-Ferguson); *United Farm Bureau Mut. Ins. Co. v. Metropolitan Human Relations Comm'n*, 24 F.3d 1008, 1016 (7th Cir. 1994) (holding duplicate prohibition of redlining under Indiana law not to preempt Fair Housing Act under McCarran-Ferguson Act).

184  *See, e.g., Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 421 (4th Cir. 1984).

185  *See U.S. v. Calvin*, 39 F.3d 1299, 1305 (5th Cir. 1994) (noting that government charges of fraud not barred by McCarran-Ferguson Act where interest in fraud protection is completely compatible with state's regulatory interests).

186  *See* 47 U.S.C. § 227(f)(1).

187  47 U.S.C. § 227(c)(4)(A)-(B) (emphasis added).

188  *See* 47 U.S.C. § 227(c)(4)(B)(iii).

189  *See also* Letter from Michael Del Casino, AT&T, to Marlene Dortch, FCC, dated March 18, 2003.

190  *FTC Order*, 68 Fed. Reg. at 4638-39.

191  *FTC Order*, 68 Fed. Reg. at 4639.

192  *See also* 16 C.F.R. § 310.4(b)(1)(iii)(B).

193  *FTC Order*, 68 Fed. Reg. at 4640.

194  *FTC Order*, 68 Fed. Reg. at 4640.

195  *Telemarketing Sales Rule Fees*, 68 Fed. Reg. 16238 (April 3, 2003) (*FTC Fees Notice*). The FTC has proposed that sellers be charged $29 per area code with a maximum annual fee of $7,250 for access to the entire national database. Sellers may request access to five or less areas codes for free.

196  *FTC Order*, 68 Fed. Reg. at 4640.

197  *FTC Order*, 68 Fed. Reg. at 4647.

198  Appropriate state and federal regulators will be capable of verifying when the telemarketer last accessed the list. *FTC Order*, 68 Fed. Reg. at 4641.

199  *FTC Order*, 68 Fed. Reg. at 4640.

200  In fact, section 227(e)(2) prohibits states from using any database that does not include the part of the national database that relates to such state. *See* 47 U.S.C. § 227(e)(2).

201  *See FTC Order*, 68 Fed. Reg. at 4641.

202  *See supra* para. 32.

203  *Central Hudson Gas & Elec. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 557 (1980). NAAG argues that *Central Hudson* may not even be the appropriate analytical framework to determine the constitutionality of regulations implementing the national do-not-call registry, since "[f]ar from being an impermissible regulation of speech, the registry merely works to prevent 'a form of trespass.'" NAAG Comments at 34. We would note, however, that the Supreme Court has analyzed other measures that protected residential privacy as restrictions on commercial speech. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) (applied *Central Hudson* analysis to Florida Bar rules that prohibited lawyers

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 369 of 409   PageID 438

from using direct mail to solicit personal injury or wrongful death clients within 30 days of accident.) *See also State of Missouri v. American Blast Fax*, 323 F.3d 649 (8th Cir. 2003) (*American Blast Fax*), *pet. for rehearing pending* and *Destination Ventures v. Federal Communications Commission*, 46 F.3d 54 (9th Cir.1995) (*Destination Ventures*), where both the Eighth and Ninth Circuits applied the *Central Hudson* analysis to the TCPA provisions banning unsolicited fax advertising.

204   *See Kathryn Moser v. Federal Communications Commission*, 46 F.3d 970 (9th Cir. 1995) (*Moser*) *cert. denied*, 515 U.S. 1161 (1995) (upholding ban on prerecorded telephone calls); *American Blast Fax* (upholding ban on unsolicited fax advertising) and *Destination Ventures* (upholding ban on unsolicited fax advertising).

205   *Central Hudson*, 447 U.S. at 566. Specifically, the Court found that "[f]or commercial speech to come within the First Amendment, it at least must concern lawful activity and not be misleading. Next, it must be determined whether the asserted governmental interest is to be served by the restriction on commercial speech is substantial. If both inquiries yield positive answers, it must then be decided whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.* at 557.

206   *Frisby v. Schultz*, 487 U.S. 474, 485. *See also Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) ( "[I]n the privacy of the home, ... the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.").

207   *Rowan v. United States Post Office*, 397 U.S. 728 at 737-738 (1970); *see also Martin v. City of Struthers*, 319 U.S. 141 (1943), in which the Court struck down a ban on door-to-door solicitation because it "substituted the judgment of the community for the judgment of the individual householder," *id.* at 144, but noted in *dicta* that a regulation "which would make it an offense for any person to ring a bell of a householder who has appropriately indicated that he is unwilling to be disturbed" would be constitutional. *Id.* at 148.

208   H.R. REP. NO. 102-317 at 2 (1991).

209   *See supra* para. 8.

210   *See supra* para. 19.

211   *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (citations omitted).

212   *Id.* at 628 (citation omitted).

213   *See, e.g.*, Brenda J. Donat Comments; Alice and Bill Frazee Comments; Tammy Packett Comments.

214   *See e.g.*, H.R. REP. NO. 108-8 at 3 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

215   *See, e.g.*, ATA Comments at 85-88 and WorldCom Comments at 27-33.

216   *United States v. Edge Broadcasting Company*, 509 U.S. 418, 434 (1993). *See also Moser v. FCC*, 46 F.3d at 975 ("Congress may reduce the volume of telemarketing calls without completely eliminating the calls.").

217   H.R. REP. NO. 102-317 at 16 (1991).

218   *See American Blast Fax* and *Destination Ventures*.

219   We reject Vector's argument that because its direct sellers and others make a *de minimis* number of calls relative to the high-volume of calls that telemarketers make, that the national do-not-call registry, as applied to companies like Vector's, "would not directly or materially advance the government's interest." Vector Comments at 12-13. The Supreme Court

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 370 of 409 PageID 439

has held, in applying *Central Hudson's* second prong, that the state does not have to demonstrate that the government's interest is advanced as applied to every case. *See Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) ("[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."); *Edge Broadcasting*, 509 U.S. 418, *discussing Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978) ( "[T]he State was entitled to protect its interest by applying a prophylactic rule to those circumstances generally; we declined to go further and to prove that the state interests supporting the rule actually were advanced by applying the rule in ... [the] particular case.").

220  *Florida Bar*, 515 U.S. 618, 632.

221  *Id*.

222  *Id*. at 624.

223  *Moser*, 46 F.3d at 975; *see also American Blast Fax*, 323 F.3d at 658-60 (TCPA's ban on unsolicited faxes was not more extensive than necessary to "prevent ... unwanted fax advertising from shifting advertising costs to unwilling consumers and interfering with their fax machines."); *Destination Ventures* (FCC sustained its burden of demonstrating reasonable fit between interest in preventing shift of advertising costs to consumers and banning unsolicited commercial faxes.).

224  *See Florida Bar*, 515 U.S. at 633-34.

225  *See supra* para. 19.

226  *See supra* para. 39.

227  *See supra* paras. 30-32. We also reject Vector's argument that the failure in our rules to provide an exemption for direct sellers and others who make a *de minimis* number of calls means that our regulations do not meet the requirement of *Central Hudson's* third prong of being "narrowly tailored to ensure that ... [they are] ... no more extensive than necessary to serve the governmental interest." Vector Comments at 10, quoting *Central Hudson*, 447 U.S. at 565-66. As stated above, the Supreme Court requires a "not necessarily perfect, but reasonable" fit, *Florida Bar*, 515 U.S. at 632. In upholding a ban which prohibited lawyers from using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident, even in cases where the injuries or grief was relatively minor, the Court held that, "We find little deficiency in the ban's failure to distinguish among injured Floridians by the severity of their pain or the intensity of their grief.... The Bar's rule is reasonably well tailored to its stated objective." *Id*. at 633. Similarly, we find our regulations implementing the national do-not-call registry do not need to provide for an exemption for direct sellers and others who make a *de minimis* number of calls in order to be a "reasonable fit" between the governmental ends and means.

228  *See* ATA Comments at 64-79 and WorldCom Comments at 36-38.

229  *City of Cincinnati v. Discovery Network Inc. et al*, 507 U.S. 410 at 430 (1993).

230  *Id*. at 428 (citation omitted).

231  *Id*. at 429.

232  *Id*. at 429-30.

233  H.R. REP. No. 102-317, at 16 (1991). ATA asserts that we cannot give weight to Congress' findings to support our decision to exclude non-profit organizations from our regulations implementing the do-not-call registry. ATA Comments at 60-61. ATA argues that we may only consider the record compiled in this proceeding and that its market survey of consumer attitudes regarding telemarketing commissioned in November 2002 calls into question the validity of the Congressional findings distinguishing between non-profit and commercial calls. ATA Comments at 73-74. We disagree.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 371 of 409   PageID 440

As a preliminary matter, it is not clear to us that ATA's data support its assertion that consumers make no distinction between commercial and charitable calls. For example, while ATA does not provide exact data, it appears from the bar graph illustrating the data that approximately twice as many consumers find charitable calls "more acceptable" than other types of unsolicited calls than find commercial calls "more acceptable" than other types of unsolicited calls (approximately 18% v. 9%). The Congressional findings were supported by a poll undertaken by the National Association of Consumer Agency Administrators of its state level members for statistical data describing the extent to which consumer complaints about unsolicited telemarketing calls involved commercial, charitable, or political calls. The evidence showed that the overwhelming majority of consumer complaints were about commercial calls. H.R. REP. No. 102-137 at 16. Both the Eighth and Ninth Circuits have credited Congress' findings relating to the TCPA. *See American Blast Fax*, 323 F.3d at 655-656 (citing Congress' evidence in upholding the distinction between commercial and non-commercial faxes in the TCPA) and *Moser v. FCC*, 46 F.3d at 974 (finding that "[t]here was significant evidence before Congress of consumer concerns about telephone solicitation" before the passage of the TCPA). "When Congress makes findings on essentially factual issues ... those findings are entitled to a great deal of deference, inasmuch as Congress as an institution is better equipped to amass and evaluate the vast amounts of data." *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331 n.12 (1985). We also note that in its *1992 TCPA Order*, the Commission stated that no evidence had been presented to show that non-commercial calls represented as serious a concern for telephone subscribers as unsolicited commercial calls and unsolicited commercial calls and concluded, based on the comments and the legislative history of the TCPA, that it would not seek additional authority to curb calls by tax-exempt organizations. TCPA Order, 7 FCC Rcd at 8773-8774, para. 40. Congress recently reaffirmed this judgment by requiring us "to maximize consistency" with the rule promulgated by the Federal Trade Commission, which contains an exemption for non-profit organizations.

234    *Id*. at 14.

235    *Missouri ex rel. v. American Blast Fax*, 323 F.3d at 656 n.4 (*citing United States v. Edge Broad. Co.*, 509 U.S. 418 at 434).

236    *FTC Order*, 68 Fed. Reg. at 4636, n. 675, *quoting from Metromedia v. San Diego*, 453 U.S. 490, 513 (1981) ("[I]nsofar as it regulates commercial speech, the San Diego ordinance meets the constitutional requirements of *Central Hudson* .... It does not follow, however, that San Diego's ban on signs carrying noncommercial advertising is also valid ..." Commercial speech cases have consistently accorded noncommercial speech a greater a greater degree of protection than commercial speech.") and *citing Watchtower Bible and Tract Soc'y v. Village of Stratton*, 122 S.Ct. 2080 (summarized by the FTC Order as "the Court invalidated an ordinance that required anyone who wanted to engage in door-to-door canvassing or soliciting to obtain a permit before doing so, the Court went out of its way to suggest that the ordinance may have been constitutional if it were limited to commercial speech.").

237    *FTC Order*, 68 Fed. Reg. at 4636.

238    Thirty-six states have adopted no-call laws.

239    *See* Do-Not-Call Act, Sec. 3.

240    *See* 47 U.S.C. § 227(e) and (f).

241    *See* Letter from James Bradford Ramsay, NARUC General Counsel, to FCC filed March 14, 2003 (NARUC *ex parte*); NARUC Winter Committee Meetings, February 23-26, 2003, at which FCC and FTC staff discussed the national do-not-call registry and ways to harmonize federal and state programs. *See also* FTC Further Comments.

242    *See, e.g.*, AARP Comments at 3; Visa Comments at 1-3.

243    *See* 47 U.S.C. § 227(e)(2).

244    *See* new rule at 47 C.F.R. § 64.1200(h).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 372 of 409   PageID 441

245   *FTC Order*, 68 Fed. Reg. at 4641. Approximately 19.2 million consumers have registered on state do-not-call lists.

246   The FTC estimates that many states will be able to transfer their do-not-call registrations to the national database prior to its implementation on October 1, 2003. For other states it may take from 12 to 18 months to achieve this result. *FTC Order*, 68 Feg. Reg. at 4641.

247   *See* 47 U.S.C. § 227(e)(2).

248   *See 2002 Notice*, 17 FCC Rcd at 17493-96, paras. 60-66.

249   *See, e.g.*, DMA Reply Comments at 5. *See also* Nextel Comments at 4-6; Visa Comments at 3-4; Wells Fargo Comments at 1-2; Xpedite Comments at 14-16 (arguing that the Commission should preempt to create more uniform rules). We note that, although Bank One raises its preemption arguments, in part, by referencing the Commerce Clause, its analysis clearly focuses on the Commission's authority under the Communications Act to preempt. ("Congress' general power to regulate interstate commerce *and* its delegation of that authority to the FCC in the Communications Act of 1934." Bank One Further Comments at 5.) Moreover, to the extent Bank One suggests that, in the absence of federal statutory preemption, the Commerce Clause operates to preempt states from unduly burdening interstate commerce, such a finding would require a more particularized showing with regard to the specific statute at issue and the burden on interstate commerce. *See e.g., Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978) (considering whether state statute that prohibited oil producers and refiners from operating retail gas stations impermissibly burdened interstate commerce.).

250   *See, e.g.*, WorldCom Reply Comments at 27-30 (arguing that state do-not-call lists are preempted by operation of law to the extent they purport to regulate interstate calls).

251   *See, e.g.*, NAAG Comments at 12; Attorney General of Indiana Further Reply Comments.

252   *See, e.g.*, American Express Comments at 2-3; Nextel Comments at 4-5; Visa Reply Comments 8-9.

253   *See, e.g.*, NAAG Comments at 12; NARUC Comments at 3-4; North Dakota PSC Comments at 2; Attorney General of Indiana Further Reply Comments.

254   *See, e.g.* NARUC Comments at 3-4; North Dakota PSC Comments at 2; OPCDC Comments at 3; Texas PUC Comments. In addition, a large number of consumers filed comments in this proceeding indicating that state do-not-call regulations have improved their privacy rights. *See, e.g.*, Brenda J. Donat Comments (cancer patient appreciates reduction in calls due to Indiana Telephone Privacy Act); Alice and Bill Frazee Comments; Tammy Puckett Comments (Indiana law provides for quiet for terminally ill family member).

