# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| KELLY PINN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 4:23-cv-01208-Y |
| vs. | |
| HUFSEY HOME SERVICES, INC. D/B/A ONE HOUR AIR CONDITIONING & HEATING AND 33 MILE RADIUS LLC D/B/A EVERCONNECT, | |
| Defendants. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## 33 MILE RADIUS LLC D/B/A EVERCONNECT'S MOTION TO DISMISS

I.   Contents

**II.   Tables of Authorities** ................................................................................................... iii

**III.   Introduction** ...................................................................................................... 1

**IV.   Factual Background** .......................................................................................... 1

**V.   Legal Standard** .................................................................................................. 2

**VI.   Argument** .......................................................................................................... 3

   A.   Ms. Pinn has adequately pled a vicarious liability claim against EverConnect because she has pled facts which demonstrate that EverConnect controlled and hired a call center to make the illegal calls at issue. ................................................................................................. 3

      1.   Ms. Pinn makes an adequate showing to raise the inference of an agency relationship between the caller, EverConnect, and Hufsey, based upon Hufsey's representations. .......... 4

      2.   Ms. Pinn has adequately pled that she received more than one call by or on behalf of Defendants because she has pled similarity in a peculiar script. ........................................... 9

   B.   The Do Not Call Registry pliantly applies to cell phones, as confirmed by this Court, Circuit Courts of Appeal, and the FCC. .................................................................................. 12

      1.   The TCPA's Do Not Call Registry Provisions apply to cell phones, as multiple courts and the FCC have unequivocally declared. ........................................................................... 12

      2.   A textualist reading of the TCPA definitively forecloses Defendant's argument. ...... 16

**VII.   Conclusion** ........................................................................................................ 23

## II.   TABLES OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................... 2, 6

*Barton v. Temescal Wellness, LLC*, No. 4:20-cv-40114-TSH, 2021 U.S. Dist. LEXIS 42211 (D. Mass. Mar. 8, 2021) ............................................................... 13

*Birchmeier v. Caribbean Cruise Line, Inc.,* No. 12 C 4069, 2012 U.S. Dist. LEXIS 182536 (N.D. Ill. Dec. 28, 2012) ............................................................... 4

*Bird v. Pro Star Builders, Inc.,* No. 2:22-cv-03610-JLS-JEM, 2022 U.S. Dist. LEXIS 215155 (C.D. Cal. Nov. 28, 2022) ............................................................... 11

*Boardman v. Green DOT Corp.*, No. 21-cv-174, U.S. Dist. LEXIS 156403 (W.D.N.C. Aug. 19, 2021) ............................................................... 13

*Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2022 WL 4088205 (W.D. Tex. Sept. 6, 2022) ............................................................... 8

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ............................................................... 4

*Consol. Grain & Barge, Inc. v. Anny*, No. CIV.A. 11-2204, 2013 WL 486687 (E.D. La. Feb. 6, 2013) ............................................................... 5

*Cunningham v. Daybreak Solar Power, LLC*, No. 4:22-CV-00599-O, 2023 WL 3985245 (N.D. Tex. June 13, 2023) ............................................................... 6

*Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988 (N.D. Ill. 2016) ............................................................... 8

*Dudley v. Vision Solar, LLC*, No. CV 21-659, 2021 WL 3077557 (E.D. Pa. July 21, 2021) ............................................................... 20

*Fed. Trade Comm'n v. Lifewatch Inc.*, 176 F. Supp. 3d 757 (N.D. Ill. 2016) ............................................................... 10

*Gaker v. Q3M Ins. Sols.*, No. 3:22-CV-00296-RJC-DSC, 2023 WL 2472649 (W.D.N.C. Feb. 8, 2023) ............................................................... 21

*Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983 (9th Cir. 2023) ............................................................... 13

*Holmes v. Back Doctors, Ltd.*, 695 F. Supp.2d 843 (S.D. Ill. 2010) ............................................................... 15

*Hunsinger v. Alpha Cash Buyers, LLC*, No. 3:21-CV-1598-D, 2022 WL 562761 (N.D. Tex. Feb. 24, 2022) ............................................................... 15

*Hunsinger v. Dynata LLC*, No. 3:22-CV-00136-G-BT, 2023 WL 2377481 (N.D. Tex. Feb. 7, 2023) ............................................................... 7

*In re DISH Network*, 28 FCC Rcd. 6592-93 ................................................................................ 8

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449 (M.D. Pa. Jan. 17, 2024) .............................................................................................................. 19, 20, 21

*Katz v. Caliber Home Loans, Inc.*, No. 3:23-CV-0145-S, 2023 WL 5311488 (N.D. Tex. Aug. 17, 2023) ........................................................................................................................... 7

*Klein v. Just Energy Grp., Inc*., No. CV 14-1050, 2016 WL 3539137 (W.D. Pa. June 29, 2016) . 8

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ............................................... 12

*Mantha v. QuoteWizard.com, LLC*, No. CV 19-12235-LTS, 2022 WL 325722 (D. Mass. Feb. 3, 2022) ............................................................................................................................ 20

*Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451 (N.D. Ill. Sep. 7, 2016) .............................................................................................................................. 8

*Parchman v. SLM Corp.*, 896 F.3d 728 (6th Cir. 2018) ............................................................. 15

*Perrin v. United States*, 444 U.S. 37 (1979) ............................................................................... 17

*Pinn v. CycleBar Franchising, LLC*, No. 3:23-CV-01540-M, 2023 WL 8374749 (N.D. Tex. Dec. 4, 2023) ......................................................................................................................... 9, 13

*Riley v. California*, 573 U.S. 373 (2014) ................................................................................... 16

*Rosenberg v. LoanDepot.com LLC*, No. 19-10661-NMG, 2020 U.S. Dist. LEXIS 11928 (D. Mass. Jan. 24, 2020) .................................................................................................... 13

*Ross v. Blake*, 578 U.S. 632 (2016) ........................................................................................... 16