255   *See* NAAG Comments at 2. NAAG estimates that approximately 150 state enforcement actions have been taken against telemarketing companies call across state lines.

256   47 U.S.C. § 227(f)(6)("Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.").

257   *Van Bergen v. Minnesota*, 59 F.3d 1541, 1547-48 (8th Cir. 1995).

258   Ala. Code 1975 § 8-19A-4; Ark. Code Ann. § 4-99-103; Fla. Stat. Ann. § 501.604.

259   Ind. Code § 24-4.7-1-1 (no EBR exception); Idaho Code § 48-1003A (nonprofit exception for minors only).

260   Alaska Stat. § 45.50.475; Vt. Stat. Ann. tit. 9 § 2464a; Kan. Stat. Ann. § 50-670 and § 50-671.

261   Section 2(b) provides the Commission with the authority to apply the TCPA to intrastate communications. *See* 47 U.S.C. § 152(b).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 373 of 409   PageID 442

262   47 U.S.C. § 227(f)(1).

263   *See, e.g., Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (where state law frustrates the purposes and objectives of Congress, conflicting state law is "spatified" by the Supremacy Clause); *City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will preempt any state or local law that conflicts with such regulations or frustrates the purposes thereof.").

264   47 U.S.C. § 227(e)(1).

265   Section 227(e)(1) provides that:

(e) Effect on State Law. -

(1) State Law Not Preempted. - Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits–

(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

(B) the use of automatic telephone dialing systems;

(C) the use of artificial or prerecorded voice messages; or

(D) the making of telephone solicitations.

266   *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986); *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133 (1930).

267   S. REP. NO. 102-178, at 3; *see also id.* at 5 ("Federal action is necessary because States do not have jurisdiction to protect their citizens against those who ... place interstate telephone calls."); Cong. Rec. S16205 (Nov. 7, 1991) (remarks of Sen. Hollings) ("State law does not, and cannot, regulate interstate calls."); TCPA § 2(7) (finding that "[o]ver half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation.").

268   *See, e.g.,* 137 Cong. Rec. S18317-01, at 1 (1991) (remarks of Sen. Pressler) ("The Federal Government needs to act now on uniform legislation to protect consumers.").

269   *See, e.g.*, AWS Further Comments at 7 (separate state requirements will confuse customers and increase costs and burdens for telemarketers); Intuit Further Comments at 2-4 (Congress intended that more restrictive state laws be preempted); Visa Further Comments at 8 (contending that state lists that are inconsistent with federal requirements should be preempted).

270   NAAG Comments at 12.

271   47 U.S.C. § 227(f)(6).

272   *1992 TCPA Order*, 7 FCC Rcd at 8765-66, para. 23. Specifically, the Commission's rules require that persons or entities engaged in telephone solicitations must have a written policy available upon demand for maintaining a do-not-call list, must inform and train any personnel engaged in telephone solicitations in the existence and use of the list, and must record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. 47 C.F.R. § 64.1200(e)(2)(i)-(iii). In addition, the Commission's rules require that a do-not-call request be honored for a period of ten years from the date of the request. 47 C.F.R. § 64.1200(e)(2)(vi). In the absence of a specific request by the subscriber to the contrary, a do-not-call request applies to the particular business entity making the call or on

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 374 of 409   PageID 443

whose behalf the call is made, and does not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised. 47 C.F.R. § 64.1200(e)(2)(v).

273    *2002 Notice*, 17 FCC Rcd at 17468-72, paras. 13-20.

274    *2002 Notice*, 17 FCC Rcd at 17469-70, paras. 14-15.

275    *2002 Notice*, 17 FCC Rcd at 17470, para. 17.

276    Lyle Bickley Comments; Pete Nico, Jr. Comments.

277    *See, e.g.,* James D. Gagnon Comments; Norman C. Hamer Comments; Rosanna Santiago Comments; Elizabeth J. Yocam Comments.

278    *See, e.g.,* Harley H. Cudney Comments (telemarketers fail to identify themselves); Timothy Walton Comments (telemarketers failure to send do-not-call policy when requested).

279    Gregory S. Reichenbach Comments.

280    Thomas M. Pechnik Comments at 2; Wayne Strang Comments at 4.

281    *See* Telecommunications for the Deaf Comments at 2.

282    *See, e.g.,* ATA Comments at 97-100; DMA Comments at 16-18; SBC Reply Comments at 6.

283    *See, e.g.,* Household Financial Comments at 3; MBA Comments at 6-7; Nextel Comments at 7-9; Qwest Comments at 6-7. *But see* MBNA Comments at 7.

284    *FTC Order*, 68 Fed. Reg. at 4629.

285    *FTC Order*, 67 Fed. Reg. at 4629.

286    *See, e.g.,* Nancy J. Barginear Comments; David K. McClain Comments; John A. Rinderle Comments; Ryan Tobin Comments.

287    *But see* Nextel Comments at 7 (contending that adoption of a national do-not-call list may render unnecessary any detailed company-specific requirements).

288    *See, e.g.,* DMA Comments at 16; Electronic Retailing Association Comments at 5-6; Ohio PUC Comments at 17.

289    *See, e.g.,* ABA Comments at 8; AGF Comments at 3; Call Compliance Comments at 7.

290    *See, e.g.,* DMA Comments at 16; Electronic Retailing Association Comments at 5-6; Ohio PUC Comments at 17-18.

291    *See* amended rule at 47 C.F.R. § 64.1200(d)(6).

292    *See, e.g.,* MBA Comments at 6; Nextel Comments at 7-9; Qwest Comments at 6-7.

293    *See, e.g.,* Household Financial Services Comments at 3-4 (contending that it takes 90 days to process requests); Verizon Comments at 6 (45 days to process request).

294    *See, e.g.,* WorldCom Comments at 40.

295    Consistent with our existing rules, such request applies to all telemarketing campaigns of the seller and any affiliated entities that the consumer reasonably would expect to be included given the identification of the caller and the product

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 375 of 409 PageID 444

being advertised. 47 C.F.R. § 64.1200(e)(2)(v). *See also* AGF Comments at 4 (indicating that a reasonable time to process requests is 30 days); MBNA Comments at 7 (reasonable time to process requests is a minimum of 30 days).

296   47 C.F.R. § 64.1200(e)(2)(iii).

297   As noted above, the safe harbor period for compliance with the national do-not-call list is three-months. However, given that the national list will contain many more registrants than the individual company-specific lists, we believe that it is reasonable to allow some additional time for telemarketers to comply with the national do-not-call requests.

298   *See* 47 U.S.C. § 227(a)(3)(C).

299   *1995 TCPA Reconsideration Order,* 10 FCC Rcd at 12397, para. 13.

300   *2002 Notice,* 17 FCC Rcd at 17479, para. 33.

301   *See* amended rule at 47 C.F.R. § 64.1200(d).

302   *See* amended rule at 47 C.F.R. § 64.1200(f)(3)(i).

303   *2002 Notice,* 17 FCC Rcd at 17471-72, paras. 18-19.

304   The Act defines CPNI as "(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier." 47 U.S.C. § 222(h)(1)(A) and (B) (the 911 Act amended the definition of CPNI in section 222(h) to include "location" among a customer's information that carriers are required to protect under the privacy provisions of section 222). CPNI includes personal information such as the phone numbers called by a consumer, the length of phone calls, and services purchased by a consumer, such as call waiting. *See Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information; Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 2000 Biennial Regulatory Review - Review of Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers,* CC Docket Nos. 96-115, 96-149, and 00-257, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd 14860 at 14864, para. 7 (2002) (*CPNI Third Report and Order*).

305   Opt-out approval and opt-in approval refer to methods of obtaining customer consent to use, disclose, or permit access to customers' CPNI. The opt-in approval method "requires that the carrier obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request consistent with the requirements" adopted by the Commission. 47 C.F.R. § 64.2003(h). Under the opt-out approval method "a customer is deemed to have consented to the use, disclosure, or access to the customer's CPNI if the customer has failed to object thereto within the waiting period [adopted by the Commission in 47 C.F.R. § 64.2009(d)(1)] after the customer is provided appropriate notification of the carrier's request for consent consistent with the rules" adopted by the Commission. 47 C.F.R. § 64.2003(i).

306   Such marketing is not limited to telemarketing and may include direct mail or other marketing.

307   *2002 Notice,* 17 FCC Rcd at 17471-72, para. 19. The Commission noted that the carrier would still be able to market to that consumer in other ways (e.g., direct mail, e-mail, etc.). *Id.*

308   *2002 Notice,* 17 FCC Rcd at 17471-72, para. 19.

309   BellSouth Comments at 6; Verizon Comments at 16; Michael C. Worsham Comments at 3; Yellow Pages Comments at 6.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 376 of 409   PageID 445

310    Cingular Comments at 10; Sprint Comments at 15.

311    AT&T Wireless Comments at 20-21.

312    Concerned Telephone Companies Comments at 1-8; NTCA Comments at 2 ("Offering opt-out consent to the consumer's telecommunications carrier under section 222 indicates an interest in receiving information on new services that may be available either now or in the future from the carrier.").

313    NYSCPB Comments at 5.

314    *See* 47 C.F.R. § 64.1200(f)(4). *See also infra* Section VI.

315    *See supra* para. 42.

316    BellSouth Comments at 6; Michael C. Worsham Comments at 3; Verizon Comments at 16; Yellow Pages Comments at 6.

317    As one commenter stated "under the Commission's CPNI rules ... a customer's CPNI consent does not equate to customer consent to receive telemarketing by that carrier." AT&T Wireless Comments at 19.

318    *See infra* para. 112.

319    We disagree with the Concerned Telephone Companies' assertion that a customer's CPNI consent equates to a "prior express invitation or permission" to be contacted. *See* Concerned Telephone Companies Comments at 2. As we discuss herein, a customer's CPNI consent indicates her willingness to have her telephone company use her CPNI in order to, among other things, tailor marketing proposals to her. CPNI approval, however, is not a blanket approval for any and all marketing a carrier may decide to pursue. A customer's affirmative decision to enroll on a do-not-call list is a much more direct and reliable indicator of a customer's willingness to receive marketing advances via the telephone. Accordingly, we disagree with the Concerned Telephone Companies' assertion that "consent given by a customer under the CPNI rules renders Section 227 constraints inapplicable." Concerned Telephone Companies Comments at 2.

320    Some commenters equated obtaining customers' consent to use the customers' CPNI with having an established business relationship. *See* Nextel Comments at 16, section entitled "The Commission Should Interpret the Established Business Relationship Rules in a Manner Consistent With the Consent Requirements of the CPNI Rules." We concur with those commenters who argue that the carrier's established business relationship allows the carrier to contact those customers via telemarketing who have requested to be on the national do-not-call list. However, as we determine herein, the CPNI consent does not overcome or trump a customer's request to be included on the national do-not-call list. *See* Cingular Comments at 10; Nextel Comments at 17; Sprint Comments at 16 ("The view that telecommunications service providers should be allowed to contact their existing customers, even if such customers have asked to be placed on a general (non-company specific) DNC list, is consistent with the Commission's view of the importance of 'established business relationships.'").

321    Concerned Telephone Companies Comments at 2; AT&T Wireless Reply Comments at 26.

322    Concerned Telephone Companies Comments at 2 (emphasis added).

323    AT&T Wireless Reply Comments at 26-27.

324    Yellow Pages Comments at 7 ("Consumers who do not want to receive solicitations via telephone are going to request to be placed on the do-not-call list, regardless of whether the consumer has consented to the use of their CPNI").

325    AT&T Wireless Reply Comments at 27.

326    AT&T Wireless Comments at 18-19 (contending that under circumstances where "the express opt-in CPNI consent includes customer consent to be contacted by telephone, AWS believes the carrier has the permission to contact the

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 377 of 409   PageID 446

customer even if that customer has placed her name on either the carrier's or a national do-not-call list."). *See also* NYSCPB Comments at 5.

327   AT&T Wireless Reply Comments at 27.

328   NYSCPB Comments at 5.

329   NYSCPB Comments at 5.

330   AT&T Wireless Reply Comments at 26; Verizon Comments at 16; Yellow Pages Comments at 6.

331   Concerned Telephone Companies Comments at 3.

332   47 U.S.C. § 227(a)(3)(B).

333   *1992 TCPA Order*, 7 FCC Rcd at 8770, para. 34; *see also* 47 C.F.R. § 64.1200(c)(3).

334   *2002 Notice*, 17 FCC Rcd at 17480, para. 34.

335   47 C.F.R. § 64.1200(f)(4).

336   *See, e.g.,* MPA Comments at 5, 13; MBNA Comments at 7; NAII Comments at 3; SBC Comments at 10; Nextel Comments at 11-13.

337   *See, e.g.*, ATA Comments at 101-105; NADA Comments at 2.

338   *See, e.g.,* SBC Comments at 12-13; Intuit Comments at 6; DMA Comments at 20-21; ATA Comments at 105. *But see, e.g.,* ERA Comments at 11 (definition should cover 24 month period prior to call); AT&T Wireless Reply Comments at 18-19 (favoring the FTC's 18-month duration on the established business relationship); Scholastic Comments at 8 (3 years following payment for goods and 6 months following an inquiry); MidFirst Bank Comments at 2-3 (suggesting the existing business relationship be terminated no earlier than a period of 12 months following the last purchase and no earlier than 60 days following the closure of all accounts with a company).

339   *See, e.g.*, HFS Comments at 6; WorldCom Comments at 14-16; Comcast Comments at 5-7; American Express Comments at 3-4.

340   *See, e.g.*, NASUCA Comments at 17; John A. Shaw Comments at 4; TOPUC Comments at 5; NYSCPB Comments at 7-8 (should not extend to related business entities); Michael C. Worsham Comments at 10 (should delete "inquiry, application" from definition, as they do not constitute permission to receive prerecorded messages); PUC of Ohio Comments at 15 (should be limited to contact about changes or updates to current product or service); NYSCPB–Other Than DNC List Comments at 7-8, 14-17 (should not extend to related business entities or include a mere inquiry); NCL Comments at 5 (explaining that under the current definition of established business relationship, consumers have to remember the name of every company with whom they have ever had any contact in order to determine which can call legally and which cannot).

341   Thomas M. Pechnik Comments at 3 (no authority in section 227 for an EBR exemption for artificial or prerecorded message calls); Wayne G. Strang Comments at 12 (should revoke EBR exemption for prerecorded messages).

342   *See* AARP Comments at 6; *see also* NCL Comments at 5 (urging the Commission to require telemarketers to disclose to their customers that they plan to make telemarketing calls and to provide the opportunity for them to opt-out).