*Sagar v. Kelly Auto Grp., Inc.*, No. 21-cv-10540, 2021 U.S. Dist. LEXIS 227781 (D. Mass. Nov. 29, 2021). ................................................................................................................... 13

*Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253 (4th Cir. 1950).................................. 15

*Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356 (E.D. Pa. 2019)........................... 20

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506(2002)...................................................................... 5

*Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727 (N.D. Ill. 2014)................................................ 11

*Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741 (5th Cir. 2010) ....................................................... 2

*Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276 (9th Cir. 1988) .......... 8

## Statutes

28 U.S.C. § 2342 ......................................................................................................... 21

47 C.F.R. § 64.1200(c) ............................................................................................... 16

47 U.S.C. § 227(b) ...................................................................................................... 17

47 U.S.C. § 227(c)(1)(A-E) ........................................................................................ 13

47 U.S.C. § 227(c)(2) ............................................................................................ 13, 16

47 U.S.C. § 227(c)(3) .................................................................................................. 13

FED. R. CIV. P. 8 ............................................................................................................. 2

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ... 17, 19

Complaint, ECF No. 1 ......................................................................................... 1, 4, 10

*In re Rules & Regs. Implementing the TCPA of 1991*, 18 F.C.C. Rcd. 14014 (July 3, 2003) 18, 22

Motion to Dimiss Complaint, ECF No. 12 .................................................... 1, 3, 13, 14

*Second Report and Order, Second Further Notice of Proposed Rulemaking in CG Docket Nos.02-278 and 21-402, and Waiver Order in CF Nocket No. 17-59*, No. FCC 23-107 (FCC released Dec. 18, 2023) [hereinafter FCC Order] .................................................... 14

Statement of Senator Fritz Hollings, 137 Cong. Rec. 9840 (1991) ............................. 15

Webster's Collegiate Dictionary (1936) ...................................................................... 18

Webster's Ninth New Collegiate Dictionary (1990) .................................................... 18

### III.    INTRODUCTION

Defendant 33 Mile Radius, LLC, doing business as EverConnect (EverConnect or Defendant)'s motion to dismiss must be denied because the Plaintiff has pled sufficient facts to demonstrate EverConnect's vicarious liability for the calls at issue. Specifically, Plaintiff has pled that she received the five calls at issue, which all used nearly identical scripts, in an unbroken line of a "warm transfer" calls, ultimately leading to Defendant Hufsey Home Services. The Plaintiff and Hufsey then investigated those calls, and Hufsey was able to determine that it purchased the Plaintiff's live call warm transfer lead from EverConnect, despite the fact that EverConnect was never mentioned on the call. Such facts are sufficient to give rise to the inference of an agency relationship between the caller and EverConnect.

Defendant's attempts to dismiss this case on the basis that the TCPA does not apply to cell phones is an argument that fares no better. Multiple federal and circuit courts nationwide have had no trouble rejecting identical arguments because this argument runs contrary to *multiple* FCC decisions, beginning in 2003 and continuing as recently as last year. These thoughtful courts also have had no trouble concluding that the Defendant's argument runs contrary to the statutory text, the regulatory text, textualism and common sense.

As so many other courts have done in other TCPA cases involving vicarious liability and unlawful calls to cell phones on the Do Not Call Registry, this case must be allowed to proceed.

### IV.    FACTUAL BACKGROUND

The original complaint in this matter was filed on December 1, 2023 against the moving Defendant, 33 Mile Radius LLC d/b/a Everconnect. (ECF No. 1). After requesting an extension, Defendant filed its motion to dismiss on January 19, 2024, together with an appendix in support. (ECF No. 12). In it, the Defendant makes two basic arguments. First, despite the fact that

1

Defendant Hufsey investigated the calls and determined it purchased the call from EverConnect, EverConnect contends that the Plaintiff has inadequately pled facts which support EverConnect's vicarious liability for the calls. Second, it advances the at least ten-times-rejected argument that cell phones are ineligible for registration on the National Do Not Call Registry. This response follows.

## V.   LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests." *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (cleaned up). The requirement that a plaintiff "show" that he is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786–87. After identifying elements to set forth a claim and removing conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Twombly*, 550 U.S. at 570.

2

## VI.    ARGUMENT

A.    *Ms. Pinn has adequately pled a vicarious liability claim against EverConnect because she has pled facts which demonstrate that EverConnect controlled and hired a call center to make the illegal calls at issue.*

The Defendant, in essence, adopts in its motion the classic "I didn't do it" defence, but styles it instead as an attack couched in the TCPA's statutory requirement that a person receive more than one call "by *or on behalf of* the same entity." 47 U.S.C. § 227(c)(5) (emphasis added). But such an allegation is more properly the subject of a jury trial or at the very least a motion for summary judgment. And although the Defendant points out that the plaintiff has insufficiently pled "facts showing that EverConnect made or initiated these calls," (Br. at p. 11), this misstates both the applicable law and the Plaintiff's burden entirely. As a preliminary matter, the Plaintiff is not required to plead the intricacies of an agency relationship at the pleadings stage. Moreover, if the Plaintiff does provide sufficient facts which can lead a court to make an inference that there was agency relationship (as she does here), the matter should unquestionably proceed to discovery.

Adopting the Defendant's motion to dismiss on this basis requires the Court to adopt a false and unproven premise: that EverConnect had nothing to do with the calls alleged and is the wrong defendant entirely. But even if this court were to assume *arguendo* that EverConnect committed none of the illegal conduct as alleged in the Plaintiff's complaint, such an allegation is not properly the subject of dismissing the complaint for failure to state a claim because it raises a factual dispute not properly brought at the pleading stage. As explained below, that's not the standard.

3

1. Ms. Pinn makes an adequate showing to raise the inference of an agency relationship between the caller, EverConnect, and Hufsey, based upon Hufsey's representations.