343   *See, e.g.*, AARP Comments at 5; NASUCA Comments at 17-18.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 378 of 409 PageID 447

344    AARP Comments at 5.

345    AARP Comments at 5.

346    Some suggest 24 months (MPA Comments at 12-13 and NASUCA Comments at 17); others advocate a 36-month period (Scholastic Comments at 8 and Bank of America Comments at 4); some commenters maintain that a 12-month period would be sufficient (Sprint Comments at 18); other commenters advocated a definition comparable to the FTC's (DIRECTV Further Comments at 2; NTCA Further Comments at 2-3). *See also* TOPUC Comments at 6 (stating that Commission rules should require that the relationship be ongoing. To qualify as "ongoing," the customers must have completed a purchase or transaction with a specific company within 24 months prior to the call).

347    *FTC Order*, 68 Fed Reg. at 4634; 16 C.F.R. § 310.2(n).

348    *FTC Order*, 68 Fed. Reg. at 4634.

349    *FTC Order*, 68 Fed Reg. at 4592.

350    *FTC Order*, 68 Fed. Reg. at 4593-94.

351    The "established business relationship" permits telemarketers to call consumers registered on the national do-not-call list and to deliver prerecorded messages to consumers. The "established business relationship," however, is not an exception to the company-specific do-not-call rules. Companies that call their EBR customers must maintain company-specific do-not-call lists and record any do-not-call requests as required by amended 47 C.F.R. § 64.1200(d). *See infra* discussion in para. 124. The Commission has also reversed its prior conclusion that an "established business relationship" provides the necessary permission to deliver unsolicited facsimile advertisements. *See infra* discussion in para. 188-191.

352    *See, e.g.*, ATA Comments at 105; Verizon Comments at 13-14.

353    American Express Comments at 4.

354    *See, e.g.*, Bank of America Comments at 3; ATA Comments at 101.

355    *See infra* discussion on unsolicited facsimile messages, paras. 185-193.

356    *See* H.R. REP. NO. 102-317 at 14 (1991) ("In the Committee's view, an 'established business relationship' ... could be based upon any prior transaction, negotiation, or inquiry between the called party and the business entity that has occurred during a reasonable period of time... The Committee recognized this relationship so as not to foreclose the capacity of businesses to place calls that build upon, follow up, or renew, within a reasonable period of time, what had once been [an] 'existing customer relationship.'") The House Report also states that "... the Committee believes the test to be applied must be grounded in the consumer's expectation of receiving the call. Consequently, the test shall consist of a determination of whether the new solicitation occurs within a reasonable period of time and the new product or service being promoted is related substantially to the prior relationship." *Id*. at 14-15.

357    *See* amended 47 C.F.R. § 64.1200(f)(3).

358    We also note that the act of "terminating" an established business relationship will not hinder or thwart creditors' attempts to reach debtors by telephone, to the extent that debt collection calls constitute neither telephone solicitations nor include unsolicited advertisements. *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12400, para. 17.

359    *See* amended 47 C.F.R. § 64.1200(f)(3).

360    *See infra* discussion on the interplay between the established business relationship and a do-not-call request, para. 124.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y  Document 13  Filed 01/19/24  Page 379 of 409  PageID 448

361    NASUCA Comments at 17; TOPUC Comments at 5-6; NCL Comments at 5 (EBR should be narrowed to require a consumer to actually set up an account with a company for the purpose of making recurring or repeated purchases); Michael C. Worsham Comments at 10; Stewart Abramson-December 9, 2002 Comments at 4-5; NYSCPB-Other Than DNC List Comments at 15.

362    Verizon Comments at 15; FSR Comments at 3-4.

363    *See* H.R. REP. NO. 102-317 at 14-15 (1991) (noting that if an investor had written to a mutual fund or responded to an ad requesting additional information, the fund's manager could make follow-up calls. The Report also explains that a loan officer or financial consultant may call a telephone subscriber who had requested a loan.).

364    H.R. REP. NO. 102-317 at 14, 15 (1991).

365    *See, e.g.*, TOPUC Comments at 5-6, 11 ("there is no reason for a customer who merely inquires about a product or service, or answers a survey, to be subject to future telemarketing calls"); NCL Comments at 5 (definition should be narrowed to include situations in which the consumer has set up an account with a company for purposes of making recurring or repeated purchases).

366    Verizon Comments at 15; ATA Comments at 104; ABA Comments at 5.

367    Most commenters who suggested a time limit on the EBR did not specify that it would apply to inquiries. *But see* Scholastic Comments at 8 (for requests of information, the reasonable amount of time should be at least 6 months); DIRECTV Reply Comments at 5 (FCC should adopt the same timeframes adopted by the FTC–18 months for a purchase and 3 months for an inquiry); Intuit Reply Comments at 7 (3-month rule is not practical from the perspective of an online service provider and software company; customers may be interested in upgrading software or in new products and services several years after the initial purchase).

368    *2002 Notice*, 17 FCC Rcd at 17472, para. 20.

369    NCTA Comments at 2-5 ("[I]t is precisely because cable operators now compete with a range of other wireline and wireless entities in providing packages of *different* services and products that it is more important than ever– for cable operators *and* their customers–that operators be able to keep their customers informed of the full range of offerings and promotions available to them."); Comcast Comments at 7-8; Cox Comments at 6-8; Yellow Pages Comments at 8; American Express Comments at 3; DMA Comments at 28.

370    John A. Shaw Comments at 4; PUC of Ohio Comments at 15 (should limit the contact about changes or updates to the current product or service. For example, a lawn care service cannot call to offer vinyl siding); Joe Shields Further Comments at 3 (any product or service offered through telemarketing must be substantially related to the product that created the relationship).

371    *See* WorldCom Comments at 9 (describing its "Neighborhood" product, which combines a special feature package and unlimited local and long distance calling for one price); Cablevision Reply Comments at 3 (noting that in addition to telephone and telecom products, the company owns an array of entertainment and retail venues. It also faces strong competition from other providers of video programming, and needs to be able to let customers for one line of service know about other services).

372    As required by the amended rules we adopt today, "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." *See* 47 C.F.R. § 64.1200(d)(4). The amended rules also require that all artificial or prerecorded telephone messages shall, "[a]t the beginning of the message, state clearly the identify of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to

conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated, and [d]uring or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player which placed the call) of such business, other entity, or individual..." *See* 47 C.F.R. § 64.1200(b).

373   *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

374   NCL Comments at 5-6; NYSCPB-Other Than DNC List Comments at 7.

375   *See, e.g.*, SBC Comments at 11 (This is consistent with sec. 272(g), which allows Bell Operating Companies to jointly market services of their long distance affiliates); Visa Comments at 6 (should also apply to co-brand and affinity partners); FSR Comments at 4 (Commission should make clear that any member of a corporate family, including subsidiaries and affiliates, should be permitted to call as long as customer has EBR with any member).

376   Given the numerous types of business relationships, the Commission believes it appropriate to treat the issue of a consumer's "reasonable expectations" in any complaint on a case-by-case basis. *See also* H.R. REP. NO. 102-317 at 15 (noting that contact by an affiliate of the company with whom a consumer has an established business relationship may be permissible if the solicitation by the affiliate related to a transaction in progress with the consumer or was substantially related to the product or service forming the basis of the business relationship.).

377   *See, e.g.*, American Express Comments at 4.

378   *See* 47 C.F.R. § 64.1200(e)(2)(v).

379   *See* New Jersey Ratepayer Further Reply Comments at 3 (providing an exemption for referrals by existing customers would provide an open door and the element of consent would still be missing). *But see* NAIFA Comments at 3.

380   *See* AT&T Wireless Comments at 25 (arguing that an established business relationship is formed in such a situation).

381   *See* Verizon Comments at 14-15.

382   *See* Nextel Reply Comments at 15-17. However, if a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller, entitling the seller to call that consumer under the EBR exemption.

383   *See* Notice of *Ex Parte Presentation* from WorldCom to FCC at 8, filed June 16, 2003.

384   WorldCom Comments at 7.

385   WorldCom Comments at 9 ("telemarketing is the most cost-effective way to introduce new products and services to the public, especially local and long distance telecommunications services that customers customize for their specific needs" (footnote omitted)).

386   WorldCom Comments at 13; *see also* ATA Reply Comments at 30-32; Winstar Further Comments at 3-4 (maintaining that the FCC should either exempt telecommunications service providers from the do-not-call rules or implement rules that prevent incumbents from using the EBR to preserve their monopoly); CompTel Further Reply Comments at 2 (should follow WorldCom's suggestion and determine that all consumers have an EBR with all providers of local service). *But see* Wayne G. Strang Reply Comments at 16 (suggesting that WorldCom's arguments are exaggerated as even those entities that have an established business relationship with a subscriber may not take advantage of the exemption once the subscriber makes a do-not-call request).

387   *See 2002 Notice*, 17 FCC Rcd at 17472, para. 20; *see also* Shaw Further Reply Comments at 13 (if there is any competition problem, the EBR for ILECS should not allow them to sell the customer additional services or products).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 381 of 409 PageID 450

388    WorldCom Comments at 15. *See also* WorldCom Comments at 15-16 (arguing that limiting calls to those related to the customer's current service does not make sense in a market where products are increasingly integrated).

389    WorldCom Reply Comments at 11. *But see* Verizon Further Reply Comments at 2-3 (it would be at odds with the plain meaning of EBR to adopt WorldCom's suggestion that all consumers would have an EBR with WorldCom).

390    WorldCom Reply Comments at 11.

391    *See* 47 U.S.C. § 227(c)(1).

392    We note that of the TCPA-related complaints filed by consumers with the Commission, a substantial number have been against common carriers. *See* Caroline E. Mayer, "Do Not Call' List Operator AT&T Leads in Complaints," Washingtonpost.com (April 23, 2003) <http://washingtonpost.com/wp-dyn/articles/A17683-2003Apr22.html> (describing the number of complaints filed against AT&T and other common carriers for do-not-call violations); *see also* ATA Comments, Appendix 16.

393    *See supra* para. 113 for a discussion regarding termination of the established business relationship for purposes of telemarketing calls.

394    *2002 Notice*, 17 FCC Rcd at 17480-81, para. 35.

395    *See* H.R. REP. NO. 102-317 at 15-16 (1991) ("If a subscriber asks a company with whom it has an established relationship not to call again, that company has an obligation to honor the request and avoid further contacts. Despite the fact that objecting subscribers can be called based on an 'established business relationship,' it is the strongly held view of the Committee that once a subscriber objects to a business that calls based on an established relationship, such business must honor this second objection and implement procedures not to call that twice-objecting subscriber again.").

396    *See, e.g.*, Thomas M. Pechnik Comments at 3; Joe W. McDaniel-Fifth December 5, 2002 Comments; City of Chicago Comments at 11-12; Philip J. Charvat Comments at 8; Mark A. Hiner Comments; Barbara Crouse Comments (receives calls from a newspaper because she is a subscriber, even when she asks to be placed on a do-not-call list); Wayne G. Strang Comments at 13; TOPUC Comments at 6.

397    Owen O'Neill Comments at 2; City of New Orleans Comments at 10.

398    *See, e.g.*, DialAmerica Comments at 14; AT&T Wireless Comments at 26-27; Verizon Comments at 15; HFS Comments at 9; NCTA Comments at 5. *But see* Bank of America Comments at 6 (a do-not-call request should not terminate the relationship, and businesses should be able to continue calling those customers).

399    *See, e.g.*, Philip J. Charvat Comments at 8 (If product exceptions to do-not-call requests were allowed, the TCPA's effectiveness would be eviscerated. "A 'credit card' offer declined by a consumer with a [do-not-call] demand, will be followed by a 'shopping convenience card' offer from the same entity"); Stewart Abramson-December 9, 2002 Comments at 1 (a do-not-call request should apply to the business generally, not just by product or service. Otherwise, it would be very time-consuming for the consumer).

400    In some instances, however, a consumer may grant explicit consent to be called during the course of a subsequent purchase or transaction.

401    *See* amended rule at 47 C.F.R. § 64.1200(d). *See also supra* para. 96.

402    *See* amended rule at 47 C.F.R. § 64.1200(f)(3)(i).

403    47 U.S.C. § 227(a)(3). In its initial rulemaking in 1992, the Commission concluded that, in the same vein, calls by tax-exempt nonprofit organizations also should be exempt from the prohibition on prerecorded messages to residences as

non-commercial calls. *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40; *see also* 47 U.S.C. § 227(a)(3)(C) and 47 C.F.R. § 64.1200(c)(4).

404    *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

405    *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

406    *2002 Notice*, 17 FCC Rcd at 17479, para. 33.

407    NPCC Comments at 12-13; March of Dimes Comments at 2; Special Olympics-Hawaii Comments; NPCC Comments at 4 ("An estimated 60 percent to 70 percent of nonprofit and charitable organizations use professional fundraisers to deliver their messages to consumers and solicit donations." (cites omitted)).

408    NPCC Comments at 10; Donald R. Davis Comments; Private Citizen Comments at 4; Gregory S. Reichenbach Comments.

409    NPCC Comments at 10. *See also* Private Citizen Comments at 4; Gregory S. Reichenbach Comments.

410    NAAG Comments at 39 (describing an example of a for-profit sending prerecorded messages "to residential phone numbers, promising to reduce interest rates and save consumers money repaying their credit card debt. The prerecorded message did not disclose how the savings would be achieved and did not identify any nonprofit organization. If a caller responded to the 1-800 number on the message, the caller reached the for-profit call center. In the sales pitch that followed, the telemarketer described credit counseling services offered by a nonprofit organization. However, the telemarketer solicited "enrollment fees" (between $199-499), payable entirely to the for-profit company... Consumers interested in nonprofit credit counseling would be referred to a nonprofit credit counselor, but only after they paid hundreds of dollars to the for-profit marketing company."); *see also* Wayne G. Strang Comments at 7; City of New Orleans Comments at 9-10; Donald R. Davis Comments.

411    AFP Comments at 3.

412    Reese Comments at 10.

413    DialAmerica Comments at 13-14. *See also* DialAmerica Reply Comments at 13 (DialAmerica's Sponsor Magazine Program donates 12.5% of the proceeds to the charity.).

414    We again reiterate that calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list. These may include calls regarding surveys, market research, and calls involving political and religious discourse. *See supra* para. 37.

415    *See* H.R. REP. NO. 102-317 at 16-17 (1991).

416    *See* NPCC Comments at 13 ("Nonprofit and charitable organizations rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns and disseminate their message.... *Such trained professionals offer significant resources, expertise and operational efficiencies that cannot be duplicated by nonprofit and charitable organizations*." (emphasis added; cites omitted))

417    These restrictions are found in amended 47 C.F.R. §§ 64.1200(c) and (d).

418    *See* 47 U.S.C. § 227(a)(3) and amended 47 C.F.R. § 64.1200(f)(9).

419    Similarly, an affiliate of a tax-exempt nonprofit organization that is itself not a tax-exempt nonprofit is not exempt from the TCPA rules when it makes telephone solicitations.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 383 of 409 PageID 452

420  *See* NPCC Comments at 10; AFP Comments at 3.