As described above, the Court's analysis must begin and end with whether or not the Plaintiff has plausibly alleged the Defendant's involvement in the calls with sufficient specificity to give rise to the inference of an agency relationship. She has done so because, on the last call complained of, the call was transferred, *on the very same call*, to Defendant Hufsey. (Compl. ¶ 36). And, when Plaintiff later asked as to where the call came from or why the Plaintiff was transferred, Hufsey investigated and determined that it purchased the Plaintiff's lead, and therefore the live-transfer call, from EverConnect. (*Id.* ¶ 38).

Defendant Hufsey offers home improvement services, and to generate clients, it relies on EverConnect, which itself uses illegal telemarketing call centers. It is simply incorrect for EverConnect to claim that it is immune from liability because it did not physically place the calls. *See e.g. Birchmeier v. Caribbean Cruise Line, Inc.,* No. 12 C 4069, 2012 U.S. Dist. LEXIS 182536, at *3 (N.D. Ill. Dec. 28, 2012) ("To offer an example, suppose that A, a well-heeled entity that wants to sell a product or service, stands next to B, an impecunious defendant, and directs B to place unsolicited, prerecorded calls to consumers on their cell phones. Defendants' position, it appears, is that only B, the impecunious dialer, would be liable and that A would get off scot-free. A Congressional enactment that permitted this would be absurd indeed. Fortunately that is not the law under the TCPA.") Rather, as the TCPA makes clear, one can make calls on behalf of another entity and initiate calls through another party. Indeed, the Supreme Court in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), held that traditional agency and vicarious liability principles apply for liability under the TCPA.

In sum, the allegations of Plaintiff's complaint are more than sufficient to demonstrate a fair inference leading to the existence of some agency relationship. Overseas call centers are

4

hired by US based entities, like EverConnect, to blast calls to US residents, either directly for those entities' benefits, or, like here, for ultimate sale to other companies who buy leads. The Plaintiff's allegations make clear that the agency relationship here takes the form of a lead generator-lead seller-lead buyer arrangement. The overseas call center is the generation entity from whom the lead seller (EverConnect) purchases leads, which it then sells on to lead buyers (like Hufsey).

Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint or for determining whether the plaintiff has any evidence to back up what is in the complaint. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). However, that's precisely what the Defendant attempts to do here, making a red-herring argument that the Plaintiff has failed to state a claim because it has allegedly not pled sufficient facts demonstrating an agency relationship. But that's a "red herring" that begs the question "who did, then?" and begs the question as to what relationship the players here had if it was not an agency relationship. *See Consol. Grain & Barge, Inc. v. Anny*, No. CIV.A. 11-2204, 2013 WL 486687, at *6 (E.D. La. Feb. 6, 2013). But the answer to that question is a factual one reserved for discovery.

Defendant EverConnect, and only EverConnect, is in the best, and indeed, only, position to identify the entity that placed the calls Plaintiff received which it then sold on to Defendant Hufsey. It holds the keys to uncovering any agency relationship, together with any associated proofs of requisite degrees of control, or it may even reveal that the call center that called the Plaintiff was directly owned by EverConnect. Discovery will bear these facts out.

Defendant's reasoning for why the Plaintiff loses requires the Court to adopt an unproven premise: that the Plaintiff has pled no facts giving rise to the inference of an agency relationship. Defendant cannot be permitted to play games in such a manner. Here, the Plaintiff pleads facts

5

which permit the court to plausibly determine that the Defendant was responsible for the alleged conduct and that the Defendant acted unlawfully, namely by referencing Defendant Hufsey's representation that it purchased the live transfer call lead from Defendant EverConnect. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It fails to explain how or why Hufsey knew that it obtained the lead, which was a direct transfer, warm lead, from EverConnect (and presumably paid EverConnect for the lead), despite the fact that EverConnect was never mentioned on the call. There necessarily had to be some degree of control of EverConnect's call center sufficient to demonstrate agency, particularly because the call seemingly went from a call center to Hufsey without EverConnect's apparent involvement, but somehow EverConnect knew to bill Hufsey for the lead. EverConnect therefore had control over the call center because it was able to ascertain that the call took place as a verified, valid transfer and therefore bill Hufsey for it.

Likewise, the cases cited by the Defendant for the proposition that this case can be dismissed on a 12(b)(6) motion for failure to plead agency are easily distinguishable. In *Cunningham v. Daybreak Solar Power, LLC*, the plaintiff received calls which were identified as "The-Solar-Project.com," which were then transferred to the defendant, who had *no clue* who that entity was. No. 4:22-CV-00599-O, 2023 WL 3985245, at *1 (N.D. Tex. June 13, 2023). On that basis, the Court held that there was no factual support for the contention that the defendant, and not The Solar Project, was *directly* liable for the calls at issue on the basis that The Solar Project was merely a trade name and no facts demonstrated the exercise of vicarious liability and therefore dismissed the case. *Id.* at 3.

Not so here, as *Daybreak* is the *exact opposite* of what happened here. Although the Plaintiff was transferred to Hufsey, a subsequent investigation revealed the exact source of the lead that Plaintiff purchased: it came from EverConnect, and the call directly transferred from

the overseas call center to agents of Hufsey. Plaintiff does not plead direct liability as in *Daybreak*. That Hufsey was able to trace the call in the other direction back to EverConnect is the greatest evince possible of an agency relationship because it shows an unbroken chain in both directions, despite the seeming lack of a third link in the chain: the caller directly transferred the call to Hufsey, and Hufsey knew that the call came from and was transferred from EverConnect.