421  Unlike debt collection calls, a consumer may "terminate" an established business relationship with a company offering debt consolidation services by requesting placement on a company-specific do-not-call list. *See supra* note 358.

422  47 U.S.C. § 227(b)(1)(A)(i)-(iii); 47 C.F.R. § 64.1200(a)(1)(i)-(iii).

423  47 U.S.C. § 227(a)(1); *see also,* 47 C.F.R. § 64.1200(f)(1).

424  *2002 Notice,* 17 FCC Rcd at 17473-74, paras. 23-24.

425  *See, e.g.*, Mastercard Comments at 6; Verizon Comments at 23; HFS Comments at 7; Discover Comments at 8; CBA Comments at 7-8; Bank of America Comments at 5; ATA Comments at 113-114. *But see* American General Finance Comments at 1 (urging the Commission to clarify the definitions of "automatic telephone dialing system" and "autodialer," which focus on equipment that *has the capacity* to generate random number and sequential dialing patterns, rather than on whether the equipment is actually used in that fashion).

426  *See, e.g.*, Mastercard Comments at 6; HFS Comments at 7; Verizon Comments at 23; Discover Comments at 8.

427  *See, e.g.*, EPIC Comments at 12; City of Chicago Comments at 9-11; Stewart Abramson Comments at 1-2; Michael C. Worsham Comments at 6.

428  *See, e.g.*, Thomas M. Pechnik Comments at 4; Stewart Abramson Comments at 2 (FCC should not have to identify specific technologies covered by definition as technologies are always changing). *But see* Wayne G. Strang Comments at 6 (should ask Congress to change the definition to cover all devices capable of automatically dialing calls).

429  *See* Thomas M. Pechnik Comments at 5; Michael C. Worsham Comments at 5.

430  *See* LCC Comments at 7. LCC explains that, on behalf of certain clients, it installs terrestrial repeaters across the country, which receive satellite signals and retransmit the signals into areas that the signals would not otherwise reach. The repeaters contain an on-board modem, which may be programmed to call the client's number in the event a malfunction occurs. If the modem is programmed incorrectly, it may dial a number other than the number of the client. *See* LCC Comments at 2-3.

431  *See, e.g.*, HFS Comments at 7; ATA Comments at 110; ABA Comments at 3.

432  *See* ATA Comments at 113, n. 108; DMA Comments at 21 ("Some dialers are capable of being programmed for sequential or random dialing; some are not.").

433  Mastercard Comments at 6.

434  HFS Comments at 7.

435  47 U.S.C. § 227(a)(1).

436  *See* 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies."). *See also Southern Co. v. FCC*, 293 F.3d 1338, 1346 (11th Cir. 2002) ("While the FCC is correct that the principle of nondiscrimination is the primary purpose of the 1996 Telecommunications Act, we must construe statutes in such a way to 'give effect, if possible, to every clause and word of a statute'.") (*quoting Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted)).

437  ATA Comments at 113.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 384 of 409   PageID 453

438   NASUCA Comments at 4-5.

439   One commenter suggests that databases of emergency and cellular numbers are commercially available which can be used to exclude emergency numbers, health care facilities and wireless numbers from an automated dialer's calling list. *See* ECN Comments at 3. The Commission is not persuaded that any such databases would include all numbers covered by the prohibition at 47 U.S.C. § 227(b)(1)(A), or that such databases are sufficiently accurate. Assuming, though, that predictive dialers can be programmed to avoid calling such numbers, there would be no reason to then exclude the dialing equipment from the TCPA's prohibition.

440   *See* S. REP. No. 102-178 at 5 *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972-73 (1991) ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services.").

441   *See* 47 U.S.C. § 227(a)(1).

442   Because the statutory definition does not turn on whether the call is made for marketing purposes, we also conclude that it applies to modems that have the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See* 47 U.S.C. § 227(a)(1).

443   Customer Premises Equipment is defined in the Communications Act as "equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications." *See* 47 U.S.C. § 153(14).

444   *See* ATA Comments at 120; ATA Further Comments at 11-12; DMA Reply Comments at 17; WorldCom Comments at 41 (asserting that predictive dialers are customer premises equipment).

445   *See* ATA Comments at 120-122 (noting that the Commission also has authority to forebear from adopting a specific rule governing predictive dialers to promote marketplace flexibility). *See also* DMA Comments at 17 ("Predictive dialers are customer premises equipment ("CPE"), and thus beyond the states' power to regulate pursuant to the Communications Act of 1934 and longstanding Commission rules and orders. These policies apply because predictive dialers are used interchangeably and inseparably for both inter- and intrastate communications, and are not susceptible to a segregated regulatory framework that would govern inter- and intrastate uses separately."); DMA Further Comments at 4.

446   *See Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Docket No. 20828, 77 FCC2d 384, Final Decision (1980) (*Computer II*). In the *Computer II* Order, the Commission explained that "In conferring jurisdiction upon this agency over 'all instrumentalities ... incidental to ... transmission,' the intent was '... to give the FCC ability to regulate any charge or practice associated with a common carrier service in order to insure that the carrier operated for the public benefit.'" *See Computer II*, 77 FCC2d at 450, para. 170.

447   *Computer II*, 77 FCC2d at 442-43, para. 149; *see also In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace*, Report and Order, CC Docket Nos. 96-91 and 98-183, 16 FCC Rcd 7418, 7422, para. 5 (March 30, 2001).

448   *Computer II*, 77 FCC2d at 451, para. 172. The Commission explained that "[e]quipment manufacturers, distributors, and even regulated carriers routinely offer terminal equipment for sale or lease on an untariffed basis."

449   *See Computer II*, 77 FCC2d at 451-52, paras. 172-173. ("[S]uch activities are not necessarily beyond the jurisdiction of the Commission to the extent they are encompassed within the definition of wire or radio communications in Section 3(a) of the Act. The definitions of wire and radio communications in Section 3(a) and (b) are far-reaching and include 'all instrumentalities, facilities, apparatus, and services incidental to such transmission.'" Indeed we explicitly find that all terminal equipment used with interstate communications services are within the Act's definition of wire and radio communications. However, the fact that the provision of incidental 'instrumentalities,' etc. is within the subject matter jurisdiction of the Act does not mandate regulation of the 'instrumentalities.'") (footnotes omitted).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 385 of 409 PageID 454

450  *Computer II*, 77 FCC2d at 451-452, para. 173.

451  The Commission earlier stated that "[a]ny regulation by tariff or otherwise of terminal equipment must be demonstrated to be reasonably ancillary to the effective performance of the Commission's responsibilities under Title II or 'imperative for the achievement of an agency's ultimate purposes.'" *Computer II*, 77 FCC Rcd at 451-52, para. 173.

452  *See* Private Citizen Comments at 7 ("California will be implementing a 1% abandonment rate soon."); HFS at 7 ("California adopted legislation requiring a maximum for abandoned calls, but the regulatory body charged with setting the maximum has, to our knowledge, been unable to establish a maximum yet."). Oklahoma bans the use of automatic or predictive dialing devices that abandon more than 5% of calls answered per day per telemarketing campaign. *See* Okla. Stat. tit. 15, §755.1 (2002). Virginia failed to pass legislation proposing to regulate the use of predictive dialers. *See* S.B. 918, 2003 Gen. Assem. (Va. 2003).

453  In this context, war dialing uses automated equipment to dial telephone numbers, generally sequentially, and software to determine whether each number is associated with a fax line or voice line.

454  *See* Thomas M. Pechnik Comments at 6; PRC Comments at 4-5; Michael C. Worsham Comments at 5; Carl Paulson Comments; Wayne G. Strang Reply Comments at 21.

455  *See, e.g.,* Thomas M. Pechnik Comments at 5; Wayne G. Strang Reply Comments at 21.

456  *See* amended rule at 47 C.F.R. § 64.1200(a)(7).

457  47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2).

458  47 U.S.C. § 227(b)(2)(B).

459  *See 1992 NPRM*, 7 FCC Rcd at 2737, para. 11. Among the examples of calls that do not include the transmission of any unsolicited advertisement, the Commission cited calls from a business that wishes to advise its employees of a late opening time due to weather; or calls from a nationwide organization that wishes to remind members of an upcoming meeting or change in schedule; or calls from a catalogue or delivery company to confirm the arrival, shipment, or delivery date of a product to a customer. We reiterate that such calls also would typically be covered by the exemption for an established business relationship. *See* amended 47 C.F.R. § 64.1200(f)(3).

460  *1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

461  *1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40.

462  NAAG Comments at 33 ("The telephone records subpoenaed for one autodialing telemarketer revealed the business was using 47 lines to leave messages that lasted less than 30 seconds. Considering that calls could be placed over at least a 14-hour period, the equipment could leave more than half a million calls per week."); Wayne G. Strang Comments at 5; Mathemaesthetics Comments at 7; Philip J. Charvat Comments at 5.

463  Michael Sprinker Comments; Dale Carson Comments; Judith Hanes Comments; Jean Armstrong Comments; NACAA Comments at 2-3.

464  *See, e.g.,* NACAA Comments at 2-3; Tom Burch Comments; James D. Gagnon Comments; Neil J. Nitzberg Comments at 1; John Cox Comments; NYSCPB - Other Than DNC List Comments at 2.

465  Debra Denson-Royal Oak Comments.

466  Dennis C. Brown December 6, 2002 Comments at 4; David Purk Comments.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 386 of 409   PageID 455

467   *See, e.g.*, NCL Comments at 5.

468   NCL Comments at 5; Thomas Pechnik Comments at 8; TOPUC Comments at 4-5; Michael C. Worsham Comments at 9; City of New Orleans Comments at 8; J. Melville Capps Comments at 6-7; NAAG Comments at 37; NYSCPB Comments at 12; S. Abramson Comments at 4; NACAA Comments at 4; Wayne G. Strang Comments at 16; Philip J. Charvat Comments at 7; EPIC Comments at 13.

469   *See, e.g.,* NAAG Comments at 36-37; TOPUC Comments at 5; J. Melville Capps Comments at 6; NYSCPB Comments at 12. *See also* NAAG at 33, n. 108 (describing a prerecorded message received by many state attorneys general offices which invited the called party to call an 800 number to participate in Disney's 100th Anniversary celebration by visiting south Florida for a cost of $99 per person for three days); NAAG at 37 (describing another message that advertised a "revolutionary new product" and asked consumers to attend a local meeting to learn how to make a six-figure income. At the meeting, consumers are encouraged to purchase new products for resale.)

470   Wells Fargo Comments at 2; HFS Comments at 8; AT&T Wireless Comments at 27-28.

471   Wells Fargo Comments at 2; *see also* AT&T Wireless Comments at 27-28.

472   Joe Shields Reply Comments at 6-7.

473   *TCPA*, Section 2(10), *reprinted in* 7 FCC Rcd at 2744.

474   *TCPA*, Section 2(12), *reprinted in* 7 FCC Rcd at 2744-45.

475   47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5).

476   *See* 47 U.S.C. § 227(a)(4).

477   Therefore, a prerecorded message that contains language describing a new product, a vacation destination, or a company that will be in "your area" to perform home repairs, and asks the consumer to call a toll-free number to "learn more," is an "unsolicited advertisement" under the TCPA if sent without the called party's express invitation or permission. *See* 47 U.S.C. § 227(a)(4). However, as long as the message is limited to identification information only, such as name and telephone number, it will not be considered an "unsolicited advertisement" under our rules. *See* FTC Further Comments at 32. *But see* Joe Shields Further Comments at 4-5 (arguing that all prerecorded messages that introduce a business are by definition an advertisement).

478   The current rule exempts from the prohibition any call that is made for a commercial purpose but does not include the transmission of any unsolicited advertisement. *See* 47 C.F.R. § 64.1200(c)(2). We amend the rule to exempt a call that is made for a commercial purpose but does not include or introduce an unsolicited advertisement or *constitute a telephone solicitation. See* amended rule at 47 C.F.R. § 64.1200(a)(2)(iii).

479   *See, e.g.*, NAAG Comments at 43.

480   *See TCPA*, Section 2(12) and (13), *reprinted in* 7 FCC Rcd at 2744-45.

481   *See, e.g.,* Michael Worsham Comments at 9; Stewart Abramson Comments; City of New Orleans Comments at 8; J. Melville Capps Comments at 6.

482   *See 2002 Notice*, 17 FCC Rcd at 17478, para. 31.

483   Wayne G. Strang Reply Comments at 6-7.

484   *See* 47 C.F.R. § 64.1200(d).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 387 of 409   PageID 456

485    47 C.F.R. § 64.1200(e)(2)(iv).

486    47 C.F.R. § 64.1200(f)(3).

487    *2002 Notice*, 17 FCC Rcd at 17476-77, para. 28.

488    AT&T Wireless Comments at 23; ARDA Comments at 9; ABA Comments at 4; Stewart Abramson Comments at 3; NCL Comments at 4; Carl Paulson Comments.

489    City of New Orleans Comments at 8; NCL Comments at 4; PRC Comments at 5-6.

490    *See, e.g.,* Carl Paulson Comments; City of New Orleans Comments at 7-8; Joe Shields Reply Comments at 6-7.

491    *See* amended 47 C.F.R. § 64.1200(b).

492    This would be 9 a.m. - 5 p.m., Monday through Friday, during the particular telemarketing campaign. A seller or telemarketer's telephone number must permit consumers to make their do-not-call requests in a timely manner. Therefore, the seller or telemarketer must staff the "do-not-call number" sufficiently or use an automated system for processing requests in such a way that consumers are not placed on hold or forced to wait for an agent to answer the connection for an unreasonable length of time. We also reiterate the Commission's determination in its *1995 Reconsideration Order* that any number provided for identification purposes may not be a number that requires the recipient of a solicitation to incur more than nominal costs for making a do-not-call request (*i.e.,* for which charges exceed costs for transmission of local or ordinary station-to-station long distance calls). *See 1995 Reconsideration Order*, 10 FCC Rcd at 12409, para. 38. *See also* amended 47 C.F.R. § 64.1200(b)(2).

493    *See* amended 47 C.F.R. § 64.1200(d)(3).

494    47 U.S.C. § 227(b)(1)(B).

495    47 C.F.R. § 64.1200(c)(2).

496    *2002 Notice*, 17 FCC Rcd at 17478-79, para. 32.

497    NYSCPB states that they have not received complaints on these types of messages by radio and television stations. *See* NYSCPB Comments at 13.