The other cases cited by Defendant here are similarly from distinguishable from this case. In *Katz v. Caliber Home Loans, Inc.*, the plaintiff did not even *attempt* to prove an agency theory, but instead proceeded on direct liability by alleging that the caller *directly* made the calls at issue. Plaintiff's sole evidence for direct liability in that case was premised on the *caller's* assertion that they were calling from the "Caliber Home Loan Mortgage Refinance Team," unlike here, where an *investigation* revealed evidence of an agency relationship, together with associated payment records. No. 3:23-CV-0145-S, 2023 WL 5311488, at *3 (N.D. Tex. Aug. 17, 2023). This case is also unlike *Hunsinger v. Dynata LLC*, where the plaintiff made the formulaic, conclusory allegation that the caller was "an agent for Dynata." No. 3:22-CV-00136-G-BT, 2023 WL 2377481, at *6 (N.D. Tex. Feb. 7, 2023). And in almost all circumstances, plaintiffs in such cases are either permitted to amend or engage in limited discovery as to liability and agency.

Requiring a putative TCPA plaintiff to allege more than basic facts giving rise to agency, such as requiring the name of a third-party call center be pled or pleading various contractual nuances, would eviscerate the TCPA's protection and would simply allow defendants to run rampant with all manner of anonymous and unidentified calls. The Defendant's standard provides a perverse incentive for a caller to conceal their identity by making it impossible for any plaintiff to prove a claim against the defendant at the pleadings stage based on a lack of information and evidence. This Court need not dive into a vicarious liability analysis.

But even if this Court were to dive into a vicarious liability analysis, EverConnect would be liable under theories of actual authority, apparent authority, and ratification. These vicarious liability principles apply to a company who participated in or authorized another entity, like a lead generator, to perform the violative conduct, even when the seller did not directly commit the violative conduct or even place the calls at issue. *Callier v. Nat'l United Grp., LLC*, No. EP-21-CV-71-DB, 2022 WL 4088205, at *6–7 (W.D. Tex. Sept. 6, 2022) (imposing vicarious personal liability on an individual insurance agent who was responsible for writing an insurance policy based on an illegal call initiated by an unrelated, unnamed caller).

"[A] party may be liable under the TCPA in accordance with tort-related vicarious liability rules," including actual authority, apparent authority, and ratification principles. *Klein v. Just Energy Grp., Inc*., No. CV 14-1050, 2016 WL 3539137, at *9 (W.D. Pa. June 29, 2016). The existence of an agency relationship is normally one for the trier of fact to decide. *See Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988). Moreover, "[A] plaintiff is not required to plead all of its evidence in the complaint in order to plausibly allege agency." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 996 (N.D. Ill. 2016). A plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016). And a 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of [agency] relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46.

And here, the Plaintiff has pled sufficient facts to infer an agency relationship, or at the very least, facts sufficient to permit discovery into any vicarious liability issues. Defendant does

8

not address or explain how Hufsey knew that a direct-transfer call came from EverConnect, when EverConnect's name was never mentioned on the call. It does not explain why it billed Hufsey for the calls. Discovery will permit the Plaintiff to further suss out the exact agency relationship involved in the calls and plead more specifically the exact agency between the various players involved. Because the facts pled give rise to the inference that the call center had direct access to EverConnect and possibly Hufsey's systems demonstrates at the very least ratification, if not actual authority. At the very least, this Court should nevertheless conclude that the facts pled here give rise to the inference of some agency relationship and permit discovery.

   2.  Ms. Pinn has adequately pled that she received more than one call by or on behalf of Defendants because she has pled similarity in a peculiar script.

   In short, this case is nothing like Ms. Pinn's other case dismissed by Judge Lynn in December. In that case, Ms. Pinn included in her complaint a printout of her cell phone records which demonstrated that she received multiple text messages from the same caller ID. In an unelucidated opinion, Judge Lynn stated that the Plaintiff pled no facts which would allow the Court to conclude that she received more than one telephone communication from the defendant, without articulating further reasoning. Indeed, it appears the *actual* basis for the dismissal was premised on insufficient factual allegations regarding state law claims in a complaint which defendant removed from state court. *Pinn v. CycleBar Franchising, LLC*, No. 3:23-CV-01540-M, 2023 WL 8374749, at *3 (N.D. Tex. Dec. 4, 2023). The Court also noted that, with that particular defendant and different counsel (not the undersigned), the case appeared to be the second bite at the apple for state law claims that were already dismissed, a more likely basis for its decision. *Id.*

   Nevertheless, the Plaintiff pleads multiple violative calls on multiple dates and times in her complaint, including at least five calls between November 3, 2023 and November 17, 2023.

(Compl. ¶ 25). And not having the same caller ID is not the be-all-end-all of determining whether or not the numbers all originated from a single source. As alleged here, the telemarketers "spoofed" their caller ID in order to make the numbers appear to come from local residents. (*Id.* ¶ 28, 30). Moreover, illegal telemarketers frequently also take advantage of the fact that "spoofed" caller IDs do not appear as spam or otherwise slip by number-based call blocking algorithms. Furthermore, the calls stopped as soon as the call center hired by EverConnect generated the lead which it then sold to Hufsey. That the calls stopped after the Plaintiff was transferred makes sense, since the lead had already been generated. For what it's worth, in addition to demonstrating the calls all came from the same place, such action also demonstrates both EverConnect and Hufsey's control over the caller's conduct, a feather in the Plaintiff's cap for plausibly alleging vicarious liability at the pleadings stage.

Therefore, and when not relying on questionable and illegally manipulated caller ID data, the Plaintiff has pled specific facts, which this Court must accept as true, which will allow it to draw the inference that the calls all came from the same source. Specifically, the Plaintiff has alleged that the aforementioned calls all used a nearly identical and unique script, specifically asking the peculiar question "did you know Christmas is coming up?" (Compl. ¶ 30, 33, 35). What's more, in addition to using "identical or nearly identical scripts," they all used the fake name "US Saving Center" or "US Home Improvements." (Compl. ¶ 25). Other courts have had no trouble concluding that pleading similarities in script construction is an adequate basis for connecting multiple illegal calls, and this Court should do so here. *See, e.g.*, *Fed. Trade Comm'n v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 766 (N.D. Ill. 2016).