498    Thomas Pechnik Comments at 9 (prerecorded messages sent by radio stations are commercial ads covered by the TCPA); Hershovitz Comments at 3-4 (such messages clearly prohibited under the TCPA); NAB Comments at 3 (broadcaster audience invitation calls do not promote the commercial availability or quality of property, goods or services and are therefore exempted under TCPA rules); TBT Comments at 1 (invitation to listen to a radio station is not a solicitation as defined by FCC); Michael C. Worsham Comments at 9 (true purpose of call is not charitable or political); Wayne G. Strang Reply Comments at 13-14 (calls made to increase listener/viewer shares are commercial in nature, even though no sale was made or was intended to be made); Shaw Further Comments at 4 (calls to invite a consumer to listen to a radio station are regulated by the TCPA and may not be made to numbers on the do-not-call list).

499    *See* amended 47 C.F.R. § 64.1200(a)(2)(iii). However, messages that encourage consumers to listen to or watch programming, including programming that is retransmitted broadcast programming for which consumers must pay (e.g., cable, digital satellite, etc.), would be considered advertisements for purposes of our rules.

500    *2002 Notice*, 17 FCC Rcd at 17473-74, para. 24.

501    *See supra* note 31 for a description of a "predictive dialer."

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 388 of 409   PageID 457

502   "Dead air" may also be the result of Answering Machine Detection (AMD) software which is used to determine whether the call has reached a live person or an answering machine. AMD may be programmed to have a certain amount of time in which to determine whether an answering machine or live person has answered the call. During this time, the consumer may experience "dead air" until either the dialer transfers the called party to a sales agent or disconnects the call. *See* ECN Comments at 3-4; Alek Szlam Comments at 4.

503   *See 2002 Notice,* 17 FCC Rcd at 17465, para. 7, n.38.

504   *See 2002 Notice,* 17 FCC Rcd at 17475, para. 26.

505   *2002 Notice,* 17 FCC Rcd at 17475-76, para. 26.

506   *See, e.g.*, NACAA Comments at 3; Pacesetter Comments at 5; WorldCom Comments at 41. We note that the vast majority of commenters that engage in telemarketing described their use of predictive dialers.

507   *See, e.g.*, F. Jenny Holder Comments at 1; Caroline Henriques Comments.

508   *See, e.g.,* NCL Comments at 4 ("It is the equivalent of sending 3 door-to-door salespeople to a neighborhood with twenty homes, using a remote technology to knock on all the doors at once, and leaving seventeen homeowners standing at their doors wondering who was there."); NACAA Comments at 3-4; TOPUC Comments at 3; NAAG Comments at 34; Edwin Bailey Hathaway Comments at 1; Stewart Abramson Comments at 1; Kent Rausch Comments (worries that when his children answer the phone, there is a predator on the other end of the line).

509   *See, e.g.,* Thomas Callahan Comments; Vivian Sinclair Comments; Carmen Brown Comments (caretaker of husband with MS); Henry Jackson Comments.

510   *See, e.g.,* Edwin Bailey Hathaway Comments; Karen M. Meyer Comments; AARP Comments at 2.

511   *See, e.g.,* NACAA Comments at 3; Thomas Pechnik Comments at 2; Stewart Abramson Comments at 1; Katherine S. Raulston Comments at 1.

512   TOPUC Comments at 3.

513   *See, e.g.,* NAAG Comments at 34-35 (a 0% abandonment rate is the appropriate standard); NASUCA Comments at 3; TOPUC Comments at 3; AARP Comments at 2; Michael C. Worsham Comments at 6.

514   *See, e.g.,* Mathemaesthetics Comments at 6; NCL Comments at 4; Private Citizen Comments at 7.

515   ATA Comments at 109.

516   Pacesetter Comments at 5; Teleperformance Comments at 2; ATA Comments at 109; MBNA Comments at 7; NAA Comments at 15-16; Allstate Comments at 2.

517   ATA Comments at 109.

518   SER Comments at 2; MPA Comments at 21.

519   SBC Reply Comments at 4; Sytel Reply Comments at 4; DMA Reply Comments at 19.

520   Cendant Comments at 3; CBA Comments at 8; Bank of America Comments at 5; ABA Comments at 3; DialAmerica Comments at 10; ITC Further Comments at 4.

521   Sytel Comments at 7; DMA Comments at 31; Nextel Further Comments at 11 (stating that any Commission regulation of call abandonment rates should be no more restrictive than the maximum three percent rate established by the FTC).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 389 of 409   PageID 458

522   Sytel Reply Comments at 2, 4.

523   *See FTC Order*, 68 Fed. Reg. at 4642. The FTC found that a three (3) percent abandonment rate was "feasible, realistic" and "fully capable" of being achieved. *Id.* at 4643. *See also* FTC Further Comments at 33-38.

524   Section 310.4(b)(1)(iv) of the amended TSR defines a prohibited abandoned outbound call as one in which the recipient of the call answers the call, and the telemarketer does not connect the call to a sales representative within two seconds of the person's completed greeting. *FTC Order*, 68 Fed. Reg. at 4642. The FTC notes that this definition of abandoned call covers "dead air" and "hang-up" calls, in which the telemarketer hangs up on a called consumer without connecting that consumer to a sales representative. *Id.*

525   Under FTC Rule 310.4(b)(4), a seller or telemarketer will not be liable for violating 310.4(b)(1)(iv) if: (i) the seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured per day per calling campaign; (ii) the seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed; and (iv) the seller or telemarketer, in accordance with 310.5(b)-(d), retains records establishing compliance with 310.4(b)(4)(i)-(iii). *FTC Order*, 68 Fed. Reg. at 4643-45.

The FTC's rules on call abandonment were to go into effect on March 31, 2003. In response to petitions filed by the DMA and ATA, the FTC determined to stay the date by which it would require compliance with the abandoned call rules until October 1, 2003. The FTC concluded that "staying these provisions will provide ample time for all telemarketers who use predictive dialers to obtain, install, and test the necessary hardware or software, and should alleviate concerns that predictive dialer manufacturers might not have adequate supplies of the necessary products" by the March 31 deadline. *See* Letter from Donald S. Clark, Secretary, FTC, to Robert Corn-Revere, Ronald G. London and Paul A. Werner III, Counsel for the ATA, March 14, 2003 (available at <http:// www.ftc.gov/os/2003/03/030314ataletter.htm>). *See also Telemarketing Sales Rule* (Federal Trade Comm'n, Stay of Compliance Date), 68 Fed. Reg. 16414 (April. 4, 2003).

526   *See 2002 Notice*, 17 FCC Rcd at 17475-76, para. 26 (seeking comment on what approaches we might take to minimize any harm that results from the use of predictive dialers and on alternative approaches to the problems associated with abandoned calls).

527   However, some industry commenters indicate that a 3 percent rate still obtains productivity benefits. *See, e.g,* WorldCom Comments at 44.

528   *See* <http://www.the-dma.org/guidelines/dotherightthing.pdf.>

529   *See, e.g.*, Sprint Comments at 6 (uses 5%); CMOR Comments at 6 (uses a 1% rate); WorldCom Comments at 44 (uses 3-5%); *see also* ATA Reply Comments at 70 (many telemarketers from all industries use a 5% limit on abandoned calls); Technion Comments at 5 (uses 5% abandonment rate).

530   *See, e.g.,* Edwin Bailey Hathaway Comments; Stewart Abramson Comments at 1; Kent Rausch Comments.

531   Reese Comments at 7; ERA Comments at 16; MPA Comments at 20; DMA Reply Comments at 19-20; DialAmerica Reply Comments at 3-4 (noting that California allows compliance with its abandoned call rules over a 30-day period); DialAmerica Further Reply Comments at 5 (stating that it can achieve an average abandonment rate of 5% or less when the measuring period spans a month).

532   WorldCom Reply Comments at 20; WorldCom Further Comments at 8 (advocating that the abandonment rate be measured over a six-month period); Teleperformance Further Comments at 4; *see also* MPA Comments at 21.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 390 of 409   PageID 459

533    *See, e.g.,* Reese Comments at 7; WorldCom Reply Comments at 20.

534    *See* ERA Comments at 16; Stonebridge Further Comments at 6 (three percent abandonment rate imposes an unnecessary burden on telemarketers, which should be alleviated by eliminating any reference to a per-day measure); Teleperformance Further Comments at 3.

535    *See* WorldCom Reply Comments at 19-20; Reese Comments at 7.

536    *See, e.g.,* Katherine S. Raulston Comments; Edwin Bailey Hathaway Comments; NAAG Comments at 34.

537    *See supra* discussion on the use of prerecorded messages, paras. 136-144.

538    Calls that reach voicemail or an answering machine will not be considered "answered" by the called party. Therefore, a call that is disconnected upon reaching an answering machine will not be considered an abandoned call.

539    *See* 16 C.F.R. § 310.4(b)(1)(iv).

540    *See, e.g.,* MBNA Comments at 7-8; ATA at 112. *But see* Reese Comments at 6 ("Abandons should not be defined so as to include any measure of 'time to transfer,' as these timings are not available in currently installed dialers.").

541    Technion Comments at 5.

542    ATA Comments at 117 (suggesting a 4-second transfer requirement); DMA Reply Comments at 19 ("AMD serves perfectly legitimate business purposes causing negligible harm to consumers, but current technology simply will not ensure that 'dead air' lasts less than five seconds.").

543    *But see* Alek Szlam Comments at 5 (stating that "[o]ne possible solution is to require the threshold in the AMD to be set to err on the side of connecting vs. disconnecting. If the dialer cannot determine within the first second whether it is a live call or answering machine, it will assume that it is a live call and connect it to an agent. On the agent side, when they are passed a call that turns out to be an answering machine, they should have the ability to quickly terminate the call or to push a button to play a message. This approach will reduce the amount of dead air, while not significantly impacting the productivity of the call center agent."). *See also* Sytel Comments at 5 ("We believe that the loss of productivity (measured in terms of talk time per agent hour) that results when answering machines are connected to agents in call centers is not significant when set against the improvement in call quality that results from having live calls connected to agents immediately i.e. not exposing consumers to 'dead air' whilst detection is done by the switch.").

544    *See* DialAmerica Comments at 10; ABA Comments at 4; Hershovitz Comments at 9. We reiterate that under the TCPA, it is unlawful to initiate any telephone call to any residential line using a prerecorded message without the prior express of the called party, absent an emergency or an exemption by Commission rule or order. Delivery of a message to an answering machine does not render the call lawful. *See* 47 U.S.C. § 227(b)(1)(B).

545    Reese Comments at 9; *see also* Convergys Comments at 7. ("Elimination of the use of AMD would cause Convergys to re-revaluate its participation in the industry.")

546    Sytel Comments at 3-4; Alek Szlam Comments at 4.

547    DialAmerica Comments at 10.

548    *See* Sytel Comments at 3-5. The Commission notes that in addition to requiring the delivery of a prerecorded identification message when a call is abandoned. Commission rules also permit prerecorded messages in limited circumstances, including when a company has an established business relationship with a consumer. *See* 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(2).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 391 of 409   PageID 460

549     *See* FTC's amended TSR at 16 C.F.R. § 310.4(b)(4)(iii); *see also FTC Order*, 68 Fed. Reg. at 4644.

550     By requiring such notice, we believe consumers will be less likely to return the call simply to learn the purpose of the call and possibly incur unnecessary charges.

551     *See supra* para. 137. *See also* Wayne G. Strang Further Comments at 5-6.

552     *See, e.g.*, NASUCA Further Reply Comments at 8-9 (because the FTC's identification requirements mitigate the nuisance aspects of abandoned calls, the FCC should make an exception for prerecorded messages that are used to comply with the FTC's safe harbor provision).

553     As long as the message is limited to identification information only, it will not be considered an "unsolicited advertisement" under our rules. *See* FTC Further Comments at 32. *But see* Joe Shields Further Comments at 4-5 (arguing that all prerecorded messages that introduce a business are by definition an advertisement).

554     *See supra* discussion on prerecorded messages, paras. 136-144. Contrary to the claims of some parties, even an incidental reference to a product or service could transform the identification message into a prohibited unsolicited advertisement. *See* Nextel Further Comments at 14-15.

555     *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

556     *But see* FTC Further Comments at 40-41 ("The FCC may need to eliminate the established business relationship exemption with respect to prerecorded message calls, especially if, as the FTC urges, it includes in its revised TCPA regulations provisions addressing the practice of call abandonment and creating a safe harbor.")

557     *See, e.g.*, NAAG Comments at 39; Joe Shields Reply Comments at 6-7.

558     *See* amended 47 C.F.R. § 64.1200(a)(6)(i).

559     *See* FTC Further Comments at 40-41 (under the FTC's amended rules, such prerecorded messages would be prohibited as abandoned calls).

560     DMA Comments, Exhibit 1 (Guidelines for Ethical Business Practice) at 23.

561     WorldCom Reply Comments at 20-21.

562     Sytel Comments at 3.

563     WorldCom indicated that such recommendation should not be implemented, yet stated that its dialers are programmed to disconnect the call if there is no answer after 4 ring cycles, which provides sufficient time for a consumer to reach the phone. *See* WorldCom Reply Comments at 20-21.

564     *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40.

565     Because this will result in an inconsistency with the FTC's rules, we will discuss the call abandonment rules in the report due to Congress within 45 days after the promulgation of final rules. *See* Do-Not-Call Act, Section 4.

566     *See* Notices of *Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 9.5-month implementation period for the call abandonment rules).

567     *2002 Notice*, 17 FCC Rcd at 17485, para. 45 (footnote omitted); *see also* 47 U.S.C. § 227(b)(2)(C).

568     *1992 TCPA Order*, 7 FCC Rcd at 8775, para. 45.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 392 of 409   PageID 461

569 *2002 Notice*, 17 FCC Rcd at 17485, para. 43.

570 *2002 Notice*, 17 FCC Rcd at 17485, para. 45

571 Wireless carriers will begin providing local number portability (LNP) on November 24, 2003. LNP "means the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. § 153(30). *See also* 47 C.F.R. § 52.21(k).

572 Wireless carriers began participating in thousands-block number pooling (pooling) on November 24, 2002. Thousands-block number pooling is a process by which the 10,000 numbers in a central office code (NXX) are separated into sequential blocks of 1,000 numbers each (thousands-blocks), and allocated separately within a rate center. *See* 47 C.F.R. § 52.20(a).

573 *2002 Notice*, 17 FCC Rcd at 17485-86, para. 46.

574 *Telephone Number Portability*, CC Docket No. 95-116, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352, 8393, para. 77 (1996) (*Number Portability First Report and Order*).

575 *Telephone Number Portability*, CC Docket No. 95-116, First Memorandum Opinion and Order on Reconsideration, 12 FCC Rcd 7236, 7272-3, paras. 59-60 (1997) (*Number Portability First Order on Reconsideration*).

576 *Verizon Wireless's Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation*, WT Docket No. 01-184, and *Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order, 17 FCC Rcd 14972, 14981, para. 23 *affirmed CTIA v. FCC*, No. 02-1264, 2003 WL 21293569 (D.C. Cir. June 6, 2003).

577 *Id*. at 14985-86.