10

Taking all factual inferences in the Plaintiff's favor, as the Court must do now, the Plaintiff's allegations are sufficient. As Judge St. Eve, prior to being appointed by President Trump to the Seventh Circuit, held in a TCPA case denying a similar motion to dismiss:

> Sempris does not dispute that Quality initiated four calls to Toney in December 2012, but contends that Toney "cannot plausibly allege that the three unanswered calls she purportedly received were initiated by Quality for the purpose of marketing Sempris's Budget Savers membership program, because Toney does not allege--and cannot allege--that she has any personal knowledge of what the content of those calls would have been." Sempris submits that Quality "just as easily could have been calling Toney to market the goods or services of another company it contracts with, for the exclusive purpose of confirming Toney's Stompeez order, or for a different purpose altogether" and that "Toney's assertion that that Quality made the three unanswered calls for the purpose of marketing Budget Savers is nothing more than rank speculation."
>
> The court disagrees. Toney has alleged that she received and answered a call from Quality in which the caller tried to sell her a Budget Savers membership the day after she received three unanswered calls from Quality. The content and timing of the fourth call allows the court to draw a reasonable inference that Quality made the first three calls to market Sempris's services.

*Toney v. Quality Res., Inc.,* 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014) (cleaned up). Judge Staton made a similar finding in *Bird v. Pro Star Builders, Inc.,* No. 2:22-cv-03610-JLS-JEM, 2022 U.S. Dist. LEXIS 215155, at *7-8 (C.D. Cal. Nov. 28, 2022) (cleaned up):

> Further, it is reasonable to infer that Pro Star was responsible for the alleged February 24 unanswered call from the same number as the second call on April 19. Indeed, courts in other districts have recently found that a plaintiff has sufficiently alleged multiple calls from the same entity when he or she received more than one call from the same number but traced the calls back to the defendant after having answered only once. *See, e.g., Chapman v. Nat'l Health Plans & Benefits Agency, LLC*, 2022 U.S. Dist. LEXIS 138916, 2022 WL 3130225, at *7 (E.D. Mich. Aug. 4, 2022) (finding that plaintiff plausibly pleaded that four calls—including three unanswered calls—had come from the same defendant because they had originated from the same number and the plaintiff alleged that other individuals had complained about receiving solicitations from that number); *Spurlark v. Dimension Serv. Corp.*, 2022 U.S. Dist. LEXIS 120468, 2022 WL 2528098, at *3 (S.D. Ohio July 7, 2022) (finding that plaintiff who had ignored multiple calls from the same number until he answered and was able to identify the caller plausibly pleaded that the calls were all placed by the defendant). The Court agrees that it is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not. Accordingly, the Court finds that Plaintiff has plausibly alleged that the two calls at issue came from Pro Star.

11

The same reasonable inference can be made here, as Ms. Pinn received a variety of calls that used the same exact scripting.

B.   *The Do Not Call Registry pliantly applies to cell phones, as confirmed by this Court, Circuit Courts of Appeal, and the FCC.*

Perhaps realizing it cannot realistically proceed in a challenge at the motion to dismiss stage of merely denying liability for the calls, the Defendant also adopts the position that the Plaintiff has failed to state a claim for a violation of the TCPA's Do Not Call Registry provisions because it claims such provisions allegedly do not apply to cell phones. The arguments and authorities relied upon by Defendant in its motion, which have been rejected by multiple Courts including this one, do not foreclose Ms. Pinn's claims, which should proceed.

1.   The TCPA's Do Not Call Registry Provisions apply to cell phones, as multiple courts and the FCC have unequivocally declared.

"The Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, she can add her number to the list. The TCPA then restricts the telephone solicitations that can be made to that number." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019). Although the Defendant claims that calls sent to the Plaintiff's personal, residential cell phone are not prohibited by the TCPA, Defendant's reading is mistaken and at odds with the mountain of case law holding otherwise. Plaintiff has pled that her cell phone is a "residential" line is on the Do Not Call Registry and that is used for "personal, residential, and household reasons." (Compl. ¶ 21, 22). These well-pled factual allegations are unquestionably sufficient to state a claim. Moreover, as Defendant points out in its brief, Plaintiff, like most individuals, does not maintain a copper landline and

12

instead uses her cell phone for personal, residential communications. *See, e.g.*, *CycleBar*, No. 3:23-cv-01540-G (compliant filed July 7, 2023).

As Defendant is forced to admit, "there are decisions to the contrary in this district." (Br. at 14). For that reason alone, Defendant's challenge to the well-reasoned protections afforded residential cellular telephone subscribers under the National Do Not Call Registry.

As nearly every district and circuit court to address this issue has concluded, allegations nearly identical to those here are sufficient to allow the Court to conclude that a cell phone is "residential" for MTD purposes. *See, e.g.*, *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023); *Rosenberg v. LoanDepot.com LLC*, No. 19-10661-NMG, 2020 U.S. Dist. LEXIS 11928, at \*27 (D. Mass. Jan. 24, 2020) ("Rosenberg submits that she placed her cellular phone number on the National Do Not Call registry and that she uses her cell phone as her residential line. Those allegations are adequate for the purposes of pleading."); *Barton v. Temescal Wellness, LLC*, No. 4:20-cv-40114-TSH, 2021 U.S. Dist. LEXIS 42211, at \*13-14 (D. Mass. Mar. 8, 2021); *Boardman v. Green DOT Corp.*, No. 21-cv-174, U.S. Dist. LEXIS 156403, at \*1, 4-6 (W.D.N.C. Aug. 19, 2021); *Sagar v. Kelly Auto Grp., Inc.*, No. 21-cv-10540, 2021 U.S. Dist. LEXIS 227781, at \*16 (D. Mass. Nov. 29, 2021).