578 *Numbering Resource Optimization*, CC Docket No. 99-200, First Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 7574 (2000) (*Numbering Resource Optimization First Report and Order*).

579 *Numbering Resource Optimization*, CC Docket No. 99-200, Third Order on Reconsideration in CC Docket No. 99-200, Third Further Notice of Proposed Rulemaking in CC Docket No. 99-200, and Second Further Notice of Proposed Rulemaking in CC Docket No. 95-116. 17 FCC Rcd 4784 at 4787, para. 9 (2002).

580 *Numbering Resource Optimization Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Telephone Number Portability*, CC Docket Nos. 99-200, 96-98, and 95-116, Fourth Report and Order and Fourth Further Notice of Proposed Rulemaking, FCC 03-126 (rel. June 18, 2003), para. 11 (*Numbering Resource Optimization Fourth Report and Order*).

581 *Numbering Resource Optimization Fourth Report and Order. See also Numbering Resource Optimization*, CC Docket No. 99-200, Order, 17 FCC Rcd 7347 (2002) (*Pooling Rollout Schedule*).

582 *See Verizon Wireless Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation*, WT Docket No. 01-184, and Telephone Number Portability, CC Docket No. 95-116, Memorandum Opinion and Order, 17 FCC Rcd 14972, *affirmed CTIA v. FCC*, No. 02-1264, 2003 WL 21293569 (D.C. Cir. June 6, 2003).

583 *But see* April Jordan Comments at 1; Mark A. Hiner Comments at 2; Rhett Riviere Comments (all three of whom received marketing calls on their cell phones); AT&T Wireless Comments at 29 ("little telemarketing is directed to wireless subscribers ... [although] such activity likely will increase.").

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 393 of 409 PageID 462

584  *See, e.g.*, CTIA Comments at 5 ("having built it, [they] will come"); AT&T Wireless Comments at 29 (reported receiving some complaints from customers regarding calls to wireless phones).

585  ARDA Comments at 12; BellSouth Comments at 6-7. *But see* Nextel Comments at 21-22 (whose report indicates that only 3 percent of wireless service subscribers have used their mobile phones to displace traditional residential landline service).

586  AT&T Wireless Reply Comments at 21.

587  Cingular Wireless Comments at 5; DMA Comments at 35; NeuStar Comments at 2.

588  *See* <http://www.dmaconsumers.org/cgi/offtelephonedave> (accessed June 2, 2003).

589  Cingular Wireless Comments at 5. This service provides a list of 280 million phone numbers that are currently used or have been set aside for CMRS carriers. *Id.*

590  American Bankers Association Comments at 5; AT&T Wireless Comments at 29; American Teleservices Association Reply at 78; Cingular Wireless Comments at 4; AT&T Wireless Reply at 21. One commenter, however, state that calls to wireless phones are an existing and growing problem. CTIA Comments at 5. *See also* AT&T Wireless Reply at 21 ("...it is likely that telemarketing to wireless phones will increase...").

591  Cingular Wireless Comments at 4-5.

592  *See, e.g.*, NASUCA Comments at 19 (suggesting that telemarketing calls to wireless phones be prohibited unless expressly authorized by the subscriber); NCL Comments at 6-7; TOPUC Comments at 7; NAAG Comments at 35-36.

593  *See, e.g.*, J. Melville Capps Comments; City of New Orleans Comments at 12.

594  *See* J. Melville Capps Comments; J. Shaw Comments at 5; NCL Comments at 6-7; City of Chicago Comments at 13; NAAG Comments at 35-36; EPIC Comments at 13 (arguing that many consider their wireless phone more personal than their wireline phone).

595  *See* NAAG Comments at 35; CTIA Comments at 4-5 (arguing that the depletion of one's minutes by unwanted telemarketing calls is a cost. Telemarketers have no way of knowing what rate plan a consumer has.).

596  *See* Sprint Comments at 10; Verizon Wireless Reply Comments at 7 (noting that statutory prohibition on autodialing and artificial messages to wireless service is absolute).

597  ATA Comments at 126-128; ATA Reply Comments at 77-80; CBA Comments at 9 (arguing that premature amendments to the rules could stifle the evolution of mobile commerce).

598  AGF Comments at 2.

599  *See, e.g.*, AGF Comments at 1.

600  CMOR Comments at 7 (if calls to cell phones are not permitted, the quality of survey research will be harmed). *But see* John Shaw Reply Comments at 13 (if survey calls are exempted from the TCPA, many sham surveys could result as telemarketers try to circumvent the regulations).

601  HFS Comments at 10; BellSouth Comments at 6-7; Bank of America Comments at 6; AGF Comments at 1.

602  ATA Comments at 130-134. *See also* HFS Comments at 10 (urging the Commission to permit even those calls to wireless numbers made by autodialers and prerecorded messages).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 394 of 409   PageID 463

603    *See* 47 U.S.C. § 227(b)(1), which provides that it is "unlawful for any person within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

604    47 C.F.R. § 64.1200(a)(1)(iii).

605    47 U.S.C. § 227(b)(1)(A)(iii).

606    SMS, for example, "provides the ability for users to send and receive text messages to and from mobile handsets with maximum message length ranging from 120 to 500 characters." *Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 17 FCC Rcd 12985, 13051 (2002).

607    *TCPA*, Section 2(10), *reprinted in* 7 FCC Rcd at 2744. The TCPA prohibits the initiation of any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is for emergency purposes or is exempted by Commission rule or order. See 47 U.S.C. § 227(b)(1)(B).

608    *See, e.g.*, Verizon Wireless Comments at 11; J. Shaw Comments at 5; NAAG Comments at 40-41.

609    *See, e.g.*, AT&T Wireless Comments at 24.

610    Consistent with our determination in 1992, calls made by cellular carriers to their subscribers, for which subscribers are not charged in any way for the call (either on a per minute, per call, or as a reduction in their "bucket" of minutes) are not prohibited under the TCPA. *See* Verizon Wireless Comments at 11 (noting that for "bucket" plans, exceeding the bucket allowance is not unusual).

611    We note, however, that the TCPA already prohibits live solicitation calls to wireless numbers using an autodialer. *See* 47 U.S.C. § 227(b)(1).

612    Registration on the do-not-call database will not prevent calls from entities that have an established business relationship with a wireless subscriber. Wireless subscribers who receive such live calls can easily make a company-specific do-not-call request. Moreover, we note that the record reveals that telemarketing to wireless numbers is not widespread at this time.

613    *See* Bell South Comments at 6-7; ARDA Comments at 12.

614    A USA Today/CNN/Gallop poll found that almost one in five mobile telephony users regard their wireless phone as their primary phone. *2002 CMRS Competition Report*, Section II.A.1.e, citing Michelle Kessler, *18% See Cellphones as Their Main Phone*, USA Today, Feb. 1, 2002.

615    *See* 47 C.F.R. § 64.1200(e).

616    *See supra* paras. 33-36. *See also* 47 U.S.C. § 227(b)(1)(A)(iii).

617    *See, e.g.*, Citigroup Comments at 6; Cingular Wireless Comments at 6-7; John Shaw Reply Comments at 14.

618    *See supra* paras. 160-163.

619    *See supra* para. 163.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 395 of 409   PageID 464

620    Cingular Wireless Comments at 5; DMA Comments at 35; Letters from Neustar to FCC, filed January 23, 2003 and May 5, 2003.

621    *See* Letter from Neustar to FCC, filed June 4, 2003.

622    ABA Comments at 5; AT&T Wireless Comments at 29; Cingular Wireless Comments at 4; ATA Reply Comments at 78; AT&T Wireless Reply Comments at 21.

623    *See* ATA Comments at 134-36; BMO Financial Group Comments at 6; Sprint Comments at 21; ATA Reply Comments at 82. Commenters also suggest other exceptions, such as where a subscriber uses wireless as his sole telephone service, AGF Comments at 1, or where the subscriber provides his wireless number as a contact number to a business. *Id. See also* Bank of America Comments at 6; CBA Comments at 9; BellSouth Comments at 6-7.

624    *See 1992 TCPA Order*, 7 FCC Rcd at 8762, para. 17.

625    *2002 Notice*, 17 FCC Rcd at 17473, para 22.

626    Thomas Pechnik Comments at 4; TOPUC Comments at 3; Wayne G. Strang Comments at 15; Michael C. Worsham Comments at 4; Samuel E. Whitley Comments at 2; HFS Comments at 6; CTIA Comments at 7; Michael J. Blitch Comments at 5; AT&T Wireless Comments at 23; ARDA Comments at 9; Louis J Hoppman Jr. Comments; PUC of Ohio Comments at 19; TN AG Comments at 13; DialAmerica Comments at 11-12; Stewart Abramson Comments at 3; Thomas F. Kirby Comments; David Griffith Comments; Ghita & Stephan Strain Comments.

627    *See, e.g.,* Brad Totten Comments at 3; DC Hunter Comments; James D. Gagnon Comments; Brian Klug Comments; Thomas Pechnik Comments at 4; NCL Comments at 3; EPIC Comments at 12; Verizon Reply Comments at 12.

628    *See, e.g.,* F. Jenny Holder Comments at 1; Thomas Callahan Comments; Michael C. Worsham Comments at 2; NCL Comments at 4; Gregory S. Reichenbach Comments; TOPUC Comments at 6-7; EPIC Comments at 12; Stewart Abramson Comments at 3; Thomas Pechnik Comments at 4; AGF Comments at 4; Joe Shields Comments at 7.

629    OPC-DC Comments at 6; Janice G. Farkosh Comments; Leslie Price Comments; Josephine K. Presley Comments.

630    *See, e.g.,* Verizon Comments at 18; PRC Comments at 5; NYSCPB Comments at 9; PUC of Ohio Comments at 19.

631    OPC-DC Comments at 6; Owen O'Neill Comments at 1; TOPUC Comments at 3; Technion Comments at 6-7; Verizon Comments at 18; PUC of Ohio Comments at 19, NASUCA Comments at 3; Thomas Pechnik Comments at 4. *But see* NAA Comments at 17; Nextel Comments at 17-18; Comcast Comments at 14; Teleperformance Comments at 3; ABA Comments at 3 (should restrict caller ID blocking, but not require the transmission of caller ID).

632    Stewart Abramson Comments at 3.

633    Teleperformance Comments at 3; WorldCom Comments at 45; DMA Reply Comments at 30; Mastercard Comments at 7; Nextel Comments at 17-18; SER Comments at 2; Sprint Comments at 7; ECN Comments at 9 (asserting that telemarketers will provide caller ID when technologically feasible, and thus, the Commission need not adopt a caller ID requirement).

634    Teleperformance Comments at 3; WorldCom Comments at 45; DMA Reply Comments at 30; Nextel Comments at 18; SER Comments at 2; Sprint Comments at 7-8.

635    WorldCom Reply Comments at 23.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 396 of 409   PageID 465

636     WorldCom Reply Comments at 23. We note that both typical T-1 and ISDN trunks contain 24 channels. ISDN trunks dedicate one channel specifically to data transmission, while typical T-1 lines dedicate all 24 channels to voice transmission.

637     DialAmerica Comments, Attachment A at 1.

638     DialAmerica Comments, Attachment A at 2.

639     DialAmerica Comments, Attachment A at 1.

640     WorldCom Reply Comments at 24.

641     "Signaling System 7" (SS7) refers to a carrier to carrier out-of-band signaling network used for call routing, billing and management. *See* 47 C.F.R. § 64.1600(f).

642     DMA Reply Comments at 30.

643     *See* 47 C.F.R. § 64.1601(d).

644     DMA Reply Comments at 29-30. *But see* NASUCA Comments at 9; Verizon Comments at 18 (indicating that caller ID is technically viable because CPN is transmitted to the LECs).

645     DMA Reply Comments at 30; WorldCom Reply Comments at 26.

646     *See, e.g.*, DMA Reply Comments at 30.

647     Jeff Mitchell Comments at 1; Martin C. Kaplan Comments at 2; City of New Orleans Comments at 8.

648     Jeff Mitchell Comments at 1; NCL Comments at 4; Xpedite Systems Comments at 12; PRC Comments at 5.

649     ECN Comments at 4.

650     *FTC Order*, 68 Fed. Reg. at 4623.

651     *FTC Order*, 68 Fed. Reg. at 4625.

652     DMA Reply Comments at 30. The DMA notes that the FCC has the requisite experience to evaluate technical feasibility and a more comprehensive view of the larger issues of how a caller ID requirement might fit into the regulation of the communications network as a whole. *See* DMA Reply Comments at 29.

653     *See* WorldCom Reply Comments at 26 (arguing that requiring caller ID could create an expectation in the minds of consumers that they should always receive the information and that such a regulation creates a situation where companies will be unfairly accused of breaking the law, and as a consequence, face undue litigation and harm to their reputations).

654     *See* Nextel Further Comments at 16 (stating that most telemarketers are currently capable of transmitting caller ID using their existing equipment, and that the FCC should adopt an approach similar to the FTC's, if it chooses to regulate the transmission of caller ID for telemarketing calls).

655     Cynthia Stichnoth Comments; Stewart Abramson Comments at 1.

656     *See, e.g.,* Sprint Comments at 7-8, CBA Comments at 8.

657     The *69 feature, available through many subscribers' telephone service providers, provides either: (1) information regarding the last incoming call, and the option to dial the caller back, or (2) the ability to return the last incoming

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 397 of 409   PageID 466

call. Call information, however, would not be available for an incoming call, if the caller failed to transmit caller ID information or blocked such information.

658     *See* *FTC Order,* 68 Fed. Reg. at 4623-24.

659     "Charge number" is defined in 47 C.F.R. §64.1600(d) and refers to the delivery of the calling party's billing number by a local exchange carrier for billing or routing purposes, and to the subsequent delivery of such number to end users.

660     *See* 47 C.F.R. §§ 64.1600, 64.1601.

661     The term "ANI" refers to the delivery of the calling party's billing number by a local exchange carrier to any interconnecting carrier for billing or routing purposes, and to the subsequent delivery to end users. *See* 47 C.F.R. § 64.1600(b). ANI is generally inferred by the switch. Each line termination on the telco switch corresponds to a different phone number for ANI.

662     Provision of Caller ID information does not obviate the requirement for a caller to verbally supply identification information during a call. *See* 47 C.F.R. § 64.1200(e)(iv).

663     *See* *FTC Order,* 68 Fed. Reg. at 4623-28.

664     This would mean 9:00 a.m. - 5:00 p.m. Monday through Friday. A seller or telemarketer calling on behalf of a seller must be able to record do-not-call requests at the number transmitted to consumers as caller ID. Therefore, if the person answering the calls at this number is not the sales representative who made the call or an employee of the seller or telemarketer who made the call, or if the telemarketer is using an automated system to answer the calls, the seller is nevertheless responsible for ensuring that any do-not-call request is recorded and the consumer's name, if provided, and telephone number are placed on the seller's do-not-call list at the time the request is made. *See also supra* note 492.