To this end, since at least 2003, the FCC[1] has established a presumption that "wireless subscribers who ask to be put on the national do-not-call list are residential subscribers." *FCC Report and Order*, 18 FCC Rcd. 14014, 14039 (2003) (cleaned up). This is so, *even if they also use such numbers partially for business purposes.* Indeed, the Fourth Circuit in *Krakauer*, 925

---

[1] The Federal Communication Commission ("FCC") possesses authority to issue implementing rules and regulations for the TCPA. *See* 47 U.S.C. § 227(c)(1)(A-E) and (c)(2) and (c)(3). Pursuant to that authority, the FCC promulgated regulations relating to the implementation, interpretation of the TCPA. *See* 47 C.F.R. § 64.1200(a)-(m).

F.3d at 657, concluded the TCPA's language was clear and that cell phone numbers on the Do

Not Call Registry, by virtue of their mere registration, are *presumptively residential*:

> The statute marks its own boundary. Suit can only be brought by those who receive multiple violative calls. Calls are only violative if the phone number was on the Do-Not-Call registry. And **a number can only be placed on such a registry if the number is a residential line.** Whatever work we may be required to do for more broadly worded statutes, Congress did the work for us here.

Furthermore, the FCC recently clarified this essential holding in its *Second Report and

Order, Second Further Notice of Proposed Rulemaking in CG Docket Nos.02-278 and 21-402,

and Waiver Order in CF Nocket No. 17-59*, No. FCC 23-107 (FCC released Dec. 18, 2023)

[hereinafter FCC Order]. In response to recent abuse of the ilk here and attempts to sidestep the

TCPA's requirements for calls to cell phones, the FCC saw fit to "codify" its existing regulations

that the Registry has "long applied to wireless phones." FCC Order at p. 26, ¶63. In the FCC

Order, the FCC explicitly confirmed that the TCPA's protections apply to cell phones, and not

just for telephone calls, but text messages, as well. FCC Order at p. 10 ("Texters must have the

consumer's prior express invitation or permission before sending a marketing text to a wireless

number in the DNC Registry. The Commission previously concluded that the national database

should allow for the registration of wireless telephone numbers and that such action will further

the objectives of the TCPA and the Do-Not-Call Act.").

Defendant's contention that courts "strictly and narrowly construe the TCPA's

language," (Br. at p. 16), is demonstrably false both looking at the legislative history of the

TCPA and the litany of circuit and district court decisions holding otherwise. Indeed, the

Plaintiff, not the Defendant, is entitled to its expansive, consumer protectionist reading of the

statute. It is utterly tone deaf to the fact that the TCPA was designed as a consumer law to

respect, among other things, the wishes of those who express their desire not to be called. Indeed,

as Senator Hollings, the TCPA's chief sponsor, noted, "owning a telephone does not give the

14

world the right and privilege to assault the consumer with machine-generated telephone calls." 137 Cong. Rec. 9840 (1991). The TCPA is a remedial statute and thus entitled to a broad, liberal construction to further its consumer protective purposes. *See, e.g., Parchman v. SLM Corp.*, 896 F.3d 728, 738–39 (6th Cir. 2018); *Krakauer*, 925 F.3d at 663; *Holmes v. Back Doctors, Ltd.*, 695 F. Supp.2d 843, 854 (S.D. Ill. 2010). As such, it "should be liberally construed and should be interpreted . . . in a manner tending to discourage attempted evasions by wrongdoers." *Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1950) (cleaned up).

Defendant's citations to other, different portions of the statute designed to address different harms by different technologies has already been rejected by *this very Court* in *Hunsinger v. Alpha Cash Buyers, LLC*, No. 3:21-CV-1598-D, 2022 WL 562761, at *2 (N.D. Tex. Feb. 24, 2022). Defendant's argument does not change the inevitable conclusion reached by the *Hunsinger* court that cell phones are subject to the Do Not Call Registry's protections, as more fully described in the next section addressing why a textualist reading of the TCPA can only support the Plaintiff. In fact, this very Court in *Hunsinger expressly distinguished* between the protections afforded by Section 227(c) of the TCPA, which govern the Do Not Call Registry and which Plaintiff sues under, and Section 227(b) of the TCPA, which govern prerecorded and other automated calls to users of certain technologies. *Compare id.* at *2 *with id.* at *3 (holding that "cellular telephone owners" may qualify as "residential telephone subscribers" when they receive "telephone calls and text messages on a cellular telephone that [is] used for residential purposes").

In sum, the mountain of case law and regulatory rulemaking directly contrary to the Defendant's position, as the Defendant itself is forced to admit, all but forecloses the

Defendant's approach. The meritless argument adopted by the Defendant should fail right out of the gate because it runs contrary to the decisions of other courts and the FCC itself.

    2.  A textualist reading of the TCPA definitively forecloses Defendant's argument.

    Defendant's reading of the statute rests on a statutory interpretation that is "a bit strained as an initial matter." *Riley v. California*, 573 U.S. 373, 397 (2014). As with any question of statutory interpretation, the court's inquiry "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). It is true that the TCPA and the Do Not Call registry extend only to "residential telephone subscribers." 47 U.S.C. § 227(c)(2); 47 C.F.R. § 64.1200(c)(2). But the Defendant does not analyze what Congress and the FCC meant when it used the term "residential telephone subscriber" which, as described below, references the *purpose* for which a number is used, *not* the specific *technology* used by the number. The statute does *not* say "residential technology" or "residential service" or even "residential telephone." It says "residential telephone *subscriber*." From this point of not even grappling with the definition and statutory text, Defendant conclusory and matter-of-factly declares that a residential telephone number must mean the *technology* used to receive calls, not the *actual use* of the number, and by its own fiat denies protection to almost 200 million cell phones on the National Do Not Call Registry.