665     *See supra* para. 175.

666     *See* Telcordia Notes on the Networks - Notes Design and Configuration, Telcordia Technologies Special Report SR-2275, Issue 4, October 2000, pp. 4-30. *See also, Administration of the North American Numbering Plan, Carrier Identification Codes (CICs)*, CC Docket No. 92-237, Second Report and Order, 12 FCC Rcd 8024 (1997).

667     We note that a telemarketer using a service that prevents the transmission of the required caller ID information will be in violation of the Commission's caller ID rules.

668     *See* WorldCom Reply Comments at 26.

669     *See, e.g.*, Discover Comments at 7; DMA Reply Comments at 30.

670     *See, e.g.*, TOPUC Comments at 3; Verizon Comments at 18; Owen O'Neill Comments at 1; Rob McNeal Comments; Jeff Mitchell Comments at 1.

671     NASUCA Comments at 8-9; NCL Comments at 3.

672     *See* 47 C.F.R. § 64.1601(b).

673     *See* new rule at 47 C.F.R. § 64.1601(e). *See also* FTC Further Comments (explaining that the goals of regulatory consistency will be promoted if the FCC adopts caller ID requirements analogous to Amended TSR 16 C.F.R. § 310.4(a)(7)).

674     *See* Notices of *Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 13-month implementation period for the caller ID rules). *See also* FTC Further Comments (explaining that the goals

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 398 of 409   PageID 467

of regulatory consistency will be promoted if the FCC adopts caller ID requirements analogous to Amended TSR 16 C.F.R. § 310.4(a)(7)).

675   47 U.S.C. § 227(b)(1)(C). The United States Court of Appeals for the Eighth Circuit recently upheld the TCPA's provision on unsolicited faxes as satisfying the constitutional test for regulation of commercial speech. *See Missouri ex rel Nixon v. American Blast Fax, Inc.*, 323 F.3d 649 (8th Cir. 2003) (*petition for rehearing pending*).

676   47 C.F.R. § 64.1200(f)(5).

677   Specifically, the TCPA provides that the facsimile include "in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual." 47 U.S.C. § 227(d)(1)(B). The Commission determined that the sender of a facsimile message is the creator of the content of the message. *See 1997 Reconsideration Order*, 12 FCC Rcd at 4613, para. 6.

678   *1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87.

679   *1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87.

680   *2002 Notice*, 17 FCC Rcd at 17482, para. 37

681   *2002 Notice*, 17 FCC Rcd at 17482-83, para. 38. The Commission sought comment specifically on the Commission's determination that a prior business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisement transmissions. *See 2002 Notice*, 17 FCC Rcd at 17483, para. 39.

682   Chris Hernandez Comments; Damien Blevins Comments; Peter LeCody Comments; Joe Shields Comments at 6; Mathemaesthetics Comments at 2.

683   Anthony Oppenheim Comments; W. Allen Wilkens, Jr. Comments.

684   J. Greg Coontz Comments at 15-17.

685   NCL Comments at 6.

686   Dennis C. Brown Comments at 13; City of New Orleans Comments at 11.

687   Jim Carter Comments; JC Homola Comments; Autoflex Comments at 1-2; Rob McNeal Comments (unsolicited faxes costs company tens of thousands of dollars each year in materials and employee time); *see also* NCL Comments at 6 ("[P]eople who work out of their homes are especially harmed by unsolicited faxes, which use up their paper and toner and tie up their machines."); Mathemaesthetics Reply Comments at 7 ("[U]nsolicited [fax] ads caused my business fax machine to become prematurely empty, which rendered *wholly useless* the equipment my small business crucially depends on for its revenue. When a customer of mine a short time later attempted to fax a purchase order for over $3,000 worth of my company's product, my empty fax machine was not able to capture this transaction for a significant period of time..." (emphasis in original)).

688   ABM Comments at 4 (Members have found that targeted fax communication is cost-effective way to seek renewal "request" forms from existing subscribers, and to communicate with subscribers about industry trade shows.).

689   MPA Comments at 22; Nextel Comments at 25; NADA Comments at 2; Scholastic Comments at 13; Reed Comments at 2-3.

690   NADA Comments at 2; NFIB Comments at 3.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 399 of 409 PageID 468

691     The term "signature" in the amended rule shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law. *See, e.g.*, Cendant Comments at 6.

692     *2002 Notice*, 17 FCC Rcd at 17483, para. 39.

693     ABM Comments at 9; DIRECTV Comments at 9-19; Hunton & Williams Comments at 5-6; Lorman Further Comments at 7 (noting that parties with an established business relationship expect to be in communications with companies with which they do business, and that any company that transmits ads by fax should be required to maintain a company-specific do-not-fax list).

694     Nextel Reply Comments at 6.

695     *See* Xpedite Reply Comments at 6; ABM Comments at 4-5; Nextel Comments at 25; DIRECTV Comments at 9-10; Lorman Further Comments at 8.

696     Biggerstaff Reply Comments at 22 (noting that express permission can easily be requested from existing customers, as paperwork is exchanged between merchants and their customers regularly); NAAG Comments at 31 (stating that treating express consent on a case-by-case basis can be costly and time-consuming, as consent is the main defense asserted by fax advertisers. NAAG suggests that the Commission adopt a concrete definition of "express," meaning definite, explicit or direct, and not left to inference).

697     NAAG Comments at 31-32 (arguing that creating an established business relationship exception runs contrary to the clear wording of the statute. "The TCPA defines 'unsolicited advertisement' as an advertisement sent to a person 'without that person's prior express invitation or permission.' A business relationship exemption would rely on *implied* invitation or permission which is contrary to the clear wording of the statute." (emphasis in original; footnotes omitted)); Mark R. Lee Comments; Biggerstaff Comments at 3; John Holcomb Comments at 4; Kondos & Kondos Comments at 3-4; Marc A. Wites Comments; Wayne G. Strang Comments at 12; Michael C. Worsham Comments at 13; Wayne G. Strang Reply Comments at 16. *But see* NYSCPB Comments at 18 (recommends retaining the EBR as permission to receive faxes).

698     *See* Kondos & Kondos Comments at 1-2 and Exhibit A (noting that three versions of the House predecessor bill to the TCPA included an EBR exemption for unsolicited fax ads. "Not only is an EBR not a defense to unsolicited fax advertising under the TCPA, the U.S. Congress specifically included such a defense in numerous predecessor TCPA bills and then excluded it in the law which overwhelmingly passed in 1991." Kondos & Kondos Comments at 2); John Holcomb Comments at 4; Biggerstaff Comments at 3.

699     *See 1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87 (finding that facsimile transmissions from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient). *See also* 47 C.F.R. 64.1200(f)(4) for the definition of an "established business relationship." We emphasize that, prior to the effectuation of rules contained herein, companies that transmitted facsimile advertisements to customers with whom they had established business relationships were in compliance with the Commission's existing rules.

700     NCL Comments at 6; Michael J. Blitch Comments at 7; Autoflex Comments at 1-2.

701     *See* 47 U.S.C. § 227(b)(1).

702     47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

703     *See, e.g.*, Blocklist.com Comments (operates a national do-not-fax list); Davide Di Labio Comments (should be a national fax list for those opposed to faxes); William B. Hayes Comments (no-fax lists are an alternative solution); Paul Aratow Comments (do-not-fax lists do not work); W. Allen Wilkins Comments (after responding to a "remove your fax number," receives more faxes).

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 400 of 409   PageID 469

704   *See* 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

705   A facsimile advertisement containing a telephone number and an instruction to call if the recipient no longer wishes to receive such faxes, would constitute a "negative option." This option (in which the sender presumes consent unless advised otherwise) would impose costs on facsimile recipients unless or until the recipient were able to ask that such transmissions be stopped.

706   *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37.

707   *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37.

708   *2002 Notice*, 17 FCC Rcd at 17482-83, para. 38.

709   ABM Comments at 8; *see also* Brunswick Comments at 8-10; DIRECTV Comments at 11 (generally, publication of a fax number should constitute permission, but consumers should be able to control the circumstances under which they will receive faxes. For example, a trade association could note in its directory that faxes are not to be used for advertising purposes).

710   *See, e.g.*, NCL Comments at 6; NAAG Comments at 31; TOPUC Comments at 6; John Holcomb Comments at 4.

711   TOPUC Comments at 6; *see also* Mathemaesthetics Reply Comments at 7 (operators of a trade show ignored request not to use fax number for advertising and began transmitting multi-page fax ads for services my business has no interest in). *But see* NADA Comments at 3 (in deciding to become a member of a trade association, the member voluntarily seeks the benefit of the association's services).

712   *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37; *see also* Hunton & Williams Comments at 7 (recommends at opt-out mechanism for unsolicited faxes).

713   *2002 Notice*, 17 FCC Rcd at 17483-84, para. 40.

714   *2002 Notice*, 17 FCC Rcd at 17483-84, para. 40.

715   AIADA Comments at 2; Nextel Comments at 40.

716   AIADA Comments at 2.

717   Nextel Comments at 38; *see also* NAAG Comments at 32 (stating that fax broadcasters that maintain their own databases of fax numbers are the subject of the vast majority of consumer complaints and state enforcement actions, and that fax broadcasters who determine the content of the advertisement or its destination should be held liable for unsolicited faxes).

718   Nextel Comments at 25, 38-40; *see also* DIRECTV Comments at 3, 9 (asking whether DIRECTV or its independent contractors have the established business relationship with a consumer).

719   Xpedite Comments at 5-7; Globecomm Comments at 4-5; ADVAL Reply Comments at 3 (fax broadcasters never see the list of recipients or the faxed document, which is often uploaded directly through the Internet); Xpedite Reply Comments at 3, 8.

720   ADVAL Reply Comments at 3; Xpedite Reply Comments at 3.

721   Xpedite Comments at 3-4; NAAG Comments at 32-33; NCL Comments at 6; ADVAL Comments at 3 ("Fax carriers should not be penalized for traffic sent by third parties.").

722   Reed Comments at 6.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y    Document 13    Filed 01/19/24    Page 401 of 409    PageID 470

723    *1992 TCPA Order*, 7 FCC Rcd at 8780, para. 54 (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987)).

724    A high degree of involvement might be demonstrated by a fax broadcaster's role in reviewing and assessing the content of a facsimile message.

725    *See* 47 C.F.R. § 64.1200(f)(4).

726    Cox Comments at 12-19.

727    Cox Comments at 13.

728    *1992 TCPA Order*, 7 FCC Rcd at 8780, para. 54 (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987)).

729    Nextel Comments at 40-41.

730    47 U.S.C. § 217.

731    47 U.S.C. § 227(b)(1)(C).

732    47 U.S.C. § 227(a)(2); this definition was incorporated in § 64.1200(f)(2) of the Commission's rules.

733    *2002 Notice*, 17 FCC Rcd at 17482, para. 37.

734    *See* Nextel Comments at 31-32.

735    Nextel Reply Comments at 4-5.

736    Michael C. Worsham Comments at 20; James Suggs Comments at 1. Commenters also note that some commercial facsimile services transmit faxes to the recipients as email attachments. We emphasize that any rules the Commission adopts with respect to unsolicited facsimile advertisements would not extend to facsimile messages transmitted as email over the Internet. *See* definition of telephone facsimile machine at 47 U.S.C. § 227(a)(2).

737    Autoflex Comments at 2; J. Greg Coontz Reply Comments at 11-15, 16-17.

738    *See* Kauffman Comments at 3. Although fax boards alone do not have the capability to transcribe text onto or from paper, the Commission nevertheless determined that fax modem boards, which enable personal computers to transmit messages to or receive messages from conventional facsimile machines or other computer fax boards, are the functional equivalent of telephone facsimile machines. *See 1995 Reconsideration Order*, 10 FCC Rcd at 12404-06, paras. 28-30.

739    H.R. REP. NO. 102-317 at 10 (1991).

740    H.R. REP. NO. 102-317 at 25 (1991).

741    *See Covington & Burling v. International Marketing & Research, Inc. et al.*, No. 01-0004360 (D.C. Sup. Ct. (April 16, 2003) (finding a fax broadcaster liable under the TCPA for transmitting unsolicited fax advertisements to a law firm's fax server).

742    47 U.S.C. § 227(d)(1)(B); 47 C.F.R. § 68.318(d).

743    *2002 Notice*, 17 FCC Rcd at 17483-84, paras. 37 and 40.

744    *1997 Reconsideration Order*, 12 FCC Rcd at 4612-13, para. 6.

745    *See* NAAG Comments at 32-33 (stating that only requiring the advertiser's identify has been a hindrance in enforcing the TCPA. It has been the states' experience that fax broadcasters, who maintain their own databases and send others'

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 402 of 409   PageID 471

advertisements to these fax numbers, frequently omit their identifying information as the sender in order to avoid detection and enforcement action.).

746     *See* amended rule at 47 C.F.R. § 68.318(d).

747     *See supra* discussion, paras. 194-195.

748     Michael C. Worsham Comments at 11-12; NCL Comments at 6; Michael J. Blitch Comments at 7 (both seller and fax broadcaster should be identified); NAAG at 33 (should require identifying information of fax broadcaster). *But see* Xpedite Reply Comments at 8 (requiring a fax broadcaster's identifying information could confuse consumers as to who created the message. Uninvolved fax broadcasters should not be required to identify themselves on faxes.).

749     *See supra* discussion on identification requirements for telemarketers, para. 144.

750     47 U.S.C. § 227(b)(3).

751     47 U.S.C. § 227(c)(5).

752     *2002 Notice,* 17 FCC Rcd at 17486-87, para. 47.

753     Mastercard Comments at 7; BMO Financial Comments at 4; Bank of America Comments at 6; DialAmerica Comments at 14; AT&T Wireless Reply Comments at 27-28.

754     Martin C. Kaplan Comments at 2 (acknowledging that "[u]p to one call per year is permitted ... should be amended to total prohibition"); April Jordon Comments at 2; Wayne G. Strang Reply Comments at 16; NCL Comments at 7.

755     NYSCPB Comments at 19; Michael C. Worsham Comments at 15 (Commission should clarify that once threshold of two calls received within one year is met all violations in any calls are actionable).

756     *See* DIRECTV Comments at 3-4; Nextel Comments at 39.

757     *See, e.g.,* AIA Comments at 2; AIADA Comments at 2; Kauffman Comments at 8; DIRECTV Reply Comments at 7; ABM Comments at 2.

758     *See* Hershovitz Reply Comments at 1, 8-9; Wayne G. Strang Reply Comments at 4; *see also* City of New Orleans Comments at 11; Joe Shields Reply Comments at 9.

759     47 U.S.C. § 227(c)(5).