    As support for this strained proposition that runs contrary to language and common sense, Defendant cites to an unrelated portion of the TCPA which extended special protections to certain "services," which include specifically defined *technologies* used by subscribers, including cell phones and other radio telephones, like ship-to-shore radio communications services. Subscribers to services utilizing these enumerated technologies incur specific financial and capacity-based harms because of their unique technical nature. For this reason, cases citing the various technologies and protections afforded by Section 227(b) of the TCPA did so specifically

because that section delimits cell phones and other technologies from less sophisticated ones, like copper landlines, where such noncommercial prerecorded calls are less harmful. 47 U.S.C. § 227(b)(1)(A)(iii) (extending protections to cell phones and other radio-based services).

Despite claiming it is applying a textualist reading of the statute, Defendant's approach is not textualism. It pays lip service to textualism, treating the doctrine as an infinitely malleable pretext to reach a policy outcome that it and other big businesses prefer. But textualism is not a pretext. It is a neutral doctrine that aims to faithfully interpret our nation's laws, regardless of who benefits. Fidelity to true textualism in this case means that the flesh-and-blood little girl wins and the mega marketing corporation loses. In sum, a textualist reading of the statute results in a reading of "residential" to mean the particular *purpose* for which a telephone number is used. What matters is not the *technology* the telephone service uses, but rather what matters is how the subscriber *uses* the telephone service. If a subscriber uses the number for residential or mixed *purposes*, calls to such numbers on the Registry without consent are illegal. If a subscriber uses the number solely for commercial *purposes*, the calls are not illegal.

Reading the term "residential" to exclude other technologies, such as cellular telephone services used for personal, household purposes, is inconsistent with multiple canons of construction. Without a controlling statutory definition, as here, the term "residential" takes on its "ordinary . . . common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). And, under the fixed-meaning canon, "[w]ords must be given the meaning they had when the text was adopted." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012). Of course, codified definitions can also assist in a textualist analysis, as here.

With respect to the TCPA, there are potentially two relevant time frames to consider: 1934, when the Telecommunications Act of which the TCPA is a part was enacted, and 2003,

when Congress passed the Do-Not-Call Implementation Act. Regardless of which the Court chooses, the meaning of the term "residential," as an adjective modifying "telephone subscribers," is the same. "Residential" means "used as a residence *or by residents*; adapted to (1936)/restricted to (2003) . . . residences; of or connected with (1936)/relating to (2003) . . . residence or residences." *Compare* Webster's New Collegiate Dictionary, Eleventh Ed. (2003) *with* Webster's Collegiate Dictionary (1936) (emphasis added) (cleaned up).

Especially in Webster's 2003 sense of "residential" meaning "restricted to" residences, the term "residential" is contrasted with the adjective "nonresidential," which is "not used as" or "not restricted to" residences or by residents. Webster's New Collegiate Dictionary, Eleventh Ed. (2003). That textual definition mirrors the codified rulemaking definition of both "residential" and "business" telephone subscribers outlined in the Code of Federal Regulations, coincidentally, at almost the exact same time as Congress drafted the DNC Registry provisions.

Importantly, at the time the DNC Registry provisions of the TCPA were enacted, and indeed to this day, the Code of Federal Regulations already defined in its regulatory text the term Congress used in the statutory text. Specifically relating to "Telecommunications," the CFRs defined a "residential subscriber" as a "subscriber to a telephone exchange service that is not a business subscriber." *See* 47 C.F.R. § 64.2305(d).[2] A "business subscriber" was defined as a "subscriber to a telephone exchange service for businesses." *See* 47 C.F.R. § 64.2305(b). The definition of each is simple. Accordingly, consumers who subscribe to telephone exchange

---

[2] The regulatory definitions of "business subscriber" and "residential subscriber" were enacted in 1999, prior to Congress' creation of the Do Not Call Registry in 2003. *Compare* 47 C.F.R. § 64.1200(e), *citing* 18 F.C.C. Rcd. 14014, 14032, 14043; 2003 FCC LEXIS 3673 at ¶¶ 22, 42 (June 26, 2003) (Do Not Call Registry was enacted in 2003) *with* 47 C.F.R. § 64.2305(b) and (d) (effective date of regulations is October 5, 1999).

services are protected by the DNC Registry. Businesses who subscribe to telephone exchange services for businesses are not. Congress was aware of this when it drafted the DNC provisions.

In using "residential" language, the agency tasked with interpreting rulemaking, together with Congress in using that term verbatim, realized that, in the future, traditional residential forms of telecommunication like copper landlines may come to be supplanted by other technologies, like ISDN and T1 lines, Fiber Optics, VoIP, and cellular technologies. In using the term "residential," Congress meant what it said. It meant to contrast residential service *uses* from nonresidential *uses* and restrict DNC Registry protections to the former, regardless of the type of *technology* that the consumer chooses to use or a technology that can change. Indeed, as the Middle District of Pennsylvania so eloquently put it:

> The best reading of the word "residential" is not that it modifies the "telephone," but rather that "residential" and "telephone" both modify the "subscriber." So instead of describing a "subscriber" who owns a "residential telephone," Section 227(c)(1) describes a "telephone subscriber" who has subscribed for "residential," i.e., personal, purposes. "Residential" is therefore used in the broader sense of "relating to a resident" to distinguish such a subscriber from a business or commercial telephone subscriber, who cannot be added to the Do Not Call registry.

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449, at *5 (M.D. Pa. Jan. 17, 2024).