760     *2002 Notice,* 17 FCC Rcd at 17486-87, para. 47. *See generally Establishment of Rules Governing Procedures to Be Followed When Informal Complaints Are Filed by Consumers Against Entities Regulated by the Commission; Amendment of Subpart E of Chapter I of the Commission's Rules Governing Procedures to Be Followed When Informal Complaints Are Filed Against Common Carriers; 2000 Biennial Review,* Memorandum Opinion and Order and Notice of Proposed Rulemaking, CI Docket No. 02-32, CC Docket Nos. 94-93, 00-175, 17 FCC Rcd 3919 (2002).

761     47 C.F.R. § 64.1200(e)(1).

762     *2002 Notice,* 17 FCC Rcd at 17481-82, para. 36.

763     *See, e.g.,* ATA Comments at 105; BMO Financial Comments at 5; HFS Comments at 9; Technion Comments at 7; AT&T Wireless Comments at 28.

764     Teleperformance Comments at 2; ATA Comments at 106.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 403 of 409   PageID 472

765   *See, e.g.*, Melva L. Taylor Comments at 1; Michael C. Worsham Comments at 11; Robert Jaglowski Comments; Linda M. Deakl Comments; Richard M. Bryant Comments.

766   J. Melville Capps Comments; Mandy Burkart Comments; Jeff Bryson Comments; John Shaw Comments at 7 (due to the number of nighttime workers, time of day restrictions should begin at 9 am).

767   PUC of Ohio Comments at 22-23; James Wood Comments.

768   EPIC Comments at 13.

769   *See* 16 C.F.R. § 310.4(c); *see also* FTC Further Comments at 47-50 (stating that the FCC should retain its existing calling time restrictions and maintain the consistency that both agencies have sought on this issue).

770   The Commission encourages any seller or telemarketer to comply with consumers' requests not to be called during certain times of the day.

771   *See* <http://www.fcc.gov/eb/News_Releases/DOC-230145A1.html>.

772   There are other overlapping regulations such as provisions governing abandoned calls, transmission of caller ID, and time-of-day restrictions. *See supra* paras. 146-159, 173-184, 208-210.

773   47 U.S.C. § 152(b). *See supra* paras. 9 and 16.

774   *See* 47 U.S.C. § 227(f)(3), (7).

775   Review of the FTC do-not-call database will be particularly important so that our enforcement staff can easily determine the date of any do-not-call request and the date that a company last downloaded information from the database.

776   In the course of its investigations, the Enforcement Bureau will follow up with individual complainants as appropriate. In light of the state court private right of action under the TCPA and the fact that many TCPA complaints are not against common carriers, consistent with existing practice, the staff will not necessarily contact each individual TCPA complainant. Compare 47 U.S.C. § 208.

777   Before initiating a forfeiture proceeding against most entities that do not hold an FCC authorization, the violator must have received a Commission citation and then engaged in an additional violation. 47 U.S.C. § 503(b)(5).

778   *See 2002 Notice*, 17 FCC Rcd at 17466, para. 8.

779   *See, e.g.,* ATA Comments at 41-43 (stating that "[a]s a general matter, access to the [complaints] is necessary to ensure that 'interested parties have a meaningful opportunity to participate ... and that the Court has an adequate record from which to determine whether the agency properly performed its functions.'"); MBNA Comments at 10 (requesting "an opportunity to review the complaints to determine the nature of the specific practices complained of, and the extent to which such practices reasonably require new TCPA rules ...").

780   *See, e.g.*, ABM Comments at 7; SBC Comments at 7-8, 17; BellSouth Comments at 4.

781   The ATA's FOIA request was for copies of the over 11,000 complaints about telemarketing practices received during the period January 2000 through December 2001. The request also asked for copies of all similar complaints about telemarketing practices the FCC has received since January 1, 2002; copies of the over 1,500 inquiries about predictive dialing received from June 2000 to December 2001; and any non-publicly released FCC responses to the above-referenced complaints. *See Motion For Extension of Time* filed by the ATA, CG Docket No. 02-278, Tab 1, Electronic FOIA Request from Ronnie London. On November 14, 2002, following a meeting with the ATA regarding its FOIA request, CGB confirmed in a letter to ATA counsel that it would take a number of months and considerable staff resources

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 404 of 409   PageID 473

in order to provide the over 11,000 documents covered by the request. *See* Letter from K. Dane Snowden, FCC, to Ronnie London, Counsel to ATA, November 14, 2002.

782  *See* 5 U.S.C. § 552.

783  5 U.S.C. § 552(b)(6); *see also* 47 C.F.R. §§ 0.441 *et seq.*

784  5 U.S.C. § 552(a); 47 C.F.R. §§ 0.551 *et seq.*

785  We explained that informal complaints often contain personally identifiable information such as addresses, phone numbers, social security numbers, and personal financial information. The ATA subsequently filed an *Application for Review of the Freedom of Information Action*, requesting that the Commission "overturn the staff's classification of the telemarketing complaints and predictive dialing inquiries as 'not routinely available' documents" and immediately release them for public consideration. *See Review of Freedom of Information Action* filed by the ATA at 5, CG Docket No. 02-278, December 6, 2002. (In the alternative, ATA requested that "the Commission require the staff to significantly accelerate its release of the redacted documents in time for consideration of them in the notice and comment period, and to substantially reduce or waive the charge associated with producing the requested documents.") On December 23, 2002, the ATA filed a *Motion for Expedited Review of its Application for Review of the Freedom of Information Act Action* to "ensure that ATA and other parties participating in the ... proceeding are afforded timely access to critical documents central to the issues raised...by the [*2002 Notice*]." *See Motion for Expedited Review* at 1.

786  As directed by the ATA, the Commission stopped processing the FOIA on January 27, 2003. The comment period in this proceeding was subsequently extended following the release of a Further Notice, and the ATA wrote to the Commission asking that the FOIA processing continue. However, the ATA did not represent that it would pay the additional FOIA fees that would accrue from the processing, and CGB wrote to the ATA for further directions. The ATA then paid for complaint records provided through January 27, 2003, and asked the Commission to continue processing the request. CGB has provided the ATA with a total of 2,420 redacted complaints thus far.

787  *See, e.g.,* ATA Comments at 36 (noting that "the Commission's tally of complaints, inquiries and website visits fails to demonstrate a significant problem ... the existence of a complaint does not amount to a violation of the rules.")

788  Other considerations included: the Commission's own enforcement experience; the amount of time that had passed since the Commission undertook a broad review of the TCPA rules, during which time telemarketing practices have changed significantly; and the actions by the FTC to consider changes to its telemarketing rules, including the establishment of a national do-not-call registry. *See 2002 Notice*, 17 FCC Rcd at 17464-68, para. 7-11.

789  *See, e.g.,* ATA Comments at 41.

790  *2002 Notice*, 17 FCC Rcd at 17461, para. 1.

791  *See* Do-Not-Call Act, Sec. 4.

792  *See* 5 U.S.C. § 604.

793  *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (*SBREFA*), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

794  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking (NPRM) and Memorandum Opinion and Order (MO&O), 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90. In the MO&O, the Commission closed and terminated CC Docket No. 92-90 and opened a new docket to address the issues raised in this proceeding.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 405 of 409   PageID 474

795     Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 1601.

796     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Further Notice of Proposed Rulemaking, 68 Fed. Reg. 16250 (March 25, 2003).

797     *See* 5 U.S.C. § 604.

798     Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227. The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. §§ 201 *et seq*.

799     *See Telemarketing Sales Rule*, 68 Fed. Reg. 4580 (Jan. 29, 2003).

800     *See TCPA*, Section 2(9), *reprinted in* 7 FCC Rcd 2736 at 2744.

801     *2002 Notice*, 17 FCC Rcd at 17497-501, paras. 70-80.

802     *See* Do-Not-Call Act, Sec. 4(b).

803     WorldCom Reply Comments at 2.

804     NEMA Comments at 8; PLP Comments at 1.

805     *See e.g.*, Yellow Pages Comments at 2.

806     NADA Comments at 2-3.

807     John Shaw Reply Comments at 10; Mathemaesthetics Comments at 6; Gail Berk Comments.

808     John Holcomb Comments at 1; Jim Carter Comments.

809     Order, paras. 21, 88.

810     *See e.g.*, MBNA Comments at 4.

811     *See e.g.*, Privacy Rights at 2.

812     NFIB Comments at 1. *See also*, PLP Comments at 4; NEMA Comments at 8.

813     MBNA Comments at 3; MBNA Reply at 7.

814     MBNA Comments at 3.

815     SBSC Comments at 2-3. *See also*, PLP Comments at 4-5; MBA Reply at 5-6; Farmers Comments at 1.

816     NAIFA Comments at 3-4. *See also*, DSA Comments at 6-7 and Vector Comments at 8-10.

817     NAMB Comments at 2; NRF Comments at 9-10.

818     MBA Comments at 3.

819     DSA Comments at 4-5. *See also*, NAA Comments at 10-11.

820     MBA Comments at 3. *See also*, MPA Comments at 10-11 ("small businesses will be daunted by or unable to afford the computer processing time and expense involved in 'scrubbing' their relatively small marketing lists against a [national list]"); *see also* NRF Comments at 9.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y Document 13 Filed 01/19/24 Page 406 of 409 PageID 475

821    Strang Reply Comments at 12. *See also* Joe W. McDaniel-First Dec 4, 2002 Comments.

822    Yellow Pages Comments at 2-4.

823    Mathemaesthetics Comments at 6.

824    Mathemaesthetics Comments at 6.

825    David T. Piekarski Comments (Docket No. 03-62) at 1-2.

826    NCS Comments at 4-5. *See also*, Mathemaesthetics Comments at 7-8.

827    NCS Comments at 5.

828    *2002 Notice*, 17 FCC Rcd at 17470-71, para. 17.

829    *2002 Notice*, 17 FCC Rcd at 17470-71, para. 17.

830    MBA Comments at 6.

831    MBA Comments at 6-7.

832    MBA Comments at 6-7.

833    NFIB Comments at 2.

834    NFIB Comments at 2.

835    NFIB Comments at 2.

836    NADA Comments at 2.

837    NADA Comments at 2.

838    NADA Comments at 2.

839    *See, e.g.*, NASUCA Comments at 17-18; DMA Comments at 20-21; Nextel Reply Comments at 11-13.

840    DMA Comments at 20.

841    DMA Comments at 20.

842    Nextel Reply Comments 12-13.

843    Privacy Rights Comments at 4-5.

844    Privacy Rights Comments at 4-5.

845    NFIB Comments at 3-4. *See also*, NADA Comments at 2-3.

846    NFIB Comments at 3-4.

847    NFIB Comments at 3-4. *But see,* Mathemaesthetics Comments at 2-5.

848    NADA Comments at 2.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 407 of 409   PageID 476

849    NADA Comments at 2.

850    Mathemaesthetics Comments at 2.

851    Jeff Bryson Comments; Carolyn Capps Comments at 2.

852    Michael C. Addison Comments.

853    John Holcomb Comments at 1.

854    Jim Carter Comments; JC Homola Comments; Autoflex Comments at 1-2; Rob McNeal Comments (unsolicited faxes costs company tens of thousands of dollars each year in materials and employee time); *see also* NCL Comments at 6 ("[P]eople who work out of their homes are especially harmed by unsolicited faxes, which use up their paper and toner and tie up their machines."); Mathemaesthetics Reply Comments at 7 ("[U]nsolicited [fax] ads caused my business fax machine to become prematurely empty, which rendered *wholly useless* the equipment my small business crucially depends on for its revenue. When a customer of mine a short time later attempted to fax a purchase order for over $3,000 worth of my company's product, my empty fax machine was not able to capture this transaction for a significant period of time ... ." (emphasis in original)).

855    NFIB Comments at 2 (emphasis added).

856    NYSCPB-Other Than National DNC List Comments at 9-10.

857    NYSCPB-Other Than National DNC List Comments at 9.

858    NYSCPB-Other Than National DNC List Comments at 10.

859    5 U.S.C. § 604(a)(3).

860    5 U.S.C. § 601(6).

861    5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comments, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

862    15 U.S.C. § 632.

863    47 C.F.R. § 64.1200.

864    *See* SBA, Programs and Services, SBA Pamphlet No. CO-0028, at page 40 (July 2002).

865    1992 Economic Census, U.S. Bureau of the Census, Table 6 (special tabulation of data under contract to Office of Advocacy of the U.S. Small Business Administration).

866    *See* 13 C.F.R. § 121.201, NAICS code 561422.

867    U.S. Census Bureau, 1997 Economic Census, Subject Series: "Administrative and Support and Waste Management and Remediation Services, Receipts Size of Firms Subject to Federal Income Tax: 1997," Table 4, NAICS code 561422 (issued Oct. 2000).

868    Order, paras 16-85.

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Case 4:23-cv-01208-Y   Document 13   Filed 01/19/24   Page 408 of 409   PageID 477

869     Order, paras. 129-134, 146-159.

870     Order, paras. 173-184.

871     Order, paras. 185-203.

872     5 U.S.C. § 603(c)(1)-(c)(4).

873     Order, paras. 25-41.

874     *See e.g.*, MBNA Comments at 4.

875     *See e.g.*, Privacy Rights Comments at 2.

876     Order, paras. 46-49, 54.

877     *See e.g.*, Mathemaesthetics Comments at 6.

878     Order, para. 54.

879     *See e.g.*, MBA Reply at 3; NAA Comments at 3; SBSC Comments at 2; PLP Comments at 5.

880     NCS Comments at 4-5.

881     *See e.g.*, NAA Comments at 12-14 (exempt newspapers); NAIFA Comments at 3 (exempt referral calls); SBSC Comments at 2 (exempt local calls); MBA Comments at 5 (exempt calls to set up face-to-face meetings).

882     Order, paras. 46-54.

883     Order, para. 94.

884     Order, para. 94.

885     Order, para. 92.

886     Order, para. 113.

887     *See FTC Order*, 68 Fed. Reg. 4580 at 4591-94.

888     *See, e.g.*, Bank of America Comments at 4 (36 months); MPA Comments at 12-13 (24 months); Sprint Comments at 18 (12 months).

889     *2002 Notice*, 17 FCC Rcd at 17475-76, para. 26.

890     Mathemaesthetics Comments at 6.

891     WorldCom Reply at 18-19.

892     Order, paras. 150-152.

893     *See, e.g.*, WorldCom Further Comments at 8; Teleperformance Further Comments at 4.

894     NFIB Comments at 3-4.

895     John Holcomb Comments at 1; Mathemaesthetics Comments at 2-3.

| 896 | Order, para. 189. |
|---|---|
| 897 | Order, para. 191. |
| 898 | Order, para. 93. |
| 899 | MBA Comments at 6-7. |
| 900 | *See* 5 U.S.C. § 801(a)(1)(A). |
| 901 | *See* 5 U.S.C. § 604(b). |

18 FCC Rcd. 14014 (F.C.C.), 18 F.C.C.R. 14014, 29 Communications Reg. (P&F) 830, 2003 WL 21517853

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.