But still other canons of construction further dictate against Defendant's interpretation. Plaintiff's reading comports with the general-terms canon, which holds that general terms should be interpreted generally. *See* Scalia & Garner at 101. Defendant's reading, however, arbitrarily limits the scope of the term "residential" to read "copper landline." No part of the statute contains a suggestion that the general term "residential" should be given such a limited, narrow meaning. Indeed, the *Jackson* court realized as much, noting, "the structure of subsection 227(c) itself supports the point. The subsection never references any such thing as a 'residential

19

telephone;' only 'telephone subscribers' and 'residential subscribers.' . . . Section 227(c)'s focus

on the telephone subscriber demonstrates that the term 'residential' is a functional term not

tethered to a particular technology, focusing instead on the subscriber's privacy rights." *Jackson*,

2024 WL 184449, at *6–7 (citing *Mantha v. QuoteWizard.com, LLC*, No. CV 19-12235-LTS,

2022 WL 325722, at *4 (D. Mass. Feb. 3, 2022)) (cleaned up).

  Defendant eschews actual argument on this point in favor of illusionary tactics presented

to this Court to make the case law on its position appear stronger than it actually is. "Plain

language" is not a magical incantation, however. Defendant either selectively quotes from cases

to hide each respective court's aforementioned business/residential reasoning that properly

interprets the statute as written or otherwise relies on unpersuasive case law that adopts an

unduly wooden interpretation of the TCPA's text. For example, in *Shelton v. Fast Advance

Funding, LLC*, 378 F. Supp. 3d 356 (E.D. Pa. 2019), the plaintiff received multiple calls to his

cellular telephone from the defendant. In direct contradiction to the omitted-case canon, the court

*sua sponte* expressed its own divination whether cellular telephone numbers were covered by the

DNC provisions. The court nevertheless *awarded* the plaintiff $33,000 in statutory damages.

Moreover, the Eastern District later backpedaled on *Shelton's* dicta and expressly held that "the

consensus in this Circuit is that Do Not Call claims may apply to cell phones." *Dudley v. Vision

Solar, LLC*, No. CV 21-659, 2021 WL 3077557, at *5 (E.D. Pa. July 21, 2021) (citing cases).

  As already noted, as recently as last week, the Middle District of Pennsylvania expressly

distinguished the *dicta* in *Shelton* and conducted a textualist analysis of which Scalia would be

proud to hold that the Do Not Registry applies to cell phones, writing that the defendant relied on

"two ill-founded textual arguments." *Jackson*, 2024 WL 184449, at *5 (M.D. Pa. Jan. 17, 2024).

In fact, the *Jackson* court **<u>expressly counseled against Defendant's tactics here</u>** in borrowing

20

language from other portions of the statute in writing that "slicing a statute into phrases while ignoring their contexts is a formula for disaster because the full body of a text contains implications that can alter the literal meaning of individual terms." *Id.* (cleaned up).

The other cases cited by the Defendant are similarly unpersuasive for various reasons, not the least of which because they did not properly undertake a true textualist analysis. Importantly, the magistrate judge's report and recommendations in *Gaker v. Q3M Ins. Sols.*, No. 3:22-CV-00296-RJC-DSC, 2023 WL 2472649 (W.D.N.C. Feb. 8, 2023), failed on both textualism and as a matter of interpreting agency rulemaking. Unlike Plaintiff's textualist analysis here, the Court's analysis in *Gaker* was severely lacking and and did not even contrast the dictionary definition of "residential" with "nonresidential," the same issue the *Jackson* court noted the *Shelton* court undertook. In essence, the *Gaker* court failed to look at what residential is *not* and thereby appreciate the true distinction Congress intended: distinguishing residential use from business use of a phone number, a textualist reading in complete conformity with the text and as endorsed by agency rulemaking. Moreover, *Gaker* also pays insufficient heed to the FCC's statutorily codified definition of "residential" in the Code of Federal Regulations.

Beyond the text itself, which serves as the "starting point" for this Court's inquiry, as discussed above, the Hobbs Act required this Court and the *Gaker* court to adopt the FCC's interpretation of the statutory text. *Gaker* expressly disregarded the Hobbs Act or the fact that the FCC was propounding a legislative, not an interpretative, rule. It conducted no *Chevron* analysis. The Hobbs Act grants the federal courts of appeal "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the [FCC] made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1). District courts have no jurisdiction to review FCC declaratory rulings, as *Gaker* did. Under the Hobbs Act, jurisdiction lies with the Courts of Appeal. As such, the FCC's interpretation is binding on this Court. And

21

all this is no matter the fact that *Chevron's* days appear to be numbered, because the agency's purported current legislative authority nevertheless is in lockstep with the statutory text.

As mentioned above, in enacting the Do Not Call provisions of the TCPA, the FCC explicitly acknowledged that the section was applicable to "wireless telephone numbers." In this regard, the Code of Federal Regulations at 47 C.F.R. § 64.1200(e) also provides that the DNC rules "are applicable to . . . **wireless telephone numbers**." 47 C.F.R. § 64.1200(e) (emphasis added). In 2003, the FCC interpreted this provision and noted that "there is nothing in section 227 to suggest that only a customer's 'primary residential telephone service' was all that Congress sought to protect through the TCPA." *In re Rules & Regs. Implementing the TCPA of 1991*, 18 F.C.C. Rcd. 14014, 14038, ¶ 35 (July 3, 2003). The FCC "conclude[d] that wireless subscribers may participate in the national do-not-call list." *Id.* at 14039, ¶ 36. And, as alleged in the Complaint, the Plaintiff has stated that she requested inclusion on the DNC. The FCC also presumed that *any* subscribers who request inclusion on the DNC are "residential." *Id.*

Textualism has been called one of the greatest philosophies in the history of jurisprudence. But the approach proffered by the Defendant is not textualism. It is jumbling of different statutory portions in the name of textualism. As demonstrated above, the textual analysis misses the mark in so many ways because the Defendant does not actually undertake an authentic textual analysis. And once this Court undertakes an authentic, proper, and well-reasoned textual analysis, it must come to only one conclusion: that the reference to "residential telephone subscriber" in the text of Section 227(c) of the TCPA applies to both landline and cellular subscribers, like the Plaintiff, who use their telephones for residential purposes.

## VII.   CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent that the Court finds that additional questions remain, it should permit the Plaintiff to amend to correct the deficiencies or permit discovery as to vicarious liability, as necessary.

Dated: February 9, 2024

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong (N.D. Tex. # 333687PA)
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com
>
> *Attorney for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

February 9, 2024

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong (N.D. Tex. # 333687PA)
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com
>
> *Attorney for Plaintiff and the Class*

23